1  Patrice L. Bishop (182256)
   service@ssbla.com
2  STULL, STULL & BRODY
   10940 Wilshire Boulevard
3  Suite 2300
   Los Angeles, CA  90024
4  Tel:    (310) 209-2468
   Fax:    (310) 209-2087
5
   Howard T. Longman
6  STULL, STULL & BRODY
   6 East 45th Street
7  New York, NY 10017
   Tel:    (212) 687-7230
8  Fax:    (212) 490-2022
9  Gary S. Graifman
   KANTROWITZ, GOLDHAMER & GRAIFMAN
10 747 Chestnut Ridge Road
   Chestnut Ridge, New York 10977
11 Tel:    (845) 356-2570
   Fax:    (845) 356-4335
12
   Attorneys for Plaintiffs
13

14              **UNITED STATES DISTRICT COURT**

15             **NORTHERN DISTRICT OF CALIFORNIA**

16

17 MARTIN VOGEL and KENNETH              )    CASE NO. C06-05208 MHP
   MAHONEY, on Behalf of Themselves and All )
18 Others Similarly Situated,             )    **CLASS ACTION**
                                          )
19               Plaintiffs,              )    COMPLAINT FOR VIOLATION OF
                                          )    FEDERAL SECURITIES LAWS
20        v.                              )
                                          )    **JURY TRIAL DEMANDED**
21 STEVEN P. JOBS, PETER OPPENHEIMER,     )
   FRED ANDERSON, WILLIAM V.              )
22 CAMPBELL, MILLARD S. DREXLER,          )
   ALBERT GORE, JR., ARTHUR D.            )
23 LEVINSON, JEROME P. YORK and APPLE     )
   COMPUTER, INC.,                        )
24                                        )
                 Defendants.              )
25 _____ )

26

27

28

**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**
**CASE NO. C06-05208 MHP**
W:\STULL\APPLE3\PLD\COMPLAINT(Judge).wpd

1    Plaintiffs, by and through their attorneys, bring this Complaint and allege on personal

2    knowledge as to themselves and their own activities, and on information and belief as to all other

3    matters, based on investigation and discovery conducted by counsel, including but not limited to: (a)

4    review and analysis of public filings made by Apple Computer, Inc. ("Apple" or the "Company"),

5    with the Securities and Exchange Commission (the "SEC"); (b) review and analysis of press

6    releases and other publications disseminated by defendants; and (c) other publicly available

7    information about Apple.

8    ### NATURE AND SUMMARY OF THE ACTION

9        1.    This is a class action complaint brought on behalf of purchasers of Apple securities

10   and/or who sold put options on Apple shares (the "Class"), between  December 1, 2005 and August

11   11, 2006, inclusive (the "Class Period") against Apple and the Individual Defendants, as described

12   *infra*, who were members of the Company's Board of Directors (the "Board") and/or executive

13   officers of the Apple and signed its Form 10-K for its fiscal 2005 year ended September 24, 2005

14   (the "2005 Form 10-K"), and/or authorized the issuance of its Proxy Statement on or about March

15   13, 2006, for the Company's annual meeting held on April 27, 2006 (the "2006 Proxy Statement").

16       2.    Stock options give employees of a publically traded company the right to purchase

17   company stock at a fixed price in the future.  The general policy behind a grant of stock options is to

18   link employees' compensation to the value of the company's shares and, therefore, to the wealth of

19   the company's shareholders.  Typically, the options' fixed price is aligned with the price of the stock

20   on the day of the grant.  If the stock price rises from the fixed grant price the employee profits by

21   exercising the options and selling the shares.  In contrast, backdated stock options allow the

22   employees of a publically traded company, such as Apple, to maximize their wealth at the expense

23   of the company and its shareholders.

24       3.    As further alleged below, defendants improperly backdated (and/or had knowledge

25   and approved of, or acquiesced in, such backdating) stock option grants to certain senior Apple

26   executives so that the options appeared to granted on dates when the market price of Apple stock

27   was lower than the market price on the actual grant date, and then concealed this practice from the

28   investing public during the Class Period.  This improper backdating resulted in option grants with

2

lower exercise prices which improperly increased the value of the options to the recipients and improperly reduced the amounts the recipients of these option had to pay the Company upon exercise of the options, unfairly transferring shareholder equity to defendants while diluting the value of the shares owned by the Class.  Defendants' conduct also violated the Company's: (i) shareholder-approved stock option plans; (ii) corporate governance guidelines;  (iii) standards of business conduct; and (iv) conflicts of interest policy.

4.     Moreover, during the Class Period defendants caused Apple to file materially false and misleading statements with the SEC, including but not limited to Apple's 2005 Form 10-K and its 2006 Proxy Statement, which stated that options issued to employees and/or executives of the Company were granted at the fair market value as of the date of grant.  In reality, because of defendants' scheme of backdating options, recipients received stock options priced **lower** then the "fair market value" of the stock on actual date of the grant.

5.     In fact, defendants were aware that the practices employed by the Board frequently allowed the stock option grants to be backdated to a price when the Company's shares were at the near low trading price of the relevant period.  Indeed, as of 2001, defendants' backdating scheme had yielded stock option grants to the Company's executive officers worth millions of dollars.

6.     On June 29, 2006, Apple announced that an internal investigation discovered irregularities related to stock option grants from 1997 to 2001, including a problematic grant to CEO Steven P. Jobs ("Jobs").  This particular problematic grant was later cancelled.

7.     On August 4, 2006, Apple shares declined 4.02%, from a close of $67.81 on August 3 to close at $64.96 on August 4, on news that Apple would "likely need" to restate earnings and would delay filing its quarterly report because of additional irregularities related to its accounting for stock options granted to its executives and that its financial results issued since September 29, 2002 could not be relied upon.

8.     On August 11, 2006, Apple announced that its mishandling of its employee stock options would require "significant" revisions to its most recent quarterly (ending July 1, 006) results compared to the previous June 25, 2005.  On this news the Company's shares continued to drop to

3

close at $63.65 on August 11, 2006.  The drop on August 11, 2006, was a 6.1% drop from the price

Apple stock closed at on August 3, 2006.

### JURISDICTION AND VENUE

9.      Jurisdiction is conferred by Section 27 of the Securities Exchange Act of 1934 (the

"Exchange Act") [15 U.S.C. § 78aa] and 28 U.S.C. §§ 1331, 1337.  The claims asserted herein arise

under and pursuant to Sections 10(b), 14(a) and 20(a) of the Exchange Act [15 U.S.C. §§ 78n(a),

78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange

Commission ("SEC"), 17 C.F.R. § 240.10b-5.

10.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15

U.S.C. § 78aa and 28 U.S.C. § 1391(b) and (c).  Venue is proper in this District because the

Company has its headquarters in this district and many of the acts and practices complained of

herein occurred in substantial part in this District.

11.     In connection with the acts, transactions and conduct alleged herein, defendants used

the means and instrumentalities of interstate commerce, including the United States mails, interstate

telephone communications and the facilities of the national securities exchanges and markets.

### PARTIES

12.     Plaintiff Martin Vogel purchased shares of Apple and engaged in transactions of

Apple securities during the Class Period, as set forth in the certification attached hereto, and

suffered damages thereby.

13.     Plaintiff Kenneth Mahoney purchased shares of Apple and engaged in transactions of

Apple securities during the Class Period, as set forth in the certification attached hereto, and

suffered damages thereby.

14.     Defendant Jobs has served as the Company's Chief Executive Officer ("CEO") and a

director since 2000.  He also served as interim CEO from 1997 until 2000.

a.      In light of defendant Jobs' positions, access to internal corporate documents,

conversations and connections with other corporate officers and employees, attendance at

management and Board meetings and committees thereof, and via reports and other information

provided to him in connection therewith, he knew or should have known that Apple executives,

4

1  including himself and certain other defendants named herein, were receiving improperly backdated

2  stock option grants which maximized their personal profits at the expense of Apple shareholders,

3  and that the defendants concealed this practice in public filings during the Class Period.

4           b.        Moreover, Jobs received at least 20,000,000 options which were suspiciously

5  dated at or very close to the lowest stock price for the month of the purported grant date and/or

6  immediately before significant share price increases.  On information and belief, plaintiffs allege

7  that defendants backdated these stock options so that defendants Jobs would receive illegal

8  compensation from Apple that was not disclosed to the Company's shareholders.

9           c.        In addition, on or about March 19, 2006, defendant Jobs sold 4,573,553

10  shares of his personally held Apple stock for proceeds of $295,725,936.68.  At the time of this sale

11  defendant Jobs was in possession of material, non-public information concerning the illegally

12  undisclosed backdating stock option grant practices.

13           d.        Defendant Jobs signed the 2005 Form 10-K filed with the SEC on December

14  1, 2001, attached his Certification (as defined *infra*) attesting to its accuracy, and solicited

15  shareholders through the 2006 Proxy Statement.

16       15.      Defendant Peter Oppenheimer ("Oppenheimer") is Apple's Senior Vice President

17  and Chief Financial Officer ("CFO").   Oppenheimer was Apple's Controller for the Americas in

18  1996.  In 1997 defendant Oppenheimer was promoted to Vice President and Worldwide Sales

19  Controller and then to Corporate Controller.

20           a.        In light of defendant Oppenheimer's positions, access to internal corporate

21  documents, conversations and connections with other corporate officers and employees, attendance

22  at management meetings and committees thereof, and via reports and other information provided to

23  him in connection therewith, he knew or should have known that Apple executives, including

24  himself and certain other defendants named herein, were receiving improperly backdated stock

25  option grants which maximized their personal profits at the expense of Apple shareholders, and that

26  the defendants concealed this practice in public filings during the Class Period.

27

28

**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**
**CASE NO. C06-05208 MHP**
W:\STULL\APPLE3\PLD\COMPLAINT(Judge).wpd

1          b.      Moreover, during the Class Period, while in possession of material, non-

2 public information concerning the undisclosed backdating stock option grant practices, defendant

3 Oppenheimer sold 407,500 of his personally held shares for $29,871,125 in proceeds.  Specifically:

4          i.      On January 3, 2006, Oppenheimer exercised his option to buy

5 200,000 Apple shares for a reduced price of $2,762,500 and, on that same day, sold said 200,000

6 Apple shares at the artificially inflated market price(s) for proceeds of $14,535,000;

7          ii.      On January 4, 2006, Oppenheimer exercised his option to buy:

8          (1)      70,210 Apple shares for a reduced price of $969,775 and, on that

9                      same day, sold said 70,210 Apple shares at the artificially inflated

10                     market price(s) for proceeds of $5,284,000;

11          (2)      47,690 Apple shares for a reduced price of $658,718 and, on that

12                     same day, sold said 47,690 Apple shares at the artificially inflated

13                     market price(s) for proceeds of $3,577,000;

14          (3)      25,700 Apple shares for a reduced price of $354,981 and on that same

15                     day sold said 25,700 Apple shares at the artificially inflated market

16                     price(s) for proceeds of $1,921,000;

17          (4)      38,900 Apple shares for a reduced price for proceeds of approximately

18                     $466,800 and on that same day sold said 38,900 Apple shares at the

19                     artificially inflated market price(s) for proceeds of $2,922,000;

20          iii.      On or about February 14, 2006, Oppenheimer sold 25,000 shares of

21 Apple for proceeds of $1,632,125.

22          c.      Defendant Oppenheimer signed the 2005 Form 10-K and attached his

23 Certification (as defined *infra*) attesting to its accuracy .

24      16.      Defendant Fred D. Anderson ("Anderson") is a director of Apple and has been since

25 2004.  Anderson was Apple's Executive Vice President and CFO from April 1996 to June 2004.

26          a.      In light of defendant Anderson's positions, access to internal corporate

27 documents, conversations and connections with other corporate officers and employees, attendance

28 at management meetings and committees thereof, and via reports and other information provided to

**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**
**CASE NO. C06-05208 MHP**
W:\STULL\APPLE3\PLD\COMPLAINT(Judge).wpd

1  him in connection therewith, he knew or should have known that Apple executives, including

2  himself and other defendants named herein, were receiving improperly backdated stock option

3  grants which maximized their personal profits at the expense of Apple shareholders, and that the

4  defendants concealed this practice in public filings during the Class Period.

5           b.      On October 24, 2005, just prior to the Class Period herein, while in

6  possession of material, non-public information concerning the undisclosed backdating stock option

7  grant practices, defendant Anderson exercised an option to purchase 20,000 shares of Apple stock

8  for the sum of $298,100 and, on the same day sold, said 20,000 shares of Apple stock for proceeds

9  of $1,126,928.

10          c.      Defendant Anderson Defendant signed the 2005 Form 10-K and solicited

11 shareholders through the 2006 Proxy Statement.

12   17.    Defendant Arthur D. Levinson ("Levinson") is a director of Apple and has been since

13 2000.  During the Fiscal Year 2005, which ran from September 25, 2004 to September 24, 2005,

14 and during the Fiscal Year 2006, which runs from September 25, 2005 to September 24, 2006,

15 defendant Levinson was and is a member of both the Audit Committee and the Corporate

16 Governance Committee of the Company.

17          a.      In light of defendant Levinson's position as a director and member of said

18 committees, access to internal corporate documents, conversations and connections with other

19 corporate officers and employees, attendance at Board meetings and committees thereof, and via

20 reports and other information provided to him in connection therewith, he knew or should have

21 known that Apple executives, including defendants named herein, were receiving improperly

22 backdated stock option grants which maximized their personal profits at the expense of Apple

23 shareholders, and that the defendants concealed this practice in public filings during the Class

24 Period.

25          b.      During the Class Period, while in possession of material, non-public

26 information concerning the undisclosed backdating stock option grant practices, defendant Levinson

27 sold 7,385 shares of Apple and 70,000 shares of Apple for $4,855,883.60 in proceeds.

28

7

**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**
**CASE NO. C06-05208 MHP**

1          c.          Defendant Levinson signed the 2005 Form 10-K and solicited shareholders

2    through the 2006 Proxy Statement.

3          18.          Defendant Jerome B. York ("York") is a director of Apple and has been since 1997.

4          a.          In light of defendant York's position as a director, access to internal corporate

5    documents, conversations and connections with other corporate officers and employees, attendance

6    at Board meetings and committees thereof, and via reports and other information provided to him in

7    connection therewith, he knew or should have known that Apple executives, including defendants

8    named herein, were receiving improperly backdated stock option grants which maximized their

9    personal profits at the expense of Apple shareholders, and that the defendants concealed this

10   practice in public filings during the Class Period.

11         b.          During times relevant herein, while in possession of material, non-public

12   information concerning the undisclosed backdating stock option grant practices, defendant York

13   sold 90,000 of Apple shares for $4,282,429.82 in proceeds.

14         c.          Defendant York signed the 2005 Form 10-K and solicited shareholders

15   through the 2006 Proxy Statement

16         19.          Defendant Albert A. Gore, Jr. ("Gore") is a director of Apple and has been since

17   2003.  During the Fiscal Year 2005, which ran from September 25, 2004 to September 24, 2005,

18   and during the Fiscal Year 2006, which runs from September 25, 2005 to September 24, 2006,

19   defendant Gore was a member of both the Compensation Committee and the Corporate Governance

20   Committee of the Company.

21         a.          In light of defendant Gore's position as a director and member of said

22   committees, access to internal corporate documents, conversations and connections with other

23   corporate officers and employees, attendance at Board meetings and committees thereof, and via

24   reports and other information provided to him in connection therewith, he knew or should have

25   known that Apple executives, including defendants named herein, were receiving improperly

26   backdated stock option grants which maximized their personal profits at the expense of Apple

27   shareholders, and that the defendants concealed this practice in public filings during the Class

28   Period.

8

1          b.        Defendant Gore signed the 2005 Form 10-K and solicited shareholders

2   through the 2006 Proxy Statement.

3          20.      Defendant William V. Campbell ("Campbell") is a director of Apple and has been

4   since 1997.  During the Fiscal Year 2005, which ran from September 25, 2004 to September 24,

5   2005, and during the Fiscal Year 2006, which runs from September 25, 2005 to September 24,

6   2006, defendant Campbell was a member of both the Compensation Committee and the Audit

7   Committee of the Company.

8          a.        In light of defendant Campbell's position as a director and member of said

9   committees, access to internal corporate documents, conversations and connections with other

10  corporate officers and employees, attendance at Board meetings and committees thereof, and via

11  reports and other information provided to him in connection therewith, he knew or should have

12  known that Apple executives, including defendants named herein, were receiving improperly

13  backdated stock option grants which maximized their personal profits at the expense of Apple

14  shareholders, and that the defendants concealed this practice in public filings during the Class

15  Period.

16         b.        Defendant Campbell signed the 2005 Form 10-K and solicited shareholders

17  through the 2006 Proxy Statement.

18         21.      Defendant Millard S. Drexler ("Drexler") is a director of Apple and has been since

19  1999.  During the Fiscal Year 2005, which ran from September 25, 2004 to September 24, 2005,

20  and during the Fiscal Year 2006, which runs from September 25, 2005 to September 24, 2006,

21  defendant Drexler was a member of both the Compensation Committee and the Corporate

22  Governance Committee of the Company.

23         a.        In light of defendant Drexler's position as a director and member of said

24  committees, access to internal corporate documents, conversations and connections with other

25  corporate officers and employees, attendance at Board meetings and committees thereof, and via

26  reports and other information provided to him in connection therewith, he knew or should have

27  known that Apple executives, including defendants named herein, were receiving improperly

28  backdated stock option grants which maximized their personal profits at the expense of Apple

**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**
**CASE NO. C06-05208 MHP**
W:\STULL\APPLE3\PLD\COMPLAINT(Judge).wpd

1   shareholders, and that the defendants concealed this practice in public filings during the Class

2   Period.

3                    b.           Defendant Drexler signed the 2005 Form 10-K and solicited shareholders

4   through the 2006 Proxy Statement.

5               22.       Collectively, defendants Jobs, Oppenheimer, Anderson, Campbell, Drexler, Gore,

6   Levinson and York are collectively referred to herein as the "Individual Defendants."

7               23.       Defendants Campbell, York and Levinson are collectively referred to herein as the

8   "Audit Committee Directors."

9               24.       Defendants Campbell, Drexler and Gore are collectively referred to herein as the

10   "Compensation Committee Directors."

11               25.       Defendants Anderson and Jobs, together with non-parties Jonathan Rubenstein,

12   Timothy Cook, Ronald B. Johnson and Avidis Tevanian, who are and/or at relevant times herein

13   were all officers of Apple, are referred to herein as the "Backdated Option Recipients."

14   **CLASS ALLEGATIONS**

15               26.       Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the

16   Federal  Rules of Civil Procedure on behalf of the Class, consisting of all those who purchased

17   and/or sold put options in the securities of Apple between December 1, 2005 and August 11, 2006

18   inclusive and who were damaged thereby.  Excluded from the Class are defendants, the officers and

19   directors of the Company, at all relevant times, members of their immediate families and their legal

20   representatives, heirs, successors or assigns and any entity in which defendants have or had a

21   controlling interest.

22               27.       The members of the Class are so numerous that joinder of all members is

23   impracticable.  During the Class Period, Apple had more than 852 million shares of common stock

24   outstanding, which were actively traded on the NASDAQ, under the ticker symbol "AAPL," and at

25   least tens of millions of shares of common stock were traded during the Class Period.  While the

26   exact number of Class members is unknown to plaintiffs at this time and can only be ascertained

27   through appropriate discovery.  Plaintiffs believe that there are hundreds or thousands of members

28   in the proposed Class.  Record owners and other members of the Class may be identified from

10

**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**
**CASE NO. C06-05208 MHP**
W:\STULL\APPLE3\PLD\COMPLAINT(Judge).wpd

1   records maintained by Apple or its transfer agent and brokerage firms and may be notified of the

2   pendency of this action by mail, using the form of notice similar to that customarily used in

3   securities class actions.

4        28.    Plaintiffs' claims are typical of the claims of the members of the Class as all

5   members of the Class are similarly affected by defendants' wrongful conduct in violation of federal

6   law that is complained of herein.

7        29.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

8   and has retained counsel competent and experienced in class and securities litigation.

9        30.    Common questions of law and fact exist as to all members of the Class and

10  predominate over any questions solely affecting individual members of the Class.  Among the

11  questions of law and fact common to the Class are:

12             a.    whether the federal securities laws were violated by defendants' acts as

13  alleged herein;

14             b.    whether statements made by defendants to the investing public during the

15  Class Period misrepresented material facts about (i) how the Company awarded options to its

16  executives, and (ii) whether the Company's financial 2005 Form 10-K, certain interim financial

17  reports, including its Form 10-Q's filed with the SEC during the Class Period,  Apple's press

18  releases, and the 2006 Proxy Statement, contained false and misleading statements; and

19             c.    to what extent the members of the Class have sustained damages and the

20  proper measure of damages.

21       31.    A class action is superior to all other available methods for the fair and efficient

22  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

23  damages suffered by individual Class members may be relatively small, the expense and burden of

24  individual litigation make it impossible for members of the Class to individually redress the wrongs

25  done to them.  There will be no difficulty in the management of this action as a class action.

26

27

28

11

**SUBSTANTIVE ALLEGATIONS**

32.     From the fiscal years 1997 to 2001, the Compensation Committee granted certain Apple stock options to certain members of the board and executives of the Company, as set forth in Exhibit A attached hereto.  The grants were frequently dated just after a sharp drop in the Company's stock price and before a substantial rise in the Company's stock price.  Exhibit B, attached hereto, sets forth the ten (10) day prices for Apple's common stock prior to and after the purported date of grant.

33.     This extraordinary pattern of stock option grants, as alleged herein and in Exhibits A and B attached hereto, demonstrates that the purported grant dates were not the actual dates on which the stock option grants were made.  Rather, at the behest of the defendants, and/or the Compensation Committee, defendants improperly backdated the stock option grants to make it appear as though the grants were made on dates when the market price of Apple's stock was lower than the market price of the actual grant dates.

34.     This improper backdating violated the terms of, and rendered materially false and misleading, the Company's shareholder-approved stock option plans.  Pursuant to the terms of the Company's shareholder-approved stock option plans, the exercise price of options must be no less than the closing price of Apple stock on the date of grant so that the executives of the Company's interests are aligned with the shareholders.  In contrast, the backdated options improperly increased the value of the options granted to the Backdated Options Recipients and gave them an immediate paper profit which: (i) undermined the incentive purpose of such options; (ii) improperly reduced the amounts the recipients of the backdated options had to pay the Company upon exercise of the options; and (iii) unfairly transferred shareholder equity to defendants.

**A.     Defendants' Backdating of Options Also Rendered Apple's Financial Statements and Results to Be Materially False and Misleading**

35.     Defendants' backdating scheme also rendered the Company's financial statements made in its 2005 Form 10-K, as well as interim financial statements and results for the 2005 and 2006 fiscal years, to be materially false and misleading.

**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**
**CASE NO. C06-05208 MHP**
W:\STULL\APPLE3\PLD\COMPLAINT(Judge).wpd

36.     Pursuant to Accounting Principles Board ("APB") Opinion No. 25 ("APB 25"), "Accounting for Stock Issued to Employees," the applicable Generally Accepted Accounting Principles ("GAAP") provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the options, the company must recognize the difference as an expense, thereby reducing the Company's net income.  Defendants' backdating practice resulted in understated expenses on each Form 10-K because the difference between the market price and option exercise price was not expensed by the Company.

37.     As a result of the improper backdating of stock options, the Company, with the knowledge, approval, and participation of each of the defendants, violated GAAP, as acknowledged by defendants in their press release dated August 11, 2006 and outlined *supra*.

38.     Moreover, during the Class Period, defendants repeatedly disseminated materially false and misleading press releases regarding the Company's financials.  For example, on October 11, 2005, Apple issued a press release reporting its revenue and net profit for the fiscal year ended September 24, 2005 and the fourth quarter then ended.  The release stated in part, "…for fiscal 2005, the Company generated revenue of $13.93 billion and a net profit of $ 1.335 billion, reflecting an annual growth of 68% and 384 % respectively, and representing the highest annual revenue and net profit in the Company's history."

39.     The 2005 Form 10-K, filed with the SEC on December 1, 2005, and contemporaneously distributed to the public, including Apple's shareholders, repeated these materially false and misleading statements regarding the Company's financial information.  In particular, the revenue and net profit figures disseminated in the October 11, 2005 press release were repeated in the audited financial statements contained in 2005 Form 10-K report and also contained comparative financial statements for the fiscal years ended 2005 and 2004.  Indeed, the 2005 Form 10-K professes to be prepared in conformity with GAAP.  Specifically, in Footnote 1- Summary of Significant Accounting Policies to the comparative financial statements, the defendants stated:

**Stock-Based Compensation**

The Company currently measures compensation expense for its employee stock-based compensation plans using the intrinsic value method prescribed by Accounting Principles Board (APB) Opinion No. 25, *Accounting for Stock Issued to Employees*. The Company applies the disclosure provisions of SFAS No. 123, *Accounting for Stock-based Compensation*, as amended by SFAS No. 148, *Accounting for Stock-based Compensation—Transition and Disclosure* as if the fair-value-based method had been applied in measuring compensation expense. <u>Under APB Opinion No. 25, when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of the grant, no compensation expense is recognized</u>.

(Emphasis added).

40.     The 2005 Form 10-K Report, for the year ended September 24, 2005, was signed and dated on November 29, 2005, by defendants Jobs, Oppenheimer, Anderson, Campbell, Drexler, Gore, Jr., Levinson and York.

41.     The 2005 Form 10-K also contains a list of documents including the "Apple Computer, Inc. 1998 Executive Officer Stock Plan (As Amended Through 6/27/00)" which defines the exercise price of the options granted and follows:

9.  OPTION EXERCISE PRICE AND CONSIDERATION

(a)  EXERCISE PRICE.  The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be determined by the Administrator, subject to the following:

(i)  In the case of an Incentive Stock Option;

(A)  granted to an Employee who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price shall be no less than 110% of the Fair Market Value per Share on the date of grant; or

(B)  granted to any Employee other than an Employee described in paragraph (A) immediately above, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant;

(ii)  In the case of a Nonstatutory Stock Option, the per Share exercise price shall be determined by the Administrator. In the case of a Nonstatutory Stock Option intended to qualify as 'performance-based compensation' within the meaning of Section 162(m) of the Code, <u>the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant;</u> (emphasis added)

//

//

1

(iii)  Notwithstanding the foregoing, Options may be granted with a per Share exercise price of less than 100% of the Fair Market Value per Share on the date of grant as determined by the Administrator or pursuant to a merger or other corporate transaction.

2

3

4

Similar language appears in the Apple Computer, Inc. 1990 Stock Option Plan (As Amended

5

Through 11/5/97), as follows:

6

8.  Exercise Price and Consideration. (a) Exercise Price. The per Share exercise price for the Shares issuable pursuant to an Option shall be such price as is determined by the Administrator, but shall in no event be less than 100% of the Fair Market Value of Common Stock, determined as of the date of grant of the Option. In the event that the Administrator shall reduce the exercise price, the exercise price shall be no less than 100% of the Fair Market Value as of the date of that reduction. In no event shall the per Share exercise price be less than 110% of the Fair Market Value per Share as of the date of grant in the case of an Incentive Stock Option granted to an Optionee who, immediately before the grant of such Option, owns Shares representing more than 10% of the voting power or value of all classes of stock of the Company or any Parent or Subsidiary. (b) Method of Payment. The consideration to be paid for the Shares to be issued upon exercise of an Option, including the method of payment, shall be determined by the Administrator (and, in the case of an Incentive Stock Option, shall be determined at the time of grant) and may consist of (i) cash, (ii) check, (iii) promissory note, (iv) other Shares which have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which said Option shall be exercised, (v) delivery of a properly executed exercise notice together with irrevocable instructions to a broker to promptly deliver to the Company the amount of sale or loan proceeds required to pay the exercise price, or (vi) any combination of the foregoing methods of payment and/or any other consideration or method of payment as shall be permitted under applicable corporate law.   (Emphasis added).

7

8

9

10

11

12

13

14

15

16

17

18

42.     In addition, defendant Jobs, in his position as Chief Executive Officer, and defendant

19

Oppenheimer, in his position as Senior Vice President and Chief Financial Officer, submitted

20

certifications to the SEC, as required pursuant to 18 U.S.C. 1350, as adopted at Section 906 of the

21

Sarbanes-Oxley Act of 2002 (the "Certification(s)").

22

43.     Each Certification stated, among other things:  " Based on my knowledge, this

23

report does not contain any untrue statement of a material fact or omit to state a material fact

24

necessary to make the statements made, in light of the circumstances under which such statements

25

were made, not misleading with respect to the period cover by this report."

26

44.     The 2005 Form 10-K Report also contained Apple's materially false and misleading

27

comparative financial statements for the fiscal years ended September 2005 and September 2004,

28

which were not prepared in accordance with GAAP as a result of defendants' violations of APB 25,

15

**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**
**CASE NO. C06-05208 MHP**
W:\STULL\APPLE3\PLD\COMPLAINT(Judge).wpd

as outlined *supra*.  As a result of these violations, Apple's net profit and stockholder equity were overstated and compensation cost attributable to the backdated options was correspondingly understated.  In addition, the 2005 Form 10-K was materially false and misleading because it concealed and/or omitted defendants' backdating scheme and continued to falsely assert that employee stock options were and had been issued at fair market value at the date of grant when, as described herein, they were not.

45.     On January 18, 2006, Apple announced financial results for its fiscal first quarter ended December 31, 2005, reporting the highest revenue and earnings in the Company's history. The Company's Press Release and Form 8-K filing stated:  "Apple posted revenue of $5.75 billion and net quarterly profit of $565 million..."  The Press Release went on to state:

> "We're very pleased to report year-over-year revenue growth of 65 percent and net income that was nearly twice the year-ago level" said Peter Oppenheimer, Apple's CFO.

46.     Apple filed its Form 10-Q Report for its first fiscal quarter ended December 31, 2005, with the SEC on February 3, 2006. The Form 10-Q Report contained unaudited financial statements and reported the same revenues and net income as reported in the press release dated January 18, 2006.  Defendant Jobs and defendant Oppenheimer submitted Certifications attached to the Form 10-Q Report, which each state, in relevant part:

> Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

47.     The Form 10-Q Report for the quarter ended December 31, 2005 contained Apple's comparative financial statements for the fiscal first quarters of 2006 and 2005, which were materially false and misleading and were not prepared in accordance with GAAP, due to the improper accounting for the backdated stock option grants.  *See* Exhibits A and B, attached hereto. As a result, Apple's net profits and stockholder equity were overstated and compensation cost attributable to the backdated options was correspondingly understated.

16

**B.     Defendants Concealment of the Backdated of Stock Options Rendered Apple's' 2006 Proxy Statement Materially False and Misleading**

48.     Defendants' backdating scheme also rendered the 2006 Proxy Statement materially false and misleading because defendants continued to conceal the Company's illicit policy of backdating options.

49.     The Apple 2006 Proxy Statement dated March 13, 2006, for the meeting to be held April 27, 2006, issued by each of the Individual Defendants, other than defendant Oppenheimer, contained various disclosures pertaining to compensation paid to executives, including stock options exercised and held.  This Proxy Statement was materially false and misleading because shareholders were not informed of the Company's practice of backdating options.

**The Truth Is Disclosed**

50.     On June 29, 2006, Apple disclosed that an internal investigation discovered irregularities related to options granted between 1997 and 2001.

51.     Apple reported in its Form 8-K report dated August 3, 2006 as follows:

> On August 3, 2006, management of Apple Computer, Inc. (Apple) concluded, and the Audit and Finance Committee of Apple's Board of Directors approved the conclusion, that Apple's financial statements for the fiscal years ended 2003, 2004 and 2005, the interim periods contained therein, the fiscal quarters ended December 31, 2005 and April 1, 2006, and all earnings and press releases and similar communications issued by Apple relating to periods commencing on September 29, 2002 should no longer be relied upon. Apple's management and the Audit and Finance Committee have discussed the matters disclosed in this filing with KPMG LLP, Apple's independent registered public accounting firm.  (Emphasis added).

52.     Apple also reported additional information related to its grants of options to the SEC in the Form 12b-25 dated August 10, 2006, wherein the Company stated that it would not timely file its Quarterly Report on Form 10-Q for the quarter ended July 1, 2006. The Form 12b-25 included the following narrative:

> The Company anticipates that there will be significant changes in the results of operations for the quarter ended July 1, 2006 compared to the quarter ended June 25, 2005, including significant increases in the Company's revenue and expenses. The Company cannot provide a reasonable estimate of the results because it will likely need to restate its historical financial statements to record non-cash charges for compensation expense relating to past stock option grants. As the investigation related to stock option grants is currently ongoing, the Company cannot at this time reasonably estimate the amount of any such charges, the resulting tax and accounting impact, or which periods may require restatement. (Emphasis added).

17

53.     On August 4, 2006, Apple shares declined 4.02%, from a close of $67.81 on August 3 to close at $64.96 on August 4, on news that Apple would "likely need" to restate earnings and would delay filing its quarterly report because of additional irregularities related to its accounting for stock options granted to its executives and that its financial results issued since September 29, 2002 could not be relied upon.

54.     On August 11, 2006, Apple announced that its mishandling of its employee stock options grants would require "significant" revisions to its most recent quarterly results (for the quarter ending July 1, 2006) compared to the June 25, 2005 quarter.  On this news the Company's shares continued to drop to close at $63.65 on August 11, 2006.

55.     As a result of all of the foregoing, plaintiffs and members of the Class have been damaged.

### APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE

56.     At all relevant times, the market for Apple's common stock was an efficient market for the following reasons, among others:

a.     Apple's common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.     As a regulated issuer, Apple filed periodic public reports with the SEC and the NASDAQ;

c.     Apple regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.     Apple was followed by securities analysts, including those who were employed by major brokerage firms, who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

57.     As a result of the foregoing, the market for Apple's shares promptly digested current information regarding Apple from all publicly available sources and reflected such information in

18

1   Apple's stock price.  Under these circumstances, all purchasers of Apple securities during the Class

2   Period suffered similar injury through their purchase of Apple's common stock at artificially

3   inflated prices and a presumption of reliance applies

4                    **ADDITIONAL SCIENTER ALLEGATIONS**

5          58.    Certain members of Apple's management, including defendants sold material

6   amounts of artificially inflated Apple shares, while in the possession of materially adverse inside

7   knowledge regarding backdating options scheme, as described herein.  Many of these shares were

8   acquired by the exercise of stock options.  The insider sales of Apple for Defendants Jobs,

9   Oppenheimer, Anderson, Levinson and York are set forth in detail, *supra* at paragraphs 14 through

10  18.

11         59.    In addition, members of the Compensation Committee during all or part of the Class

12  Period, which included Individual Defendants Campbell, Drexler and Gore (previously defined

13  herein as the "Compensation Committee Directors"), were aware of, or but for their reckless

14  disregard should have been aware of, the backdating options scheme.  The Charter of the

15  Compensation Committee of Apple  states that the purpose of the Compensation Committee is, *inter*

16  *alia*, to "(i) establish and modify compensation and incentive plans and programs (ii) review and

17  approve compensation and awards under compensation and incentive plans and programs for

18  elected officers of the Corporation, and (iii) be the administering committee for certain stock option

19  and other stock-based plans, as designated by the Board."  The Committee is charged with

20  "Review[ing] periodically and approv[ing] all compensation and incentive plans and programs..."

21  The Committee is to "Act as administering committee of the Corporation's various bonus plans,

22  stock plans and equity arrangements that may he adopted by the Corporation from time to time...."

23  The Charter vests the Committee with such authority and powers as annually reviewing and

24  approving for the CEO and executive officers of the Company, the annual salary, bonuses, equity

25  compensation, incentive bonuses and any other benefits, compensation or arrangements.  Therefore,

26  because of their intricate involvement in the formulation and issuance of such options, the

27  Compensation Committee Directors possessed the requisite scienter.

28

**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**
**CASE NO. C06-05208 MHP**
W:\STULL\APPLE3\PLD\COMPLAINT(Judge).wpd

60.     Those defendants who were members of the Audit Committee, which included Individual Defendants Campbell, York and Levinson (previously defined herein as the "Audit Committee Directors") for the Class Period, were responsible for maintaining the adequacy of internal controls, and therefore, knew, or at a minimum recklessly disregarded, the impermissible option backdating scheme which internal controls of the Company should have detected.  The Audit Committee Charter of Apple states that the Company has the primary purposes of "oversight and monitoring of: (i) the Corporation's financial statements and other financial information provided by the Corporation to its shareholders and others; (ii) compliance with legal and regulatory requirements; (iii) the independent auditors, including their qualifications and independence; (iv) the Corporation's systems of internal controls, including the Internal Audit function; and (v) the auditing, accounting and financial reporting process generally."  In sum, the Committee, has an obligation to insure that it produces and publicly distributes financial statements which are consistent, fairly presented and in conformance with GAAP.  It is the duty of the Audit Committee to oversee the Company's accounting and financial reporting process, "review the adequacy of the Corporation's internal controls and the procedures designed to ensure compliance with the applicable laws and regulations." and the auditing of the Company's financial statements.  In addition, members of the Audit Committee whose duty it was to meet periodically with management to review the adequacy of the Company's internal controls, did, or but for their reckless disregard should have, detected and been aware of the illicit option backdating scheme.  Therefore, the Audit Committee Directors possessed the requisite scienter.

## COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE10b-5 PROMULGATED THEREUNDER

### (Against All Defendants)

61.     Plaintiffs repeat and reallege each and every allegation set forth above.  During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct that was intended to and/or did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; (ii) artificially inflate  the market price of Apple common stock; and

20

(iii) cause plaintiffs and other members of the Class to buy Apple stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, defendants, and each of them, took the actions set forth herein.

62.     These defendants:  (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the buyers of Apple's publicly traded securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63.     Defendants' material misrepresentations and/or omissions were done knowingly or recklessly.

64.     As a result of the defendants' dissemination of deceptive and misleading information regarding the Apple's practice of  backdating options in violation of the Company's own internal policies and procedures and in contradiction to statement made in the Company's filings with the SEC.  Furthermore, the backdating of options resulted in understating expenses and thus overstating net income in the Company's financial results contained in Apple's 2005 Form 10-K filed with the SEC at the beginning of the Class Period.  In ignorance of the fact that the market price of Apple's shares were artificially inflated, and relying upon the integrity of the market in which Apples common stock trades, and/or on the absence of material information that was known to and/or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period, plaintiffs and the other members of the Class bought Apple common stock during the Class Period at artificially inflated prices and were damaged thereby.

65.     At the time of said misrepresentations and omissions, plaintiffs and the other members of the Class were ignorant of the omitted material facts and believed defendants' statements regarding the awarding of options and their financial statements contained in Apple's 2005 Form 10-K and certain fiscal 2005 and 2006 interim financial reports to be completely truthful, candid and not deceptive or misleading or suffering from omissions of material facts.  Had plaintiffs and the other members of the Class known of the omitted material facts, plaintiffs and the other members of the Class would not have bought their Apple common stock during the Class

21

Period, or, if they had bought such stock during the Class Period, they would not have done so at the artificially inflated prices which they paid for their Apple common stock which they bought during the Class Period.

66.    By virtue of the foregoing, each of the defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of Apple common stock during the Class Period.

**COUNT II**

**FOR VIOLATION OF SECTION 14(a) OF THE EXCHANGE ACT**

**(Against All Defendants Except Defendant Oppenheimer)**

68.    Plaintiffs incorporate by reference the above paragraphs, except those paragraphs relating to scienter, as if set forth fully herein.

69.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act provides that no proxy statement shall contain "any statement which at the time and in light of the circumstances under which it is made is false and misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false and misleading." 17 C.F.R. Section 240.14a-9.

70.    The Proxy Statement for annual shareholders' meeting held in 2006 violated Rule 14(a) and Rule 14a-9 because it omitted material facts, including the fact that defendants were causing Apple to engage in an option backdating scheme which had occurred since at least 1997.

71.    In the exercise of reasonable care, defendants should have known that the 2006 Proxy Statement was materially false and misleading.

72.    The misrepresentations and omissions in the 2006 Proxy Statement were material to plaintiffs in voting on the Proxy Statement.  The 2006 Proxy Statement was an essential link in the accomplishment and continuation of defendants' unlawful stock option backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders'

1 | endorsement of the directors' position, the executive officers' compensation and the Company's

2 | compensation policies.

3 |      73.    Plaintiffs and the Class were damaged as a result of the material misrepresentations

4 | and omissions in the 2006 Proxy Statement.

5 | ## COUNT III

6 | ### AGAINST THE INDIVIDUAL DEFENDANTS PURSUANT TO
### SECTION 20(a) OF THE EXCHANGE ACT

7 |

8 |      74.    Plaintiffs repeat and reallege each and every allegation set forth above.

9 |      75.    This claim is asserted against the Individual Defendants pursuant to Section 20(a) of

10 | the Exchange Act, 15 U.S.C. §78t(a).

11 |      76.    During the Class Period, Individual Defendants Jobs, Oppenheimer, Anderson,

12 | Campbell, Drexler, Gore, Levinson and York were "controlling persons" of defendant Apple, within

13 | the meaning of Section 20(a) of the Exchange Act.

14 |      77.    The Individual Defendants were "controlling persons" of Apple because, due to the

15 | officer and/or director positions they held with Apple, they had the influence and power over Apple

16 | to cause, and they did cause, Apple to engage in the wrongful conduct complained of herein, and

17 | because they had the power to have prevented Apple from engaging in the unlawful conduct alleged

18 | herein, but they purposely, intentionally and recklessly did not use that power to do so.

19 |      78.    As set forth above in Count I, Apple violated Section 10(b) of the Exchange Act and

20 | Rule 10b-5 promulgated thereunder by its acts and omissions as alleged in this Complaint.  By

21 | virtue of their status as a "controlling person" of Apple, the Individual Defendants are liable, to the

22 | same extent as is Apple for its violations of Section 10(b) of the Exchange Act and Rule 10b-5

23 | promulgated thereunder, pursuant to Section 20(a) of the Exchange Act.

24 |      79.    As set forth in Count II, Apples also violated Section 14(a) of the Exchange Act by

25 | its acts and omissions.  By virtue of their status as a "controlling person" of Apple, the Individual

26 | Defendants are liable, to the same extent as is Apple for its violations of Section 14(a) of the

27 | Exchange Act, pursuant to Section 20(a) of the Exchange Act.

28 |

**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**
**CASE NO. C06-05208 MHP**
W:\STULL\APPLE3\PLD\COMPLAINT(Judge).wpd

## **PRAYER FOR RELIEF**

WHEREFORE,  plaintiffs, on behalf of themselves and the Class, pray for judgment as follows:

1.   Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

2.   Finding that the defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and Sections 20(a) and  14(a) by their acts and omissions as alleged in this Complaint;

3.   Awarding plaintiffs and the members of the Class damages, together with interest thereon;

4.   Awarding plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

5.   Awarding plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury as to all issues so triable.


Dated:  August 24, 2006                    Patrice L. Bishop
                                           STULL, STULL & BRODY


                              By:   _____/s/_____
                                    Patrice L. Bishop
                                    10940 Wilshire Boulevard
                                    Suite 2300
                                    Los Angeles, CA  90024
                                    Tel:    (310) 209-2468
                                    Fax:    (310) 209-2087

                                    Howard T. Longman
                                    STULL, STULL & BRODY
                                    6 East 45th Street
                                    New York, NY 10017
                                    Tel:    (212) 687-7230
                                    Fax:    (212) 490-2022

24

**COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS**
**CASE NO. C06-05208 MHP**
W:\STULL\APPLE3\PLD\COMPLAINT(Judge).wpd

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gary S. Graifman
KANTROWITZ, GOLDHAMER & GRAIFMAN
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Tel:     (845) 356-2570
Fax:     (845) 356-4335

**Attorneys for Plaintiffs**

25

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS
PURSUANT TO CIVIL L.R. 3-16**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

/s/
Patrice L. Bishop, Esq.
STULL, STULL & BRODY
Attorneys for Plaintiffs

26