1   Jay W. Eisenhofer
    Geoffrey C. Jarvis
2   Michael J. Barry
    Mary S. Thomas (State Bar No. 175110)
3   GRANT & EISENHOFER P.A.
    Chase Manhattan Centre
4   1201 North Market Street
    Wilmington, DE 19801
5   Tel:  302.622.7000
    Fax:  302.622.7100
6   jeisenhofer@gelaw.com

7

8   Merrill Glen Emerick (State Bar No. 117248)
    ANDERLINI, FINKELSTEIN, EMERICK & SMOOT
    400 S. El Camino Real – Suite 700
9   San Mateo, CA 94402
    Tel: 650.348.0102
10   Fax: 650.348.0962
    memerick@afeslaw.com

11

12   *Attorneys for Proposed Lead Plaintiff*
    *The New York City Employees' Retirement System*

13

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

14

| | |
|---|---|
| **MARTIN VOGEL and KENNETH MAHONEY, on Behalf of Themselves and All Other Similarly Situated,** | **Case No.: C06-05208-MHP** |
| **Plaintiffs,** | **MEMORANDUM OF LAW IN SUPPORT OF THE NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM'S MOTION FOR ITS APPOINTMENT AS LEAD PLAINTIFF AND FOR APPROVAL OF ITS SELECTION OF COUNSEL** |
| **v.** | |
| **STEVEN JOBS, PETER OPPENHEIMER, FRED ANDERSON, WILLIAM V. CAMPBELL, MILLARD S. DREXLER, ALBERT GORE, Jr., ARTHUR D. LEVINSON, JEROME B. YORK and APPLE COMPUTER, INC.,** | **Judge: Honorable Marilyn H. Patel** |
| **Defendants.** | |

1

**TABLE OF CONTENTS**

2   TABLE OF AUTHORITIES ..................................................................................................ii

3   STATEMENT OF ISSUES TO BE DECIDED ...................................................................1

4   PRELIMINARY STATEMENT .........................................................................................1

5   BACKGROUND OF THE ACTION ..................................................................................3

6   ARGUMENT.....................................................................................................................12

7   I.       NYCERS Should Be Appointed Lead Plaintiff...............................................12

8            A.       NYCERS Has The Largest Financial Stake In The Lawsuit................................13

9                     1.       Section 10(b) Damages Are *De Minimis* Due To The
                               PSLRA's "Look Back" Provision ............................................................13

10                    2        The Section 14(a) Claims Predominate ....................................................14

11           B.       NYCERS Satisfies The Requirements Of Fed. R. Civ. P. 23...............................15

12  II.      The Court Should Approve NYCERS' Choice Of Lead Counsel......................17

13  CONCLUSION ................................................................................................................18

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                                            i

28

1

## TABLE OF AUTHORITIES

2

**CASES**                                                                                      **PAGE**

3

*Armour v. Network Assocs.,Inc.,*
    171 F. Supp. 2d 1044 (N.D. Cal. 2001)............................................................................16

4

*Bowman v. Legato Sys.,*
    195 F.R.D. 655 (N.D. Cal. 2000) ....................................................................................12

5

6

*In re Cavanaugh,*
    306 F.3d 726 (9th Cir. 2002) ...........................................................................12, 15, 17

7

*Erikson v. Cornerstone Propane Partners LP,*
    No. C-03-2522, 2003 WL 22232387 (N.D. Cal. Sept. 15, 2003)....................................16

8

9

*In re Hollinger Int'l,Inc. Sec. Litig.,*
    No. 04 C 0834, 2006 WL 1806382 (N.D. Ill. Jun. 28, 2006)...........................................13

10

*Mills v. Elec. Auto-Lite Co.,*
    396 U.S. 375 (1970) ......................................................................................................14

11

12

*Weltz v. Lee,*
    199 F.R.D. 129 (S.D.N.Y. 2001)...................................................................................15

13

*Wenderhold v. Cylink Corp.,*
    188 F.R.D. 577 (N.D. Cal. 1999) ..................................................................................16

14

15

## STATUTES

16

15 U.S.C. § 78u-4(a)(3) ....................................................................................................*passim*

17

15 U.S.C. § 78u-4(e)..............................................................................................................13

18

S. Rep. No. 104-98 (1995),
    *as reprinted in* 1995 U.S.C.C.A.N. 679, 687-90, 1995 WL 372783 ................................12

19

20

## RULES

21

Fed R. Civ. P. 23....................................................................................................................15

22

23

24

25

26

27

28

ii

1     The New York City Employee's Retirement System ("NYCERS") submits this
2  memorandum of law in support of its motion:  (a) to be appointed lead plaintiff of a class (the
3  "Class") of investors in the publicly traded securities of Apple Computer, Inc. ("Apple" or the
4  "Company") pursuant to Section 21D(a)(3)(B) of the Securities Exchange Act of 1934
5  ("Exchange Act"), 15 U.S.C. § 78u-4(a)(3)(B), as amended by Section 101(a) of the Private
6  Securities Litigation Reform Act of 1995 (the "PSLRA"), and (b) for approval of its selection
7  of the law firm of Grant & Eisenhofer P.A. as lead counsel for the Class.

8                          **STATEMENT OF ISSUES TO BE DECIDED**

9     1.     Whether NYCERS has the "largest financial interest" in this litigation where
10  significant claims under Section 14(a) relating to false and misleading disclosures through
11  which the Company elicited shareholder approval for the issuance of some 51 million shares to
12  management and employees, far outweigh any claims under Section 10(b), the availability of
13  which are severely circumscribed by the 90-day "look back" provision of the PSLRA?

14    2.     Whether NYCERS otherwise satisfies the applicable "adequacy" and
15  "typicality" requirements of Rule 23 of the Federal Rules of Civil Procedure and, thus, should
16  be appointed lead plaintiff.

17    3.     Whether the Court should approve NYCERS' choice of Grant & Eisenhofer
18  P.A., a law firm with a track record of proven success in class action securities litigation, to act
19  as lead counsel for the class.

20                               **PRELIMINARY STATEMENT**

21    NYCERS respectfully submits that it is ideally situated to represent Apple investors in
22  this class action asserting proxy violation claims under Section 14(a) and securities fraud
23  claims under Section 10(b) of the Exchange Act.  As a public pension fund, NYCERS is
24  precisely the type of sophisticated institutional investor that Congress envisioned taking
25  control of class action securities litigation when it enacted the PSLRA.  NYCERS has
26  experience acting in a fiduciary capacity, is committed to conducting this litigation efficiently
27  and maximizing recovery on behalf of the class.  NYCERS has retained experienced counsel --

28
                                                            1

1   Grant & Eisenhofer P.A. ("Grant & Eisenhofer") – who are capable of conducting this
2   litigation on behalf of itself and the Class.

3        In addition, NYCERS believes it has the largest financial interest in the relief that may
4   be sought by the class and, thus, is presumptively the "most adequate" plaintiff pursuant to the
5   PSLRA.  *See* 15 U.S.C. § 78u-4(a)(3)(B).[1]  Here, unlike in the typical class action, the
6   damages available under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated
7   thereunder are *de minimis*; and the lion's share of the available relief may be obtained under
8   Section 14(a) of the Exchange Act.  This is because the damages recoverable under section
9   10(b) are severely limited by the PSLRA's 90-day "look back" provision.  *See* 15 U.S.C. §
10  78u-4(e)(1).

11       As discussed in detail below, the 90-day "look back" limits the recoverable Section
12  10(b) damages to those investors who bought Apple shares at prices higher than $72.55.  While
13  the proposed class period extends from December 1, 2005 through August 11, 2006 (the "Class
14  Period"), the only time Apple's shares traded above the 90-day look back price during the
15  Class Period was during a brief period -- encompassing parts of only 44 trading days -- in
16  December and January 2006.  Therefore, the only investors in the putative class who could
17  possibly have recoverable Section 10(b) damages are those who purchased Apple's stock
18  during this narrow time frame.

19       By contrast, the financial relief available pursuant to the Section 14(a) claims as a result
20  of Apple's false and misleading proxy statements is substantial.  Apple has conceded that it
21  wrongfully concealed from the shareholders the illicit "backdating" of stock options.  Yet over
22  the last three years alone (the applicable period within the statute of limitations on a claim
23  under Section 14(a)), Apple sought and obtained shareholder approval for the amendment of
24  stock plans authorizing the issuance of some 51 million shares to employees and management

25

26

---

27  [1] A copy of the Certification of Valerie Budzik, Acting General Counsel for the Office of the New York City
    Comptroller, is attached as hereto as Exhibit A.  This certification sets forth the transactions of NYCERS in the
28  securities of Apple during the Class Period (as hereinafter defined).

2

of the Company.[2]  At today's price this stock would be worth over $400 million, and would dilute the ownership of public shareholders by approximately 6%.  In fact, during the period that Apple has conceded it wrongfully concealed the backdating of stock options, the Company sought and obtained shareholder approval for the plans authorizing the issuance of over *188 million* shares of stock to management and employees.  This stock is worth about *$15.3 billion* and represents approximately *22%* of the total outstanding shares of the corporation.  Had investors been told the truth about "backdating," Apple's public shareholders would not have given their approval to the issuance of these shares.  Thus, the relief available dwarfs the relief available pursuant to the 10(b) claims.

As of the record date for each of Apple's last three annual meetings, NYCERS held about or in excess of one million Apple shares (with a market value of over $11 million, $55 million, and $78 million as of the record dates for the 2004, 2005 and 2006 annual meetings, respectively), and continues to hold more than one million shares with a market value exceeding $80 million as of the date hereof.  With respect to the predominant Section 14(a) claims, therefore, NYCERS believes it has the greatest financial interest in the relief that can be recovered in this action.

Finally, NYCERS also satisfies the applicable requirements of Rule 23 of the Federal Rules of Civil Procedure.  Thus, NYCERS respectfully submits that it should be appointed lead plaintiff, and the Court should approve its selection of lead counsel.

## BACKGROUND OF THE ACTION

This case involves so-called "backdating" of stock options.  As discussed below, Apple recently admitted that it engaged in this practice and that, as a result, it will be required to restate it financial results.

### Stock Options Generally

Companies award stock options to give employees the right to purchase shares of the company's stock.  The employees do so by paying the company a set price in exchange for the

---

[2] While the first filed class action complaint only includes filings from December 1, 2005 onward, NYCERS, if selected as lead plaintiff, will expand the class period to the maximum permissible under Section 14(a).

Memorandum Of Law In Support Of The New York
City Employees' Retirement System's Motion For Its
Appointment As Lead Plaintiff And For Approval
Of Its Selection Of Counsel (Case No.: C06-05208-MHP)

1    shares. The price is referred to as the "exercise price" and is typically fixed at the company's

2    closing stock market price on the same date the option was granted. This is referred to as

3    granting options "at the money."

4         An "at the money" option is not immediately valuable to the executive. This is

5    because, at the time the option is first awarded, the amount the executive must pay to acquire

6    the shares (*i.e.*, the exercise price) and the stock market trading price at which he could sell

7    them are the same. At the outset, therefore, there is no gain to be had by exercising the option

8    because the executive would merely break even. Granting the option "at the money," by

9    design, gives the executive extra incentive to work toward increasing the Company's stock

10   market price above the fixed exercise price so the option has value.

11        Over time, when the company's stock market price rises above the fixed exercise price,

12   the option becomes valuable; it is then referred to as being "in the money." After a fixed

13   period of time has elapsed since the option was first granted (referred to as the "vesting

14   period"), the executive can pay the exercise price, acquire the shares, sell them in the

15   marketplace for an amount greater than the exercise price he paid and thereby realize a profit.

16   In other words, the executive can "buy low and sell high" just like a shareholder hopes to do.

17   In this way, the corporate executives' interests are more closely aligned with shareholder

18   interests than would be the case if the executive was simply paid in cash. Many companies

19   emphasize this alignment of interests in proxy statements seeking to convince shareholders that

20   approving lucrative stock option incentives for executives is a good idea.

21        The practice of option backdating also has important accounting ramifications. Under

22   accounting rules in effect through December 31, 2005 (APB No. 25, "Accounting for Stock

23   Issued to Employees" ("APB No. 25")), companies were allowed to expense options according

24   to the intrinsic value method, whereby the expense equaled the difference between the fair

25   value of the underlying stock and the exercise price of the option. This expense is zero for

26   option grants where the exercise price equals the prevailing market price on the grant date (*i.e.*,

27   the option is granted "at the money"). Where, however, an option grant is "in the money" at

28   the time of the award, under APB No. 25 the instant paper gain is the equivalent of additional

Memorandum Of Law In Support Of The New York
City Employees' Retirement System's Motion For Its
Appointment As Lead Plaintiff And For Approval
Of Its Selection Of Counsel (Case No.: C06-05208-MHP)

1    compensation to the executive and must be treated as a cost to the corporation. Where a

2    corporation improperly "backdates" stock option grants, the company fails to properly account

3    for this extra compensation expense. As a result, the practice of improperly "backdating" stock

4    options causes the corporation to violate GAAP, to overstate its net income, to understate its

5    operating expense, and to overstate its retained earnings. And, because retained earnings

6    accumulate year over year, "backdating" in one period causes a corporation's financial

7    statements to be materially false in the fiscal periods that follow, until the corporation corrects

8    its accounting.

9    **Apple's Stock Option Grants**

10          Before fiscal year 1998, the terms of the Company's stock option plans provided that

11   the exercise price of options must be no less than the closing price of Apple stock on the

12   business day immediately preceding the grant date. After fiscal 1998, the plans provided that

13   the exercise price must be no less than the closing price on the date of the grant. At all times,

14   Apple represented that it complied with APB No. 25, and did not recognize any extra expense

15   from the issuance of stock options. Annual financial reports, signed by officers and directors

16   of the Company, consistently disclosed to shareholders that its financial statements were

17   prepared in accordance with Generally Accepted Accounting Principles ("GAAP"). More

18   specifically with respect to stock options, the annual reports stated in words or in substance:

19   "The Company has elected to follow [APB No. 25]....Under [APB No. 25], when the exercise

20   price of the Company's employee stock options equals the market price of the underlying stock

21   on the date of grant, no compensation expense is recognized."

22          From 1993 through 2001, the following option grants were made to CEO Jobs and

23   twelve other current and former senior officers of the Company:[3]

24   [3]      The twelve current and former executives listed in the table are:  (1) Fred D. Anderson, the Company's
     CFO from April 1996 to June 2004 and until his recent resignation on September 30, 2006, a member of the
25   Company's board of directors; (2) James J. Buckley, a holder of various Apple offices from January 1986 to May
     1996 and President of Apple USA from January 1994 to May 1996; (3) Robert Calderoni, a Senior Vice President
26   of Finance from June 1996 to November 1997; (4) Timothy D. Cook, the Company's current Chief Operating
     Officer; (5) Guerrino DeLuca, a Company officer from 1992 to 1997; (6) Ian Diery, a Company officer from 1989
27   to April 1995 and the Computer Division's General Manager from July 1993 to April 1995; (7) G. Frederick
     Forsyth, a Company officer from June 1989 to February 1998 and a Senior Vice President of Worldwide
28   Operations from June 1993 to February 1998; (8) Ronald B. Johnson, currently a Senior Vice President, Retail;

Memorandum Of Law In Support Of The New York
City Employees' Retirement System's Motion For Its
Appointment As Lead Plaintiff And For Approval
Of Its Selection Of Counsel (Case No.: C06-05208-MHP)

| Option Recipient | Purported Grant Date | Exercise Price[4] | Number of Options Granted |
|---|---|---|---|
| Jobs | 01/12/00 | $ 43.5938 | 20,000,000 |
|  | 10/19/01 | $   18.30 | 7,500,000 |
| Anderson | 04/01/96 | $   24.56 | 400,000 |
|  | 07/11/97 | $   13.25 | 500,000 |
|  | 08/05/97 | $   19.75 | 250,000 |
|  | 12/19/97 | $ 13.6875 | 250,000 |
|  | 03/02/99 | $   34.625 | 475,000 |
|  | 01/17/01 | $ 16.8125 | 1,000,000 |
| Buckley | 10/12/93 | $   23.75 | 15,000 |
|  | 12/20/93 | $   29.50 | 30,000 |
|  | 01/26/94 | $   33.875 | 20,000 |
|  | 04/27/95 | $   38.25 | 200,000 |
| Calderoni | 08/05/97 | $   19.75 | 80,000 |
| Cook | 02/02/98 | $ 17.6875 | 700,000 |
|  | 03/02/99 | $   34.625 | 300,000 |
|  | 01/17/01 | $ 16.8125 | 1,000,000 |
| DeLuca | 07/11/97 | $   13.25 | 309,750 |
|  | 08/05/97 | $   19.75 | 190,250 |
| Diery | 10/12/93 | $   23.75 | 40,000 |
|  | 12/20/93 | $   29.50 | 90,000 |
| Eilers | 10/03/94 | $   33.69 | 200,000 |
|  | 04/27/95 | $   38.25 | 60,000 |
| Forsyth | 04/27/95 | $   38.25 | 40,000 |
| Johnson | 12/14/99 | $ 47.4375 | 1,200,000 |
| Mandich | 12/19/97 | $ 13.6875 | 224,250 |
|  | 12/29/97 | $   13.125 | 200,000 |
|  | 03/02/99 | $   34.625 | 387,876 |
| Rubinstein | 07/11/97 | $   13.25 | 200,000 |
|  | 08/05/97 | $   19.75 | 300,000 |
|  | 12/19/97 | $ 13.6875 | 300,000 |
|  | 03/02/99 | $   34.625 | 458,334 |
|  | 01/17/01 | $ 16.8125 | 1,000,000 |
| Spindler | 10/13/93 | $   24.00 | 200,000 |
| Tevanian | 01/17/01 | $ 16.8125 | 1,000,000 |

Each of these options was granted on dates that fell just after a sharp dip and just before a sizeable jump in Apple's stock price as demonstrated in the table below:

---

(9) Mitchell Mandich, a Company officer from February 1997 to October 2000 and a Senior Vice President of Worldwide Sales from December 1997 to October 2000; (10) Jonathan Rubinstein, a Company officer from February 1997 to May 2006 and the Company's Senior Vice President of the iPod Division from may 2004 to March 2006; (11) Michael H. Spindler, a Company officer from 1980 to February 1996 and the Company's CEO from June 1993 to February 1996; and (12) Avadis Tevanian, Jr., a Company officer from February 1997 to March 2006 and the Company's Chief Software Technology Officer from July 2003 to March 2006.

[4]      Exercise prices reflect the Company's two-for-one stock split in June 2000 and February 2005.

6

| Purported Grant Date | Exercise Price | Share Price Ten Business Days Before Grant Date | Share Price Ten Business Days After Grant Date | Percentage Gain In Stock Price Ten Business Days After Grant Date |
|---|---|---|---|---|
| 10/12/93 | $23.75 | $24.75 | $29.75 | 25.3% |
| 10/13/93 | $ 24.00 | $23.87 | $31.75 | 32.3% |
| 12/20/93 | $29.50 | $32.25 | $31.50 | 6.8% |
| 01/26/94 | $33.875 | $30.50 | $36.25 | 7.0% |
| 10/03/94 | $33.69 | $35.50 | $39.75 | 18.0% |
| 04/27/95 | $38.25 | $39.00 | $41.00 | 7.2% |
| 04/01/96 | $24.56 | $26.12 | $25.87 | 5.3% |
| 07/11/97 | $13.25 | $14.69 | $16.25 | 21.9% |
| 08/05/97 | $19.75 | $16.56 | $24.44 | 23.7% |
| 12/19/97 | $13.6875 | $15.81 | $18.94 | 39.4% |
| 12/29/97 | $13.125 | $14.13 | $19.50 | 48.6% |
| 02/02/98 | $17.6875 | $18.81 | $19.62 | 10.9% |
| 03/02/99 | $34.625 | $38.31 | $35.50 | 2.5% |
| 12/14/99 | $47.4375 | $48.935 | $50.345 | 6.1% |
| 01/12/00 | $43.5938 | $50.345 | $55.00 | 26.2% |
| 01/17/01 | $16.8125 | $14.88 | $21.62 | 28.6% |
| 10/19/01 | $18.30 | $16.14 | $18.57 | 1.5% |

Apple's uncanny timing of the market is not attributable to happenstance. Rather, the option grant dates are not the true dates on which the options were actually granted. As described below, recent revelations make clear that, in pricing these options, historical stock price performance was examined and grant dates were selected to provide the Apple senior officers with an instant paper profit based on a purported grant date that was earlier than the date on which the historical performance information was reviewed. In other words, the options were backdated.

**"Backdating" Is Exposed**

A March 18, 2006 *Wall Street Journal* article first disclosed the existence of options backdating. The *Journal* explained that instead of setting the exercise price on the date the option was first granted so it was "at the money," some companies waited until later. They looked back at a chart of the company's historical stock market closing prices, picked a day when the company's stock price had dropped to a low or near-low point and pretended that the options had been awarded on that date. Thus, the exercise price assigned to the option was lower than the company's trading price on the real date the option was awarded. The idea was

7

1   to give the executive an instant paper profit (*i.e.*, put the option "in the money" from the
2   outset).

3         But, the companies did not tell shareholders the truth about how the exercise price was
4   selected.   Instead, the same companies that had solicited proxies to sell shareholders on the
5   notion that executive and shareholder interests were closely aligned lied about the selection
6   process.  They told shareholders that the option was granted "at the money" or, more precisely,
7   that the option's exercise price was not less than the company's stock market closing price on
8   the date the option was granted.  This was not true.  The exercise price was in fact less than
9   (and in many cases a lot less than) the company's closing stock market price on the date the
10  option was truly granted.  Contrary to the company's representations, therefore, the executive
11  did not need to work to increase the company's stock price above the exercise price; through
12  backdating, it was already there.

13        The Journal article triggered a widespread investigation by the Department of Justice,
14  SEC and Internal Revenue Service that is now focused on more than one hundred companies
15  that reportedly engaged in the backdating of options.  Apple is one of those companies.

16  **Apple Admits To Backdating**

17        On June 29, 2006, more than three months after the *Journal* article, Apple issued a
18  press release announcing that an internal investigation had uncovered "irregularities" related
19  to the issuance of stock option grants made between 1997 and 2001.  One of the grants was
20  made to CEO Steven P. Jobs but, Apple claimed in its disclosure, that grant alleged "was
21  subsequently cancelled and resulted in no financial gain to [Jobs]."   On August 3, 2006,
22  Apple announced that it found "additional evidence of irregularities" and will likely need to
23  restate its earnings as the result of failing to properly record compensation expenses relating
24  to option grants, and that the market should no longer rely on the Company's financial
25  statements or earnings releases from September 29, 2002 going forward.

26        The June 29, 2006 press release continued Apple's history of misleading investors
27  about stock options because it failed to disclose that, in exchange for canceling some of the
28  "irregularly" granted options, Jobs received ten million (split adjusted) restricted shares of

Memorandum Of Law In Support Of The New York
City Employees' Retirement System's Motion For Its
Appointment As Lead Plaintiff And For Approval
Of Its Selection Of Counsel (Case No.:  C06-05208-MHP)

1   the Company's common stock, which were scheduled to vest in full on the third anniversary
2   of the grant date (*i.e.*, March 2006). At the October 23, 2006 closing price of $81.46, these
3   ten million restricted shares have a value in excess of $800 million.

4     Subsequently, on October 4, 2006, Apple admitted that (i) at least 15 stock option
5   grants between 1997 and 2002 appear to have been backdated, (ii) Steve Jobs, Apple's
6   current CEO, knew about some of them, and (iii) an internal investigation raised serious
7   concerns regarding the actions of two former officers in connection with the accounting,
8   recording and reporting of stock option grants the details of which the Company is providing
9   to the SEC. In addition, the Company announced that defendant Fred Anderson, the
10  Company's former Chief Financial Officer from April 1996 to June 2004, and a member of
11  the Company's board of directors since 2004, resigned his directorship effective September
12  30, 2006.

13  **False and Misleading Statements**

14    Within the three year limitations period applicable to claims under Section 14(a), the
15  Company sought and obtained shareholder approval for the issuance of 51 million shares of
16  stock to management and employees based on false and misleading proxy materials, and while
17  fraudulently concealing practice of improperly backdating stock option grants. Specifically,
18  the Company's proxy statement dated March 14, 2005, distributed for the annual meeting held
19  April 21, 2005, sought shareholder approval for (i) an amendment to the Company's 2003
20  Employee Stock Option Plan (formerly known as the 1998 Executive Officer Stock Plan) that
21  increased the aggregate shares available thereunder by forty-nine million, and (ii) an
22  amendment of the Employee Stock Purchase Plan that increased the aggregate shares available
23  by two million up to a total of seventy million shares.[5] In doing so, however, Apple made
24  numerous statements that are rendered false and/or misleading by the failure to disclose that
25  options were backdated. As a result, shareholders were deprived of their rights to make an
26  informed shareholder vote and suffered significant dilution to their shareholder interests.

27  _____
    [5] While this particular proxy statement is not within the scope of the Class Period in the pending action, if selected
    as lead plaintiff NYCERS would file a complaint expanding the Class Period to assert the full scope of claims
28  under Section 14(a) available to Apple's shareholders.

Memorandum Of Law In Support Of The New York
City Employees' Retirement System's Motion For Its
Appointment As Lead Plaintiff And For Approval
Of Its Selection Of Counsel (Case No.: C06-05208-MHP)

1   First, by concealing the improper backdating of stock options, the Company

2   misrepresented its compensation practices.  For example, in the 2005 proxy statement, the

3   Company represented that "The [Compensation] Committee's compensation philosophy is that

4   total cash compensation should be competitive in the market and tied to personal and Company

5   performance, and that any long-term incentive compensation should be closely aligned with

6   shareholder interests. For executive officers, the Committee believes that a substantial portion

7   of their compensation should be closely aligned with Company performance."  Apple 2005

8   Proxy Statement, filed on Form DEF 14A on 3/15/2005 ("Apple 2005 Proxy") at 8.  Yet by

9   backdating stock options, the Company hid the fact that a substantial portion of the "equity"

10  component of executive compensation was not, in fact, tied to the future success of the

11  corporation, and as a result did not "align[] [this compensation] with Company performance."

12  The Company also represented that: "The grant of stock options and/or other equity awards,

13  when annualized over the term of the vesting period, are generally at market median of grants

14  made by comparable companies." Apple 2005 Proxy at 9.  Given the fact that Apple has now

15  admitted that a substantial portion of its stock option grants were improperly backdated, this

16  statement was obviously false.   Nevertheless, based on these assertions, the Company

17  represented that: "The infrequent grant of stock options and/or other equity awards is

18  insufficient to make up for the less than competitive total cash compensation paid to executive

19  officers," and that "The market data indicated that the infrequent option grants when

20  annualized over the vesting period were below the market median of executive officer grants

21  made by comparable companies."  Apple 2005 Proxy at 9, 10.  Because Apple failed to

22  properly account for backdated stock options, the Company had no credible basis for its

23  assertion that its stock option grants were "insufficient" to make up for the supposedly less

24  than competitive cash compensation paid to executive officers, or that the options granted were

25  somehow below the "market median of executive officer grants made by comparable

26  companies."

27  Apple's 2005 proxy statement also enclosed the Company's financial reports on Form

28  10-K for the fiscal year ending September 25, 2004 ("Apple 2005 10K").  The Apple 2005

Memorandum Of Law In Support Of The New York
City Employees' Retirement System's Motion For Its
Appointment As Lead Plaintiff And For Approval
Of Its Selection Of Counsel (Case No.: C06-05208-MHP)

1  10K included disclosures of the Company's financial for the fiscal years 2000 through 2004.

2  Because Apple has now conceded that it improperly backdated stock option grants through

3  2002, the financial disclosures in the Apple 2005 10K included periods during which the

4  Company issued backdated options. Accordingly, the Company's disclosures regarding net

5  income, earnings per share (Apple 2005 Proxy at 23, 61, 63), operating expenses (Apple 2005

6  Proxy at 36, 61, 63), through 2002 were flat-out wrong, and retained earnings through 2004

7  (Apple 2005 Proxy at 60, 62) (and indeed through the present date) were materially incorrect.

8  **This Class Action**

9        The captioned class action complaint was filed on behalf of Apple investors in the

10  United States District Court for the Northern District of California on August 24, 2006. In

11  addition to the Company, the defendants include (i) CEO Jobs, (ii) Anderson, (iii) Peter

12  Oppenheimer, the Company's current CFO, and (iv) other members of the Company's board

13  of directors who at various times had responsibilities for administering the Company's stock

14  option plans.[6]   The complaint asserts proxy violation claims under Section 14(a) and

15  securities fraud claims under Section 10(b) of the Exchange Act on behalf of purchasers of

16  Apple securities and/or sellers of put options on Apple shares during the Class Period

17  (December 1, 2005 and August 11, 2006) and control person liability under Section 20(a) of

18  the Exchange Act. Although the complaint asserts Section 14(a) claims based on the

19  Company's 2006 proxy statement, it ignores the very significant claims under the 2005 proxy

20  statement. This raises serious questions regarding the capabilities of the named plaintiffs to

21  adequately represent the interests of the class. As a result, the Class Period must be

22  expanded to include at the least claims under Section 14(a) regarding the 2005 proxy

23  statement.

24

25

26

27

28  [6]   William V. Campbell, Millard S. Drexler, Albert Gore, Jr., Arthur D. Levinson and Jerome P. York.

11

1    A notice of the pendency of this litigation was published alerting Apple investors of

2  the October 24, 2006 deadline to move to serve as Lead Plaintiff on behalf of a class of

3  Apple investors.  With the filing of this motion, NYCERS satisfies that deadline.[7]

4                                   **ARGUMENT**

5  **I.    NYCERS Should Be Appointed Lead Plaintiff**

6    As a public pension fund that invests assets on behalf of more than 200,000 public

7  pensioners and beneficiaries in New York City, NYCERS is precisely the type of institutional

8  investor Congress wanted to serve as lead plaintiff under the PSLRA.  *See* S. Rep. No. 104-98

9  (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 687-90, 1995 WL 372783 ("Senate PSLRA

10  Report") (PSLRA was intended "to increase the likelihood that institutional investors will

11  serve as lead plaintiffs" because, among other reasons, institutional investors and other class

12  members with large amounts at stake "will represent the interests of the plaintiff class more

13  effectively than class members with small amounts at stake").  *See also Bowman v. Legato

14  Sys.,* 195 F.R.D. 655, 657  (N.D. Cal. 2000) ("There is no doubt that Detroit [a public pension

15  fund] is eligible. . . Detroit is exactly the type of lead plaintiff envisioned by Congress when it

16  instituted the lead plaintiff requirements [of the PSLRA].").

17    The PSLRA establishes a presumption that the "most adequate plaintiff" is the "person

18  or group of persons" that "has the largest financial interest in the relief sought by the class and

19  otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." 15

20  U.S.C. § 78u-4(a)(3)(B)(iii)(I); *see In re Cavanaugh,* 306 F.3d 726, 730 (9th Cir. 2002)

21  (applying these PSLRA provisions; "In other words, the district court must compare the

22  financial stakes of the various plaintiffs and determine which one has the most to gain from the

23  lawsuit.").  NYCERS should be appointed lead plaintiff because it has the largest financial

24

25

26

27  ───────────────────
[7]      The PSLRA permits any member of the putative class to move for appointment as lead plaintiff within 60
28  days of the publication of the first notice that the action has been filed. *See* 15 U.S.C. § 78u-4(a)(3)(A)(I)(II).

Memorandum Of Law In Support Of The New York
City Employees' Retirement System's Motion For Its
Appointment As Lead Plaintiff And For Approval
Of Its Selection Of Counsel (Case No.: C06-05208-MHP)

1  interest in the relief available to the Class and satisfies the applicable requirements of Rule 23

2  of the Federal Rules of Civil Procedure.[8]

3        **A.      NYCERS Has The Largest Financial Stake In The Lawsuit**

4               **1.      Section 10(b) Damages Are *De Minimis***
                        **Due To The PSLRA's "Look Back" Provision**
5

6        Where, as here, a plaintiff in a securities fraud class action seeks to calculate damages

7  by referring to the market price of a company's stock, the PSLRA's so-called "look back"

8  provision limits the damages recoverable.  The PSLRA provides that

9        in any private action arising under this chapter in which the plaintiff seeks to
         establish damages by reference to the market price of a security, the award of
10       damages to the plaintiff shall not exceed the difference between the purchase or
         sale price paid or received, as appropriate, by the plaintiff for the subject
11       security and the mean trading price of that security during the 90-day period
         beginning on the date on which the information correcting the misstatement or
12       omission that is the basis for the action is disseminated to the market.

13  15 U.S.C. § 78u-4(e).  In essence, the "look back" provision states that the damages arising

14  from an investor's purchase or sale of securities may not exceed the difference between the

15  purchase price paid (or received when shares were sold) and the average trading price during

16  the 90 days following a "corrective" disclosure. *See generally In re Hollinger Int'l, Inc. Sec.*

17  *Litig.*, No. 04C 0834, 2006 WL 1806382, at **12-13 (N.D. Ill. Jun. 28, 2006) (analyzing "look

18  back" provision).  Here, the Class Period ends on August 11, 2006, the date on which the

19  instant complaint alleges Apple announced that the existence of "backdating" would require

20  revisions to its then most recent quarterly results (*i.e.*, the "corrective" disclosure date).  This

21  means that the 90-day "look back" period runs from August 12, 2006 through November 10,

22  2006.  The 90-day "look back" period has, thus, not yet concluded.  However, as of October

23  23, 2006, the average price during this 90-day look back period is $72.55.  Shareholders with

24  average purchase prices below $72.55, therefore, have no cognizable damages under the

25  PSLRA.

26

27  [8]      The presumption may be overcome only by proof that the presumed lead plaintiff will not fairly and
adequately represent the class or is subject to unique defenses. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II). There is no
28  such proof here.

                                                                            13

1    Apple's historical stock price during the Class Period has traded above $72.55 only

2  intermittently during the period from December 5, 2005 through February 2, 2006.  Thus,

3  during the Class Period as proposed, there are parts of only 44 trading days (out of a total of

4  175 trading days) upon which investors could have purchased shares that have a claim under

5  Section 10(b).  Therefore, only those shareholders who purchased during this extremely narrow

6  time frame will be able to prove any recoverable damages.  Further, any expansion of the Class

7  Period to the full five years permitted under the statue of limitations for Section 10(b) would

8  not expand the class of potential Section 10(b) claimants since the trading price of Apple

9  shares did not exceed $72.55 (the "look back" price) at any time from August 11, 2001 to

10  November 30, 2005.

11    Indeed, applying the 90-day "look back" to the Section 10(b) claims of the named

12  plaintiffs in this action reveals that they have no recoverable damages.  Named plaintiff Martin

13  Vogel purchased his Apple shares at $67.90 (more than $4 below the "look back" price) and,

14  thus, has no section 10(b) damages.  Similarly, named plaintiff Kenneth Mahoney purchased

15  his Apple shares for $72.18 (more than 30¢ below the "look back" price) and, thus, also has no

16  Section 10(b) damages.  The number of putative class members who purchased during the

17  narrow sliver of time when Apple's share price was above the look back price is severely

18  limited and, as a result, the available Section 10(b) damages in this case are *de minimis*.

19            **2.    The Section 14(a) Claims Predominate**

20    The financial relief available pursuant to the Section 14(a) claims as a result of Apple's

21  false and misleading proxy statements is far more substantial than the recovery potentially

22  available pursuant to the Section 10(b) claims.[9]  Over the last three years, Apple sought and

23  obtained shareholder approval for the amendments to stock plans authorizing the issuance of

24  51 million new shares to employees and executives.  At the current market prices of

25  _____

[9]    In *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 385 (1970), the Supreme Court noted that, without
26  intending to preclude other forms of relief, damages, an accounting and myriad other forms of equitable relief can
be awarded to retrospectively redress a violation of section 14(a).  Since such damages will not be established "by
27  reference to the market price of a security," 15 U.S.C. § 78u-4(e)(1), the "look back" provision will not apply.  In
addition, to the extent plaintiff seeks equitable relief (as opposed to money damages) as a remedy, by its express
28  terms, the look back provision does not apply.

14
Memorandum Of Law In Support Of The New York
City Employees' Retirement System's Motion For Its
Appointment As Lead Plaintiff And For Approval
Of Its Selection Of Counsel (Case No.: C06-05208-MHP)

approximately $80 per share, the value of these shares exceeds $400 million, and will result in the dilution of shareholders by approximately 6%.[10]   Indeed, in the period that Apple has now admitted it wrongfully concealed the improper backdating of stock options, the Company sought and obtained approval for the adoption of plans authorizing the issuance of over *188 million* shares to company employees, diluting the ownership interests of public shareholders by about 22%.

As of March 1, 2005, the record date for the 2005 annual meeting, NYCERS held 1,038,152 shares of Apple common stock which (at that time) had a market value in excess of $44 million.  And as of October 23, 2006, NYCERS holds in excess of one million shares with a market value in excess of  $80 million. *See Weltz v. Lee*, 199 F.R.D. 129, 132 (S.D.N.Y. 2001) (in Section 14(a) case, court looked to competing lead plaintiffs' share ownership in determining which plaintiff had largest financial interest).  NYCERS, therefore, believes it has the greatest financial interest in the relief sought and, after application of the "look back" provision, the relief that will actually be available in this action.

**B.     NYCERS Satisfies The Requirements Of FED. R. CIV. P. 23.**

Section 21D(a)(3)(B)(iii)(cc) of the Exchange Act provides that the lead plaintiff must "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure."  15 U.S.C.  §  78u-4(a)(3)(B)(iii)(cc).   Rule 23(a) provides that a party may serve as a class representative so long as the following four requirements are satisfied:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED R. CIV. P. 23(a).  Of the four prerequisites of class certification under Rule 23(a), only two – typicality and adequacy of representation – directly address the characteristics of a lead plaintiff under the PSLRA that must be satisfied. *See Cavanaugh*, 306 F.3d at 730.

---

[10]   This figure is based upon 850,508,144 total Apple shares outstanding as of April 26, 2006, as disclosed in Apple's 10-Q filed with the SEC on May 5, 2006.

1    Among the applicants for lead plaintiff, the party that has suffered the greatest financial

2    loss that also meets the "typicality" and "adequacy" requirements of Rule 23(a) will be

3    presumed to be the most adequate plaintiff. *See Erikson v. Cornerstone Propane Partners LP*,

4    No. C-03-2522, 2003 WL 22232387, at * 2 (N.D. Cal. Sept. 15, 2003) (citing *Cavanaugh*, 306

5    F.3d at 730). All that is required is a "preliminary showing" that the lead plaintiff will satisfy

6    these requirements. *See Wenderhold v. Cylink Corp.,* 188 F.R.D. 577, 587 (N.D. Cal. 1999).

7    The typicality requirement of Rule 23(a)(3) is satisfied if the proposed lead plaintiff

8    has: "(1) suffered the same injuries as the absent class members, (2) as a result of the same

9    course of conduct, and (3) their claims are based on the same legal issues." *See Armour v.*

10   *Network Assocs., Inc.*, 171 F. Supp. 2d 1044, 1052 (N.D. Cal. 2001). "[A]dequacy requires the

11   absence of antagonistic interests between class representatives and absent class members." *Id.*

12   Here, NYCERS' claims arise from the same course of conduct from which the claims of all

13   other class members arise. As a public stockholders of Apple, NYCERS, like other members

14   of the class, is an innocent victim of defendants' fraudulent conduct. NYCERS' damages, like

15   those suffered by other members of the class, arise from defendants' manipulation and

16   backdating of stock option grants. The issues surrounding the defendants' wrongdoing are the

17   same for every class member. Thus, the interests of NYCERS are aligned with the interests of

18   the class as a whole. NYCERS is not subject to any unique or special defenses. Thus, its

19   claims are in all respects "typical" of the claims of the class.

20   Rule 23(a)(4)'s requirement of adequate representation is satisfied if: (1) the interests of

21   the class representative coincide with those of the class and (2) the representative has the

22   ability to prosecute the action vigorously through the services of competent counsel. *Armour,*

23   171 F. Supp. 2d at 1052 (citing *In re Computer Memories Sec. Litig.*, 111 F.R.D. 675, 682

24   (N.D. Cal. 1986)). NYCERS easily meets the adequacy requirements.

25   NYCERS's interests are the same as those of other class members. Like other class

26   members, it seeks to hold defendants liable for the consequences of their violations of the

27   federal securities laws. There are no facts which indicate any conflict of interest between the

28

16

Memorandum Of Law In Support Of The New York
City Employees' Retirement System's Motion For Its
Appointment As Lead Plaintiff And For Approval
Of Its Selection Of Counsel (Case No.: C06-05208-MHP)

1  NYCERS and the other class members.  In addition, NYCERS has the resources and

2  sophistication to fulfill the statutory role of lead plaintiff.

3  **II.    The Court Should Approve NYCERS' Choice Of Lead Counsel**

4         The Court should approve NYCERS' choice of the law firm of Grant & Eisenhofer to

5  serve as lead counsel.  Pursuant to Section 21D(a)(3)(B)(v) of the Exchange Act, codified at 15

6  U.S.C. § 78u-4(a)(3)(B)(v), the lead plaintiff is to select and retain lead counsel to represent

7  the Class, subject to Court approval.  *See Cavanaugh*, 306 F.3d at 734 ("Selecting a lawyer in

8  whom a litigant has confidence is an important client prerogative and we will not lightly infer

9  that Congress meant to take away this prerogative from securities plaintiffs. And, indeed, it

10 did not. While the appointment is made subject to the approval of the court, the Reform Act

11 clearly leaves the choice of class counsel in the hands of the lead plaintiff.").  Grant &

12 Eisenhofer has retained local counsel who is admitted to and familiar with practice before this

13 Court.

14        Grant & Eisenhofer is among the preeminent securities class action law firms in the

15 country, having been appointed sole or co-lead counsel in numerous complex securities class

16 actions pending around the country.  Indeed, Grant & Eisenhofer has been lead counsel in

17 several of the largest securities class actions in history, achieving over $2 billion in recoveries

18 in cases where it has served as lead counsel. Among other representations, Grant & Eisenhofer

19 is: (a) lead counsel in *In re Global Crossing, Ltd. Securities & "ERISA" Litigation*, 02 Civ.

20 910, where it has already obtained settlements in excess of $345 million and continues to

21 litigate against additional defendants; (b) co-lead counsel in *In re Refco, Inc. Securities*

22 *Litigation*, 05 Civ. 8626 (GEL) (S.D.N.Y.); and (c) co-lead counsel in *In re Parmalat*

23 *Securities Litigation*, 04 Civ. 0030 (LAK) (S.D.N.Y.). Grant & Eisenhofer also has experience

24 taking securities class actions to trial, having served as sole lead counsel in *In re Safety-Kleen*

25 *Bondholders Litigation*, No. 3:00-CV-1145-17 (D.S.C.), which went to a jury trial and ended

26 in judgments as a matter of law against two of the company's executives for nearly $200

27 million, and settlements with the last remaining defendants shortly before closing arguments.

28 *See* Grant & Eisenhofer's Firm Biography attached hereto as Exhibit B.

Memorandum Of Law In Support Of The New York
City Employees' Retirement System's Motion For Its
Appointment As Lead Plaintiff And For Approval
Of Its Selection Of Counsel (Case No.: C06-05208-MHP)

## CONCLUSION

For the foregoing reasons, NYCERS respectfully requests that the Court (a) appoint it as Lead Plaintiff pursuant to Section 21D(a)(3)(B) of the Exchange Act, (b) approve its selection of Grant & Eisenhofer, to serve as counsel to the class; and (c) grant such other and further relief as the Court may deem just and proper.

Dated: October 24, 2006

Respectfully submitted,

**ANDERLINI, FINKELSTEIN, EMERICK & SMOOT**

Merrill Glen Emerick (State Bar No. 117248)
400 S. El Camino Real – Suite 700
San Mateo, CA 94402
Tel: 650-348-0102

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Geoffrey C. Jarvis
Michael J. Barry
Mary S. Thomas (State Bar No. 175110)
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE 19801
Tel: 302-622-7000

*Attorneys for Proposed Lead Plaintiff*
*The New York City Employees' Retirement System*

Memorandum Of Law In Support Of The New York
City Employees' Retirement System's Motion For Its