Jay W. Eisenhofer
Charles T. Caliendo
GRANT & EISENHOFER P.A.
45 Rockefeller Center, 15th Floor
New York, NY 10111
Tel:  646.722.8500
Fax:  646.722.8501
jeisenhofer@gelaw.com

Michael J. Barry (*pro hac vice*)
Lesley E. Weaver (State Bar No. 191305)
GRANT & EISENHOFER P.A.
1201 North Market Street
Wilmington, DE 19801
Tel:  302.622.7000
Fax:  302.622.7100

Merrill Glen Emerick (State Bar No. 117248)
ANDERLINI, FINKELSTEIN, EMERICK & SMOOT
400 S. El Camino Real – Suite 700
San Mateo, CA 94402
Tel: 650.348.0102
Fax: 650.348.0962
memerick@afeslaw.com

*Attorneys for Lead Plaintiff*
*The New York City Employees' Retirement System*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| MARTIN VOGEL and KENNETH MAHONEY, on Behalf of Themselves and All Other Similarly Situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>STEVEN JOBS, PETER OPPENHEIMER, FRED ANDERSON, WILLIAM V. CAMPBELL, MILLARD S. DREXLER, ALBERT GORE, Jr., ARTHUR D. LEVINSON, JEROME B. YORK and APPLE COMPUTER, INC.,<br><br>                    Defendants. | Case No.: C-06-05208-JF<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br> Honorable Jeremy Fogel |

# TABLE OF CONTENTS

**Page**

I.     OVERVIEW OF CLAIMS .................................................................................................. 2

II.    PARTIES ........................................................................................................................... 2

    A.    Plaintiffs .................................................................................................................. 2

    B.    Corporate Defendant ............................................................................................... 3

    C.    Relevant Committees Of Apple's Board of Directors ............................................. 3

    D.    The Director Defendants .......................................................................................... 4

    E.    Defendant Anderson ................................................................................................ 5

    F.    The Former Director Defendants ............................................................................. 5

    G.    Defendants' Fiduciary Obligations ......................................................................... 6

III.   JURISDICTION AND VENUE ....................................................................................... 6

IV.    INTRADISTRICT ASSIGNMENT ................................................................................. 7

V.     FACTUAL BACKGROUND ........................................................................................... 7

    A.    Overview Of Stock Option Awards ......................................................................... 7

    B.    The Wall Street Journal Exposes Widespread Backdating .................................... 10

    C.    Apple Admits To Backdating ................................................................................ 11

    D.    Apple Restates Its Financial Results ...................................................................... 12

    E.    Shareholders Have Suffered Substantial Injury .................................................... 18

    F.    Relief Sought ......................................................................................................... 19

    G.    Summary Of Disclosures Concerning The Company's Stock Option Plans ........ 21

    H.    Apple's Backdated Option Grants ......................................................................... 22

    I.    "Repricings" ........................................................................................................... 26

VI.    FALSE AND MISLEADING STATEMENTS ............................................................. 28

    A.    Proxy Statements ................................................................................................... 28

        1.    1996 Proxy .................................................................................................. 30

        2.    1997 Proxy .................................................................................................. 31

**3.** 1998 Proxy .................................................................... 33

**4.** 2000 Proxy .................................................................... 36

**5.** 2001 Proxy .................................................................... 39

**6.** 2002 Proxy .................................................................... 42

**7.** 2003 Proxy .................................................................... 44

**8.** 2005 Proxy .................................................................... 48

**B.** Annual Reports ...................................................................... 50

**1.** 1996 Annual Report ........................................................ 51

**2.** 1997 Annual Report ........................................................ 52

**3.** 1998 Annual Report ........................................................ 53

**4.** 1999 Annual Report ........................................................ 55

**5.** 2000 Annual Report ........................................................ 58

**6.** 2001 Annual Report ........................................................ 61

**7.** 2002 Annual Report ........................................................ 64

**8.** 2003 Annual Report ........................................................ 66

**9.** 2004 Annual Report ........................................................ 69

**10.** 2005 Annual Report ........................................................ 71

**C.** Registration Statements ........................................................ 74

VII.   CLASS ACTION ALLEGATIONS ................................................. 75

VIII.  TOLLING OF STATUTE OF LIMITATIONS – STATE LAW CLAIMS .................... 77

IX.    LOSS CAUSATION ALLEGATIONS ............................................... 78

X.     CLAIMS FOR RELIEF ......................................................... 78

COUNT I CLASS CLAIM FOR VIOLATION OF SECTION 14(a)  AGAINST THE COMPANY, THE DIRECTOR DEFENDANTS AND  FORMER DIRECTOR ANDERSON WITH RESPECT TO THE 2005 PROXY ................................................. 78

COUNT II CLASS CLAIM FOR VIOLATION OF  SECTION 20(a) AGAINST THE DIRECTOR DEFENDANTS AND  FORMER DIRECTOR ANDERSON WITH RESPECT TO THE 2005 PROXY ................................................. 80

COUNT III CLASS CLAIM FOR BREACH  OF THE DUTY OF DISCLOSURE ....... 81

1

XI.    PRAYER FOR RELIEF ................................................................................................. 84

XII.    DEMAND FOR JURY TRIAL ...................................................................................... 86

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

Lead plaintiff The New York City Employees' Retirement System ("Lead Plaintiff" or "NYCERS") makes the following allegations upon information and belief, except the allegations relating to Lead Plaintiff, which Lead Plaintiff makes upon personal knowledge, against Apple Inc. ("Apple" or the "Company")[1] and certain of its current and former directors and officers. Lead Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all other similarly situated shareholders who fall into two different classes of current and/or former Apple shareholders (collectively, "Plaintiffs") as follows:

(1) the proxy violation claim discussed in detail below under Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) ("Exchange Act"), and SEC Rule 14a-9 promulgated thereunder ("Section 14(a)"), and Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) ("Section 20(a)"), is asserted on behalf of holders of record of Apple's common stock on March 1, 2005 (the record date for shareholders to be eligible to vote at Apple's 2005 annual meeting) (the "Section 14(a) Class" or "the Section 14(a) Class Period"); and

(2) the pendent state law class disclosure claims discussed in detail below are asserted on behalf of all holders of record of Apple's common stock who were entitled to vote at the Company's annual meetings for fiscal years 1995, 1996, 1998, 2000, 2001, 2003 and/or 2005 (the "State Law Class" or the "State Law Class Period").

(The Section 14(a) Class and the State Law Class are sometimes hereinafter referred to individually as a "Class" or collectively as the "Classes.")

Plaintiffs' information and belief is based on their investigation (made by and through their attorneys), which investigation included, among other things, a review and analysis of: (1) public documents relating to the defendants; (2) Apple's filings with the SEC; (3) press releases published by Apple; (4) analyst reports concerning the Company; and (5) newspaper and magazine articles (and other media coverage) regarding Apple and its business. Many of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their possession, custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this complaint (the "Complaint") after a reasonable opportunity for discovery.

---

[1]      As reflected in a Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC") on January 10, 2007, on January 9, 2007, Apple changed its name from "Apple Computer, Inc." to "Apple Inc."

1

## I.   OVERVIEW OF CLAIMS

1.     Apple has admitted in SEC filings that it "backdated" more than 6,000 stock option awards to its executives.  These abuses occurred from at least 1997 to 2002 during which time Apple repeatedly misrepresented in its proxy statements the true facts concerning how stock options were priced.  In these same proxy statements, Apple solicited shareholder approval to increase the stock available for employee stock option plans to benefit the very executives who were hiding backdating practices from shareholders in the first place.   In addition, in one proxy statement, Apple falsely told shareholders that a $150 million stock option award to CEO Steve Jobs was approved at a board meeting that Apple now admits never took place.

2.     In total, during the more than ten years when backdating practices were being concealed from shareholders, Apple's false and misleading proxy statements convinced shareholders to approve the authorization for issuance of more than 200 million (split-adjusted) shares for use in connection with Apple's executive stock option plans.  This caused dilution of shareholder equity in excess of 20%, or more than $19 billion based on Apple's current market capitalization.  Shareholders would not have voted in favor of any of these share authorizations had defendants told them the truth about backdating practices, which, as fiduciaries, defendants were required to do.

3.     Lead Plaintiff seeks damages and other relief for these injuries to the Apple shareholders' economic interests pursuant to Section 14(a) and pendent state law claims for breaches of defendants' fiduciary duties of disclosure.  These claims do not require proof of scienter.

## II.   PARTIES

**A.    Plaintiffs**

4.     NYCERS is a pension fund within the actuarial pension systems of New York City, which includes other funds such as the Police Pension Fund, the Fire Department Pension Fund, the Teachers' Retirement System, the Board of Education Retirement System, and six

2

variable supplements funds (collectively, the "Funds").  As of June 30, 2004, the Funds had 258,609 retired members and 347,575 active members.

5.       NYCERS is a public pension fund within the actuarial pension systems of New York City.  NYCERS has over 200,000 active members, and approximately 120,000 retirees and beneficiaries.  NYCERS, established under Section 120102 of the Administrative Code of the City of New York, provides pension benefits to all New York City employees who are not eligible to participate in other New York City pension funds.

6.       NYCERS is presently and has been an Apple shareholder continuously since at least January 1993 and, therefore, was a shareholder of record eligible to vote at Apple's annual shareholder meetings each year from 1995 through 2005.

**B.     Corporate Defendant**

7.       Defendant Apple is a California corporation with its principal executive offices located at 1 Infinite Loop, Building 4, Cupertino, California.  According to its filings with the SEC, the Company is a leading worldwide manufacturer of personal computers, computer software and portable digital music players.  Its common stock trades on the Nasdaq National Market under the ticker symbol AAPL.  As of February 26, 2006, there were 851,679,185 shares outstanding of Apple's common stock.

**C.     Relevant Committees Of Apple's Board of Directors**

8.       The Company's board of directors maintained certain committees relevant to the allegations herein as follows.  The Stock Option Committee of the Company's board of directors (the "Stock Option Committee") was primarily responsible for administering the Company's stock option plans, restricted stock plans and employee share purchase plans from at least December 12, 1994 to April 1995.  In April 1995, the Stock Option Committee was dissolved and its functions were assumed by the Compensation Committee of the board of directors (the "Compensation Committee") which administered the Company's executive compensation programs, including its stock option plans, at all times relevant to the allegations herein except that:  (a) during the period of time from April 2000 to August 2001, the Company's full board of directors administered such programs; and (b) the Company's full

3
**CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

board of directors was responsible for the approval of executive compensation matters concerning the Company's CEO.

9.     The board of directors also maintained an Audit and Finance Committee (the "Audit Committee") during the relevant time.  The Audit Committee was generally responsible for, among other things, assisting the full Apple board in fulfilling its oversight responsibility by reviewing the financial information provided to shareholders and others and evaluating the Company's accounting policies and system of internal controls, including internal controls respecting stock options and the proper accounting treatment thereof.

**D.     The Director Defendants**

10.     Defendant Steven P. Jobs is the Company's Chief Executive Officer and has acted in that capacity since January 2000.  Jobs was previously Interim Chief Executive Officer from September 10, 1997 to January 2000.  Jobs co-founded the Company beginning in 1976 and has been a member of the Company's board of directors since 1997.  According to the Company's proxy statements, although defendant Jobs was a member of the Company's board of directors, he did not participate in board deliberations concerning executive compensation matters.

11.     Defendant William V. Campbell has been a member of the Company's board of directors since 1997.  Campbell has also been a member of the Audit Committee since at least December 1997 and a member of the Compensation Committee since August 2001.

12.     Defendant Millard S. Drexler has been a member of the Company's board of directors since 1999.  Drexler has also been a member of the Compensation Committee since at least March 24, 2003.

13.     Defendant Arthur D. Levinson has been a member of the Company's board of directors since 2000.  Levinson has also been a member of the Audit Committee since fiscal 2000 and was a member of the Compensation Committee from August 2001 to at least March 24, 2003.

14.     Defendant Jerome B. York has been a member of the Company's board of directors since August 1997.  York has also been a member of the Audit Committee since

1   August 1997 and was a member of the Compensation Committee from August 2001 to at least

2   March 21, 2002.

3        15.   Jobs, Campbell, Drexler, Levinson and York are sometimes hereinafter referred

4   to as the "Director Defendants."

5   **E.   Defendant Anderson**

6        16.   Defendant Fred D. Anderson was the Company's Chief Financial Officer from

7   April 1996 to June 2004 and was a member of the Company's board of directors from 2004

8   until September 30, 2006 when he was forced to resign due to his involvement with backdating

9   as alleged more fully below.

10  **F.   The Former Director Defendants**

11       17.   Defendant Gareth C.C. Chang was a member of the Company's board of

12  directors from 1996 to at least March 12, 2001.  From January 1997 through April 2000,

13  Chang was a member of the Compensation Committee.

14       18.   Defendant Peter O. Crisp was a member of the Company's board of directors

15  from 1980 to at least December 19, 1995.  Crisp was a member of the Stock Option Committee

16  from at least December 12, 1994 to April 1995, when the Stock Option Committee was

17  dissolved and its functions were assumed by the Compensation Committee.  From April 1995

18  to at least December 19, 1995, Crisp was a member of the Compensation Committee.

19       19.   Defendant Lawrence J. Ellison was a member of the Company's board of

20  directors from 1997 to September 2002.

21       20.   Defendant B. Jurgen Hintz was a member of the Company's board of directors

22  from 1994 to at least January 1997.  Hintz was a member of the Compensation Committee

23  from at least December 19, 1995 to January 1997.

24       21.   Defendant Katherine M. Hudson was a member of the Company's board of

25  directors from 1994 to at least December 19, 1995.  Hudson was a member of the Stock Option

26  Committee from at least December 12, 1994 to April 1995, when the Stock Option Committee

27  was dissolved and its functions were assumed by the Compensation Committee.  From April

28  1995 to June 1997, Hudson was a member of the Compensation Committee.

**CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

22.     Defendant Delano E. Lewis was a member of the Company's board of directors from 1994 to July 1997.  Lewis was a member of the Compensation Committee from at least December 26, 1996 to July 1997.

23.     Defendant A.C. Markkula, Jr. was a member of the Company's board of directors from 1977 to at least December 27, 1996.  Markkula was a member of the Stock Option Committee of the board of directors during the Company's fiscal year 1994.

24.     Defendant Edgar S. Wollard, Jr. was a member of the Company's board of directors from 1996 to April 2000.  From June 1997 through April 2000, Wollard was a member of the Compensation Committee.

25.     Chang, Crisp, Ellison, Hintz, Hudson, Lewis, Markkula and Wollard are sometimes referred to hereinafter as the "Former Director Defendants."

**G.     Defendants' Fiduciary Obligations**

26.     By virtue of the individual defendants' positions as present or former directors and/or officers, they have been in a fiduciary relationship to Apple, and the Company's public shareholders, and owed to Apple and its public shareholders the highest obligation of good faith, fair dealing, due care and candor, and had an obligation to protect and preserve the assets and interests of Apple and to tell shareholders the truth about matters on which shareholders were asked to vote.

**III.   JURISDICTION AND VENUE**

27.     Jurisdiction is based on § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, as this case arises from defendants' violations of Sections 14(a) and 20(a) of the Exchange Act and the rules promulgated thereunder by the SEC.

28.     This court may exercise supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. § 1367, as such claims arise from the same nucleus of operative facts as the federal claims asserted herein.

29.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Many of the acts and transactions forming

6

the basis for the claims in this action, including the preparation and dissemination of materially false and misleading information, and the failure to disclose material information, occurred in substantial part in this District.

30.     The claims asserted herein are not the product of any collusive conduct designed to confer jurisdiction on this Court which it otherwise would not have.

## IV.   INTRADISTRICT ASSIGNMENT

31.     As substantial part of the events or omissions which give rise to Plaintiffs' claims occurred within Santa Clara County, where defendant Apple is located.  Therefore, this action is properly assigned to the Court's San Jose Division in accordance with Civil L.R. 3-2(c) and (d).

## V.   FACTUAL BACKGROUND

**A.   Overview Of Stock Option Awards**

32.     Companies award stock options to give employees the right to purchase shares of the company's stock.  The employees do so by paying the company a set price in exchange for the shares.  The price is referred to as the "exercise price" and is typically fixed at the company's closing stock market price on the same date the option was granted.  This is referred to as granting options "at the money."

33.     An "at the money" option is not immediately valuable to the executive.  This is because, at the time the option is first awarded, the amount the executive must pay to acquire the shares (*i.e.*, the exercise price) and the stock market trading price at which he could sell them are the same.  There is, therefore, no gain to be had by exercising the option because the executive would merely break even.  Granting the option "at the money," by design, gives the executive extra incentive to work toward increasing the company's stock market price above the fixed exercise price so the option has value.

34.     Over time, when the company's stock market price rises above the fixed exercise price, the option becomes valuable; it is then referred to as being "in the money."  After a fixed period of time has elapsed since the option was first granted (referred to as the "vesting period"), the executive can pay the exercise price, acquire the shares, sell them in the

7

marketplace for an amount greater than the exercise price he paid and thereby realize a profit. In other words, the executive can "buy low and sell high" just like a shareholder hopes to do. When options are awarded "at the money," the corporate executives' interests are more closely aligned with shareholder interests than would be the case if the executive was simply paid in cash. Many companies, including Apple, emphasized this alignment of interests in proxy statements seeking to convince shareholders that approving lucrative stock option incentives for executives is a good idea.

35. Backdating stock options also has a material impact on the company's financial statements. Specifically, prior to January 1, 2006, corporations were not required to recognize any compensation expense relating to stock option grants *unless* the exercise price of the options was below the publicly traded price of the company's stock on the date of the grant. However, if the corporation granted options that carried an exercise price below the publicly traded stock price, the company was required to recognize and disclose the "in the money" portion of the option grant (*i.e.*, the difference between the exercise price and the publicly traded price, times the number of shares underlying the options) as compensation expense paid to the grant recipients. By backdating stock options – and thus concealing the "in the money" nature of the grant – corporations, including Apple, failed to account for this additional compensation paid to corporate directors, executives and employees who received these grants, thus rendering their financial statements materially misleading. Specifically, corporations, such as Apple, that engaged in the nefarious practice of options backdating, *inter alia*, (a) understated their disclosed compensation expense in the period when the options were granted, (b) overstated the company's net income for the fiscal year when the options were granted, and (c) overstated the company's retained earnings for every accounting period that followed an illegally backdated option grant.

36. The accounting implications of options backdating, therefore, can be – and at Apple have proven to be – massive and far-reaching. On December 29, 2006, Apple announced that it had failed to properly account for over 6,400 separate grants made to employees and executives since at least 1998, and that as a result the Company understated

CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)

stock-based compensation expense of $105 million and $84 million on pre-tax and after-tax bases, respectively.   As discussed below, however, even these disclosures did not properly account for several massive backdated option grants that the Company nevertheless failed to correct.

37.    Proper disclosures of executive compensation are essential to ensuring that shareholder votes solicited through corporate proxy statements are cast on a fully informed basis.  Where the corporation seeks shareholder approval of executive compensation programs advanced by management and the corporation's board, the importance of clear and accurate disclosures regarding the company's existing and historical compensation practices is heightened.  By concealing executive compensation paid to employees and executives through backdated option grants, corporations, including Apple, misled investors and solicited shareholder votes through false and misleading proxy statements.

38.    Shareholders who cast votes on executive compensation programs, which votes were procured as a result of false and misleading proxy statements, were directly injured not only as a result of being deprived of their right to cast their votes on a fully informed basis (which itself represents a compensable injury), but also by virtue of the corporation reserving shares that were authorized for use with these programs, the issuance of which dilutes the public shareholders' interests.  For example, and as discussed below, throughout the period when the Company *acknowledges* that backdating occurred, Apple sought and obtained shareholder approval for the adoption of stock-based compensation plans that reserved over 200 million shares for issuance to Apple directors, executives and employees.  This stock at today's prices is worth over $19 billion, and, if fully issued, would dilute the public shareholders' interests by over 20%.  As alleged below, Apple's shareholders would not have voted to approve any of these compensation plans had they known that Apple's management and board were lying about how the Company administered its existing plans and had abused their authority in backdating millions of options issued the corporate employees.

**CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

**B.** **The Wall Street Journal Exposes Widespread Backdating**

39.    A March 18, 2006 *Wall Street Journal* (the "*Journal*") article first disclosed the existence of options backdating by certain companies.  The *Journal* explained that instead of setting the exercise price on the date the option was first granted (*i.e.*, so it was "at the money"), some companies waited until later.  They looked back at a chart of the company's historical stock market closing prices, picked a day when the company's stock price had dropped to a low or near-low point and pretended that the options had been awarded on that date.  Thus, the exercise price assigned to the option was *lower* than the company's trading price on the real date the option was awarded.  This "backdating" would give the executive an instant paper profit (*i.e.*, put the option "in the money" from the outset).

40.    The companies did not tell shareholders the truth about how the exercise price was selected.  Instead, the same companies that had solicited proxies to sell shareholders on the idea that executive and shareholder interests were closely aligned lied about the selection process.  They told shareholders that the option was granted "at the money" or, more precisely, that the option's exercise price was not less than the company's stock market closing price on the date the option was granted.  This was not true.  The exercise prices were in fact *less* than (and in many cases a lot less than) the companies' closing stock market prices on the dates the options were truly granted.  Contrary to the companies' representations, therefore, the executive did not need to work to increase the company's stock price above the exercise price; through backdating, it was already there.  And the companies failed to disclose to shareholders that when the option is ultimately exercised, the executive pays the company less than he or she would have if the options had been priced properly under the terms of the applicable stock option plan.

41.    Backdating is not simply a dishonest way of cherry-picking favorable exercise prices to unjustly enrich executives.  It has a dramatic negative effect on a company's financial position in a different way.  The company not only receives less than it should have from option exercises, but backdating also artificially lowers the company's expenses thereby artificially boosting the company's operating and net income during the year in which

10

backdating occurs.  This is because the amount of the "instant paper gain" was required to be recognized as an expense on the company's books.  More specifically, for financial statements prior to January 1, 2006, under APB No. 25, "Accounting for Stock Issued to Employees" ("APB No. 25"), a provision of Generally Accepted Accounting Principles ("GAAP"), if the market price of the company's stock on the date of grant was higher than the exercise price of the options (*i.e.*, the option was granted "in the money" instead of "at the money"), companies are required to recognize the difference as an expense.  Failure to recognize such expense means that the operating and net income figures the company reports to shareholders are falsely inflated.

42.     In addition, backdating can cause negative tax consequences.  Section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"), generally disallows a public company's tax deduction for compensation to executive officers in excess of $1 million in any tax year.  Compensation that qualifies as "performance-based compensation" is excluded from the $1 million deductibility cap and, therefore, remains fully deductible by the company that pays it.  To qualify as "performance based" within the meaning of Section 162(m), options must be granted with an exercise price of not less than 100% of the fair market value of the common stock on the date of the grant.  Failure to issue stock options "at the money," therefore, can cause a company to lose the tax deduction that would otherwise be available under Section 162(m).

43.     While the *Journal* article identified numerous technology companies that appeared to engage in the practice of backdating, Apple was not one of them.  But, the *Journal* article triggered a widespread investigation by the Department of Justice, SEC and Internal Revenue Service that is now focused on more than 140 companies that reportedly engaged in the backdating of options.  Apple is now the subject of one such investigation, and has admitted that it engaged in a widespread practice of improperly backdating stock options.

**C.     Apple Admits To Backdating**

44.     Despite the *Journal* article and knowledge of its long history of backdating, Apple initially remained silent.  In fact, just five days prior to the revelations in the March 18

**CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

*Journal* article, Apple had distributed (on March 13, 2006) its 2006 proxy statement seeking reelection of six directors who now have been identified as being involved in the Company's backdating practices.  Forty-five days later, Apple held its annual meeting, knowing that shareholders would cast ballots for directors ignorant of their involvement with backdating. Rather than come clean, Apple never said a word.

45.     Then, on June 29, 2006, more than three months after the *Journal* article and after more than a decade of concealing backdating practices, Apple issued a press release announcing that an internal investigation had uncovered "irregularities" related to the issuance of stock option grants.

46.     On August 3, 2006, Apple announced that:  (a) it found "additional evidence of irregularities" in its accounting practices; (b) it would likely need to restate its earnings as the result of failing to properly record compensation expenses relating to option grants; and (c) the market should no longer rely on the Company's financial statements or earnings releases from September 29, 2002 going forward.

47.     On October 4, 2006, Apple announced that its continuing investigation "raised serious concerns regarding the actions of two former officers in connection with the accounting, recording and reporting of stock option grants" and that "Apple CEO Steve Jobs was *aware* that favorable grant dates had been selected."  (Emphasis added.)  According to subsequent press reports, defendant Fred Anderson, the Company's former Chief Financial Officer and a director since 2004 who was forced to resign his directorship effective September 30, 2006, and Nancy Heinen, the Company's former General Counsel and Secretary who left mysteriously and without announcement by Apple in May 2006, are the officers referenced in the October 4th press release.

**D.     Apple Restates Its Financial Results**

48.     In its Form 10-K for the fiscal year ended September 30, 2006 (filed with the SEC on December 29, 2006) (the "2006 Annual Report"), Apple announced the results of the internal investigation that had continued since the October 4th announcement of the investigation's interim findings.  Apple also restated certain financial results.

**CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

49.     The 2006 Annual Report discloses that Apple's outside counsel and a team of forensic accountants examined the circumstances surrounding stock option grants made between October 1996 and January 2003.  (The investigation examined some unidentified grants after January 2003 and "sampled" certain unidentified grants between 1994 and 1997, but failed to examine any grants made during 1993.)

50.     The results of this investigation depict a startling picture of corporate abuse and a flagrant disregard for the central tenet on which the federal proxy solicitation laws are based - - telling shareholders the whole truth about matters on which they are asked to vote.

51.     First, the 2006 Annual Report states that stock option:

grant dates were *intentionally* selected in order to obtain favorable exercise prices. The terms of these and certain other grants…were finalized *after* the originally assigned grant dates.

(Emphasis added)  In other words, options were intentionally backdated.

52.      Second, the 2006 Annual Report admits that the first instance of backdating that was concealed from shareholders occurred almost ten years ago on December 29, 1997 and that since then at least 6,428 stock option grants occurring on forty-two separate dates were backdated.  These 6,428 instances of backdating resulted in "instant paper profits" for executives that, according to the investigation, required Apple to recognize stock-based compensation expense of $105 million and $84 million on pre-tax and after-tax bases, respectively.

53.     As a consequence, Apple restated:  (a) its consolidated balance sheet as of September 24, 2005, and the related consolidated statement of operations, shareholders' equity, and cash flows for each of the fiscal years ended September 24, 2005 and September 24, 2004, and each of the quarters in 2005; and (b) "Selected Consolidated Financial Data" in Item 6 for the fiscal years ended September 2005, 2004, 2003 and 2002, and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 for the fiscal years ended September 24, 2005 and September 25, 2004.

54.     Third, whereas Apple previously announced in an October 4, 2006 press release that CEO Jobs was merely "aware" of backdating, the investigation revealed that he actually

13

**recommended** backdating options.  While disturbing, this conduct is consistent with Jobs' actions as a director at Pixar Animation Studios ("Pixar"), a company he co-founded in 1986. As stated in a February 9, 2007 article in the *Journal*, in or about March 2001, "Jobs helped negotiate an employment contract with a top film director that included a large stock-options grant with an especially well-timed date, according to a person familiar with the matter."  The one million share options grant, which was part of an employment contract with the director that Jobs signed in his then-capacity as Pixar's Chairman and CEO, "carried the lowest share price of the previous year – on a date more than three months before the employment contract was actually signed."  The contract was signed by Jobs on March 21, 2001, but the options carried an exercise price from December 6th of the prior year.  Pixar's shares had risen approximately 24% during the period from December 6th to March 20th.  (Pixar has since been acquired by Walt Disney Co.)  Thus, according to the *Journal* article, Jobs had participated in awarding the director an instant paper profit of $6.4 million.

55.     Fourth, and clearly the most troubling aspect of the abuses, the investigation revealed that at least one of the 6,428 instances of admitted backdating by Apple involved a massive 7.5 million option share grant (not split-adjusted) to CEO Jobs that was supposedly "approved" at a board meeting that Apple now admits never occurred.  In Apple's proxy statement dated March 21, 2002, Apple's shareholders had been told that:

> *in October 2001* the Compensation Committee recommended and *the Board approved* granting Mr. Jobs options to purchase 7,500,000 shares…in order to provide him with an incentive to continue to serve as the Company's CEO and maximize shareholder value.  The options were granted at an exercise price of $18.30, which is equal to the fair market value on the date of grant.

(Emphasis added.)

56.     This statement was false – the Board did no such thing.  As stated in the 2006 Annual Report:

> the approval for the grant was improperly recorded as occurring at a special Board meeting on October 19, 2001.  **Such a special Board meeting did not occur.**

(Emphasis added)

**CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

57.     The meeting not only never took place, but Apple took affirmative steps to hide the truth.  Former General Counsel Heinen directed a former Apple in-house lawyer to falsify documents and cover up the hoax.  As reported in a January 12, 2007 *Journal* article, when the bogus paper trail for Jobs' 2001 backdated grant was created, the Apple lawyer was acting at the direction of Heinen.  The *Journal* article states:

> People familiar with the matter say the false documentation was created by an Apple attorney named Wendy Howell, whom the company quietly dismissed last month.  Ms. Howell contends that Apple's general counsel at the time, Nancy Heinen, instructed her to create the false documentation, these people say.  Thomas Carlucci, Ms. Howell's attorney, said that while at Apple Ms. Howell acted as instructed by Apple management….

58.     The actual grant date was December 18, 2001 which means the assigned exercise price should have been $21.01 -- Apple's December 18 closing price representing the fair market value of Apple's shares on the *true* date of grant.

59.     The net result of the pretense that the grant of these options was approved at an October 2001 board meeting is this -- CEO Jobs was given an "instant paper profit" in the amount of $20,325,000 (*i.e.*, $21.01 minus $18.30 multiplied times 7.5 million shares) that was never disclosed to shareholders.  A graphic display of how the exercise price for this grant was retroactively cherry-picked from almost two months' worth of Apple closing prices is set forth below.



15

60.     Incredibly, this was not the first time Apple misled its shareholders about CEO Jobs' receipt of backdated options.  Jobs received an even larger grant of 10 million options (not split-adjusted) in January 2000.  Apple's March 12, 2001 proxy statement informed shareholders that these options "were at an exercise price equal to the fair market value of [Apple's common stock] on the date of grant."   The proxy statement further asserted that the grant date was January 12, 2000, a date when Apple's stock price closed at $43.5938.  These statements were false.

61.     As Apple now admits, this grant was not "memorialized" until six days later on January 18, 2000.  What happened during this six-day period?  Apple's stock price ran up from $43.5938 to $51.97 - a jump of almost 20%.  Only then (on January 18, 2000) was board action taken to memorialize the grant.  But, the exercise price assigned was not the January 18 Apple closing price of $51.97; rather Jobs was given the much lower pre-run up closing price from six days earlier.  Since the actual grant date on which the award was memorialized was January 18, 2000, the assigned exercise price should have been $51.97 -- Apple's January 18 closing price representing the fair market value of Apple's shares on the *true* date of grant.

62.     The net result is that CEO Jobs was given an "instant paper profit" in the amount of $83,762,000 (*i.e.*, $51.97 minus $43.5938 multiplied times 10 million shares) that was never disclosed to shareholders.  A graph depicting the uncanny timing of this grant is set forth below.



CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)

63.     Misrepresentations to shareholders concerning CEO Jobs' stock-based compensation did not end with these two massive stock option grants in 2000 and 2001.  In exchange for these backdated options, Jobs received other compensation tainted by backdating.  In Apple's subsequent proxy statements for the years 2003, 2004 and 2005, Apple stated that in March 2003, CEO Jobs voluntarily cancelled these options and the Board instead awarded him ten million (split adjusted) shares of restricted stock.  (At today's prices, these shares carry a value in excess of $900 million.)  No mention was made, however, of the falsification of documents to cover up the phantom board meeting or that the options in exchange for which CEO Jobs received the restricted stock had been backdated.

64.     The Company claims in the 2006 Annual Report that Jobs failed to "appreciate the accounting implications" of backdating and that he did not "financially benefit" from backdated options because his massive option awards were subsequently cancelled.  These assertions are disingenuous at best.  Jobs, and his fellow directors, had an obligation to understand the proper accounting rules and, more importantly, year after year, falsely represented to shareholders in SEC filings that the Company was following them.  Jobs and his fellow directors knew, as any reasonable person would, that backdating options awards to executives and not telling shareholders the truth about it was cheating.

65.     It was, or should have been, obvious to the defendants that shareholders would consider the $104,087,000 in "instant paper profits" Jobs received from backdating important in deciding how to vote on executive compensation matters.  The fact that Jobs received restricted stock in exchange for these ill-gotten gains does not change the significance to shareholders because in exchange for the "instant paper profits," Jobs received an inflated amount of restricted stock that he would not have received had the cancelled options not been backdated.  An excerpt from a January 11, 2007 *Washington Post* article explains:

> [The restricted stock Jobs received in 2001] was worth $75 million at the time, nearly the same as the value of the options he relinquished, using a technique for calculating the value of investments popular with financial analysts and used by Apple.

Steve Dowling, Apple's director of corporate communications, said the 2003 transaction did not directly benefit Jobs because he could not sell the restricted shares until he had remained at Apple for another three years.

**Some investor advocates call that explanation disingenuous. "You are torturing the English language to say he did not benefit from the options," said Patrick McGurn, executive vice president of Institutional Shareholder Services. He certainly benefited from the grant because the grant was converted on a value-to-value basis**. McGurn and other analysts also said the amount of stock Jobs received appeared to be inflated because the value of his options was exaggerated, at least in the case of one grant, by improper backdating.

(Emphasis added.)

66. The January 11, 2007 *Washington Post* article further concluded that the backdated 2001 stock option grant alone resulted in Jobs receiving 630,000 more restricted shares in exchange for backdated options than he would have received had the options not been backdated. The article states:

In the case of the 2001 grant, for instance, the difference between the false October [grant] date and the December [grant] date, which Apple now says was the proper one, was worth about $5 million to Jobs when he traded the options in. Had the lower value been used in calculating the amount of stock he would get in return, he would have received 630,000 fewer shares. By the time he could sell them three years later, these shares would have been worth more than $40 million….

At more recent prices, these extra 630,000 shares have a value in excess of $50 million.

67. Today, Jobs reportedly holds only about half of these tainted restricted shares. On March 19, 2006 – just one day after publication of the *Journal* article disclosing the backdating issue -- Jobs sold 4,573,553 of his restricted shares at $64.66 for $295.7 million. The remaining 5,426,451 shares are currently worth in excess of $450 million.

**E.    Shareholders Have Suffered Substantial Injury**

68. The *Journal* article and subsequent fallout forced Apple to admit backdating. But for more than a decade prior to that time Apple repeatedly misled its shareholders about how stock options were priced. Beginning at least as early as 1995 and continuing through 2005, the Company's proxy statements and other filings stated in substance that its stock option plans were intended to align stockholder and employee interests. Consistent with that ostensible intention, the Company's proxy statements, annual reports and other SEC filings during this same time frame stated that the exercise price of stock options granted to its

18

employees was equal to the fair market value of the Company's common stock on the date the option was granted (or, with respect to pre-fiscal 1998 option grants, the trading day immediately preceding the date of grant).

69.     These statements were false and misleading and have resulted in substantial injuries to Plaintiffs.  During the relevant time, Apple's shareholders unwittingly voted to expand the ability of directors who had direct involvement with backdating to award backdated options and other types of executive compensation.  From 1995 through 2005, Apple sought shareholder approval for the creation and amendment of stock option and other executive compensation plans authorizing the reservation of over 200 million (split-adjusted) shares of stock for issuance to employees.  These shares represent almost 20% of Apple's outstanding common stock during that time period.  Shareholders would not have approved any of the matters on which they were asked to vote if they had known the truth about backdating.  The issuance of some or all of these 200 million (split-adjusted) shares, shareholder authorization for which was obtained through false and misleading proxy statements, caused or will in the future cause substantial dilution to shareholders' interests.

## F.     **Relief Sought**

70.     The Complaint asserts:  (a) class action claims for violation of Sections 14(a) and 20(a) of the Exchange Act based on materially false and misleading disclosures in and/or material omissions from Apple's proxy statement dated March 14, 2005 for the Company's annual meeting held on April 21, 2005 (the "Section 14(a) Class Claim"); and (b) class action claims for breaches of defendants' fiduciary duty of disclosure based on materially false and misleading disclosures in and/or material omissions from proxy statements, annual reports and registration statements distributed and/or filed with the SEC by the Company during the period from 1995 to 2005 (the "State Law Class Disclosure Claims").

71.     Pursuant to the Section 14(a) Class Claim and the State Law Class Disclosure Claims, Plaintiffs seek rescission of:  (a) the amendment to the Company's 2003 Employee Stock Option Plan (formerly known as the 1998 Executive Officer Stock Plan) (the "2003 ESOP") that increased the aggregate shares available thereunder by forty-nine million; and

(b) the amendment of the Employee Stock Purchase Plan ("ESPP") that increased the aggregate shares available by two million up to a total of seventy million shares because shareholder approval for such action was secured by the false and misleading proxy statement distributed by the Company for the 2005 annual meeting.  In the alternative, to the extent the additional forty-nine million shares under the 2003 ESOP and/or the additional two million shares authorized under the ESPP have actually been issued, Plaintiffs seek damages based on the dilution suffered by Plaintiffs to their shareholder interests.

72.     Pursuant to the State Law Class Disclosure Claims, Plaintiffs seek rescission of the amendment to the Company's 2003 ESOP that enabled broad-based grants to all employees and the amendment to the ESPP that increased the number of shares of common stock reserved for issuance thereunder by four million shares because shareholder approval for such amendments was secured by a false and misleading proxy statement dated March 24, 2003 distributed by the Company for the annual meeting held April 24, 2003.  In the alternative, to the extent these additional four million shares under the 2003 ESOP have actually been issued, Plaintiffs seek damages based on the dilution suffered by Plaintiffs to their shareholder interests.

73.     Pursuant to the State Law Class Disclosure Claims, Plaintiffs seek damages based on the dilution suffered by Plaintiffs to their shareholder interests caused by the authorization for issuance and/or subsequent issuance of more than 200 million (split-adjusted) shares of stock under Apple's stock option and other executive compensation plans (including the 2003 ESOP and the ESPP) approval for which was secured by false and misleading proxy solicitations from 1995 to 2005.  In the alternative, to the extent that some of these more than 200 million (split-adjusted) shares remain authorized but unissued, Plaintiffs seek rescission of the authorization of such shares.

74.     Pursuant to the Section 14(a) Class Claim and the State Law Class Disclosure Claims, Plaintiffs seek an accounting to determine, among other things:  (a) the identity of all current and former Apple employees who received stock option grants; (b) the dates on which options were truly granted and priced; (c) the exercise prices that were assigned to said

20

options; (d) the exercise prices that should have been assigned to said options had they been assigned on the actual date of grant instead of backdated; (e) when said options were exercised, if applicable, or when they are currently exerciseable; and (f) whether said options were exchanged for other forms of compensation.

**G.   Summary Of Disclosures Concerning The Company's Stock Option Plans**

75.     During the relevant time, the Company had numerous stock option and other executive compensation plans pursuant to which stock options and/or other executive compensation could be, and was, awarded to Apple executives.  In addition to the 2003 ESOP and the ESPP, those plans include, among others:  (a) the 1981 Stock Option Plan; (b) the 1986 Employee Incentive Stock Option Plan; (c) the 1987 Executive Long Term Stock Option Plan; (d) the 1990 Stock Option Plan (the "1990 Plan"); (e) the 1993 Restricted Stock Plan; (f) the 1997 Employee Stock Option Plan;(g) the 1997 Director Stock Option Plan; (h) the 1998 Executive Officer Stock Plan (the "1998 Plan"); and (i) the Senior Officers Restricted Performance Share Plan (the "Performance Share Plan").  As detailed further herein, these are the plans for which Apple reserved more than 200 million (split-adjusted) shares through the use of false and misleading proxy statements.

76.     Apple's fiscal years from 1993 through 1998 ended on the last Friday in September.  Thereafter, from 1999 to the current period, Apple's fiscal year has ended on the last Saturday in September.

77.     The salient terms of the applicable stock option plans referred to above indicated that prior to fiscal year 1998, the Company issued incentive stock options to employees at the fair market value of the Company's common stock on the trading day immediately preceding the date of grant.  And after fiscal year 1998, the Company issued incentive stock options to employees at the fair market value of the Company's common stock on the grant date.

78.     The Company's disclosures to shareholders were consistent with the salient terms of the stock option plans.  Accordingly:  (a) prior to fiscal year 1998, the Company's proxy statements stated that the exercise price of stock options granted to its employees was

equal to the fair market value of the Company's common stock on the trading day immediately preceding the date of grant;[2] and (b) after fiscal year 1998, the Company's proxy statements stated that the exercise price of stock options granted to its employees was equal to the fair market value of the Company's common stock on the grant date.

79.     The Company's annual reports on Form 10-K for fiscal years 1996 through 2005 stated that options may be granted at not less than the fair market value on the date of grant.[3]

80.     The Company's annual reports on Form 10-K for fiscal years 1996 through 2005 stated that the Company followed APB No. 25.

81.     The Company's proxy statements for fiscal years 1998 through 2002 stated that the Company intends that options granted under the Company's stock option plans be deductible under Section 162(m).

82.     The Company's annual reports on Form 10-K for fiscal years 1999 through 2001 stated that the Company intends that options granted under the Company's stock option plans be deductible under Section 162(m).

## H.    Apple's Backdated Option Grants

83.     From 1993 through 2001, as reported in the Company's proxy filings, the Company made options grants to at least the following executives:  (1) defendant Jobs; (2) defendant Anderson; (3) James J. Buckley, a holder of various Apple offices from January 1986 to May 1996 and President of Apple USA from January 1994 to May 1996; (4) Robert Calderoni, a Senior Vice President of Finance from June 1996 to November 1997; (5) Timothy D. Cook, the Company's current Chief Operating Officer; (6) Guerrino DeLuca, a Company

---

[2]     The Company's preliminary proxy statement dated December 22, 1997 states that on November 5, 1997, for administrative purposes, the board of directors amended Apple's stock option plans to provide that the "exercise price of options granted under such plans will be the fair market value based on the closing market value on the date of grant."

[3]     Although the administrative change to setting the exercise price on the date of the grant did not occur until November 5, 1997, as noted *infra*, the Company's annual reports for fiscal years 1996 and 1997 (unlike the Company's proxy statements) nevertheless stated that options may be granted at not less than the fair market value on the date of grant, instead of the business day immediately preceding the date of grant.

officer from 1992 to 1997; (7) Ian Diery, a Company officer from 1989 to April 1995 and the Computer Division's General Manager from July 1993 to April 1995; (8) G. Frederick Forsyth, a Company officer from June 1989 to February 1998 and a Senior Vice President of Worldwide Operations from June 1993 to February 1998; (9) Ronald B. Johnson, currently a Senior Vice President, Retail; (10) Mitchell Mandich, a Company officer from February 1997 to October 2000 and a Senior Vice President of Worldwide Sales from December 1997 to October 2000; (11) Jonathan Rubinstein, a Company officer from February 1997 to May 2006 and the Company's Senior Vice President of the iPod Division from May 2004 to March 2006; (12) Michael H. Spindler, a Company officer from 1980 to February 1996 and the Company's CEO from June 1993 to February 1996; and (13) Avadis Tevanian, Jr., a Company officer from February 1997 to March 2006 and the Company's Chief Software Technology Officer from July 2003 to March 2006.

84.     Option grants to the executive officers identified in the immediately preceding paragraph, as disclosed in the relevant proxy statements, are reflected in the table below:

| Option Recipient | Purported Grant Date[4] | Exercise Price[5] | Number of Options Granted |
|---|---|---|---|
| Jobs | 01/12/00 | $ 43.5938 | 20,000,000 |
|  | 10/19/01 | $   18.30 | 7,500,000 |
| Anderson | 04/01/96 | $   24.56 | 400,000 |
|  | 07/11/97[6] | $   13.25 | 500,000 |
|  | 08/05/97 | $   19.75 | 250,000 |
|  | 12/19/97[7] | $ 13.6875 | 250,000 |

[4]     The proxy statements from which the purported grant dates were derived state in substance that all options granted under the applicable stock option plans expire ten years from the date of grant.  The "Option Grants In Last Fiscal Year" table in the proxy statements, which specifies option grants that occurred during the fiscal year, provides an expiration date for each individual grant.  The reader of the proxy statement, therefore, is able to determine that the purported grant date was ten years prior to the stated expiration date.

[5]     Exercise prices and number of options granted are as listed in the proxy statement first reporting the option grant and, where applicable, reflect the Company's two-for-one stock split in June 2000.  Exercise prices and number of options granted do not reflect the Company's two-for-one stock split in February 2005.

[6]     The options granted to Anderson and others on July 11, 1997 were granted pursuant to the Company's "Exchange Program," under which certain "out of the money" or "underwater" options were "re-priced."

CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)

| Option Recipient | Purported Grant Date[4] | Exercise Price[5] | Number of Options Granted |
|---|---|---|---|
| Anderson (cont.) | 03/02/99 | $   34.625 | 475,000 |
| | 01/17/01 | $ 16.8125 | 1,000,000 |
| Buckley | 10/12/93 | $    23.75 | 15,000 |
| | 12/20/93 | $    29.50 | 30,000 |
| | 01/26/94 | $    33.875 | 20,000 |
| | 04/27/95 | $    38.25 | 200,000 |
| Calderoni | 08/05/97 | $    19.75 | 80,000 |
| Cook | 02/02/98 | $ 17.6875 | 700,000 |
| | 03/02/99 | $    34.625 | 300,000 |
| | 01/17/01 | $ 16.8125 | 1,000,000 |
| DeLuca | 07/11/97 | $    13.25 | 309,750 |
| | 08/05/97 | $    19.75 | 190,250 |
| Diery | 10/12/93 | $    23.75 | 40,000 |
| | 12/20/93 | $    29.50 | 90,000 |
| Eilers | 10/03/94 | $    33.69 | 200,000 |
| | 04/27/95 | $    38.25 | 60,000 |
| Forsyth | 04/27/95 | $    38.25 | 40,000 |
| Johnson | 12/14/99 | $ 47.4375 | 1,200,000 |
| Mandich | 12/19/97 | $ 13.6875 | 224,250 |
| | 12/29/97 | $    13.125 | 200,000 |
| | 03/02/99 | $    34.625 | 387,876 |
| Rubinstein | 07/11/97 | $    13.25 | 200,000 |
| | 08/05/97 | $    19.75 | 300,000 |
| | 12/19/97 | $ 13.6875 | 300,000 |
| | 03/02/99 | $    34.625 | 458,334 |
| | 01/17/01 | $ 16.8125 | 1,000,000 |
| Spindler | 10/13/93 | $    24.00 | 200,000 |
| Tevanian | 01/17/01 | $ 16.8125 | 1,000,000 |

85.     In a pattern that cannot be attributed to happenstance, each of the foregoing options were purportedly granted on dates that fell just after a sharp dip and just before a sizeable jump in Apple's stock price as demonstrated in the table below:

| Purported Grant Date | Exercise Price | Share Price Ten Business Days Before Grant Date | Share Price Ten Business Days After Grant Date | Percentage Gain In Stock Price Ten Business Days After Grant Date |
|---|---|---|---|---|
| 10/12/93 | $23.75 | $24.75 | $29.75 | 25.3% |
| 10/13/93 | $ 24.00 | $23.87 | $31.75 | 32.3% |
| 12/20/93 | $29.50 | $32.25 | $31.50 | 6.8% |
| 01/26/94 | $33.875 | $30.50 | $36.25 | 7.0% |
| 10/03/94 | $33.69 | $35.50 | $39.75 | 18.0% |
| 04/27/95 | $38.25 | $39.00 | $41.00 | 7.2% |

[7]     The options granted to Anderson and others on December 19, 1997 were granted pursuant to the Company's "Exchange Program," under which certain "out of the money" or "underwater" options were "re-priced."

CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)

| Purported Grant Date | Exercise Price | Share Price Ten Business Days Before Grant Date | Share Price Ten Business Days After Grant Date | Percentage Gain In Stock Price Ten Business Days After Grant Date |
|---|---|---|---|---|
| 04/01/96 | $24.56 | $26.12 | $25.87 | 5.3% |
| 07/11/97 | $13.25 | $14.69 | $16.25 | 22.6% |
| 08/05/97 | $19.75 | $16.56 | $24.44 | 23.7% |
| 12/19/97 | $13.6875 | $15.81 | $18.94 | 38.4% |
| 12/29/97 | $13.125 | $14.13 | $19.50 | 48.6% |
| 02/02/98 | $17.6875 | $18.81 | $19.62 | 10.9% |
| 03/02/99 | $34.625 | $38.31 | $35.50 | 2.5% |
| 12/14/99 | $47.4375 | $48.935 | $50.345 | 6.1% |
| 01/12/00 | $43.5938 | $50.345 | $55.00 | 26.2% |
| 01/17/01 | $16.8125 | $14.88 | $21.62 | 28.6% |
| 10/19/01 | $18.30 | $16.14 | $18.57 | 1.5% |

86.    As the Company has now admitted with respect to more than 6,000 stock option grants on forty-two separate dates, the purported grant date was *not* the true date on which the stock option grants were made.  Instead, the Stock Option Committee, the Compensation Committee or the full board of directors (for the grants to defendant Jobs and those grants applicable to the period from April 2000 to August 2001 when the full board of directors had responsibility for administering stock options) improperly backdated stock option grants.  And, during the period from April 2000 to August 2001 when the full board of directors had responsibility for administering options plans, the full board honored the exercise of backdated options previously awarded by the Compensation Committee or Stock Option Committee.

87.    Backdating improperly reduced the amounts option recipients needed to pay to acquire the Company's shares upon exercise of options or currently need to pay with respect to those options that are still outstanding.

88.    Based on the Company's admission of backdating in more than 6,000 instances on forty-two separate dates, there are clearly many more individuals who received backdated grants than those identified above.  Indeed, the Company's proxy statements reveal that during the period from 1993 through 2001, in addition to the option grants to acquire an aggregate 39,120,460 shares of Apple's common stock to the identified officers as reflected in the table above, options to acquire an additional 64,834,039 shares were made to numerous Company

25

1   employees other than those identified above.  In its restatement, however, except for option

2   grants to defendant Jobs, the Company has not provided the identity of individuals who

3   received backdated grants.  As a result, at this time, Plaintiffs' investigation has revealed only

4   the foregoing instances of backdating based on statistical analyses.  Many more instances of

5   backdating will be specifically identifiable with the benefit of proper discovery.

6   **I.     "Repricings"**

7        89.     Backdating sometimes did not have the desired effect because Apple's stock

8   price dropped and erased the instant paper profit that had been awarded to executives.  In at

9   least two cases, the Compensation Committee simply "repriced" the options downward.  In

10  other words, the "out of the money" or "underwater" options were cancelled and new options

11  with lower exercise prices were given to executives.  The Company's preliminary proxy

12  statement dated December 22, 1997, definitive proxy statement dated March 16, 1998 and

13  definitive proxy statement dated February 9, 1999 described the "repricings" but failed to alert

14  shareholders that some or all of the options that were "repriced" had initially been backdated.

15       90.     The preliminary proxy statement dated December 22, 1997 states that:  "Under

16  the Exchange Program, current employees of the Company were permitted to exchange all (but

17  not less than all) of their options for new options on a one-for-one basis with an exercise price

18  of $13.25, the fair market value of the Common Stock as determined under the 1990 Plan."

19  The December 22, 1997 preliminary proxy statement discloses that 19,629,231 options were

20  granted to all employees in fiscal 1997, including 7,866,155 options that were granted "in

21  exchange for the cancellation of the same number of outstanding options as of July 11, 1997 on

22  a one-for-one basis pursuant to the Exchange Program."  The March 16, 1998 proxy statement

23  contains similar language and states that six Apple executives participated in the Exchange

24  Program.

25       91.     The February 9, 1999 proxy statement states the Compensation Committee

26  approved a second round of "repricings" in December 1997 pursuant to which current

27  employees were permitted to exchange all (but not less than all) of their stock options with an

28  exercise price greater than $13.6875 for new stock options with an exercise price of $13.6875

26

which was the closing trading price of Apple's common stock on December 19, 1997.  The February 9, 1999 proxy statement discloses that six Apple officers participated and that there was an aggregate 13,879,349 options granted to all employees during fiscal year 1998, including 4,707,220 options cancelled under the Exchange Program.

92.     Aside from failing to disclose to shareholders that the "repriced" options were offered in exchange for backdated ones, the July 11, 1997 "repricing" was improperly timed to precede the release of positive news that the Company knew would cause Apple's stock price to increase after the option was issued.  Once again, therefore, executives secured nearly instantaneous paper profits.

93.     On July 11, 1997 several executives, including Anderson, Rubinstein and Tevanian, received "repriced" option grants with an exercise price of $13.25.  This exercise price was less than 25¢ shy of Apple's lowest trading price in the ten years prior to July 11, 1997, and Apple's share price has been above it ever since.

94.     Less than one month later, on August 5, 1997, several executives, including Anderson, Rubinstein and Tevanian, received options with an exercise price of $19.75.  The very next day, August 6, 1997, Apple made a market-moving announcement.  As reported in an August 25, 1997 *Business Week* article, the following transpired:

> Apple Computer Inc. may have long ago lost its magic, but co-founder Steven P. Jobs has surely kept his touch.  On Aug. 6, he bounded onto a stage before thousands of partisans at a Boston trade show and stunned the high-tech world with announcements that cast Apple in a brand-new light.
>
> With no official role at Apple other than "adviser," Jobs replaced most of its board with heavy hitters including himself, Oracle Corp. CEO Lawrence J. Ellison, and former IBM CFO Jerome B. York. And in a departure from Apple's solitary fight against the personal-computer masses, he announced a broad pact with archrival Microsoft Corp., which will invest $150 million in Apple and has pledged to write Mac programs for five years.

95.     The announcement of the Microsoft deal caused Apple's share price to soar from an August 5th close of $19.75 to an August 7th close of $29.19.  This represents a 47.8% "in the money" gain in two days.  It also represents a 120.3% "in the money" rise above the July 11, 1997 exercise price given to executives in the "repricing."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## VI.   FALSE AND MISLEADING STATEMENTS

96.    Apple solicited shareholder votes for the reelection of directors who were directly involved with backdating and shareholder approval for executive compensation matters pursuant to proxy statements containing false and misleading statements.    In considering these matters, shareholders relied on not only the false and misleading statements in the proxies themselves, but also on false and misleading financial statements and registration statements used to register shares of the Company's common stock that were issued to honor the exercise of backdated stock options.    These false and misleading proxy statements, financial statements and registration statements are described below.

**A.      Proxy Statements**

97.    The failure to disclose options backdating was a breach of the individual defendants' fiduciary duty of candor and rendered numerous disclosures materially misleading in violation of the securities laws, including the proxy rules.   Each and every violation of the SEC's proxy rules deprived shareholders of their right to cast an informed vote.

98.    From 1995 to 2006, the Company, with the knowledge, approval, participation, reckless disregard or negligence of each individual defendant (with respect to those disclosures made at a time when such defendant was a director of the Company), disseminated to shareholders and filed with the SEC annual proxy statements that contained material misstatements and omissions falling into four general categories:   (a) statements failing to disclose that the stated purpose of option grants by Apple – *i.e.*, aligning executive and shareholder interests – was significantly undermined because the option grants described in the proxies were backdated; (b) misstatements that the options granted were priced at the fair market value on the date of grant (or for pre-fiscal 1998 proxy statements, fair market value on the trading day immediately preceding the date of grant), when in fact they were backdated; (c) misstatements relating to the amount of compensation received by Apple executives during

the relevant time; and (d) misstatements (with respect to certain proxy statements) relating to the Company's intention to have executive stock options qualify for tax deductions under Section 162(m).

99.   The Company's proxy statements were distributed to shareholders in connection with the annual election of directors, as well as for shareholder approval of proposals offered by management, including numerous votes seeking approval of the authorization for issuance of shares to be used for executive compensation arrangements.  The relevant shareholder action sought with respect to each proxy statement is as follows:

| Proxy | Record Date | Meeting Date | Executive Compensation Plan | Shares (Not Split-Adjusted) Reserved For Issuance |
|--------|--------|--------|--------|--------|
| 1996 | 12/12/95 | 01/23/96 | Employee Stock Purchase Plan | 1,500,000 |
| 1996 | 12/12/95 | 01/23/96 | 1990 Stock Option Plan | 4,200,000 |
| 1997 | 12/09/96 | 02/05/97 | Employee Stock Purchase Plan | 3,500,000 |
| 1997 | 12/09/96 | 02/05/97 | 1990 Stock Option Plan | 1,000,000 |
| 1997 | 12/09/96 | 02/05/97 | Senior Officers Restricted Performance Share Plan | 2,000,000 |
| 1998 | 02/23/98 | 04/22/98 | 1997 Director Stock Option Plan | 430,000 |
| 1998 | 02/23/98 | 04/22/98 | 1998 Executive Officer Stock Plan | 17,000,000 |
| 2000 | 02/22/00 | 04/20/00 | 1998 Executive Officer Stock Plan | 2,000,000 |
| 2001 | 02/21/01 | 04/19/01 | 1998 Executive Officer Stock Plan | 5,000,000 |
| 2002 | 03/01/02 | 04/24/02 | 1998 Executive Officer Stock Plan | 5,000,000 |
| 2003 | 03/04/03 | 04/23/03 | Employee Stock Purchase Plan | 4,000,000 |
| 2005 | 03/01/05 | 04/21/05 | Employee Stock Purchase Plan | 2,000,000 |
| 2005 | 03/01/05 | 04/21/05 | 2003 Employee Stock Option Plan | 49,000,000 |
|  |  |  | **TOTAL** | 96,630,000 |

100.   After adjustments for stock splits, the total number of shares authorized for issuance through the use of false and misleading proxy statements is 205,520,000 shares.

101.   The materially misleading statements and omissions in each of these proxy statements are set forth below.  (Emphasis in passages excerpted from the proxy statements described below is supplied and does not appear in the original.)

29

1    **1.    1996 Proxy**

2        102.    Apple's definitive proxy statement dated December 19, 1995 filed with the SEC

3    on Form 14A for the annual meeting to be held January 23, 1996 (the "1996 Proxy") was

4    materially false and misleading.  (All of the Former Director Defendants except Chang and

5    Ellison were directors at this time.)  With respect to shareholders of record as of December 12,

6    1995, the 1996 Proxy solicited shareholder votes to, among other things:  (a) "approve an

7    amendment to the [ESPP] to increase the number of shares…reserved for issuance thereunder

8    by 1.5 million shares"; and (b) "approve an amendment to the [Company's 1990 Plan] to

9    increase the number of shares…reserved for issuance thereunder by 4.2 million shares."

10        103.    The 1996 Proxy stated that "[o]ptions are granted under the 1990 Plan at an

11    exercise price equal to fair market value of the Company's Common Stock on the business day

12    immediately preceding the date of the grant" and, in a footnote to a chart depicting option

13    grants during the fiscal year, "[a]ll options were granted at an exercise price equal to fair

14    market value based on the closing market value of the Company's Common Stock on the

15    Nasdaq National Market on the business day immediately preceding the date of grant."  These

16    statements are false and misleading because they fail to disclose the backdating scheme and

17    that the exercise price in fact was not the fair market value of the Company's common stock on

18    the trading day immediately preceding the date of grant.

19        104.    In addition, the Summary Compensation Table from the 1996 Proxy materially

20    misstated the compensation of, and failed to disclose the illegal compensation received from

21    the Company by, Spindler, Diery, Buckley and Eilers in fiscal years 1993 through 1995 as a

22    result of their receipt of backdated stock options at less than fair market value on the trading

23    day immediately preceding the date of grant in fiscal years 1993, 1994 and/or 1995.

24        105.    Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the

25    Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned

26    by    the    named    executive    officer    during    the    fiscal    year    covered    .    ."

27    (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and

28    (B) further provide that the following items be disclosed in the Summary Compensation Table:

30

(i)     For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

(ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii)   The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the disclosure of the additional compensation received as a result of the backdated options.

106.   Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 1995 were backdated.

107.   A shareholder who knew that Apple backdated options (thereby providing not only improper compensation to Apple employees but also artificially inflating net income) and/or the other facts set forth herein would not have voted in favor of expanding Apple's ability to award stock options or other executive compensation sought in the 1996 Proxy.

## 2.   1997 Proxy

108.   Apple's definitive proxy statement dated December 25, 1996 filed with the SEC on Form 14A for the annual meeting to be held February 5, 1997 (the "1997 Proxy") was materially false and misleading.  (All of the Former Director Defendants except Crisp, Ellison, and Hintz were directors at this time.)  With respect to shareholders of record as of December 9, 1996, the 1997 Proxy solicited shareholder votes to, among other things:  (a) approve an amendment to the ESPP to increase the number of shares reserved for issuance thereunder by 3.5 million shares; (b) approve an amendment to increase the number of shares reserved for

1  issuance under the 1990 Plan by one million shares; and (c) approve the Performance Share

2  Plan for executive officers, which plan provided for the issuance of up to two million shares of

3  common stock.

4      109.   The 1997 Proxy stated:

5      The Company's executive compensation programs are designed to use Company
       performance, individual executive performance and increasing stockholder value
6      over time as determinants in establishing levels of executive compensation.
       These design principles are **intended to motivate executive officers** to improve
7      the financial position of the Company, hold executives accountable for the
       performance of the organizations for which they are responsible and to attract key
8      executives into the service of the Company.

9      110.   This statement is misleading because it fails to disclose the instant paper profits

10  being received by executives from backdating.  Such profits may not motivate executives to

11  improve the financial position of the Company because an executive does not necessarily need

12  to work to improve the financial position of the Company to gain from the award.  Unlike for

13  shareholders, profit from backdated stock option awards is built-in from the outset.

14     111.   The 1997 Proxy stated, in a footnote to a chart depicting option grants during

15  the fiscal year, that "[a]ll options were granted at an exercise price equal to fair market value

16  based on the closing market value of Common Stock on the Nasdaq National Market on the

17  business day immediately preceding the date of grant."  This statement is false and misleading

18  because it fails to disclose the backdating scheme and that the exercise price in fact was not the

19  fair market value of the Company's common stock on the trading day immediately preceding

20  the date of grant.

21     112.   In addition, the Summary Compensation Table from the 1997 Proxy materially

22  misstated the compensation of, and failed to disclose the illegal compensation received from

23  the Company by, Spindler in fiscal years 1994 and 1995 and Anderson in fiscal year 1996 as a

24  result of their receipt of backdated stock options at less than fair market value on the trading

25  day immediately preceding the date of grant in fiscal years 1994, 1995 and/or 1996.

26     113.   Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the

27  Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned

28  by  the  named  executive  officer  during  the  fiscal  year  covered  .  .  ."

(17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

    (i)    For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

    (ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

    (iii)    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)  In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

114.  Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 1996 were backdated.

115.  A shareholder who knew that Apple backdated options (thereby providing not only improper compensation to Apple employees but also artificially inflating net income) and/or the other facts set forth herein would not have voted in favor of expanding Apple's ability to award stock options or other executive compensation sought in the 1997 Proxy.

**3.    1998 Proxy**

116.  Apple's definitive proxy statement dated March 16, 1998 filed with the SEC on Form 14A for the annual meeting to be held April 22, 1998 (the "1998 Proxy") was materially false and misleading.  (Defendants Jobs, Chang, Woolard, Ellison, Campbell and York were directors at this time.)  With respect to shareholders of record as of February 23, 1998, the 1998 Proxy solicited shareholder votes to, among other things:  (a) "approve the 1997 Director Stock Option Plan which provid[ed] for the issuance of up to 400,000 shares of…common stock;" (b) approve the grant of 15,000 stock options each to defendants Chang and Wollard;

(c) approve the reservation of 430,000 shares of common stock for issuance under the 1997 Director Stock Option Plan; and (d) approve the 1998 Plan and the reservation of 17 million shares for issuance thereunder.

117.    The 1998 Proxy stated:

> **The Company's executive compensation program utilizes** Company performance, individual performance and **an increase in stockholder value over time as determinants of executive pay levels**.  These principles are **intended to motivate executive officers** to improve the financial position of the Company, to hold executives accountable for the performance of the organizations for which they are responsible, to attract key executives into the service of the Company and **to create value for the Company's shareholders**.

118.    This statement is misleading because it fails to disclose the instant paper profits being received by executives from backdating.  An increase in stockholder value over time cannot be a determinant of executive pay levels where instant paper profits from stock options are built-in at the time of the award.  Such profits may not motivate executives to improve the financial position of the Company because an executive does not necessarily need to work to improve the financial position of the Company to gain from the award.   Unlike for shareholders, profit from backdated stock option awards is built-in from the outset.

119.    The 1998 Proxy stated "[d]uring fiscal year 1997, fourteen executive officers of the Company received new option grants under the 1990 Plan.  Options are granted under the 1990 Plan at an exercise price equal to the fair market value of the Common Stock…."[8] and, in a footnote to a chart depicting option grants during the fiscal year, "[a]ll options were granted at an exercise price equal to fair market value based on the closing market value of  Common Stock on the Nasdaq National Market on the trading day immediately preceding the date of grant.  For administrative purposes, the Board on November 5, 1997 amended the Company's stock option plans to provide that the exercise price of options granted under such plans will be the fair market value based on the closing market value on the date of grant."  These statements are false and misleading because they fail to disclose the backdating scheme and that the exercise price in fact was not the fair market value of the Company's common stock on either

---

[8]    This is the statement as it appears in the proxy statement.  Apparently the words "on the date of grant" were inadvertently omitted.

CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)

the trading day immediately preceding the date of grant or the fair market value on the date of grant.

120.    In addition, the Summary Compensation Table from the 1998 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Anderson in fiscal years 1996 and 1997 and Calderoni, DeLuca and Rubinstein in fiscal year 1997 as a result of their receipt of backdated stock options at less than fair market value on either the date of grant or the trading day immediately preceding the date of grant.

121.    Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered  .  .  ." (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

(i)     For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

(ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii)   The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount in available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)    In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

122.    Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal 1997 were backdated.

**CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

123.   Finally, the 1998 Proxy stated that the "Company intends that options granted under the 1990 Plan and any payments made or stock issued under the Performance Share Plan be deductible by the Company under Section 162(m)."   Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."   To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant.   Thus, a company's "at the money" stock option expenses are generally tax deductible even though an executive is paid more than $1 million.   The Company's statements of an intention to have options be deductible under Section 162(m) were false and misleading because certain options were backdated and, as a result, expense incurred with respect to such options could not have been properly deductible under Section 162(m).

124.   A shareholder who knew that Apple backdated options (thereby providing not only improper compensation to Apple employees but also artificially inflating net income) and/or the other facts set forth herein would not have voted in favor of expanding Apple's ability to award stock options or other executive compensation sought in the 1998 Proxy.

**4.      2000 Proxy**

125.   Apple's definitive proxy statement dated March 6, 2000 filed with the SEC on Form 14A for the annual meeting to be held April 20, 2000 (the "2000 Proxy") was materially false and misleading.   (Defendants Jobs, Campbell, Chang, Drexler, Ellison and York were directors at this time.)   With respect to shareholders of record as of February 22, 2000, the 2000 Proxy solicited shareholder votes to, among other things, approve an amendment to the 1998 Plan to increase the number of shares reserved for issuance thereunder by two million shares.

126.   The 2000 Proxy stated:

**The Company's executive compensation program utilizes** Company performance, individual performance and an **increase in stockholder value over time as determinants of executive pay levels**.   These principles are **intended to motivate executive officers** to improve the financial position of the Company, to

36

hold executives accountable for the performance of the organizations for which they are responsible, to attract key executives into the service of the Company and **to create value for the Company's shareholders**.

127.    This statement is misleading because it fails to disclose the instant paper profits being received by executives from backdating.  An increase in stockholder value over time cannot be a determinant of executive pay levels where instant paper profits from stock options are built-in at the time of the award.  Such profits may not motivate executives to improve the financial position of the Company because an executive does not necessarily need to work to improve the financial position of the Company to gain from the award.   Unlike for shareholders, profit from backdated stock option awards is built-in from the outset.

128.    The 2000 Proxy stated that "[d]uring fiscal year 1999, all of the executive officers  of the Company received new option grants under the 1998 Plan.  The options granted under the 1998 Plan were at an exercise price equal to the fair market value of the Common Stock on the date of grant…." and, in a footnote to a chart depicting option grants during the fiscal year, "[a]ll options were granted at an exercise price equal to fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of grant."  These statements are false and misleading because they fail to disclose the backdating scheme and that the exercise price in fact was not the fair market value of the Company's common stock on the date of grant.

129.    In addition, the Summary Compensation Table from the 2000 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Anderson in fiscal years 1997 and 1999, Mandich and Rubinstein in fiscal years 1997 and 1999 and Cook in fiscal years 1998 and 1999 as a result of their receipt of backdated stock options at less than fair market value on the date of grant.

130.    Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by   the   named   executive   officer   during   the   fiscal   year   covered   .   .   ."

(17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

(i)     For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

(ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii)   The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading absent the disclosure of the additional compensation received as a result of the backdated options.

131.    Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 1999 were backdated.

132.    Finally, the 2000 Proxy stated that the "Company intends that options granted under the Company's stock option plans be deductible by the Company under Section 162(m)."   Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."   To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant.   Thus, a company's "at the money" stock option expenses are generally tax deductible even though an executive is paid more than $1 million.   The Company's statements of an intention to have options be deductible under Section 162(m) were false and misleading because certain options were backdated and, as a result, expense incurred with respect to such options could not have been properly deductible under Section 162(m).

38

133.    A shareholder who knew that Apple backdated options (thereby providing not only improper compensation to Apple employees but also artificially inflating net income) and/or the other facts set forth herein would not have voted in favor of expanding Apple's ability to award stock options or other executive compensation sought in the 2000 Proxy.

**5.      2001 Proxy**

134.    Apple's definitive proxy statement dated March 12, 2001 filed with the SEC on Form 14A for the annual meeting to be held April 19, 2001 (the "2001 Proxy") was materially false and misleading.  (Defendants Jobs, Campbell, Chang, Drexler, Ellison, Levinson and York were directors at this time.)  With respect to shareholders of record as of February 21, 2001, the 2001 Proxy solicited shareholder votes to, among other things, approve an amendment to the 1998 Plan to increase the number of shares reserved for issuance thereunder by 5 million shares.

135.    The 2001 Proxy stated:

> **The Company's executive compensation program focuses on** Company performance, individual performance and **increases in stockholder value over time as determinants of executive pay levels**.  These principles are **intended to motivate executive officers** to improve the financial position of the Company, to hold executives accountable for the performance of the organizations for which they are responsible, to attract key executives into the service of the Company and **to create value for the Company's shareholders**.

136.    This statement is misleading because it fails to disclose the instant paper profits being received by executives from backdating.  An increase in stockholder value over time cannot be a determinant of executive pay levels where instant paper profits from stock options are built-in at the time of the award.  Such profits may not motivate executives to improve the financial position of the Company because an executive does not necessarily need to work to improve the financial position of the Company to gain from the award. Unlike for shareholders, profit from backdated stock option awards is built-in from the outset.

137.    The 2001 Proxy stated that "[d]uring fiscal year 2000, options were granted under the 1998 Plan to Messrs. Jobs [and] Johnson…and Ms. Heinen.  The options granted under the 1998 Plan were at an exercise price equal to the fair market value of the Common Stock on the date of grant…." and, in a footnote to a chart depicting option grants during the

39

fiscal year, "[a]ll options were granted at an exercise price equal to fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of grant." These statements are false and misleading because they fail to disclose the backdating scheme and that the exercise price in fact was not the fair market value of the Company's common stock on the date of grant.

138. The 2001 Proxy stated that Jobs received a grant of 10 million (not split-adjusted) options in January 2000 "at an exercise price equal to the fair market value based on the closing market value of Common Stock on the Nasdaq National market on the date of grant." The 2001 Proxy further disclosed that the grant date was January 12, 2000, a date when Apple's stock price closed at $43.5938 and, therefore, the exercise price assigned to the award was $43.5938. These statements were false.

139. As Apple has now admitted, this grant was not memorialized until six days after January 12, 2000. During that time, Apple's stock price ran up from $43.5938 to $51.97 - a jump of almost 20%. Only then (on January 18, 2000) was board action taken to memorialize the grant. Thus, the exercise price assigned to the option grant should have been the January 18 Apple closing price of $51.97 rather than the $43.5938 that was falsely disclosed in the 2001 Proxy. The net result is that CEO Jobs was given an "instant paper profit" in the amount of $83,762,000 (*i.e.*, $51.97 minus $43.5938 multiplied times 10 million shares) that was never disclosed to shareholders.

140. In addition, the Summary Compensation Table from the 2001 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal year 2000, Anderson in fiscal year 1999, Johnson in fiscal year 2000 and Mandich and Rubinstein in fiscal year 1999 as a result of their receipt of backdated stock options at less than fair market value.

141. Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered . . ." (17 C.F.R. § 229.402(b)(2)(iii)(B)) Additionally, the Instructions to Item 402(b)(2)(iii)(A) and

40

(B) further provide that the following items be disclosed in the Summary Compensation Table:

(i)     For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

(ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii)   The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

142.    Further, the Option Grants in Last Fiscal Year Table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 2000 were backdated.

143.    Finally, the 2001 Proxy stated that the "Company intends that options granted under the Company's stock option plans be deductible by the Company under Section 162(m)."   Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."   To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant.   Thus, a company's "at the money" stock option expenses are generally tax deductible even though an executive is paid more than $1 million.   The Company's statements of an intention to have options be deductible under Section 162(m) were false and misleading because certain options were backdated and, as a result, expense incurred with respect to such options could not have been properly deductible under Section 162(m).

144.    A shareholder who knew that Apple backdated options (thereby providing not only improper compensation to Apple employees but also artificially inflating net income)

41

1    and/or the other facts set forth herein would not have voted in favor of expanding Apple's

2    ability to award stock options or other executive compensation sought in the 2001 Proxy.

3        **6.      2002 Proxy**

4        145.    Apple's definitive proxy statement dated March 21, 2002 filed with the SEC on

5    Form 14A for the annual meeting to be held April 24, 2002 (the "2002 Proxy") was materially

6    false and misleading.  (All of the Director Defendants and Ellison were directors at this time.)

7    With respect to shareholders of record as of March 1, 2002, the 2002 Proxy solicited

8    shareholder votes to, among other things, approve an amendment to the 1998 Plan to increase

9    the number of shares reserved for issuance thereunder by 5 million shares.

10       146.    The 2002 Proxy stated:

11       **The Company's executive compensation program focuses on** Company
         performance, individual performance and **increases in stockholder value over**
12       **time as determinants of executive pay levels**.  These principles are **intended to**
         **motivate executive officers** to improve the financial position of the Company, to
13       hold executives accountable for the performance of the organizations for which
         they are responsible, to attract key executives into the service of the Company and
14       **to create value for the Company's shareholders**.

15       147.    This statement is misleading because it fails to disclose the instant paper profits

16   being received by executives from backdating.  An increase in stockholder value over time

17   cannot be a determinant of executive pay levels where instant paper profits from stock options

18   are built-in at the time of the award.  Such profits may not motivate executives to improve the

19   financial position of the Company because an executive does not necessarily need to work to

20   improve the financial position of the Company to gain from the award.   Unlike for

21   shareholders, profit from backdated stock option awards is built-in from the outset.

22       148.    The 2002 Proxy stated that "[d]uring fiscal year 2001, all of the Company's

23   executive officers, excluding Mr. Jobs, received stock option grants under the 1998 Plan….

24   The options granted under the 1998 Plan were at an exercise price equal to the fair market

25   value of the Common Stock on the date of grant…." and, in a footnote to a chart depicting

26   option grants during the fiscal year, "[a]ll options were granted at an exercise price equal to the

27   fair market value based on the closing market value of Common Stock on the Nasdaq National

28   Market on the date of grant."  These statements are false and misleading because they fail to

42

CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)

disclose the backdating scheme and that the exercise price in fact was not the fair market value of the Company's common stock on the date of grant.

149.    The 2002 Proxy disclosed that:

> **in October 2001** the Compensation Committee recommended and **the Board approved** granting Mr. Jobs options to purchase 7,500,000 shares…in order to provide him with an incentive to continue to serve as the Company's CEO and maximize shareholder value.  The options were granted at an exercise price of $18.30, which is equal to the fair market value…on the date of grant.

150.    Apple has now admitted that this statement was false because such a Board meeting did not occur. The true grant date was December 18, 2001 which means the assigned exercise price should have been $21.01 -- Apple's December 18 closing price representing the fair market value of Apple's shares on the true date of grant.  The net result of the pretense that the grant of these options was approved at an October 2001 board meeting is CEO Jobs was given an "instant paper profit" in the amount of $20,325,000 (*i.e.*, $21.01 minus $18.30 multiplied times 7.5 million shares) that was never disclosed to shareholders.

151.    In addition, the Summary Compensation Table from the 2002 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal year 2000, Anderson, Cook and Rubinstein in fiscal years 1999 and 2001 and Tevanian in fiscal year 2001 as a result of their receipt of backdated stock options at less than fair market value on the date of grant.

152.    Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered . . ." (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

> (i)     For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

> (ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

> (iii)   The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise),

43

and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

153.   Further, the Option Grants in Last Fiscal Year Table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 2001 were backdated.

154.   Finally, the 2002 Proxy stated that the "Company intends that options granted under the Company's stock option plans be deductible by the Company under Section 162(m)."   Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."   To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant.   Thus, a company's "at the money" stock option expenses are generally tax deductible even though an executive is paid more than $1 million.   The Company's statements of an intention to have options be deductible under Section 162(m) were false and misleading because certain options were backdated and, as a result, expense incurred with respect to such options could not have been properly deductible under Section 162(m).

155.   A shareholder who knew that Apple backdated options (thereby providing not only improper compensation to Apple employees but also artificially inflating net income) and/or the other facts set forth herein would not have voted in favor of expanding Apple's ability to award stock options or other executive compensation sought in the 2002 Proxy.

### 7.   **2003 Proxy**

156.   Apple's definitive statement dated March 24, 2003 filed with the SEC on Form 14A for the annual meeting to be held April 24, 2003 (the "2003 Proxy") was materially false and misleading.   (All of the Director Defendants were directors at this time.)   With respect to

44

shareholders of record as of March 4, 2003, the 2003 Proxy solicited shareholder votes to, among other things:  (a) "approve an amendment to the 1998 Executive Officer Stock Plan to allow broad-based grants to all employees"; and (b) "approve an amendment to the [ESPP] to increase the number of shares of Common Stock reserved for issuance thereunder by 4 [million] shares."

157.    The 2003 Proxy stated:

The goal of the [Compensation] Committee is to align compensation with Company performance….

\*   \*   \*

The Committee believes that a substantial portion of an executive officer's compensation **should be closely aligned with Company performance**.

\*   \*   \*

The Committee believes that the granting of stock options is an important method of rewarding and motivating employees **by aligning the interests of the employee with those of the shareholders. Stock options have value for an employee only if the Company's stock price increases above the exercise price of the option** and the employee remains employed by the Company for the duration of the vesting period.

158.    These statements are false and misleading because they fail to disclose the instant paper profits being received by executives from backdating.  Contrary to the statement above, backdated stock options that are "in the money" from the outset do have immediate value for an employee; no increases of the Company's stock price are necessary.  Such instant paper profits do not align executive and shareholder interests because only the executive receiving the backdated option, not the shareholder who purchased in the open market at fair market value, has received a built-in paper profit from the outset.

159.    The 2003 Proxy stated that "[i]n fiscal year 2002…[t]he Committee made stock option grants to…Mr. Jobs…in connection with [a] performance evaluation[,]" "[t]he options granted under the 1998 Plan were at an exercise price equal to the fair market value of the Common Stock on the date of grant…." and, in a footnote to a chart depicting the option  grant to Jobs during the fiscal year, "[a]ll options were granted at an exercise price equal to the fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of grant."  These statements are false and misleading because they fail to

disclose the backdating scheme and that the exercise price in fact was not the fair market value of the Company's common stock on the date of grant.

160.    As with the 2002 Proxy, the 2003 Proxy falsely stated:

**in October 2001** the Compensation Committee recommended and **the Board approved**, granting Mr. Jobs options to purchase 7,500,000 [not split-adjusted] shares…in order to provide him with an incentive to continue to serve as the Company's CEO and maximize shareholder value.  The options were granted at an exercise price of $18.30, which was equal to the fair market value of the common stock on the date of grant.

161.    Apple has now admitted that this statement was false because such a Board meeting did not occur. The true grant date was December 18, 2001 which means the assigned exercise price should have been $21.01 -- Apple's December 18 closing price representing the fair market value of Apple's shares on the true date of grant.  The net result of the pretense that the grant of these options was approved at an October 2001 board meeting is CEO Jobs was given an "instant paper profit" in the amount of $20,325,000 (*i.e.*, $21.01 minus $18.30 multiplied times 7.5 million shares) that was never disclosed to shareholders.

162.    Unlike the 2002 Proxy, however, the 2003 Proxy goes on to state:

In March 2003, Mr. Jobs voluntarily cancelled all of his outstanding options, excluding those granted to him in his capacity as a director….In keeping with its philosophy to relate compensation to building shareholder value, **in exchange for his cancelled options**, the Board approved a new retention and incentive program in the form of long-term equity compensation consisting of five million [not adjusted for stock splits] restricted shares of the Company's Common Stock which generally vest in full on the third anniversary of the grant date.

163.    This statement is misleading because it fails to disclose that the five million restricted shares (now ten million after adjustments for stock splits) were received by Jobs in exchange for the backdated stock options discussed earlier herein.  It is estimated that as the result of the $104,087,000 in "instant paper profits" Jobs received from backdated options, he received at least an additional 630,000 shares of restricted stock that he would not have received had the cancelled options not been backdated.  At prices prevailing in or about the date of the 2003 Proxy, these extra 630,000 shares had a value in excess of $50 million.  The 2003 Proxy also fails to disclose these facts.

164.    In addition, the Summary Compensation Table from the 2003 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal years 2000 and 2002 and Anderson, Cook, Rubinstein and Tevanian in fiscal year 2001 as a result of their receipt of backdated stock options at less than fair market value on the date of grant.

165.    Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered  .  .  ." (17 C.F.R. § 229.402(b)(2)(iii)(B).)   Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

(i)    For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

(ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii)    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)    In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

166.    Further, the Option Grants in Last Fiscal Year Table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 2002 were backdated.

167.    A shareholder who knew that Apple backdated options (thereby providing not only improper compensation to Apple employees but also artificially inflating net income), that Jobs received restricted stock in exchange for stock options that had been backdated, and/or the

47

other facts set forth herein would not have voted in favor of expanding Apple's ability to award stock options or other executive compensation sought in the 2003 Proxy.

### 8.    **2005 Proxy**

168.    Apple's definitive proxy statement dated March 14, 2005 filed with the SEC on Form 14A for the annual meeting to be held April 21, 2005 (the "2005 Proxy") was materially false and misleading.  (All of the Director Defendants and Defendant Anderson were directors at this time.)  With respect to shareholders of record as of March 1, 2005, the 2005 Proxy solicited shareholder votes to, among other things:  (a) increase the aggregate shares available for the ESPP by 2 million up to a total of 70 million shares; and (b) increase the aggregate shares available for the 2003 ESOP by 49 million.

169.    The 2005 Proxy stated:

> The [Compensation] Committee's compensation philosophy is…that any long-term incentive compensation **should be closely aligned with shareholder interests**.  For executive officers, the Committee believes that a substantial portion of their compensation **should be closely aligned with Company performance**.
>
> *    *    *
>
> The Committee believes that the granting of long-term incentives, typically grants of stock options, is an important method of rewarding and motivating employees **by aligning the interests of the employee with those of the shareholders. Stock options have value for an employee only if the Company's stock price increases above the exercise price of the option** and the employee remains employed by the Company for the remainder of the vesting period.

170.    These statements are false and misleading because they fail to disclose the instant paper profits being received by executives from backdating.  Contrary to the statement above, backdated stock options that are "in the money" from the outset do have immediate value for an employee; no increases of the Company's stock price are necessary.  Such instant paper profits do not align executive and shareholder interests because only the executive receiving the backdated option, not the shareholder who purchased in the open market at fair market value, has received a built-in paper profit from the outset.

171.    The 2005 Proxy stated that "Mr. Jobs has ten million [split-adjusted] shares of restricted stock that were granted to him in 2003 which generally vest in full on the third anniversary of the grant date" and that "[i]n March 2003, Mr. Jobs voluntarily cancelled all of

48

his outstanding options, excluding those granted to him in his capacity as a director.  In March 2003, the Board awarded Mr. Jobs 10 million [split-adjusted] restricted shares of the Company's Common Stock that generally vest on the third anniversary of the grant date."

172.    This statement is misleading because it fails to disclose that the ten million restricted shares were received by Jobs in exchange for the backdated stock options discussed earlier herein.  It is estimated that as the result of the $104,087,000 in "instant paper profits" Jobs received from backdated options, he received at least an additional 630,000 shares of restricted stock that he would not have received had the cancelled options not been backdated.  At prices prevailing in or about the date of the 2003 Proxy, these extra 630,000 shares had a value in excess of $50 million.  The 2005 Proxy also fails to disclose these facts.

173.    The 2005 Proxy also provided additional disclosures about the Company's compensation practices.  Specifically, it noted the number of options that were outstanding from prior stock option plans, and the fact that the Compensation Committee hired a consultant to examine compensation trends, reviewed each executive's past performance in light of those trends, and on that basis increased the executives' base pay and adopted a cash bonus program upon which they asked shareholders to vote in the 2005 Proxy.  The 2005 Proxy states:  "The Committee's outside compensation consultant concluded that the infrequent grant of options…did not make up for the below market median total cash compensation paid to executive officers."

174.    This representation that Apple employees were paid "below market median total cash compensation" was materially misleading.  Certainly executives part with less cash when exercising backdated stock options then they would have if the exercise price had been determined on the actual date of grant instead of retrospectively cherry-picked based on historical stock price dips.

175.    Finally, in casting their votes for the compensation package described in the 2005 Proxy, shareholders relied upon the validity of the Company's financial results and other statements about the Company's compensation practices.  The 2005 Proxy stated that based upon a review of audited financial statements by the Audit Committee and discussion with the

Company's auditors, "the Audit Committee recommended to the Board of Directors that the [audited] financial statements [reviewed with the Company's accountants] be included in the Company's Annual Report on Form 10-K for the fiscal year ended September 24, 2004." This statement was misleading because, as the Company has now admitted, these financial statements were materially inaccurate and should not be relied upon.

176.   A shareholder who knew that Apple backdated options (thereby providing not only improper compensation to Apple employees but also artificially inflating net income), that Jobs received restricted stock in exchange for stock options that had been backdated, that the conclusion that executives were paid below market cash compensation did not take into account the value of backdated options and/or the other facts set forth herein would not have voted in favor of expanding Apple's ability to award stock options or other executive compensation sought in the 2005 Proxy.

**B.   Annual Reports**

177.   In casting their ballots on the matters for which shareholder votes were sought in proxy statements, shareholders relied on the integrity of the financial statements and other disclosures in the Company's annual reports.   The Company's annual reports contained numerous false and misleading statements as well.

178.   From 1996 to 2005, the Company, with the knowledge, approval, participation, reckless disregard or negligence of each individual defendant (with respect to those disclosures made at a time when such defendant was a director of the Company), disseminated to shareholders and filed with the SEC annual reports on Form 10-K and/or Form 10-K405 that contained material misstatements and omissions falling into five general categories:   (a) misstatements that options granted were priced at the fair market value on the date of the grant when in fact they were backdated; (b) misstatements relating to the amount of compensation received by Apple executives during the relevant time; (c) misstatements that the Company applied appropriate GAAP accounting for stock options by following APB No. 25; (d) misstatements (with respect to the Company's annual reports for fiscal years 1999 through 2001) relating to the Company's intention to have executive stock options qualify for tax

deductions under Section 162(m); and (e) overstatement of the Company's operating and/or net income (or understatement of the Company's operating and/or net loss) due to the failure to recognize "instant paper profits" as expense and related financial effects associated with backdated options awarded to executives (the incremental impact of which the Company reported in the 2006 restatement was at least $105 million on a pre-tax basis and $84 million on an after-tax basis from fiscal years 1998 through 2006).

### 1.   1996 Annual Report

179.   The Company's Form 10-K for the fiscal year ended September 27, 1996 (filed with the SEC on December 19, 1996 and signed by Anderson, Chang, Hintz, Hudson, Lewis, Markkula and Woolard (the "1996 Annual Report")) was materially false and misleading for the reasons discussed below.

180.   The 1996 Annual Report states "[o]ptions may be granted under the 1990 Plan to employees, including officers and directors who are employees, at not less than the fair market value on the date of grant."  This statement was false and misleading because stock options were backdated and, as a result, the exercise prices of options were in fact less than the fair market value on the true date of grant.

181.   The 1996 Annual Report incorporated by reference certain sections of the 1997 Proxy, which as stated in the 1996 Annual Report was "to be delivered to shareholders in connection with the Annual Meeting of Shareholders to be held February 5, 1997" (*i.e.*, delivered subsequent to the date of the 1996 Annual Report).  Such sections included the Summary Compensation Table in the 1997 Proxy which was false and misleading for the reasons stated above.

182.   The 1996 Annual Report states "the Company has elected to continue measuring compensation expense for its stock-based employee compensation plans using the intrinsic value method prescribed by [APB No. 25], 'Accounting for Stock Issued to Employees'."  This statement is false and misleading.  Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference

(*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, the Company's statement that it followed APB No. 25 was false and misleading.

183.  And because the Company did not properly account for the compensation expense created by backdating, the following operating income/loss and net income/loss figures in the 1996 Annual Report were overstated or understated, as the case may be:  (a) the $1.383 billion operating loss and $816 million net loss figures reported for fiscal year 1996 were understated; (b) the $684 million operating income and $424 million net income figures for fiscal year 1995 were overstated; and (c) the $522 million operating income and $310 million net income figures for fiscal year 1994 were overstated.

### 2.   **1997 Annual Report**

184.  The Company's Form 10-K for the fiscal year ended September 26, 1997 (filed with the SEC on December 5, 1997 and signed by Jobs, Anderson, Campbell, Chang, Ellison, Woolard and York (the "1997 Annual Report")) was materially false and misleading for the reasons discussed below.

185.  The 1997 Annual Report states "[o]ptions may be granted under the 1990 Plan to employees, including officers and directors who are employees, at not less than the fair market value on the date of grant."  This statement was false and misleading because stock options were backdated and, as a result, the exercise prices of options were in fact less than the fair market value on the true date of grant.

186.  The 1997 Annual Report incorporated by reference certain sections of the 1998 Proxy, which as stated in the 1997 Annual Report was "to be delivered to shareholders in connection with the Annual Meeting of Shareholders to be held February 3, 1998" (*i.e.*, delivered subsequent to the date of the 1997 Annual Report).  Such sections included the Summary Compensation Table in the 1998 Proxy which was false and misleading for the reasons stated above.

187.  The 1997 Annual Report states "the Company has elected to follow [APB No. 25] and related interpretations in accounting for its employee stock option plans….Under [APB No. 25], if the exercise price of the Company's employee stock options equals or

exceeds the fair value of the underlying stock on the date of grant, no compensation expense is recognized."   This statement is false and misleading.  Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, the Company's statement that it followed APB No. 25 was false and misleading.

188.   And because the Company did not properly account for the compensation expense created by backdating, the following operating income/loss and net income/loss figures in the 1997 Annual Report were overstated or understated, as the case may be:  (a) the $1.070 billion operating loss and $1.045 billion net loss figures reported for fiscal year 1997 were understated; (b) the $1.383 billion operating loss and $816 million net loss figures reported for fiscal year 1996 were understated; (b) the $684 million operating income and $424 million net income figures for fiscal year 1995 were overstated.

**3.      1998 Annual Report**

189.   The Company's Form 10-K405 for the fiscal year ended September 25, 1998 (filed with the SEC on December 23, 1998 and signed by Jobs, Anderson, Campbell, Chang, Ellison, Woolard and York (the "1998 Annual Report")) was materially false and misleading for the reasons discussed below.

190.   The 1998 Annual Report states, in a chart setting forth the aggregate number of stock option grants and their weighted average exercise price for fiscal years 1996, 1997 and 1998, that the options were "Granted (price equals FMV)."  "FMV" stands for fair market value.  This statement was false and misleading because some or all of the stock options granted in those years were backdated and, as a result, the exercise price did not equal the fair market value on the date of grant.[9]

---

[9]        The same chart contains a row depicting options "[g]ranted (price *less than* FMV)" and a footnote states:  "The options granted in fiscal 1997 at a price *less than* fair market value were to existing…optionholders [of a company Apple acquired] as part of the total purchase price paid for [the acquired company]."  (Emphasis added)  This differentiation between "in the money" options granted to optionholders in connection with an acquisition and the supposedly "at the money" options granted to Apple executives establishes that Apple knew how to distinguish between the two when it wanted to tell shareholders the truth.

**CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

191.   The 1998 Annual Report includes a chart depicting option grants during fiscal year 1998 to Anderson, Cook, Rubinstein and Mandich as reflected in the table included earlier herein and states that "[a]ll options were granted at an exercise price equal to the fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of grant."  These statements are false and misleading because they fail to disclose the backdating scheme and that the exercise price in fact was not the fair market value of the Company's common stock on the date of grant.

192.   In addition, the 1998 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Anderson in fiscal years 1996, 1997 and 1998, Mandich and Rubinstein in fiscal years 1997 and 1998 and Cook in fiscal year 1998 as a result of their receipt of backdated stock options at less than fair market value.

193.   Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered . . ." (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

   (i)    For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

   (ii)   Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

   (iii)  The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

194.     Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 1998 were backdated.

195.     The 1998 Annual Report states "the Company has elected to follow [APB No. 25] and related interpretations in accounting for its employee stock option plans and employee stock purchase plan shares….Under APB No. 25, when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."   This statement is false and misleading.   Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.   As a result, the Company's statement that it followed APB No. 25 was false and misleading.

196.     And because the Company did not properly account for the compensation expense created by backdating, the following operating income/loss and net income/loss figures in the 1998 Annual Report were overstated or understated, as the case may be:  (a) the $261 million operating income and $309 million net income figures reported for fiscal year 1998 were overstated; (b) the $1.070 billion operating loss and $1.045 billion net loss figures reported for fiscal year 1997 were understated; (c) the $1.383 billion operating loss and $816 million net loss figures reported for fiscal year 1996 were understated; and (d) the $484 million net income figure reported for fiscal year 1995 was overstated.

**4.     <u>1999 Annual Report</u>**

197.     The Company's Form 10-K for the fiscal year ended September 25, 1999 (filed with the SEC on December 22, 1999 and signed by Anderson, Jobs, Campbell, Chang, Drexler, Ellison, Woolard (the "1999 Annual Report")) was materially false and misleading for the reasons discussed below.

198.     The 1999 Annual Report states, in a chart setting forth the aggregate number of stock option grants and their weighted average exercise price for fiscal years 1997, 1998 and

1   1999, that the options were "Granted (price equals FMV)."  "FMV" stands for fair market

2   value.  This statement was false and misleading because some or all of the stock options

3   granted in those years were backdated and, as a result, the exercise price did not equal fair

4   market value on the date of grant.[10]

5        199.   The 1999 Annual Report includes a chart depicting option grants during fiscal

6   year 1998 to Anderson, Cook, Rubinstein and Mandich as reflected in the table included earlier

7   herein and states that "[a]ll options were granted at an exercise price equal to the fair market

8   value based on the closing market value of Common Stock on the Nasdaq National Market on

9   the date of grant."  These statements are false and misleading because they fail to disclose the

10  backdating scheme and that the exercise price in fact was not the fair market value of the

11  Company's common stock on the date of grant.

12       200.   In addition, the 1999 Annual Report includes a Summary Compensation Table

13  that materially misstated the compensation of, and failed to disclose the illegal compensation

14  received from the Company by, Anderson, Mandich and Rubinstein in fiscal years 1997, 1998

15  and 1999, and Cook in fiscal years 1998 and 1999 as a result of their receipt of backdated stock

16  options at less than fair market value.

17       201.   Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the

18  Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned

19  by    the    named    executive    officer    during    the    fiscal    year    covered    .   .   ."

20  (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and

21  (B) further provide that the following items be disclosed in the Summary Compensation Table:

22       (i)    For stock or any other form of non-cash compensation, disclose the fair market
             value at the time the compensation is awarded, earned or paid.

23

24

25  [10]     The same chart contains a row depicting options "[g]ranted (price *less than* FMV)" and
    a footnote states:  "The options granted in fiscal 1997 at a price *less than* fair market value
26  were to existing…optionholders [of a company Apple acquired] as part of the total purchase
    price paid for [the acquired company]."  (Emphasis added)  This differentiation between "in
27  the money" options granted to optionholders in connection with an acquisition and the
    supposedly "at the money" options granted to Apple executives establishes that Apple knew
28  how to distinguish between the two when it wanted to tell shareholders the truth.

**CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

(ii)     Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii)    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)    In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

202.    Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 1999 were backdated.

203.    The 1999 Annual Report states "the Company has elected to follow [APB No. 25] and related interpretations in accounting for its employee stock option plans and employee stock purchase plan shares….Under APB No. 25, when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."  This statement is false and misleading.  Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, the Company's statement that it followed APB No. 25 was false and misleading.

204.    The 1999 Annual Report stated that the "Company intends that options granted under the Company's stock option plans be deductible by the Company under Section 162(m)."  Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."  To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant.  Thus, a company's "at the money" stock option expenses are generally tax deductible

57

1   even though an executive is paid more than $1 million.  The Company's statement of an

2   intention to have options be deductible under Section 162(m) was false and misleading because

3   certain options were backdated and, as a result, expense incurred with respect to such options

4   could not have been properly deductible under Section 162(m).

5       205.   And because the Company did not properly account for the compensation

6   expense created by backdating, the following operating income/loss and net income/loss

7   figures in the 1999 Annual Report were overstated or understated, as the case may be:  (a) the

8   $359 million operating income and $601 million net income figures reported for fiscal year

9   1999 were overstated; (b) the $261 million operating income and $309 million net income

10  figures reported for fiscal year 1998 were overstated; (c) the $1.070 billion operating loss and

11  $1.045 billion net loss figures reported for fiscal year 1997 were understated; (d) the $816

12  million net loss figure reported for fiscal year 1996 was understated; and (e) $424 million net

13  income figure reported for fiscal year 1995 was overstated.

14      **5.      2000 Annual Report**

15      206.   The Company's Form 10-K for the fiscal year ended September 30, 2000 (filed

16  with the SEC on December 14, 2000 and signed by Anderson, Jobs, Campbell, Chang, Drexler,

17  Ellison, Levinson and York (the "2000 Annual Report")) was materially false and misleading

18  for the reasons discussed below.

19      207.   The 2000 Annual Report includes a chart depicting option grants during fiscal

20  year 2000 to Jobs and Johnson as reflected in the table included earlier herein and states that

21  "[a]ll options were granted at an exercise price equal to the fair market value based on the

22  closing market value of Common Stock on the Nasdaq National Market on the date of grant."

23  These statements are false and misleading because they fail to disclose the backdating scheme

24  and that the exercise price in fact was not the fair market value of the Company's common

25  stock on the date of grant.

26      208.   The 2000 Annual Report  reflects that Jobs received a grant of 10 million

27  options (not split-adjusted) in January 2000 "at an exercise price equal to the fair market value

28  based on the closing market value of Common Stock on the Nasdaq National market on the

date of grant."   The 2000 Annual Report further disclosed that the grant date was January 12, 2000, a date when Apple's stock price closed at $43.5938, and therefore the exercise price assigned to the award was $43.5938.  These statements were false.

209.    As Apple has now admitted, this grant was not memorialized until six days after January 12, 2000.  During that time, Apple's stock price ran up from $43.5938 to $51.97 - a jump of almost 20%.  Only then (on January 18, 2000) was board action taken to memorialize the grant.  Thus, the exercise price assigned to the option grant should have been the January 18 Apple closing price of $51.97 rather than the $43.5938 that was falsely disclosed in the 2000 Annual Report.  The net result is that CEO Jobs was given an "instant paper profit" in the amount of $83,762,000 (*i.e.*, $51.97 minus $43.5938 multiplied times 10 million shares) that was never disclosed to shareholders.

210.    In addition, the 2000 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal year 2000, Anderson, Mandich and Rubinstein in fiscal years 1998 and 1999, and Johnson in fiscal year 2000 as a result of their receipt of backdated stock options at less than fair market value on the date of grant.

211.    Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by    the    named    executive    officer    during    the    fiscal    year    covered    .   .   ." (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

(i)      For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

(ii)     Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii)    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

212.   Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 2000 were backdated.

213.   The 2000 Annual Report states "the Company has elected to follow [APB No. 25] and related interpretations in accounting for its employee stock option plans and employee stock purchase plan shares….Under…[APB No. 25], when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."   This statement is false and misleading. Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.   As a result, the Company's statement that it followed APB No. 25 was false and misleading.

214.   The 2000 Annual Report stated that the "Company intends that options granted under the Company's stock option plans be deductible by the Company under Section 162(m)."   Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."   To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant.   Thus, a company's "at the money" stock option expenses are generally tax deductible even though an executive is paid more than $1 million.   The Company's statement of an intention to have options be deductible under Section 162(m) was false and misleading because certain options were backdated and, as a result, expense incurred with respect to such options could not have been properly deductible under Section 162(m).

215.   And because the Company did not properly account for the compensation expense created by backdating, the following operating income/loss and net income/loss figures in the 2000 Annual Report were overstated or understated, as the case may be:  (a) the $522 million operating income and $786 million net income figures reported for fiscal year 2000 were overstated; (b) the $359 million operating income and $601 million net income figures reported for fiscal year 1999 were overstated; (c) the $261 million operating income and $309 million net income figures reported for fiscal year 1998 were overstated; (d) the $1.045 billion net loss figure reported for fiscal year 1997 was understated; and (e) the $816 million net loss figure reported for fiscal year 1996 was understated.

**6.    2001 Annual Report**

216.   The Company's Form 10-K405 for the fiscal year ended September 29, 2001 (filed with the SEC on December 21, 2001 and signed by Anderson, Jobs, Campbell, Drexler, Ellison, Levinson and York (the "2001 Annual Report")) was materially false and misleading for the reasons discussed below.

217.   The 2001 Annual Report includes a chart depicting option grants during fiscal year 2001 to Anderson, Cook, Rubinstein and Tevanian as reflected in the table included earlier herein and states that "[a]ll options were granted at an exercise price equal to the fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of grant."  These statements are false and misleading because they fail to disclose the backdating scheme and that the exercise price in fact was not the fair market value of the Company's common stock on the date of grant.

218.   The 2001 Annual Report  reflects that Jobs received a grant of 20 million options (split-adjusted).  While the 2001 Annual Report does not expressly state that these 20 million options were granted at fair market value on the date of grant, it does generally state that "options granted under the 1998 Plan were at an exercise price equal to the fair market value of the Common Stock on the date of grant."  These statements were false and misleading because they failed to disclose that these options were backdated.

219.     As Apple has now admitted, this grant was not memorialized until six days after January 12, 2000.  During that time, Apple's stock price ran up from $43.5938 to $51.97 - a jump of almost 20%.  Only then (on January 18, 2000) was board action taken to memorialize the grant.  Thus, the exercise price assigned to the option grant should have been the January 18 Apple closing price of $51.97 rather than the $43.5938 that was falsely disclosed.  The net result is that CEO Jobs was given an "instant paper profit" in the amount of $83,762,000 (*i.e.*, $51.97 minus $43.5938 multiplied times 10 million shares) that was never disclosed to shareholders.

220.     In addition, the 2001 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal year 2000, Anderson, Cook and Rubinstein in fiscal years 1999 and 2001, and Tevanian in fiscal year 2001 as a result of their receipt of backdated stock options at less than fair market value on the date of grant.

221.     Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered . . ." (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

> (i)      For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.
>
> (ii)     Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…
>
> (iii)    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

222.    Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 2001 were backdated.

223.    The 2001 Annual Report stated "the Company has elected to follow [APB No. 25] and related interpretations in accounting for its employee stock options and employee stock purchase plan shares….Under…[APB No. 25], when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of the grant, no compensation expense is recognized."  This statement is false and misleading.  Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, the Company's statement that it followed APB No. 25 was false and misleading.

224.    The 2001 Annual Report stated that the "Company intends that options granted under the Company's stock option plans be deductible by the Company under Section 162(m)."  Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."  To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant.  Thus, a company's "at the money" stock option expenses are generally tax deductible even though an executive is paid more than $1 million.  The Company's statement of an intention to have options be deductible under Section 162(m) was false and misleading because certain options were backdated and, as a result, expense incurred with respect to such options could not have been properly deductible under Section 162(m).

225.    And because the Company did not properly account for the compensation expense created by backdating, the following operating income/loss and net income/loss figures in the 2001 Annual Report were overstated or understated, as the case may be:  (a) the $344 million operating loss and $25 million net loss figures reported for fiscal year 2001 were

understated; (b) the $522 million operating income and $786 million net income figures reported for fiscal year 2000 were overstated; (c) the $359 million operating income and $601 million net income figures reported for fiscal year 1999 were overstated; (d) the $309 million net income figure reported for fiscal year 1998 was overstated; and (d) the $1.045 billion net loss figure reported for fiscal year 1997 was understated.

### 7. 2002 Annual Report

226. The Company's Form 10-K for the fiscal year ended September 28, 2002 (filed with the SEC on December 19, 2002 and signed by Anderson, Jobs, Campbell, Drexler, Levinson and York) (the "2002 Annual Report")) was materially false and misleading for the reasons discussed below.

227. The 2002 Annual Report includes a chart depicting option grants during fiscal year 2002 to Jobs as reflected in the table included earlier herein and states that "[a]ll options were granted at an exercise price equal to the fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of grant."  These statements are false and misleading because they fail to disclose the backdating scheme and that the exercise price in fact was not the fair market value of the Company's common stock on the date of grant.

228. The 2002 Annual Report  disclosed that 7.5 million (not split-adjusted) shares were granted to Jobs on October 19, 2001 at an exercise price equal to fair market value on the date of grant.  Apple has now admitted that this statement was false.

229. Apple has now admitted that no Board meeting occurred on October 19, 2001 despite the bogus documentation falsely indicating that such a meeting took place. The true grant date was December 18, 2001 which means the assigned exercise price should have been $21.01 -- Apple's December 18 closing price representing the fair market value of Apple's shares on the true date of grant.  The net result of the pretense that the grant of these options was approved at an October 2001 board meeting is CEO Jobs was given an "instant paper profit" in the amount of $20,325,000 (*i.e.*, $21.01 minus $18.30 multiplied times 7.5 million shares) that was never disclosed to shareholders.

230. In addition, the 2002 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal years 2000 and 2002, and Anderson, Cook, Rubinstein and Tevanian in fiscal year 2001 as a result of their receipt of backdated stock options at less than fair market value on the date of grant.

231. Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered . . ." (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

(i)     For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

(ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii)   The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)    In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

232. Further, the Option Grants in Last Fiscal Year Table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 2002 were backdated.

233. The 2002 Annual Report stated "[t]he Company measures compensation expense for its employee stock-based compensation plans using the intrinsic value method prescribed by [APB No. 25]….The Company has elected to follow APB No. 25…. Under…[APB No. 25], when the exercise price of the Company's employee stock options

equals the market price of the underlying stock on the date of grant, no compensation expense is recognized." This statement is false and misleading. Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so. As a result, the Company's statement that it followed APB No. 25 was false and misleading.

234. And because the Company did not properly account for the compensation expense created by backdating, the following operating income/loss and net income/loss figures in the 2002 Annual Report were overstated or understated, as the case may be: (a) the $17 million operating income and $65 million net income figures reported for fiscal year 2002 were overstated; (b) the $344 million operating loss and $25 million net loss figures reported for fiscal year 2001 were understated; (c) the $522 million operating income and $786 million net income figures reported for fiscal year 2000 were overstated; (d) the $601 million net income figure reported for fiscal year 1999 was overstated; and (e) the $309 million net income figure reported for fiscal year 1998 was overstated.

**8.   2003 Annual Report**

235. The Company's Form 10-K for the fiscal year ended September 27, 2003 (filed with the SEC on December 19, 2003 and signed by Anderson, Jobs, Campbell, Drexler, Levinson and York) (the "2003 Annual Report")) was materially false and misleading for the reasons discussed below.

236. The 2003 Annual Report disclosed that 7.5 million (not split-adjusted) shares were granted to Jobs during fiscal year 2002. This statement was false and misleading because it fails to disclose that these options were backdated.

237. Apple has now admitted that no Board meeting occurred on October 19, 2001 despite the bogus documentation falsely indicating that such a meeting took place. The true grant date was December 18, 2001 which means the assigned exercise price should have been $21.01 -- Apple's December 18 closing price representing the fair market value of Apple's shares on the true date of grant. The net result of the pretense that the grant of these options was approved at an October 2001 board meeting is CEO Jobs was given an "instant paper

**CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

profit" in the amount of $20,325,000 (*i.e.*, $21.01 minus $18.30 (the October 19[th] closing price) multiplied times 7.5 million shares) that was never disclosed to shareholders.

238.    The 2003 Annual Report also states:

In March 2003, Mr. Jobs voluntarily cancelled all of his outstanding options, excluding those granted to him in his capacity as a director.  In March 2003, the Board awarded Mr. Jobs five million [not split-adjusted] restricted shares of the Company's Common Stock which generally vest in full on the third anniversary of the grant date.

239.    This statement is misleading because it fails to disclose that the five million restricted shares (now ten million after adjustments for stock splits) were received by Jobs in exchange for the backdated stock options discussed earlier herein.  As alleged earlier herein, as the result of the $104,087,000 in "instant paper profits" Jobs received from backdated options, he received at least an additional 630,000 shares of restricted stock that he would not have received had the cancelled options not been backdated.  At prices prevailing in or about the date of the 2003 Annual Report, these extra 630,000 shares had a value in excess of $50 million.  The 2003 Annual Report fails to disclose these facts.

240.    In addition, the 2003 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal years 2000 and 2002, and Anderson, Cook, Rubinstein and Tevanian in fiscal year 2001 as a result of their receipt of backdated stock options at less than fair market value on the date of grant.

241.    Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered  . . ." (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

(i)      For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

(ii)     Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii)    The dollar value of the difference between the price paid by a named executive

officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

242.   The 2003 Annual Report stated "[t]he Company measures compensation expense for its employee stock-based compensation plans using the intrinsic value method prescribed by [APB No. 25]….The Company has elected to follow APB No. 25…. Under…[APB No. 25], when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."  This statement is false and misleading.  Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, the Company's statement that it followed APB No. 25 was false and misleading.

243.   And because the Company did not properly account for the compensation expense created by backdating, the following operating income/loss and net income/loss figures in the 2003 Annual Report were overstated or understated, as the case may be:  (a) the $1 million operating loss figure reported for fiscal year 2003 was understated and the $69 million net income figure reported for fiscal year 2003 was overstated; (b) the $17 million operating income and $65 million net income figures reported for fiscal year 2002 were overstated; (c) the $344 million operating loss and $25 million net loss figures reported for fiscal year 2001 were understated; (d) the $786 million net income figure reported for fiscal year 2000 was overstated; and (e) the $601 million net income figure reported for fiscal year 1999 was overstated.

CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)

1

### 9.    2004 Annual Report

2      244.    The Company's Form 10-K for the fiscal year ended September 25, 2004 (filed

3 with the SEC on December 3, 2004 and signed by Anderson, Jobs, Campbell, Drexler,

4 Levinson and York) (the "2004 Annual Report")) was materially false and misleading for the

5 reasons discussed below.

6      245.    As previously alleged with respect to defendant Jobs, the 2004 Annual Report

7 disclosed that 7.5 million (not split-adjusted) shares were granted to Jobs during fiscal year

8 2002.   This statement was false and misleading because it fails to disclose that these options

9 were backdated.

10      246.    Apple has now admitted that no Board meeting occurred on October 19, 2001

11 despite the bogus documentation falsely indicating that such a meeting took place. The true

12 grant date was December 18, 2001 which means the assigned exercise price should have been

13 $21.01 -- Apple's December 18 closing price representing the fair market value of Apple's

14 shares on the true date of grant.  The net result of the pretense that the grant of these options

15 was approved at an October 2001 board meeting is CEO Jobs was given an "instant paper

16 profit" in the amount of $20,325,000 (*i.e.*, $21.01 minus $18.30 (the October 19th closing

17 price) multiplied times 7.5 million shares) that was never disclosed to shareholders.

18      247.    The 2004 Annual Report also states:

19      In March 2003, Mr. Jobs voluntarily cancelled all of his outstanding options,
        excluding those granted to him in his capacity as a director.  In March 2003, the
20      Board awarded Mr. Jobs five million [not split-adjusted] restricted shares of the
        Company's Common Stock which generally vest in full on the third anniversary
21      of the grant date.

22      248.    The 2004 Annual Report further states:

23      On March 19, 2003, the Company entered into an Option Cancellation and
        Restricted Stock Award Agreement (the Agreement) with Mr. Steven P. Jobs, its
24      CEO.  The Agreement cancelled stock option awards for the purchase of 27.5
        million shares of the Company's common stock previously granted to Mr. Jobs in
25      2000 and 2001.  Mr. Jobs retained options to purchase 60,000 shares of the
        Company's common stock granted in August of 1997 in his capacity as a member
26      of the Company's Board of Directors, prior to becoming the Company's CEO.
        The Agreement replaced the cancelled options with a restricted stock award of 5
27      million shares [not split-adjusted] of the Company's common stock….

28

69

**CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

249.   These statements are misleading because they fail to disclose that the five million restricted shares (now ten million after adjustments for stock splits) were received by Jobs in exchange for the backdated stock options discussed earlier herein.  As alleged earlier herein, it is estimated that as the result of the $104,087,000 in "instant paper profits" Jobs received from backdated options, he received at least an additional 630,000 shares of restricted stock that he would not have received had the cancelled options not been backdated.  At prices prevailing in or about the date of the 2003 Annual Report, these extra 630,000 shares had a value in excess of $50 million.  The 2004 Annual Report fails to disclose these facts.

250.   In addition, the 2004 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal year 2002 as a result of his receipt of backdated stock options at less than fair market value and in fiscal year 2003 as a result of his receipt of restricted stock in exchange for backdated stock options at less than fair market value on the date of grant.

251.   Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered  .  .  ." (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

(i)   For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

(ii)   Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii)   The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

1  (*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual

2  Compensation" and "Securities Underlying Options" are materially misleading because they

3  omit the additional compensation received as a result of the backdated options.

4    252.   The 2004 Annual Report stated "[t]he Company measures compensation

5  expense for its employee stock-based compensation plans using the intrinsic value method

6  prescribed by [APB No. 25]….The Company has elected to follow APB No. 25….

7  Under…[APB No. 25], when the exercise price of the Company's employee stock options

8  equals the market price of the underlying stock on the date of grant, no compensation expense

9  is recognized."  This statement is false and misleading.  Since the market price of Apple shares

10  on the true grant date exceeded the exercise price, Apple should have recognized the difference

11  (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, the

12  Company's statement that it followed APB No. 25 was false and misleading.

13    253.   And because the Company did not properly account for the compensation

14  expense created by backdating, the following operating income/loss and net income/loss

15  figures in the 2004 Annual Report were overstated or understated, as the case may be:  (a) the

16  $326 million operating income and $276 million net income figures reported for fiscal year

17  2004 were overstated; (b) the $1 million operating loss figure reported for fiscal year 2003 was

18  understated and the $69 million net income figure reported for fiscal year 2003 was overstated;

19  (c) the $17 million operating income and $65 million net income figures reported for fiscal

20  year 2002 were overstated; (d) the $25 million net loss figure reported for fiscal year 2001 was

21  understated; and (e) the $786 million net income figure reported for fiscal year 2000 was

22  overstated.

23    **10.** **2005 Annual Report**

24    254.   The Company's Form 10-K for the fiscal year ended September 24, 2005 (filed

25  with the SEC on December 1, 2005 and signed by Anderson, Jobs, Campbell, Drexler,

26  Levinson and York) (the "2005 Annual Report")) was materially false and misleading for the

27  reasons discussed below.

28

255.    The 2005 Annual Report states:

In March 2003, Mr. Jobs voluntarily cancelled all of his outstanding options, excluding those granted to him in his capacity as a Director.  In March 2003, the Board awarded Mr. Jobs 10 million (split-adjusted) restricted shares of the Company's Common Stock that generally vest in full on the third anniversary of the grant date.

256.    The 2005 Annual Report further states:

On March 19, 2003, the Company entered into an Option Cancellation and Restricted Stock Award Agreement (the Agreement) with Mr. Steven P. Jobs, its CEO.  The Agreement cancelled stock option awards for the purchase of 55 million shares of the Company's common stock previously granted to Mr. Jobs in 2000 and 2001.  Mr. Jobs retained options to purchase 120,000 shares of the Company's common stock granted in August of 1997 in his capacity as a member of the Company's Board of Directors, prior to becoming the Company's CEO. The Agreement replaced the cancelled options with a restricted stock award of 10 million shares of the Company's common stock….

*        *        *

The Company determined the value of the restricted stock award in accordance with APB Opinion No. 25….

257.    These statements are misleading because they fail to disclose that the ten million (split-adjusted) shares were received by Jobs in exchange for the backdated stock options discussed earlier herein.  As alleged earlier herein, it is estimated that as the result of the $104,087,000 in "instant paper profits" Jobs received from backdated options, he received at least an additional 630,000 shares of restricted stock that he would not have received had the cancelled options not been backdated.  At prices prevailing in or about the date of the 2003 Annual Report, these extra 630,000 shares had a value in excess of $50 million.  The 2005 Annual Report fails to disclose these facts.

258.    In addition, the 2005 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal year 2003 as a result of his receipt of restricted stock in exchange for backdated stock options at less than fair market value on the date of grant.

259.    Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned

72

by the named executive officer during the fiscal year covered   .   .   .”
(17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and
(B) further provide that the following items be disclosed in the Summary Compensation Table:

    (i)      For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

    (ii)     Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

    (iii)    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of “Annual Compensation” and “Securities Underlying Options” are materially misleading because they omit the additional compensation received as a result of the backdated options.

260.  The 2005 Annual Report stated “[t]he Company currently measures compensation expense for its employee stock-based compensation plans using the intrinsic value method prescribed by [APB No. 25]….Under…[APB No. 25], when the exercise price of the Company’s employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized.”  This statement is false and misleading.  Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, Jobs should not have received less restricted stock  than he actually did in exchange for the backdated and options and, consequently, the Company’s statement that it followed APB No. 25 was false and misleading.

261.  Because the Company did not properly account for the compensation expense created by backdating, the following operating income/loss and net income/loss figures in the 2005 Annual Report were overstated or understated, as the case may be:  (a) the $1.650 billion operating income and $1.335 billion net income figures reported for fiscal year 2005 were overstated; (b) the $326 million operating income and $276 million net income figures reported for fiscal year 2004 were overstated; (c) the $1 million operating loss figure reported

1   for fiscal year 2003 was understated and the $69 million net income figure reported for fiscal

2   year 2003 was overstated; (d) the $65 million net income figure reported for fiscal year 2002

3   was overstated; and (e) the $25 million net loss figure reported for fiscal year 2001 was

4   understated.

5   **C.   Registration Statements**

6       262.   Options to acquire shares would be far less valuable to employees if they were

7   unable to sell them on the Nasdaq National Market where Apple's stock trades publicly.  Thus,

8   in a series of registration statements filed with the SEC, Apple registered the shares it had

9   reserved for issuance under its various stock option plans to enable employees to publicly sell

10  shares acquired through option exercises.  This enabled the employees to realize the unlawful

11  instant paper profit built in to the backdated options the Stock Option Committee,

12  Compensation Committee or the full board of directors had awarded them.

13      263.   The registration statements the Company used to register these shares failed to

14  disclose backdating practices and incorporated by reference the Company's false Form 10-K's

15  for the fiscal year corresponding to the year in which the registration statement was filed or the

16  fiscal year prior to the year in which the registration statement was filed.  As a result, these

17  registration statements are materially false and misleading as well.

18      264.   The following false and misleading registration statements were used for the

19  purpose of enabling employees to sell shares in the public market through the exercise of

20  backdated stock options:

21      (a)     registration statement on Form S-8 dated March 21, 1997 to register 1 million
                newly reserved shares of the Company's common stock under the Company's
22              1990 Plan, signed by Anderson, Calderoni, Chang, Hudson, Lewis, Markkula and
                Woolard;
23

24      (b)     registration statement on Form S-8 dated December 22, 1999 to register 8 million
                newly reserved shares of the Company's common stock under the Company's
25              1997 Employee Stock Option Plan, signed by Jobs, Anderson, Chang, Campbell,
                Drexler, Ellison, York and Woolard, and to which Heinen's legal opinion letter of
26              the same date was attached stating "[a]s counsel in connection with this
                transaction, I have examined the actions taken, and I am familiar with the actions
27              proposed to be taken….";

28      (c)     registration statement on Form S-8 dated December 19, 2000 to register 20
                million  newly  reserved  shares  of  the  Company's  common  stock  under  the

74

Company's 1997 Employee Stock Option Plan, signed by Jobs, Anderson, Chang, Campbell, Drexler, Ellison and York, and to which Heinen's legal opinion letter of the same date was attached stating "[a]s counsel in connection with this transaction, I have examined the actions taken, and I am familiar with the action proposed to be taken….";

(d)     registration statement on Form S-8 dated May 18, 2001 to register 5 million newly reserved shares of the Company's common stock under the Company's 1998 Plan, signed by Jobs, Anderson, Chang, Campbell, Drexler, Ellison, Levinson and York, and to which Heinen's legal opinion letter of the same date was attached stating "[a]s counsel in connection with this transaction, I have examined the actions taken, and I am familiar with the action proposed to be taken….";

(e)     registration statement on Form S-8 dated September 28, 2001 to register 2 million newly reserved shares of the Company's common stock under the Company's 1997 Employee Stock Option Plan, signed by Jobs, Anderson, Campbell, Drexler, Ellison, Levinson and York, and to which Heinen's legal opinion letter dated September 25, 2001 was attached stating "[a]s counsel in connection with this transaction, I have examined the actions taken, and I am familiar with the action proposed to be taken….";

(f)     registration statement on Form S-8 dated December 26, 2001 to register 10 million newly reserved shares of the Company's common stock under the Company's 1997 Employee Stock Option Plan, signed by Jobs, Anderson,

(g)     Campbell, Drexler, Ellison, Levinson and York, and to which Heinen's legal opinion letter dated December 20, 2001 was attached stating "[a]s counsel in connection with this transaction, I have examined the actions taken, and I am familiar with the action proposed to be taken…."; and

(h)     registration statement on Form S-8 dated December 23, 2002, to register 5 million newly reserved shares of the Company's common stock under the Company's 1998 Plan, signed by Jobs, Anderson, Campbell, Drexler, Levinson and York, and to which Heinen's legal opinion letter of the same date was attached stating "[a]s counsel in connection with this transaction, I have examined the actions taken, and I am familiar with the action proposed to be taken…."

## VII. CLASS ACTION ALLEGATIONS

265.    Lead Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all others similarly situated. As set forth earlier herein, there are two different classes of current and/or former Apple shareholders: (a) the Section 14(a) Class Claim (including the Section 20(a) Claim) is asserted on behalf of holders of record of Apple's common stock on March 1, 2005 (the record date for shareholders to be eligible to vote at Apple's 2005 annual meeting) (previously defined as the "Section 14(a) Class Period"); and (b) the State Law Class Disclosure Claims are asserted on behalf of all

75

CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)

holders of record of Apple's common stock who were entitled to vote at the Company's annual meetings for fiscal years 1995, 1996, 1998, 2000, 2001, 2003 and/or 2005 (previously defined as the "State Law Class Period").  (The Section 14(a) Class Period and the State Law Class Period are sometimes hereinafter referred to individually as a "Class" or collectively as the "Classes.")  Excluded from each of the Classes are defendants and any person or entity related to or affiliated with any of the defendants, as well as any person or entity who received stock options from Apple, whether or not vested or exercised, that were backdated or any consideration in exchange for backdated stock options.

266.    The counts asserted herein are properly maintainable as class action counts.

267.    Each Class is so numerous that joinder of all members is impracticable.  As of February 28, 2006, there were 851,679,185 shares outstanding of Apple's common stock, held by individuals and entities and entities too numerous to bring separate actions.  It is reasonable to assume that holders of the common stock are geographically dispersed throughout the United States.

268.    There are questions of law and fact which are common to each Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

(a)    whether certain defendants owed a duty of full disclosure to Apple's shareholders that required them to make complete and accurate disclosures in Apple's proxy statements;

(b)    whether certain defendants backdated stock options, knew or should have known options were being backdated and/or received backdated stock options;

(c)    whether Apple's financial statements report artificially inflated net income as the result of failing to recognize compensation expenses associated with improper backdating;

(d)    whether certain defendants negligently issued false and misleading proxy statements in violation of Section 14(a);

(e)    whether Apple's proxy statements were materially false and misleading; and

(f)    whether and to what extent Plaintiffs suffered financial loss as a result of defendants' misstatements and omissions.

76

269.    Lead Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Lead Plaintiff's claims are typical of the claims of other members of each of the Classes.  Accordingly, Lead Plaintiff is an adequate representative of each Class and will fairly and adequately protect the interests of the Classes.

270.    Lead Plaintiff anticipates that there will be no difficulty in the management of this action as a class action.

271.    Defendants have acted on grounds generally applicable to each of the Classes with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to each of the Classes.

272.    The prosecution of separate actions would create the risk of:

(a)    inconsistent or varying adjudications which would establish incompatible standards for conduct for the defendants; and/or

(b)    adjudications which would as a practical matter be dispositive of the interests of other members of each of  the Classes.

## VIII.    TOLLING OF STATUTE OF LIMITATIONS – STATE LAW CLAIMS

273.    Defendants wrongfully concealed their manipulation of Apple's stock option plans by issuing false and misleading proxy statements, annual reports and registration statements regarding the pricing of options and failing to disclose until, at the earliest, June 29, 2006 that Apple engaged in "irregularities" relating to stock option awards.

274.    Apple's public investors had no reason to know of the defendants' breaches of their fiduciary duties or materially false and misleading disclosures relating to backdating of stock options until, at the earliest, June 29, 2006 when Apple issued its press release admitting to stock option "irregularities."

275.    As fiduciaries of Apple and its public shareholders, defendants cannot rely on any limitations defense where, as described more fully herein, they withheld from Apple's public shareholders the facts that give rise to the claims asserted herein, namely that:  (a) the board of directors and/or its Compensation or Stock Option Committees awarded backdated options, honored the exercise of backdated stock options and/or exchanged backdated stock

77

1   options for other valuable consideration; and (b) certain officers of the Company received

2   backdated stock options, exercised them and were unjustly enriched thereby.

3   ### IX.   LOSS CAUSATION ALLEGATIONS

4   276.   With respect to the Section 14(a) Class Claims, the false and misleading 2005

5   Proxy which omitted backdating practices caused dilution to the Section 14(a) Class's

6   shareholder interests as alleged herein.

7   277.   Shareholder dilution from the authorization for issuance of the shares so

8   authorized pursuant to the 2005 Proxy was the proximate and foreseeable result of the false

9   and misleading statements contained therein.

### X.   CLAIMS FOR RELIEF

### COUNT I

### CLASS CLAIM FOR VIOLATION OF SECTION 14(a)
### AGAINST THE COMPANY, THE DIRECTOR DEFENDANTS AND
### FORMER DIRECTOR ANDERSON WITH RESPECT TO THE 2005 PROXY

278.   Plaintiffs hereby reallege and incorporate the allegations in the preceding
paragraphs as if fully set forth herein.

279.   Lead Plaintiff brings this claim as a direct claim on behalf of itself and the
Section 14(a) Class against the Company, the Director Defendants and Former Director
Anderson (the "Section 14(a) Defendants") for violation of Section 14(a) of the Exchange Act
and Rule 14a-9 promulgated thereunder.

280.   The Section 14(a) Defendants caused Apple to issue the 2005 Proxy Statement
which sought shareholder approval to, among other things:  (a) increase the aggregate shares
available for the ESPP by 2 million up to a total of 70 million shares; and (b) increase the
aggregate shares available for the 2003 ESOP by 49 million.

281.   As alleged in detail above, the 2005 Proxy contained materially false and
misleading statements and omissions, including, without limitation:  (a) the failure to disclose
that in violation of the Company's stock option plans, Apple was backdating option grants; (b)
the false statements that the Company's long-term executive compensation plans closely
aligned shareholder and executive interests; (c) the false statement that stock options have

value for an employee only if the Company's stock price increases above the exercise price; (d) the failure to disclose that Jobs' ten million (split-adjusted) restricted share award was received in exchange for backdated stock options; and (e) the misleading statement that a compensation consultant concluded that the infrequent grant of options did not make up for below market median total cash compensation to executive officers, without having taken into account the value of backdated stock options.

282.    In addition, in casting their votes for the compensation packages described in the 2005 Proxy, shareholders relied upon the validity of the Company's financial results and other statements about the Company's compensation practices.  But, as shareholders have now been told by the Company, the financial statements are materially inaccurate and should not be relied upon.  Indeed, the 2005 Proxy states that based upon a review of audited financial statements by the Audit Committee of the Apple board of directors and discussion with the Company's auditors, "the Audit Committee recommended to the Board of Directors that the [audited] financial statements [reviewed with the Company's accountants] be included in the Company's Annual Report on Form 10-K for the fiscal year ended September 24, 2004."

283.    At the time the foregoing false and misleading statements were made, the Section 14(a) Defendants negligently failed to ascertain their falsity.

284.    A shareholder who knew (a) that Company executives had backdated stock options, (b) that members of the full board, Audit and/or Compensation Committees either knew about the backdating or failed to have reasonable procedures in place to detect it, (c) that the failure to properly account for backdated stock options artificially inflated the Company's operating and/or net income (and/or understated operating and/or net loss) for numerous years, and/or (d) the other misrepresentations alleged herein would not have voted in favor of expanding Apple's ability to award executive compensation as indicated above.

285.    The misrepresentations in and omissions from the 2005 Proxy were material to shareholders who were being asked to vote on the matters in the 2005 Proxy.  Apple's shareholders were harmed because they were deprived of the opportunity to cast a fully informed vote on the matters considered at the Company's 2005 annual meeting.

286.   The false and misleading 2005 Proxy was an essential link in accomplishing the transactions challenged hereby, and as a direct and proximate result, Lead Plaintiff and the Section 14(a) Class have been damaged because the value of their shares were improperly diluted through the issuance of these additional shares as a direct and proximate result of the defendants' breach of their duty of full disclosure.

**COUNT II**

**CLASS CLAIM FOR VIOLATION OF
SECTION 20(a) AGAINST THE DIRECTOR DEFENDANTS AND
FORMER DIRECTOR ANDERSON WITH RESPECT TO THE 2005 PROXY**

287.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

288.   Lead Plaintiff asserts this count on behalf of itself and the Section 14(a) Class against the Director Defendants and former director Anderson (the "Section 20(a) Defendants") for violations of Section 20(a).

289.   The Section 14(a) Defendants committed a primary violation of Section 14(a) by making false and misleading statements of material fact in connection with the matters contained in the 2005 Proxy.  At the time these false and misleading statements were made, the Section 14(a) negligently failed to ascertain their falsity.

290.   The Section 20(a) Defendants had direct control and/or supervisory involvement in the operations of the Company and therefore had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

291.   By reason of their status as officers, directors and members of management and/or as senior executives of Apple, or their ownership of substantial amounts of Apple's voting shares during the Section 14(a) Class Period, the Section 20(a) Defendants are "controlling persons" of Apple within the meaning of Section 20(a) because they had the power and influence and cause Apple to engage in the unlawful conduct complained of herein.

Because of their positions of control, the Section 20(a) Defendants were able to, and did, directly or indirectly, control the conduct of Apple's business, the information contained in its filings with the SEC, and public statements about its business.

292.    Each of the Section 20(a) Defendants named in this Count was provided with or had access to copies of the Company's proxy statements, reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

293.    As set forth above, each of the Section 20(a) Defendants controlled persons or entities who violated Section 14(a).  By virtue of their positions as controlling persons, the Section 20(a) Defendants are liable pursuant to Section 20(a).

294.    As a direct and proximate cause of the Section 20(a) Defendants' wrongful conduct, Lead Plaintiff and the Section 14(a) Class suffered damages.

### COUNT III

### CLASS CLAIM FOR BREACH
### OF THE DUTY OF DISCLOSURE

295.    Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

296.    Lead Plaintiff brings this claim as a direct claim on behalf of itself and the State Law Class against the Director Defendants, Former Director Anderson and the Former Director Defendants for breach of their fiduciary duty of disclosure with respect to those proxy statements dated at a time when such defendant was a director of the Company.

297.    As identified more fully above, Apple solicited shareholder votes for the authorization for issuance of (in the aggregate) over 200 million (split-adjusted) shares of the Company's common stock through the use of false and misleading proxy statements distributed in connection with the Company's annual meetings held in 1996, 1997, 1998, 2000, 2001, 2002, 2003 and 2005.

298.    The 2005 Proxy sought shareholder approval for the actions, and contained the materially false and misleading statements, indicated in Counts I and II hereof and are incorporated herein by reference.

299.    The 2003 Proxy sought approval for an amendment to the 1998 Plan to allow broad-based grants to all employees and to approve an amendment to the ESPP to increase the number of shares of common stock reserved for issuance thereunder by 4 million shares.

300.    As alleged in detail above, the 2003 Proxy Statement contained materially false and misleading statements and omissions, including, without limitation:  (a) the failure to disclose that in violation of the Company's stock option plans, Apple was backdating option grants; (b) the false statements that the Company's long-term executive compensation plans closely aligned shareholder and executive interests; (c) the false statement that stock options have value for an employee only if the Company's stock price increases above the exercise price; (d) the false statement that defendant Jobs was granted options with an exercise price equal to the fair market value on the date of grant; (e) the false statement that Apple's Board approved a 7.5 million share option grant to defendant Jobs in October 2001 when, as the Company has now admitted, no such board approval was given; (f) the failure to disclose that the 2001 option grant to defendant Jobs included an instant paper profit exceeding $20 million; and (g) the failure to disclose that Jobs' five million (not split-adjusted) restricted share award was received in exchange for backdated stock options.

301.    In reviewing the 2003 Proxy, Plaintiffs also relied on the validity of disclosures in the 2003 Annual Report which, among other things alleged herein:  (a) reported falsely inflated operating and/or net income (and/or falsely understated operating and/or net loss); (b) falsely stated that options may be granted at not less than fair market value on the date of grant; and (c) falsely stated that the Company followed APB No. 25 in accounting for stock options.

302.    All of the foregoing false and misleading statements were material.

303.    A shareholder who knew that Company executives backdated options (thereby providing not only improper compensation to Apple employees but also artificially inflating net income) and/or the other misrepresentations alleged herein would not have voted in favor

82

of an amendment to the 1998 Plan to allow broad-based stock option grants to all employees or to approve an amendment to the ESPP to increase the number of shares designed to provide employees with the ability to purchase company stock at a discount.

304.   Apple's shareholders were harmed because they were deprived of the opportunity of casting a fully informed vote on the matters considered at the Company's 2003 annual meeting and because the value of their shares were improperly diluted through the issuance of these additional shares as a direct and proximate result of the defendants' breach of their duty of full disclosure.

305.   As alleged in detail above, the 1996 Proxy, 1997 Proxy, 1998 Proxy, 2000 Proxy, 2001 Proxy, and 2002 Proxy contained materially false and misleading statements and omissions, including, as applicable and without limitation:  (a) the failure to disclose that in violation of the Company's stock option plans, Apple was backdating option grants; (b) the false statement that options were granted at an exercise price equal to the fair market value of the Company's common stock on the date of grant or the business day immediately preceding the date of grant; (c) the false statement that defendant Jobs was granted options in 2000 and/or 2001 with an exercise price equal to the fair market value on the date of grant; (d) the false statement that Apple's Board approved a 7.5 million share option grant to defendant Jobs in October 2001 when, as the Company has now admitted, no such board approval was given; (e) the failure to disclose instant paper profits awarded to numerous executive officers identified in the proxy statements' compensation tables.

306.   In reviewing proxy statements, Plaintiffs also relied on the validity of disclosures in the 1996 Annual Report, 1997 Annual Report, 1998 Annual Report, 1999 Annual Report, 2001 Annual Report and 2002 Annual Report which, among other things alleged herein:  (a) reported falsely inflated operating and/or net income (and/or falsely understated operating and/or net loss); (b) falsely stated that options may be granted at not less than fair market value on the date of grant;  (c) falsely stated that the Company followed APB

No. 25 in accounting for stock options; and (d) misrepresented (with respect to the 1999 Annual Report, 2000 Annual Report and 2001 Annual Report) the Company's intention to have executive stock options qualify for tax deductions under Section 162(m).

307.    All of the foregoing false and misleading statements were material.

308.    A shareholder who knew that Company executives backdated options (thereby providing not only improper compensation to Apple employees but also artificially inflating operating and/or net income (and/or understating operating and/or net loss)) and/or the other misrepresentations alleged herein would not have voted in favor of the authorization for issuance of the shares of the Company's common stock as indicated in the 1996 Proxy, 1997 Proxy, 1998 Proxy, 2000 Proxy, 2001 Proxy, and 2002 Proxy because shareholder votes for such authorizations were obtained through the use of the false and misleading proxy statements.

309.    Apple's shareholders were harmed because they were deprived of the opportunity of casting fully informed voted on the matters considered at the Company's annual meetings associated with these proxy statements and, as a direct and proximate of the defendants' breach of their duty of full disclosure, the value of their shares were improperly diluted.

## XI.  PRAYER FOR RELIEF

310.    **WHEREFORE,** Plaintiffs pray that the Court enter judgment and relief in their favor against defendants on the counts contained herein as follows:

(a)    declaring that the Section 14(a) Defendants violated Section 14(a) by publishing false and misleading statements in the 2005 Proxy;

(b)    declaring that the Section 20(a) Defendants violated Section 20(a) by the conduct alleged herein;

(c)    declaring that the Director Defendants, Former Director Anderson and the Former Director Defendants breached their duty of disclosure to Plaintiffs and other Apple shareholders with respect to the proxy statements dated at a time when such defendants were directors of the Company;

(d)    rescinding the amendment to the 2003 ESOP that increased the aggregate shares available thereunder by forty-nine million and the amendment of the ESPP that increased the aggregate shares available by two million up to a total of seventy million shares that were approved pursuant to the false and misleading 2005

84

Proxy, or, in the alternative, awarding Plaintiffs damages based on the dilution to their shareholder interests;

(e)     rescinding the amendment to the 2003 ESOP that enabled broad-based grants to all employees and the amendment to the ESPP that increased the number of shares of common stock reserved for issuance thereunder by four million shares that were approved pursuant to the false and misleading 2003 Proxy or, in the alternative, awarding Plaintiffs damages based on the dilution to their shareholder interests;

(f)     awarding Plaintiffs damages based on the dilution to their shareholder interests resulting from the authorization for issuance and/or subsequent issuance of more than 200 million (split-adjusted) shares of Apple common stock shareholder approval for which was obtained through false and misleading proxy statements distributed for Apple's annual meetings held in 1996, 1997, 1998, 2000, 2001, 2002, 2003 and 2005 in an amount to be determined at trial or, in the alternative, to the extent that some of these 200 million (split-adjusted) shares remain authorized but unissued, Plaintiffs seek rescission of the authorization of such shares;

(g)     ordering an accounting to determine: (i) all current and former Apple employees who received option grants; (ii) the dates on which options were actually granted; (iii) the exercise prices that were assigned to said options; (iv) the exercise prices that should have been assigned to said options had they been assigned on the actual date of grant instead of backdated; (v) when said options were exercised, if applicable, or when they are currently exerciseable; (vi) when, if applicable, said options were "re-priced;" (vii) the circumstances surrounding the "re-pricing;" and (viii) whether said options were exchanged for other forms of compensation;

(h)     certifying the Classes;

(i)     awarding compensatory damages together with pre- and post-judgment interest;

(j)     awarding Plaintiffs the costs and expenses incurred in this action, including, but not limited to, reasonable experts' and attorneys' fees; and

(k)     granting such other and further relief as may be just and proper.

CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)

1

## DEMAND FOR JURY TRIAL

2      Plaintiffs demand a trial by jury on all claims so triable.

3   Dated:  March 23, 2007

4                                          **ANDERLINI, FINKELSTEIN, EMERICK**
                                           **& SMOOT**
5
                                           __/s/ Merrill Glen Emerick__
6                                          Merrill Glen Emerick (State Bar No. 117248)
                                           400 S. El Camino Real – Suite 700
7                                          San Mateo, CA 94402
                                           Tel: 650.348.0102
8                                          Fax: 650.348.0962
                                           memerick@afeslaw.com
9
                                           **GRANT & EISENHOFER P.A.**
10                                         Jay W. Eisenhofer
                                           Charles T. Caliendo
11                                         GRANT & EISENHOFER P.A.
                                           45 Rockefeller Center, 15th Floor
12                                         New York, NY 10111
                                           Tel:  646.722.8500
13                                         Fax:  646.722.8501
                                           jeisenhofer@gelaw.com
14                                                        -and-
                                           Michael J. Barry (*pro hac vice*)
15                                         Lesley E. Weaver (State Bar No. 191305)
                                           GRANT & EISENHOFER P.A.
16                                         1201 North Market Street
                                           Wilmington, DE 19801
17                                         Tel:  302.622.7000
                                           Fax:  302.622.7100
18
                                           *Attorneys for Lead Plaintiff*
19                                         *The New York City Employees' Retirement System*

20

21

22

23

24

25

26

27

28

**CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**