**EXHIBIT A**

**TO THE DECLARATION OF VIVI N. TRAN IN SUPPORT OF MOTION
TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 ASXr1cWzoyLMtcvdWZYb6z3cTZ8tav9T4UEa+0jj5UzihMHJKYvlCBMPwdAkaYei
 haM198/ng9bXCsq1dew/iw==

<SEC-DOCUMENT>0001047469-98-010062.txt : 19980317
<SEC-HEADER>0001047469-98-010062.hdr.sgml : 19980317
ACCESSION NUMBER:               0001047469-98-010062
CONFORMED SUBMISSION TYPE:      DEF 14A
PUBLIC DOCUMENT COUNT:          1
CONFORMED PERIOD OF REPORT:     19980422
FILED AS OF DATE:               19980316
SROS:                NASD

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:            APPLE COMPUTER INC
                CENTRAL INDEX KEY:                 0000320193
                STANDARD INDUSTRIAL CLASSIFICATION:  ELECTRONIC COMPUTERS [3571]
                IRS NUMBER:                        942404110
                STATE OF INCORPORATION:            CA
                FISCAL YEAR END:                   0930

        FILING VALUES:
                FORM TYPE:           DEF 14A
                SEC ACT:
                SEC FILE NUMBER:     000-10030
                FILM NUMBER:         98566590

        BUSINESS ADDRESS:
                STREET 1:            1 INFINITE LOOP
                CITY:                CUPERTINO
                STATE:               CA
                ZIP:                 95014
                BUSINESS PHONE:      4089961010

        MAIL ADDRESS:
                STREET 1:            ONE INFINITE LOOP
                CITY:                CUPERTINO
                STATE:               CA
                ZIP:                 95014
</SEC-HEADER>
<DOCUMENT>
<TYPE>DEF 14A
<SEQUENCE>1
<DESCRIPTION>DEF 14A
<TEXT>

<PAGE>
                    SCHEDULE 14A
                   (RULE 14-101)

            INFORMATION REQUIRED IN PROXY STATEMENT
```

SCHEDULE 14A INFORMATION
PROXY STATEMENT PURSUANT TO SECTION 14 OF THE
SECURITIES EXCHANGE ACT OF 1934


    Filed by the Registrant /X/
    Filed by a Party other than the Registrant / /

    Check the appropriate box:
    / /  Preliminary Proxy Statement
    / /  Confidential, for Use of the Commission Only (as permitted by Rule
         14a-6(e)(2))
    /X/  Definitive Proxy Statement
    / /  Definitive Additional Materials
    / /  Soliciting Material Pursuant to Rule 14a-11(c) or Rule 14a-12



                         APPLE COMPUTER, INC.
- --------------------------------------------------------------------------------
               (Name of Registrant as Specified In Its Charter)


- --------------------------------------------------------------------------------
     (Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

/X/  No fee required.
/ /  Fee computed on table below per Exchange Act Rules 14a-6(i)(1)
     and 0-11.
     1)  Title of each class of securities to which transaction applies:
         -----------------------------------------------------------------------
     2)  Aggregate number of securities to which transaction applies:
         -----------------------------------------------------------------------
     3)  Per unit price or other underlying value of transaction computed
         pursuant to Exchange Act Rule 0-11 (set forth the amount on which the
         filing fee is calculated and state how it was determined):
         -----------------------------------------------------------------------
     4)  Proposed maximum aggregate value of transaction:
         -----------------------------------------------------------------------
     5)  Total fee paid:
         -----------------------------------------------------------------------
/ /  Check box if any part of the fee is offset as provided by Exchange Act Rule
     0-11(a)(2) and identify the filing for which the offsetting fee was paid
     previously. Identify the previous filing by registration statement number,
     or the Form or Schedule and the date of its filing.
     1)  Amount Previously Paid:
         -----------------------------------------------------------------------
     2)  Form, Schedule or Registration Statement No.:
         -----------------------------------------------------------------------
     3)  Filing Party:
         -----------------------------------------------------------------------
     4)  Date Filed:
         -----------------------------------------------------------------------
<PAGE>


                              [LOGO]

                NOTICE OF ANNUAL MEETING OF SHAREHOLDERS
                    TO BE HELD ON APRIL 22, 1998

To Holders of Common Stock of

Apple Computer, Inc.:


    Notice is hereby given that the Annual Meeting of Shareholders of Apple
Computer, Inc., a California corporation (the "COMPANY"), will be held on
Wednesday, April 22, 1998 at 10:00 a.m., local time, at the Company's principal
executive offices located at 1 Infinite Loop, Cupertino, California 95014, for
the following purposes, as more fully described in the accompanying Proxy
Statement:


    1.  To elect three directors to Class II of the Company's Board of
        Directors.

    2.  To approve an amendment to the Company's Restated Articles of
        Incorporation to eliminate the classification of the Company's Board of
        Directors and thereby ensure that each director will stand for election
        annually.

    3.  To approve (i) the Apple Computer, Inc. 1997 Director Stock Option Plan,
        which provides for the issuance of up to 400,000 shares of the Company's
        common stock, no par value (the "COMMON STOCK"), and (ii) the grant
        pursuant to a predecessor stock option plan for non-employee directors of
        15,000 stock options to each of Edgar S. Woolard, Jr. and Gareth C.C.
        Chang, both non-employee directors of the Company, and the reservation of
        430,000 shares of Common Stock in the aggregate for issuance pursuant to
        the 1997 Director Stock Option Plan and such grants.


    4.  To approve the Apple Computer, Inc. 1998 Executive Officer Stock Plan
        and the reservation for issuance thereunder of 17,000,000 shares of
        Common Stock.



    5.  To ratify the appointment of KPMG Peat Marwick LLP as independent
        auditors of the Company for fiscal year 1998.



    6.  To transact such other business as may properly come before the meeting
        and any postponement(s) or adjournment(s) thereof.


    All shareholders are cordially invited to attend the meeting in person.
However, to ensure that each shareholder's vote is counted at the meeting,
shareholders are requested to mark, sign, date and return the enclosed proxy
card as promptly as possible in the envelope provided. Shareholders attending
the meeting may vote in person even if they have previously returned proxy
cards.


    Only shareholders of record as of the close of business on February 23, 1998
are entitled to receive notice of, to attend and to vote at the meeting.

Sincerely,


[SIGNATURE]

NANCY R. HEINEN

SENIOR VICE PRESIDENT,
GENERAL COUNSEL AND SECRETARY


Cupertino, California
March 16, 1998

<PAGE>

APPLE COMPUTER, INC.
1 INFINITE LOOP
CUPERTINO, CALIFORNIA 95014

PROXY STATEMENT

INTRODUCTION


   The enclosed Proxy is solicited on behalf of the Board of Directors (the
"BOARD") of Apple Computer, Inc., a California corporation (the "COMPANY"), for
use at the Company's annual meeting of shareholders (the "ANNUAL MEETING") to be
held on Wednesday, April 22, 1998 at 10:00 a.m., local time, and at any
postponement(s) or adjournment(s) thereof. The purposes of the Annual Meeting
are set forth in this Proxy Statement and in the accompanying Notice of Annual
Meeting of Shareholders. The Annual Meeting will be held at the Company's
principal executive offices at the address set forth above.


   The Company's complete mailing address is 1 Infinite Loop, Cupertino,
California 95014, and its telephone number is (408) 996-1010. Georgeson &
Company Inc., which is assisting with the mechanics of the return of the
proxies, may be contacted at (800) 223-2064.


   These proxy solicitation materials were mailed on or about March 16, 1998 to
all shareholders entitled to vote at the Annual Meeting.


PROCEDURAL MATTERS


   Shareholders of record as of the close of business on February 23, 1998 (the
"RECORD DATE") are entitled to notice of, to attend and to vote at the Annual
Meeting. There were 132,761,530 shares of Common Stock issued and outstanding on
the Record Date. Each share has one vote on all matters. The closing sale price
of Common Stock as reported on the Nasdaq National Market on the Record Date was
$21.25 per share.


   A shareholder may revoke any proxy given pursuant to this solicitation by
attending the Annual Meeting and voting in person, or by delivering to the
Company's Corporate Secretary at the Company's principal executive offices
referred to above, prior to the Annual Meeting, a written notice of revocation

or a duly executed proxy bearing a date later than that of the previously
submitted proxy.


     The Company will bear the cost of this solicitation. The Company has
retained the services of Georgeson & Company Inc. to assist in obtaining proxies
from brokers and nominees of shareholders for the Annual Meeting. The estimated
cost of such services is $12,500 plus out-of-pocket expenses. In addition, the
Company will reimburse brokerage firms and other persons representing beneficial
owners of shares for their reasonable expenses in forwarding solicitation
material to such beneficial owners. Proxies may be solicited by certain of the
Company's directors, officers and regular employees, without additional
compensation, personally or by telephone, facsimile or telegram.


QUORUM; ABSTENTIONS; BROKER NON-VOTES


     In the election of directors, the three candidates receiving the highest
number of affirmative votes will be elected as directors. Proposal 2 requires
for approval the affirmative vote of a majority of the shares of Common Stock of
the Company outstanding as of the Record Date. Proposals 3, 4 and 5 each require
for approval (i) the affirmative vote of a majority of the shares "represented
and voting" and (ii) the affirmative vote of a majority of the required quorum.
The required quorum for the transaction of business at the Annual Meeting is a
majority of the shares of Common Stock issued and outstanding on the Record Date
(the "QUORUM"). Shares that are voted "FOR", "AGAINST" or "ABSTAIN" in a matter
are treated as being present at the meeting for purposes of establishing the
Quorum, but only shares voted "FOR" or "AGAINST" are treated as shares
"represented and voting" at the Annual Meeting (the "VOTES CAST") with respect
to such matter. Accordingly, abstentions and broker non-votes will be counted
for purposes of determining the presence or absence of the Quorum for the
transaction of business, but will not be counted for purposes of determining the
number of Votes Cast with respect to a proposal.


<PAGE>
DIRECTORS

     The name of, principal occupation of, and certain additional information
about each of the three nominees and the three current directors with unexpired
terms are set forth below. On August 5, 1997, all of the members of the Board
other than Messrs. Woolard and Chang resigned and were replaced by Steven P.
Jobs, Lawrence J. Ellison, William V. Campbell and Jerome B. York. One Class II
director seat remained unfilled on Apple's Board after August 5, 1997 and,
pursuant to an amendment to the Company's by-laws, has been eliminated, thereby
reducing the number of directors on the Board from seven to six.

     Shareholders are being asked to approve an amendment to the Company's
Restated Articles of Incorporation which would, if approved, eliminate the
classification of the Board and ensure that each director will stand for
election annually. For a description of this proposal, see the section of this
Proxy Statement entitled "PROPOSAL NO. 2--APPROVAL OF AN AMENDMENT TO THE
COMPANY'S RESTATED ARTICLES OF INCORPORATION TO ELIMINATE CLASSIFICATION OF THE
BOARD OF DIRECTORS".

     Listed below are the Class II directors nominated for re-election at the
Annual Meeting. If shareholders approve the proposal to declassify the Board,
all of the directors elected at the Annual Meeting will serve a one-year term
expiring at the next annual meeting of shareholders.

```
<TABLE>
<CAPTION>

NAME                                                 POSITION WITH THE COMPAN
- --------------------------------------------- ---------------------------------
<S>                                                  <C>
Steven P. Jobs................................ Director and Interim Chief Executive
Lawrence J. Ellison........................... Director
Edgar S. Woolard, Jr.......................... Director
</TABLE>
```

Listed below are the Class I directors whose two-year terms do not expire until the next annual meeting of shareholders.

```
<TABLE>
<CAPTION>

NAME                                                 POSITION WITH THE COMPAN
- --------------------------------------------- ---------------------------------
<S>                                                  <C>
Gareth C.C. Chang............................. Director
William V. Campbell........................... Director
Jerome B. York................................ Director
</TABLE>
```

WILLIAM V. CAMPBELL has been President and Chief Executive Officer and a director of Intuit Inc. since April 1994. From January 1991 to December 1993, Mr. Campbell was President and Chief Executive Officer of GO Corporation. From 1987 to January 1991, he served as President and Chief Executive Officer of Claris Corporation, a subsidiary of the Company. Mr. Campbell also serves on the board of directors of SanDisk Corporation and Great Plains Software.

GARETH C. C. CHANG has been Corporate Senior Vice President of Hughes Electronics since 1993. Previously, he was Corporate Vice President of McDonnell Douglas Corporation. He is currently a director of Mallinckrodt, Inc.

LAWRENCE J. ELLISON has been Chief Executive Officer and a director of Oracle Corporation ("ORACLE") since he co-founded Oracle in May 1977, and was President of Oracle until June 1996. Mr. Ellison has been Chairman of the Board of Oracle since June 1995. Mr. Ellison is a director of SuperGen, Inc. and Co-Chairman of California's Council on Information Technology.

STEVEN P. JOBS is one of the Company's co-founders and currently serves as its Interim Chief Executive Officer. Mr. Jobs is the also the Chairman and Chief Executive Officer of Pixar Animation Studios. In addition, Mr. Jobs co-founded NeXT Software, Inc. ("NEXT") and served as the Chairman and Chief Executive Officer of NeXT from 1985 until 1997, when NeXT was acquired by the Company.

2

```
<PAGE>
```
EDGAR S. WOOLARD, JR. served as the Chairman of the Board of Directors of E. I. DuPont de Nemours & Co. ("DUPONT") until October 1997. Previously, he held the positions of President and Chief Executive Officer of DuPont. He is currently a director of Citicorp and Zurich Holding Company of America, Inc.

JEROME B. YORK has served as Vice Chairman of Tracinda Corporation since September 1995 and has served in a number of executive positions at Chrysler Corporation, including Executive Vice President-Finance and Chief Financial Officer from May 1990 to May 1993. He also served as a director of Chrysler Corporation from 1992 to 1993. In May 1993, he joined International Business Machines Corporation ("IBM") as Senior Vice President and Chief Financial Officer, and he served as a director of IBM from January 1995 to August 1995. Mr. York also is a director of USA Waste Services, Inc., MGM Grand, Inc. and Metro-Goldwyn-Mayer, Inc.

BOARD MEETINGS AND COMMITTEES

    The Board met a total of twelve times during fiscal year 1997 and took action once by unanimous written consent in lieu of a meeting. The Board has a standing Audit and Finance Committee and a Compensation Committee. Until September 10, 1997, the Board maintained a Director Affairs Committee.

    The current members of the Board's Audit and Finance Committee are Messrs. York and Campbell, neither of whom is an employee of the Company. The Audit and Finance Committee is primarily responsible for reviewing the services performed by the Company's independent auditors and internal audit department, evaluating the Company's accounting policies and its system of internal controls and reviewing significant finance transactions. The Audit and Finance Committee met three times during fiscal year 1997 and took action once by unanimous written consent in lieu of a meeting.

    The current members of the Board's Compensation Committee (the "COMPENSATION COMMITTEE") are Messrs. Woolard and Chang, neither of whom is an employee of the Company. In fiscal year 1997, the members of the Compensation Committee were, through January 1997, Delano E. Lewis (Chairman), B. Jurgen Hintz and Katherine M. Hudson. From January 1997 through June 1997, the members of the Compensation Committee were Mr. Lewis (Chairman), Mr. Chang and Ms. Hudson. From June 1997 through July 1997, the Compensation Committee was comprised of Messrs. Lewis (Chairman), Chang and Woolard. In July 1997, Mr. Lewis resigned from the Board and Mr. Woolard became the Chairman of the Compensation Committee. No person who was an employee of the Company in fiscal year 1997 served on the Compensation Committee in fiscal year 1997. The Compensation Committee is primarily responsible for reviewing compensation to be paid to officers of the Company and for administering the Company's equity-based incentive plans. The Compensation Committee met eleven times during fiscal year 1997 and took action four times by unanimous written consent in lieu of a meeting.

    Through September 10, 1997, the Board maintained a Director Affairs Committee. Messrs. Lewis and Woolard and Ms. Hudson were members of the Board's Director Affairs Committee at various times. Mr. Lewis and Ms. Hudson resigned from the Board on July 25, 1997 and August 5, 1997, respectively, and the Board officially dissolved the Director Affairs Committee on September 10, 1997. The Director Affairs Committee was primarily responsible for reviewing and recommending qualified candidates for election as directors to the Board. The Director Affairs Committee met three times during fiscal year 1997.

    During fiscal year 1997, with the exception of Mr. Ellison, no director attended fewer than 75% of the aggregate of all meetings of the Board and the committees, if any, upon which such director served and which were held during the period of time that such person served on the Board or such committee.

DIRECTOR COMPENSATION

    Prior to April 1, 1997, directors who were not employees of the Company were

paid a retainer of $7,000 per quarter and a fee of $1,000 per Board meeting
attended. No additional fees were paid for

                                    3
<PAGE>
attendance at committee meetings. During the period from April 1, 1997 through
August 5, 1997, the Company's directors were paid a retainer of $6,750 per
quarter, a fee of $2,000 per Board meeting attended and a fee of $1,000 per
committee meeting, if such meeting was held on a different day than a Board
meeting. In addition, the Company adopted a stock option plan for its
non-employee directors (the "PRIOR PLAN") which provided for automatic grants of
15,000 options to each non-employee director.

    As of August 5, 1997, the Company ended its practice of paying cash
retainers and fees to directors, terminated the Prior Plan and approved the
Apple Computer, Inc. 1997 Director Stock Option Plan (the "DIRECTOR PLAN"),
pursuant to which the Company's non-employee directors are granted 30,000 stock
options upon their initial election to the Board. On the fourth anniversary of a
non-employee director's initial election to the Board and on each subsequent
anniversary, the director will be entitled to receive 10,000 vested stock
options.

    Messrs. Woolard and Chang were each granted 15,000 stock options under the
Prior Plan on March 25, 1997. In connection with the replacement of the Prior
Plan with the Director Plan, Messrs. Woolard and Chang were permitted to retain
their grants under the Prior Plan and received only 15,000 stock options for
their initial grants under the Director Plan. For a description of the Director
Plan and the automatic grants to Messrs. Woolard and Chang under the Prior Plan,
see the section of the Proxy Statement entitled "PROPOSAL NO. 3--APPROVAL OF THE
APPLE COMPUTER, INC. 1997 DIRECTOR STOCK OPTION PLAN AND INDEPENDENT STOCK
OPTION GRANTS TO EDGAR S. WOOLARD, JR. AND GARETH C.C. CHANG". The Company
reimburses non-employee directors for travel and other incidental expenses
incurred in attending Board and committee meetings.

EXECUTIVE OFFICERS


    The following sets forth certain information regarding the executive
officers. Information pertaining to Mr. Jobs, who is both a director and an
executive officer of the Company, may be found in the section of this Proxy
Statement entitled "DIRECTORS".


    FRED D. ANDERSON, Executive Vice President and Chief Financial Officer (age
53), joined the Company in April 1996. Prior to joining the Company, Mr.
Anderson was Corporate Vice President and Chief Financial Officer of Automatic
Data Processing, Inc. ("ADP"), a position he held from August 1992 to March
1996. Prior to joining ADP, Mr. Anderson held several domestic and international
executive positions at MAI Basic Four, Inc., including President and Chief
Operating Officer.

    NANCY R. HEINEN, Senior Vice President, General Counsel and Secretary (age
41), joined the Company in September 1997. Prior to joining the Company, Ms.
Heinen held the position of Vice President, General Counsel and Secretary of the
Board of Directors at NeXT from February 1994 until the acquisition of NeXT by
the Company in February 1997. Prior to joining NeXT, Ms. Heinen was Group
Counsel and Assistant Secretary at Tandem Computers Incorporated from 1989 to
1994, and previously had been employed in private legal practice.

MITCHELL MANDICH, Senior Vice President, Americas Sales and Service (age 49), joined the Company in Feburary 1997 upon the Company's acquisition of NeXT. Mr. Mandich has also served the Company in the position of Vice President, North American Business Division. Prior to joining the Company, Mr. Mandich held the position of Vice President, Worldwide Sales and Service with NeXT from December 1995 through February 1997. Before joining NeXT, Mr. Mandich served in the position of Senior Vice President, Americas Sales and Marketing with Pyramid Technology Corporation from January 1993 to November 1995.

JONATHAN RUBINSTEIN, Senior Vice President, Hardware Engineering (age 41), joined the Company in February 1997. Before joining the Company, Mr. Rubinstein was Executive Vice President and Chief Operating Officer of FirePower Systems Incorporated ("FIREPOWER"), from May 1993 to August 1996. Before joining FirePower, Mr. Rubinstein was Vice President and General Manager, Hardware and Vice President, Hardware Engineering at NeXT.

                                        4
<PAGE>

AVADIS TEVANIAN, JR., PH.D., Senior Vice President, Software Engineering (age 37), joined the Company in February 1997 upon the Company's acquisition of NeXT. With NeXT, Dr. Tevanian held several positions, including Vice President, Engineering, from April 1995 to February 1997. Prior to April 1995, Dr. Tevanian worked as an engineer with NeXT and held several management positions.

SINA TAMADDON, Vice President and General Manager, Newton Group (age 40), joined the Company in September 1997. Before joining the Company, Mr. Tamaddon held the position of Vice President, Europe with NeXT from September 1996 through March 1997. From August 1994 to August 1996, Mr. Tamaddon held the position of Vice President, Professional Services with NeXT. Prior to joining NeXT, Mr. Tamaddon served as Vice President, Advanced Technology for Software Alliance Incorporated.

SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT

The following table sets forth, as of February 2, 1998 (the "TABLE DATE"), certain information with respect to the beneficial ownership of Common Stock. Based on information available to the Company, there are no shareholders known to the Company to be the beneficial owner of more than 5% of the outstanding Common Stock. The following table contains information concerning (i) each director of the Company and each nominee; (ii) each Named Executive Officer listed in the Summary Compensation Table below; and (iii) all directors and executive officers of the Company as a group. On the Table Date, 132,760,480 shares of Common Stock were issued and outstanding. Unless otherwise indicated, all persons named as beneficial owners of Common Stock have sole voting power and sole investment power with respect to the shares indicated as beneficially owned.

SECURITY OWNERSHIP OF DIRECTORS, NOMINEES AND EXECUTIVE OFFICERS

<TABLE>
<CAPTION>

                                                                      SHARES OF COM
NAME OF BENEFICIAL OWNER                                              BENEFICIALLY
- ----------------------------------------------------------------- -----------

```
<S>                                                            <C>
Gilbert F. Amelio.....................................................      16,
 Fred D. Anderson.....................................................       1,
 Robert Calderoni.....................................................
 William V. Campbell..................................................
 Gareth C. C. Chang...................................................       2,
 Guerrino De Luca.....................................................       1,
 Lawrence J. Ellison..................................................
 Ellen Hancock........................................................
 Steven P. Jobs.......................................................
 Jonathan Rubinstein..................................................       2,
 Edgar S. Woolard, Jr.................................................       8,
 Jerome B. York.......................................................      10,
 All executive officers and directors as a group (12 persons)........      92,
</TABLE>
```

- ------------------------

(1) All amounts listed in this table represent less than 1% of the issued and
    outstanding shares of Common Stock on the Table Date.

(2) Includes 10,000 shares subject to outstanding warrants held by Dr. Amelio
    that were exercisable at the Table Date.

(3) Represents shares of Common Stock held by 12 executive officers and
    directors and options held by such individuals that were exercisable at the
    Table Date or within 60 days thereafter.

                                       5
<PAGE>
SECTION 16(A) BENEFICIAL OWNERSHIP REPORTING COMPLIANCE

     Section 16(a) of the Securities Exchange Act of 1934, as amended, requires
the Company's officers and directors, and persons who own more than ten percent
of a registered class of the Company's equity securities, to file reports of
securities ownership and changes in such ownership with the Securities and
Exchange Commission (the "SEC"). Officers, directors and greater than ten
percent shareholders also are required by rules promulgated by the SEC to
furnish the Company with copies of all Section 16(a) forms they file.

     Based solely upon a review of the copies of such forms furnished to the
Company, the absence of a Form 3 or Form 5 or written representations that no
Forms 5 were required, the Company believes that, during fiscal year 1997, its
officers, directors and greater than ten percent beneficial owners complied with
all applicable Section 16(a) filing requirements.

                 REPORT OF THE COMPENSATION COMMITTEE
            OF THE BOARD OF DIRECTORS ON EXECUTIVE COMPENSATION

     The Company's executive compensation program is administered by the
Compensation Committee. The role of the Compensation Committee, which is
currently comprised of two outside non-employee directors, is to review and
approve the base salaries, bonuses, stock options and other compensation of the
executive officers and director-level employees of the Company.

The Company's executive compensation program utilizes Company performance, individual performance and an increase in stockholder value over time as determinants of executive pay levels. These principles are intended to motivate executive officers to improve the financial position of the Company, to hold executives accountable for the performance of the organizations for which they are responsible, to attract key executives into the service of the Company and to create value for the Company's shareholders.

During fiscal year 1997, the Company experienced extensive changes in its senior management. On July 8, 1997, Dr. Amelio resigned as Chief Executive Officer of the Company and was replaced on an interim basis beginning on September 10, 1997 by Mr. Jobs pending the completion of a nationwide search for a new chief executive officer. Also during fiscal year 1997, the Company hired and/or promoted John B. Douglas, III (Senior Vice President, General Counsel and Secretary), James McCluney (Senior Vice President, Operations), Guerrino De Luca (Executive Vice President, Marketing), Avadis Tevanian, Jr. (Senior Vice President, Software Engineering), David Manovich (Senior Vice President, International Sales and Service), Jonathan Rubinstein (Senior Vice President, Hardware Engineering) and Mitchell Mandich (Senior Vice President, Americas Sales and Service). Messrs. Douglas, De Luca, McCluney and Manovich have since terminated their employment relationships with the Company.

As a result of these management changes, the Company was required to make certain one-time compensation adjustments to reflect the new job responsibilities of those who were promoted and certain one-time payments to reflect, in the Compensation Committee's judgment, the amount necessary to attract these new employees to the Company and to compensate them for amounts forfeited as a result of leaving their former employers. In addition, the Company made severance and other termination payments to departing executives which are described in the section of this Proxy Statement entitled "ARRANGEMENTS WITH NAMED EXECUTIVE OFFICERS."

In connection with these management changes, the Compensation Committee took a number of steps in fiscal year 1997 (which are described below) to realign the mix of current cash and long-term compensation paid to executive officers and to renew and reinforce the Company's commitment to utilizing stock options as a significant component of long-term compensation for executive officers.

6

<PAGE>
CASH COMPENSATION

The Company utilizes executive compensation surveys in the computer industry and general industry to ensure that the total cash compensation provided to executive officers and senior management remains at a competitive level to enable the Company to attract and retain management personnel with the talents and skills required to meet the challenges of a highly competitive industry. Executive officer base salaries were reviewed by the Compensation Committee periodically throughout fiscal year 1997. These base salary reviews resulted in some executive officers receiving an increase in base salary to take into account new responsibilities and positions within the organization.

BONUSES

For fiscal year 1997, the Compensation Committee approved the Senior Executive Incentive Bonus Plan (the "BONUS PLAN"), in which cash bonuses for

executive officers were determined with reference to specified financial performance targets for the Company, including operating margins and revenue targets. The Bonus Plan stated that no bonuses would be payable in the absence of a corporate profit. No executive officers received a payout under the Bonus Plan for fiscal year 1997.

EQUITY-BASED COMPENSATION

     In fiscal year 1997, the Compensation Committee emphasized equity-based compensation, principally in the form of options, as the cornerstone of the Company's executive compensation program. Equity awards are typically set by the Compensation Committee based on industry surveys, each officer's individual performance and achievements, market factors and the recommendations of management. In fiscal year 1997, executive officers were eligible to receive grants of stock options under the Apple Computer, Inc. 1990 Stock Option Plan (the "1990 PLAN") and conditional, performance-based awards of Common Stock ("PERFORMANCE SHARES") under the Apple Computer, Inc. Senior Officers Restricted Performance Share Plan (the "PERFORMANCE SHARE PLAN"). In addition, executive officers were eligible to participate in the Company's Employee Stock Purchase Plan.

     During fiscal year 1997, fourteen executive officers of the Company received new option grants under the 1990 Plan. Options are granted under the 1990 Plan at an exercise price equal to the fair market value of the Common Stock and generally vest in equal increments over a three-year period after grant, subject to the participant's continued employment with the Company. All options granted under the 1990 Plan expire ten years from the date of grant, unless a shorter term is provided in the option agreement or the participant's employment with the Company ends before the end of such ten-year period.

     In July 1997, the Compensation Committee also reviewed the employees' outstanding options and determined that many employees of the Company held options at exercise prices that limited their effectiveness as a tool for employee retention and as a long-term incentive. To address this problem, the Compensation Committee consulted with an independent benefits consultant and, after considering various methods of dealing with this problem, approved the Exchange Program. Under the Exchange Program, current employees of the Company were permitted to exchange all (but not less than all) of their options for new options on a one-for-one basis with an exercise price of $13.25, the fair market value of the Common Stock as determined under the terms of the 1990 Plan. Six executive officers elected to participate in the Exchange Program. Dr. Amelio was precluded from participating in the Exchange Program as were former employees of the Company. The terms of the Exchange Program are described in the section of this Proxy Statement entitled "STOCK OPTION EXCHANGE PROGRAM".

     In November 1996, the Compensation Committee approved the Performance Share Plan, which was approved by shareholders at the annual meeting held on February 5, 1997. Pursuant to the Performance Share Plan, executives of the Company at the level of senior vice president and above and other key employees designated from time to time by the Compensation Committee were eligible to earn shares of Common Stock based upon the achievement by the Company of targets under performance goals

                                   7

<PAGE>

established by the Compensation Committee for each fiscal year. The Compensation Committee established Company-wide performance goals for fiscal year 1997 and conditionally granted 269,950 Performance Shares to nine executive officers as the target number of total shares that could be earned based on Company

performance during fiscal year 1997. After the end of fiscal year 1997, the Compensation Committee determined whether the Company achieved the applicable performance goals and targets for fiscal year 1997 and, accordingly, whether and how many shares of Common Stock would be awarded pursuant to the conditionally awarded Performance Shares. For fiscal year 1997, nine executive officers (including Dr. Amelio) were awarded 45,082 shares of Common Stock in the aggregate in settlement of their Performance Shares. Participants in the Performance Share Plan may elect to receive up to 50% of their final award in cash. On November 5, 1997, the Board terminated the Performance Share Plan.

COMPENSATION OF THE CHIEF EXECUTIVE OFFICER

    As noted above, Dr. Amelio was Chief Executive Officer of the Company until his resignation on July 8, 1997. Dr. Amelio's compensation for fiscal year 1997 was set forth in his employment agreement with the Company. The compensation elements under the agreement included base salary, bonus, and long-term incentives. Dr. Amelio received a base salary for fiscal year 1997 of $990,000 and a cash bonus of $1,000,000 payable after the end of fiscal year 1997 pursuant to the terms of his employment agreement.

    Dr. Amelio did not receive any grants of stock options in fiscal year 1997.

    Under the Performance Share Plan, Dr. Amelio received a target award of 200,000 Performance Shares conditioned upon the achievement of goals specified by the Compensation Committee for fiscal year 1997. After the end of the year, the Compensation Committee reviewed the Company's performance against the applicable performance goals and targets for the year and, in its judgment, determined that Dr. Amelio earned Performance Shares at the level of 16.7% of the target number of shares with the resulting award of 33,400 shares of Common Stock, of which Dr. Amelio elected to receive 50% in cash.

    In fiscal year 1997, the Company made severance and other termination payments to Dr. Amelio in accordance with his employment agreement and a negotiated separation agreement. These amounts are described in this Proxy Statement under the heading "ARRANGEMENTS WITH NAMED EXECUTIVE OFFICERS".

    On September 10, 1997, Mr. Jobs assumed the position of Interim Chief Executive Officer. Mr. Jobs did not receive any compensation for the services he performed for the Company in fiscal year 1997 (other than 30,000 stock options granted to Mr. Jobs pursuant to the terms of the Director Plan, subject to the approval of the Company's shareholders).

SECTION 162(M)

    The Company intends that options granted under the 1990 Plan and payments made or stock issued under the Performance Share Plan be deductible by the Company under Section 162(m) of the Internal Revenue Code of 1986, as amended (the "CODE").

                    MEMBERS OF THE COMPENSATION COMMITTEE*

        Edgar S. Woolard, Jr., Chairman            Gareth C.C. Chang

- ------------------------

*   The composition of the Compensation Committee changed three times during
    fiscal year 1997. All of the individuals who served on the Compensation

Committee during fiscal year 1997 and their periods of service are described
in this Proxy Statement in the section entitled "BOARD MEETINGS AND
COMMITTEES".

8

<PAGE>

INFORMATION REGARDING EXECUTIVE COMPENSATION

The following table summarizes compensation information for the last three
fiscal years for (i) Mr. Jobs, Interim Chief Executive Officer, and Dr. Amelio,
former Chairman of the Board and Chief Executive Officer, (ii) the four most
highly compensated executive officers other than the Chief Executive Officer who
were serving as executive officers of the Company at the end of fiscal year 1997
and (iii) Ms. Hancock, former Executive Vice President and Chief Technology
Officer, who would have been one of the Company's four most highly compensated
executive officers for which disclosure is required had she been an executive
officer of the Company at the end of fiscal year 1997 (collectively, the "NAMED
EXECUTIVE OFFICERS").

SUMMARY COMPENSATION TABLE

<TABLE>
<CAPTION>

|  |  | ANNUAL COMPENSATION | | LO ------ |
| NAME AND PRINCIPAL POSITION (1)(2) | FISCAL YEAR | SALARY ($) | BONUS ($) | RESTR STOCK ( |
| - -------------------------------- | ------ | -------- | ----------- | ---- |
| <S> | <C> | <C> | <C> | <C> |
| Steven P. Jobs..................... | 1997 | -- | -- | - |
| Interim Chief Executive Officer | 1996 | | | |
|  | 1995 | | | |
| Gilbert F. Amelio.................. | 1997 | 997,617 | 1,000,000(4) | 5 |
| Former Chairman of the Board | 1996 | 655,061 | 2,334,000 | 3,8 |
| and Chief Executive Officer | 1995 | | | |
| Fred D. Anderson................... | 1997 | 520,311 | -- | |
| Executive Vice President | 1996 | 252,156 | 1,275,000 | - |
| and Chief Financial Officer | 1995 | | | |
| Guerrino De Luca................... | 1997 | 430,496 | 322,732 | |
| Executive Vice President, | 1996 | 269,034 | 104,489 | - |
| Marketing | 1995 | | | |
| Robert Calderoni.................. | 1997 | 288,058 | 75,000(15) | |
| Senior Vice President, | 1996 | 63,794 | 125,000 | - |
| Corporate Controller | 1995 | | | |
| Jonathan Rubinstein............... | 1997 | 250,262 | 100,000 | |
| Senior Vice President, | 1996 | | | |
| Hardware Engineering | 1995 | | | |
| Ellen Hancock...................... | 1997 | 424,120 | 360,000(16) | - |
| Former Executive Vice President | 1996 | 111,646 | 200,000 | - |
| and Chief Technology Officer | 1995 | | | |

</TABLE>

- --------------------------

(1) Dr. Amelio and Ms. Hancock resigned as executive officers of the Company
    effective as of July 8, 1997 and July 25, 1997, respectively. Messrs. De
    Luca and Calderoni resigned as executive officers effective as of October
    10, 1997 and November 7, 1997, respectively.

(2) Messrs. Jobs and Rubinstein became executive officers of the Company during
    fiscal year 1997. Dr. Amelio, Messrs. Anderson, De Luca and Calderoni and
    Ms. Hancock became executive officers of the Company during fiscal year
    1996.

(3) Mr. Jobs was granted 30,000 stock options in his capacity as a director of
    the Company pursuant to the Director Plan, subject to the approval of the
    Director Plan by shareholders at the Annual Meeting.

(4) Represents Dr. Amelio's annual Component B Bonus paid pursuant to the terms
    of his employment agreement and his separation agreement. For a description
    of the terms of Dr. Amelio's separation agreement, see the section of this
    Proxy Statement entitled "ARRANGEMENTS WITH NAMED EXECUTIVE
    OFFICERS--SEPARATION AGREEMENT WITH GILBERT F. AMELIO".

(5) For fiscal year 1997, these amounts represent the values on February 5,
    1997 of the Common Stock underlying the Performance Shares earned by the
    Named Executive Officers under the terms of the Performance Share Plan.

                                    9
<PAGE>

    The amounts of Common Stock earned by participating Named Executive Officers
    are as follows: Dr. Amelio - 33,400; Mr. Anderson - 2,672; Mr. De Luca -
    2,004; Mr. Calderoni - 626; and Mr. Rubinstein - 1,253. No dividends were
    paid on the Performance Shares. As of the last day of fiscal year 1997, the
    Named Executive Officers held no other Performance Shares or restricted
    stock.

(6) Consists of (i) a lump sum severance payment of $6,731,871 paid pursuant to
    the terms of Dr. Amelio's separation agreement, $1,500,000 of which was
    immediately applied in partial repayment of his outstanding indebtedness to
    the Company, (ii) $8,272, the value of certain computer equipment that Dr.
    Amelio was permitted to keep or which the Company agreed to deliver after
    his termination of employment pursuant to the terms of his separation
    agreement, (iii) a $4,194 matching contribution made by the Company in
    accordance with the terms of its 401(k) plan and (iv) the payment by the
    Company of $4,757 of premiums on a life insurance policy for the benefit of
    Dr. Amelio.

(7) Represents the value on February 2, 1996 of 130,960 shares of Common Stock
    earned by Dr. Amelio for fiscal year 1996 under the Performance Share Plan.
    No dividends were paid on the Performance Shares.

(8) Pursuant to Dr. Amelio's separation agreement, 800,000 of the options
    granted to him during fiscal year 1996 were forfeited upon his resignation

of employment, which became effective on September 27, 1997.

(9) Consists of matching contributions made by the Company in accordance with the terms of its 401(k) plan.

(10) Includes the replacement of 500,000, 309,750 and 200,000 options that were previously granted to Messrs. Anderson, De Luca and Rubinstein, respectively, and canceled pursuant to the Stock Option Exchange Program (the "EXCHANGE PROGRAM"), which is described in the section of this Proxy Statement entitled "STOCK OPTION EXCHANGE PROGRAM".

(11) Consists of $245,497 in relocation assistance and $4,992 in matching contributions made by the Company in accordance with the terms of its 401(k) plan.

(12) Consists of $140,155 in relocation assistance and $1,206 in matching contributions made by the Company in accordance with the terms of its 401(k) plan.

(13) Consists of $158,373 in relocation assistance and $11,140 in matching contributions made by the Company in accordance with the terms of its 401(k) plan.

(14) Consists of $49,451 in relocation assistance and $12,876 in matching contributions made by the Company in accordance with the terms of its 401(k) plan.

(15) Paid pursuant to the terms of Mr. Calderoni's employment agreement with the Company, which agreement terminated upon his resignation as an employee of the Company effective November 7, 1997. For a description of employment agreements with Named Executive Officers, see the section of this Proxy Statement entitled "ARRANGEMENTS WITH NAMED EXECUTIVE OFFICERS--EMPLOYMENT AGREEMENTS WITH NAMED EXECUTIVE OFFICERS".

(16) Paid pursuant to the terms of Ms. Hancock's employment agreement with the Company, which agreement terminated upon her resignation as an employee of the Company effective July 25, 1997.

(17) Consists of a severance payment made by the Company to Ms. Hancock pursuant to the terms of her employment agreement with the Company.

(18) Ms. Hancock forfeited 200,000 of these stock options upon her termination of employment.

                                       10
<PAGE>
OPTION GRANTS IN LAST FISCAL YEAR

    The following table provides information about option grants to the Named Executive Officers during fiscal year 1997.

                        OPTION GRANTS IN LAST FISCAL YEAR

<TABLE>
<CAPTION>

                                                              INDIVIDUAL GRANTS

| NAME | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED (#) | PERCENT OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR (1) | EXERCISE OR BASE PRICE ($/SH)(2) |
|------|------|------|------|
| <S> | <C> | <C> | <C> |
| Steven P. Jobs...................... | 30,000(4) | 0.15% | 23.625 |
| Gilbert F. Amelio................... | -- | -- | -- |
| Fred D. Anderson.................... | 100,000 | 0.51% | 18.375 |
| | 500,000(5) | 2.55% | 13.25 |
| | 250,000 | 1.27% | 19.75 |
| Guerrino De Luca(6)................. | 200,000 | 1.02% | 17.00 |
| | 309,750(5) | 1.58% | 13.25 |
| | 190,250 | 0.97% | 19.75 |
| Robert Calderoni(6)................. | 25,000 | 0.13% | 17.00 |
| | 20,000 | 0.10% | 18.375 |
| | 80,000 | 0.41% | 19.75 |
| Jonathan Rubinstein................. | 200,000 | 1.02% | 17.00 |
| | 200,000(5) | 1.02% | 13.25 |
| | 300,000 | 1.53% | 19.75 |
| Ellen Hancock....................... | -- | -- | -- |

</TABLE>

- ------------------------

(1) Based on an aggregate of 19,629,231 options granted to all employees during
    fiscal year 1997, including 7,866,155 options granted in exchange for the
    cancellation of the same number of outstanding options as of July 11, 1997
    on a one-for-one basis pursuant to the Exchange Program. This amount does
    not include (i) NeXT options which were converted into Apple options during
    fiscal year 1997 in connection with Apple's acquisition of NeXT or (ii)
    Apple options granted to Dr. Amelio during fiscal year 1996 which were
    subject to shareholder approval obtained during fiscal year 1997. Options
    vest in three equal annual installments commencing on the first anniversary
    of the date of grant.

(2) All options were granted at an exercise price equal to fair market value
    based on the closing market value of Common Stock on the Nasdaq National
    Market on the trading day immediately preceding the date of grant. For
    administrative purposes, the Board on November 5, 1997 amended the Company's
    stock option plans to provide that the exercise price of options granted
    under such plans will be the fair market value based on the closing market
    value on the date of grant.

(3) Potential gains are net of exercise price, but before taxes associated with
    exercise. These amounts represent certain assumed rates of appreciation
    only, based on SEC rules, and do not represent the Company's estimate or
    projection of the price of the Company's stock in the future. Actual gains,
    if any, on stock option exercises depend upon the actual future price of

Common Stock and the continued employment of the option holders throughout
the vesting period. Accordingly, the potential realizable values set forth
in this table may not be achieved.

(4) Mr. Jobs was granted 30,000 stock options in his capacity as a director of
the Company pursuant to the Director Plan, subject to the approval of the
Director Plan by shareholders at the Annual Meeting.

(5) Grants of stock options pursuant to the Exchange Program in exchange for the
cancellation of outstanding stock options. The first grant of stock options
listed in the table above for each of Messrs. Anderson, De Luca and
Rubinstein was canceled in connection with the Exchange Program and is no
longer outstanding.

(6) All stock options held by Messrs. De Luca and Calderoni were forfeited upon
their termination of employment.

                                  11
<PAGE>
OPTIONS EXERCISED AND YEAR-END OPTION HOLDINGS

    The following table provides information about stock option exercises by the
Named Executive Officers during fiscal year 1997 and stock options held by each
of them at fiscal year-end.

                AGGREGATED OPTION EXERCISES IN THE LAST FISCAL YEAR
                      AND FISCAL YEAR-END OPTION VALUES

<TABLE>
<CAPTION>

| | | | NUMBER OF SECU UNDERLYING UNEX OPTIONS AT FISCAL (#) | |
| NAME | SHARES ACQUIRED ON EXERCISE (#) | VALUE REALIZED ($)(1) | EXERCISABLE | UNEX |
| --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> |
| Steven P. Jobs......................... | -- | -- | 0 | |
| Gilbert F. Amelio...................... | 50,000 | 134,375 | 150,000 | |
| Fred D. Anderson....................... | -- | -- | 0 | |
| Guerrino De Luca....................... | -- | -- | 0 | |
| Robert Calderoni....................... | 25,000 | 133,125 | 0 | |
| Jonathan Rubinstein.................... | -- | -- | 0 | |
| Ellen Hancock.......................... | 100,000 | 949,375 | 0 | |

</TABLE>

- --------------------------

(1) Market value of underlying securities (based on the fair market value of
Common Stock on the Nasdaq National Market) at the time of exercise, minus
the exercise price.

(2) Market value of securities underlying in-the-money options at the end of
fiscal year 1997 (based on $21.3125 per share, the closing price of Common
Stock on the Nasdaq National Market on September 26, 1997), minus the
exercise price.

(3) Forfeited upon termination of employment.

COMPENSATION COMMITTEE INTERLOCKS AND INSIDER PARTICIPATION

    The composition of the Compensation Committee changed several times during
fiscal year 1997. No person who was an employee of the Company in fiscal year
1997 served on the Compensation Committee in fiscal year 1997. During fiscal
year 1997, no executive officer of the Company (i) served as a member of the
compensation committee (or other board committee performing similar functions
or, in the absence of any such committee, the board of directors) of another
entity, one of whose executive officers served on the Company's Compensation
Committee, (ii) served as a director of another entity, one of whose executive
officers served on the Company's Compensation Committee, or (iii) served as a
member of the compensation committee (or other board committee performing
similar functions or, in the absence of any such committee, the board of
directors) of another entity, one of whose executive officers served as a
director of the Company.

STOCK OPTION EXCHANGE PROGRAM

    The following table sets forth certain information concerning the Exchange
Program, including (i) the name and position of each executive officer who
participated in the Exchange Program, (ii) the date of any such exchange, (iii)
the number of securities underlying exchanged options, (iv) the per share market
price of the underlying security at the time of the exchange, (v) the original
exercise price or base price of the canceled option at the time of exchange,
(vi) the per share exercise of the option received in exchange for the existing
option and (vii) the original option term remaining at the date of exchange.

                                  12
<PAGE>
                        10-YEAR OPTION REPRICINGS

<TABLE>
<CAPTION>

| NAME AND POSITION(1) | DATE OF REPRICING | NUMBER OF SECURITIES UNDERLYING OPTIONS REPRICED (#) | MARKET PRICE OF STOCK AT TIME OF REPRICING ($) | EX PR T RE |
| --- | --- | --- | --- | --- |
| <S> | <C> | <C> | <C> | <C> |
| Fred D. Anderson ................... | 7/11/97 | 400,000 | 13.25 | |
| Executive Vice President | | | | |
| and Chief Financial Officer | 7/11/97 | 100,000 | 13.25 | |
| | | | | |
| Guerrino De Luca.................... | 7/11/97 | 200,000 | 13.25 | |
| Executive Vice President, | | | | |
| Marketing | 7/11/97 | 28,000 | 13.25 | |
| | | | | |
| | 7/11/97 | 20,000 | 13.25 | |
| | | | | |
| | 7/11/97 | 15,000 | 13.25 | |
| | | | | |
| | 7/11/97 | 8,000 | 13.25 | |
| | | | | |
| | 7/11/97 | 8,000 | 13.25 | |
| | | | | |
| | 7/11/97 | 7,500 | 13.25 | |

|                                                                          |         |         |       |
|--------------------------------------------------------------------------|---------|---------|-------|
|                                                                          | 7/11/97 | 5,600   | 13.25 |
|                                                                          | 7/11/97 | 5,600   | 13.25 |
|                                                                          | 7/11/97 | 5,000   | 13.25 |
|                                                                          | 7/11/97 | 2,914   | 13.25 |
|                                                                          | 7/11/97 | 2,800   | 13.25 |
|                                                                          | 7/11/97 | 1,336   | 13.25 |
| Jonathan Rubinstein ................ Senior Vice President, Hardware Engineering | 7/11/97 | 200,000 | 13.25 |
| David Manovich ..................... Senior Vice President, International Sales and Service | 7/11/97 | 200,000 | 13.25 |
| Avadis Tevanian, Jr. .............. Senior Vice President, Software Engineering | 7/11/97 | 100,000 | 13.25 |
| John B. Douglas, III............... Senior Vice President, General Counsel and Secretary | 7/11/97 | 100,000 | 13.25 |
|                                                                          | 7/11/97 | 40,000  | 13.25 |
|                                                                          | 7/11/97 | 25,000  | 13.25 |

</TABLE>

- -----------------------------

(1) All options received by Messrs. De Luca, Manovich and Douglas pursuant to
    the Exchange Program were forfeited upon termination of employment.

                                  13
<PAGE>
COMPENSATION COMMITTEE REPORT ON THE EXCHANGE PROGRAM

     After meeting with an outside compensation consultant and considering
various alternatives to address employee retention and long-term compensation,
the Compensation Committee approved the Exchange Program on July 11, 1997.
Pursuant to the Exchange Program, all individuals who held stock options granted
under one of the Company's stock option plans were offered the opportunity to
exchange all of their stock options for new stock options with an exercise price
of $13.25, the fair market value of the Common Stock as determined under the
terms of the 1990 Plan. All new stock options issued pursuant to the Exchange
Program were issued under the 1990 Plan. No partial exchanges were permitted.
Stock options originally granted by NeXT were not permitted to be exchanged
under the Exchange Program. In addition, the new stock options issued under the
Exchange Program were issued on a one-for-one basis with the stock options
exchanged and were made subject to a new three-year vesting schedule. All stock
options issued under the Exchange Program will expire on July 11, 2007. A total
of 7,866,155 stock options were exchanged by the Company's employees.

     Stock options are intended to provide incentives to the Company's officers
and employees. The Compensation Committee believes that such equity incentives

are a significant factor in the Company's ability to attract, retain and
motivate employees who are critical to the Company's long-term success. The
disparity between the original exercise prices of the Company's outstanding
stock options and the market price for the Common Stock did not provide, in the
judgment of the Compensation Committee, a meaningful incentive or retention
device to the employees holding those stock options and, therefore, the
Compensation Committee determined that offering the Exchange Program to
employees was in the best interests of the Company and its shareholders.

MEMBERS OF THE COMPENSATION COMMITTEE

Edgar S. Woolard, Jr. (Chairman)          Gareth C.C. Chang

14
<PAGE>
COMPANY STOCK PERFORMANCE

     The following graph shows a five-year comparison of cumulative total
shareholder return, calculated on a dividend reinvested basis, for the Company,
the S&P 500 Composite Index (the "S&P 500") and the S&P Computers (Hardware)
Index (the "INDUSTRY INDEX"). The graph assumes $100 was invested in each of the
Common Stock, the S&P 500 and the Industry Index on September 30, 1992. Data
points on the graph are annual. Note that historic stock price performance is
not necessarily indicative of future stock price performance.

EDGAR REPRESENTATION OF DATA POINTS USED IN PRINTED GRAPHIC

<TABLE>
<CAPTION>
          CUMULATIVE TOTAL RETURN
<S>                                       <C>                  <C>
Based on reinvestment of $100 on September 30,
1992

                              Apple Computer, Inc.   S&P 500-R
Sep-92                                    $100             $10
Sep-93                                     $52             $11
Sep-94                                     $77             $11
Sep-95                                     $86             $15
Sep-96                                     $51             $18
Sep-97                                     $50             $25
</TABLE>


ARRANGEMENTS WITH NAMED EXECUTIVE OFFICERS

     The Company has from time to time entered into employment, retention and
severance arrangements with certain of its Named Executive Officers. A summary
of the terms of such arrangements is set forth in the following paragraphs.

     SEPARATION AGREEMENT WITH GILBERT F. AMELIO

     Pursuant to a separation agreement with the Company, Dr. Amelio resigned as
an officer of the Company as of July 8, 1997 and as an employee of the Company
as of September 27, 1997. Pursuant to his separation agreement, Dr. Amelio
received a lump sum payment of $6,731,871, less $1,500,000, which was
immediately applied to the partial repayment of Dr. Amelio's outstanding $5
million loan from the Company. In addition, Dr. Amelio received a payment of
$1,000,000 representing the fiscal year 1997

15
<PAGE>

Component B Bonus provided for in his employment agreement. Dr. Amelio was permitted to remain a participant in the Performance Share Plan for fiscal year 1997. In addition, Dr. Amelio is entitled to continued health benefits for himself and his family through February 2, 2001, the end of the original term of his employment agreement. Pursuant to the separation agreement, the maturity date of Dr. Amelio's $5 million loan from the Company made to him in accordance with the terms of his employment agreement was extended to September 15, 1998, whereupon the entire outstanding balance will become due and payable. Dr. Amelio forfeited 800,000 unvested stock options upon his termination of employment on September 27, 1997. For more information regarding the loan from the Company to Dr. Amelio, see the section of this Proxy Statement entitled "CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS".

EMPLOYMENT AGREEMENTS WITH NAMED EXECUTIVE OFFICERS

    The Company entered into an employment agreement with Mr. Anderson effective April 1, 1996, pursuant to which he serves as Executive Vice President and Chief Financial Officer of the Company. Pursuant to his agreement, Mr. Anderson is entitled to an annual base salary of no less than $500,000 and a target bonus under the Bonus Plan for fiscal year 1997 of 80% of his base salary, which target bonus will thereafter be reviewed annually by the Company. In fiscal year 1997, however, no cash bonuses were paid under the Bonus Plan. During fiscal year 1997, the Company paid Mr. Anderson the second half of an $800,000 hiring bonus. If Mr. Anderson's employment is terminated by the Company without "Cause" at any time during the five-year period following April 1, 1996, he will be entitled to receive a lump sum severance payment equal to the sum of his annual base salary and target bonus. Mr. Anderson's agreement generally defines "Cause" to include a felony conviction, willful disclosure of confidential information or willful and continued failure to perform his employment duties.

    The Company entered into an employment agreement with Ms. Hancock, effective July 8, 1996, pursuant to which she served as Executive Vice President and Chief Technology Officer until her termination of employment on July 25, 1997. Pursuant to her agreement, Ms. Hancock was entitled to receive a base salary of $480,000 and a bonus of $360,000 during fiscal year 1997. Upon Ms. Hancock's termination of employment with the Company, she received $480,000 in a lump sum severance payment.

    The Company entered into an employment agreement with Mr. Calderoni, effective July 8, 1996, pursuant to which he served as Senior Vice President, Corporate Controller until his termination of employment on November 7, 1997. Pursuant to his agreement, Mr. Calderoni was entitled to receive a base salary of $275,000 and was guaranteed a minimum bonus of $75,000 for fiscal year 1997.

CHANGE IN CONTROL ARRANGEMENTS--STOCK OPTIONS

    In the event of a "change in control" of the Company, all outstanding options under the Company's stock option plans will, unless otherwise determined by the plan administrator, become exercisable in full, and will be cashed out at an amount equal to the difference between the applicable "change in control price" and the exercise price. A "change in control" under these plans is generally defined as (i) the acquisition by any person of 50% or more of the combined voting power of the Company's outstanding securities or (ii) the occurrence of a transaction requiring shareholder approval and involving the sale of all or substantially all of the assets of the Company or the merger of the Company with or into another corporation.

CHANGE IN CONTROL ARRANGEMENTS--RETENTION AGREEMENTS

    The Company is currently party to retention agreements (the "RETENTION

AGREEMENTS") with two Named Executive Officers (Messrs. Anderson and Rubinstein)
providing for certain cash payments in the event of a termination of an
executive's employment following a change in control of the Company. For
purposes of the Retention Agreements, a "change in control" is defined as (i) a
reorganization, merger, consolidation or other corporate transaction in which
the holders of voting stock of the Company

16

<PAGE>

immediately before the corporate transaction will not own more than 50% of the
voting shares of the continuing or surviving corporation immediately after such
corporate transaction, (ii) the acquisition of 30% or more of the combined
voting power of the Company's then-outstanding securities, (iii) a change of 50%
in the membership of the Board within a two-year period, unless the election or
nomination for election by shareholders of an adequate number of directors
within such period was approved by the vote of at least three-fourths of the
directors then still in office who either were directors at the beginning of the
period or whose election or nomination for election was previously so approved,
(iv) all or substantially all of the assets of the Company are sold, liquidated
or distributed, or (v) a "change in control" or a "change in the effective
control" of the Company within the meaning of Section 280G of the Code.


    In the event of an Involuntary Termination (as defined in the Retention
Agreements) of any executive officer who is a party to a Retention Agreement
within two years following a change in control, such executive officer will
receive a cash payment equal to the sum of (i) three times his annual base
salary immediately prior to the date of his termination or, if greater, the
highest annualized base salary in effect during the three-year period ending on
the change in control, and (ii) three times his target bonus for the year in
which the termination occurs or, if greater, the highest target annual bonus
applicable to the executive officer in any of the three years ending prior to
the change in control. In addition, the executive officer would be eligible to
participate in the medical, dental, health, life and other fringe benefit plans
and arrangements applicable to him until the second anniversary of his date of
termination.

    The Retention Agreements further provide that, in the event of an
Involuntary Termination of an executive officer on or following a change in
control, such executive officer's equity awards granted to him under the
Company's equity-based incentive plans (the "EQUITY PLANS") will vest and become
exercisable. All equity awards also will vest and become exercisable as of the
date of a change in control as defined in the Equity Plans, regardless of
whether the executive officer's employment has then terminated. Subject to
certain limits on payments, the Retention Agreements also require tax gross-up
payments to the executive officers to mitigate any excise tax imposed on the
executive officers under Section 4999 of the Code in connection with a change in
control.

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

    In connection with the Company's use of an aircraft owned by Aero Ventures,
an entity wholly owned by Dr. Amelio, the Company made monthly payments of
approximately $14,000 to Aero Ventures during fiscal year 1997 through the date
of Dr. Amelio's termination of employment. The Company also paid for certain
other expenses, including pilot and copilot fees, parking and landing fees and
simulator training and fuel expenses. During fiscal year 1997, the Company paid
approximately $471,461 to Aero Ventures in the aggregate. Pursuant to the terms
of Dr. Amelio's separation agreement, the Company's obligation to make payments

in connection with the use of his aircraft ended upon his termination of employment.

Pursuant to the terms of Dr. Amelio's employment agreement with the Company, the Company extended a $5 million loan to Dr. Amelio in February 1996, which was to be repaid over a period of 5 years. The largest aggregate amount of indebtedness outstanding on this loan during fiscal year 1997 was $5 million. Upon the termination of Dr. Amelio's employment with the Company, $1.5 million of his severance was immediately applied in partial repayment of the outstanding loan balance. Pursuant to Dr. Amelio's employment agreement, the loan was to become due and payable on the 90th day after his termination of employment. However, in consideration for Dr. Amelio's executing a release of the Company from certain legal claims, the Company agreed to extend the maturity date of the loan to September 15, 1998. The loan bears interest at the rate of 7% and is secured by real estate owned by Dr. Amelio.

In connection with a relocation assistance package, the Company loaned James McCluney (Senior Vice President, Operations) $100,000 bearing interest at the rate of 7.31%. The largest amount of the indebtedness outstanding on this loan during fiscal year 1997 was $100,000.

                                  17
<PAGE>
                        OVERVIEW OF PROPOSALS


    This Proxy Statement contains four proposals requiring shareholder action. Proposal No. 1 requests the election of three directors to the Company's Board. Proposal No. 2 requests that shareholders approve an amendment to the Company's Restated Articles of Incorporation which would, if approved, declassify the Board and ensure that each director will stand for election annually. Proposal No. 3 requests approval of the Director Plan, the previous grants of stock options to two non-employee directors of the Company under a prior plan and the reservation for issuance under the Plan and previous grants of 430,000 shares of Common Stock in the aggregate. Proposal No. 4 requests approval of the 1998 Executive Officer Stock Plan and the reservation for issuance thereunder of 17,000,000 shares of Common Stock. Proposal No. 5 requests ratification of the Company's independent auditors. Each of the proposals is discussed in more detail in the pages that follow.


                              PROPOSAL NO. 1
                          ELECTION OF DIRECTORS

    Three directors are to be elected at the Annual Meeting. The Board has nominated three of the current Class II directors to be re-elected. Holders of proxies solicited by this Proxy Statement will vote the proxies received by them as directed on the proxy card or, if no direction is made, for the election of the Board's three nominees below. If any nominee is unable or declines to serve as a director at the time of the Annual Meeting, the proxy holders will vote for a nominee designated by the present Board to fill the vacancy. It is not presently expected that any nominee will be unable or will decline to serve as a director.

    The Board's nominees for re-election at this Annual Meeting are Messrs. Jobs, Woolard and Ellison.

VOTE REQUIRED

    The three nominees for director receiving the highest number of affirmative

votes of the shares entitled to be voted for them shall be elected as directors. Votes withheld from any director are counted for purposes of determining the presence or absence of the Quorum, but have no other legal effect under California law.

RECOMMENDATION

    THE BOARD RECOMMENDS THAT SHAREHOLDERS VOTE FOR RE-ELECTION OF MESSRS. JOBS, WOOLARD AND ELLISON.

                        PROPOSAL NO. 2
    APPROVAL OF AN AMENDMENT TO THE COMPANY'S RESTATED ARTICLES OF INCORPORATION
          TO ELIMINATE CLASSIFICATION OF THE BOARD OF DIRECTORS

PROPOSED ACTION

    The Board is proposing an amendment (the "AMENDMENT") to the Company's Restated Articles of Incorporation (the "RESTATED ARTICLES") to eliminate the classification of the Board and thereby ensure that each director will stand for election annually.

DESCRIPTION OF PROPOSAL

    Article VII of the Restated Articles currently provides that the Board shall be divided into two classes, Class I and Class II, each class consisting of one-half of the total number of directors or as close an approximation as possible. The Restated Articles further provide that each director shall be elected for a term running until the second annual meeting of shareholders of the Company next succeeding his or her election. An amendment to the Restated Articles instituting classification of the Board was approved by the shareholders of the Company in January 1990.

                                18
<PAGE>
    If this proposal is approved by the shareholders, the Restated Articles will be amended to eliminate the classification of the Board, such that all directors will stand for election annually. The Board believes that elimination of the classification of the Board is in the best interest of the Company and its shareholders in that it will allow shareholders to review and express their views on the performance of all directors each year. This proposal is not being presented in response to any stockholder demand.

    The Board has determined that the declassification of the Board should become effective commencing with the annual meeting of shareholders of the Company in fiscal year 1999, so as not to shorten the term of the Class I directors. Accordingly, if this proposal is approved by the shareholders, the terms of all directors will end at the annual meeting of shareholders of the Company in fiscal year 1999, and all directors elected at that annual meeting will have one-year terms.

    If the Amendment is approved by the shareholders, Article VII of the Restated Articles will be amended as set forth in Appendix A hereto.

VOTE REQUIRED

    The affirmative vote of a majority of the shares of Common Stock of the Company outstanding as of the Record Date will be required to approve the Amendment.

RECOMMENDATION

THE BOARD HAS UNANIMOUSLY APPROVED THE AMENDMENT AND RECOMMENDS THAT THE SHAREHOLDERS VOTE FOR THE AMENDMENT.

PROPOSAL NO. 3
APPROVAL OF THE APPLE COMPUTER, INC. 1997 DIRECTOR STOCK OPTION PLAN
AND INDEPENDENT STOCK OPTION GRANTS TO
EDGAR S. WOOLARD, JR. AND GARETH C.C. CHANG

PROPOSED ACTION

   The shareholders are being asked to approve (i) the 1997 Director Stock Option Plan (the "DIRECTOR PLAN"), which provides for the reservation for issuance of 400,000 shares of Common Stock to directors of the Company who are not employees of the Company upon the exercise of stock options granted under the Director Plan, and (ii) the grant of 15,000 stock options under the Prior Plan (as defined below) to each of Mr. Woolard and Mr. Chang in connection with the Prior Plan (as defined below), and the reservation of 30,000 shares of Common Stock for issuance in connection with such options.

DESCRIPTION OF PROPOSAL

   The Director Plan provides for automatic, non-discretionary awards of stock options to non-employee directors. The Board adopted the Director Plan on August 5, 1997, subject to shareholder approval at the Annual Meeting.

   On March 25, 1997, the Board adopted a plan (the "PRIOR PLAN") which provided for a combination of automatic, non-discretionary awards of stock options as well as cash fees to the Company's non-employee directors. Pursuant to the Prior Plan, each non-employee director at that time received a grant of 15,000 stock options (the "PRIOR GRANTS"), subject to the approval of shareholders. In its effort to move away from cash-based retainers for its directors, the Board subsequently terminated the Prior Plan, replacing it with the Director Plan. However, upon terminating the Prior Plan, the Board determined that Messrs. Woolard and Chang would be permitted to keep their Prior Grants, subject to shareholder approval.

   Summarized below are certain key provisions of the Director Plan. The following description is subject in its entirety to the text of the Director Plan, which is set forth in Appendix B hereto.

19
<PAGE>
DESCRIPTION OF THE DIRECTOR PLAN

   PURPOSE.  The Director Plan provides for the automatic grant of stock options to non-employee directors. The purposes of the Director Plan are to promote the Company's long-term growth and financial success by attracting, motivating and retaining non-employee directors of outstanding ability, and to foster a greater identity of interest between the Company's non-employee directors and shareholders.

   ELIGIBILITY.  Only directors who are not employees of the Company or any of its subsidiaries may participate in the Plan. All members of the Board are currently eligible to participate in the Director Plan.

   SHARES AVAILABLE FOR ISSUANCE.  A total of 400,000 shares of Common Stock will be available for issuance under the Director Plan. If an option lapses, expires or is otherwise terminated without the issuance of shares, or if shares are tendered to pay the exercise price of an option, the shares underlying the

lapsed, expired or terminated option or the tendered shares will not reduce the aggregate number of shares available for issuance under the Plan. Either authorized and unissued shares of Common Stock or treasury shares will be issued under the Director Plan. The number of shares available for issuance will be adjusted if there is a change in the Company's capitalization, a merger, or a similar transaction.

GRANTS OF STOCK OPTIONS.  Each non-employee director received an initial grant of 30,000 options on August 14, 1997 ("INITIAL OPTIONS"), except Messrs. Woolard and Chang, who each received 15,000 options. Non-employee directors who are subsequently elected to the Board will similarly be granted 30,000 Initial Options. Each non-employee director will be granted 10,000 options on the fourth anniversary of the non-employee director's initial election or appointment to the Board and on each subsequent anniversary ("ANNUAL OPTIONS"). The exercise price of each option will be the closing sales price for the Common Stock as quoted on the Nasdaq National Market on the date of grant. Initial Options vest and become exercisable in equal annual installments on each of the first through third anniversaries of the date of grant. Annual Options are fully vested and immediately exercisable on their date of grant. Upon a change in control of the Company, all unvested options held by non-employee directors will become fully vested and exercisable and will be cashed out at a price equal to the excess of the value of the consideration offered in connection with the change in control over the exercise price of the options.

TERMINATIONS OF SERVICE.  In general, if a non-employee director ceases to be a member of the Board, the director's options will be exercisable by the director for a period of 90 days, to the extent vested at the time of termination of service. If a non-employee director's service on the Board terminates by reason of the director's death, the director's vested options will remain outstanding and the director's beneficiary may exercise the options at any time through the third anniversary of the director's death. If a non-employee director is removed from the Board for "cause" (as determined by the Board in accordance with the Company's by-laws), all of the director's options, whether or not vested, will immediately be forfeited.

ADMINISTRATION.  The Chief Financial Officer of the Company or the individual appointed by the Chief Executive Officer of the Company (the "ADMINISTRATOR") will administer the Director Plan. The Administrator will have authority to adopt rules and regulations that it considers necessary or appropriate to carry out the purposes of the Director Plan and to interpret and construe the provisions of the Plan.

AMENDMENT AND TERMINATION.  The Board will have authority to amend or terminate the Director Plan at any time. However, the Board may not, without shareholder approval, increase the number of shares available for issuance.

TERM.  Unless terminated earlier by the Board, the Director Plan will expire on August 14, 2007. No further stock options will be awarded under the Director Plan after that date.

STOCK PRICE.  On February 23, 1998, the closing price of the Common Stock as quoted on the Nasdaq National Market was $21.25.

20

<PAGE>
FEDERAL INCOME TAX CONSEQUENCES.  The federal income tax consequences of issuing and exercising stock options under the Director Plan may be summarized as follows. The grant of a stock option has no immediate federal income tax

effect. The director will not recognize taxable income and the Company will not receive a tax deduction. When the director exercises the option, the director will recognize ordinary income and the Company will receive a tax deduction, in each case measured by the difference between the exercise price and the fair market value of the shares on the date of exercise. When the director sells Common Stock obtained from exercising a stock option, any gain or loss will be taxed as a capital gain or loss (long-term or short-term, depending on how long the shares have been held).

    NEW PLAN BENEFITS.  The following table sets forth the number of stock options that were awarded in 1997 to current non-employee directors, subject to shareholder approval of the Director Plan and the separate stock option grants to Messrs. Woolard and Chang under the Prior Plan.

                NEW PLAN BENEFITS TABLE FOR APPROVAL OF THE
          APPLE COMPUTER, INC. 1997 DIRECTOR STOCK OPTION PLAN AND THE
             SEPARATE STOCK OPTION GRANTS TO MESSRS. WOOLARD AND CHANG

| DIRECTOR | OPTIONS GRANTED | EX |
| --- | --- | --- |
| Steven P. Jobs | 30,000 | $ |
| Lawrence J. Ellison | 30,000 | |
| William V. Campbell | 30,000 | |
| Jerome B. York | 30,000 | |
| Edgar S. Woolard, Jr.* | 15,000 | |
| | 15,000 | |
| Gareth C.C. Chang* | 15,000 | |
| | 15,000 | |
| Executive Group** | 30,000 | |
| Non-Executive Director Group*** | 150,000 | |
| Non-Executive Officer Employee Group | 0 | |

- -----------------------

    * As described above, Messrs. Woolard and Chang each received a grant of
      15,000 stock options on March 25, 1997 in connection with grants to all
      non-employee directors then serving on the Board. The exercise price of
      these options is $16.50. Upon termination of the Prior Plan and adoption of
      the Director Plan, Messrs. Woolard and Chang received grants of 15,000,
      rather than 30,000, options.

   ** The only executive officer who participates in the Director Plan is Mr.
      Jobs, who is currently serving as the Company's Interim Chief Executive
      Officer.

  *** Includes the non-employee directors listed in this table, other than Mr.
      Jobs.

VOTE REQUIRED

    The affirmative vote of (i) a majority of the Votes Cast and (ii) a majority
of the Quorum will be required to approve this Proposal.

RECOMMENDATION


     THE BOARD HAS APPROVED THE DIRECTOR PLAN AND, PURSUANT TO ITS PRIOR APPROVAL
OF THE PRIOR PLAN, THE GRANTS OF 15,000 STOCK OPTIONS EACH TO MESSRS. WOOLARD
AND CHANG. ACCORDINGLY, THE BOARD HAS APPROVED THE RESERVATION OF 400,000 SHARES
FOR ISSUANCE UNDER THE DIRECTOR PLAN AND 30,000 SHARES UNDER THE TWO PRIOR
GRANTS. THE BOARD RECOMMENDS THAT SHAREHOLDERS VOTE FOR THE DIRECTOR PLAN, THE
PRIOR GRANTS AND THE RESERVATION OF 430,000 SHARES IN THE AGGREGATE FOR ISSUANCE
THEREUNDER.


                                   21
<PAGE>

                          PROPOSAL NO. 4
               APPROVAL OF THE 1998 EXECUTIVE OFFICER STOCK PLAN


PROPOSED ACTION


     The shareholders are being asked to approve the 1998 Executive Officer Stock
Plan (the "1998 Plan"). The 1998 Plan is intended to replace the Apple Computer,
Inc. 1990 Plan (the "1990 Plan") which was approved by Apple's shareholders at
Apple's 1990 Annual Meeting of Shareholders. If the 1998 Plan is approved by
shareholders, authority to make future grants under the 1990 Plan will be
terminated, although previously granted awards under the 1990 Plan will remain
outstanding in accordance with their terms. Apple's Board of Directors decided
to adopt an entirely new plan (a) to increase the number of shares of Common
Stock that may be subject to awards; (b) to expand the types of stock-based and
performance related awards that may be granted to participants; and (c) to
otherwise adopt provisions intended to enable the Compensation Committee to
better promote its goals and policies with respect to executive compensation. If
approved, a total of 17,000,000 shares of Common Stock will be available for
issuance under the 1998 Plan upon the exercise of stock options, stock
appreciation rights or stock purchase rights granted under the 1998 Plan.


DESCRIPTION OF THE PROPOSAL


     The Board of Directors has approved, subject to subsequent shareholder
approval at the Annual Meeting, the 1998 Plan, pursuant to which the Chairman
and executive officers of the Company at the level of Senior Vice President and
above and other key employees may be granted stock options, stock appreciation
rights and stock purchase rights. As of February 23, 1998, no stock options,
stock appreciation rights or stock purchase rights had been granted pursuant to
the 1998 Plan. Shareholder approval of the 1998 Plan is sought to (1) meet the
requirements of the Nasdaq National Market; (2) qualify certain compensation
under the 1998 Plan as performance-based compensation that is tax deductible
without limitation under Section 162(m) of the Code; and (3) qualify certain
stock options to be granted under the 1998 Plan as incentive stock options.

Summarized below are certain key provisions of the 1998 Plan. The following description is subject in its entirety to the text of the 1998 Plan, which is set forth in Appendix C hereto.


DESCRIPTION OF THE 1998 PLAN


PURPOSE.  The primary purpose of the 1998 Plan is to attract and retain the best available personnel for positions of substantial responsibility with the Company. In particular, it is contemplated that a substantial majority of the shares reserved for issuance under the 1998 Plan will be used for grants to the Chairman and senior executive officers, including a Chief Executive Officer and Chief Operating Officer and other key employees of the Company. The Board believes that such grants will be necessary to attract and retain critical executive personnel to the Company. Mr. Jobs is currently serving as interim Chief Executive Officer of the Company. In the event that Mr. Jobs continues in this position, the Board intends to grant options, stock appreciation rights or stock purchase rights to him under the 1998 Plan.


ELIGIBILITY; LIMITATIONS.  Options, stock appreciation rights and stock purchase rights may be granted under the 1998 Plan. Options granted under the 1998 Plan may be either "incentive stock options," as defined in Section 422 of the Internal Revenue Code of 1986, as amended (the "Code"), or nonstatutory stock options. Nonstatutory stock options, stock appreciation rights and stock purchase rights may be granted under the 1998 Plan to the Chairman of the Company and to executive officers of the Company and any parent or subsidiary of the Company. Incentive stock options may only be granted to executive officers of the Company. The Administrator, in its discretion, selects the person(s) to whom options, stock appreciation rights and stock purchase rights may be granted, the time or times at which such options, stock appreciation rights and stock purchase rights shall be granted, and the number of shares subject to

                                    22
<PAGE>

each such grant. For this reason, it is not possible to determine the benefits or amounts that will be received by any particular individual or individuals in the future. The 1998 Plan provides that no person(s) may be granted, in any fiscal year of the Company, options, stock appreciation rights or stock purchase rights to purchase more than 17,000,000 shares of Common Stock.


SHARES AVAILABLE FOR ISSUANCE.  A total of 17,000,000 shares of Common Stock will be available for issuance under the 1998 Plan. If an option, stock appreciation right or stock purchase right lapses, expires or is otherwise terminated without the issuance of shares, or if shares are tendered to pay the exercise price of an option, stock appreciation right or stock purchase right, the shares underlying the lapsed, expired or terminated option, stock appreciation right or stock purchase right or the tendered shares, shall revert to the 1998 Plan. The number of shares available for issuance will be adjusted if there is a change in the Company's capitalization, a merger, or a similar transaction.

ADMINISTRATION.  The Plan may generally be administered by the Board or a Committee appointed by the Board (as applicable, the "Administrator").

TERMS AND CONDITIONS OF OPTIONS.  Each option is evidenced by a stock option agreement between the Company and the optionee, and is subject to the following additional terms and conditions:

(a)  EXERCISE PRICE.  The Administrator determines the exercise price of options at the time the options are granted. The exercise price of an incentive stock option may not be less than 100% of the fair market value of the Common Stock on the date such option is granted; provided, however, the exercise price of an incentive stock option granted to a 10% shareholder may not be less than 110% of the fair market value of the Common Stock on the date such option is granted. The fair market value of the Common Stock is generally determined with reference to the closing sale price for the Common Stock (or the closing bid if no sales were reported) on the date the option is granted.

(b)  EXERCISE OF OPTION; FORM OF CONSIDERATION.  The Administrator determines when options become exercisable, and may in its discretion, accelerate the vesting of any outstanding option. Stock options granted under the 1998 Plan generally vest and become exercisable over four years. The 1998 Plan permits payment to be made by cash, check, promissory note, other shares of Common Stock of the Company (with some restrictions), cashless exercises, a reduction in the amount of any Company liability to the optionee, any other form of consideration permitted by applicable law, or any combination thereof.

(c)  TERM OF OPTION.  All options granted under the 1998 Plan expire ten years from the date of grant, unless a shorter term is provided in the option agreement. The term of an incentive stock option may be no more than ten (10) years from the date of grant; provided that in the case of an incentive stock option granted to a 10% shareholder, the term of the option may be no more than five (5) years from the date of grant. No option may be exercised after the expiration of its term.

(d)  TERMINATION OF EMPLOYMENT.  If the optionee's employment or status as Chairman terminates for any reason other than death or unless the Administrator otherwise approves, then options may be exercised no later than 90 days after such termination and may be exercised only to the extent the option was exercisable on the termination date. Special provisions apply in the case of death of the optionee.

(e)  DEATH.  If an optionee ceases to be an employee or Chairman as a result of his or her death, then all options held by such optionee under the 1998 Plan may be exercised at any time within six months after death, or such other period up to twelve months as may be provided in the option agreement, but only to the extent the options would have been exercisable within six months after the date

of death.


     (f)  NONTRANSFERABILITY OF OPTIONS, STOCK APPRECIATION RIGHTS OR STOCK
PURCHASE RIGHTS.  Unless determined otherwise by the Administrator, options,
stock appreciation rights and stock purchase rights granted under the 1998 Plan
are not transferable other than by will or the laws of descent and distribution
or pursuant to a qualified domestic relations order, and may be exercised during
the optionee's lifetime only

                                   23
<PAGE>

by the optionee, or in the event of death, by the optionee's estate or by a
person who acquires the right to exercise the option, stock appreciation right
or stock purchase right.


     (g)  OTHER PROVISIONS.  The stock option agreement may contain other terms,
provisions and conditions not inconsistent with the 1998 Plan as may be
determined by the Administrator.


     STOCK APPRECIATION RIGHTS.  The Administrator is authorized to grant stock
appreciation rights in connection with all or any part of an option granted
under the 1998 Plan, either concurrently with the grant of the option or at any
time thereafter, and to grant stock appreciation rights independently of
options. A stock appreciation right granted in connection with an option is
exercisable only when and to the extent that the underlying option is
exercisable, and expires no later than the date on which the underlying option
expires. Independent stock appreciation rights are exercisable in whole or in
part at such times as the Administrator specifies in the grant or agreement.


     The Company's obligations arising upon the exercise of a stock appreciation
right may be paid in cash or Common Stock, or any combination of the same, as
the Administrator may determine. Shares issued upon the exercise of a stock
appreciation right are valued at their fair market value as of the date of
exercise. When a stock appreciation right is exercised, the aggregate number of
shares of Common Stock available for issuance under the 1998 Plan will be
reduced by the number of underlying shares of Common Stock as to which the stock
appreciation right is exercised.


     STOCK PURCHASE RIGHTS.  The Administrator is authorized to grant stock
purchase rights under the 1998 Plan, either concurrently with a grant of options
or stock appreciation rights and/or cash awards made outside of the 1998 Plan or
at any time thereafter, and to grant stock purchase rights independently of
other awards. In the case of stock purchase rights, unless the Administrator
determines otherwise, the agreement shall grant the Company a repurchase option
exercisable upon the voluntary or involuntary termination of the purchaser's
employment with the Company for any reason (including death or disability). The
purchase price for Shares repurchased pursuant to the agreement shall be the
original price paid by the purchaser and may be paid by cancellation of any

indebtedness of the purchaser to the Company. The repurchase option shall lapse at a rate determined by the Administrator.

ADJUSTMENTS UPON CHANGES IN CAPITALIZATION.  In the event that the stock of the Company changes by reason of any stock split, reverse stock split, stock dividend, combination, reclassification or other similar change in the capital structure of the Company effected without the receipt of consideration, appropriate adjustments shall be made in the number and class of shares of stock subject to the 1998 Plan, the number and class of shares of stock subject to any option, stock appreciation right or stock purchase right outstanding under the 1998 Plan, and the exercise price of any such outstanding option, stock appreciation right or stock purchase right.

In the event of a liquidation or dissolution, any unexercised options, stock appreciation rights or stock purchase rights will terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Administrator. The Administrator may, in its discretion, provide that each optionee shall have the right to exercise all of the optionee's options, stock appreciation rights and stock purchase rights as to all or any part of the optioned stock, stock appreciation right or stock purchase right, including those shares not otherwise exercisable.

CHANGE IN CONTROL.  In the event of a "change in control" of the Company (as defined below), all options, stock appreciation rights and stock purchase rights outstanding under the 1998 Plan as of the date on which such change in control occurs will, unless otherwise determined by the Administrator, become fully exercisable and the value of all outstanding options, stock appreciation rights and stock purchase rights will be cashed out. The cash-out price will be the difference between the exercise price and the defined "change in control price."

                                      24
<PAGE>

A "change in control" is defined as (i) the acquisition by any person of 50% or more of the combined voting power of the Company's outstanding securities, or (ii) the occurrence of a transaction requiring shareholder approval and involving the sale of all or substantially all the assets of the Company or the merger of the Company with or into another corporation. The "change in control price" is determined by the Administrator and may be either (x) the highest closing price of Common Stock as reported in the public market during the 60-calendar-day period immediately preceding the date of determination of the change in control price or (y) the highest price paid or offered (as determined by the Administrator) in any bona fide transaction or offer related to the change in control of the Company during the 60-calendar-day period preceding the date of determination of the change in control price.

In the event of a sale of all or substantially all the assets of the Company or the merger of the Company with or into another corporation, in a transaction in which options, stock appreciation rights or stock purchase rights outstanding under the 1998 Plan are not accelerated and cashed out as provided above, each outstanding option, stock appreciation right or stock purchase right will be

assumed or an equivalent option, stock appreciation right or stock purchase right will be substituted by the successor corporation in the transaction or by a parent or subsidiary of such successor corporation, unless the Administrator determines, in the exercise of its sole discretion and in lieu of such assumption or substitution, that the optionee shall have the right to exercise the option, stock appreciation right or stock purchase right as to all of the shares subject thereto, including shares that would not otherwise be exercisable. If the Administrator makes an option, stock appreciation right or stock purchase right fully exercisable in lieu of assumption or substitution in the event of a merger or sale of assets, then the Company shall notify the optionee that the option, stock appreciation right or stock purchase right will be fully exercisable for a period of 30 days from the date of such notice, and the option, stock appreciation right or stock purchase right will terminate upon the expiration of such period.


    AMENDMENT AND TERMINATION OF THE 1998 PLAN.  The Board may amend, alter, suspend or terminate the 1998 Plan, or any part thereof, at any time and for any reason. However, the Company shall obtain shareholder approval for any amendment to the 1998 Plan to the extent necessary to comply with Section 162(m) and Section 422 of the Code, or any similar rule or statute. No such action by the Board or shareholders may alter or impair any option, stock appreciation right or stock purchase right previously granted under the 1998 Plan without the written consent of the optionee.


    STOCK PRICE.  On February 23, 1998, the closing price of the Common Stock as quoted on the Nasdaq National Market was $21.25.


FEDERAL INCOME TAX CONSEQUENCES


    INCENTIVE STOCK OPTIONS.  An optionee who is granted an incentive stock option does not recognize taxable income at the time the option is granted or upon its exercise, although the exercise may subject the optionee to the alternative minimum tax. Upon an optionee's sale of the shares (assuming that the sale occurs at least two years after grant of the option and at least one year after exercise of the option), any gain will be taxed to the optionee as long-term capital gain. If the optionee disposes of the shares prior to the expiration of the above holding periods, then the optionee will recognize ordinary income in an amount generally measured as the difference between the exercise price and the lower of the fair market value of the shares at the exercise date or the sale price of the shares. Any gain or loss recognized on such premature sale of the shares in excess of the amount treated as ordinary income will be characterized as capital gain or loss.


    NONSTATUTORY STOCK OPTIONS.  An optionee does not recognize any taxable income at the time he or she is granted a nonstatutory stock option. Upon exercise, the optionee recognizes taxable income generally measured by the excess of the then fair market value of the shares over the exercise price. Upon a disposition of such shares by the optionee, any difference between the sale price and the optionee's

25

<PAGE>

exercise price, to the extent not recognized as taxable income as provided above, is treated as long-term or short-term capital gain or loss, depending on the holding period.


STOCK PURCHASE RIGHTS.  Stock purchase rights will generally be taxed in the same manner as nonstatutory stock options. However, restricted stock is generally purchased upon the exercise of a stock purchase right. At the time of purchase, restricted stock is subject to a "substantial risk of forfeiture" within the meaning of Section 83 of the Code. As a result, the purchaser will not recognize ordinary income at the time of purchase. Instead, the purchaser will recognize ordinary income on the dates when a stock ceases to be subject to a substantial risk of forfeiture. The stock will generally cease to be subject to a substantial risk of forfeiture when it is no longer subject to the Company's right to repurchase the stock upon the purchaser's termination of employment with the Company. At such times, the purchaser will recognize ordinary income measured as the difference between the purchase price and the fair market value of the stock on the date the stock is no longer subject to a substantial risk of forfeiture.


The purchaser may accelerate to the date of purchase his or her recognition of ordinary income, if any, and the beginning of any capital gain holding period by timely filing an election pursuant to Section 83(b) of the Code. In such event, the ordinary income recognized, if any, is measured as the difference between the purchase price and the fair market value of the stock on the date of purchase, and the capital gain holding period commences on such date. The ordinary income recognized by a purchaser who is an employee will be subject to tax withholding by the Company.


STOCK APPRECIATION RIGHTS.  No income will be recognized by a recipient in connection with the grant of a stock appreciation right. When the stock appreciation right is exercised, the recipient will generally be required to include as taxable ordinary income in the year of exercise an amount equal to the sum of the amount of cash received and the fair market value of any Common Stock received upon the exercise. In the case of a recipient who is also an employee, any taxable income recognized upon exercise of a stock appreciation right will constitute wages for which withholding will be required. The Company will generally be entitled to a tax deduction in the same amount. Any gain or loss on the resale of Common Stock acquired upon exercise of a stock appreciation right will be treated as a taxable gain or loss.


SECTION 162(m) OF THE CODE.  Section 162(m) of the Code generally disallows a public company's tax deduction for compensation to executive officers in excess of $1,000,000 in any tax year beginning on or after January 1, 1994. Compensation that qualifies as "performance-based compensation" is excluded from the $1,000,000 deductibility cap, and therefore remains fully deductible by the company that pays it. To qualify as "performance-based" within the meaning of Section 162(m) of the Code, options and stock appreciation rights must be granted with an exercise price of not less than 100% of the fair market value of

the Common Stock on the date of the grant, among other things. To the extent these requirements are met, compensation attributable to options and stock appreciation rights granted to executive officers under the 1998 Plan will qualify as performance-based compensation for purposes of Section 162(m) of the Code, and the Company will generally be entitled to a tax deduction in the amount recognized by such officers upon exercise of the options. No tax authority or court has ruled on the applicability of Section 162(m) to the 1998 Plan and any final determination of the deductibility of amounts realized upon exercise of an option granted under the 1998 Plan could ultimately be made by the Internal Revenue Service or a court having final jurisdiction with respect to the matter. The Company retains the right to grant options under the 1998 Plan in accordance with the terms of the 1998 Plan regardless of any final determination as to the applicability of Section 162(m) of the Code to these grants.

     Compensation attributable to stock purchase rights granted under the 1998 Plan will not generally qualify as "performance-based" within the meaning of Section 162(m) of the Code. As a result, income recognized by executive officers in connection with stock purchase rights will be subject to the limitations on deductibility under such section.

                                   26
<PAGE>

     THE FOREGOING IS ONLY A SUMMARY OF THE EFFECT OF FEDERAL INCOME TAXATION UPON OPTIONEES, HOLDERS OF STOCK APPRECIATION RIGHTS, HOLDERS OF STOCK PURCHASE RIGHTS AND THE COMPANY WITH RESPECT TO THE GRANT AND EXERCISE OF OPTIONS, STOCK APPRECIATION RIGHTS AND STOCK PURCHASE RIGHTS UNDER THE 1998 PLAN. IT DOES NOT PURPORT TO BE COMPLETE, AND DOES NOT DISCUSS THE TAX CONSEQUENCES OF THE EMPLOYEE'S DEATH OR THE PROVISIONS OF THE INCOME TAX LAWS OF ANY MUNICIPALITY, STATE OR FOREIGN COUNTRY IN WHICH THE EMPLOYEE MAY RESIDE.

VOTE REQUIRED

     The affirmative vote of (i) a majority of the Votes Cast and (ii) a majority of the Quorum will be required to approve this Proposal.

     THE BOARD OF DIRECTORS RECOMMENDS THAT SHAREHOLDERS VOTE "FOR" THE APPROVAL OF THE COMPANY'S 1998 PLAN.

                            PROPOSAL NO. 5
                 RATIFICATION OF APPOINTMENT OF AUDITORS

     The Board of Directors has appointed KPMG Peat Marwick LLP ("KPMG"), independent auditors, to audit Apple's consolidated financial statements for fiscal year 1998. KPMG served as the Company's independent auditors for fiscal year 1997. At the Annual Meeting, the shareholders are being asked to ratify the appointment of KPMG as the Company's independent auditors for fiscal year 1998.

In the event of a negative vote on such ratification, the Board of Directors will reconsider its selection.

Representatives of KPMG are expected to be present at the Annual Meeting and will have the opportunity to respond to appropriate questions and to make a statement if they so desire.

On November 5, 1997, the Audit and Finance Committee of the Board recommended to the full Board that the Company engage KPMG to audit the consolidated financial statements of the Company for fiscal year 1998. On November 5, 1997, the Board adopted the Committee's recommendation and approved the proposed engagement of KPMG.

During fiscal year 1996, Ernst & Young LLP ("ERNST & YOUNG") served as the independent auditor of the Company. At the annual meeting of shareholders held on February 5, 1997, shareholders ratified the decision by the Company's Board of Directors to replace Ernst & Young effective December 19, 1996 as the Company's independent auditors with KPMG. Neither the report of Ernst & Young on the Company's consolidated financial statements for fiscal year 1996 nor the report of KPMG on the Company's consolidated financial statements for fiscal year 1997 contained an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles.

In connection with the audit of the Company's consolidated financial statements for fiscal year 1996 and the subsequent period up to and including December 19, 1996, there were no disagreements between the Company and Ernst & Young on any matters of accounting principles or practices, financial statement disclosure, or audit scope and procedures which, if not resolved to the satisfaction of Ernst & Young, would have caused Ernst & Young to make reference to the matter in its report.

In connection with the audit of the Company's consolidated financial statements for fiscal year 1997, there were no disagreements between the Company and KPMG on any matters of accounting principles or practices, financial statement disclosure, or audit scope and procedures which, if not resolved to the satisfaction of KPMG, would have caused KPMG to make reference to the matter in its report.

There were no reportable events (as defined in Regulation S-K Item 304(a)(1)(v)) during fiscal years 1996 and 1997 and the subsequent interim period prior to December 1, 1997.

                                    27
<PAGE>
During fiscal year 1996 and the subsequent interim period up to and including December 19, 1996, the Company did not consult with KPMG on either the application of accounting principles or type of opinion KPMG might issue on the Company's financial statements.

VOTE REQUIRED

The affirmative vote of (i) a majority of the Votes Cast and (ii) a majority of the Quorum will be required to approve this Proposal.

RECOMMENDATION

THE BOARD RECOMMENDS THAT SHAREHOLDERS VOTE FOR RATIFICATION OF THE APPOINTMENT OF KPMG PEAT MARWICK LLP AS THE COMPANY'S INDEPENDENT AUDITORS.

OTHER MATTERS

The Company knows of no other matters to be submitted to the shareholders at the Annual Meeting. If any other matters properly come before the shareholders at the Annual Meeting, it is the intention of the persons named on the enclosed proxy card to vote the shares they represent as the Board may recommend.

SHAREHOLDER PROPOSALS

Shareholders who intend to present proposals at the next annual meeting of shareholders must send such proposals to the Company for receipt no later than September 1, 1998 in order for such proposals to be considered for inclusion in the proxy statement and form of proxy relating to such meeting.

THE BOARD OF DIRECTORS


Dated: March 16, 1998


                                 28
<PAGE>
                                                          APPENDIX A

        SECTION VII OF THE COMPANY'S RESTATED ARTICLES OF INCORPORATION,
                       AS PROPOSED TO BE AMENDED

                                "VII.

Through and until immediately prior to the annual meeting of shareholders to be held in fiscal year 1999, the directors shall be divided into two classes, designated Class I and Class II, each consisting of one-half of the directors or as close an approximation as possible, and each director shall serve for a term running until the second annual meeting of shareholders succeeding his or her election and until his or her successor shall have been duly elected and qualified; PROVIDED, HOWEVER, that the terms of all directors shall expire at the annual meeting of shareholders to be held in fiscal year 1999. Commencing at the annual meeting of shareholders to be held in fiscal year 1999, each director shall be elected to serve until the annual meeting of shareholders held in the following fiscal year and until his or her successor shall have been duly elected and qualified."
<PAGE>
                                                          APPENDIX B

                          APPLE COMPUTER, INC.
                     1997 DIRECTOR STOCK OPTION PLAN

1. PURPOSES.  The purposes of the Plan are to retain the services of qualified individuals who are not employees of the Company to serve as members of the Board and to secure for the Company the benefits of the incentives inherent in increased Common Stock ownership by such individuals by granting such individuals Options to purchase shares of Common Stock.

2. ADMINISTRATION.  The Administrator will be responsible for administering the Plan. The Administrator will have authority to adopt such rules as it may deem appropriate to carry out the purposes of the Plan, and shall have authority to interpret and construe the provisions of the Plan and any agreements and notices under the Plan and to make determinations pursuant to any Plan provision. Each interpretation, determination or other action made or taken by

the Administrator pursuant to the Plan shall be final and binding on all
persons. The Administrator shall not be liable for any action or determination
made in good faith, and shall be entitled to indemnification and reimbursement
in the manner provided in the Company's Articles of Incorporation and By-Laws as
such documents may be amended from time to time.

    3.  SHARES AVAILABLE.  Subject to the provisions of Section 7(b) of the
Plan, the maximum number of shares of Common Stock which may be issued under the
Plan shall not exceed 400,000 shares (the "SECTION 3 LIMIT"). Either authorized
and unissued shares of Common Stock or treasury shares may be delivered pursuant
to the Plan. For purposes of determining the number of shares that remain
available for issuance under the Plan, the following rules shall apply:

        (a) the number of shares of Common Stock underlying Options shall be
    charged against the Section 3 Limit; and

        (b) the Section 3 Limit shall be increased by (i) the number of shares
    subject to an Option which lapses, expires or is otherwise terminated
    without the issuance of such shares, and (ii) the number of shares, if any,
    tendered to pay the exercise price of an Option.

    4.  OPTIONS.  Each Non-Employee Director shall receive grants of Options
under the Plan as follows:

        (a)  OPTION GRANTS.

            (i)  INITIAL GRANT.  Non-Employee Directors who were members of the
        Board on the day prior to the Effective Date shall be granted an Initial
        Option to purchase 15,000 shares of Common Stock as of August 14, 1997
        ("INITIAL GRANT DATE"), PROVIDED that such individual continues to serve
        as a Non-Employee Director through the Initial Grant Date. Non-Employee
        Directors who were elected or appointed to the Board on the Effective
        Date shall be granted an Initial Option to purchase 30,000 shares of
        Common Stock on the Initial Grant Date, PROVIDED that such individual
        continues to serve as a Non-Employee Director through the Initial Grant
        Date. Non-Employee Directors who are elected or appointed to the Board
        after the Effective Date shall be granted an Initial Option to purchase
        30,000 shares of Common Stock as of the date of their election or
        appointment to the Board. The provisions of this Section 4(a)(i) shall
        not apply to any member of the Board who first becomes a Non-Employee
        Director by reason of such member's ceasing to be an employee of the
        Company and its Subsidiaries.

            (ii)  ANNUAL GRANTS.  Each Non-Employee Director shall receive an
        Annual Option to purchase 10,000 shares of Common Stock on the fourth
        anniversary of the Non-Employee Director's initial election or
        appointment to the Board and on each subsequent anniversary thereof,
        PROVIDED that the individual has remained in continuous service as a
        director of the Company through such anniversary date and is a
        Non-Employee Director on the applicable anniversary date.

        (b)  EXERCISE PRICE.  The per share exercise price of each Option shall
    be the Fair Market Value of a share of Common Stock as of the date of grant
    of the Option determined in accordance with the provisions of the Plan.
<PAGE>
        (c)  VESTING.  Initial Options shall vest and become exercisable in
    equal annual installments on each of the first through third anniversaries
    of the date of grant, PROVIDED that the Non-Employee Director has remained
    in continuous service as a director of the Company through each such
    anniversary date. Annual Options shall be fully vested and immediately

exercisable on their date of grant.

    (d)    TERM OF OPTIONS.

      (i)    TEN-YEAR TERM.  Each Option shall expire ten (10) years from its date of grant, subject to earlier termination as provided herein.

      (ii)    EXERCISE FOLLOWING TERMINATION OF SERVICE DUE TO DEATH.  If a Non-Employee Director ceases to be a member of the Board by reason of such Non-Employee Director's death, the Options granted to such Non-Employee Director may be exercised by such Non-Employee Director's Beneficiary, but only to the extent the Option was exercisable at the time of the Non-Employee Director's death, at any time within three (3) years after the date of such termination of service, subject to the earlier expiration of such Options as provided for in Section 4(d)(i) above. At the end of such three-year period, the vested portion of the Option shall expire. The unvested portion of the Option shall expire on the date of the Non-Employee Director's death.

      (iii)    TERMINATION OF OPTIONS IF A NON-EMPLOYEE DIRECTOR IS REMOVED FROM THE BOARD FOR CAUSE.  In the event a Non-Employee Director is removed from the Board for "cause," all Options granted to such Non-Employee Director (whether or not then vested and exercisable) shall immediately terminate and be of no further force and effect as of the effective date of such removal from the Board. Whether a Non-Employee Director is removed by the Board for "cause" shall be determined by the Board in accordance with the By-Laws of the Company.

      (iv)    EXERCISE FOLLOWING OTHER TERMINATIONS OF SERVICE.  If a Non-Employee Director ceases to be a member of the Board for any reason other than death or removal from the Board for cause, the Options granted to such Non-Employee Director may be exercised by such Non-Employee Director, but only to the extent the Option was exercisable at the time of the Non-Employee Director's termination, at any time within ninety (90) days after the date of such termination of service, subject to the earlier expiration of such Options as provided for in Section 4(d)(i) above. At the end of such ninety-day period, the vested portion of the Option shall expire. The unvested portion of the Option shall expire on the date of the Non-Employee Director's termination of service with the Board.

    (e)    TIME AND MANNER OF EXERCISE OF OPTIONS.

      (i)    NOTICE OF EXERCISE.  Subject to the other terms and conditions hereof, a Non-Employee Director may exercise any Option, to the extent such Option is vested, by giving written notice of exercise to the Company; PROVIDED, HOWEVER, that in no event shall an Option be exercisable for a fractional share. The date of exercise of an Option shall be the later of (A) the date on which the Company receives such written notice and (B) the date on which the conditions provided in Section 4(e)(ii) are satisfied.

      (ii)    METHOD OF PAYMENT.  The consideration to be paid for the shares to be issued upon exercise of an Option may consist of (A) cash, (B) check, (C) other shares which have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the shares as to which the Option shall be exercised and which have been owned by the Non-Employee Director for at least six (6) months at the time of exercise, (D) delivery of a properly executed exercise notice together with irrevocable instructions to a broker to promptly deliver to the

Company the amount of proceeds required to pay the exercise price, or (E) any combination of the foregoing methods of payment.

B-2

<PAGE>

(iii)  STOCKHOLDER RIGHTS.  A Non-Employee Director shall have no rights as a stockholder with respect to any shares of Common Stock issuable upon exercise of an Option until a certificate evidencing such shares shall have been issued to the Non-Employee Director pursuant to Section 4(e)(v), and no adjustment shall be made for dividends or distributions or other rights in respect of any share for which the record date is prior to the date upon which the Non-Employee Director shall become the holder of record thereof.

(iv)  LIMITATION ON EXERCISE.  No Option shall be exercisable unless the Common Stock subject thereto has been registered under the Securities Act and qualified under applicable state "blue sky" laws in connection with the offer and sale thereof, or the Company has determined that an exemption from registration under the Securities Act and from qualification under such state "blue sky" laws is available.

(v)  ISSUANCE OF SHARES.  Subject to the foregoing conditions, as soon as is reasonably practicable after its receipt of a proper notice of exercise and payment of the exercise price of the Option for the number of shares with respect to which the Option is exercised, the Company shall deliver to the Non-Employee Director (or following the Non-Employee Director's death, the Beneficiary entitled to exercise the Option), at the principal office of the Company or at such other location as may be acceptable to the Company and the Non-Employee Director (or such Beneficiary), one or more stock certificates for the appropriate number of shares of Common Stock issued in connection with such exercise. Shares sold in connection with a "cashless exercise" described in clause C of Section 4(e)(ii) shall be delivered to the broker referred to therein in accordance with the procedures established by the Company from time to time.

(f)  RESTRICTIONS ON TRANSFER.  An Option may not be transferred, pledged, assigned, or otherwise disposed of, except by will or by the laws of descent and distribution; PROVIDED, HOWEVER, that an Option may be, with the approval of the Administrator, transferred to a Non-Employee Director's family members or to one or more trusts established in whole or in part for the benefit of one or more of such family members. The Option shall be exercisable, during the Non-Employee Director's lifetime, only by the Non-Employee Director or by the individual or entity to whom the Option has been transferred in accordance with the previous sentence. No assignment or transfer of the Option, or of the rights represented thereby, whether voluntary or involuntary, by operation of law or otherwise, except by will or the laws of descent and distribution, shall vest in the assignee or transferee any interest or right in the Option, but immediately upon any attempt to assign or transfer the Option the same shall terminate and be of no force or effect.

5.  DESIGNATION OF BENEFICIARY.

(a)  BENEFICIARY DESIGNATIONS.  Each Non-Employee Director may designate a Beneficiary to exercise an Option upon the Non-Employee Director's death by executing a Beneficiary Designation Form.

(b)  CHANGE OF BENEFICIARY DESIGNATION.  A Non-Employee Director may change an earlier Beneficiary designation by executing a later Beneficiary

Designation Form and delivering it to the Administrator. The execution of a Beneficiary Designation Form and its receipt by the Administrator will revoke and rescind any prior Beneficiary Designation Form.

6.   CHANGE IN CONTROL.

Anything in the Plan to the contrary notwithstanding, in the event of a Change in Control of the Company, the following provisions shall apply:

(a) Any Options outstanding as of the date such Change in Control is determined to have occurred that are not yet exercisable and vested on such date shall become fully exercisable and vested.

B-3

<PAGE>

(b) The value of all outstanding Options (to the extent not previously exercised) shall be cashed out on the date of the Change in Control. The amount at which such Options shall be cashed out shall be equal to the excess, if any, of (i) the Change in Control Price over (ii) the exercise price of the Common Stock covered by the Option. The cash-out proceeds shall be paid to the Non-Employee Director or, in the event of death of the Non-Employee Director prior to payment, to the Beneficiary thereof.

(c) If the Administrator shall receive an opinion from a nationally recognized firm of accountants to the Company that the cash-out provisions in Section 6(b) above with respect to Options will prohibit the utilization of "pooling of interests" accounting in connection with the transaction resulting in the Change in Control of the Company, then the following shall apply, but only to the extent necessary to permit such accounting treatment: (i) the provisions of Section 6(b) shall not apply to the Options, (ii) each such Option shall become immediately vested and exercisable as of the date such opinion is received by the Administrator, and (iii) the Administrator shall promptly inform each Non-Employee Director of such opinion and of the accelerated vesting and exercisability of the Option sufficiently prior to the anticipated date of the Change in Control, so as to permit the Option to be exercised prior to the date of the Change in Control.

7.   RECAPITALIZATION OR REORGANIZATION.

(a)   AUTHORITY OF THE COMPANY AND SHAREHOLDERS.  The existence of the Plan shall not affect or restrict in any way the right or power of the Company or the shareholders of the Company to make or authorize any adjustment, recapitalization, reorganization or other change in the Company's capital structure or its business, any merger or consolidation of the Company, any issue of stock or of options, warrants or rights to purchase stock or of bonds, debentures, preferred or prior preference stocks whose rights are superior to or affect the Common Stock or the rights thereof or which are convertible into or exchangeable for Common Stock, or the dissolution or liquidation of the Company, or any sale or transfer of all or any part of its assets or business, or any other corporate act or proceeding, whether of a similar character or otherwise.

(b)   CHANGE IN CAPITALIZATION.  Notwithstanding any other provision of the Plan, in the event of any change in the outstanding Common Stock by reason of a stock dividend, recapitalization, reorganization, merger, consolidation, stock split, combination or exchange of shares (a "CHANGE IN CAPITALIZATION"), (i) such proportionate adjustments as may be necessary (in the form determined by the Administrator in its sole discretion) to reflect such change shall be made to prevent dilution or enlargement of the rights of Non-Employee Directors under the Plan with respect to the aggregate

number of shares of Common Stock authorized to be awarded under the Plan,
the number of shares of Common Stock covered by each outstanding Option and
the exercise prices in respect thereof and the number of shares of Common
Stock covered by future Option grants and (ii) the Administrator may make
such other adjustments, consistent with the foregoing, as it deems
appropriate in its sole discretion.

    (c)  DISSOLUTION OR LIQUIDATION.  In the event of the proposed
dissolution or liquidation of the Company, each outstanding Option will vest
and become exercisable on a date prior to the consummation of the proposed
action that is reasonably sufficient to enable the Non-Employee Directors to
exercise their Options.

8.   TERMINATION AND AMENDMENT OF THE PLAN.

    (a)  TERMINATION.  The Plan shall terminate on the tenth anniversary of
the Effective Date. Following such date, no further grants of Options shall
be made pursuant to the Plan.

    (b)  GENERAL POWER OF BOARD.  Notwithstanding anything herein to the
contrary, the Board may at any time and from time to time terminate, modify,
suspend or amend the Plan in whole or in part; PROVIDED, HOWEVER, that no
such termination, modification, suspension or amendment shall be effective

                                    B-4
<PAGE>
without shareholder approval if such approval is required to comply with any
applicable law or stock exchange rule; and PROVIDED FURTHER that the Board
may not, without shareholder approval, increase the maximum number of shares
issuable under the Plan except as provided in Section 7(b) above.

    (c)  WHEN NON-EMPLOYEE DIRECTORS' CONSENTS REQUIRED.  The Board may not
alter, amend, suspend, or terminate the Plan without the consent of any
Non-Employee Director to the extent that such action would adversely affect
his or her rights with respect to Options that have previously been granted.

9.   MISCELLANEOUS.

    (a)  NO RIGHT TO REELECTION.  Nothing in the Plan shall be deemed to
create any obligation on the part of the Board to nominate any of its
members for reelection by the Company's stockholders, nor confer upon any
Non-Employee Director the right to remain a member of the Board for any
period of time, or at any particular rate of compensation.

    (b)  SECURITIES LAW RESTRICTIONS.  The Administrator may require each
Non-Employee Director purchasing or acquiring shares of Common Stock
pursuant to the Plan to agree with the Company in writing that such
Non-Employee Director is acquiring the shares for investment and not with a
view to the distribution thereof. All certificates for shares of Common
Stock delivered under the Plan shall be subject to such stock-transfer
orders and other restrictions as the Administrator may deem advisable under
the rules, regulations, and other requirements of the Securities and
Exchange Commission or any exchange upon which the Common Stock is then
listed, and any applicable federal or state securities law, and the
Administrator may cause a legend or legends to be put on any such
certificates to make appropriate reference to such restrictions. No shares
of Common Stock shall be issued hereunder unless the Company shall have
determined that such issuance is in compliance with, or pursuant to an
exemption from, all applicable federal and state securities laws.

(c)  EXPENSES.  The costs and expenses of administering the Plan shall be borne by the Company.

(d)  APPLICABLE LAW.  Except as to matters of federal law, the Plan and all actions taken thereunder shall be governed by and construed in accordance with the laws of the State of California without giving effect to conflicts of law principles.

(e)  EFFECTIVE DATE.  The Plan shall be effective as of the Effective Date, subject to the approval thereof by the stockholders of the Company by no later than the next Annual Meeting to occur after the Effective Date. If such stockholder approval is not obtained by the date of such Annual Meeting, all prior Option grants shall be void AB INITIO and of no further force and effect.

10.  DEFINITIONS.  Capitalized words not otherwise defined in the Plan have the meanings set forth below:

"ADMINISTRATOR" means the Chief Financial Officer of the Company or the individual appointed by the Chief Executive Officer of the Company to administer the Plan.

"ANNUAL MEETING" means an annual meeting of the Company's stockholders.

"ANNUAL OPTION" means an Option granted to a Non-Employee Director pursuant to Section 4(a)(ii) of the Plan.

"BENEFICIARY" or "BENEFICIARIES" means an individual or entity designated by a Non-Employee Director on a Beneficiary Designation Form to exercise Options in the event of the Non-Employee Director's death; PROVIDED, HOWEVER, that, if no such individual or entity is designated or if no such designated individual is alive at the time of the Non-Employee Director's death, Beneficiary shall mean the Non-Employee Director's estate.

B-5

<PAGE>
"BENEFICIARY DESIGNATION FORM" means a document, in a form approved by the Administrator to be used by Non-Employee Directors to name their respective Beneficiaries. No Beneficiary Designation Form shall be effective unless it is signed by the Non-Employee Director and received by the Administrator prior to the date of death of the Non-Employee Director.

"BOARD" means the Board of Directors of the Company.

"CHANGE IN CONTROL" means the happening of any of the following:

(i) When any "person", as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than the Company, a Subsidiary or a Company employee benefit plan, including any trustee of such plan acting as trustee) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the combined voting power of the Company's then outstanding securities; or

(ii) The occurrence of a transaction requiring shareholder approval, and involving the sale of all or substantially all of the assets of the Company or the merger of the Company with or into another corporation.

"CHANGE IN CONTROL PRICE" means, as determined by the Administrator, (i) the highest Fair Market Value at any time within the sixty-day period

immediately preceding the date of determination of the Change in Control Price by the Administrator (the "SIXTY-DAY PERIOD"), or (ii) the highest price paid or offered, as determined by the Administrator, in any bona fide transaction or bona fide offer related to the Change in Control of the Company, at any time within the Sixty-Day Period.

"CODE" means the Internal Revenue Code of 1986, as amended, and the applicable rules and regulations promulgated thereunder.

"COMMON STOCK" means the common stock of the Company, no par value per share.

"COMPANY" means Apple Computer, Inc., a California corporation, or any successor to substantially all of its business.

"EFFECTIVE DATE" means, subject to Section 9(e), August 5, 1997.

"EXCHANGE ACT" means the Securities Exchange Act of 1934, as amended, and the applicable rules and regulations promulgated thereunder.

"FAIR MARKET VALUE" means the value of Common Stock determined as follows:

(i) If the Common Stock is listed on any established stock exchange or a national market system (including without limitation the Nasdaq National Market), its Fair Market Value shall be the closing sales price for such stock or the closing bid if no sales were reported, as quoted on such system or exchange (or the exchange with the greatest volume of trading in the Common Stock) for the date of determination or, if the date of determination is not a trading day, the immediately preceding trading day, as reported in THE WALL STREET JOURNAL or such other source as the Administrator deems reliable.

(ii) If the Common Stock is regularly quoted on the Nasdaq system (but not on the Nasdaq National Market) or quoted by a recognized securities dealer but selling prices are not reported, its Fair Market Value shall be the mean between the high and low asked prices for the Common Stock on the date of determination or, if there are no quoted prices on the date of determination, on the last day on which there are quoted prices prior to the date of determination.

(iii) In the absence of an established market for the Common Stock, the Fair Market Value thereof shall be determined in good faith by the Administrator.

B-6

<PAGE>

"INITIAL OPTION" means an Option granted to a Non-Employee Director pursuant to Section 4(a)(i) of the Plan.

"NON-EMPLOYEE DIRECTOR" means a member of the Board who is not an employee of the Company or any of its Subsidiaries.

"OPTION" means an option to purchase shares of Common Stock awarded to a Non-Employee Director pursuant to the Plan and includes Initial Options and Annual Options.

"PLAN" means the Apple Computer, Inc. 1997 Director Stock Option Plan.

"SECTION 3 LIMIT" shall have the meaning set forth in Section 3 of the

Plan.

   "SUBSIDIARY" means any corporation which is a "subsidiary corporation"
within the meaning of Section 424(f) of the Code with respect to the
Company.

                                    B-7
<PAGE>

                                                        APPENDIX C


                          APPLE COMPUTER, INC.
                    1998 EXECUTIVE OFFICER STOCK PLAN


   1.  PURPOSES OF THE PLAN.  The purposes of this Stock Plan are:


      - to attract and retain the best available personnel for positions of
        substantial responsibility;


      - to provide additional incentive to the Chairman and/or Executive
        Officers and other key employees; and


      - to promote the success of the Company's business.


   Options granted under the Plan may be Incentive Stock Options (as defined
under Section 422 of the Code) or Nonstatutory Stock Options, as determined by
the Administrator at the time of grant. Stock appreciation rights ("SARs") may
be granted under the Plan in connection with Options or independently of
Options. Stock Purchase Rights may also be granted under the Plan.


   2.  DEFINITIONS.  As used herein, the following definitions shall apply:


       (a) "ADMINISTRATOR" means the Board or any of its Committees as shall be
administering the Plan, in accordance with Section 4 of the Plan.


       (b) "AGREEMENT" means an agreement between the Company and an Optionee
evidencing the terms and conditions of an individual Option, SAR or Stock
Purchase Right grant. The Agreement is subject to the terms and conditions
of the Plan.

(c) "APPLICABLE LAWS" means the requirements relating to the administration of stock option plans under U.S. state corporate laws, U.S. federal and state securities laws, the Code, any stock exchange or quotation system on which the Common Stock is listed or quoted and the applicable laws of any foreign country or jurisdiction where Options, SARs or Stock Purchase Rights are, or will be, granted under the Plan.

(d) "BOARD" means the Board of Directors of the Company.

(e) "CHAIRMAN" means the Chairman of the Board.

(f) "CODE" means the Internal Revenue Code of 1986, as amended.

(g) "COMMITTEE" means a committee of Directors appointed by the Board in accordance with Section 4 of the Plan.

(h) "COMMON STOCK" means the common stock of the Company.

(i) "COMPANY" means Apple Computer, Inc., a California corporation.

(j) "CONTINUOUS STATUS AS CHAIRMAN" unless determined otherwise by the Administrator, means the absence of any interruption or termination as Chairman of the Board with the Company. Continuous Status as Chairman shall not be considered interrupted in the case of medical leave, military leave, family leave, or any other leave of absence approved by the Administrator, provided, in each case, that such leave does not result in termination as Chairman with the Company. Neither service as a Director nor payment of a director's fee by the Company shall be sufficient to constitute status as "Chairman" by the Company.

(k) "CONTINUOUS STATUS AS AN EMPLOYEE" means the absence of any interruption or termination of the employment relationship with the Company or any Subsidiary. Continuous Status as an Employee shall not be considered interrupted in the case of (i) medical leave, military leave, family leave, or any other leave of absence approved by the Administrator, provided, in each case, that such leave does not result in termination of the employment relationship with the Company or any Subsidiary, as the case may be, under the terms of the respective Company policy for such leave; or (ii) in the case of transfers between locations of the Company or between the Company, its Subsidiaries, or its

<PAGE>

successor. For purposes of Incentive Stock Options, no such leave may exceed

ninety days, unless reemployment upon expiration of such leave is guaranteed by statute or contract. If reemployment upon expiration of a leave of absence approved by the Company is not so guaranteed, on the 91st day of such leave any Incentive Stock Option held by the Optionee shall cease to be treated as an Incentive Stock Option and shall be treated for tax purposes as a Nonstatutory Stock Option. Neither service as a Chairman nor as a Director nor payment of a director's fee by the Company shall be sufficient to constitute "employment" by the Company.

(l) "DIRECTOR" means a member of the Board.

(m) "EMPLOYEE" means any person employed by the Company or any Parent or Subsidiary of the Company subject to (k) above.

(n) "EXCHANGE ACT" means the Securities Exchange Act of 1934, as amended.

(o) "EXECUTIVE OFFICER" means any person who is an officer of the Company within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

(p) "FAIR MARKET VALUE" means, as of any date, the value of Common Stock determined as follows:

(i) If the Common Stock is listed on any established stock exchange or a national market system, including without limitation the Nasdaq National Market or The Nasdaq SmallCap Market of The Nasdaq Stock Market, its Fair Market Value shall be the closing sales price for such stock (or the closing bid, if no sales were reported) as quoted on such exchange or system, on the date of determination or, if the date of determination is not a trading day, the immediately preceding trading day, as reported in THE WALL STREET JOURNAL or such other source as the Administrator deems reliable;

(ii) If the Common Stock is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share of Common Stock shall be the mean between the high bid and low asked prices for the Common Stock on the date of determination or, if there are no quoted prices on the date of determination, on the last day on which there are quoted prices prior to the date of determination, as reported in THE WALL STREET JOURNAL or such other source as the Administrator deems reliable; or

(iii) In the absence of an established market for the Common Stock,

the Fair Market Value shall be determined in good faith by the
Administrator.

(q) "INCENTIVE STOCK OPTION" means an Option intended to qualify as an
incentive stock option within the meaning of Section 422 of the Code and the
regulations promulgated thereunder and is expressly designated by the
Administrator at the time of grant as an incentive stock option.

(r) "NONSTATUTORY STOCK OPTION" means an Option not intended to qualify
as an Incentive Stock Option.

(s) "OPTION" means a stock option granted pursuant to the Plan.

(t) "OPTIONED STOCK" means the Common Stock subject to an Option, SAR or
Stock Purchase Right.

(u) "OPTIONEE" means the holder of an outstanding Option, SAR or Stock
Purchase Right.

(v) "PARENT" means a "parent corporation," whether now or hereafter
existing, as defined in Section 424(e) of the Code.

(w) "PLAN" means this 1998 Executive Officer Stock Plan.

C-2

<PAGE>

(x) "RESTRICTED STOCK" means shares of Common Stock acquired pursuant to
a grant of Stock Purchase Rights under Section 12 of the Plan.

(y) "RULE 16B-3" means Rule 16b-3 of the Exchange Act or any successor
to Rule 16b-3, as in effect when discretion is being exercised with respect
to the Plan.

(z) "SAR" means a stock appreciation right granted pursuant to Section
10 below.

(aa) "SECTION 16(B)" means Section 16(b) of the Exchange Act.

(bb) "SHARE" means a share of the Common Stock, as adjusted in accordance with Section 15 of the Plan.

(cc) "STOCK PURCHASE RIGHT" means the right to purchase Common Stock pursuant to Section 12 of the Plan, as evidenced by an Agreement.

(dd) "SUBSIDIARY" means a "subsidiary corporation", whether now or hereafter existing, as defined in Section 424(f) of the Code.

3.   STOCK SUBJECT TO THE PLAN.  Subject to the provisions of Section 15 of the Plan, the maximum aggregate number of Shares which may be optioned and sold under the Plan or for which SARs or Stock Purchase Rights may be granted and exercised is 17,000,000 Shares. The Shares may be authorized, but unissued, or reacquired Common Stock.

In the discretion of the Administrator, any or all of the Shares authorized under the Plan may be subject to SARs issued pursuant to the Plan.

If an Option, SAR or Stock Purchase Right issued under the Plan should expire or become unexercisable for any reason without having been exercised in full, the unpurchased Shares which were subject thereto shall become available for other Options, SARs or Stock Purchase Rights under this Plan (unless the Plan has terminated); however, should the Company reacquire Shares which were issued pursuant to the exercise of an Option or SAR, such Shares shall not become available for future grant under the Plan. If Shares of Restricted Stock are repurchased by the Company at their original purchase price, such shares shall become available for future grant under the Plan.

4.   ADMINISTRATION OF THE PLAN.

(a)   PROCEDURE.

(i)   MULTIPLE ADMINISTRATIVE BODIES.  If permitted by Rule 16b-3 promulgated under the Exchange Act or any successor rule thereto, as in effect at the time that discretion is being exercised with respect to the Plan, and by the legal requirements of the Applicable Laws relating to the administration of stock plans such as the Plan, if any, the Plan may (but need not) be administered by different administrative bodies with respect to (A) Directors who are not Employees, (B) Directors who are Employees, (C) Officers who are not Directors and (D) Employees who are neither Directors nor Officers.

(ii)   SECTION 162(M).  To the extent that the Administrator determines it to be desirable to qualify Options or SARs granted hereunder as "performance-based compensation" within the meaning of Section 162(m) of the Code, the Plan shall be administered by a Committee of two or more "outside directors" within the meaning of Section 162(m) of the Code.


(iii)   RULE 16B-3.  To the extent desirable to qualify transactions hereunder as exempt under Rule 16b-3, the transactions contemplated hereunder shall be structured to satisfy the requirements for exemption under Rule 16b-3.


                                    C-3
<PAGE>
(iv)   OTHER ADMINISTRATION.  Other than as provided above, the Plan shall be administered by (A) the Board or (B) a Committee, which committee shall be constituted to satisfy Applicable Laws.


(b)   POWERS OF THE ADMINISTRATOR.  Subject to the provisions of the Plan, and in the case of a Committee, subject to the specific duties delegated by the Board to such Committee, the Administrator shall have the authority, in its discretion:


(i) to determine the Fair Market Value;


(ii) to select the person(s) to whom Options, SARs and Stock Purchase Rights may be granted hereunder;


(iii) to determine the number of shares of Common Stock to be covered by each Option, SAR or Stock Purchase Right granted hereunder;


(iv) to approve forms of agreement for use under the Plan;


(v) to determine the terms and conditions, not inconsistent with the terms of the Plan, of any Option, SAR or Stock Purchase Right granted hereunder. Such terms and conditions include, but are not limited to, the exercise price, the date of grant, the time or times when Options, SARs or Stock Purchase Rights may be exercised (which may be based on performance criteria), any vesting acceleration or waiver of forfeiture restrictions, and any restriction or limitation regarding any Option, SAR or Stock Purchase Right or the shares of Common Stock relating thereto, based in each case on such factors as the Administrator, in its sole

discretion, shall determine;

    (vi) to reduce the exercise price of any Option, SAR or Stock
Purchase Right to the then current Fair Market Value if the Fair Market
Value of the Common Stock covered by such Option, SAR or Stock Purchase
Right shall have declined since the date the Option, SAR or Stock
Purchase Right was granted;

    (vii) to construe and interpret the terms of the Plan and awards
granted pursuant to the Plan;

    (viii) to prescribe, amend and rescind rules and regulations relating
to the Plan, including rules and regulations relating to sub-plans
established for the purpose of qualifying for preferred tax treatment
under foreign tax laws;

    (ix) to modify or amend each Option, SAR or Stock Purchase Right
(subject to Section 17(c) of the Plan), including the discretionary
authority to extend the post-termination exercisability period of Options
longer than is otherwise provided for in the Plan;

    (x) to allow Optionees to satisfy withholding tax obligations by
electing to have the Company withhold from the Shares to be issued upon
exercise of an Option, SAR or Stock Purchase Right that number of Shares
having a Fair Market Value equal to the amount required to be withheld.
The Fair Market Value of the Shares to be withheld shall be determined on
the date that the amount of tax to be withheld is to be determined. All
elections by an Optionee to have Shares withheld for this purpose shall
be made in such form and under such conditions as the Administrator may
deem necessary or advisable;

    (xi) to authorize any person to execute on behalf of the Company any
instrument required to effect the grant of an Option, SAR or Stock
Purchase Right previously granted by the Administrator; and

    (xii) to make all other determinations deemed necessary or advisable
for administering the Plan.

                                C-4
<PAGE>

    (c)  EFFECT OF ADMINISTRATOR'S DECISION.  The Administrator's decisions,
determinations and interpretations shall be final and binding on all
Optionees and any other holders of Options, SARs or Stock Purchase Rights.

5. ELIGIBILITY. Nonstatutory Stock Options, SARs and Stock Purchase Rights may be granted to the Chairman, Executive Officers and other key employees or to such other individuals as determined by the Administrator whom the Company has offered a position of Chairman or Executive Officer. Incentive Stock Options may be granted only to Executive Officers and other key employees.

6. LIMITATIONS.

(a) Each Option shall be designated in the Agreement as either an Incentive Stock Option or a Nonstatutory Stock Option. However, notwithstanding such designation, to the extent that the aggregate Fair Market Value of the Shares with respect to which Incentive Stock Options are exercisable for the first time by the Optionee during any calendar year (under all plans of the Company and any Parent or Subsidiary) exceeds $100,000, such Options shall be treated as Nonstatutory Stock Options. For purposes of this Section 6(a), Incentive Stock Options shall be taken into account in the order in which they were granted. The Fair Market Value of the Shares shall be determined as of the time the Option with respect to such Shares is granted.

(b) Neither the Plan nor any Option, SAR or Stock Purchase Right shall confer upon an Optionee any right with respect to continuing the Optionee's relationship as an Employee with or Chairman of the Company, nor shall they interfere in any way with the Optionee's right or the Company's right to terminate such relationship at any time, with or without cause.

(c) The following limitations shall apply to grants of Options and SARs:

(i) No participant shall be granted, in any fiscal year of the Company, Options or SARs to purchase more than 17,000,000 Shares;

(ii) The foregoing limitations shall be adjusted proportionately in connection with any change in the Company's capitalization as described in Section 15;

(iii) If an Option or SAR is canceled in the same fiscal year of the Company in which it was granted (other than in connection with a transaction described in Section 15), the canceled Option will be counted against the limits set forth in subsections (i) above. For this purpose, if the exercise price of an Option or SAR is reduced, the transaction will be treated as a cancellation of the Option or SAR and the grant of a new Option or SAR.

7.  TERM OF PLAN.  Subject to Section 21 of the Plan, the Plan shall become effective upon its adoption by the Board. It shall continue in effect for a term of ten (10) years unless terminated earlier under Section 16 of the Plan.


8.  TERM OF OPTION.  The term of each Option shall be stated in the Agreement. In the case of an Incentive Stock Option, the term shall be ten (10) years from the date of grant or such shorter term as may be provided in the Agreement. Moreover, in the case of an Incentive Stock Option granted to an Optionee who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the total combined voting power of all classes of stock of the Company or any Parent or Subsidiary, the term of the Incentive Stock Option shall be five (5) years from the date of grant or such shorter term as may be provided in the Agreement.

                                C-5
<PAGE>

9.  OPTION EXERCISE PRICE AND CONSIDERATION.


    (a)  EXERCISE PRICE.  The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be determined by the Administrator, subject to the following:


        (i) In the case of an Incentive Stock Option;


            (A) granted to an Employee who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price shall be no less than 110% of the Fair Market Value per Share on the date of grant; or


            (B) granted to any Employee other than an Employee described in paragraph (A) immediately above, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant;


        (ii) In the case of a Nonstatutory Stock Option, the per Share exercise price shall be determined by the Administrator. In the case of a Nonstatutory Stock Option intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the Code, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant;

(iii) Notwithstanding the foregoing, Options may be granted with a per Share exercise price of less than 100% of the Fair Market Value per Share on the date of grant as determined by the Administrator or pursuant to a merger or other corporate transaction.


(b)  WAITING PERIOD AND EXERCISE DATES.  At the time an Option is granted, the Administrator shall fix the period within which the Option may be exercised and shall determine any conditions which must be satisfied before the Option may be exercised.


(c)  FORM OF CONSIDERATION.  The Administrator shall determine the acceptable form of consideration for exercising an Option, including the method of payment. In the case of an Incentive Stock Option, the Administrator shall determine the acceptable form of consideration at the time of grant. Such consideration may consist entirely of:


(i) cash;


(ii) check;


(iii) promissory note;


(iv) other Shares which (A) in the case of Shares acquired upon exercise of an option, have been owned by the Optionee for more than six months on the date of surrender, and (B) have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which said Option shall be exercised;


(v) consideration received by the Company under a cashless exercise program implemented by the Company in connection with the Plan;


(vi) a reduction in the amount of any Company liability to the Optionee, including any liability attributable to the Optionee's participation in any Company-sponsored deferred compensation program or arrangement;


(vii) any combination of the foregoing methods of payment; or


(viii) such other consideration and method of payment for the issuance of Shares to the extent permitted by Applicable Laws.

C-6

<PAGE>

10.   STOCK APPRECIATION RIGHTS.


     (a)   GRANTED IN CONNECTION WITH OPTIONS.  At the sole discretion of the
Administrator, SARs may be granted in connection with all or any part of an
Option, either concurrently with the grant of the Option or at any time
thereafter during the term of the Option. The following provisions apply to
SARs that are granted in connection with Options:


        (i) The SAR shall entitle the Optionee to exercise the SAR by
surrendering to the Company unexercised a portion of the related Option.
The Optionee shall receive in exchange from the Company an amount equal
to the excess of (x) the Fair Market Value on the date of exercise of the
SAR of the Common Stock covered by the surrendered portion of the related
Option over (y) the exercise price of the Common Stock covered by the
surrendered portion of the related Option. Notwithstanding the foregoing,
the Administrator may place limits on the amount that may be paid upon
exercise of a SAR; provided, however, that such limit shall not restrict
the exercisability of the related Option;


        (ii) When a SAR is exercised, the related Option, to the extent
surrendered, shall no longer be exercisable;


        (iii) A SAR shall be exercisable only when and to the extent that the
related Option is exercisable and shall expire no later than the date on
which the related Option expires; and


        (iv) A SAR may only be exercised at a time when the Fair Market
Value of the Common Stock covered by the related Option exceeds the
exercise price of the Common Stock covered by the related Option.


     (b)   INDEPENDENT SARS. At the sole discretion of the Administrator,
SARs may be granted without related Options. The following provisions apply
to SARs that are not granted in connection with Options:


        (i) The SAR shall entitle the Optionee, by exercising the SAR, to
receive from the Company an amount equal to the excess of (x) the Fair
Market Value of the Common Stock covered by exercised portion of the SAR,
as of the date of such exercise, over (y) the Fair Market Value of the
Common Stock covered by the exercised portion of the SAR, as of the date
on which the SAR was granted; provided, however, that the Administrator
may place limits on the amount that may be paid upon exercise of a SAR;

and


        (ii) SARs shall be exercisable, in whole or in part, at such times
    as the Administrator shall specify in the Optionee's Agreement.


    (c)  FORM OF PAYMENT.  The Company's obligation arising upon the
exercise of a SAR may be paid in Common Stock or in cash, or in any
combination of Common Stock and cash, as the Administrator, in its sole
discretion, may determine. Shares issued upon the exercise of a SAR shall be
valued at their Fair Market Value as of the date of exercise.


    (d)  RULE 16B-3.  SARs granted hereunder shall contain such additional
restrictions as may be required to be contained in the Plan or Agreement in
order for the SAR to qualify for the maximum exemption provided by Rule
16b-3.


11.  EXERCISE OF OPTION OR SAR.


    (a)  PROCEDURE FOR EXERCISE; RIGHTS AS A SHAREHOLDER.  Any Option or SAR
granted hereunder shall be exercisable according to the terms of the Plan
and at such times and under such conditions as determined by the
Administrator and set forth in the Agreement. An Option may not be exercised
for a fraction of a Share.

                                    C-7
<PAGE>

    An Option or SAR shall be deemed exercised when the Company receives:
(i) written or electronic notice of exercise (in accordance with the terms
of the Option or SAR) from the person entitled to exercise the Option or
SAR, and (ii) full payment for the Shares with respect to which the Option
is exercised. Full payment may consist of any consideration and method of
payment authorized by the Administrator and permitted by the Agreement and
the Plan. Shares issued upon exercise of an Option shall be issued in the
name of the Optionee or, if requested by the Optionee, in the name of the
Optionee and his or her spouse. Until the Shares are issued (as evidenced by
the appropriate entry on the books of the Company or of a duly authorized
transfer agent of the Company), no right to vote or receive dividends or any
other rights as a shareholder shall exist with respect to the Optioned
Stock, notwithstanding the exercise of the Option. The Company shall issue
(or cause to be issued) such Shares promptly after the Option is exercised.
No adjustment will be made for a dividend or other right for which the
record date is prior to the date the Shares are issued, except as provided
in Section 15 of the Plan.


    Exercising an Option in any manner shall decrease the number of Shares
thereafter available, both for purposes of the Plan and for sale under the

Option, by the number of Shares as to which the Option is exercised. Exercise of a SAR in any manner shall, to the extent the SAR is exercised, result in a decrease in the number of Shares which thereafter shall be available for purposes of the Plan, and the SAR shall cease to be exercisable to the extent it has been exercised.

(b)   TERMINATION OF CONTINUOUS STATUS AS CHAIRMAN.   Upon termination of an Optionee's Continuous Status as Chairman (other than termination by reason of the Optionee's death), the Optionee may, but only within ninety (90) days after the date of such termination, exercise his or her Option or SAR to the extent that it was exercisable at the date of such termination. Notwithstanding the foregoing, however, an Option or SAR may not be exercised after the date the Option or SAR would otherwise expire by its terms due to the passage of time from the date of grant.

(c)   TERMINATION OF CONTINUOUS EMPLOYMENT.   Upon termination of an Optionee's Continuous Status as Employee (other than termination by reason of the Optionee's death), the Optionee may, but only within ninety (90) days after the date of such termination, exercise his or her Option or SAR to the extent that it was exercisable at the date of such termination. Notwithstanding the foregoing, however, an Option or SAR may not be exercised after the date the Option or SAR would otherwise expire by its terms due to the passage of time from the date of grant.

(d)   DEATH OF OPTIONEE.   If an Optionee dies (i) while an Employee or Chairman, the Option or SAR may be exercised at any time within six (6) months (or such other period of time not exceeding twelve (12) months as determined by the Administrator) following the date of death by the Optionee's estate or by a person who acquired the right to exercise the Option by bequest or inheritance, but only to the extent of the right to exercise that would have accrued had the Optionee continued living and terminated his or her employment six (6) months (or such other period of time not exceeding twelve (12) months as determined by the Administrator) after the date of death; or (ii) within ninety (90) days after the termination of Continuous Status as an Employee or Chairman, the Option or SAR may be exercised, at any time within six (6) months (or such other period of time not exceeding twelve (12) months as determined by the Administrator) following the date of death by the Optionee's estate or by a person who acquired the right to exercise the Option or SAR by bequest or inheritance, but only to the extent of the right to exercise that had accrued at the date of termination. If the Option or SAR is not so exercised within the time specified herein, the Option or SAR shall terminate, and the Shares covered by such Option or SAR shall revert to the Plan.

Notwithstanding the foregoing, however, an Option or SAR may not be exercised after the date the Option or SAR would otherwise expire by its terms due to the passage of time from the date of grant.

C-8

<PAGE>

(e)   BUYOUT PROVISIONS.  The Administrator may at any time offer to buy
out for a payment in cash or Shares an Option or SAR previously granted
based on such terms and conditions as the Administrator shall establish and
communicate to the Optionee at the time that such offer is made.


12.  STOCK PURCHASE RIGHTS.


     (a)   RIGHTS TO PURCHASE.  Stock Purchase Rights may be issued either
alone, in addition to, or in tandem with other awards granted under the Plan
and/or cash awards made outside of the Plan. After the Administrator
determines that it will offer Stock Purchase Rights under the Plan, it shall
advise the Optionee in writing or electronically, of the terms, conditions
and restrictions related to the offer, including the number of Shares that
the Optionee shall be entitled to purchase, the price to be paid, and the
time within which the Optionee must accept such offer. The offer shall be
accepted by execution of an Agreement in the form determined by the
Administrator.


     (b)   REPURCHASE OPTION.  Unless the Administrator determines otherwise,
the Agreement shall grant the Company a repurchase option exercisable upon
the voluntary or involuntary termination of the purchaser's service with the
Company for any reason (including death or Disability). The purchase price
for Shares repurchased pursuant to the Agreement shall be the original price
paid by the purchaser and may be paid by cancellation of any indebtedness of
the purchaser to the Company. The repurchase option shall lapse at a rate
determined by the Administrator.


     (c)   OTHER PROVISIONS.  The Agreement shall contain such other terms,
provisions and conditions not inconsistent with the Plan as may be
determined by the Administrator in its sole discretion.


     (d)   RIGHTS AS A SHAREHOLDER.  Once the Stock Purchase Right is
exercised, the purchaser shall have the rights equivalent to those of a
shareholder, and shall be a shareholder when his or her purchase is entered
upon the records of the duly authorized transfer agent of the Company. No
adjustment will be made for a dividend or other right for which the record
date is prior to the date the Stock Purchase Right is exercised, except as
provided in Section 15 of the Plan.


13.  TRANSFERABILITY OF OPTIONS, SARS AND STOCK PURCHASE RIGHTS.  Unless
determined otherwise by the Administrator, an Option, SAR or Stock Purchase
Right may not be sold, pledged, assigned, hypothecated, transferred, or disposed
of in any manner other than by will or by the laws of descent or distribution or
pursuant to a qualified domestic relations order as defined by the Code or Title
1 of the Employee Retirement Income Security Act, and may be exercised, during
the lifetime of the Optionee, only by the Optionee. If the Administrator makes
an Option, SAR or Stock Purchase Right transferable, such Option, SAR or Stock
Purchase Right shall contain such additional terms and conditions as the

Administrator deems appropriate.


     14.   STOCK WITHHOLDING TO SATISFY WITHHOLDING TAX OBLIGATIONS.  When an
Optionee incurs tax liability in connection with the exercise of an Option, SAR
or Stock Purchase Right, which tax liability is subject to tax withholding under
applicable tax laws, and the Optionee is obligated to pay the Company an amount
required to be withheld under applicable tax laws, the Optionee may satisfy the
withholding tax obligation (including, at the election of the Optionee, any
additional amount which the Optionee desires to have withheld in order to
satisfy in whole or in part the Optionee's full estimated tax in connection with
the exercise) by electing to have the Company withhold from the Shares to be
issued upon exercise of the Option, or the Shares to be issued upon exercise of
the SAR or Stock Purchase Right, if any, that number of Shares having a Fair
Market Value equal to the amount required to be withheld (and any additional
amount desired to be withheld, as aforesaid). The Fair Market Value of the
Shares to be withheld shall be determined on the date that the amount of tax to
be withheld is to be determined (the "Tax Date").


     All elections by an Optionee to have Shares withheld for this purpose shall
be made in writing in a form acceptable to the Administrator and shall be
subject to the following restrictions:


          (i) the election must be made on or prior to the applicable Tax Date;
     and


                              C-9
<PAGE>
          (ii) all elections shall be subject to the consent or disapproval of the
     Administrator.


     In the event the election to have Shares withheld is made by an Optionee and
the Tax Date is deferred under Section 83 of the Code because no election is
filed under Section 83(b) of the Code, the Optionee shall receive the full
number of Shares with respect to which the Option, SAR or Stock Purchase Right
is exercised but such Optionee shall be unconditionally obligated to tender back
to the Company the proper number of Shares on the Tax Date.


     15.   ADJUSTMENTS UPON CHANGES IN CAPITALIZATION, DISSOLUTION, MERGER OR
ASSET SALE.


          (a)   CHANGES IN CAPITALIZATION.  Subject to any required action by the
     shareholders of the Company, the number of shares of Common Stock covered by
     each outstanding Option, SAR or Stock Purchase Right, and the number of
     shares of Common Stock which have been authorized for issuance under the
     Plan but as to which no Options, SARs or Stock Purchase Rights have yet been
     granted or which have been returned to the Plan upon cancellation or

expiration of an Option, SAR or Stock Purchase Right, as well as the price per share of Common Stock covered by each such outstanding Option, SAR or Stock Purchase Right, shall be proportionately adjusted for any increase or decrease in the number of issued shares of Common Stock resulting from a stock split, reverse stock split, stock dividend, combination or reclassification of the Common Stock, or any other increase or decrease in the number of issued shares of Common Stock effected without receipt of consideration by the Company; provided, however, that conversion of any convertible securities of the Company shall not be deemed to have been "effected without receipt of consideration." Such adjustment shall be made by the Board, whose determination in that respect shall be final, binding and conclusive. Except as expressly provided herein, no issuance by the Company of shares of stock of any class, or securities convertible into shares of stock of any class, shall affect, and no adjustment by reason thereof shall be made with respect to, the number or price of shares of Common Stock subject to an Option, SAR or Stock Purchase Right.

        (b)  DISSOLUTION OR LIQUIDATION.  In the event of the proposed dissolution or liquidation of the Company, all outstanding Options, SARs and Stock Purchase Rights will terminate immediately prior to the consummation of such proposed action, unless otherwise provided by the Administrator. The Administrator may, in the exercise of its sole discretion in such instances, declare that any Option, SAR or Stock Purchase Right shall terminate as of a date fixed by the Administrator and give each Optionee the right to exercise his or her Option, SAR or Stock Purchase Right as to all or any part of the Optioned Stock, including Shares as to which the Option, SAR or Stock Purchase Right would not otherwise be exercisable.

        (c)  MERGER OR ASSET SALE.  Unless otherwise determined by the Administrator, in the event of a merger of the Company with or into another corporation, or the sale of substantially all of the assets of the Company, each outstanding Option, SAR and Stock Purchase Right shall be assumed or an equivalent option or right substituted by the successor corporation or a Parent or Subsidiary of the successor corporation. In the event that the successor corporation refuses to assume or substitute for the Option, SAR or Stock Purchase Right, the Optionee shall fully vest in and have the right to exercise the Option, SAR or Stock Purchase Right as to all of the Optioned Stock, including Shares as to which it would not otherwise be vested or exercisable. If an Option, SAR or Stock Purchase Right becomes fully vested and exercisable in lieu of assumption or substitution in the event of a merger or sale of assets, the Administrator shall notify the Optionee in writing or electronically that the Option, SAR or Stock Purchase Right shall be fully vested and exercisable for a period of thirty (30) days from the date of such notice, and the Option, SAR or Stock Purchase Right shall terminate upon the expiration of such period. For the purposes of this paragraph, the Option, SAR or Stock Purchase Right shall be considered assumed if, following the merger or sale of assets, the option or right confers the right to purchase or receive, for each Share of Optioned Stock subject to the Option, SAR or Stock Purchase Right immediately prior to the merger or sale of assets, the consideration (whether

                                C-10

<PAGE>

        stock, cash, or other securities or property) received in the merger or sale

of assets by holders of Common Stock for each Share held on the effective
date of the transaction (and if holders were offered a choice of
consideration, the type of consideration chosen by the holders of a majority
of the outstanding Shares); provided, however, that if such consideration
received in the merger or sale of assets is not solely common stock of the
successor corporation or its Parent, the Administrator may, with the consent
of the successor corporation, provide for the consideration to be received
upon the exercise of the Option, SAR or Stock Purchase Right, for each Share
of Optioned Stock subject to the Option, SAR or Stock Purchase Right, to be
solely common stock of the successor corporation or its Parent equal in fair
market value to the per share consideration received by holders of Common
Stock in the merger or sale of assets.


     (d)  CHANGE IN CONTROL.  In the event of a "Change in Control" of the
Company, as defined in paragraph (e) below, unless otherwise determined by
the Administrator prior to the occurrence of such Change in Control, the
following acceleration and valuation provisions shall apply:


     (i) Any Options, SARs and Stock Purchase Rights outstanding as of
the date such Change in Control is determined to have occurred that are
not yet exercisable and vested on such date shall become fully
exercisable and vested; and


     (ii) The value of all outstanding Options, SARs and Stock Purchase
Rights shall, unless otherwise determined by the Administrator at or
after grant, be cashed-out. The amount at which such Options, SARs and
Stock Purchase Rights shall be cashed out shall be equal to the excess of
(x) the Change in Control Price (as defined below) over (y) the exercise
price of the Common Stock covered by the Option, SAR or Stock Purchase
Right. The cash-out proceeds shall be paid to the Optionee or, in the
event of death of an Optionee prior to payment, to the estate of the
Optionee or to a person who acquired the right to exercise the Option,
SAR or Stock Purchase Right by bequest or inheritance.


     (e)  DEFINITION OF "CHANGE IN CONTROL".  For purposes of this Section
15, a "Change in Control" means the happening of any of the following:


     (i) When any "person", as such term is used in Sections 13(d) and
14(d) of the Exchange Act (other than the Company, a Subsidiary or a
Company employee benefit plan, including any trustee of such plan acting
as trustee) is or becomes the "beneficial owner" (as defined in Rule
13d-3 under the Exchange Act), directly or indirectly, of securities of
the Company representing fifty percent (50%) or more of the combined
voting power of the Company's then outstanding securities; or


     (ii) The occurrence of a transaction requiring shareholder approval,
and involving the sale of all or substantially all of the assets of the
Company or the merger of the Company with or into another corporation.

        (f)   CHANGE IN CONTROL PRICE.  For purposes of this Section 15, "Change
in Control Price" shall be, as determined by the Administrator, (i) the
highest Fair Market Value at any time within the 60-day period immediately
preceding the date of determination of the Change in Control Price by the
Administrator (the "60-Day Period"), or (ii) the highest price paid or
offered, as determined by the Administrator, in any bona fide transaction or
bona fide offer related to the Change in Control of the Company, at any time
within the 60-Day Period.


    16.   DATE OF GRANT.  The date of grant of an Option, SAR or Stock Purchase
Right shall be, for all purposes, the date on which the Administrator makes the
determination granting such Option, SAR or Stock Purchase Right, or such other
later date as is determined by the Administrator. Notice of the determination
shall be provided to each Optionee within a reasonable time after the date of
such grant.


                                    C-11
<PAGE>

    17.   AMENDMENT AND TERMINATION OF THE PLAN.


        (a)   AMENDMENT AND TERMINATION.  The Board may at any time amend, alter,
suspend or terminate the Plan.


        (b)   SHAREHOLDER APPROVAL.  The Company shall obtain shareholder
approval of any Plan amendment to the extent necessary and desirable to
comply with Applicable Laws.


        (c)   EFFECT OF AMENDMENT OR TERMINATION.  No amendment, alteration,
suspension or termination of the Plan shall impair the rights of any
Optionee, unless mutually agreed otherwise between the Optionee and the
Administrator, which agreement must be in writing and signed by the Optionee
and the Company. Termination of the Plan shall not affect the
Administrator's ability to exercise the powers granted to it hereunder with
respect to Options, SARs or Stock Purchase Rights granted under the Plan
prior to the date of such termination.


    18.   CONDITIONS UPON ISSUANCE OF SHARES.


        (a)   LEGAL COMPLIANCE.  Shares shall not be issued pursuant to the
exercise of an Option, SAR or Stock Purchase Right unless the exercise of
such Option, SAR or Stock Purchase Right and the issuance and delivery of
such Shares shall comply with Applicable Laws and shall be further subject
to the approval of counsel for the Company with respect to such compliance.

      (b)  INVESTMENT REPRESENTATIONS.  As a condition to the exercise of an
Option, SAR or Stock Purchase Right, the Company may require the person
exercising such Option, SAR or Stock Purchase Right to represent and warrant
at the time of any such exercise that the Shares are being purchased only
for investment and without any present intention to sell or distribute such
Shares if, in the opinion of counsel for the Company, such a representation
is required.


      19.  INABILITY TO OBTAIN AUTHORITY.  The inability of the Company to obtain
authority from any regulatory body having jurisdiction, which authority is
deemed by the Company's counsel to be necessary to the lawful issuance and sale
of any Shares hereunder, shall relieve the Company of any liability in respect
of the failure to issue or sell such Shares as to which such requisite authority
shall not have been obtained.


      20.  RESERVATION OF SHARES.  The Company, during the term of this Plan, will
at all times reserve and keep available such number of Shares as shall be
sufficient to satisfy the requirements of the Plan.


      21.  SHAREHOLDER APPROVAL.  The Plan shall be subject to approval by the
shareholders of the Company within twelve (12) months after the date the Plan is
adopted. Such shareholder approval shall be obtained in the manner and to the
degree required under Applicable Laws.

                                 C-12
<PAGE>
                        [APPLE COMPUTER LOGO]

    [LOGO]
  PRINTED ON RECYCLED PAPER

748-PS-98
<PAGE>


                             PROXY CARD

                        APPLE COMPUTER, INC.

       THIS PROXY IS SOLICITED ON BEHALF OF THE BOARD OF DIRECTORS

    FOR THE ANNUAL MEETING OF SHAREHOLDERS TO BE HELD ON APRIL 22, 1998

    The undersigned shareholder of Apple Computer, Inc., a California
corporation, hereby acknowledges receipt of the Notice of Annual Meeting of
Shareholders and Proxy Statement with respect to the Annual Meeting of
Shareholders of Apple Computer, Inc. to be held at  1 Infinite Loop,
Cupertino, California 95014 on Wednesday, April 22, 1998 at 10:00 a.m., and
hereby appoints Fred D. Anderson and Nancy R. Heinen, and each of them,
proxies and attorneys-in-fact, each with power of substitution and

revocation, and each with all powers that the undersigned would possess if
personally present, to vote the Apple Computer, Inc. Common Stock of the
undersigned at such meeting and any postponements or adjournments of such
meeting, as set forth below, and in their discretion upon any other business
that may properly come before the meeting (and any such postponements or
adjournments).

     THIS PROXY WILL BE VOTED AS SPECIFIED OR, IF NO CHOICE IS SPECIFIED, FOR
THE ELECTION OF THE NOMINEES, FOR PROPOSALS 2, 3, 4 AND 5 AND AS SAID PROXIES
DEEM ADVISABLE ON SUCH OTHER MATTERS AS MAY PROPERLY COME BEFORE THE MEETING
AND ANY POSTPONEMENTS OR ADJOURNMENTS THEREOF.

               IMPORTANT - TO BE SIGNED AND DATED ON REVERSE SIDE


<PAGE>

                                   [MAP]


In the interest of saving time and money, Apple has opted to provide you with
the enclosed Form 10-K for fiscal 1997 in lieu of producing a glossy annual
report.

/X/ Please mark
    votes as in this
    example.

PLEASE VOTE, SIGN, DATE AND PROMPTLY
RETURN THIS CARD.

1. To elect three directors to Class II of the
   Company's Board of Directors.

NOMINEES: Steven P. Jobs, Lawrence J.
          Ellison and Edgar S. Woolard, Jr.

                      WITHHELD
         FOR ALL       FROM ALL
         NOMINEES      NOMINEES
          / /           / /

/ /
    ---------------------------------------
    For all nominees except as noted above

    MARK HERE FOR   / /
    ADDRESS
    CHANGE AND
    NOTE BELOW

                                             FOR   AGAINST   ABSTAIN
                                             / /    / /       / /
2. To approve an amendment to the Company's
   Restated Articles of Incorporation to eliminate
   the classification of the Company's Board of
   Directors and thereby ensure that each director
   will stand for election annually.

3. To approve (i) the Apple Computer, Inc. 1997    / /    / /       / /

Director Stock Option Plan, which provides for
the issuance of up to 400,000 shares of the
Company's Common Stock, and (ii) the grant
pursuant to a predecessor stock option plan for
non-employee directors of 15,000 stock options
to each of Edgar S. Woolard, Jr. and Gareth
C.C. Chang, both non-employee directors of the
Company, and the reservation of 430,000 shares
of Common Stock in the aggregate for issuance
pursuant to the 1997 Director Stock Option Plan
and such grants.

4. To approve the Apple Computer, Inc. 1998          / /    / /      / /
   Executive Officer Stock Plan and the
   reservation for issuance thereunder of
   17,000,000 shares of Common Stock.

5. To ratify the appointment of KPMG Peat            / /    / /      / /
   Marwick LLP as independent auditors of the
   Company for fiscal year 1998.

6. To transact such other business as may            / /    / /      / /
   properly come before the meeting or any
   adjournment(s) thereof.

This proxy card should be signed by the shareholder(s) exactly as his or her
name(s) appear(s) hereon, dated and returned promptly in the enclosed
envelope. Persons signing in a fiduciary capacity should so indicate.If
shares are held by joint tenants or as community property, both persons
should sign.

Signature_____ Date_____  Signature_____Date_____
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----