**EXHIBIT C**

**TO THE DECLARATION OF VIVI N. TRAN IN SUPPORT OF MOTION
TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT**

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 Lb4Tkk7kwwLQd9zb7SrnE68paXoT/K+9eagyHC+UvRjtXzMhyegVKKDJVH8i6e31
 1b0QlaJF+Id5caf8NUhK5w==

<SEC-DOCUMENT>0000320193-98-000007.txt : 19980804
<SEC-HEADER>0000320193-98-000007.hdr.sgml : 19980804
ACCESSION NUMBER:                0000320193-98-000007
CONFORMED SUBMISSION TYPE:       S-8
PUBLIC DOCUMENT COUNT:           9
FILED AS OF DATE:                19980731
EFFECTIVENESS DATE:              19980731
SROS:                  NASD

FILER:

        COMPANY DATA:
                COMPANY CONFORMED NAME:               APPLE COMPUTER INC
                CENTRAL INDEX KEY:                    0000320193
                STANDARD INDUSTRIAL CLASSIFICATION:   ELECTRONIC COMPUTERS [3571]
                IRS NUMBER:                           942404110
                STATE OF INCORPORATION:               CA
                FISCAL YEAR END:                      0930

        FILING VALUES:
                FORM TYPE:             S-8
                SEC ACT:
                SEC FILE NUMBER:       333-60455
                FILM NUMBER:           98675834

        BUSINESS ADDRESS:
                STREET 1:              1 INFINITE LOOP
                CITY:                  CUPERTINO
                STATE:                 CA
                ZIP:                   95014
                BUSINESS PHONE:        4089961010

        MAIL ADDRESS:
                STREET 1:              ONE INFINITE LOOP
                CITY:                  CUPERTINO
                STATE:                 CA
                ZIP:                   95014
</SEC-HEADER>
<DOCUMENT>
<TYPE>S-8
<SEQUENCE>1
<TEXT>




As filed with the Securities and Exchange Commission on July 31, 1998
Registration No. 333-

                        Form S-8
```

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON , D.C. 20549

APPLE COMPUTER, INC.
(Exact name of registrant as specified in its charter)

REGISTRATION STATEMENT
under
THE SECURITIES ACT OF 1933

CALIFORNIA                          94-2404110
(State of other                     I.R.S. Employer
jurisdiction of                     Identification No.
Incorporation or
Organization


One Infinite Loop
Cupertino, California 95014
(Address, including zip code, of principal executive offices)


1997 Director Stock Option Plan
1997 Employee Stock Option Plan
1998 Executive Officer Stock Plan
Stock Option Grants to Edgar S. Woolard, Jr.
and Gareth C.C. Chang
(Full title of the plan)

Michael C. Wyatt, Esq.
Associate General Counsel
Apple Computer, Inc.
One Infinite Loop, M/S 301-4CL
Cupertino, California 95014
(408) 996-1010
(Name, address, including zip code, and telephone number,
including area code, of agent for service)

Copy to:


Tom Klein, Esq.
Wilson, Sonsini, Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304


1
<PAGE>


CALCULATION OF REGISTRATION FEE

  <TABLE>
<CAPTION>

| Title of Securities To Be Registered | Amount To Be Registered (1) | Proposed Maximum Average Offering Price Per Share (2) | Proposed Maximum Aggregate Offering Price (3) | Amount of Registration Fee (3) |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |

Common Stock,
no par value

| | | | | |
|---|---|---|---|---|
| - --Newly reserved under 1997 Director Stock Option Plan | 400,000 shares | $33.8125 | $13,525,000 | $3,990 |
| - --Newly reserved under 1997 Employee Stock Option Plan | 5,000,000 shares | $33.8125 | $69,062,000 | $49,873 |
| - --Newly reserved under 1998 Executive Officer Stock Plan | 9,400,000 shares | $33.8125 | $317,838,000 | $93,762 |
| - --Newly reserved for the option grants to Edgar S. Woolard, Jr. and Gareth C.C. Chang | 30,000 shares | $33.8125 | $1,014,000 | $300 |

</TABLE>

(1)    Pursuant to Rule 429 promulgated under the Securities Act of 1933, as amended (the "Securities Act"), the prospectus relating to this Registration statement also relates to shares registered under Form S-8 Registration Statements Nos. 2-70449, 2-85095, 33-866, 33-23650, 33-31075,  33-47596, 33-53895,  333-07437 and 333-23725. A total of 7,600,000 shares issuable under the 1998 Executive Officer Stock Plan and its predecessors, the 1990 Stock Option Plan and the 1981 Stock Option Plan, have been previously registered under the Securities Act.

(2)    Estimated in accordance with Rule 457(h) solely for the purpose of calculating the filing fee on the basis of $33.8125 per share, which represents the average of the high and low prices of the Common Stock reported on the NASDAQ National Market for July 28, 1998.

(3)    Estimated pursuant to Rule 457 solely for purposes of calculating the registration fee.  Amount of the Registration Fee was calculated pursuant to Section 6(b) of the Securities Act of 1933, as amended, and was determined by multiplying the aggregate offering amount by .000295.

2

<PAGE>
PART II

INFORMATION REQUIRED IN THE REGISTRATION STATEMENT

Item 3   Incorporation of Documents by Reference.

There are hereby incorporated by reference into this Registration Statement the following documents and information heretofore filed with the Securities and Exchange Commission (the "Commission"):

(a)  The Registrant's annual report on Form 10-K for the fiscal year ended September 26, 1997;

(b)  The Registrant's quarterly report on Form 10-Q for the quarters ended December 26, 1997 and March 27, 1998;

(c)  All other reports filed by the Registrant pursuant to Sections 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange

Act"), since September 26, 1997; and

   (d)  The description of the Registrant's common stock and associated common
stock purchase rights, contained in the Registrant's Registration Statements
on Form 8-A filed with the Commission on October 30, 1981 and May 26, 1989,
respectively, registering such shares and associated rights pursuant to
Section 12 of the Exchange Act, including any amendment or report updating
such descriptions.

        All documents subsequently filed by the Registrant pursuant to
Sections 13(a), 13(c), 14 and 15(d) of the Exchange Act, prior to the filing
of a post-effective amendment which indicates that all securities offered
hereby have been sold or which deregisters all securities then remaining
unsold, also shall be deemed to be incorporated by reference in this
Registration Statement and to be part hereof from the date of filing of such
documents.

Item 4.  Description of Securities.

                Not Applicable.

Item 5.  Interests of Named Experts and Counsel.

                Not Applicable.

                                    3

<PAGE>

Item 6.  Indemnification of Directors and Officers.

        Section 317 of the California General Corporations Law (the "CGCL")
authorizes a court to award, or a corporation's board of directors to grant,
indemnity to directors and officers who are parties or are threatened to be
made parties to any proceeding (with certain exceptions) by reason of the
fact that the person is or was an agent of the corporation, against expenses,
judgments, fines, settlements and other amounts actually and reasonably
incurred in connection with the proceeding if that person acted in good faith
and in a manner the person  reasonably believed to be in the best interests of
the corporation.  Section 204 of the CGCL provides that this limitation on
liability has no effect on a director's liability if (i) for acts or omissions
that involve intentional misconduct or a knowing and culpable violation of
law, (ii) for acts or omissions that a director believes to be contrary to the
best interests of the corporation or its shareholders or that involve the
absence of good faith on the part of the director, (iii) for any transaction
from which a director derived an improper personal benefit, (iv) for acts or
omissions that show a reckless disregard for the director's duty to the
corporation or its shareholders in circumstances in which the director was
aware, or should have been aware, in the ordinary course of performing a
director's duties, of a risk of a serious injury to the corporation or its
shareholders, (v) for acts or omissions that constitute an unexcused pattern
of inattention that amounts to an abdication of the director's duty to the

corporation or its shareholders, (vi) under Section 310 of the CGCL
(concerning contracts or transactions between the corporation and a director)
or (vii) under Section 316 of the CGCL (directors' liability for improper
 dividends, loans and guarantees).  Section 317 does not extend to acts or
omissions of a director in his capacity as an officer.  Further, Section 317
has no effect on claims arising under federal or state securities laws and
does not affect the availability of injunctions and other equitable remedies
available to the Company's shareholders for any violation of a director's
fiduciary duty to the Company or its shareholders.

        In accordance with Section 317, the Restated Articles of
Incorporation, as amended (the "Articles"), of the Company limit the liability
of a director to the Company or its shareholders for monetary damages to the
fullest extent permissible under California law.  The Articles further
authorize the Company to provide indemnification to its agents (including
officers and directors), subject to the limitations set forth above.  The
Articles and the Company's By-Laws further provide for indemnification of
corporate agents to the maximum extent permitted by the CGCL.

        Pursuant to the authority provided in the Articles, the Company has
entered into indemnification agreements with each of its executive officers
and directors, indemnifying them against certain potential liabilities that
may arise as a result of their service to the Company, and providing for
certain other protection.

                                        4
<PAGE>


        The Company also maintains insurance policies which insure its
officers and directors against certain liabilities.

        The foregoing summaries are necessarily subject to the complete text
of the statute, the Articles, the By-Laws and the agreements referred to above
and are qualified in their entirety by reference thereto.


Item 7.  Exemption from Registration Claimed.

                Not Applicable.

Item 8.  Exhibits.

                The following exhibits are filed as part of this Registration
                Statement:

Exhibit No.         Description

  1(1)              Common Shares Rights Agreement dated as of May 15, 1989
                    between the Registrant and the First National Bank of
                    Boston, as Rights Agent.
  4.5               Form of Option Agreement
  5.1               Opinion of counsel as to the legality of the securities
                    being registered hereby
  10.A.49           1997 Employee Stock Option Plan, as amended through
                    November 1997
  10.A.50           1997 Director Stock Option Plan, as amended through

```
                    November 1997
10.A.51             1998 Executive Officer Stock Plan
23.1                Consent of counsel (included in Exhibit 5.1).
23.2                Consent of Ernst & Young LLP, independent auditors, with
                    respect to the consolidated financial statements of the
                    Registrant.
23.3                Consent of KPMG Peat Marwick LLP, independent auditors,
                    with respect to the consolidated financial statements of
                    the Registrant.
24.1                Power of Attorney (included on page 8).
```

- -----------------------------

(1)      Incorporated by reference to Exhibit 1 to the Registrant's
Registration Statement on Form 8-A filed with the Commission on May 26, 1989.

                                   5
<PAGE>


Item 9.  Undertakings.

    (a)  The Registrant hereby undertakes:

    (1)  To file, during any period in which offers or sales are being made, a
post-effective amendment to this Registration Statement to include any
material information with respect to the plan of distribution not previously
disclosed in the Registration Statement or any material change to such
information in the Registration Statement;

(2)  That, for the purpose of determining any liability under the Securities
Act, each such post-effective amendment shall be deemed to be a new
registration statement relating to the securities offered therein and the
offering of such securities at that time shall be deemed to be the initial
bona fide offering thereof.

    (3)  To remove from registration by means of a post-effective amendment any
of the securities being registered which remain unsold at the termination of
the offering.

    (b)  The undersigned Registrant hereby undertakes that, for purposes of
determining any liability under the Securities Act, each filing of the
Registrant's annual report pursuant to Section 13(a) or Section 15(d) of the
Exchange Act that is incorporated by reference in the Registration Statement
shall be deemed to be a new registration statement relating to the securities
offered therein, and the offering of such securities at that time shall be
deemed to be the initial bona fide offering thereof.

    (c)  Insofar as indemnification for liabilities arising under the Securities
Act may be permitted to directors, officers and controlling persons of the
Registrant pursuant to the foregoing provisions, or otherwise, the Registrant
has been advised that in the opinion of the Commission, such indemnification
is against public policy as expressed in the Securities Act and is, therefore,
unenforceable.  In the event that a claim for indemnification against such

liabilities (other than the payment by the Registrant of expenses incurred or
paid by a director, officer or controlling person of the Registrant in the
successful defense of any action, suit or proceeding) is asserted by such
director, officer or controlling person in connection with the securities
being registered, the Registrant will, unless in the opinion of its counsel
the matter has been settled by controlling precedent, submit to a court of
appropriate jurisdiction the question whether such indemnification by it is
against public policy as expressed in the Securities Act, and will be governed
by the final adjudication of such issue.

                                           6
<PAGE>


                              SIGNATURES

          Pursuant to the requirements of the Securities Act the
Registrant certifies that it has reasonable grounds to believe that it meets
all of the requirements for filing on Form S-8 and has duly caused this
Registration Statement to be signed on its behalf by the undersigned,
thereunto duly authorized, in the City of Cupertino, County of Santa Clara,
State of California, on the  31day of July, 1998.


                                   APPLE COMPUTER, INC.


                                   By: /s/Fred D. Anderson
                                   Fred D. Anderson
                                   Executive Vice President and
                                   Chief Financial Officer

7

<PAGE>

POWER OF ATTORNEY

        KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature
appears below hereby constitutes and appoints Steven P. Jobs,  Fred D.
Anderson, Nancy R. Heinen and Michael C. Wyatt, and each of them individually
and without the others, his attorneys-in-fact, each with the power of
substitution, for him in any and all capacities to sign any amendments to the
Registration Statement, and to file the same, with exhibits thereto and other
documents in connection therewith, with the Commission, hereby ratifying and
confirming all that each of said attorneys-in-fact, or his or her substitute
or substitutes, may do or cause to be done by virtue hereof.

        Pursuant to the requirements of the Securities Act of 1933, as
amended, this Registration Statement has been signed by the following persons
in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| /s/Steven P. Jobs<br>Steven P. Jobs | Interim Chief Executive<br>Officer and Director<br>(Principal  Executive Officer) | July  31, 1998 |
| /s/Fred D. Anderson<br>Fred D. Anderson | Executive Vice President<br>    and Chief Financial Officer<br>(Principal Financial Officer) | July  31, 1998 |
| /s/Gareth C.C. Chang<br>Gareth C. C Chang | Director | July  31, 1998 |
| /s/William V. Campbell<br>William V. Campbell | Director | July  31, 1998 |
| /s/Lawrence J. Ellison<br>Lawrence J. Ellison | Director | July  31, 1998 |
| /s/Jerome B. York<br>Jerome B. York | Director | July  31, 1998 |
| /s/Edgar S. Woolard, Jr. | Director | July  31, 1998 |

Edgar S. Woolard, Jr.

                                    8
<PAGE>


EXHIBIT INDEX

Exhibit                                                          Page
  No.                           Description                       No.

1(1)            Common Shares Rights Agreement dated as of May 15, 1989
                 between the Registrant and the First National Bank of
                 Boston, as Rights Agent.
  4.5           Form of Option Agreement                         10
  5.1           Opinion of counsel as to the legality of the securities  12
                 being registered hereby
10.A.49         1997 Employee Stock Option Plan, as amended through  14
                 November 1997
10.A.50         1997 Director Stock Option Plan, as amended through  25
                 November 1997
10.A.51         1998 Executive Officer Stock Plan                35
23.1            Consent of counsel (included in Exhibit 5.1).
23.2            Consent of Ernst & Young LLP, independent auditors,  51
                 with respect to the consolidated financial statements of
                 the Registrant.
23.3            Consent of KPMG Peat Marwick LLP, independent auditors,  52
                 with respect to the consolidated financial statements of
                 the Registrant.
24.1            Power of Attorney                                 8

- ----------------------------
(1)     Incorporated by reference to Exhibit 1 to the Registrant's
Registration Statement on Form 8-A filed with the Commission on May 26, 1989.

                                    9
<PAGE>

</TEXT>

```
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-4.5
<SEQUENCE>2
<TEXT>
                [Exhibit 4.5]
```

STOCK OPTION AGREEMENT RE: Non-Employee Director

Date of Grant:
Option price per share:
Total number of shares granted:

On the Date of Grant shown above, Apple Computer, Inc. (the "Company"), a
California corporation, granted to you (the "Optionee") an option to purchase
shares of Common Stock, no par value, of the Company, in the number and at the
price as shown above (the "Option").

1.  OPTION PRICE.  The option price indicated above for each share of Common
Stock, is equal to the fair market value per share of Common Stock on the date
of grant of this Option (the "Option Price"), as determined by the
Administrator.

2.  EXERCISE OF OPTION.   This Option shall be exercisable as follows:
      (i)  RIGHT TO EXERCISE.  This Option shall be exercisable,
cumulatively, as follows:

Number of Shares          Can be Exercised On          Must be Exercised Before


    (ii) METHOD OF EXERCISE.  This Option shall be exercisable by written
Notice of Exercise which shall state the election to exercise this Option, the
number of shares in respect of which this Option is being exercised, and such
other representations and agreements as to the holder's investment intent with
respect to such shares of Common Stock as may be required by the Company.
Such Notice of Exercise shall be signed by the Optionee and shall be delivered
in person or by mail or by facsimile to the Company.  When exercising the
Option, the Notice of Exercise form shall be accompanied by payment of the
Option Price, which shall be by cash, check, or any other method approved by
the Administrator.  When executing a same-day-sale, the Notice of Exercise
form must be submitted to Shareholder Relations by 3:00 PM the next business
day following the day of sale.  The certificate or certificates for shares of
Common Stock as to which this Option shall be exercised shall be registered in
the name of the Optionee.

    (iii) RESTRICTIONS ON EXERCISE.  This Option may not be exercised if the
issuance of such shares upon such exercise would constitute a violation of any
applicable federal or state securities law or other law or regulation.  As a
condition to the exercise of this Option, the Company may require the
Optionee to make such representations, and warranties to the Company as may be
required by any applicable law or regulation, including the execution and
delivery of a representation letter at the time of exercise of this Option.


                                    10

```
<PAGE>
```

3.  NON-TRANSFERABILITY OF OPTION.  This Option may not be transferred in any
manner otherwise than by will or by the laws of descent or distribution or

pursuant to a qualified domestic relations order as defined by the Internal
Revenue Code or Title I of the Employee Retirement Income Security Act or the
rules thereunder.  This Option may be exercised during the lifetime of the
Optionee only by the Optionee.  The terms of this option shall be binding upon
the executors, administrators, heirs, successors and assigns of the Optionee.

4.  TERMINATION OF SERVICE - This Option shall terminate 90 days following
the date of termination of service on Apple's Board of Directors and may be
exercised during such 90-day period only to the extent vested and exercisable
as of the date of termination of service.

5.  MISCELLANEOUS.  This Option (a) shall be binding upon and inure to the
benefit of any successor of the Company, (b) shall be governed by the laws of
the State of California, and any applicable laws of the United States, and (c)
may not be amended except in writing.  No contract, right of nomination for
reelection to the Board of Directors or right to remain a member of the Board
of Directors shall be implied by this Agreement, nor shall this Agreement in
any way interfere with Optionee's right or the Company's right to terminate
Optionee's status as a member of the Board of Directors at any time.

                                    11
<PAGE>

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-5.1
<SEQUENCE>3
<TEXT>
                [Exhibit 5.1]

July  31, 1998

Apple Computer, Inc.
1 Infinite Loop
Cupertino, California 95014


RE:      Registration Statement on Form S-8 for the 1997 Director Stock
         Option Plan, 1997 Employee Stock Option Plan, 1998 Executive Officer
         Stock Plan and stock option grants to Edgar S. Woolard, Jr. and
         Gareth C.C. Chang

Ladies and Gentlemen:

I have examined the Registration Statement on Form S-8 to be filed with the
Securities and Exchange Commission on or about July  31, 1998 (the
"Registration Statement") in connection with the registration under the
Securities Act of 1933, as amended, of (i) 400,000 additional shares of Apple
Computer, Inc.'s Common Stock, no par value, authorized for issuance under
the 1997 Director Stock Option Plan, as amended (the "Director Plan");
(ii) 5,000,000 additional shares of Apple Computer, Inc.'s Common Stock, no
par value, authorized for issuance under the 1997 Employee Stock Option Plan,
as amended (the "Employee Plan"); (iii) 9,400,000 shares of Apple Computer,
Inc.'s Common Stock, no par value, authorized for issuance under the 1998
Executive Officer Stock Plan (the "Executive Officer Plan"); and (iv) 30,000
additional shares of Apple Computer, Inc.'s Common Stock, no par value,
authorized for issuance pursuant to stock options to Edgar S. Woolard, Jr.
and Gareth C.C. Chang for 15,000 shares each.   The shares of Apple Common
Stock to be registered under the Registration Statement are hereinafter
referred to collectively as the "Shares".  As counsel in connection with this
transaction, I have examined the actions taken, and I am familiar with the
actions proposed to be taken, in connection with the issuance and sale of the
Shares pursuant to the Director Plan, the Employee Plan, the Executive Plan
and the individual grants to Edgar S. Woolard, Jr. and Gareth C.C. Chang.

It is my opinion that, when issued and sold in the manner described in the
Director Plan, Employee Plan, Executive Plan and the individual stock option
grants to Edgar S. Woolard, Jr. and Gareth C.C. Chang and pursuant to the
agreements which accompany each grant, the Shares will be legally and validly
issued, fully paid and nonassessable.




                                    12

<PAGE>

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.1
<SEQUENCE>4
<TEXT>
                       [Exhibit  23.1]



I consent to the use of this opinion as an exhibit to the Registration
Statement, and further consent to the use of my name wherever appearing in the
Registration Statement.

```
Very truly yours,

By: /s/ Nancy R. Heinen
Nancy R. Heinen
General Counsel
```

```
                                    13
<PAGE>
</DOCUMENT>



</TEXT>

</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.A.49
<SEQUENCE>5
<TEXT>


[EXHIBIT 10.A.49]

                        APPLE COMPUTER, INC.
                  1997 EMPLOYEE STOCK OPTION PLAN
                   (as amended through 11/5/97)
```

1.   Purposes of the Plan.  The purposes of this 1997 Employee Stock Option Plan are to assist the Company in attracting and retaining high quality personnel, to provide additional incentive to Employees who are not Directors or Officers of the Company and to promote the success of the Company's business.  Options granted under the Plan shall be Nonstatutory Stock Options.  SARs granted under the Plan may be granted in connection with Options or independently of Options.

2.   Definitions.  As used herein, the following definitions shall apply:

"Administrator" means the Board or any of its Committees, as shall be administering the Plan from time to time pursuant to Section 4 of the Plan.

"Affiliated Company" means a corporation which is not a Subsidiary but with respect to which the Company owns, directly or indirectly through one or more Subsidiaries, at least twenty percent of the total voting power, unless the Administrator determines in its discretion that such corporation is not an Affiliated Company.

"Applicable Laws" shall have the meaning set forth in Section 4 of the Plan.

"Board" means the Board of Directors of the Company.

"Change in Control" shall have the meaning set forth in Section 10 of the Plan.

"Change in Control Price" shall have the meaning set forth in Section 12 of the Plan.

"Common Stock" means the common stock, no par value, of the Company.

"Company" means Apple Computer, Inc., a California corporation, or its successor.

"Committee" means a Committee, if any, appointed by the Board in accordance with Section 4(a) of the Plan.

14

<PAGE>

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any successor thereto.

"Continuous Status as an Employee" means the absence of any interruption or termination of the employment relationship with the Company or any Subsidiary or Affiliated Company.  Continuous Status as an Employee shall not be considered interrupted in the case of (i) medical leave, military leave, family leave, or any other leave of absence approved by the Administrator, provided, in each case, that such leave does not result in termination of the employment relationship with the Company or any Subsidiary or Affiliated Company, as the case may be, under the terms of the respective Company policy for such leave; or (ii) in the case of transfers between locations of the Company or between the Company, its Subsidiaries, its successor or its Affiliated Companies.

"Director" means a member of the Board.

"Employee" means any person, employed by and on the payroll of the Company, any Subsidiary or any Affiliated Company.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Fair Market Value" means the value of Common Stock determined as follows:

(i)    If the Common Stock is listed on any established stock exchange or a national market system (including without limitation the National Market System of the National Association of Securities Dealers, Inc. Automated Quotation ("NASDAQ") System), its Fair Market Value shall be the closing sales price for such stock or the closing bid if no sales were reported, as quoted on such system or exchange (or the exchange with the greatest volume of trading in the Common Stock) for the date of determination or, if the date of determination is not a trading day, the immediately preceding trading day, as reported in The Wall Street Journal or such other source as the Administrator deems reliable.

(ii)    If the Common Stock is regularly quoted on the NASDAQ System (but not on the National Market System) or quoted by a recognized securities dealer but selling prices are not reported, its Fair Market Value shall be the mean between the high and low asked prices for the Common Stock on the date of determination or, if there are no quoted prices on the date of determination, on the last day on which there are quoted prices prior to the date of determination.

(iii)    In the absence of an established market for the Common Stock, the Fair Market Value thereof shall be determined in good faith by the Administrator.

"Nonstatutory Stock Option" means an Option that is not intended to be an incentive stock option within the meaning of Section 422 of the Code.

                                    15
<PAGE>
"Officer" means any individual designated by the Board as an elected officer of the Company.

"Option" means an option granted pursuant to the Plan.

"Optioned Stock" means the Common Stock subject to an Option or SAR.

"Optionee" means an Employee who receives an Option or SAR.

"Parent" corporation shall have the meaning defined in Section 424(e) of the Code.

"Plan" means this Apple Computer, Inc. 1997 Employee Stock Option Plan.

"SAR" means a stock appreciation right granted pursuant to Section 9 below.

"Section 3 Limit" shall have the meaning set forth in Section 3 of the Plan.

"Share" means a share of the Common Stock, as adjusted in accordance with Section 12 of the Plan.

"Sixty-Day Period " shall have the meaning set forth in Section 12(f) of the Plan.

"Subsidiary" corporation has the meaning defined in Section 424(f) of the Code.

"Tax Date" shall have the meaning set forth in Section 9 of the Plan.

3.   Stock Subject to the Plan.

(a) Limit.  Subject to the provisions of Section 12 of the Plan, the maximum aggregate number of Shares which may be optioned and sold under the Plan or for which SARs may be granted and exercised is 5,000,000 Shares (the "Section 3 Limit").  The Shares may be authorized but unissued or reacquired Common Stock.  In the discretion of the Administrator, any or all of the Shares authorized under the Plan may be subject to SARs issued pursuant to the Plan.

(b) Rules Applicable to the Calculation of the Section 3 Limit.  In calculating the number of Shares available for issuance under the Plan, the following rules shall apply:

(i)   The Section 3 Limit shall be reduced by the number of Shares of Optioned Stock subject to each outstanding Option or freestanding SAR.

(ii)  The Section 3 Limit shall be increased by the number of Shares of Optioned Stock subject to the portion of an Option or SAR that expires unexercised or is forfeited for any reason.

16

<PAGE>

(iii)  The Section 3 Limit shall be increased by the number of Shares tendered to pay the exercise price of an Option or the number of Shares of Optioned Stock withheld to satisfy an Optionee's tax liability in connection with the exercise of an Option or SAR.

(iv)  Option Stock subject to both an outstanding Option and SAR granted in connection with the Option shall be counted only once in calculating the Section 3 Limit.

4.   Administration of the Plan.

(a) Composition of Administrator.  The Plan may be administered by (i)  the Board or (ii) a Committee designated by the Board, which Committee shall be constituted in such a manner as to satisfy the applicable securities laws, California corporate law and the Code (collectively, "Applicable Laws").

Once a Committee has been appointed pursuant to this Section 4(a), such Committee shall continue to serve in its designated capacity until otherwise directed by the Board.  From time to time the Board may increase the size of the Committee and appoint additional members thereof, remove members (with or without cause) and appoint new members in substitution therefor, fill vacancies (however caused) and remove all members of the Committee and thereafter directly administer the Plan, all to the extent permitted by the Applicable Laws.

(b) Powers of the Administrator.  Subject to the provisions of the Plan and, in the case of the Committee, subject to the specific duties delegated by the Board to such Committee, the Administrator shall have the authority, in

its discretion:  (i) to determine the Fair Market Value of the Common Stock in accordance with the Plan; (ii) to determine, in accordance with Section 8(a) of the Plan, the exercise price per Share of Options and SARs to be granted; (iii)  to determine the Employees to whom, and the time or times at which, Options and SARs shall be granted and the number of Shares to be represented by each Option or SAR (including, without limitation, whether or not a corporation shall be excluded from the definition of Affiliated Company); (iv)  to construe and interpret the provisions of the Plan and any agreements or certificates issued under or in connection with the Plan; (v) to determine the terms and conditions, not inconsistent with the terms of the Plan, of any Option or SAR granted hereunder (including, but not limited to, any restriction or limitation, or any vesting acceleration or waiver of forfeiture restrictions regarding any Option or SAR or the Shares relating thereto, based in each case on such factors as the Administrator shall determine, in its sole discretion); (vi) to approve forms of agreement for use under the Plan; (vii)  to prescribe, amend and rescind rules and regulations relating to the Plan; (viii) to modify or amend each Option or SAR or accelerate the exercise date of any Option or SAR; (ix) to reduce the exercise price of any Option or SAR to the then current Fair Market Value if the Fair Market Value of the Common Stock covered by such Option or SAR shall have declined since the date the Option or SAR was granted; (x) to authorize any person to execute on behalf of the Company any instrument required to effectuate the grant of an

17

<PAGE>
Option or SAR previously granted by the Administrator; and (xi) to make all other determinations deemed necessary or advisable for the administration of the Plan.

     (c) Effect of Decisions by the Administrator.  All decisions, determinations and interpretations of the Administrator shall be final and binding on all Optionees and any other holders of any Options.

     5.  Eligibility.  The Administrator may grant Options and SARs only to individuals who are Employees or who are consultants to the Company, or a Subsidiary or Affiliated Company.  In no event may an Option or SAR be granted to any individual who, at the time of grant, is an Officer or Director.  An Employee who has been granted an Option or SAR may, if he or she is otherwise eligible, be granted an additional Option or Options, SAR or SARs.  Each Option shall be evidenced by a written Option agreement, which shall be in such form and contain such provisions as the Administrator shall from time to time deem appropriate.  Without limiting the foregoing, the Administrator may, at any time, or from time to time, authorize the Company, with the consent of the respective recipients, to issue new Options or Options in exchange for the surrender and cancellation of any or all outstanding Options, other options, SARs or other stock appreciation rights.

          Neither the Plan nor any Option or SAR agreement shall confer upon any Optionee any right with respect to continuation of employment by the Company (or any Parent, Subsidiary or Affiliated Company), nor shall it interfere in any way with the Optionee's right or the right of the Company (or any Parent, Subsidiary or Affiliated Company) to terminate the Optionee's employment at any time or for any reason.

          If an Option or SAR is granted to an individual who is a consultant to the Company or any Subsidiary or Affiliate, all references in the Plan to "Employee" shall be deemed to include the term "consultant" and all references in the Plan to "employment," "Continuous Status as an Employee" and "termination of employment". shall be deemed to refer to the individual's consultancy or status as a consultant.

6.   Term of Plan.  The Plan shall become effective upon its adoption by the Board.  It shall continue in effect for a term of ten years unless sooner terminated under Section 14 of the Plan.

7.   Term of Option.  The term of each Option shall be ten (10) years from the date of grant thereof or such shorter term as may be provided in the Option agreement.

8.   Exercise Price and Consideration.

(a)  Exercise Price.  The per Share exercise price for the Shares issuable pursuant to an Option shall be such price as is determined by the Administrator, but shall in no event be less than 100% of the Fair Market Value of Common Stock, determined as of the date of grant of the Option.  In the event that the Administrator shall reduce the exercise price, the exercise price shall be no less than 100% of the Fair Market Value as of the date of that reduction.                    18
<PAGE>
(b)  Method of Payment.  The consideration to be paid for the Shares to be issued upon exercise of an Option, including the method of payment, shall be determined by the Administrator and may consist of (i) cash, (ii) check, (iii) promissory note, (iv) other Shares which have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as to which said Option shall be exercised, (v) delivery of a properly executed exercise notice together with irrevocable instructions to a broker to promptly deliver to the Company the amount of sale or loan proceeds required to pay the exercise price, or (vi) any combination of the foregoing methods of payment and/or any other consideration or method of payment as shall be permitted under applicable corporate law.

9.   Stock Appreciation Rights.

(a) Granted in Connection with Options.  At the sole discretion of the Administrator, SARs may be granted in connection with all or any part of an Option, either concurrently with the grant of the Option or at any time thereafter during the term of the Option.  The following provisions apply to SARs that are granted in connection with Options:

(i)   The SAR shall entitle the Optionee to exercise the SAR by surrendering to the Company unexercised a portion of the related Option.  The Optionee shall receive in exchange from the Company an amount equal to the excess of (x) the Fair Market Value on the date of exercise of the SAR of the Common Stock covered by the surrendered portion of the related Option over (y) the exercise price of the Common Stock covered by the surrendered portion of the related Option.  Notwithstanding the foregoing, the Administrator may place limits on the amount that may be paid upon exercise of an SAR; provided, however, that such limit shall not restrict the exercisability of the related Option.

(ii)  When an SAR is exercised, the related Option,  to the extent surrendered, shall no longer be exercisable.

(iii)  An SAR shall be exercisable only when and to the extent that the related Option is exercisable and shall expire no later than the date on which the related Option expires.

(iv)  An SAR may only be exercised at a time when the Fair Market Value of the Common Stock covered by the related Option exceeds the exercise price of the Common Stock covered by the related Option.

(b) Independent SARs.  At the sole discretion of the Administrator, SARs may be granted without related Options.  The following provisions apply to SARs that are not granted in connection with Options:

(i)     The SAR shall entitle the Optionee, by exercising the SAR, to receive from the Company an amount equal to the excess of (x) the Fair Market Value of the Common Stock covered by exercised portion of the SAR, as of the date of such exercise, over (y) the Fair Market Value of the Common Stock covered by the exercised portion of the SAR, as of the date on which the SAR was granted;

19

<PAGE>
provided, however, that the Administrator may place limits on the amount that may be paid upon exercise of an SAR.

(ii)    SARs shall be exercisable, in whole or in part, at such times as the Administrator shall specify in the Optionee's SAR agreement.

(c) Form of Payment.  The Company's obligation arising upon the exercise of an SAR may be paid in Common Stock or in cash, or in any combination of Common Stock and cash, as the Administrator, in its sole discretion, may determine.  Shares issued upon the exercise of an SAR shall be valued at their Fair Market Value as of the date of exercise.

10.  Method of Exercise.

(a)  Procedure for Exercise; Rights as a Shareholder.  Any Option or SAR granted hereunder shall be exercisable at such times and under such conditions as determined by the Administrator and as shall be permissible under the terms of the Plan.

An Option or SAR shall be deemed to be exercised when written notice of such exercise has been given to the Company in accordance with the terms of the Option or SAR by the person entitled to exercise the Option or SAR and full payment for the Shares with respect to which the Option is exercised has been received by the Company.  Full payment may, as authorized by the Administrator and permitted by the Option agreement, consist of any consideration and method of payment allowable under Section 8(b) of the Plan. Until the issuance (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company) of the stock certificate evidencing such Shares, no right to vote or receive dividends or any other rights as a shareholder shall exist with respect to the Optioned Stock, notwithstanding the exercise of the Option.  No adjustment will be made for a dividend or other right for which the record date is prior to the date the stock certificate is issued, except as provided in Section 12 of the Plan.  An Option or SAR may not be exercised with respect to a fraction of a Share.

(b)  Termination of Continuous Employment.  Upon termination of an Optionee's Continuous Status as Employee (other than termination by reason of the Optionee's death), the Optionee may, but only within ninety days after the date of such termination, exercise his or her Option or SAR to the extent that it was exercisable at the date of such termination.  Notwithstanding the foregoing, however, an Option or SAR may not be exercised after the date the Option or SAR would otherwise expire by its terms due to the passage of time from the date of grant.

(c) Death of Optionee.  In the event of the death of an Optionee:

(i)  Who is at the time of death an Employee and who shall have been in Continuous Status as an Employee since the date of grant of the Option, the Option or SAR may be exercised at any time within six (6) months (or such other period of time not exceeding twelve (12) months as determined by the

20

<PAGE>

Administrator) following the date of death by the Optionee's estate or by a person who acquired the right to exercise the Option by bequest or inheritance, but only to the extent of the right to exercise that would have accrued had the Optionee continued living and terminated his or her employment six (6) months (or such other period of time not exceeding twelve (12) months as determined by the Administrator) after the date of death; or

(ii)  Within ninety days after the termination of Continuous Status as an Employee, the Option or SAR may be exercised, at any time within six (6) months (or such other period of time not exceeding twelve (12) months as determined by the Administrator) following the date of death by the Optionee's estate or by a person who acquired the right to exercise the Option by bequest or inheritance, but only to the extent of the right to exercise that had accrued at the date of termination.

Notwithstanding the foregoing, however, an Option or SAR may not be exercised after the date the Option or SAR would otherwise expire by its terms due to the passage of time from the date of grant.

(d)  Stock Withholding to Satisfy Withholding Tax Obligations.  When an Optionee incurs tax liability in connection with the exercise of an Option or SAR, which tax liability is subject to tax withholding under applicable tax laws, and the Optionee is obligated to pay the Company an amount required to be withheld under applicable tax laws, the Optionee may satisfy the withholding tax obligation (including, at the election of the Optionee, any additional amount which the Optionee desires to have withheld in order to satisfy in whole or in part the Optionee's full estimated tax in connection with the exercise) by electing to have the Company withhold from the Shares to be issued upon exercise of the Option, or the Shares to be issued upon exercise of the SAR, if any, that number of Shares having a Fair Market Value equal to the amount required to be withheld (and any additional amount desired to be withheld, as aforesaid).  The Fair Market Value of the Shares to be withheld shall be determined on the date that the amount of tax to be withheld is to be determined (the "Tax Date").

All elections by an Optionee to have Shares withheld for this purpose shall be made in writing in a form acceptable to the Administrator and shall be subject to the following restrictions:

(i)  the election must be made on or prior to the applicable Tax Date; and

(ii)  all elections shall be subject to the consent or disapproval of the Administrator.

11.  Non-Transferability of Options.  Options and SARs may not be sold, pledged, assigned, hypothecated, transferred or disposed of in any manner other than by will or by the laws of descent or distribution or pursuant to a qualified domestic relations order as defined by the Code or Title I of the Employee Retirement Income Security Act, or the rules thereunder; provided, however, that the Administrator may grant Nonstatutory Stock Options that are freely transferable.  The designation of a beneficiary by an Optionee or holder of an SAR does not constitute a transfer.  An Option or an SAR may be

21

<PAGE>
exercised, during the lifetime of the Optionee or SAR holder, only by the
Optionee or SAR holder or by a transferee permitted by this Section 11.

    12.  Adjustments Upon Changes in Capitalization or Merger.

        (a) Changes in Capitalization.  Subject to any required action by the
shareholders of the Company, the number of Shares covered by each outstanding
Option and SAR, and the number of Shares which have been authorized for
issuance under the Plan but as to which no Options or SARs have yet been
granted or which have been returned to the Plan upon cancellation or
expiration of an Option or SAR, as well as the price per Share covered by each
such outstanding Option or SAR, shall be proportionately adjusted for any
increase or decrease in the number of issued Shares resulting from a stock
split, reverse stock split, stock dividend, combination or reclassification of
the Common Stock, or any other increase or decrease in the aggregate number
of issued Shares effected without receipt of consideration by the Company;
provided, however, that conversion of any convertible securities of the
Company shall not be deemed to have been "effected without receipt of
consideration."  Such adjustment shall be made by the Administrator, whose
determination in that respect shall be final, binding and conclusive.  Except
as expressly provided herein, no issuance by the Company of shares of stock of
any class, or securities convertible into shares of stock of any class, shall
affect, and no adjustment by reason thereof shall be made with respect to, the
number or price of Shares subject to an Option or SAR.

        (b) Dissolution or Liquidation.  In the event of the proposed
dissolution or liquidation of the Company, all outstanding Options and SARs
will terminate immediately prior to the consummation of such proposed action,
unless otherwise provided by the Administrator.  The Administrator may, in the
exercise of its sole discretion in such instances, declare that any Option or
SAR shall terminate as of a date fixed by the Administrator and give each
Optionee the right to exercise his or her Option or SAR as to all or any part
of the Optioned Stock or SAR, including Shares as to which the Option or SAR
would not otherwise be exercisable.

        (c) Sale of Assets or Merger. Subject to the provisions of Section
12(d), in the event of a proposed sale of all or substantially all of the
assets of the Company, or the merger of the Company with or into another
corporation, each outstanding Option and SAR shall be assumed or an equivalent
option or stock appreciation right shall be substituted by such successor
corporation or a parent or subsidiary of such successor corporation, unless
the Administrator determines, in the exercise of its sole discretion and in
lieu of such assumption or substitution, that the Optionee shall have the
right to exercise the Option or SAR as to all of the Optioned Stock, including
Shares as to which the Option or SAR would not otherwise be exercisable.  If
the Administrator makes an Option or SAR fully exercisable in lieu of
assumption or substitution in the event of a merger or sale of assets, the
Company shall notify the Optionee that the Option or SAR shall be fully
exercisable for a period of thirty (30) days from the date of such notice,
and the Option or SAR will terminate upon the expiration of such period.  For
purposes of this paragraph, an Option granted under the Plan shall be deemed

                                    22

<PAGE>
to be assumed if, following the sale of assets or merger, the Option confers
the right to purchase, for each Share of Optioned Stock subject to the Option
immediately prior to the sale of assets or merger, the consideration (whether
stock, cash or other securities or property) received in the sale of assets or
merger by holders of Common Stock for each Share held on the effective date of

the transaction (and if such holders were offered a choice of consideration, the type of consideration chosen by the holders of a majority of the outstanding Shares); provided, however, that if such consideration received in the sale of assets or merger was not solely Common Stock of the successor corporation or its parent, the Administrator may, with the consent of the successor corporation and the participant, provide for the per share consideration to be received upon exercise of the Option to be solely Common Stock of the successor corporation or its parent equal in Fair Market Value to the per share consideration received by holders of Common Stock in the sale of assets or merger.

        (d) Change in Control.  In the event of a "Change in Control" of the Company, as defined in Section 12(e), unless otherwise determined by the Administrator prior to the occurrence of such Change in Control, the following acceleration and valuation provisions shall apply:

        (i)    Any Options and SARs outstanding as of the date such Change in Control is determined to have occurred that are not yet exercisable and vested on such date shall become fully exercisable and vested; and

        (ii)    The value of all outstanding Options and SARs shall, unless otherwise determined by the Administrator at or after grant, be cashed-out.  The amount at which such Options and SARs shall be cashed out shall be equal to the excess of (x) the Change in Control Price (as defined below) over (y) the exercise price of the Common Stock covered by the Option or SAR.  The cash-out proceeds shall be paid to the Optionee or, in the event of death of an Optionee prior to payment, to the estate of the Optionee or to a person who acquired the right to exercise the Option or SAR by bequest or inheritance.

        (e) "Definition of "Change in Control".  For purposes of this Section 12, a "Change in Control" means the happening of any of the following:

        (i)    When any "person", as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than the Company, a Subsidiary or a Company employee benefit plan, including any trustee of such plan acting as trustee) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the combined voting power of the Company's then outstanding securities; or

        (ii)    The occurrence of a transaction requiring shareholder approval, and involving the sale of all or substantially all of the assets of the Company or the merger of the Company with or into another corporation.

        (f) Change in Control Price.  For purposes of this Section 12, "Change

                                    23
<PAGE>
in Control Price" shall be, as determined by the Administrator, (i) the highest Fair Market Value at any time within the sixty-day period immediately preceding the date of determination of the Change in Control Price by the Administrator (the "Sixty-Day Period"), or (ii) the highest price paid or offered, as determined by the Administrator, in any bona fide transaction or bona fide offer related to the Change in Control of the Company, at any time within the Sixty-Day Period.
13.  Time of Granting Options and SARs.  The date of grant of an Option or SAR shall, for all purposes, be the date on which the Administrator makes the determination granting such Option or SAR.  Notice of the determination shall be given to each Employee to whom an Option or SAR is so granted within

a reasonable time after the date of such grant.

14.  Amendment and Termination of the Plan.

(a) Amendment and Termination.  The Board may at any time amend, alter, suspend or terminate the Plan, as it may deem advisable.

(b) Effect of Amendment or Termination.  Any such amendment, alteration, suspension or termination of the Plan shall not impair the rights of any Optionee or SAR holder under any grant theretofore made without his or her consent.  Such Options and SARs shall remain in full force and effect as if this Plan had not been amended or terminated.

15.  Conditions Upon Issuance of Shares.  Shares shall not be issued with respect to an Option or SAR unless the exercise of such Option or SAR and the issuance and delivery of such Shares pursuant thereto shall comply with all relevant provisions of law, including, without limitation, the Securities Act of 1933, as amended, the Exchange Act, the rules and regulations promulgated thereunder, and the requirements of any stock exchange or quotation system upon which the Shares may then be listed or quoted, and shall be further subject to the approval of counsel for the Company with respect to such compliance.

As a condition to the exercise of an Option or SAR or the issuance of Shares upon exercise of an Option or SAR, the Company may require the person exercising such Option or SAR to represent and warrant at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required by any of the aforementioned relevant provisions of law.

Inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale of any Shares hereunder, shall relieve the Company of any liability in respect of the non-issuance or sale of such Shares as to which such requisite authority shall not have been obtained.

16.  Reservation of Shares.  The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

24

<PAGE>

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10
<SEQUENCE>6
<TEXT>


EXHIBIT 10.A.50

Apple Computer, Inc.

1997 Director Stock Option Plan

(Effective as of August 5, 1997)

25

<PAGE>


Apple Computer, Inc.

1997 Director Stock Option Plan

1.  Purposes.   The purposes of the Plan are to retain the services
of qualified individuals who are not employees of the Company to serve as
members of the Board and to secure for the Company the benefits of the
incentives inherent in increased Common Stock ownership by such individuals
by granting such individuals Options to purchase shares of Common Stock.

2.  Administration.   The Administrator will be responsible for
administering the Plan. The Administrator will have authority to adopt such
rules as it may deem appropriate to carry out the purposes of the Plan, and
shall have authority to interpret and construe the provisions of the Plan and
any agreements and notices under the Plan and to make determinations
pursuant to any Plan provision. Each interpretation, determination or other
action made or taken by the Administrator pursuant to the Plan shall be final
and binding on all persons. The Administrator shall not be liable for any
action or determination made in good faith, and shall be entitled to

indemnification and reimbursement in the manner provided in the Company's Articles of Incorporation and By-Laws as such documents may be amended from time to time.

3.  Shares Available.

Subject to the provisions of Section 7(b) of the Plan, the maximum number of shares of Common Stock which may be issued under the Plan shall not exceed 400,000 shares (the "Section 3 Limit"'). Either authorized and unissued shares of Common Stock or treasury shares may be delivered pursuant to the Plan. For purposes of determining the number of shares that remain available for issuance under the Plan, the following rules shall apply:

     (a)   the number of shares of Common Stock underlying Options shall be charged against the Section 3 Limit; and

     (b)   the Section 3 Limit shall be increased by (i) the number of shares subject to an Option which lapses, expires or is otherwise terminated without the issuance of such shares, and (ii) the number of shares, if any, tendered to pay the exercise price of an  Option.

4.  Options.  Each Non-Employee Director shall receive grants of Options under the Plan as follows

     (a)   Option Grants.

26

<PAGE>

        (i)  Initial Grants.   Non-Employee Directors who were members of the Board on the day prior to the Effective Date shall be granted an Initial Option to purchase 15,000 shares of Common Stock as of August 14, 1997 ("Initial Grant Date"), provided that such individual continues to serve as a Non-Employee Director through the Initial Grant Date. Non-Employee Director who were elected or appointed to  the Board on the Effective Date  an Initial Option to purchase 30,000 shares of Common Stock on the Initial Grant Due, provided  that such individual continues to serve as a Non-Employee Director through the Initial Grant Date. Non-Employee Directors who are elected or appointed to the Board after the Effective Date shall be granted an Initial Option to purchase 30,000 shares of Common Stock as of the date of their election or appointment to the Board. The provisions of this Section 4(a)(i) shall not apply to any member of the Board who first becomes a Non-Employee Director by reason of such member's ceasing to be an employee of the Company and its Subsidiaries.

        (ii)  Annual Grants.  Each Non-Employee Director shall receive an Annual Option to purchase 10,000 shares of Common Stock on the fourth anniversary of the Non-Employee Director's initial election or appointment to the Board and on each subsequent anniversary thereof, provided  that the individual has remained in continuous service as a director of the Company through such anniversary date and is a Non-Employee Director on the applicable anniversary date.

(b)    Exercise Period.    The per share exercise price of each Option
shall be the Fair Market Value of a share of Common Stock as of the date of
grant of the Option determined in accordance with the provisions of the Plan.

(c)    Vesting.    Initial Options shall vest and become exercisable in
annual installments on each of the first through third anniversaries of the
date of grant, provided  that the Non-Employee Director has remained in
continuous service as a director of the Company through each such anniversary
date. Annual Options shall be fully vested and immediately exercisable on their
date of grant.

(d)    Term of Options.

(i)    Ten-Year Term.    Each Option shall expire ten (10) years from
its date of grant, subject to earlier termination as provided herein.

(ii)    Exercise Following Termination of Service Due to Death.  If
a Non-Employee Director ceases to be a member of the Board by reason of
such Non-Employee Director's death, the Options granted to such Non-
Employee Director may be exercised by such Non-Employee Director's

Beneficiary, but only to the extent the Option was exercisable at the time
of the Non-Employee Director's death, at any time within three (3) years
after the date of such termination of service, subject to the earlier
expiration of such Options as provided for in Section 4(d)(i) above. At the

                                    27
<PAGE>
end of such three-year period, the vested portion of the Option shall
expire. The unvested portion of the Option shall expire on the date of the
Non-Employee Director's death.

(iii)    Termination of Options if a Non-Employee Director is
Removed from the Board for Cause.  In the event a Non-Employee
Director is removed from the Board for "cause," all Options granted to
such Non-Employee Director (whether or not then vested and
exercisable) shall immediately terminate and be of no further force and
effect as of the effective date of such removal from the Board. Whether a
Non-Employee Director is removed by the Board for "cause" shall be
determined by the Board in accordance with the By-Laws of the
Company.

(iv)    Exercise Following Other Terminations of Service.    If a Non-
Employee Director ceases to be a member of the Board for any reason
other than death or removal from the Board for cause, the Options
granted to such Non-Employee Director may be exercised by such Non-
Employee Director, but only to the extent the Option was exercisable at
the time of the Non-Employee Director's termination, at any time within
ninety (90) days after the date of such termination of service, subject to the
earlier expiration of such Options as provided for in Section 4(d)(i) above.
At the end of such ninety-day period, the vested portion of the Option
shall expire. The unvested portion of the Option shall expire on the date
of the Non-Employee Director's termination of service with the Board.

(e)    Time and Manner of Exercise of Options.

(i)    Notice of Exercise.    Subject to the other terms and conditions
hereof, a Non-Employee Director may exercise any Option, to the extent
such Option is vested, by giving written notice of exercise to the
Company; provided, however, that in no event shall an Option be

exercisable for a fractional share. The date of exercise of an Option shall
be the later of (A) the date on which the Company receives such written
notice and (B) the date on which the conditions provided in Section
4(e)(ii) are satisfied.

(ii)  Method of Payment.  The consideration to be paid for the
shares to be issued upon exercise of an Option may consist of (A) cash, (B)
check, (C) other shares which have a Fair Market Value on the date of
surrender equal to the aggregate exercise price of the shares as to which
the Option shall be exercised and which have been owned by the Non-
Employee Director for at least six (6) months at the time of exercise, (D)
delivery of a properly executed exercise notice together with irrevocable
instructions to a broker to promptly deliver to the Company the amount
of proceeds required to pay the exercise price, or (E) any combination of
the foregoing methods of payment.

(iii)  Stockholder Rights.   A Non-Employee Director shall have
no rights as a stockholder with respect to any shares of Common Stock
issuable upon exercise of an Option until a certificate evidencing such

28

<PAGE>

shares shall have been issued to the Non-Employee Director pursuant to
Section 4(e)(v), and no adjustment shall be made for dividends or
distributions or other rights in respect of any share for which the record
date is prior to the date upon which the Non-Employee Director shall
become the holder of record thereof.

(iv)  Limitation on Exercise.   No Option shall be exercisable
unless the Common Stock subject thereto has been registered under the
Securities Act and qualified under applicable state "blue sky" laws in
connection with the offer and sale thereof, or the Company has
determined that an exemption from registration under the Securities Act
and from qualification wider such state "blue sky" laws is available.

(v)  Issuance of Shares.   Subject to the foregoing conditions, as
soon as is reasonably practicable after its receipt of a proper notice of
exercise and payment of the exercise price of the Option for the number of
shares with respect to which the Option is exercised, the Company shall
deliver to the Non-Employee Director (or following the Non-Employee
Director's death, the Beneficiary entitled to exercise the Option), at the
principal office of the Company or at such other location as may be
acceptable to the Company and the Non-Employee Director (or such
Beneficiary), one or more stock certificates for the appropriate number of
shares of Common Stock Issued in connection with such exercise. Shares
sold in connection with a "cashless exercise" described in clause C of
Section 4(e)(ii) shall be delivered to the broker referred to therein in
accordance with the procedures established by the Company from time to
time.

(f)  Restrictions on Transfer. An Option may not be transferred,
pledged, assigned, or otherwise disposed of, except by will or by the laws of
descent and distribution; provided, however,  that an Option may be
transferred to a Non-Employee Director's family members or to one or more
trusts established in whole or in part for the benefit of one or more of such
family members. The Option shall be exercisable, during the Non-Employee
Director's lifetime, only by the Non-Employee Director or by the individual or
entity to whom  the Option has been transferred in accordance with the previous
sentence. No assignment or transfer of the Option, or of the rights

represented thereby, whether voluntary or involuntary, by operation of law or otherwise, except by will or the laws of descent and distribution, shall vest in the assignee or transferee any interest or right in the Option, but immediately upon any attempt to assign or transfer the Option the same shall terminate and be of no force or effect.

5.  Designation of Beneficiary.

    (a)    Beneficiary Designations.    Each Non-Employee Director may designate a Beneficiary to exercise an Option upon the Non-Employee Director's death by executing a Beneficiary Designation Form.

                                29
<PAGE>

    (b)    Change of Beneficiary Designation.    A Non-Employee Director may change an earlier Beneficiary designation by executing a later Beneficiary Designation Form and delivering it to the Administrator. The execution of a Beneficiary Designation Form and its receipt by the Administrator will revoke and rescind any prior Beneficiary Designation Form.

6.  Change in Control.

Anything in the Plan to the contrary notwithstanding, in the event of a Change in Control of the Company, the following provisions shall apply:

    (a)    Any Options outstanding as of the date such Change in Control is determined to have occurred that are not yet exercisable and vested on such date shall become fully exercisable and vested.

    (b)    The value of all outstanding Options (to the extent not previously exercised) shall be cashed out on the date of the Change in Control. The amount at which such Options shall be cashed out shall be equal to the excess, if any, of (i) the Change in Control Price over (ii) the exercise price of the Common Stock covered by the Option. The cash-out proceeds shall be paid to the Non-Employee Director or, in the event of death of the Non-Employee Director prior to payment, to the Beneficiary thereof.

    (c)    If the Administrator shall receive an opinion from a nationally recognized firm of accountants to the Company that the cash-out provisions in Section 6(b) above with respect to Options will prohibit the utilization of "pooling of interests" accounting in connection with the transaction resulting in the Change in Control of the Company, then the following shall apply, but only to the extent necessary to permit such accounting treatment: (i) the provisions of Section 6(b) shall not apply to the Options, (ii) each such Option shall become immediately vested and exercisable as of the date such opinion is received by the Administrator, and (iii) the Administrator shall promptly inform each Non-Employee Director of such opinion and of the accelerated vesting and exercisability of the Option sufficiently prior to the anticipated date of the Change in Control, so as to permit the Option to be exercised prior to the date of the Change in Control.

7.  Recapitalization or Reorganization.

    (a)    Authority of the Company and Shareholders.    The existence of the Plan shall not affect or restrict in any way the right or power of the Company or the shareholders of the Company to make or authorize any adjustment, recapitalization, reorganization or other change in the Company's capital structure or its business, any merger or consolidation of the Company,

any issue of stock or of options, warrants or rights to purchase stock or of
bonds, debentures, preferred or prior preference stocks whose rights are
superior to or affect the Common Stock or the rights thereof or which are
convertible into or exchangeable for Common Stock, or the dissolution or
liquidation of the Company, or any sale or transfer of all or any part of its
assets or business, or any other corporate act or proceeding, whether of a
similar character or otherwise.

30

<PAGE>

     (b)    Change in Capitalization.  Notwithstanding any other
provision of the Plan, in the event of any change in the outstanding Common
Stock by reason of a stock dividend, recapitalization, reorganization, merger,
consolidation,  stock split, combination or exchange of shares (a "change in
Capitalization"),  (i) such proportionate adjustments as may be necessary (in
the form determined by the Administrator in its sole discretion) to reflect
such change shall be made to prevent dilution or enlargement of the rights of
Non-Employee Directors under the Plan with respect to tile aggregate number of
shares of Common Stock authorized to be awarded under the Plan, the number
of shares of Common Stock covered by each outstanding Option and the
exercise prices in respect thereof and the number of shares of Common Stock
covered by future Option grants and (ii) the Administrator may make such
other adjustments, consistent with the foregoing, as it deems appropriate in
its sole discretion.

     (c)    Dissolution or Liquidation. In the event of the proposed
dissolution or liquidation of the Company, each outstanding Option will vest
and become exercisable on a date prior to the consummation of the proposed
action that is reasonably sufficient to enable the Non-Employee Directors to
exercise their Options.

8.   Termination and Amendment of the Plan.

     (a)    Termination.   The Plan shall terminate on the tenth
anniversary of the Effective Date, Following such date, no further grants of
Options shall be made pursuant to the Plan.

     (b)    General Power of Board.   Notwithstanding anything herein
to the contrary, the Board may at any time and from time to time terminate,
modify, suspend or amend the Plan in whole or in part; provided, however, that
no such termination, modification, suspension or amendment shall be effective
without shareholder approval if such approval is required to comply with any
applicable law or stock exchange rule; and provided further, that the Board
may not, without shareholder approval, increase the maximum number of shares
issuable under the Plan except as provided in Section 7(b) above.

     (c)    When Non-Employee Directors' Consents Required.   The
Board may not alter, amend, suspend, or terminate the Plan without the consent
of any Non-Employee Director to the extent that such action would adversely
affect his or her rights with respect to Options that have previously been
granted.

9.   Miscellaneous.

     (a)    No Right to Reelection.   Nothing in the Plan shall be deemed
to create any obligation on the part of the Board to nominate any of its
members for reelection by the Company's stockholders, nor confer upon any
Non-Employee Director the right to remain a member of the Board for any
period of time, or at any particular rate of compensation

31

<PAGE>

(b)    Securities Law Restrictions.   The Administrator may require
each Non-Employee Director purchasing or acquiring shares of Common Stock
pursuant to the Plan to agree with the Company in writing that such Non-
Employee Director is acquiring the shares for investment and not with a view
to the distribution thereof. All certificates for shares of Common Stock
delivered under the Plan shall be subject to such stock transfer orders and
other restrictions as the Administrator may deem advisable under the rules,
regulations, and other requirements of the Securities and Exchange
Commission or any exchange upon which the Common Stock is then listed,
and any applicable federal or state securities law, and the Administrator may
cause a legend or legends to be put on any such certificates to make
appropriate reference to such restrictions. No shares of Common Stock shall be
issued hereunder unless the Company shall have determined that such
issuance is in compliance with, or pursuant to an exemption from, all
applicable federal and state securities laws.

(c)    Expenses.   The costs and expenses of administering the Plan
shall be borne by the Company.

(d)    Applicable Law.   Except as to matters of federal law, the Plan
and all actions taken thereunder shall be governed by and construed in
accordance with the laws of the State of California without giving effect to
conflicts of law principles.

(e)    Effective Date.   The Plan shall be effective as of the Effective
Date, subject to the approval thereof by the stockholders of the Company by no
later than the next Annual Meeting to occur after the Effective Date. If such
stockholder approval is not obtained by the date of such Annual Meeting, all
prior Option grants shall be void ab initio  and of no further force and
effect.

10. Definitions.  Capitalized words not otherwise defined in the
Plan have the meanings set forth below:

"Administrator"  means the Chief Executive Officer of the Company
or the individual appointed by the Chief Executive Officer of the
Company to administer the Plan.

"Annual Meeting"  means an annual meeting of the Company's
stockholders.

"Annual Option"  means  an Option granted to a Non-Employee
Director pursuant to Section 4(a)(ii) of the Plan.

"Beneficiary" or "Beneficiaries" means an individual or entity
designated by a Non-Employee Director on a Beneficiary Designation
Form to exercise Options in the event of the Non-Employee Director's
death; provided, however, that, if no such individual or entity is designated
or if no such designated individual is alive at the time of the Non-
Employee Director's death, Beneficiary shall mean the Non-Employee
Director's estate.

32

<PAGE>

"Beneficiary Designation Form"  means  a document, in a form

approved by the Administrator to be used by Non-Employee Directors to
name their respective Beneficiaries. No Beneficiary Designation Form
shall be effective unless it is signed by the Non-Employee Director and
received by the Administrator prior to the date of death of the Non-
Employee Director.

"Board"  means the Board of Directors of the Company.

"Change in Control"  means the happening of any of the following:

        (i)  When any "person", as such term is used in Sections
13(d) and 14(d) of the Exchange Act (other than the Company, a
Subsidiary or a Company employee benefit plan, including any
trustee of such plan acting as trustee) is or becomes the "beneficial
owner" (as defined in Rule 13d-3 under the Exchange Act), directly
or indirectly, of securities of the Company representing fifty
percent (50%) or more of the combined voting power of the
Company's then outstanding securities; or

        (ii)  The occurrence of a transaction requiring shareholder
approval, and involving the sale of all or substantially all of the
assets of the Company or the merger of the Company with or into
another corporation.

"Change in Control Price"  means, as determined by the
Administrator, (i) the highest Fair Market Value at any time within the
sixty-day period immediately preceding the date of determination of the
Change in Control price by the Administrator (the "Sixty-Day Period"), or
(ii) the highest price paid or offered, as determined by the Administrator,
in any bona fide transaction or bona fide offer related to the Change in
Control of the Company, at any time within the Sixty-Day Period.

"Code,"  means the Internal Revenue Code of 1986, as amended,
and the applicable rules and regulations promulgated thereunder.

"Common Stock"  means the common stock of the Company, no par
value per share.

"Company"  means Apple Computer, Inc., a California corporation,
or any successor to substantially all of its business.

"Effective Date"  means, subject to Section 9(e), August 5, 1997.

"Exchange Act"  means the  Securities Exchange Act of 1934, as
amended, and the applicable rules and relations promulgated thereunder.

"Fair Market Value"  means the value of Common Stock determined
as follows:

                                33
<PAGE>

        (i)  If the Common Stock is listed on any established stock
exchange or a national market system (including without limitation the
National Market System of the National Association of Securities Dealers,
Inc. Automated Quotation ("NASDAQ") System), its Fair Market Value
shall be the closing sales price for such stock or the closing bid if no sales
were reported, as quoted on such system or exchange (or the exchange
with the greatest volume of trading in the Common Stock) for the date of

determination or, if the date of determination is not a trading day, the immediately preceding trading day, as reported in The Wall Street Journal or such other source as the Administrator deems reliable.

     (ii)  If the Common Stock is regularly quoted on the NASDAQ System  (but not on the National Market System) or quoted by a recognized securities dealer but selling prices are not reported, its Fair Market Value shall be the mean between the high and low asked prices for the Common Stock on the date of determination or, if there are no quoted prices on the date of determination, on the last day on which there are quoted prices prior to the date of determination.

     (iii)  In the absence of an established market for the Common Stock, the Fair Market Value thereof shall be determined in good faith by the Administrator.

"Initial Option"  means an Option granted to a Non-Employee Director pursuant to Section 4(a)(i) of the Plan.

"Non-Employee Director"  means a member of the Board who is not an employee of the Company or any of its Subsidiaries.

"Option "means an option to purchase shares or Common Stock awarded to a Non-Employee Director pursuant to the Plan and includes Initial Options and Annual Options.

"Plan"  means the Apple Computer, Inc. 1997 Director Stock Option Plan.

"Section 3 Limit " shall have the meaning set forth in Section 3 of the Plan.

"Subsidiary" means any corporation which is a "subsidiary corporation" within the meaning of Section 424(f) of the Code with respect to the Company.

                                  34
<PAGE>


</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-10.A.51
<SEQUENCE>7
<TEXT>


EXHIBIT 10.A.51


                      APPLE COMPUTER, INC. 1998
                    EXECUTIVE OFFICER STOCK PLAN
                          April 22, 1998

1.  Purposes of the Plan.  The purposes of this Stock Plan are:

  -- To attract and retain the best available personnel for positions of
substantial responsibility;

  -- To provide additional incentive to the Chairman and/or Executive Officers
and other key employees; and

  -- To promote the success of the Company's business.

   Options granted under the Plan may be Incentive Stock Options (as defined
under Section 422 of the Code) or Nonstatutory Stock Options, as determined by
the Administrator at the time of grant. Stock appreciation rights ("SARs") may
be granted under the Plan in connection with Options or independently of
Options. Stock Purchase Rights may also be granted under the Plan.

2.  Definitions.  As used herein, the following definitions shall apply:

    (a)  "Administrator"  means the Board or any of its Committees as shall be
administering the Plan, in accordance with Section 4 of the Plan.

(b)  "Agreement"  means an agreement between the Company and an Optionee
evidencing the terms and conditions of an individual Option, SAR or Stock
Purchase Right grant. The Agreement is subject to the terms and conditions
of the Plan.

(c)  "Applicable Laws"  means the requirements relating to the
administration of stock option plans under U.S. state corporate laws, U.S.
federal and state securities laws, the Code, any stock exchange or quotation
system on which the Common Stock is listed or quoted and the applicable laws
of any foreign country or jurisdiction where Options, SARs or Stock Purchase
Rights are, or will be, granted under the Plan.

    (d)  "Board"  means the Board of Directors of the Company.

    (e)  "Chairman"  means the Chairman of the Board.

                                    35
<PAGE>

    (f)  "Code"  means the Internal Revenue Code of 1986, as amended.

    (g)  "Committee"  means a committee of Directors appointed by the Board
in accordance with Section 4 of the Plan.

    (h)  "Common Stock" means the common stock of the Company.

    (i)  "Company" means Apple Computer, Inc., a California corporation.

    (j)  "Continuous Status as Chairman"  unless determined otherwise by the
Administrator, means the absence of any interruption or termination as
Chairman of the Board with the Company. Continuous Status as Chairman
shall  not be considered interrupted in the case of medical leave, military
leave,  family leave, or any other leave of absence approved by the
Administrator,  provided, in each case, that such leave does not result in
termination as  Chairman with the Company. Neither service as a Director nor
payment of a  director's fee by the Company shall be sufficient to constitute
status as  "Chairman" by the Company.

(k)  "Continuous Status as an Employee"  means the absence of any interruption or termination of the employment relationship with the Company or any Subsidiary. Continuous Status as an Employee shall not be considered interrupted in the case of (i) medical leave, military leave, family leave, or any other leave of absence approved by the Administrator, provided, in each case, that such leave does not result in termination of the employment relationship with the Company or any Subsidiary, as the case may be, under the terms of the respective Company policy for such leave; or (ii) in the case of transfers between locations of the Company or between the Company,  its Subsidiaries, or its  successor. For purposes of Incentive Stock Options, no such leave may exceed ninety days, unless reemployment upon expiration of such leave is guaranteed  by statute or contract. If reemployment upon expiration of a leave of  absence approved by the Company is not so guaranteed, on the 91st day of  such leave any Incentive Stock Option held by the Optionee shall cease to be  treated as an Incentive Stock Option and shall be treated for tax purposes  as a Nonstatutory Stock Option. Neither service as a Chairman nor as a  Director nor payment of a director's fee by the Company shall be sufficient  to constitute "employment" by the Company.

(l)  "Director"  means a member of the Board.

(m)  "Employee"  means any person employed by the Company or any Parent or Subsidiary of the Company subject to (k) above.

(n)  "Exchange Act" means the Securities Exchange Act of 1934, as amended.

(o)  "Executive Officer"  means any person who is an officer of the Company within the meaning of Section 16 of the Exchange Act and the rules and regulations promulgated thereunder.

(p)  "Fair Market Value"  means, as of any date, the value of Common Stock determined as follows:

                              36

<PAGE>

     (i)   If the Common Stock is listed on any established stock exchange or a national market system, including without limitation the Nasdaq  National Market or The Nasdaq SmallCap Market of The Nasdaq Stock Market,  its Fair Market Value shall be the closing sales price for such stock (or  the closing bid, if no sales were reported) as quoted on such exchange or  system, on the date of determination or, if the date of determination is  not a trading day, the immediately preceding trading day, as reported in  The Wall Street Journal or such other source as the Administrator deems  reliable;

     (ii)  If the Common Stock is regularly quoted by a recognized securities dealer but selling prices are not reported, the Fair Market Value of a Share of Common Stock shall be the mean between the high bid  and low asked prices for the Common Stock on the date of determination  or, if there are no quoted prices on the date of determination, on the  last day on which there are quoted prices prior to the date of  determination, as reported in The Wall Street Journal or such other  source as the Administrator deems reliable; or

     (iii) In the absence of an established market for the Common Stock, the Fair Market Value shall be determined in good faith by the  Administrator.

(q)  "Incentive Stock Option"  means an Option intended to qualify as an incentive stock option within the meaning of Section 422 of the Code and the regulations promulgated thereunder and is expressly designated by the

Administrator at the time of grant as an incentive stock option.

(r)  "Nonstatutory Stock Option"  means an Option not intended to qualify as an Incentive Stock Option.

(s)  "Option"  means a stock option granted pursuant to the Plan.

(t)  "Optioned Stock" means the Common Stock subject to an Option, SAR or Stock Purchase Right.

(u)  "Optionee"  means the holder of an outstanding Option, SAR or Stock Purchase Right.

(v)  "Parent"  means a "parent corporation," whether now or hereafter existing, as defined in Section 424(e) of the Code.

(w)  "Plan"  means this 1998 Executive Officer Stock Plan.

(x)  "Restricted Stock"  means shares of Common Stock acquired pursuant to a grant of Stock Purchase Rights under Section 12 of the Plan.

(y)  "Rule 16b-3"  means Rule 16b-3 of the Exchange Act or any successor to Rule 16b-3, as in effect when discretion is being exercised with respect to the Plan.

(z)  "SAR"  means a stock appreciation right granted pursuant to Section 10 below.

37

<PAGE>

(aa) "Section 16(b)"  means Section 16(b) of the Exchange Act.

(bb) "Share"  means a share of the Common Stock, as adjusted in accordance with Section 15 of the Plan.

(cc) "Stock Purchase Right"  means the right to purchase Common Stock pursuant to Section 12 of the Plan, as evidenced by an Agreement.

(dd) "Subsidiary"  means a "subsidiary corporation", whether now or hereafter existing, as defined in Section 424(f) of the Code.

3.  Stock Subject To The Plan.  Subject to the provisions of Section 15 of the Plan, the maximum aggregate number of Shares which may be optioned and sold under the Plan or for which SARs or Stock Purchase Rights may be granted and exercised is 17,000,000 Shares. The Shares may be authorized, but unissued, or  reacquired Common Stock.

In the discretion of the Administrator, any or all of the Shares authorized under the Plan may be subject to SARs issued pursuant to the Plan.

If an Option, SAR or Stock Purchase Right issued under the Plan should expire or become unexercisable for any reason without having been exercised in full, the unpurchased Shares which were subject thereto shall become available for other Options, SARs or Stock Purchase Rights under this Plan (unless the Plan has terminated); however, should the Company reacquire Shares which were issued pursuant to the exercise of an Option or SAR, such Shares shall not become available for future grant under the Plan. If Shares of Restricted Stock are repurchased by the Company at their original purchase price, such shares shall become available for future grant under the Plan.

4.   Administration of the Plan.

     (a)   Procedure.

          (i)   Multiple Administrative Bodies.  If permitted by Rule 16b-3
promulgated under the Exchange Act or any successor rule thereto, as in effect
at the time that discretion is being exercised with respect to the  Plan, and
by the legal requirements of the Applicable Laws relating to  the
administration of stock plans such as the Plan, if any, the Plan may  (but
need not) be administered by different administrative bodies with  respect to
(A) Directors who are not Employees, (B) Directors who are  Employees,
(C) Officers who are not Directors and (D) Employees who are neither Directors
nor Officers.

          (ii)  Section 162(m).  To the extent that the Administrator determines
it to be desirable to qualify Options or SARs granted  hereunder as
"performance-based compensation" within the meaning of  Section 162(m) of the
Code, the Plan shall be administered by a Committee  of two or more "outside
directors" within the meaning of Section 162(m) of the Code.

                                    38

<PAGE>

          (iii) Rule 16b-3.  To the extent desirable to qualify transactions
hereunder as exempt under Rule 16b-3, the transactions contemplated hereunder
shall be structured to satisfy the requirements for exemption  under
Rule 16b-3.

          (iv)  Other Administration.  Other than as provided above, the Plan
shall be administered by (A) the Board or (B) a Committee, which  committee
shall be constituted to satisfy Applicable Laws.

     (b)   Powers of the Administrator.  Subject to the provisions of the Plan,
and in the case of a Committee, subject to the specific duties  delegated by
the Board to such Committee, the Administrator shall have the  authority, in
its discretion:

          (i)   to determine the Fair Market Value;

          (ii)  to select the person(s) to whom Options, SARs and Stock Purchase
Rights may be granted hereunder;

          (iii)   to determine the number of shares of Common Stock to be covered
by each Option, SAR or Stock Purchase Right granted hereunder;

          (iv)  to approve forms of agreement for use under the Plan;

          (v)   to determine the terms and conditions, not inconsistent with the
terms of the Plan, of any Option, SAR or Stock Purchase Right granted
hereunder. Such terms and conditions include, but are not limited to, the
exercise price, the date of grant, the time or times when Options, SARs  or
Stock Purchase Rights may be exercised (which may be based on  performance
criteria), any vesting acceleration or waiver of forfeiture  restrictions, and
any restriction or limitation regarding any Option, SAR  or Stock Purchase
Right or the shares of Common Stock relating thereto,  based in each case on
such factors as the Administrator, in its sole  discretion, shall determine;

          (vi)  to reduce the exercise price of any Option, SAR or Stock Purchase
Right to the then current Fair Market Value if the Fair Market Value of the

Common Stock covered by such Option, SAR or Stock Purchase Right shall have
declined since the date the Option, SAR or Stock  Purchase Right was granted;

        (vii) to construe and interpret the terms of the Plan and awards
granted pursuant to the Plan;

        (viii) to prescribe, amend and rescind rules and regulations relating to
the Plan, including rules and regulations relating to sub-plans  established
for the purpose of qualifying for preferred tax treatment  under foreign tax
laws;

        (ix)  to modify or amend each Option, SAR or Stock Purchase Right
(subject to Section 17(c) of the Plan), including the discretionary authority
to extend the post-termination exercisability period of Options  longer than
is otherwise provided for in the Plan;
                                39
<PAGE>

        (x)   to allow Optionees to satisfy withholding tax obligations by
electing to have the Company withhold from the Shares to be issued upon
exercise of an Option, SAR or Stock Purchase Right that number of Shares
having a Fair Market Value equal to the amount required to be withheld.
The Fair Market Value of the Shares to be withheld shall be determined on
 the date that the amount of tax to be withheld is to be determined. All
elections by an Optionee to have Shares withheld for this purpose shall be
made in such form and under such conditions as the Administrator may deem
necessary or advisable;

        (xi)  to authorize any person to execute on behalf of the Company any
instrument required to effect the grant of an Option, SAR or Stock  Purchase
Right previously granted by the Administrator; and

        (xii) to make all other determinations deemed necessary or advisable
for administering the Plan.

    (c)  Effect of Administrator's Decision.  The Administrator's decisions,
determinations and interpretations shall be final and binding on all Optionees
and any other holders of Options, SARs or Stock Purchase Rights.

5.  Eligibility.  Nonstatutory Stock Options, SARs and Stock Purchase
Rights may be granted to the Chairman, Executive Officers and other key
employees or to  such other individuals as determined by the Administrator
whom the Company has  offered a position of Chairman or Executive Officer.
Incentive Stock Options may  be granted only to Executive Officers and other
key employees.

6.  Limitations.

    (a)  Each Option shall be designated in the Agreement as either an
Incentive Stock Option or a Nonstatutory Stock Option. However,
notwithstanding such designation, to the extent that the aggregate Fair Market
Value of the Shares with respect to which Incentive Stock Options are
exercisable for the first time by the Optionee during any calendar year
(under all plans of the Company and any Parent or Subsidiary) exceeds
$100,000, such Options shall be treated as Nonstatutory Stock Options. For
purposes of this Section 6(a), Incentive Stock Options shall be taken into
account in the order in which they were granted. The Fair Market Value of the
Shares shall be determined as of the time the Option with respect to such
Shares is granted.

(b)   Neither the Plan nor any Option, SAR or Stock Purchase Right shall confer upon an Optionee any right with respect to continuing the Optionee's relationship as an Employee with or Chairman of the Company, nor shall they interfere in any way with the Optionee's right or the Company's right to terminate such relationship at any time, with or without cause.

(c)   The following limitations shall apply to grants of Options and SARs:

40

<PAGE>

(i)   No participant shall be granted, in any fiscal year of the Company, Options or SARs to purchase more than 17,000,000 Shares;

(ii)   The foregoing limitations shall be adjusted proportionately in connection with any change in the Company's capitalization as described in Section 15;

(iii)  If an Option or SAR is canceled in the same fiscal year of the Company in which it was granted (other than in connection with a transaction described in Section 15), the canceled Option will be counted  against the limits set forth in subsections (i) above. For this purpose,  if the exercise price of an Option or SAR is reduced, the transaction  will be treated as a cancellation of the Option or SAR and the grant of a  new Option or SAR.

7.   Term of Plan.  Subject to Section 21 of the Plan, the Plan shall become effective upon its adoption by the Board. It shall continue in effect for a term of ten (10) years unless terminated earlier under Section 16 of the Plan.

8.   Term of Option.  The term of each Option shall be stated in the Agreement. In the case of an Incentive Stock Option, the term shall be ten (10) years from the date of grant or such shorter term as may be provided in the Agreement. Moreover, in the case of an Incentive Stock Option granted to an Optionee who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent (10%) of the total combined voting power of  all classes of stock of the Company or any Parent or Subsidiary, the term of the  Incentive Stock Option shall be five (5) years from the date of grant or such  shorter term as may be provided in the Agreement.

9.   Option Exercise Price and Consideration.

(a)   Exercise Price.  The per share exercise price for the Shares to be issued pursuant to exercise of an Option shall be determined by the Administrator, subject to the following:

(i)   In the case of an Incentive Stock Option;

(A)  granted to an Employee who, at the time the Incentive Stock Option is granted, owns stock representing more than ten percent  (10%) of the voting power of all classes of stock of the Company or any Parent or Subsidiary, the per Share exercise price shall be no less than 110% of the Fair Market Value per Share on the date of grant; or

(B)  granted to any Employee other than an Employee described in paragraph (A) immediately above, the per Share exercise price shall be no less than 100% of the Fair Market Value per Share on the date of grant;

41

<PAGE>

(ii)  In the case of a Nonstatutory Stock Option, the per Share exercise price shall be determined by the Administrator. In the case of a Nonstatutory Stock Option intended to qualify as "performance-based compensation" within the meaning of Section 162(m) of the Code, the per Share exercise price shall be no less than 100% of the Fair Market Value  per Share on the date of grant;

(iii) Notwithstanding the foregoing, Options may be granted with a per Share exercise price of less than 100% of the Fair Market Value per  Share on the date of grant as determined by the Administrator or pursuant  to a merger or other corporate transaction.

(b)  Waiting Period and Exercise Dates.  At the time an Option is granted, the Administrator shall fix the period within which the Option may  be exercised and shall determine any conditions which must be satisfied  before the Option may be exercised.

(c)  Form of Consideration.  The Administrator shall determine the acceptable form of consideration for exercising an Option, including the method of payment. In the case of an Incentive Stock Option, the Administrator shall determine the acceptable form of consideration at the  time of grant. Such consideration may consist entirely of:

(i)  cash;

(ii)  check;

(iii) promissory note;

(iv)  other Shares which (A) in the case of  Shares acquired upon exercise of an option, have been owned by the Optionee for more than six months on the date of surrender, and (B) have a Fair Market Value on the date of surrender equal to the aggregate exercise price of the Shares as  to which said Option shall be exercised;

(v)  consideration received by the Company under a cashless exercise program implemented by the Company in connection with the Plan;

(vi)  a reduction in the amount of any Company liability to the Optionee, including any liability attributable to the Optionee's participation in any Company-sponsored deferred compensation program or  arrangement;

(vii) any combination of the foregoing methods of payment; or

(viii) such other consideration and method of payment for the issuance of Shares to the extent permitted by Applicable Laws.

42

<PAGE>

10. Stock Appreciation Rights.

    (a)  Granted in Connection with Options.  At the sole discretion of the Administrator, SARs may be granted in connection with all or any part of an Option, either concurrently with the grant of the Option or at any time thereafter during the term of the Option. The following provisions apply to SARs that are granted in connection with Options:

    (i)   The SAR shall entitle the Optionee to exercise the SAR by surrendering to the Company unexercised a portion of the related Option.  The Optionee shall receive in exchange from the Company an amount equal  to the excess of (x) the Fair Market Value on the date of exercise of the  SAR of the Common Stock covered by the surrendered portion of the related  Option over (y) the exercise price of the Common Stock covered by the  surrendered portion of the related Option. Notwithstanding the foregoing,  the Administrator may place limits on the amount that may be paid upon  exercise of a SAR; provided, however, that such limit shall not restrict  the exercisability of the related Option;

    (ii)  When a SAR is exercised, the related Option, to the extent surrendered, shall no longer be exercisable;

    (iii) A SAR shall be exercisable only when and to the extent that the related Option is exercisable and shall expire no later than the date on which the related Option expires; and

    (iv)  A SAR may only be exercised at a time when the Fair Market Value of the Common Stock covered by the related Option exceeds the  exercise price of the Common Stock covered by the related Option.

    (b)  Independent SARs.  At the sole discretion of the Administrator, SARs may be granted without related Options. The following provisions apply to SARs that are not granted in connection with Options:

    (i)   The SAR shall entitle the Optionee, by exercising the SAR, to receive from the Company an amount equal to the excess of (x) the Fair Market Value of the Common Stock covered by exercised portion of the SAR,  as of the date of such exercise, over (y) the Fair Market Value of the Common Stock covered by the exercised portion of the SAR, as of the date  on which the SAR was granted; provided, however, that the Administrator may place limits on the amount that may be paid upon exercise of a SAR;  and

    (ii)  SARs shall be exercisable, in whole or in part, at such times as the Administrator shall specify in the Optionee's Agreement.

    (c)  Form of Payment. The Company's obligation arising upon the exercise of a SAR may be paid in Common Stock or in cash, or in any  combination of Common Stock and cash, as the Administrator, in its sole  discretion, may determine. Shares issued upon the exercise of a SAR shall be valued at their Fair Market Value as of the date of exercise.

                                    43

<PAGE>


    (d)  Rule 16b-3. SARs granted hereunder shall contain such additional restrictions as may be required to be contained in the Plan or Agreement in order for the SAR to qualify for the maximum exemption provided by Rule 16b-3.

11.  Exercise of Option or SAR.

(a)  Procedure for Exercise; Rights as a Shareholder.  Any Option or SAR granted hereunder shall be exercisable according to the terms of the Plan and at such times and under such conditions as determined by the  Administrator and set forth in the Agreement. An Option may not be exercised  for a fraction of a Share.

An Option or SAR shall be deemed exercised when the Company receives: (i) written or electronic notice of exercise (in accordance with the terms of the Option or SAR) from the person entitled to exercise the Option or  SAR, and (ii) full payment for the Shares with respect to which the Option  is exercised. Full payment may consist of any consideration and method of payment authorized by the Administrator and permitted by the Agreement and  the Plan. Shares issued upon exercise of an Option shall be issued in the name of the Optionee or, if requested by the Optionee, in the name of the Optionee and his or her spouse. Until the Shares are issued (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a shareholder shall exist with respect to the Optioned  Stock, notwithstanding the exercise of the Option. The Company shall issue  (or cause to be issued) such Shares promptly after the Option is exercised.  No adjustment will be made for a dividend or other right for which the record date is prior to the date the Shares are issued, except as provided  in Section 15 of the Plan.

Exercising an Option in any manner shall decrease the number of Shares thereafter available, both for purposes of the Plan and for sale under the Option, by the number of Shares as to which the Option is exercised.  Exercise of a SAR in any manner shall, to the extent the SAR is exercised,  result in a decrease in the number of Shares which thereafter shall be  available for purposes of the Plan, and the SAR shall cease to be  exercisable to the extent it has been exercised.

(b)  Termination of Continuous Status as Chairman.  Upon termination of an Optionee's Continuous Status as Chairman (other than termination by  reason of the Optionee's death), the Optionee may, but only within ninety  (90) days after the date of such termination, exercise his or her Option or  SAR to the extent that it was exercisable at the date of such termination. Notwithstanding the foregoing, however, an Option or SAR may not be exercised after the date the Option or SAR would otherwise expire by its  terms due to the passage of time from the date of grant.

44

<PAGE>

(c)  Termination of Continuous Employment.  Upon termination of an Optionee's Continuous Status as Employee (other than termination by reason of the Optionee's death), the Optionee may, but only within ninety (90) days after the date of such termination, exercise his or her Option or SAR to the extent that it was exercisable at the date of such termination. Notwithstanding the foregoing, however, an Option or SAR may not be exercised after the date the Option or SAR would otherwise expire by its terms due to the passage of time from the date of grant.

(d)  Death of Optionee.  If an Optionee dies (i) while an Employee or Chairman, the Option or SAR may be exercised at any time within six (6) months (or such other period of time not exceeding twelve (12) months as determined

by the Administrator) following the date of death by the  Optionee's estate or
by a person who acquired the right to exercise the  Option by bequest or
inheritance, but only to the extent of the right to  exercise that would have
accrued had the Optionee continued living and  terminated his or her
employment six (6) months (or such other period of  time not exceeding twelve
 (12) months as determined by the Administrator)  after the date of death;
or (ii) within ninety (90) days after the  termination of Continuous Status as
an Employee or Chairman, the Option or  SAR may be exercised, at any time
within six (6) months (or such other  period of time not exceeding twelve (12)
months as determined by the  Administrator) following the date of death by the
Optionee's estate or by a  person who acquired the right to exercise the
Option or SAR by bequest or  inheritance, but only to the extent of the right
to exercise that had  accrued at the date of termination. If the Option or SAR
is not so exercised  within the time specified herein, the Option or SAR shall
terminate, and the  Shares covered by such Option or SAR shall revert to the
Plan.

    Notwithstanding the foregoing, however, an Option or SAR may not be
exercised after the date the Option or SAR would otherwise expire by its terms
due to the passage of time from the date of grant.

    (e)  Buyout Provisions.  The Administrator may at any time offer to buy
out for a payment in cash or Shares an Option or SAR previously granted  based
on such terms and conditions as the Administrator shall establish and
communicate to the Optionee at the time that such offer is made.

12. Stock Purchase Rights.

    (a)  Rights to Purchase.  Stock Purchase Rights may be issued either
alone, in addition to, or in tandem with other awards granted under the Plan
and/or cash awards made outside of the Plan. After the Administrator
determines that it will offer Stock Purchase Rights under the Plan, it shall
advise the Optionee in writing or electronically, of the terms, conditions
and restrictions related to the offer, including the number of Shares that  the
Optionee shall be entitled to purchase, the price to be paid, and the time
within which the Optionee must accept such offer. The offer shall be accepted
by execution of an Agreement in the form determined by the  Administrator.

                                 45

<PAGE>


    (b)  Repurchase Option.  Unless the Administrator determines otherwise,
the Agreement shall grant the Company a repurchase option exercisable upon
the voluntary or involuntary termination of the purchaser's service with the
Company for any reason (including death or Disability). The purchase price
for Shares repurchased pursuant to the Agreement shall be the original price
paid by the purchaser and may be paid by cancellation of any indebtedness of
the purchaser to the Company. The repurchase option shall lapse at a rate
determined by the Administrator.

    (c)  Other Provisions.  The Agreement shall contain such other terms,
provisions and conditions not inconsistent with the Plan as may be determined
by the Administrator in its sole discretion.

    (d)  Rights as a Shareholder.  Once the Stock Purchase Right is exercised,
the purchaser shall have the rights equivalent to those of a  shareholder, and
shall be a shareholder when his or her purchase is entered  upon the records
of the duly authorized transfer agent of the Company. No adjustment will be

made for a dividend or other right for which the record  date is prior to the
date the Stock Purchase Right is exercised, except as  provided in Section 15
of the Plan.

13. Transferability of Options, SARs and Stock Purchase Rights.  Unless
determined otherwise by the Administrator, an Option, SAR or Stock Purchase
Right may not be sold, pledged, assigned, hypothecated, transferred, or
disposed of in any manner other than by will or by the laws of descent or
distribution or  pursuant to a qualified domestic relations order as defined
by the Code or Title  1 of the Employee Retirement Income Security Act, and
may be exercised, during  the lifetime of the Optionee, only by the Optionee.
If the Administrator makes  an Option, SAR or Stock Purchase Right
transferable, such Option, SAR or Stock  Purchase Right shall contain such
additional terms and conditions as the  Administrator deems appropriate.

14. Stock Withholding to Satisfy Withholding Tax Obligations.  When an
Optionee incurs tax liability in connection with the exercise of an Option,
SAR or Stock Purchase Right, which tax liability is subject to tax withholding
under  applicable tax laws, and the Optionee is obligated to pay the Company
an amount   required to be withheld under applicable tax laws, the Optionee may
satisfy the  withholding tax obligation (including, at the election of the
Optionee, any  additional amount which the Optionee desires to have withheld in
order to  satisfy in whole or in part the Optionee's full estimated tax in
connection with  the exercise) by electing to have the Company withhold from
the Shares to be issued upon exercise of the Option, or the Shares to be
issued upon exercise of  the SAR or Stock Purchase Right, if any, that number
of Shares having a Fair  Market Value equal to the amount required to be
withheld (and any additional  amount desired to be withheld, as aforesaid).
The Fair Market Value of the  Shares to be withheld shall be determined on
the date that the amount of tax to  be withheld is to be determined (the
"Tax Date").

                                        46
<PAGE>

     All elections by an Optionee to have Shares withheld for this purpose
shall be made in writing in a form acceptable to the Administrator and shall
be subject to the following restrictions:

        (i)   the election must be made on or prior to the applicable Tax Date;
and

        (ii)  all elections shall be subject to the consent or disapproval of
the Administrator.

     In the event the election to have Shares withheld is made by an Optionee
and the Tax Date is deferred under Section 83 of the Code because no election
is  filed under Section 83(b) of the Code, the Optionee shall receive the full
number of Shares with respect to which the Option, SAR or Stock Purchase Right
is exercised but such Optionee shall be unconditionally obligated to tender
back  to the Company the proper number of Shares on the Tax Date.

15. Adjustments Upon Changes in Capitalization, Dissolution, Merger or Asset
Sale.

     (a)   Changes in Capitalization.  Subject to any required action by the
shareholders of the Company, the number of shares of Common Stock covered by
each outstanding Option, SAR or Stock Purchase Right, and the number of
shares of Common Stock which have been authorized for issuance under the Plan

but as to which no Options, SARs or Stock Purchase Rights have yet been
granted or which have been returned to the Plan upon cancellation or
expiration of an Option, SAR or Stock Purchase Right, as well as the price
per share of Common Stock covered by each such outstanding Option, SAR or
Stock Purchase Right, shall be proportionately adjusted for any increase or
decrease in the number of issued shares of Common Stock resulting from a stock
split, reverse stock split, stock dividend, combination or  reclassification
of  the Common Stock, or any other increase or decrease in  the number of
issued shares of Common Stock effected without receipt of  consideration by
the Company; provided, however, that conversion of any  convertible securities
of the Company shall not be deemed to have been  "effected without receipt
of consideration." Such adjustment shall be made by the Board, whose
determination in that respect shall be final, binding  and conclusive. Except
as expressly provided herein, no issuance by the  Company of shares of stock
of any class, or securities convertible into  shares of stock of any class,
shall affect, and no adjustment by reason  thereof shall be made with respect
to, the number or price of shares of  Common Stock subject to an Option, SAR
or Stock Purchase Right.

     (b)  Dissolution or Liquidation.  In the event of the proposed dissolution
or liquidation of the Company, all outstanding Options, SARs and  Stock
Purchase Rights will terminate immediately prior to the consummation of such
proposed action, unless otherwise provided by the Administrator. The
Administrator may, in the exercise of its sole discretion in such instances,
declare that any Option, SAR or Stock Purchase Right shall terminate as of a

                                   47

<PAGE>

date fixed by the Administrator and give each Optionee the right to exercise
his or her Option, SAR or Stock Purchase Right as to all or any part of the
Optioned Stock, including Shares as to which the Option, SAR or Stock Purchase
Right would not otherwise be exercisable.

     (c)  Merger or Asset Sale.   Unless otherwise determined by the
Administrator, in the event of a merger of the Company with or into another
corporation, or the sale of substantially all of the assets of the Company,
each outstanding Option, SAR and Stock Purchase Right shall be assumed or an
equivalent option or right substituted by the successor corporation or a
Parent or Subsidiary of the successor corporation. In the event that the
successor corporation refuses to assume or substitute for the Option, SAR or
Stock Purchase Right, the Optionee shall fully vest in and have the right to
exercise the Option, SAR or Stock Purchase Right as to all of the Optioned
Stock, including Shares as to which it would not otherwise be vested or
exercisable. If an Option, SAR or Stock Purchase Right becomes fully vested
and exercisable in lieu of assumption or substitution in the event of a merger
or sale of assets, the Administrator shall notify the Optionee in writing or
electronically that the Option, SAR or Stock Purchase Right shall be fully
vested and exercisable for a period of thirty (30) days from the date of such
notice, and the Option, SAR or Stock Purchase Right shall  terminate upon the
expiration of such period. For the purposes of this  paragraph, the Option,
SAR or Stock Purchase Right shall be considered  assumed if, following the
merger or sale of assets, the option or right  confers the right to purchase
or receive, for each Share of Optioned Stock  subject to the Option, SAR or
Stock Purchase Right immediately prior to the  merger or sale of assets, the
consideration (whether stock, cash, or other securities or property) received
in the merger or sale of assets by holders of Common Stock for each Share held
on the effective  date of the transaction (and if holders were offered a
choice of  consideration, the type of consideration chosen by the holders of

a majority of the outstanding Shares); provided, however, that if such consideration received in the merger or sale of assets is not solely common stock of the successor corporation or its Parent, the Administrator may, with the consent of the successor corporation, provide for the consideration to be received upon the exercise of the Option, SAR or Stock Purchase Right, for each Share of Optioned Stock subject to the Option, SAR or Stock Purchase Right, to be solely common stock of the successor corporation or its Parent equal in fair market value to the per share consideration received by holders of Common Stock in the merger or sale of assets.

(d)  Change in Control.  In the event of a "Change in Control" of the Company, as defined in paragraph (e) below, unless otherwise determined by the Administrator prior to the occurrence of such Change in Control, the following acceleration and valuation provisions shall apply:

(i)  Any Options, SARs and Stock Purchase Rights outstanding as of the date such Change in Control is determined to have occurred that are not yet exercisable and vested on such date shall become fully exercisable and vested; and

48

<PAGE>

(ii)  The value of all outstanding Options, SARs and Stock Purchase Rights shall, unless otherwise determined by the Administrator at or after grant, be cashed-out. The amount at which such Options, SARs and Stock Purchase Rights shall be cashed out shall be equal to the excess of (x) the Change in Control Price (as defined below) over (y) the exercise price of the Common Stock covered by the Option, SAR or Stock Purchase Right. The cash-out proceeds shall be paid to the Optionee or, in the event of death of an Optionee prior to payment, to the estate of the Optionee or to a person who acquired the right to exercise the Option, SAR or Stock Purchase Right by bequest or inheritance.

(e)  Definition of "Change in Control".  For purposes of this Section 15, a "Change in Control" means the happening of any of the following:

(i)  When any "person", as such term is used in Sections 13(d) and 14(d) of the Exchange Act (other than the Company, a Subsidiary or a Company employee benefit plan, including any trustee of such plan acting as trustee) is or becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of the Company representing fifty percent (50%) or more of the combined voting power of the Company's then outstanding securities; or

(ii)  The occurrence of a transaction requiring shareholder approval, and involving the sale of all or substantially all of the assets of the Company or the merger of the Company with or into another corporation.

(f)  Change in Control Price.  For purposes of this Section 15, "Change in Control Price" shall be, as determined by the Administrator, (i) the highest Fair Market Value at any time within the 60-day period immediately preceding the date of determination of the Change in Control Price by the Administrator (the "60-Day Period"), or (ii) the highest price paid or offered, as determined by the Administrator, in any bona fide transaction or bona fide offer related to the Change in Control of the Company, at any time within the 60-Day Period.

16.  Date of Grant.  The date of grant of an Option, SAR or Stock Purchase

Right shall be, for all purposes, the date on which the Administrator makes the determination granting such Option, SAR or Stock Purchase Right, or such other later date as is determined by the Administrator. Notice of the determination shall be provided to each Optionee within a reasonable time after the date of such grant.

17. Amendment and Termination of the Plan.

    (a)  Amendment and Termination.  The Board may at any time amend, alter, suspend or terminate the Plan.

    (b)  Shareholder Approval.  The Company shall obtain shareholder approval of any Plan amendment to the extent necessary and desirable to comply with Applicable Laws.

                                    49

<PAGE>

    (c)  Effect of Amendment or Termination.  No amendment, alteration, suspension or termination of the Plan shall impair the rights of any Optionee, unless mutually agreed otherwise between the Optionee and the Administrator, which agreement must be in writing and signed by the Optionee and the Company. Termination of the Plan shall not affect the Administrator's ability to exercise the powers granted to it hereunder with respect to Options, SARs or Stock Purchase Rights granted under the Plan  prior to the date of such termination.

18. Conditions Upon Issuance of Shares.

    (a)  Legal Compliance.   Shares shall not be issued pursuant to the exercise of an Option, SAR or Stock Purchase Right unless the exercise of such Option, SAR or Stock Purchase Right and the issuance and delivery of such Shares shall comply with Applicable Laws and shall be further subject  to the approval of counsel for the Company with respect to such compliance.

    (b)  Investment Representations.  As a condition to the exercise of an Option, SAR or Stock Purchase Right, the Company may require the person exercising such Option, SAR or Stock Purchase Right to represent and warrant at the time of any such exercise that the Shares are being purchased only  for investment and without any present intention to sell or distribute such Shares if, in the opinion of counsel for the Company, such a representation is required.

19.  Inability to Obtain Authority.   The inability of the Company to obtain authority from any regulatory body having jurisdiction, which authority is deemed by the Company's counsel to be necessary to the lawful issuance and sale  of any Shares hereunder, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority  shall not have been obtained.

20.  Reservation of Shares.   The Company, during the term of this Plan, will at all times reserve and keep available such number of Shares as shall be sufficient to satisfy the requirements of the Plan.

21.  Shareholder Approval.  The Plan shall be subject to approval by the shareholders of the Company within twelve (12) months after the date the Plan is adopted. Such shareholder approval shall be obtained in the manner and to the degree required under Applicable Laws.

                                    50

```
<PAGE>

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.2
<SEQUENCE>8
<TEXT>
```
                                                        [Exhibit 23.2]



            CONSENT OF ERNST & YOUNG LLP, INDEPENDENT AUDITORS

We consent to the incorporation by reference in the Registration Statement
(Form S-8) pertaining to the 1997 Director Stock Option Plan, 1997 Employee
Stock Option Plan, 1998 Executive Officer Stock Plan, and the Stock Option
grants to Edgar S. Woolard, Jr. and Garreth C.C. Chang, of our report dated
October 14, 1996, with respect to the consolidated financial statements and
schedule of Apple Computer, Inc., as of September 27, 1996 and for the two
years then ended, included in its Annual Report (Form 10-K) for the year ended
September 26, 1997, filed with the Securities and Exchange Commission.


                                        /s/ Ernst & Young LLP
                                        ERNST & YOUNG LLP


San Jose, California
July 29, 1998




                                  51

```
<PAGE>

</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-23.3
```

```
<SEQUENCE>9
<TEXT>
                                        [Exhibit 23.3]

CONSENT OF INDEPENDENT AUDITORS

The Board of Directors
Apple Computer, Inc.:


We consent to incorporation by reference in the registration statement on
Form S-8 of Apple Computer, Inc. of our report dated October 15, 1997,
relating to the consolidated balance sheet of Apple Computer, Inc. and
subsidiaries as of September 26, 1997, and the related consolidated statements
of operations, shareholders' equity and cash flows for the year then ended,
and the related schedule, which report appears in the September 26, 1997,
annual report on Form 10-K of Apple Computer, Inc.




                                   /s/ KPMG PEAT MARWICK LLP
                                       KPMG Peat Marwick LLP


Mountain View, California
July 29, 1998
```

                                        52
```
<PAGE>

</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```