Jay W. Eisenhofer (*pro hac vice*)
Charles T. Caliendo (*pro hac vice*)
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel:  646.722.8500
Fax:  646.722.8501
jeisenhofer@gelaw.com
ccaliendo@gelaw.com

Michael J. Barry (*pro hac vice*)
Lesley E. Weaver (State Bar No. 191305)
GRANT & EISENHOFER P.A.
1201 North Market Street
Wilmington, DE 19801
Tel:  302.622.7000
Fax:  302.622.7100
mbarry@gelaw.com
lweaver@gelaw.com

Merrill Glen Emerick (State Bar No. 117248)
ANDERLINI, FINKELSTEIN, EMERICK & SMOOT
400 S. El Camino Real – Suite 700
San Mateo, CA 94402
Tel: 650.348.0102
Fax: 650.348.0962
memerick@afeslaw.com

*Attorneys for Lead Plaintiff*
*The New York City Employees' Retirement System*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| MARTIN VOGEL and KENNETH MAHONEY, on Behalf of Themselves and All Other Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> STEVEN JOBS, PETER OPPENHEIMER, FRED ANDERSON, WILLIAM V. CAMPBELL, MILLARD S. DREXLER, ALBERT GORE, Jr., ARTHUR D. LEVINSON, JEROME B. YORK and APPLE COMPUTER, INC., <br><br> Defendants. | Case No.: C-06-05208-JF <br><br> **LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS CONSOLIDATED CLASS ACTION COMPLAINT** <br><br> Date:              September 7, 2007 <br> Time:              9:00 a.m <br> Department:   Ctrm 3, 5th Floor <br> Action Filed:   August 24, 2006 <br> Trial Date:      None Set <br> Judge:           Honorable Jeremy Fogel |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... III

STATEMENT OF ISSUES TO BE DECIDED (L.R. 7-4)...................................................... VI

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

PRELIMINARY STATEMENT............................................................................................... 1

THE COMPLAINT'S ALLEGATIONS .................................................................................. 1

    THE PARTIES ..................................................................................................................... 1

    OVERVIEW OF STOCK OPTION AWARDS ...................................................................... 2

    THE *WALL STREET JOURNAL* EXPOSES WIDESPREAD BACKDATING ..................... 2

    REPRESENTATIONS IN PROXY STATEMENTS CONCERNING
    APPLE'S STOCK OPTION PLANS .................................................................................... 3

    APPLE ADMITS TO BACKDATING AND IS FORCED TO
    RESTATE ITS FINANCIAL RESULTS ............................................................................... 4

    THE INJURY TO APPLE'S SHAREHOLDERS AND RELIEF SOUGHT ........................... 6

ARGUMENT ............................................................................................................................ 6

I.     ALL APPLICABLE PLEADING REQUIREMENTS ARE SATISFIED........................ 6

    A.    THE PROPER STANDARD ON THIS MOTION TO DISMISS ......................................... 6

    B.    RULE 9(b) DOES NOT APPLY TO THE SECTION 14(a) CLAIM OR STATE
        BREACH OF DUTY OF DISCLOSURE CLAIMS .............................................................. 7

    C.    THE REFORM ACT'S APPLICABLE PLEADING REQUIREMENTS ARE SATISFIED ........ 8

        1.    The Complaint Alleges A Strong Inference Of Negligence ....................... 8

        2.    The Reform Act's Specificity Requirement Is Satisfied........................... 10

II.    PLAINTIFFS HAVE ADEQUATELY PLED CAUSATION.......................................... 11

    A.    TRANSACTION CAUSATION IS ESTABLISHED BECAUSE DEFENDANTS
        DO NOT CONTEST (NOR CAN THEY) THE MATERIALITY OF
        THE ALLEGED MISREPRESENTATIONS ..................................................................... 11

    B.    PLAINTIFFS HAVE ADEQUATELY PLED LOSS CAUSATION.................................... 11

        1.    Plaintiffs Need Only Provide A Short And Plain Statement
            Of Loss Causation In Conformance With FRCP 8(a) And
            Have Done So ..................................................................................... 11

        2.    Plaintiffs Adequately Allege Economic Loss ........................................... 12

i

**Lead Plaintiff's Memorandum of Points and Authorities In Opposition to Defendants' Notice of Motion and
Motion to Dismiss Consolidated Class Action Complaint (Case No.: C-06-05208-JF)**

III.   PLAINTIFFS STATE A DIRECT CLAIM ......................................................... 14

IV.   THE REFORM ACT'S "LOOK BACK" PROVISION DOES NOT APPLY TO
PLAINTIFFS' SECTION 14(a) CLAIM ...................................................... 19

V.   SLUSA DOES NOT BAR PLAINTIFFS' STATE LAW CLAIMS BECAUSE THE
DELAWARE CARVE-OUTS APPLY .......................................................... 211

VI.   PLAINTIFFS' STATE LAW CLAIMS ARE TIMELY ..................................... 22

CONCLUSION ........................................................................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re AOL Time Warner, Inc. Sec. Litig.*,
2007 WL 1789013 (S.D.N.Y. Jun. 20, 2007) ............................................................22

*Barsch v. O'Toole*,
2007 WL 1795750 (N.D. Cal. June 21, 2007) ...........................................................14

*Cahill v. Liberty Mutual Ins. Co.*,
80 F.3d 336 (9th Cir.1996) .........................................................................................7

*Cannon v. University of Chicago*,
441 U.S. 677 (1979)....................................................................................................19

*In re Cendant Corp. Litig.*,
60 F. Supp. 2d 354 (D.N.J. 1999) ...............................................................................7

*City of Ann Arbor Employees' Ret. Sys. v. Gecht*,
2007 WL 760568 (N.D. Cal. March 9, 2007)..............................................................22

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005).................................................................................................11,12

*Erickson v. Pardus*,
127 S. Ct. 2197 (Jun. 7, 2007) ....................................................................................7

*In re FirstEnergy Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004).......................................................................14

*Gatz v. Ponsoldt*,
2007 WL 1120338 (Del. Apr. 16, 2007).................................................................17, 19

*Gentile v. Rossette*,
906 A.2d 91 (Del. 2006) ..........................................................................................15, 17

*Gibson v. PS Group Holdings*,
2000 WL 777818 (S.D. Cal. June 14, 2000)...............................................................22

*Hartman v. Pathmark Stores, Inc.*,
2006 WL 571852 (D. Del. Mar. 8, 2006) ...................................................................12

*Hobbs v. Bateman Eichler, Hill Richards, Inc.*,
164 Cal. App. 3d 174 (Cal. App. 2d Dist. 1985) ....................................................23,24

*J.I. Case Co. v. Borak*,
377 U.S. 426 (1964)................................................................................................14, 15

*In re J.P. Morgan Chase & Co. S'holder Litig.*,
906 A.2d 766 (Del. 2006) ...........................................................................................16

*Katz v. Pels*,
774 F. Supp. 121 (S.D.N.Y. 1991)...........................................................................15,18

**Lead Plaintiff's Memorandum of Points and Authorities In Opposition to Defendants' Notice of Motion and Motion to Dismiss Consolidated Class Action Complaint (Case No.: C-06-05208-JF)**

*Knollenberg v. Harmonic, Inc.*,
  152 Fed. Appx. 674 (9th Cir. 2005)...............................................................................7

*Lee v. Bank of America*,
  27 Cal. App. 4th 197, 32 Cal. Rptr. 2d 388 (Cal. App. 4 Dist., 1994).......................23

*Leowardy v. Oakley, Inc.*,
  2007 WL 1113984 (C.D. Cal., Apr. 10, 2007) ............................................................13

*Lewis v. Termeer*,
  445 F. Supp. 2d 366 (S.D.N.Y. 2006)...........................................................................21

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ........................................................................12

*In re MetLife Demutualization Litig.*,
  2006 WL 2524196 (E.D.N.Y. Aug. 28, 2006)...............................................................21

*Mills v. Electric Automobile-Lite Co.*,
  396 U.S. 375 (1970)......................................................................................................11

*Mills v. Forestex Co.*,
  108 Cal. App. 4th 625 (Cal. App. 5th Dist. 2003) .......................................................24

*Neel v. Magana, Olney, Levy, Cathcart & Gelfand*,
  6 Cal. 3d 176 (Cal. 1971).............................................................................................24

*Oliver v. Boston Univ.*,
  2000 WL 1091480 (Del. Ch. July 25, 2000)............................................................15,18

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*,
  411 F. Supp. 2d 1172 (N.D. Cal. 2005) ........................................................................12

*Ryan v. Gifford*,
  918 A.2d 341 (Del. Ch. 2007).......................................................................................24

*Schuster v. Gardner*,
  127 Cal. App. 4th 305 (Cal. Ct. App. 4th Dist. 2005) ............................................15,19

*Thorpe v. CERBCO, Inc.*,
  1993 WL 35967 (Del. Ch. Jan. 26, 1993)................................................................15,16

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
  845 A.2d 1031 (Del. 2004) ...........................................................................................15

*In re Tri-Star Pictures, Inc. Litig.*,
  634 A.2d 319 (Del. 1993) .........................................................................................16,17

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976)......................................................................................................11

*United States Liab. Ins. Co. v. Haidinger-Hayes*
  1 Cal. 3d 586 (Cal. 1970).....................................................................................21,22,23

*Vess v. Ciba-Giegy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ........................................................................................7

**Lead Plaintiff's Memorandum of Points and Authorities In Opposition to Defendants' Notice of Motion and
Motion to Dismiss Consolidated Class Action Complaint (Case No.: C-06-05208-JF)**

*Yamamoto v. Omiya,*
    564 F.2d 1319 (9th Cir. 1977) ...................................................................................14

*In re Zoran Corp. Deriv. Litig.,*
    2007 WL 1650948 (N.D. Cal. June 5, 2007) ...................................................... passim

*Zoren v. Genesis Energy, L.P.,*
    195 F. Supp. 2d 598 (D. Del. 2002).............................................................................22

**FEDERAL STATUTES**

15 U.S.C. § 78bb(f)..........................................................................................................20,21

15 U.S.C. § 78u-4(b) ..................................................................................................... passim

26 U.S.C. § 162(m) .............................................................................................................3,4

Cal. Civ. Proc. Code § 343 ..................................................................................................22

**RULES**

Fed.R.Civ.P. 8(a) ..................................................................................................................6

Fed. R. Civ. P. 9(b) ..............................................................................................................7

**MISCELLANEOUS**

*In The Matter of Huntington Bancshares, Inc,*
S.E.C. Docket No. 2005 WL 1307747 (June 2, 2005).......................................................14

H.R. Conf. Rep. 104-369, reprinted in 1995 U.S.C.C.A.N. 730, 741 ...............................19

S. Rep. 104-98, reprinted in 1995 U.S.C.C.A.N. 679, 698, 707.........................................19

Nick Wingfield and Steve Stecklow, *Ex-Finance Chief Says Jobs Misled Him on
    Options,* THE WALL STREET JOURNAL, April 25, 2007............................................6, 12

**Lead Plaintiff's Memorandum of Points and Authorities In Opposition to Defendants' Notice of Motion and Motion to Dismiss Consolidated Class Action Complaint (Case No.: C-06-05208-JF)**

1    The New York City Employee's Retirement System ("NYCERS" or "Lead Plaintiff"), on

2    behalf of itself and the putative class of Apple, Inc. ("Apple" or the "Company") shareholders it

3    represents ("Plaintiffs"), submits this memorandum of points and authorities in opposition to the

4    defendants' Notice of Motion and Motion To Dismiss Consolidated Class Action Complaint;

5    Memorandum of Points and Authorities In Support Thereof  ("Defs. Br.").

6    **STATEMENT OF ISSUES TO BE DECIDED (L.R. 7-4)**

7    1.        Does the particularity requirement for pleading fraud in Federal Rule of Civil

8    Procedure 9(b) apply to Plaintiffs' federal proxy violation and state law breach of fiduciary duty of

9    disclosure claims where Plaintiffs' complaint (the "Complaint") makes abundantly clear that such

10   claims are based solely on negligence?

11   2.        Even if Rule 9(b)'s heightened pleading requirement is applicable to Plaintiffs'

12   claims, does the Complaint adequately plead the "who, what, where, when and how" of defendants'

13   conduct where the Complaint alleges that Apple has:  (a) admitted to more than 6,000 instances of

14   stock options backdating (*i.e.*, granting below the fair market value on the date of grant) that

15   occurred under the individual director/officer-defendants' watch over the course of almost a

16   decade; (b) admitted to falsifying records of at least one board meeting to cover-up its conduct; (c)

17   admitted that its financial statements for fiscal years 2002 through 2005 were rendered false and

18   misleading as a result of backdating; and (d) admitted that the proxy statements it used to solicit

19   shareholder authorization for the reservation of shares to be used with stock option and other

20   executive compensation plans contained numerous false and misleading statements concerning its

21   award of stock options?

22   3.        Does the Complaint adequately plead a "strong inference" of negligence so as to

23   satisfy the "state of mind" pleading requirement in the Private Securities Litigation Reform Act of

24   1995 (the "Reform Act") where the Complaint alleges:   (a) the individual director/officer-

25   defendants were (i) members of the Stock Option Committee, Compensation Committee and/or full

26   board of directors which, at varying times, had responsibility for the administration of and

27   compliance with the terms of Apple's stock option plans, and/or (ii) members of the Audit

28   Committee which had responsibility for assisting the full board with its responsibilities to ensure

proper accounting treatment for and internal controls respecting stock options; (b) the individual director/officer-defendants had legal duties to ensure that stock options were granted at fair market value on the date of grant, but failed to discharge those duties; (c) the individual director/officer-defendants had legal duties to ensure that compensation expenses generated by backdated options were properly accounted for, but failed to discharge those duties; (d) Apple has admitted that more than 6,000 option awards were intentionally backdated during the individual director/officer defendants' tenures; (e) proxy statements seeking shareholder approval for the reservation of shares for executive option awards falsely stated that Apple only grants stock options at fair market value on the date of grant; and (f) this Court has already held that backdating allegations not nearly as specific as Plaintiffs' allegations here created a strong inference of negligence?

4.      Have Plaintiffs adequately pled transaction (*i.e.*, but for) causation where defendants do not contest (nor can they) the materiality of misrepresentations in Apple's proxy statements concerning stock options backdating which, under relevant United States Supreme Court precedent, means that transaction causation is established?

5.      Have Plaintiffs adequately alleged loss (*i.e.*, proximate) causation under Rule 8(a) where the Complaint alleges that defendants' false and misleading proxy solicitations caused shareholders to authorize shares for option and other executive compensation plans that, to the extent exercised, would "dilute" Plaintiffs' shareholdings by more than 20% while increasing corporate insiders' shareholdings by that same percentage?

6.      Have Plaintiffs stated direct claims where:   (a) the Complaint alleges Apple's decade-long practice of using false and misleading proxies to solicit shareholder approval for shares for option and other executive compensation plans:  (i) wrongfully interfered with Plaintiffs' rights to cast fully informed votes; and (ii) diluted Plaintiffs' interests by more than 20% while at the same time increasing management's shareholdings by the same percentage; (b) the corporation suffered no injury from the proxy violations; and (c) the Complaint seeks damages, rescission and other relief that will not benefit the Company?

7.      Have Plaintiffs stated claims regardless of whether the federal proxy violation and state law breach of the fiduciary duty of disclosure claims are direct, derivative or both?

8.      Does the Reform Act's so-called "look back" rule apply to Plaintiffs' federal proxy violation claim where Plaintiffs' damage theory is based on dilution to their economic and voting interests in Apple stock and Plaintiffs do not seek to establish dilution "by reference to" Apple's stock price within the meaning of the "look back" rule?

9.      Do Plaintiffs' state law breach of fiduciary duty of disclosure claims asserting that defendants were not candid with shareholders in proxy solicitations to expand stock options and other executive compensation fall squarely within the so-called "Delaware carve-outs" of the Securities Litigation Uniform Standards Act ("SLUSA"), such that the claims are expressly exempted from SLUSA's preemption provisions?

10.     Does the fact that Plaintiffs were not on notice of defendants' wrongdoing until, at the earliest, March 2006 entitle Plaintiffs to the benefit of California's discovery rule such that the four-year statute of limitations on Plaintiffs' state law fiduciary disclosure claims did not begin to run until, at the earliest, March 2006, just a year before they were filed?

11.     Does the fact that defendants' continuous misrepresentations kept shareholders in the dark about backdating equitably estop defendants from raising the statute of limitations as a defense?

**MEMORANDUM OF POINTS AND AUTHORITIES**

**PRELIMINARY STATEMENT**

Apple has:  (a) admitted to 6,428 instances of stock options backdating that occurred under the individual director/officer-defendants' watch over the course of almost ten years; (b) admitted to falsifying records of at least one board meeting to cover-up its conduct; (c) admitted that backdating rendered its financial statements for fiscal years 2002 through 2005 materially false and caused $105 million and $84 million charges to earnings on pre-tax and after-tax bases, respectively; and (d) admitted that the proxy statements it used to solicit shareholder approval for the issuance of shares for officer and employee compensation contained not only material omissions, but outright lies about its award of stock options.

Nevertheless, the individual director and/or officer defendants – the very fiduciaries who are responsible for these transgressions – shamelessly argue that the Company's recent stock price rise should get them off the hook for a decade of lying to shareholders about illegal backdating. This is absurd.  A rising stock price does not give any fiduciary the right to cheat shareholders out of their entitlement to fair corporate suffrage or to flout the federal proxy rules.  Defendants deserve no credit in this lawsuit for simply doing their well-paid jobs by raising the stock price nor does the law provide any.  As demonstrated below, the legal arguments defendants raise are without merit and their motion to dismiss should be summarily denied.

**THE COMPLAINT'S ALLEGATIONS**

The Parties

NYCERS is a 200,000-member strong public pension fund that manages retirement assets for current and former employees of the City of New York.  *See*  ¶¶ 4-6.  Apple is a California corporation.   ¶ 7.  The individual defendants are the group of current and former Apple directors and/or officers who as corporate fiduciaries were responsible for the accuracy of Apple's proxy statements, annual reports and other corporate filings during the lengthy period in which backdating took place. ¶¶ 8, 26.  They are:  (a) Steven Jobs, Apple's current Chairman and CEO; (b) Fred Anderson, Apple's former CFO and director who was forced to leave the Company due to his role in the backdating scandal; (c) William Campbell, Millard Drexler, Arthur Levinson and

1

Jerome York, four of Apple's current outside directors who are or were members of the Compensation and/or Audit Committees of Apple's board during the relevant time; and (d) Gareth Chang, Peter Crisp, Lawrence Ellison, B. Jurgen Hintz, Katherine Hudson, Delano Lewis, A.C. Markkula, Jr. and Edgar Wollard, Jr., eight of Apple's former directors who likewise oversaw stock option practices when backdating took place. ¶¶ 8-25.

Overview Of Stock Option Awards

Companies award stock options to give employees the right to purchase shares at a set price, which is referred to as the "exercise price" and typically fixed at the company's closing stock market price on the same date the option was granted.  This is referred to as granting options "at the money."  An "at the money" option is not immediately valuable to the executive which, by design, gives the executive incentive to work toward increasing the company's stock price above the exercise price so the option has value. ¶¶ 32-33.

Over time, when the company's stock market price rises above the fixed exercise price, the option becomes valuable; it is then referred to as being "in the money."  After a fixed period of time has elapsed (referred to as the "vesting period"), the executive can pay the exercise price, acquire the shares, sell them in the marketplace for an amount greater than the exercise price he paid and thereby realize a profit.  In other words, the executive can "buy low and sell high" just like a shareholder hopes to do.  When options are awarded "at the money," the executives' interests are more closely aligned with shareholder interests than would be the case if the executive was simply paid in cash. ¶ 34.

The *Wall Street Journal* Exposes Widespread Backdating

A March 18, 2006 WALL STREET JOURNAL (the "*Journal*") article first disclosed that instead of setting exercise prices on the dates options were first granted (*i.e.*, so they were "at the money"), some companies looked back at historical closing prices, picked a day when the company's stock price had dropped to a low or near-low point and pretended that the options had been awarded on that date.  Thus, the assigned exercise price was *lower* than the company's trading price on the real date the option was awarded.  This "backdating" gave executives instant paper profits (*i.e.*, options were "in the money" right away). ¶ 39.  In proxy statements seeking

shareholder approval of share issuances to be used to satisfy future executive option awards, companies did not tell shareholders the truth about how exercise prices were selected. Contrary to the proxies' representations, exercise prices were in fact *less* than closing stock market prices on the dates the options were truly granted and, therefore, executives did not need to work to increase the company's stock price above the exercise price; through backdating, it was already there. ¶ 40.

Backdating is not simply a dishonest way of cherry-picking favorable exercise prices to unjustly enrich executives. It also artificially lowers the company's expenses thereby artificially boosting income during the year in which backdating occurs. This is because the amount of the "instant paper gain" must be recognized as an expense on the company's books. More specifically, for financial statements prior to January 1, 2006, under APB No. 25, "Accounting for Stock Issued to Employees" ("APB No. 25"), a provision of Generally Accepted Accounting Principles ("GAAP"), if the market price of the company's stock on the date of grant was higher than the exercise price of the options (*i.e.*, the option was granted "in the money" instead of "at the money"), the difference must be recognized as an expense. Failure to do so means that a company (a) understated compensation expense in the period options were granted, (b) overstated net income for the fiscal year options were granted, and (c) overstated retained earnings for every accounting period following a backdated grant. In addition, under section 162(m) of the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"), backdating can result in loss of corporate tax deductions respecting remuneration paid to highly-compensated executives. ¶¶ 41-42.

Representations In Proxy Statements Concerning Apple's Stock Option Plans

The salient terms of Apple's stock option plans stated that prior to fiscal year 1998, the Company issued incentive stock options to employees at the fair market value of the Company's common stock on the trading day immediately preceding the date of grant. ¶¶ 77. And after fiscal year 1998, Apple issued incentive stock options to employees at the fair market value of the Company's common stock on the grant date. ¶77. Apple's disclosures to shareholders were consistent with these terms. Accordingly: (a) prior to fiscal year 1998, the Company's proxy statements stated that the exercise price of stock options granted to its employees was equal to the fair market value of the Company's common stock on the trading day immediately preceding the

date of grant; (b) after fiscal year 1998, the Company's proxy statements stated that the exercise price of stock options was equal to the fair market value of the Company's common stock on the grant date; (c) the Company's annual reports on Form 10-K for fiscal years 1996 through 2005 stated that (i) options may not be granted at less than fair market value on the date of grant, and (ii) the Company followed APB No. 25; and (d) the Company's proxy statements for fiscal years 1998 through 2002 and annual reports for fiscal years 1999 through 2001 stated that the Company intends that options be deductible under Section 162(m).  ¶¶ 78-82.

<u>Apple Admits To Backdating And Is Forced To Restate Its Financial Results</u>

Apple has now admitted that all the foregoing disclosures were materially false.  *See*  ¶¶ 102-107 (1996 Proxy); ¶¶ 108-115 (1997 Proxy); ¶¶ 116-124 (1998 Proxy); ¶¶ 125-133 (2000 Proxy); ¶¶ 134-144 (2001 Proxy); ¶¶ 145-155 (2002 Proxy); ¶¶ 156-167 (2003 Proxy); and ¶¶ 168-176 (2005 Proxy); ¶¶ 184-188 (1997 Annual Report); ¶¶ 189-196 (1998 Annual Report); ¶¶ 197-205 (1999 Annual Report); ¶¶ 206-215 (2000 Annual Report); ¶¶ 216-225 (2001 Annual Report); ¶¶ 226-234 (2002 Annual Report); ¶¶ 235-243 (2003 Annual Report); and ¶¶ 254-261 (2005 Annual Report); ¶¶ 262-264 (registration statements registering shares used to meet option exercises false because annual reports incorporated by reference).

More specifically, in its 2006 Annual Report, Apple made the following admissions:  (a) it intentionally backdated options (¶ 51); (b) the first instance of backdating occurred on December 29, 1997 and since then at least 6,428 instances of backdating occurred on forty-two separate occasions under defendants' watch (¶ 52); (c) the unlawful "instant paper profits" awarded to corporate employees required Apple to recognize stock-based compensation expense of $105 million and $84 million on pre-tax and after-tax bases, respectively, and necessitated a restatement of its financial results for fiscal years 2002 through 2005 (¶¶ 52-53); (d) while Apple initially disclosed that defendant Jobs was merely "aware" of backdating, Apple subsequently admitted that he actually *recommended* backdating options (¶ 54); (e) Apple's proxy statement dated March 21, 2002 falsely stated that Apple's board approved a massive stock option grant to Jobs at an October 2001 board meeting when in fact such a board meeting never took place and in reality the option grant was backdated (¶¶ 55-56); (f) Apple's former general counsel took part in a scheme to create

4

**Lead Plaintiff's Memorandum of Points and Authorities In Opposition to Defendants' Notice of Motion and Motion to Dismiss Consolidated Class Action Complaint (Case No.: C-06-05208-JF)**

a paper trail falsely documenting the occurrence of the meeting to hide the fact that the grant had been backdated (¶ 57); (g) Jobs received in excess of $20 million in "instant paper profits" from this one backdated grant alone (¶¶ 58-59); and (h) contrary to the disclosures in Apple's March 12, 2001 proxy statement, Jobs received an earlier, even larger stock option grant that was not "memorialized" until six days after it was supposedly granted during which six-day period Apple's stock price surged by almost 20% bestowing upon Jobs an "instant paper profit" in excess of $80 million.  ¶¶ 60-62.  Jobs subsequently cancelled these huge stock option grants in exchange for equally huge awards of restricted stock.  Because Jobs received backdated stock options, the amount of restricted stock he received in exchange for those options was artificially inflated.  One media report calculated that Jobs received 630,000 additional restricted shares as a result of exchanging the options he received from the second backdated grant.  ¶¶63-67.  The above-identified proxies also materially understated the compensation of proxy-named executives other than Jobs in violation of SEC regulations, and misleadingly stated that employee and shareholder interests were aligned when, in reality, backdating skewed them.  ¶¶102-176.

Although Apple has not come clean and identified which of Apple's other high-ranking executives received the remaining 6,426 backdated options, statistical analysis reveals that Anderson and numerous other Apple officers were the "lucky" recipients of backdated options totaling more than 100 million Apple shares.  ¶¶83-88.

In announcing its restatement, Apple admitted that backdating had occurred, but claimed – disingenuously – that its board never appreciated the accounting implications of its wrongful conduct.  But Jobs, Apple's celebrity CEO, *specifically instructed* that certain grants be backdated (¶¶47, 51, 54, 55-66, 84-86), and Anderson, Apple's former CFO, who not only had knowledge of and received backdated options (¶¶16, 47, 84-86), specifically informed Jobs that the Company would have to account for this extra compensation if option grants to executives were in fact backdated, yet Jobs and the Company deliberately disregarded Anderson's instructions in this regard.  *See* ¶64.[1]

---

[1]     Although Apple claimed that its supposedly independent internal investigation revealed that defendant Jobs failed to "appreciate the accounting implications" of backdating, defendant Anderson recently released a statement to the contrary.  In settling an SEC enforcement action,

The Injury To Apple's Shareholders And Relief Sought

Plaintiffs bring class claims for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 and state law claims for breach of the fiduciary duty of disclosure.  Counts I-III.  Via its  proxy statements filed from 1996 through 2005, inclusive, Apple sought and obtained shareholder authorization for the issuance of 205,520,000 (split-adjusted) Apple shares for issuance in connection with the Company's stock option and other executive compensation plans.  ¶¶97-101.  As a direct result of the false and misleading statements contained in Apple's proxy statements, however, Apple's public shareholders were deprived of the opportunity to cast fully informed votes on these compensation-related proposals.  Defendants' violations of the shareholders' voting rights resulted in two distinct injuries.  First, the issuance of these 205 million shares – more than 20% of the Company's outstanding stock – effects a transfer of voting power from Apple's public shareholders, to the Company's executives and employees.  ¶¶83-88.  Second, Plaintiffs' shareholdings have been diluted by the issuance of these improperly authorized shares resulting in direct economic injury in that they own 20% less of the Company than they would have had Apple not obtained approval of the dilutive stock plans through false and misleading proxy statements.  ¶¶2, 38, 69, 73, 276-77, 286, 309.  Plaintiffs seek rescission and damages to remedy this dilution.  ¶¶71-74.  No relief is sought on behalf of the Company.

## ARGUMENT

## I.   ALL APPLICABLE PLEADING REQUIREMENTS ARE SATISFIED

### A.   THE PROPER STANDARD ON THIS MOTION TO DISMISS

Rule 8(a) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"

Anderson, through his attorney, stated that in connection with the large, January 2001 backdated stock option award to a team of high-ranking Apple executives "he told Mr. Jobs the company might have to take a charge against earnings if it backdated stock-options grants."  Specifically, "[t]he former Apple executive said he warned Mr. Jobs in late January 2001 -- while Apple was in the process of backdating a grant -- that the company might have to take an accounting charge if Apple didn't price stock options to its executive team based on the date the board approved the grant."  Nick Wingfield and Steve Stecklow, *Ex-Finance Chief Says Jobs Misled Him on Options*, THE WALL STREET JOURNAL, April 25, 2007, at A-1 ("Wingfield and Stecklow").

1     *Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (Jun. 7, 2007) (quoting *Bell Atlantic Corp. v. Twombly*,

2     127 S. Ct. 1955 (2007)).  All allegations are taken as true and construed in plaintiffs' favor. *Cahill*

3     *v. Liberty Mut. Ins. Co.,* 80 F.3d 336, 337 (9th Cir.1996).

4
    **B.    RULE 9(b) DOES NOT APPLY TO THE SECTION 14(a) CLAIM OR STATE BREACH OF**
5              **DUTY OF DISCLOSURE CLAIMS**

6         Rule 9(b) states:  "In all averments of *fraud*…, the circumstances constituting *fraud*…shall

7     be stated with particularity."  Fed. R. Civ. P. 9(b) (emphasis added).  Defendants assert that

8     Plaintiffs' claims "sound in fraud" and, thus, must be pleaded with particularity under Rule 9(b).

9     Defs. Br. at pp. 2 (erroneously asserting Plaintiffs allege "deceit"), 20-21.  This is simply wrong.

10        Defendants do not dispute – because they cannot – that Section 14(a) claims may be based

11     on negligence for which no proof of scienter is required.  *E.g.*, *Knollenberg v. Harmonic, Inc.*, 152

12     Fed. Appx. 674, 682-83 (9th Cir. 2005) ("[N]egligence is sufficient to support a claim for a

13     violation of Section 14(a)….").  As was made plain up-front, in the third paragraph of (and

14     otherwise throughout) the Complaint, Plaintiffs' claims are based on negligence, not fraud.  ¶3

15     (Plaintiffs' "claims do not require proof of scienter."); ¶283 ("At the time the foregoing false and

16     misleading statements were made, the Section 14(a) Defendants negligently failed to ascertain

17     their falsity."); ¶289 (same).  Because Plaintiffs' claims are based on negligence and do not sound

18     in fraud, Rule 9(b), by its own terms, cannot possibly apply.  *In re Cendant Corp. Litig.*, 60 F.

19     Supp. 2d 354, 378 (D.N.J. 1999) ("[A] § 14(a) claim requires only a showing of negligence, not

20     fraud.  Because plaintiffs have alleged that defendants acted negligently, they need not plead fraud

21     at all, let alone fraud with particularity.").  Consequently, Plaintiffs need only comply with Rule

22     8(a)'s simple notice requirement and the pleading requirements in the Reform Act.  As

23     demonstrated below, Plaintiffs have easily done so.[2]

24
25       [2]     Defendants also assert that Rule 9(b) applies because the Complaint alleges wrongful
and/or intentional concealment.  Defs. Br. at p. 21.  Defendants misapprehend Plaintiffs'
allegations; concealment can be wrongful without being fraudulent.  To be sure, certain
26     defendants and others acted intentionally in backdating options; indeed, Apple has admitted as
much.  *See*, *e.g.*, ¶51.  Plaintiffs do not, however, allege that defendants acted intentionally in
27     misrepresenting facts in proxies, nor were Plaintiffs required to.  But, even if Rule 9(b) does
apply, the Complaint easily satisfies its "who, what, where, when and how" requirement. *Vess v.*
28     *Ciba-Giegy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).

C.    THE REFORM ACT'S APPLICABLE PLEADING REQUIREMENTS ARE SATISFIED

Defendants claim that the Complaint fails to comply with the Reform Act's:  (1) "state of mind" pleading section which requires a "strong inference of negligence"; and (2) requirement that the Complaint identify the particular misleading statements at issue and the reasons why they are misleading.  (*See* Defs. Br. at pp. 20-21).  Both contentions are without merit.

### 1.    The Complaint Alleges A Strong Inference Of Negligence

Defendants assert Plaintiffs have failed to plead a strong inference of negligence because: (i) "[t]here are no facts showing that any defendant knew of, or had any reason to know of, any problems with the accounting for stock options at the time any of the challenged statements were made"; (ii) the Complaint's allegations "do not show that any defendant had any reason to suspect that option improprieties existed at all…"; and (iii) the Complaint "lacks facts showing why any defendant knew or should have known of any problems with the challenged statements…." Defs. Br. at pp. 21-22.  These assertions simply ignore the plain allegations of the Complaint which make abundantly clear that given their roles and fiduciary obligations with respect to administering Apple's stock option plans (¶¶8-26), all defendants either knew or should have known that backdating:  was taking place (¶¶64-65, 97-98, 289), was contrary to the shareholder-approved terms of the stock option plans (¶¶75-82), had adverse accounting and tax consequences (¶¶52-53), had the effect of overstating Apple's revenues and understating its tax liabilities and rendered false Apple's disclosures in its proxy statements (and in annual reports and registration statements shareholders also reviewed).  ¶¶102-264.

Indeed, the arguments advanced by defendants already have been rejected by this Court in *In re Zoran Corp. Deriv. Litig.*, 2007 WL 1650948 (N.D. Cal. June 5, 2007) (Alsup, J.).  In *Zoran*, the plaintiff alleged that proxy statements "issued between 1997 and 2005 contained material misstatements and omissions by misrepresenting option grant dates, stating that the board was complying with the stock option plans, and misstating compensation expenses and financial results."  *Id.* at *22.  In *Zoran*, where there were only seventeen allegedly backdated grants in contrast to the 6,428 admitted instances here (*id.* at *11), this Court succinctly rejected the very same arguments defendants in this case present here:

Defendants argue that plaintiff has not met this element [*i.e.*, pleading a "strong inference of negligence"], and, instead, that plaintiff has merely recited boilerplate allegations that the compensation committee and audit committee defendants knew or should have known about the misstatement and omissions.

*This argument ignores that these defendants had duties with respect to the grant of stock options and accounting practices within the company. The compensation committee was given authority under the stock-option plans to administer the plans and to ensure compliance with them. Specifically, they bore ultimate responsibility for ensuring that stock options were granted at fair market value on the date of the grant as well as deciding the grant dates for the options.* Elsewhere in the complaint, plaintiff has pled that this was not the case at [the company]. Even if somehow these pled facts could lead to the inference that the compensation committee did not know that backdating was occurring, *they certainly lead to the inference that the compensation committee neglected its duty and was thus negligent.*

This argument applies with equal force to the audit committee defendants. They were charged with ensuring compliance with accounting standards and making certain that [the company's] financial statements and proxy statements were correct and accurate. *Even if they did not know backdating was occurring, under these pleaded facts, they have still shirked their duties.* Thus, plaintiff has successfully pled this element of his claim.

*Id.* at * 23 (emphasis added).  In this case, at varying points of time, each of the director and/or former director-defendants were:  (a) members of Apple's Stock Option Committee and/or Compensation Committee and, thus, had responsibilities for administering the Company's stock option plans (¶¶8-26); (b) members of the Company's full board of directors, which during the period of time from April 2000 to August 2001, had responsibility for administering the plans (¶8); (c) members of the Company's full board of directors, which always had responsibility for options awarded to Apple's CEO (¶8); and/or members of Apple's Audit Committee, which had responsibility for evaluating the Company's accounting policies and system of internal controls, including internals controls respecting stock options and the proper accounting treatment thereof. ¶9.

But Plaintiffs' allegations go well beyond mere negligence.  For their part, Jobs and Anderson, as CEO and former CFO, respectively, had *actual knowledge* of backdating practices; indeed, Jobs not only received backdated options, but actually recommended they be backdated (¶¶47, 51, 54, 55-66, 84-86) and Andersen not only had knowledge of and received backdated options (¶¶16, 47, 84-86), but also explained to Jobs the adverse accounting consequences that backdating would cause if Apple's backdating were ever revealed, as it now has been. *See* ¶64.

As it did in *Zoran*, therefore, this Court should hold that the "state of mind" pleading requirement is satisfied.

### 2. The Reform Act's Specificity Requirement Is Satisfied

The Reform Act also states that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Plaintiffs have meticulously adhered to this pleading requirement, and defendants do not seriously contend otherwise. With respect to each challenged proxy statement, the Complaint: (1) identifies the date of the relevant proxy statement, the date of the corresponding annual meeting and the applicable record date; (2) states which of the director-defendants were directors at this time so that defendants would be on notice as to which claims are asserted against which directors;[3] (3) identifies the relevant action sought at the shareholder meeting; (4) identifies the particular misstatements in and/or omissions from the proxy statements; (5) states the reasons why widespread backdating at Apple spanning a decade rendered the identified statements false or misleading; and (6) to the extent allegations were made on information and belief, cites the basis for the allegations, including admissions of backdating, restated financial statements and other admissions contained in Apple's own SEC filings. *Supra* at p. 4 (identifying paragraphs relevant to each proxy). This detailed pleading easily satisfies the Reform Act's specificity requirements.

---

[3] Defendants claim to be confused as to which allegations are asserted against which individual defendants. (Defs. Br. at p. 22 ("The Complaint's critical lack of specificity is highlighted by its failure to limit its accusations against anyone to the period in which he or she was actually at Apple."). Once again, defendants are wrong. *See* ¶¶98, 296 (noting that false and misleading proxy violations are asserted with respect to those disclosures made "at a time when such defendant was a director of the Company."); ¶¶10-25 (setting forth dates on which each defendant was director and/or officer); ¶ 102 (setting forth which defendants were directors at time of 1996 Proxy); ¶108 (same for 1997 Proxy); ¶116 (same for 1998 Proxy); ¶125 (same for 2000 Proxy); ¶134 (same for 2001 Proxy); ¶145 (same for 2002 Proxy); ¶156 (same for 2003 Proxy); and ¶168 (same for 2005 Proxy); ¶179 (identifying directors who signed false and misleading 1996 Annual Report); ¶184 (same for 1997 Annual Report); ¶189 (same for 1998 Annual Report); ¶197 (same for 1999 Annual Report); ¶206 (same for 2000 Annual Report); ¶216 (same for 2001 Annual Report); ¶226 (same for 2002 Annual Report); ¶235 (same for 2003 Annual Report); ¶244 (same for 2004 Annual Report); ¶254 (same for 2005 Annual Report); and ¶264 (citing which directors signed false registration statements). Also, the Reform Act contains no requirement to plead "highly specific facts showing falsity" nor do defendants cite any case purporting to impose such a requirement. Defs. Br. at p. 20.

## II. PLAINTIFFS HAVE ADEQUATELY PLED CAUSATION

### A. TRANSACTION CAUSATION IS ESTABLISHED BECAUSE DEFENDANTS DO NOT CONTEST (NOR CAN THEY) THE MATERIALITY OF THE ALLEGED MISREPRESENTATIONS

Defendants erroneously assert that the Complaint fails to allege transaction (*i.e.*, but for) causation. Defs. Br. at pp. 7 n.1, 8. Where, as here, materiality has been properly alleged (indeed, defendants do not even attempt to contest materiality), transaction causation is established. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 385 (1970) ("Where there has been a finding of materiality, a shareholder has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if, as here, he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."); ¶286 (alleging proxy solicitations were essential links in obtaining shareholder authorization for shares used with executive compensation matters).[4]

### B. PLAINTIFFS HAVE ADEQUATELY PLED LOSS CAUSATION

#### 1. Plaintiffs Need Only Provide A Short And Plain Statement Of Loss Causation In Conformance With FRCP 8(a) And Have Done So

Defendants claim that the Reform Act's loss causation provision and the Supreme Court's decision in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005) impose upon a plaintiff "a heavy burden to show that it was damaged." Defs. Br. at p. 7. This too is wrong. *Dura* says just the opposite – that the Reform Act's loss causation provision requires only a short and plain statement setting forth how defendants' conduct caused plaintiffs' loss. *Dura*, 544 U.S. at 346 ("[N]either the [Federal Rules of Civil Procedure] nor the securities statutes impose any

---

[4] *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (misrepresentation material if important in deciding how to vote); *In re Zoran*, 2007 WL 1650948, at *22 ("A reasonable shareholder would certainly want to know that the board was feathering the nests of insiders via backdated options to the detriment of stockholders at large."). Instead of attempting to contest materiality, defendants assert the ridiculous argument that because shareholders approved shares for options in 2007, they would have approved them in 1996 to 2005, even if they had known of the illegal backdating. *See* Defs. Br. at pp. 1, 17-18. Such speculation is absurd on its face because, among other things, there is simply no comparison between a 2007 vote held after an illegal scheme was exposed and abandoned, and the earlier votes when, under defendants' fantasy scenario, defendants would have had to disclose each year that serious accounting, fiduciary and other improprieties were ongoing and would continue. And in any event, through its whitewashed "internal investigation," Apple still has failed to make full disclosures regarding the backdating scheme.

11

**Lead Plaintiff's Memorandum of Points and Authorities In Opposition to Defendants' Notice of Motion and Motion to Dismiss Consolidated Class Action Complaint (Case No.: C-06-05208-JF)**

1   special further requirement in respect to the pleading of proximate causation or economic loss.").

2   Thus, the only requirement in pleading loss causation is "to provide a defendant with some

3   indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347; *see*

4   *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Systems, Inc.*, 411 F. Supp.2d 1172, 1176

5   (N.D. Cal. 2005) (*Dura* requires only Rule 8(a) notice pleading for loss causation).  Plaintiffs have

6   provided much more than that here.[5]  *See*  ¶¶2, 38, 69, 73, 276-77, 286, 309 (detailing Plaintiffs'

7   dilution claims).

8              **2.        Plaintiffs Adequately Allege Economic Loss**

9          The Complaint alleges that the issuance of more than 200 million shares as a result of the

10  false and misleading proxy solicitations – amounting to more than 20% of the Company's

11  outstanding stock – results in dilution to Plaintiffs' economic interests in their shareholdings and

12  effects a transfer of the same percentage of voting power and wealth from Apple's public

13  shareholders to the Company's insiders.  *See* ¶¶2, 38, 69, 73, 276-77, 286, 309.  Defendants assert

14  that Plaintiffs can only use dilution to show economic loss "if [they] can show that this dilution

15  came without *any* corresponding economic benefit" and that "alternate forms of compensation

16  (*e.g.*, cash) would not have depleted Apple's value *to a greater degree* than did" employee options

17

18  _____
    [5]      Defendants' assertion that the "Complaint's state law claims require a *showing* that the
19  alleged wrongdoing caused the harm at issue" is also without merit.  Defs. Br. at p. 7 (emphasis
    added).  Even if the Reform Act's loss causation provision and/or *Dura* required the burdensome
20  showing for which defendants clamor, this has no bearing on Plaintiffs' state law claims because,
    on its face, the loss causation provision of the Reform Act applies only to Plaintiffs' Section
21  14(a) claim and not to its state law claims.  *See* 15 U.S.C. § 78u-4(b)(4) (provision applies only
    to acts or omissions alleged to "violate this chapter.").  Defendants' reliance on *Hartman v.
22  Pathmark Stores, Inc.*, 2006 WL 571852 (D. Del. Mar. 8, 2006), is also misplaced.  Unlike here,
    where the Complaint details Plaintiffs' theory of dilution and, thus, provides defendants' with
23  more than adequate notice of the relevant loss and causal relationship between it and the
    misrepresentation, in *Hartman* the plaintiffs alleged *only* the following sentence:  "Plaintiff and
24  the Class have sustained damages by reason of Defendants' misrepresentations and omissions in
    connection with the…Transaction."  *Id.* at *2.  Defendants also erroneously claim that Plaintiffs
25  must show "a causal connection between [the loss for which plaintiffs seek to recover damage]
    and the alleged deceit."  (Defs. Br. at p. 2)  This is wrong.  Plaintiffs' Section 14(a) claim
26  requires no proof of deceit.  *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp.2d 1248, 1264
    (N.D. Cal. 2000) ("The court accordingly holds that all persons liable under Section 14 should be
27  held to the same standard of culpability: negligence.").  Nonetheless, Plaintiff has clearly
    demonstrated deception.  *See* ¶64 ("Jobs and his fellow directors knew, as any reasonable person
28  would, that backdating options awards to executives and not telling shareholders the truth about
    it was cheating."); *see also* Wingfield and Stecklow, *supra* at n.1.

12

**Lead Plaintiff's Memorandum of Points and Authorities In Opposition to Defendants' Notice of Motion and
Motion to Dismiss Consolidated Class Action Complaint (Case No.: C-06-05208-JF)**

1   exercises for which shares were authorized through false and misleading proxies.  Defs. Br. at pp.

2   9-10 (emphasis added).  This argument makes no sense and has no basis in fact or law.

3          First, Plaintiffs do not need to "show" anything on this motion to dismiss.  *Leowardy v.*

4   *Oakley, Inc.*, 2007 WL 1113984 (C.D. Cal., Apr. 10, 2007) ("The issue on a motion to dismiss for

5   failure to state a claim is not whether the claimant will ultimately prevail but whether the claimant

6   is entitled to offer evidence to support the claims asserted.")(citing *Gilligan v. Jamco Development*

7   *Corp.*, 108 F.3d 1370, 1374 (9th Cir.1997)).  Defendants' reliance on cases where discovery was

8   fully complete for the proposition that Plaintiffs must through their pleading disprove all possible

9   countervailing beneficial effects, if any, of the share authorizations is without merit.  *See* Defs. Br.

10  at p. 9.  Plaintiffs' only obligation is to provide a short and plain statement of the loss they suffered

11  so defendants can answer the allegation.  *Supra* at p. 6.  Plaintiffs have done so.  Plaintiffs allege

12  that if shareholders had known the truth about backdating, they never would have voted in favor of

13  increasing the number of shares used with stock option and other executive compensation plans

14  while the illicit practice continued in violation of the terms of shareholder-approved stock option

15  plans.  *Supra* at 6.  The consequence of defendants' breaches of their duty of disclosure and

16  dissemination of false and misleading proxies was dilution to Plaintiffs' voting and economic

17  interests, while corporate employees' percentages increased.  Defendants' argument that that the

18  Complaint "does not allege that the alleged misstatements had anything to do with the amount of

19  shares issued" or "suggest that the alleged 'dilution' exceeded the amount shareholders approved"

20  (Defs. Br. at p. 6) completely misses the point.[6]     Had shareholders known the truth, no

21  authorization of shares would have been approved unless and until the backdating stopped.  The

22

---

23  [6]     The fact that the proxy statements may have disclosed the potential dilution that would
    follow approval of the relevant plans (Defs. Br. at p. 2) is also irrelevant.  As alleged in the
24  Complaint, the Apple's shareholders would not have voted to approve compensation plans
    recommended by Apple's board, if they knew the board was *lying to them* about the true
25  compensation practices at the Company.  Shareholders were never told that whatever benefit, if
    any, the Company's stock option plans may confer on the corporation could have been (and, if
26  backdating had not taken place, would have been) achieved with less dilution to non-employee
    shareholder (*i.e.*, Plaintiffs') interests.  For example, just one of Steve Jobs' backdated grants
27  caused shareholders to suffer dilution through the issuance of at least an additional 630,000
    shares of restricted stock that would not have been necessary had the options Jobs surrendered in
28  exchange for restricted shares been priced lawfully.  *See*  ¶¶65-66.

1  Defendants fraudulently transferred ownership of over 20% of Apple – worth tens of billions of

2  dollars – through their misrepresentations.    Any "benefit" they provided is irrelevant

3  unprecedented transfer of wealth and voting power.  But if it were relevant, it would be a factual

4  matter, inappropriate for consideration at this time.    *See*, *e.g.*, *Barsch v. O'Toole*, 2007 WL

5  1795750, at *1 n.1 (N.D. Cal. June 21, 2007) ("[T]o the extent the parties dispute the facts, the

6  Court may not resolve these disputes on a motion to dismiss and must instead assume the truth of

7  plaintiff's allegations.").

8       Moreover, defendants' entire economic loss argument is misplaced because they have

9  *conceded* the materiality of the misstatements and omissions in the relevant proxies by restating

10  their financial statements. *In re FirstEnergy Sec. Litig.*, 316 F. Supp. 2d 581, 594 (N.D. Ohio

11  2004) ("[T]he purpose of a restatement is to correct an error in a previously-issued financial

12  statement. By definition then, a restatement says that the prior financial statement was false."); *see*

13  *also In The Matter of Huntington Bancshares, Inc*, 85 S.E.C. Docket 1433, 2005 WL 1307747, at

14  *10 ("Huntington's restatements are admissions of material error in violation of GAAP, which

15  requires restatement only for material misstatements.").  Plaintiffs suffered economic loss by virtue

16  of the fact that in excess of 200 million additional shares have now been approved for issuance to

17  employees.  By conceding that the alleged misstatements were material, Defendants also implicitly

18  admit that the plans would *not* have been approved – and thus the additional shares never approved

19  either – had the backdating scheme been disclosed.

20  **III.    PLAINTIFFS STATE A DIRECT CLAIM**

21       Defendants' argument that Plaintiffs' claims are derivative because dilution is an injury to

22  the corporation, not the shareholders (*see* Defs. Br. at pp. 12-17), is without merit.  In *Yamamoto v.*

23  *Omiya,* 564 F.2d 1319, 1326 (9th Cir. 1977), the Court of Appeals for the Ninth Circuit held that

24  "a shareholder who alleges a deceptive or misleading proxy solicitation is entitled to bring both

25  direct and derivative suits.  The former action protects the shareholders' interest in 'fair corporate

26  suffrage.'"    The Ninth Circuit's decision in this regard is consistent with the underlying

27  recognition that false and misleading proxy statements deprive shareholders of their right to cast a

28  fully informed vote, and that Section 14(a) of the Exchange Act provides shareholders with a

direct private right of action where their rights in this regard have been violated.  *See also J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964) ("[W]e believe that a right of action [under Section 14(a)] exists as to both derivative and direct causes"), *abrogated on other grounds as recognized in Alexander v. Sandoval*, 532 U.S. 275, 287 (2001); *Gentile v. Rossette,* 906 A.2d 91, 100 & n.19 (Del. 2006) (voting claim can give rise to both direct and directive claims); *Katz v. Pels,* 774 F. Supp. 121, 127 (S.D.N.Y. 1991) ("[A] misrepresentation claim regarding a proxy statement may be deemed both direct and derivative….").

The test for whether a claim is derivative or direct "must be based solely on the following questions:  Who suffered the alleged harm – the corporation or the suing stockholder individually – and who would receive the benefit of the recovery or other remedy?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004).[7]  In making this determination, the court "look[s] at the body of the complaint and consider[s] the nature of the wrong alleged and the relief requested" and asks "has the plaintiff demonstrated that he or she can prevail without showing an injury to the corporation?" *Id.* at 1036.  Here, shareholders suffered injury that had no effect on Apple and only they will benefit from the relief sought.

The answer to the first question – "who suffered the alleged harm" – is self evident:  the shareholders.  The specific harm alleged is deprivation of the shareholders' abilities to cast fully informed votes through the relevant proxy statements.  Apple's public shareholders were deprived of their right to cast a fully informed vote on management's proposals seeking authorization for issuance of millions of additional shares to corporate employees.  The *only* group that suffered harm from the defendants' disclosure violations are the shareholders – not the corporation.  *Oliver v. Boston Univ.,* No. 16570, 2000 WL 1091480, at *6 (Del. Ch. July 25, 2000) ("[A] claim of stockholder dilution and a corresponding reduction in a stockholder's voting power is an individual claim."); *Thorpe v. CERBCO, Inc.,* 1993 WL 35967, at *2 (Del. Ch. Jan. 26, 1993) ("The right to vote stock is the individual right of the legal owner of stock.  When the board of directors

---

[7]      California law applies to the state law claims because Apple is a California corporation (¶7); however, since Delaware and California do not differ concerning whether such claims are derivative or direct, citation to either state's precedent is appropriate. *See Schuster v. Gardner*, 127 Cal. App. 4th 305, 309, 312 (Cal. Ct. App. 4th Dist. 2005).

1   wrongfully interferes with or wrongfully impairs that right it violates individual rights of

2   stockholders . . . .   The wrong is one suffered by all those who vote, but it is not a derivative wrong

3   for that reason, but a direct one.") (citations omitted)

4       As to the remedy sought, Plaintiffs do *not* seek the repayment *to the corporation* of *any*

5   shares that may have been granted under the plans that were approved based on false and

6   misleading proxies.  Rather, Plaintiffs seek to rescind their votes – and thus the cancellation of

7   improperly authorized shares, and an award of monetary damages against each of the Defendants

8   for the damages Plaintiffs have suffered as a result of the dilution of their shareholdings by the

9   issuance of improperly authorized stock.  Under *Tooley*, these claims are unquestionably *direct*.

10      *Tooley's* second prong is satisfied because only Plaintiffs, not Apple, will benefit from  the

11  relief sought:  (a) rescission of the amendments to the Company's executive compensation plans

12  that increased managements' share of voting power and economic interest to the detriment of

13  Plaintiffs; and (b) money damages for improper dilution of Plaintiffs' economic interests and

14  voting rights.  *See supra* at p. 6.  Indeed, no repayment to the corporation of any shares granted

15  pursuant to misleading proxies is sought.[8]  Contrary to defendants' assertion (Defs. Br. at p. 15),

16  this relief will most certainly change the relative percentage of ownership as between corporate

17  insiders and employees on the one hand and innocent shareholders (*i.e.*, Plaintiffs) on the other.

18      Numerous cases make clear that a complaint states a direct claim when it alleges

19  interference with shareholder voting rights resulting in dilution to economic and voting interests.

20  In *In re Tri-Star Pictures, Inc. Litig.,* 634 A.2d 319, 331-32 (Del. 1993), the plaintiffs alleged, as

21  Plaintiffs do here, that a false and misleading proxy solicitation resulted in a "loss manifested by

22

23  [8]     Defendants' claim that the pendency of a derivative suit in this Court "demonstrates that
    the purported class members have no claims" is also without merit.  Defs. Br. at p. 16.  Plaintiffs
24  here do not seek to have defendants pay back to the Company the difference between the lower
    backdated exercise price and the higher exercise price that should have been assigned to the
25  option if had not been unlawfully backdated (*i.e.*, the amount of improper "instant paper profit").
    Thus, under *In re J.P. Morgan Chase & Co. Shareholder Litigation*, 906 A.2d 766 (Del. 2006)
26  on which defendants rely (Defs. Br. at pp. 16-17), there is no risk of double recovery.
    Defendants' additional argument that an accounting would only benefit Apple thereby
27  demonstrating that the claims are derivative,  Defs. Br. at p. 15, also falls flat because the remedy
    is sought to discover the full extent of backdating so that the amount of dilution can be
28  ascertained.  ¶¶74, 310(g))

**Lead Plaintiff's Memorandum of Points and Authorities In Opposition to Defendants' Notice of Motion and
Motion to Dismiss Consolidated Class Action Complaint (Case No.: C-06-05208-JF)**

both cash-value and voting power dilution." *Id.* at 330.  The court stated that "[a]lthough it is true that claims of waste are derivative, a claim of stock dilution and a corresponding reduction in a stockholder's voting power is an individual claim." *Id.* at 330.  Similar to *Tri-Star*, the practical effect of the dilution here is to increase share value and voting power of insiders/employees' by more than an aggregate 20% while correspondingly reducing the share value and voting power of Apple's public shareholders by the same amount.

Similarly, in *Rossette,* shareholder approval to authorize and subsequently issue excessive shares in exchange for assets of unequal value was obtained pursuant to a vote tainted by breach of the fiduciary duty of disclosure.  As here, this had the effect of increasing the wrongdoer's ownership percentage with a corresponding reduction in public shareholders' ownership.  The court held that such claims can be derivative or direct because, in addition to any harm to the corporation from the "over issuance" of shares:

> A separate harm also results:  an extraction from the public shareholders, and a redistribution to the controlling shareholder, of a portion of the economic value and voting power embodied in the minority interest.  As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited.  In such circumstances, the public shareholders are entitled to recover the value represented by that overpayment…directly and without regard to any claim the corporation may have.

906 A.2d at 100.  This is also the case here.  Apple's management extracted from Plaintiffs and redistributed to itself and Apple employees more than 20% of the aggregate ownership and voting power of the Company.  Such a claim is unquestionably direct.

The fact that the transfer to this 20% interest was made not to a single controlling shareholder, but to corporate employees and insiders, is inapposite and does not transform Plaintiffs' claims to derivative in nature.  In *Gatz v. Ponsoldt,* 2007 WL 1120338 (Del. Apr. 16, 2007), for example, the court held that shareholders had *direct* claims when their voting interests were diluted when the company's board issued new shares to a third party who previously did not own a stake in the corporation.  *Id.* at *13.  The crucial inquiry, the court observed, was whether "the fiduciary exercises its stock control to expropriate, for its benefit, economic value and voting power from the public shareholders."  *Id.*  This is precisely what happened here.  Defendants used their fiduciary positions on Apple's Board of Directors to expropriate, for their benefit and the

17

benefit of other corporate insiders, economic and voting control from Apple's public shareholders by extracting shareholder approval for the issuance of some 20% of the Company's stock to Apple employees by lying to Apple's public shareholders about the Company's compensation practices. *See also Oliver v. Boston Univ.,* 2000 WL 1091480, at *6 (Del. Ch. July 25, 2000) ("[A] claim of stock dilution and a corresponding reduction in a stockholder's voting power is an individual claim.").

And in *Katz*, similar to the instant case, shareholders approved amendments to the "change of control" provisions of a company's stock option plan pursuant to a proxy statement disseminated by management that conveyed the misleading "impression…that the Amendments were designed to achieve parity between optionholders [*i.e.*, management] and stockholders." 774 F. Supp. at 126. Prior to the amendments, "the fortunes of the corporate insiders were tied directly to the fortunes of the public shareholders" and "even in a change of control, the benefits to be enjoyed by insiders were on a par with the benefits realizable by public shareholders." *Id.* at 124-25. The proxy statement failed to inform shareholders that the amendments to the stock option plans would skew the existing alignment of interests of management and shareholders. This was because whereas shareholders received $154 for every two shares they tendered in a change of control transaction, as a result of the amendments, insiders would realize $154 for every *one* share they sold via option exercises. *Id.* at 125. In finding such voting claims were direct, the court noted: (i) "if the proxy materials were forthright and open, non-option holding shareholders would not have bound themselves to an amendment which potentially doubles the optionholder's ability to realize a gain," and (ii) "had the apparent disparity [between management and shareholder interests] been properly disclosed in the Proxy statements, the Amendments would likewise not have prompted such an overwhelmingly positive response by the shareholders at [the] meeting." *Id.* at 126. Similar to *Katz*, had Apple shareholders known backdating was continuing to place management's interests ahead of – instead of in line with – those of public shareholders, they would not have voted for the challenged amendments to Apple's executive compensation plans. *Katz* leaves no question that Plaintiffs' voting claims are direct. *See also Gatz,* 2007 WL 1120338, at *13 (Del. Apr. 16, 2007) (plaintiffs stated direct claim where they alleged that "fiduciary

18

1    exercise[d] its stock control to expropriate, for its benefit, economic value and voting power from

2    the public shareholders").

3         *Schuster*, on which defendants heavily rely (*see* Defs. Br. at pp. 12-17), is inapposite.

4    There, new shares of stock were authorized and allegedly used to finance an ill-conceived

5    acquisition spree that led to the bankruptcy of the issuer. *Schuster*, 127 Cal. App. 4th at 309-10.

6    But, *Schuster* never addressed whether voting rights were violated through breach of the duty of

7    disclosure because plaintiff abandoned the claim. *See id.* at 318 & n.1. In addition, defendants'

8    assertion that all shareholders have suffered an equal devaluation is wrong, (s*ee* Defs. Br. at p. 13),

9    because rescission will negatively effect only corporate insiders and employees who were not

10   entitled to backdated options in the first place, not innocent shareholders.

11   ## IV.    THE REFORM ACT'S "LOOK BACK" PROVISION DOES NOT APPLY TO
12             PLAINTIFFS' SECTION 14(a) CLAIM

13        Defendants' argument that the Reform Act's look-back provision, 15 U.S.C. § 78u-4(e)(1),

14   applies to the Section 14(a) claim is wrong because under the statute's plain language, the look-

15   back provision cannot possibly apply. *See* Defs. Br. at pp. 11-12. The look-back provision states:

16        [I]n any private action arising under this chapter in which the plaintiff seeks to
17        establish damages *by reference to* the market price of a security, the award of
     damages to the plaintiff shall not exceed the difference between the purchase or sale
18        price paid or received, as appropriate, by the plaintiff for the subject security and
     the mean trading price of that security during the 90-day period beginning on the
19        date on which the information correcting the misstatement or omission that is the
     basis for the action is disseminated to the market.

20   15 U.S.C. § 78u-4(e)(1) (emphasis added).[9] Unlike the typical section 10(b) securities fraud case,

21   Plaintiff here does not seek to establish damages "by reference to" Apple's market price.

22   Reference to market price is wholly unnecessary. Apple's shareholders were damaged because

23   _____

[9]    The legislative history of the Reform Act also makes clear that Congress was addressing
24   the method of calculating damages in securities *fraud* cases. *See* H.R. Conf. Rep. 104-369,
reprinted in 1995 U.S.C.C.A.N. 730, 741 (referring to "the current method of calculating
25   damages in 1934 Act securities fraud cases" and making other references to "fraud"); S. Rep.
104-98, reprinted in 1995 U.S.C.C.A.N. 679, 698, 707 (same). Simply stated, Section 14(a)
26   claims are not fraud claims because, as legislators are presumed to have known when they
enacted the Reform Act, legions of cases state that the standard for liability under Section 14(a)
27   is negligence, not fraud. *See Cannon v. University of Chicago*, 441 U.S. 677, 696-697 (1979)
("It is always appropriate to assume that our elected representatives, like other citizens, know the
28   law…."); *supra* at p. 7 (negligence liability standard for 14(a) claims).

defendants interfered with their right to a fully informed vote and their voting and economic interests were diluted.  Neither of these forms of damage necessitates "reference to" Apple's market price.  To the contrary, dilution begins at the moment the shares are authorized regardless of whether Apple's share price falls in response to a corrective disclosure or, indeed, whether there was a corrective disclosure at all.  The damage is crystallized at the time the improperly authorized shares are issued by the Company to satisfy the option award.  That is when Plaintiffs' share of votes and assets at Apple was improperly reduced relative to that of insiders and employees.  Thus, Plaintiffs' damages began at the time of the vote on the 1996 Proxy and continued up to 2005, long before the "corrective" disclosure Apple issued years later in December 2006.

Dilution will be proved "by reference" not to market price but rather by reference to the mathematical relationship between the number of shares that were authorized pursuant to the false and misleading proxies, the total number of shares held by insiders/employees at the relevant time and the total number of authorized Apple shares overall.  The percentage by which innocent shareholders' ownership interests were reduced relative to the overall share ownership of insiders and employees is the measure of damage for purposes of Plaintiff's Section 14(a) claim.  Market price simply does not factor into the equation and reference to it would make no sense.[10]

---

[10]     Not surprisingly, therefore, there is no reported case applying the look-back provision to a Section 14(a) claim.  However, even if the court were to somehow apply the look-back provision to Plaintiff's Section 14(a) claim, Plaintiffs have still stated a claim for relief and defendants' motion to dismiss must be denied.  In addition to damages, Plaintiffs seek rescission and an accounting to which the look back provision on its face does not apply because it refers only to an "award of damages."  15 U.S.C. § 78u-4(e)(1).  And the look back does not apply to Plaintiffs' state law claims nor do defendants argue that it does. Finally, defendants make the overtly false assertion that during lead plaintiff briefing Plaintiffs promised not to seek money damages.  Defs. Br. at p. 1 (quoting Lead Plaintiffs' Memorandum in Support of Motion for Appointment as Lead Plaintiff ("Lead Pl. Br.") at p. 14 n.9).  The Lead Pl. Br. stated that the Reform Act's "look-back" provision, on its face, does not apply "*to the extent* plaintiff seeks equitable relief (as opposed to money damages)…"  Lead Pl. Br. at p. 14 n.9.  Defs. Br. deliberately omits the "to the extent" lead-in and other parts of the Lead Pl. Br. to the same effect.  *See*, *e.g.*, Lead Pl. at pp. 2-3 ("[T]he financial relief available pursuant to the Section 14(a) claims…is substantial….[T]he relief available dwarfs the relief available pursuant to the 10(b) claims.").

1

2

**V.     SLUSA DOES NOT BAR PLAINTIFFS' STATE LAW CLAIMS BECAUSE THE DELAWARE CARVE-OUTS APPLY**

3       Plaintiffs concede that their state law claims fall within SLUSA's ambit and are, thus,

4   preempted unless there is an applicable exemption.  *See* 15 U.S.C. § 78bb(f)(2).  Here, Plaintiffs

5   have brought state law claims for breach of the fiduciary duty of disclosure which fall squarely

6   within SLUSA's so-called "Delaware carve-outs."  Indeed, such claims are precisely the type the

7   "carve-outs" were intended to preserve.  SLUSA provides that a class action falling within its

8   ambit is not preempted "if it involves":

9       (I)      the purchase or sale of securities by the issuer or an affiliate of the issuer
                 exclusively from or to holders of equity securities of the issuer; or

10      (II)     any recommendation, position, or other communication with respect to the
                 sale of securities of an issuer that--

11             (aa)    is made by or on behalf of the issuer or an affiliate of the issuer to
                       holders of equity securities of the issuer; and

12             (bb)    concerns decisions of such equity holders with respect to voting their
                       securities….

13

14   15 U.S.C. § 78bb(f)(3)(A)(ii).[11]

15      The subsection (II) carve-out is clearly applicable.  First, the claim involves

16   "recommendations" or "communications with respect to the sale of securities of an issuer" because

17   defendants, through Apple's proxy statements, were recommending that shareholders vote to

18   increase the amount of authorized Apple shares dedicated to the Company's stock option plans.

19   ¶¶298-99, 305.  Second, the communications were made "by or on behalf of the issuer [*i.e.*, Apple]

20   to holders of equity securities" because defendants made the communications to Apple

21   shareholders on behalf of Apple by means of Apple's proxy statements.  ¶¶297-301, 305.  Third,

22   the communications involved "decisions of such equity holders with respect to voting their

23   securities" because defendants asked shareholders to vote to increase the authorized shares

24   available for use in connection with the Company's stock option plans – increases that benefited

25

26   ───────────────
     [11]    Courts interpret "involves" broadly.  *See, e.g. Lewis v. Termeer*, 445 F. Supp.2d 366, 372
27   (S.D.N.Y. 2006) ("[t]he question is whether the word 'involves' should be construed broadly or
     narrowly," and interpreting carve-outs broadly); *In re MetLife Demutualization Litig.*, 2006 WL
28   2524196, at *7 (E.D.N.Y. Aug. 28, 2006) ("[T]he broad language of the Section controls.  The
     class action need only 'involve' a recommendation with respect to the sale of securities.").

1   certain defendants to the detriment of Plaintiffs.   ¶¶2, 38, 69, 73, 276-77, 286, 309.  As defendants

2   acknowledge, this Court has already held that nearly identical allegations relating to backdated

3   stock options fall squarely within the second carve-out.[12]   *See City of Ann Arbor Employees'*

4   *Retirement System v. Gecht*, 2007 WL 760568, at *3-*7 (N.D. Cal. March 9, 2007) (Chen,

5   M.J.)(Holding that claims relating to directors' breach of their fiduciary duties in connection with

6   seeking shareholder approval for compensation plans while concealing improper backdating

7   practices were not preempted by SLUSA, the Court observed: "In fact, the carve-out expressly

8   states that exempted class actions are those that involve communications with respect to the sale of

9   securities that concern decisions of equity holders with respect to voting their securities or acting

10  in response to a tender or exchange offer or exercising dissenters' or appraisal rights"); *see also*

11  *Gibson v. PS Group Holdings*, 2000 WL 777818, at *4 (S.D. Cal. June 14, 2000) (Delaware carve-

12  out "permits plaintiffs to bring class action lawsuits where a corporation or its principals breach a

13  fiduciary duty of disclosure to existing shareholders.").

14  **VI.   PLAINTIFFS' STATE LAW CLAIMS ARE TIMELY**

15          Plaintiffs agree with defendants that a four-year statute of limitations applies to their state

16  law claims for breach of the duty of disclosure.[13]  Defs. Br. at pp. 22-23.  A complaint, therefore,

17  must have been filed within four years from the date on which the claim accrued.  *See* Cal. Civ.

18  Proc. Code § 343.  "Ordinarily, this is when the wrongful act is done and the obligation or the

19  liability arises, but it does not 'accrue until the party owning it is entitled to begin and prosecute an

20  [12]      Defendants' reliance on *Zoren v. Genesis Energy, L.P.*, 195 F. Supp. 2d 598, 604 (D. Del.
21  2002) is misplaced.  Defs. Br. at p. 19.  *Zoren* involved shareholder allegations of securities
    *fraud* in an initial public offering and subsequent secondary offering.  The court held that the
22  second carve-out did not apply because, unlike in the proxy statement context, the IPO and
    secondary offering did not involve shareholder voting rights.  *Id.* at 604. While proxy statements
23  were subsequently distributed in connection with a restructuring, the court found that the
    complaint alleged that the restructuring was a *sham intended to continue perpetuation of the*
24  *frauds* that originally were perpetrated through the IPO and secondary offering (where
    shareholder votes were not applicable).  *See id.* at 605-606.  Here, defendants refuse to
25  acknowledge that unlike in *Zoren* Plaintiffs are not alleging fraud – only negligence.  Separately,
    in the unlikely event that the Court were to conclude that SLUSA preempts the state law claims,
26  contrary to defendants' assertion (Defs. Br. at p. 18), the Court need not dismiss the entire action.
    *See In re AOL Time Warner, Inc. Sec. Litig.*, 2007 WL 1789013, at **3-11 (S.D.N.Y. Jun. 20,
27  2007) (partial SLUSA dismissal only).

    [13]      The alternative argument for a three-year fraud limitations period (Defs. Br. at pp. 22-23)
28  is wrong because defendants again ignore that there are no fraud claims.  *See* Count III.

action thereon." *United States Liab. Ins. Co. v. Haidinger-Hayes,* 1 Cal.3d 586, 596 (Cal. 1970); *see also Lee v. Bank of America*, 27 Cal. App.4th 197, 205, 32 Cal. Rptr. 2d 388 (Cal. App. 4 Dist., 1994) ("It is settled – perhaps because it is merely common sense – that a cause of action does not begin to "accrue" until after some wrongful act is done.").  But, "[i]n...situations...where a fiduciary obligation is involved...courts...postpone[]...the accrual until the beneficiary has knowledge or notice of the act constituting a breach of fidelity." *Haidinger-Hayes,* 1 Cal. 3d at 596.  Thus, "the cause of action [does] not commence to run until plaintiff knew or should have known of the breach," *id.* at 597, and "[w]here a fiduciary relationship exists the usual duty of diligence to discover facts does not exist." *Id.* at 598*; see Hobbs v. Bateman Eichler, Hill Richards, Inc.*, 164 Cal. App.3d 174, 202 (Cal. App. 2d Dist. 1985) (emphasis in original) ("Where there is a fiduciary relationship, the usual duty of diligence to discovery does not exist....[Thus,] the limitations period does not begin to run until [plaintiff] *actually* discovers the facts constituting the cause of action, even though the means for obtaining the information are available.").  Questions of if and when a beneficiary was actually on notice cannot be resolved on a motion to dismiss. *See id.* at 596.

Here, it is unquestioned that no information concerning option backdating practices at any company, let alone at Apple itself, became public until the March 2006 *Journal* article.  *See*  ¶39.  Although Apple's current executives knew both before and immediately after the *Journal* article that Apple had been engaging in illicit options backdating for years prior to the *Journal's* expose, Apple still did not disclose to shareholders its illicit conduct, perhaps in hopes that regulatory interest would die down.  Thus, after the *Journal* article appeared, Apple held its 2006 Annual Meeting and still said nothing to its shareholder-fiduciaries about the backdating practices with which directors who were standing for reelection had direct involvement.  ¶44.  Regulatory interest did not die down, but rather intensified.  ¶43.  Thus, Apple had no choice but to admit the illegal conduct in which it had engaged to avoid having the SEC get there first.  Even then, Apple was less than forthright.  The first hint that Apple backdated options did not become public until Apple's June 29, 2006 press release attempting to downplay its illicit backdating practices by coyly announcing Apple had uncovered "irregularities" related to stock option grants.  ¶45.

Within a few short months, "irregularities" blew up into reports of the quiet dismissal of the Company's general counsel, the resignation of Anderson (the Company's former CFO and a board member), and admissions of widespread backdating and falsification of a board meeting to cover it up.  Apple's conduct flies in the face of its fiduciary obligation to shareholders to make full and complete disclosure of the facts and circumstances concerning backdating.  *See Neel v. Magana, Olney, Levy, Cathcart & Gelfand*, 6 Cal.3d 176, 188-89  (Cal. 1971) (internal quotation mark and citation omitted) ("The duty of a fiduciary embraces the obligation to make full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests.  Where there is a duty to disclose, the disclosure must be full and complete….").  Such full and complete disclosure, if it has even happened at all, did not occur until the December 2006 restatement.  There is, therefore, no question that Plaintiffs are entitled to the benefit of the discovery rule.  *See Hobbs,* 164 Cal. App.3d at 202-203 (discovery rule applied where fiduciary abused obligation to make full disclosure); *see also Ryan v. Gifford*, 918 A.2d 341, 359 (Del. Ch. 2007) (tolling statute of limitations because backdating was so hidden reasonable person could not make timely discovery necessary to file complaint).

Defendants' argument that the information on which Plaintiffs' claims are based was public for more than four years prior to the filing of the Complaint (Defs. Br. at p. 2), is frivolous and has already been rejected in *Zoran* when this Court stated:

> [D]efendants argue that…the information necessary to plead the facts in the complaint, such as stock prices and purported option grant dates, was a matter of public record.  As with plaintiff's federal claims, however, plaintiff was under no duty to conduct the kind of analysis necessary to uncover backdating particularly in view of defendants' alleged efforts to conceal it.  Accordingly, the earliest that plaintiff should have been on notice of his claim was in May 2006, so his state-law claims…are not time-barred.

2007 WL 1650948, at *26; *see also id.* at *21 ("Outsiders like plaintiff[-shareholder] did not have superpowers to detect secret backdating inside the company.").[14]

---

[14] Even if the discovery rule did not apply, Plaintiffs' claims would still be timely under the doctrine of equitable estoppel.  *Mills v. Forestex Co.*, 108 Cal. App. 4th 625, 652 (Cal. App. 5th Dist. 2003) (internal quotation marks and citations omitted) ("A defendant will be estopped to assert the statute of limitations if the defendant's conduct, relied upon by the plaintiff, has induced the plaintiff to postpone filing the action until the statute has run….")  Contrary to defendants' suggestion (Defs. Br. at p. 23), no fraud, bad faith, or intent to mislead is necessary for such an estoppel to apply.  *Id.* at 652.  As demonstrated above, Defendants' continual

24

**Lead Plaintiff's Memorandum of Points and Authorities In Opposition to Defendants' Notice of Motion and Motion to Dismiss Consolidated Class Action Complaint (Case No.: C-06-05208-JF)**

## **CONCLUSION**

Plaintiffs respectfully request that the Court deny defendants' motion in all respects and grant such other and further relief as the Court may deem just and proper.

Dated: July 30, 2007

Respectfully submitted,

**GRANT & EISENHOFER P.A.**

  /s/ Michael J. Barry
Jay W. Eisenhofer (*pro hac vice*)
Charles T. Caliendo (*pro hac vice*)
485 Lexington Avenue, 29th Floor
New York, NY 10017
Tel:  646.722.8500
Fax:  646.722.8501
jeisenhofer@gelaw.com
ccaliendo@gelaw.com
                    -and-
Michael J. Barry (*pro hac vice*)
Lesley E. Weaver (State Bar No. 191305)
1201 North Market Street
Wilmington, DE 19801
Tel:  302.622.7000
Fax:  302.622.7100
mbarry@gelaw.com
lweaver@gelaw.com

**ANDERLINI, FINKELSTEIN, EMERICK**
    **& SMOOT**

Merrill Glen Emerick (State Bar No. 117248)
400 S. El Camino Real – Suite 700
San Mateo, CA 94402
Tel: 650.348.0102
Fax: 650.348.0962
memerick@afeslaw.com

---

promises in Apple's proxy statements and annual reports that the terms of shareholder-approved stock option plans were being complied with clearly prevented shareholders from discovering the backdating practices to which they would have strenuously objected and thereby induced shareholders to forego filing suit to remedy these abuses.

25