1  Jay W. Eisenhofer (*pro hac vice*)
   GRANT & EISENHOFER P.A.
2  485 Lexington Avenue
   29th Floor
3  New York, NY 10017
   Tel:  646.722.8500
4  Fax:  646.722.8501
   jeisenhofer@gelaw.com
5
   Michael J. Barry (*pro hac vice*)
6  Lesley E. Weaver (State Bar No. 191305)
   GRANT & EISENHOFER P.A.
7  1201 North Market Street
   Wilmington, DE 19801
8  Tel:  302.622.7000
   Fax:  302.622.7100
9  mbarry@gelaw.com

10 Merrill G. Emerick (State Bar No. 117248)
   Anderlini & Emerick LLP
11 411 Borel Avenue, Suite 501
   San Mateo, CA  94402
12 Tel: 650.242.4884
   Fax: 650.212.0081
13 memerick@aelawllp.com

14 *Attorneys for Lead Plaintiff*
   *The New York City Employees' Retirement System*
15
                    **UNITED STATES DISTRICT COURT**
16
                  **NORTHERN DISTRICT OF CALIFORNIA**
17
                        **SAN JOSE DIVISION**
18

19
   IN RE: APPLE INC.                         Case No.: C06-05208-JF
20 SECURITIES LITIGATION
                                             **CLASS ACTION**
21
   THIS DOCUMENT RELATES TO:
22 ALL ACTIONS

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

**Page**

I.    OVERVIEW OF CLAIMS ..................................................................................2

3

II.   PARTIES ......................................................................................................5

4

5       A.   PLAINTIFFS ........................................................................................5

6       B.   CORPORATE DEFENDANT ....................................................................6

7       C.   THE 10(b) DEFENDANTS ....................................................................6

8       D.   THE 20(a) DEFENDANTS ....................................................................7

9    III.  JURISDICTION AND VENUE ..........................................................................9

10   IV.   INTRADISTRICT ASSIGNMENT.....................................................................10

11   V.    FACTUAL BACKGROUND ............................................................................10

12      A.   OVERVIEW OF STOCK OPTION BACKDATING.......................................10

13      B.   THE RAMPANT BACKDATING OF STOCK OPTIONS AT APPLE EXTENDS
14           BACK TO AT LEAST 1993 .................................................................13

15      C.   APPLE IS FORCED TO RESTATE ITS FINANCIAL REPORTS DUE TO Extensive
16           Backdating ....................................................................................17

17      D.   INVESTIGATIONS REVEAL INTENTIONAL MISCONDUCT ON THE PART OF THE
             INDIVIDUAL DEFENDANT AND RECKLESS CONDUCT ON THE PART OF
18           APPLE'S BOARD OF DIRECTORS. ........................................................19

19      E.   THE PARTICIPANTS TO THE SCHEME ..................................................21

20           1.    The October 19, 2001 Steve Jobs Grant ............................22

21           2.    The January 2000 Grant to Steve Jobs................................27

22           3.    The Individual Defendants' Scheme to Backdate the January 17,
23                 2001 Grant to Senior Apple Executives................................29

24   VI.   FALSE AND MISLEADING STATEMENTS........................................................32

25      A.   PROXY STATEMENTS ........................................................................32

26           1.    1997 Proxy ......................................................................33

27           2.    1998 Proxy ......................................................................37

28           3.    2000 Proxy ......................................................................41

i

4.  2001 Proxy .................................................................46

5.  2002 Proxy .................................................................51

6.  2003 Proxy .................................................................56

7.  2004 Proxy .................................................................62

8.  2005 Proxy .................................................................64

B.  ANNUAL REPORTS .................................................................66

1.  1996 Annual Report .................................................67

2.  1997 Annual Report .................................................68

3.  1998 Annual Report .................................................69

4.  1999 Annual Report .................................................73

5.  2000 Annual Report .................................................77

6.  2001 Annual Report .................................................82

7.  2002 Annual Report .................................................88

8.  2003 Annual Report .................................................94

9.  2004 Annual Report .................................................100

10. 2005 Annual Report .................................................106

C.  QUARTERLY REPORTS .................................................................112

1.  Quarterly Reports Filed in 2001 .......................112

2.  Quarterly Reports Filed in 2002 .......................113

3.  Quarterly Reports Filed in 2003 .......................114

4.  Quarterly Reports Filed in 2004 .......................116

5.  Quarterly Reports Filed in 2005 .......................118

6.  Quarterly Reports Filed In 2006 .......................120

D.  APPLE'S EARNINGS RELEASES .................................................................121

1.  Fiscal Year 2000 Earnings Releases .......................121

2.  Fiscal year 2001 Earnings Releases .......................126

3.          Fiscal year 2002 Earnings Releases ................................................. 127

4.          Fiscal Year 2003 Earnings Releases ................................................ 131

E.      EARNINGS CONFERENCE CALLS ................................................................ 147

F.      CEO AND CFO ANNUAL REPORT CERTIFICATIONS ......................................... 154

G.      CEO AND CFO QUARTERLY CERTIFICATIONS .................................................. 158

H.      REGISTRATION STATEMENTS ................................................................... 162

VII.    ADDITIONAL SCIENTER ALLEGATIONS ............................................................ 164

A.      GENERAL ALLEGATIONS OF SCIENTER OF THE INDIVIDUAL DEFENDANTS ...... 164

B.      KNOWLEDGE OR RECKLESS DISREGARD BY EACH OF THE INDIVIDUAL
DEFENDANTS ...................................................................................... 164

1.          Steve Jobs ........................................................................... 165

2.          Heinen ................................................................................. 169

3.          Anderson ............................................................................. 170

C.      20(a) DEFENDANTS' CULPABILITY ........................................................... 171

VIII.   LOSS CAUSATION ALLEGATIONS .................................................................. 171

IX.    CLASS ACTION ALLEGATIONS ................................................................... 173

X.     INAPPLICABILITY OF STATUTORY SAFE HARBOR ..................................... 175

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE:FRAUD-ON-THE-
MARKET DOCTRINE ................................................................................ 176

XII.   CLAIMS FOR RELIEF ................................................................................ 177

COUNT I CLASS CLAIM FOR VIOLATION OF SECTION 10(b) AGAINST
DEFENDANTS APPLE, JOBS, HEINEN AND ANDERSON (THE SECTION
10(b) DEFENDANTS) ................................................................................ 177

COUNT II CLASS CLAIM FOR VIOLATION OF SECTION 20(a) AGAINST
DEFENDANTS JOBS, ANDERSON, HEINEN, CAMPBELL, LEVINSON,
DREXLER, AND YORK WITH  RESPECT TO THE SECTION 10(b)
SECURITIES FRAUD CLAIM ...................................................................... 179

XIII.  PRAYER FOR RELIEF ............................................................................... 180

XIV.  DEMAND FOR JURY TRIAL ....................................................................... 181

Lead plaintiff The New York City Employees' Retirement System ("Lead Plaintiff" or "NYCERS") and Plaintiffs Martin Vogel and Kenneth Mahoney[1] make the following allegations upon information and belief, except the allegations relating to themselves, which they make upon personal knowledge, against Apple Inc. ("Apple" or the "Company")[2] and certain of its current and former directors and officers.  Plaintiffs bring this securities fraud class action under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder ("Section 10(b)"), and Section 20(a) of the Exchange Act on behalf of itself and all other persons or entities who acquired securities issued by Apple, between and including August 24, 2001 and June 29, 2006 (the "Class Period").  As a result of the wrongdoing alleged herein, the members of the Class (as defined below) collectively lost hundreds of millions of dollars.

Plaintiffs' information and belief is based on their investigation (made by and through their attorneys), which investigation included, among other things, a review and analysis of: (1) public documents relating to the defendants; (2) Apple's filings with the SEC; (3) press releases published by Apple; (4) analyst reports concerning the Company; and (5) newspaper and magazine articles (and other media coverage) regarding Apple and its business.  Many of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their possession, custody and/or control.  Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this First Amended Consolidated Class Action Complaint (the "FAC") after a reasonable opportunity for discovery.

---

[1]  By Order dated April 8, 2010 (the "April 8 Order"), this Court consolidated into this action the action styled *Martin Vogel and Kenneth Mahoney v. Apple Inc., et al.*, Case No. 5:08-cv-03123-JF ("*Vogel II*"), and ordered Plaintiffs to refile the First Amended Consolidated Complaint (originally filed on March 22, 2010) correcting the caption.  This [Corrected] First Amended Consolidated Class Action Complaint is identical to the First Amended Consolidated Complaint, and changes only the caption in accordance with the April 8 Order, includes the plaintiffs identified in *Vogel II* as named plaintiffs, and also removes duplicative allegations which, through a clerical error, appeared at paragraphs 234 through 244, and were repeated at paragraphs 245 through 255, of the prior version.

[2]  As reflected in a Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC") on January 10, 2007, on January 9, 2007, Apple changed its name from "Apple Computer, Inc." to "Apple Inc."

**[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

# I.      OVERVIEW OF CLAIMS

1.      This case involves the fraud of Apple executives and directors in backdating grants of stock options to themselves and Apple employees in order to reap instant rewards, while concealing from Apple's investors and shareholders the costs associated with their additional compensation.  In connection with its backdating scheme, Apple and Defendants Fred D. Anderson ("Anderson"), Apple's former Chief Financial Officer, Nancy R. Heinen ("Heinen"), Apple's former General Counsel, and Steven Jobs ("Jobs"), Apple's Chief Executive Officer (collectively, the "Individual Defendants"), and several members of Apple's Board of Directors (the "20(a) Defendants"), caused Apple to file false financial statements that concealed millions of dollars in executive compensation.  The Individual Defendants personally profited from Apple's backdating of stock options, receiving millions of dollars in unreported compensation.  The 20(a) Defendants knowingly facilitated and participated in the Individual Defendants' fraudulent scheme, and were directly involved in and responsible for the decisions that ultimately caused Apple to conceal millions of dollars in executive compensation and to file false financial statements.

2.      Under well-accepted accounting rules in effect throughout the relevant period, Apple was required to expense any stock option that was issued to its employees "in the money" *i.e.* when the exercise price of the option was lower than the market price of the stock on the date of the issuance.  Where the stock option was issued at its fair market value on the date of the grant, the Company did not incur an expense in connection with the grant.

3.      In order to provide themselves with additional compensation without disclosing this compensation to investors, the Individual Defendants engaged in a conspiracy pursuant to which they granted themselves in-the-money options while falsifying company records and publicly filed documents to create the appearance that the options had been granted at the market price on an earlier date.  The Individual Defendants' fraudulent conduct included creating minutes for a non-existent Board of Directors meeting to create a false paper trail to evidence when the grants were supposedly authorized.  As a consequence of this illegal

scheme, the Individual Defendants caused Apple to file financial statements throughout the Class Period that failed to account for this undisclosed compensation.

4.      An article published by the *Wall Street Journal* on March 18, 2006 first brought backdating to the attention of the investing public by highlighting apparent backdating at various corporations.  Apple, however, escaped the scrutiny of the *Wall Street Journal*'s reporters and continued to conceal its fraudulent conduct.  Although the defendants in this case knew that they too had engaged in this illicit practice for almost a decade, they remained silent. The defendants even caused Apple to hold its annual meeting in April 2006, at which directors who had substantial involvement with backdating stood for reelection, without telling investors a single thing about how backdating practices were lining the pockets of Apple's executives at the expense of its public shareholders.

5.      Then, on June 29, 2006, Apple stunned the market by announcing that there were "irregularities" in its stock option practices.  In other words, Apple engaged in backdating, just like the companies that had earlier been described in the March 18, 2006 *Wall Street Journal* article more than three months earlier.  On the news, Apple's share price fell precipitously, declining over 14% over the next two weeks and erasing more than $7 billion in market capitalization – causing substantial losses for Lead Plaintiff and other members of the Class for which Lead Plaintiff seeks recovery.  The precipitous decline in Apple's stock was, in large part, the result of investors recognizing that Apple's most senior managers lack integrity and simply could not be trusted in that they were willing to falsify company records to enhance their own compensation.  In addition, the share price also was negatively impacted because the shareholders learned that Apple's compensation expenses were materially understated, resulting in a material overstatement of net income.

6.      Ultimately, on December 29, 2006, Apple admitted that between 1997 and 2002, Apple made 6,428 option grants to its employees, including the defendants named herein, that were improperly dated.  As a result of Apple has admitted that it and its most senior executives had been lying to shareholders and the public generally regarding the intent and effect of the Company's compensation practices – demonstrating that Apple's management simply could

1   not be trusted.  In addition, Apple admitted that the effect of these misdated option grants was

2   to understate its expenses, and thus overstate net income, over this period by $105 million.

3       7.      By Apple's own admission, the bulk of the restated expenses are the result of

4   backdated options awarded to Apple's executives and its CEO stemming from *intentional*

5   *misconduct*.  Jobs himself was the primary beneficiary of this scheme.

6       8.      Neither Jobs, nor the other Individual Defendants, nor the 20(a) Defendants can

7   be heard to claim ignorance here, nor can they be heard to claim they failed to appreciate the

8   accounting implications of their decisions.  The defendants knew that options were not granted

9   on the dates that were disclosed to shareholders and falsified the company's records to create

10  the appearance of legality, and thus bear direct responsibility for their actions.  Here, Jobs and

11  the Individual Defendants clearly appreciated the fraudulent nature of their conduct.  Anderson,

12  Apple's former CFO, clearly appreciated the accounting implications of the backdating scheme

13  and, in fact, was a glad-handed recipient of backdated options.  Heinen actually falsified

14  corporate records in order to conceal the backdating scheme.  And Jobs, aside from being the

15  single largest beneficiary of the backdating scheme, repeatedly signed off on statements

16  certifying that option grants were made on certain days when, as he knew and Apple now

17  admits, they were not.

18      9.      Indeed, on April 24, 2007, the U.S. Securities and Exchange Commission

19  ("SEC") charged both Anderson and Heinen with fraud relating to stock options backdating at

20  Apple.  According to SEC Litigation Release No. 20086 dated April 24, 2007:  (a) "[b]oth

21  Heinen and Anderson personally received millions of dollars in unreported compensation as a

22  result of the backdating"; and (b) the SEC's complaint (i) allege[d] that Heinen … caused

23  Apple to backdate to large option grants to senior executives of Apple – a February 2001 grant

24  of 4.8 million options to Apple's Executive Team and a December 2001 grant of 7.5 million

25  options to Apple Chief Executive Officer Steve Jobs – and altered company records to conceal

26  the fraud" and (ii) charged that Anderson "failed to disclose key information [about

27  backdating] to Apple's auditors and neglected to ensure that the company's financial statements

28  were accurate."

10. To avoid the fraud charges, both Anderson and Heinen settled with the SEC. Anderson was permanently enjoined from committing further fraud in violation of the federal securities laws and was required to disgorge almost $3 million in ill-gotten gains from illicit backdating and paid a $150,000 penalty. Heinen was permanently enjoined from committing further fraud in violation of the federal securities laws and was required to disgorge more than $1.5 million in ill-gotten gains from illicit backdating, paid a $200,000 penalty, was barred from serving as an officer or director of a public company for five years and was suspended from appearing or practicing as an attorney before the SEC for three years.

11. For their part, the 20(a) Defendants *specifically knew* of the backdating of stock options, *specifically approved* of the practice, and took absolutely no action to prevent the Company from publishing false statements that concealed the backdating.

## II. PARTIES

### A. PLAINTIFFS

12. NYCERS is a pension fund within the actuarial pension systems of New York City, which includes other funds such as the Police Pension Fund, the Fire Department Pension Fund, the Teachers' Retirement System, the Board of Education Retirement System, and six variable supplements funds (collectively, the "Funds"). As of June 30, 2004, the Funds had 258,609 retired members and 347,575 active members. NYCERS has over 200,000 active members, and approximately 120,000 retirees and beneficiaries. NYCERS, established under Section 120102 of the Administrative Code of the City of New York, provides pension benefits to all New York City employees who are not eligible to participate in other New York City pension funds.

13. NYCERS made purchases of Apple stock at artificially inflated prices during the Class Period and suffered damages thereby.

14. Plaintiff Martin Vogel purchased shares of Apple at artificially inflated prices during the Class Period and suffered damages thereby.

15.     Plaintiff Kenneth Mahoney purchased shares of Apple at artificially inflated prices during the Class Period and suffered damages thereby.

**B.     CORPORATE DEFENDANT**

16.     Defendant Apple is a California corporation with its principal executive offices located at 1 Infinite Loop, Building 4, Cupertino, California.  According to its filings with the SEC, the Company is a leading worldwide manufacturer of personal computers, computer software and portable digital music players.  Its common stock trades on the Nasdaq National Market under the ticker symbol AAPL.  As of February 26, 2006, there were 851,679,185 shares outstanding of Apple's common stock.

**C.     THE 10(b) DEFENDANTS**

17.     Defendant Steven P. Jobs is the Company's Chief Executive Officer and has acted in that capacity since January 2000.  Jobs was previously Interim Chief Executive Officer from September 10, 1997 to January 2000.  Jobs co-founded the Company beginning in 1976 and has been a member of the Company's board of directors since 1997.  According to the Company's proxy statements, although defendant Jobs was a member of the Company's board of directors, he did not participate in board deliberations concerning executive compensation matters.

18.     Defendant Fred D. Anderson was the Company's Chief Financial Officer from April 1996 to June 2004 and was a member of the Company's board of directors from 2004 until September 30, 2006 when he was forced to resign due to his involvement with backdating as alleged more fully below.  As discussed above and further below, on April 24, 2007, the SEC charged Anderson with various counts of fraud under the federal securities laws for his role in backdating options at Apple and misrepresenting these activities in the Company's public filings, and Anderson paid substantial monetary penalties to avoid the SEC's fraud charges.

19.     Defendant Nancy R. Heinen, during the Class Period until May 2006, was the Senior Vice President, General Counsel, and Corporate Secretary at Apple.  In that position, among other things, Heinen had responsibility for overseeing Apple's legal group and

preparing and certifying the minutes of Apple's Board of Directors and its committees.  Heinen

left Apple in May 2006.  As discussed above and further below, on April 24, 2007, the SEC

charged Heinen with various counts of fraud under the federal securities laws for her role in

backdating options at Apple and misrepresenting these activities in the Company's public

filings, and Heinen paid substantial monetary penalties to avoid the SEC's fraud charges.

### D.    THE 20(a) DEFENDANTS

20.    The Company's board of directors maintained certain committees relevant to the

allegations herein as follows.  The Compensation Committee of the board of directors (the

"Compensation Committee") administered the Company's executive compensation programs,

including its stock option plans, at all times relevant to the allegations herein except that:  (a)

during the period of time from April 2000 to August 2001, the Company's full board of

directors administered such programs; and (b) the Company's full board of directors was

responsible for the approval of executive compensation matters concerning the Company's

CEO.

21.    The board of directors also maintained an Audit and Finance Committee (the

"Audit Committee") during the relevant time.  The Audit Committee was generally responsible

for, among other things, assisting the full Apple board in fulfilling its oversight responsibility

by reviewing the financial information provided to shareholders and others and evaluating the

Company's accounting policies and system of internal controls, including internal controls

respecting stock options and the proper accounting treatment thereof.

22.    Defendant William V. Campbell has been a member of the Company's board of

directors since 1997.  Campbell has also been a member of the Audit Committee since at least

December 1997 and a member of the Compensation Committee since August 2001.

23.    Defendant Millard S. Drexler has been a member of the Company's board of

directors since 1999.  Drexler has also been a member of the Compensation Committee since at

least March 24, 2003.

24.    Defendant Arthur D. Levinson has been a member of the Company's board of

directors since 2000.  Levinson has also been a member of the Audit Committee since fiscal

2000 and was a member of the Compensation Committee from August 2001 to at least March 24, 2003.

25.     Defendant Jerome B. York has been a member of the Company's board of directors since August 1997.  York has also been a member of the Audit Committee since

26.     August 1997 and was a member of the Compensation Committee from August 2001 to at least March 21, 2002.

27.     Defendants Jobs, Anderson and Heinen, as control persons of the Company, are also liable under Section 20(a) in the alternative to their liability under Section 10(b) and are, thus, also 20(a) Defendants.

28.     As officers and/or directors who were controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate prompt, accurate and truthful information with respect to Apple's financial condition and performance, operations, financial statements, management, and earnings and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of Apple's publicly-traded securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

29.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Apple, each of the Individual Defendants had access to the undisclosed information concerning Apple's backdating practices, and knew or recklessly disregarded the magnitude of the effect of such practices during the Class Period on Apple's financial performance.

30.     The Individual Defendants and the 20(a) Defendants, because of their positions of control and authority as officers and/or directors of Apple, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to Apple during the Class Period.  Each Individual Defendant and 20(a) Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants and 20(a) Defendants is responsible for the accuracy of the public reports and releases detailed herein and is, therefore, primarily liable for the representations contained therein.

31.     During the Class Period, the Individual Defendants and the 20(a) Defendants, as Apple's officers and/or directors, were privy to confidential and proprietary information concerning Apple, their operations and business prospects and were responsible for the truthfulness and accuracy of Apple's public statements described herein.  By reason of their positions with Apple, these defendants had access to internal Apple documents, reports, and other information, including, among other things, documentation concerning Apple's options grants.  These defendants were also responsible for setting and establishing Apple's policies and procedures concerning the grants of options.

**III.    JURISDICTION AND VENUE**

32.     Jurisdiction is based on § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, as this case arises from defendants' violations of Sections 10(b) and 20(a) of the Exchange Act and the rules promulgated thereunder by the SEC.

33.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Many of the acts and transactions forming the basis for the claims in this action, including the preparation and dissemination of materially false and misleading information, and the failure to disclose material information, occurred in substantial part in this District.

34.    The claims asserted herein are not the product of any collusive conduct designed to confer jurisdiction on this Court which it otherwise would not have.

**IV.    INTRADISTRICT ASSIGNMENT**

35.    As substantial part of the events or omissions which give rise to Plaintiffs' claims occurred within Santa Clara County, where defendant Apple is located.  Therefore, this action is properly assigned to the Court's San Jose Division in accordance with Civil L.R. 3-2(c) and (d).

**V.    FACTUAL BACKGROUND**

    **A.    OVERVIEW OF STOCK OPTION BACKDATING**

36.    During the late 1990s and early 2000s, Apple like many other technology companies, made liberal use of employee stock options as a form of compensation to recruit, retain, and provide incentives to its key employees.

37.    Companies award stock options to give employees the right to purchase shares of the company's stock.  The employees do so by paying the company a set price in exchange for the shares.  The price is referred to as the "exercise price" and is typically fixed at the company's closing stock market price on the same date the option was granted.  This is referred to as granting options "at the money."

38.    An "at the money" option is not immediately valuable to the executive.  This is because, at the time the option is first awarded, the amount the executive must pay to acquire the shares (*i.e.*, the exercise price) and the stock market trading price at which he could sell them are the same.  There is, therefore, no gain to be had by exercising the option because the executive would merely break even.  Granting the option "at the money," by design, gives the executive extra incentive to work toward increasing the company's stock market price above the fixed exercise price so the option has value.

39.    Over time, when the company's stock market price rises above the fixed exercise price, the option becomes valuable; it is then referred to as being "in the money." After a fixed period of time has elapsed since the option was first granted (referred to as the "vesting period"), the executive can pay the exercise price, acquire the shares, sell them in the

**[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

marketplace for an amount greater than the exercise price he paid and thereby realize a profit. In other words, the executive can "buy low and sell high" just like a shareholder hopes to do. When options are awarded "at the money," the corporate executives' interests are more closely aligned with shareholder interests than would be the case if the executive was simply paid in cash. Many companies, including Apple, emphasized this alignment of interests in proxy statements seeking to convince shareholders that approving lucrative stock option incentives for executives is a good idea.

40.     A March 18, 2006 *Wall Street Journal* (the "*Journal*") article first disclosed the existence of options backdating by certain companies. The *Journal* explained that instead of setting the exercise price on the date the option was first granted (*i.e.*, so it was "at the money"), some companies waited until later. They looked back at a chart of the company's historical stock market closing prices, picked a day when the company's stock price had dropped to a low or near-low point and pretended that the options had been awarded on that date. Thus, the exercise price assigned to the option was *lower* than the company's trading price on the real date the option was awarded. This "backdating" would give the executive an instant paper profit (*i.e.*, put the option "in the money" from the outset).

41.     The companies did not tell shareholders the truth about how the exercise price was selected. Instead, the same companies that had solicited proxies to sell shareholders on the idea that executive and shareholder interests were closely aligned lied about the selection process. They told shareholders that the option was granted "at the money" or, more precisely, that the option's exercise price was not less than the company's stock market closing price on the date the option was granted. This was not true. The exercise prices were in fact *less* than (and in many cases a lot less than) the companies' closing stock market prices on the dates the options were truly granted. Contrary to the companies' representations, therefore, the executive did not need to work to increase the company's stock price above the exercise price; through backdating, it was already there. And the companies failed to disclose to shareholders that when the option is ultimately exercised, the executive pays the company less than he or she

1   would have if the options had been priced properly under the terms of the applicable stock
2   option plan.

3          42.     In addition to demonstrating a lack of integrity on the part of management and
4   disguising the true compensation they are receiving, the price at which stock options are
5   granted also has a material impact on the company's financial statements and, therefore, its
6   stock valuation in the marketplace.  Specifically, prior to January 1, 2006, corporations were
7   not required to recognize any compensation expense relating to stock option grants *unless* the
8   exercise price of the options was below the publicly traded price of the company's stock on the
9   date of the grant.  On the other hand, if the corporation granted options that carried an exercise
10  price below the publicly traded stock price, the company was required to recognize and
11  disclose the "in the money" portion of the option grant (*i.e.*, the difference between the exercise
12  price and the publicly traded price, times the number of shares underlying the options) as
13  compensation expense paid to the grant recipients.

14         43.     More specifically, for financial statements prior to January 1, 2006, under APB
15  No. 25, "Accounting for Stock Issued to Employees" ("APB No. 25"), a provision of Generally
16  Accepted Accounting Principles ("GAAP"), if the market price of the company's stock on the
17  date of grant was higher than the exercise price of the options (*i.e.*, the option was granted "in
18  the money" instead of "at the money"), companies are required to recognize the difference as
19  an expense.  Failure to recognize such expense means that the operating and net income figures
20  the company reports to shareholders are falsely inflated.

21         44.     In addition, backdating can cause negative tax consequences.  Section 162(m) of
22  the Internal Revenue Code, 26 U.S.C. § 162(m) ("Section 162(m)"), generally disallows a
23  public company's tax deduction for compensation to executive officers in excess of $1 million
24  in any tax year.  Compensation that qualifies as "performance-based compensation" is excluded
25  from the $1 million deductibility cap and, therefore, remains fully deductible by the company
26  that pays it.  To qualify as "performance based" within the meaning of Section 162(m), options
27  must be granted with an exercise price of not less than 100% of the fair market value of the
28  common stock on the date of the grant.  Failure to issue stock options "at the money,"

therefore, can cause a company to lose the tax deduction that would otherwise be available under Section 162(m).

45.     By backdating stock options – and thus concealing the "in the money" nature of the grant – corporations, including Apple, misled the public as to the nature of their compensation practices and the integrity of their management in that they failed to account for the additional compensation being paid to corporate directors, executives and employees who received these grants, thus rendering their public statements materially misleading. Specifically, corporations, such as Apple, that engaged in the nefarious practice of options backdating, *inter alia*, (a) understated their disclosed compensation expense in the period when the options were granted, (b) overstated the company's net income for the fiscal year when the options were granted, and (c) overstated the company's retained earnings for every accounting period that followed an illegally backdated option grant.  As a result of the above, the stock prices of such companies (including Apple) were artificially inflated.

46.     While the *Journal* article identified numerous technology companies that appeared to engage in the practice of backdating, Apple was not one of them.  But, the *Journal* article triggered a widespread investigation by the Department of Justice, SEC and Internal Revenue Service that focused on more than 140 companies that reportedly engaged in the backdating of options.  Apple and/or its former employees were the subject of one such investigation, and Apple has admitted that it engaged in a widespread practice of improperly backdating stock options, and Anderson and Heinen have, among other things, been barred by the SEC from further fraud in violation of the federal securities laws.

**B.     THE RAMPANT BACKDATING OF STOCK OPTIONS AT APPLE EXTENDS BACK TO AT LEAST 1993**

47.     Despite the March 18, 2006 *Journal* article and knowledge of its long history of backdating, Apple initially remained silent.  In fact, just five days prior to the revelations in the March 18 *Journal* article, Apple had distributed (on March 13, 2006) its 2006 proxy statement seeking reelection of six directors who now have been identified as being involved in the

Company's backdating practices.  Forty-five days later, Apple held its annual meeting, knowing that shareholders would cast ballots for directors ignorant of their involvement with backdating.  Rather than come clean, Apple never said a word.

48.     It is now clear that Apple had engaged in the systematic backdating of stock options since at least 1993.  From 1993 through 2001, as reported in the Company's proxy filings, the Company made options grants to at least the following executives:  (1) defendant Jobs; (2) defendant Anderson; (3) James J. Buckley, a holder of various Apple offices from January 1986 to May 1996 and President of Apple USA from January 1994 to May 1996; (4) Robert Calderoni, a Senior Vice President of Finance from June 1996 to November 1997; (5) Timothy D. Cook, the Company's current Chief Operating Officer; (6) Guerrino DeLuca, a Company officer from 1992 to 1997; (7) Ian Diery, a Company officer from 1989 to April 1995 and the Computer Division's General Manager from July 1993 to April 1995; (8) G. Frederick Forsyth, a Company officer from June 1989 to February 1998 and a Senior Vice President of Worldwide Operations from June 1993 to February 1998; (9) Ronald B. Johnson, currently a Senior Vice President, Retail; (10) Mitchell Mandich, a Company officer from February 1997 to October 2000 and a Senior Vice President of Worldwide Sales from December 1997 to October 2000; (11) Jonathan Rubinstein, a Company officer from February 1997 to May 2006 and the Company's Senior Vice President of the iPod Division from May 2004 to March 2006; (12) Michael H. Spindler, a Company officer from 1980 to February 1996 and the Company's CEO from June 1993 to February 1996; and (13) Avadis Tevanian, Jr., a Company officer from February 1997 to March 2006 and the Company's Chief Software Technology Officer from July 2003 to March 2006.

49.     Option grants to the executive officers identified in the immediately preceding paragraph, as disclosed in the relevant proxy statements, are reflected in the table below:

| Option Recipient | Purported Grant Date[3] | Exercise Price[4] | Number of Options Granted |
|---|---|---|---|

---

[3]  The proxy statements from which the purported grant dates were derived state in substance that all options granted under the applicable stock option plans expire ten years from the date of grant.  The "Option Grants In Last Fiscal Year" table in the proxy statements, which specifies option grants that occurred during the fiscal year,

| Option Recipient | Purported Grant Date[3] | Exercise Price[4] | Number of Options Granted |
|---|---|---|---|
| Jobs | 01/12/00 | $ 43.5938 | 20,000,000 |
|  | 10/19/01 | $ 18.30 | 7,500,000 |
| Anderson | 04/01/96 | $ 24.56 | 400,000 |
|  | 07/11/97[5] | $ 13.25 | 500,000 |
|  | 08/05/97 | $ 19.75 | 250,000 |
|  | 12/19/97[6] | $ 13.6875 | 250,000 |
| Anderson (cont.) | 03/02/99 | $ 34.625 | 475,000 |
|  | 01/17/01 | $ 16.8125 | 1,000,000 |
| Buckley | 10/12/93 | $ 23.75 | 15,000 |
|  | 12/20/93 | $ 29.50 | 30,000 |
|  | 01/26/94 | $ 33.875 | 20,000 |
|  | 04/27/95 | $ 38.25 | 200,000 |
| Calderoni | 08/05/97 | $ 19.75 | 80,000 |
| Cook | 02/02/98 | $ 17.6875 | 700,000 |
|  | 03/02/99 | $ 34.625 | 300,000 |
|  | 01/17/01 | $ 16.8125 | 1,000,000 |
| DeLuca | 07/11/97 | $ 13.25 | 309,750 |
|  | 08/05/97 | $ 19.75 | 190,250 |
| Diery | 10/12/93 | $ 23.75 | 40,000 |
|  | 12/20/93 | $ 29.50 | 90,000 |
| Eilers | 10/03/94 | $ 33.69 | 200,000 |
|  | 04/27/95 | $ 38.25 | 60,000 |
| Forsyth | 04/27/95 | $ 38.25 | 40,000 |
| Johnson | 12/14/99 | $ 47.4375 | 1,200,000 |
| Mandich | 12/19/97 | $ 13.6875 | 224,250 |
|  | 12/29/97 | $ 13.125 | 200,000 |
|  | 03/02/99 | $ 34.625 | 387,876 |
| Rubinstein | 07/11/97 | $ 13.25 | 200,000 |
|  | 08/05/97 | $ 19.75 | 300,000 |
|  | 12/19/97 | $ 13.6875 | 300,000 |
|  | 03/02/99 | $ 34.625 | 458,334 |
|  | 01/17/01 | $ 16.8125 | 1,000,000 |
| Spindler | 10/13/93 | $ 24.00 | 200,000 |
| Tevanian | 01/17/01 | $ 16.8125 | 1,000,000 |

provides an expiration date for each individual grant.  The reader of the proxy statement, therefore, is able to determine that the purported grant date was ten years prior to the stated expiration date.

[4]  Exercise prices and number of options granted are as listed in the proxy statement first reporting the option grant and, where applicable, reflect the Company's two-for-one stock split in June 2000.  Exercise prices and number of options granted do not reflect the Company's two-for-one stock split in February 2005.

[5]  The options granted to Anderson and others on July 11, 1997 were granted pursuant to the Company's "Exchange Program," under which certain "out of the money" or "underwater" options were "re-priced."

[6]  The options granted to Anderson and others on December 19, 1997 were granted pursuant to the Company's "Exchange Program," under which certain "out of the money" or "underwater" options were "re-priced."

[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)

50.     In a pattern that cannot be attributed to happenstance, each of the foregoing options were purportedly granted on dates that fell just after a sharp dip and just before a sizeable jump in Apple's stock price as demonstrated in the table below:

| Purported Grant Date | Exercise Price | Share Price Ten Business Days Before Grant Date | Share Price Ten Business Days After Grant Date | Percentage Gain In Stock Price Ten Business Days After Grant Date |
|---|---|---|---|---|
| 10/12/93 | $23.75 | $24.75 | $29.75 | 25.3% |
| 10/13/93 | $ 24.00 | $23.87 | $31.75 | 32.3% |
| 12/20/93 | $29.50 | $32.25 | $31.50 | 6.8% |
| 01/26/94 | $33.875 | $30.50 | $36.25 | 7.0% |
| 10/03/94 | $33.69 | $35.50 | $39.75 | 18.0% |
| 04/27/95 | $38.25 | $39.00 | $41.00 | 7.2% |
| 04/01/96 | $24.56 | $26.12 | $25.87 | 5.3% |
| 07/11/97 | $13.25 | $14.69 | $16.25 | 22.6% |
| 08/05/97 | $19.75 | $16.56 | $24.44 | 23.7% |
| 12/19/97 | $13.6875 | $15.81 | $18.94 | 38.4% |
| 12/29/97 | $13.125 | $14.13 | $19.50 | 48.6% |
| 02/02/98 | $17.6875 | $18.81 | $19.62 | 10.9% |
| 03/02/99 | $34.625 | $38.31 | $35.50 | 2.5% |
| 12/14/99 | $47.4375 | $48.935 | $50.345 | 6.1% |
| 01/12/00 | $43.5938 | $50.345 | $55.00 | 26.2% |
| 01/17/01 | $16.8125 | $14.88 | $21.62 | 28.6% |
| 10/19/01 | $18.30 | $16.14 | $18.57 | 1.5% |

51.     Apple has admitted, via a Restatement issued in December 2006, with respect to more than 6,400 stock option grants on forty-two separate dates, the purported grant date was *not* the true date on which the stock option grants were made.  Instead, the Stock Option Committee, the Compensation Committee or the full board of directors (for the grants to defendant Jobs and those grants applicable to the period from April 2000 to August 2001 when the full board of directors had responsibility for administering stock options) improperly backdated stock option grants.  And, during the period from April 2000 to August 2001 when the full board of directors had responsibility for administering options plans, the full board honored the exercise of backdated options previously awarded by the Compensation Committee or Stock Option Committee.

52.     Based on the Company's admission of backdating in more than 6,400 instances on forty-two separate dates, there are clearly many more individuals who received backdated grants than those identified above.  Indeed, the Company's proxy statements reveal that during the period from 1993 through 2001, in addition to the option grants to acquire an aggregate 39,120,460 shares of Apple's common stock to the identified officers as reflected in the table above, options to acquire an additional 64,834,039 shares were made to numerous Company employees other than those identified above.  In its restatement, however, except for option grants to defendant Jobs, the Company has not provided the identity of individuals who received backdated grants.  As a result, at this time, Plaintiffs' investigation has revealed only the foregoing instances of backdating based on statistical analyses.  Many more instances of backdating will be specifically identifiable with the benefit of proper discovery.

C.     **APPLE IS FORCED TO RESTATE ITS FINANCIAL REPORTS DUE TO EXTENSIVE BACKDATING**

53.     The Company's announcement, on June 29, 2006, of "irregularities" in its historic accounting for stock options shocked the market and precipitated a fall in the market value of Apple by over $7 billion.  After that announcement, Apple slowly eked out further admissions relating to its backdating practices.

54.     On August 3, 2006, Apple announced that:  (a) it found "additional evidence of irregularities" in its accounting practices; (b) it would likely need to restate its earnings as the result of failing to properly record compensation expenses relating to option grants; and (c) the market should no longer rely on the Company's financial statements or earnings releases from September 29, 2002 going forward.

55.     On October 4, 2006, Apple announced that its continuing investigation "raised serious concerns regarding the actions of two former officers in connection with the accounting, recording and reporting of stock option grants" and that "Apple CEO Steve Jobs was *aware* that favorable grant dates had been selected."  (Emphasis added.)  Defendant Fred Anderson, the Company's former Chief Financial Officer and a director since 2004 who was

1  forced to resign his directorship effective September 30, 2006, and Nancy Heinen, the

2  Company's former General Counsel and Secretary who left mysteriously and without

3  announcement by Apple in May 2006, are the officers referenced in the October 4th press

4  release.

5        56.   In its Form 10-K for the fiscal year ended September 30, 2006 (filed with the

6  SEC on December 29, 2006) (the "2006 Annual Report"), Apple announced the results of the

7  internal investigation that had continued since the October 4th announcement of the

8  investigation's interim findings.  Apple also restated certain financial results.

9        57.   Specifically, the 2006 Annual Report discloses that Apple's outside counsel and

10  a team of forensic accountants examined the circumstances surrounding stock option grants

11  made between October 1996 and January 2003.  The investigation examined some unidentified

12  grants after January 2003 and "sampled" certain unidentified grants between 1994 and 1997,

13  but failed to examine any grants made during 1993.

14        58.   First, the 2006 Annual Report states that stock option:

15              grant dates were *intentionally* selected in order to obtain favorable
            exercise prices.  The terms of these and certain other grants…were

16              finalized *after* the originally assigned grant dates.

17  (Emphasis added).  In other words, options were intentionally backdated.

18        59.   Second, the 2006 Annual Report admits that the first instance of backdating that

19  was concealed from shareholders occurred more than ten years ago on December 29, 1997 and

20  that since then at least 6,428 stock option grants occurring on forty-two separate dates were

21  backdated.  These 6,428 instances of backdating resulted in "instant paper profits" for

22  executives that, according to the investigation, required Apple to recognize stock-based

23  compensation expense of $105 million and $84 million on pre-tax and after-tax bases,

24  respectively.

25        60.   As a consequence, Apple restated:  (a) its consolidated balance sheet as of

26  September 24, 2005, and the related consolidated statement of operations, shareholders' equity,

27  and cash flows for each of the fiscal years ended September 24, 2005 and September 24, 2004,

28  and each of the quarters in 2005; and (b) "Selected Consolidated Financial Data" in Item 6 for

the fiscal years ended September 2005, 2004, 2003 and 2002, and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Item 7 for the fiscal years ended September 24, 2005 and September 25, 2004.

**D.** **INVESTIGATIONS REVEAL INTENTIONAL MISCONDUCT ON THE PART OF THE INDIVIDUAL DEFENDANT AND RECKLESS CONDUCT ON THE PART OF APPLE'S BOARD OF DIRECTORS.**

61. Continuing investigations and evidence uncovered since Apple's restatement have revealed a startling picture of intentional misconduct and concealment on the part of the Individual Defendants in this action. It is important to understand the context in which Apple's backdated options and the motive behind concealing these expenses from investors, while still rewarding its employees with lucrative compensation.

62. Prior to 2006, when the accounting rules were revised to require the expensing of all grants of stock options, option awards were, effectively, a cost-free way for a Company to reward its employees. Costless, of course, if the options were truly awarded at prices at or above the fair market value of the company's stock. For companies facing pressures to meet earnings while still having to reward employees with competitive compensation, options provided relief. Option grants were particularly attractive, and indeed preferable to money in hand, during the technology boom of the 1990s, when stock prices of technology companies were soaring at an dramatic rate.

63. In a declining stock market, however, option grants as a reward to an employee are nearly worthless. This is because the options will likely never achieve "in the market" status if the stock continues to decline after the grant date. This was precisely the problem facing Apple during the period when it accelerated the backdating of option grants to its executive employees.

64. As seen by the graph below, beginning at the end of 2000, Apple's stock price began a massive decline. In addition, as set forth below, Apple's financial performance also suffered a dramatic decline beginning with Apple's financial performance for Apple's fiscal year beginning in October 2000:

1
2
3
4
5
6
7



8
9
10
11

65.     It is no coincidence, therefore, that the size of the restatement required for backdated transactions coincides with the period in which Apple was suffering the most acute financial distress and pressure to minimize expenses.  According to Apple's restatement, Apple improperly recorded expenses relating to backdating as follows:

12
13
14
15
16
17
18
19



20
21
22
23
24

66.     Thus, during a period when Apple's financial performance was strained and its stock price was declining, Apple was accelerating the backdating of options, which allowed it to conceal additional compensation expenses while giving its executives a significant head start on realizing value on options.

25
26
27
28

67.     In its Restatement, Apple admits that for 6,428 grants of options awarded on 42 different dates, the recorded measurement date for the option award was not the true measurement date.  An examination of Apple's restatement, however, reveals that of the 6,428

20

grants of options awarded which Apple concedes were incorrectly dated, 5,767, according to Apple, were the result of ministerial or administrative failures for options awarded to lower level employees.  According to Apple's restatement, these 5,767 option grants contributed to $37 million of the $105 million additional stock expense in the Restatement.

68.     Tellingly, however, the bulk of the Restatement--$68 million—is due to options awarded to Apple's senior executives—and Apple essentially concedes that these option grants were *intentionally* manipulated.  According to Apple, "these grants were not made pursuant to pre-established guidelines adopted by the Board or the Compensation Committee."  In other words, Apple's senior executives and directors gave themselves *carte blanche* authority to price options awarded to themselves as they saw fit.  Thus, during the period of Apple's Restatement, there were 1,082 grants of options to senior Apple executives and 668 of these grants, Apple essentially admits, were manipulated.

**E.     THE PARTICIPANTS TO THE SCHEME**

69.     The intentional backdating of Apple's stock options to senior executives required the concerted actions of three groups of people:  (1) the senior executives who received the options who clearly knew that they were receiving options "in the money;  (2) senior executives who were charged with approving the options and setting their pricing; and (3) the Company's Board of Directors, particularly the Compensation Committee of the Board of Directors, who had to approve option grants to senior executives and who either knew or should have known when and where they approved the grants for options.  Importantly, each of these groups of people, as described below, were also responsible for reporting the Company's financial performance and other material issues to the Company's shareholders.

70.     Each of these three groups of people intentionally flouted the rules and intentionally deceived Apple's shareholders.  In the examples set forth below, Apple's backdated options were both priced and approved by the very executives who received the financial benefits of the grants, and were approved by a Board of Directors who were expressly informed that these grants had been backdated.

71.     As detailed below, Anderson, the Company's CFO during the backdating, plainly knew of the accounting implications of backdating, and was a financial beneficiary of the scheme.

72.     Heinen, the Corporate Secretary and chief legal officer, falsified documents to conceal the backdating, thus evidencing a clear understanding of the illegality of her actions and her culpability in the scheme.

73.     Jobs, the single largest beneficiary of the backdating of stock options, not only *knew* that options were being backdated (his included), but also participated in the backdating of stock options at another company – Pixar – thus demonstrating his knowledge of the manipulative process of backdating.  Although purportedly cleared of wrongdoing in an obviously self-serving provision of the December 2006 restatement, the truth of the matter is that Jobs, as CEO, repeatedly *certified* to the investing public the truth of Apple's financial statements, and thus *certified* the truth of the Company's disclosures regarding the dates that stock options purportedly were granted, which Apple now *admits* were false.

74.     The 20(a) Defendants, as members of Apple's Compensation and Audit Committees, had a responsibility, at the very least, to make sure that the Company's disclosures regarding its compensation and accounting practices were accurate.  Here, however, the 20(a) Defendants had *specific knowledge* of the backdating, but nonetheless did nothing to prevent the prevent the Company from publishing financial reports and disclosures that they thus *knew* were false.

75.     Apple's backdating scheme and the role of these defendants is epitomized by two of the most significant option grants during the Class Period, which collectively concealed Apple's expenses by more than $40 million during a period of strained earnings for the Company *i.e.* during Apple's fiscal year 2002.

### 1.     The October 19, 2001 Steve Jobs Grant

76.     On December 18, 2001, Apple's Board of Directors, including Defendants Campbell, Drexler, Levinson and York and Defendant Jobs, concluded lengthy negotiations

over the terms of a 7.5 million share options grant to Jobs. At that time, the share price of Apple stock was $21.01.

77.    However, each of the Individual Defendants conspired to backdate the grant to Jobs to October 19, 2001, when Apple's share price was only $18.30, and the strike price for the grant was set at this substantially lower price.  Defendant Heinen created fictitious Board minutes that purported to show that the Board had approved the grant to Jobs on October 19 at a "Special Meeting," which never occurred.  By so doing, Apple improperly failed to record $20.3 million in compensation expense associated with the in-the money options grant to Jobs.

78.    While Defendant Heinen played a central role in orchestrating the backdating of Job's grant, both Jobs as recipient and the Board of Directors also played central roles. Beginning in the spring of 2001, the Board began considering ways to increase Jobs's compensation. Since returning to Apple in July 1997, Jobs had been paid only $1 a year in compensation for his services. Although he had received a grant of 10 million options in January 2000, those options were significantly underwater as a result of declines in Apple's stock price.

79.    On August 29, 2001, Apple's Board approved a grant of options to Jobs to purchase 7.5 million shares of Apple common stock.

80.    Shortly after the Board approved the 7.5 million option grant, Jobs expressed dissatisfaction with its vesting schedule. Over the course of the next three months, Apple's Compensation Committee (*i.e.* Defendants Drexler, Levinson and York), spoke frequently amongst themselves and with Jobs about the grant, holding multiple discussions and conference calls, including Compensation Committee meetings on October 16 and 19 and November 19 and 20.  Defendant Heinen, too, was aware of and involved in these discussions, and she attended the Compensation Committee meetings in her role as Corporate Secretary.

81.    As learned from the SEC's investigation into Apple's backdating, as the Compensation Committee's discussions with Jobs continued, there were concerns expressed, especially by Heinen, about the delay in reporting the Board's decision to grant Jobs an option on August 29.  Apple had missed the November deadline by which Apple was supposed to file

1   a Form 4 with the SEC reporting the specifics of Jobs's August 29 options grant. In addition,

2   Heinen also foresaw a problem with the auditors, since Apple's fiscal year had concluded at the

3   end of September, yet Apple had not disclosed the grant to KPMG.

4       82.     By mid-December, the Individual Defendants began to consider the possibility

5   of selecting a different grant date in the new fiscal year, given the time elapsed since the

6   August date. On December 17--by which time Apple's stock price had risen significantly -

7   Heinen forwarded a spreadsheet to the chair of Apple's Compensation Committee, Defendant

8   York, detailing three months of Apple's closing prices and recommending the selection of a

9   day for the backdated options grant. She wrote: "There are several days in October and

10  November, following the first meeting of the Compensation Committee on October 16th and

11  after our earnings call on October 17th, that are close to the Aug. 29th close of $17.83. I

12  suggest using a day that the Compensation Committee held a telephone call, either jointly or

13  individually with the members."

14      83.     On December 18, 2001, the Compensation Committee and Jobs finally came to

15  an agreement on the vesting schedule for the 7.5 million share grant. The following day, the

16  chair of the Compensation Committee, Defendant York e-mailed Apple's Board to let them

17  know the specifics of the grant, including the fact that the date of grant would be October 19,

18  2001, which corresponded to the date, of a Compensation Committee call. He noted: "For the

19  record, I informed Nancy [Heinen] in advance of our intentions and of the above specifics to be

20  certain we were conforming to all legal requirements/guidelines."

21      84.     On December 18, 2001, Apple's common stock closed at $21.01. Hence, by

22  retroactively repricing the grant to October 19 (when the stock closed at $18.30), the Individual

23  Defendants caused Apple to award Jobs 7.5 million in-the-money options while avoiding

24  reporting approximately $20.3 million in pre-tax compensation expense.

25      85.     The net result of the pretense that the grant of these options was approved at an

26  October 2001 board meeting is this: CEO Jobs was given an "instant paper profit" in the

27  amount of $20,325,000 (*i.e.*, $21.01 minus $18.30 multiplied times 7.5 million shares) that was

28  never disclosed to shareholders. A graphic display of how the exercise price for this grant was

24

**[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

1  retroactively cherry-picked from almost two months' worth of Apple closing prices is set forth

2  below:



12      86.    To substantiate October 19, 2001 as the grant date for Jobs's grant, Heinen had

13  fictitious minutes created for a phony "Special Meeting" of Apple's Board of Directors.

14  Minutes purporting to be from the October 19, 2001 Special Meeting state that all of the Board

15  members (other than Jobs) met to discuss CEO compensation. According to the minutes, the

16  Board voted to approve a grant to Jobs of an option to purchase 7.5 million shares at an

17  exercise price equal to the closing price on the date of the grant (October 19).  In fact, no such

18  meeting occurred.

19      87.    Following the Board's knowing approval of backdated options, Heinen, the

20  Corporate Secretary, was directed to cover up the evidence that the Board had backdated the

21  options and instead create a paper trail evidencing a contemporaneous approval of the options.

22  Heinen directed her staff to prepare the "Special Meeting" minutes in January 2002. After the

23  draft was prepared, Heinen reviewed and signed the minutes as Corporate Secretary, falsely

24  certifying that the minutes were accurate.  According to Heinen, the cover-up was done at the

25  direction of her superiors.

26      88.    Heinen similarly signed a "Secretary's Certificate," included with the Board

27  minutes, falsely attesting that the Board met on October 19, 2001 and in that meeting granted

1   Jobs the options to purchase 7.5 million shares at the exercise price of 818.30 a share (the

2   October 19 closing price).

3       89.     Heinen affixed Apple's corporate seal to the document and attested that she did

4   so on November 2, 2001. However, this document was not even created until January 2002,

5   making Heinen's certification patently false.

6       90.     Heinen also caused the alteration of previously-approved official corporate

7   minutes from the August 29, 2001 Board meeting and the October 16, 2001 Compensation

8   Committee meeting in order to conceal the backdating. Draft minutes for the August 29

9   meeting, which were reviewed and approved by Heinen, stated that the Board, in executive

10  session, "granted Mr. Jobs a stock option under the 1998 Executive Officer Stock Plan to

11  purchase 7.5 million shares of common stock."

12      91.     These draft minutes were circulated to the Board before the November 13, 2001

13  regularly-scheduled Board meeting and approved at that meeting. However, the official

14  minutes that appear in Apple's Minutes Books (which were provided to the company's

15  auditors) were altered to delete the reference to the Jobs grant, instead simply noting that the

16  Board authorized the Compensation Committee to establish compensation arrangements for

17  Jobs. The changed minutes were not presented to the Board for approval. Heinen signed the

18  modified minutes, thus falsely attesting to their accuracy.

19      92.     Similar alterations were made to the draft minutes of the October 16, 2001

20  Compensation Committee meeting. The draft minutes, which Heinen had reviewed and

21  approved, indicated that the Compensation Committee "discussed options granted to Steve Jobs

22  at the August 29, 2001 Board meeting."  Again, the official corporate minutes for Apple were

23  altered to remove this reference. Heinen signed the fraudulently redacted October 16 minutes,

24  thus falsely attesting to their accuracy.

25      93.     As a result of the Individual Defendants' actions, Apple failed to record an

26  expense for the Jobs grant in the financial statements included in Apple's Form. 10-K for its

27  fiscal year ended September 28, 2002.  This failure caused Apple to materially overstate its

28  operating income by 47.1% and its net income by 9.2%, for the 2002 fiscal year. In addition,

Apple sold securities pursuant to offering documents, including registration statements on Forms S-8 filed September 28, 2001, December 24, 2001, and December 24, 2002, which incorporated the false financial statements. In such filings, Apple also falsely represented that it did not recognize any compensation expense for options because it did not grant in-the-money options. In addition, Apple's Form 10-K for its fiscal year ended September 29, 2001 omitted that Apple's Board of Directors had approved a grant to Jobs on August 29, 2001.

94.     Apple's proxy statement for fiscal year 2002, signed by Defendants Jobs, Campbell, Drexler, York, and Levinson (Heinen signed the cover letter that accompanied the proxy) filed March 24, 2003, also falsely disclosed that "in October 2001 the Compensation Committee recommended and the Board approved Jobs's 7.5 million options grant]," and that Jobs's options were granted at $18.30 per share, which was "equal to the fair market value of the Common Stock on the date of grant."  In addition, Apple's proxy statement for fiscal year 2001, filed March 21, 2002, omitted to state that Apple's Board of Directors had approved a grant to Jobs on August 29, 2001. Heinen assisted with the preparation of Apple's proxy statements, and Heinen reviewed the statements for accuracy and completeness prior to filing.

95.     The Individual Defendants were aware, or recklessly failed to learn, that Apple's outside auditors, KPMG, received only the doctored grant documents. KPMG received a copy of the fabricated minutes from the October 19 "Special Meeting" of the Board of Directors, as well as Heinen's Secretary's Certificate vouching for those minutes. Heinen knew that Apple routinely furnished minutes from Apple Board meetings to KPMG as part of KPMG's review and that KPMG would rely on the expurgated August 29 Board minutes, which were altered to delete any reference to the original 7.5 million share grant.

### 2.     The January 2000 Grant to Steve Jobs

96.     Incredibly, the option grant to Steve Jobs in the winter of 2001 was not the first time Apple misled its shareholders about CEO Jobs's receipt of backdated options.  Jobs received an even larger grant of 10 million options (not split-adjusted) in January 2000. Apple's March 12, 2001 proxy statement informed shareholders that these options "were at an exercise price equal to the fair market value of [Apple's common stock] on the date of grant."

The proxy statement further asserted that the grant date was January 12, 2000, a date when Apple's stock price closed at $43.5938.  These statements were false.

97.     As Apple has admitted, this grant was not "memorialized" until six days later on January 18, 2000.  What happened during this six-day period?  Apple's stock price ran up from $43.5938 to $51.97 - a jump of almost 20%.  Only then (on January 18, 2000) was board action taken to memorialize the grant.  But, the exercise price assigned was not the January 18 Apple closing price of $51.97; rather Jobs was given the much lower pre-run up closing price from six days earlier.  Since the actual grant date on which the award was memorialized was January 18, 2000, the assigned exercise price should have been $51.97 -- Apple's January 18 closing price representing the fair market value of Apple's shares on the *true* date of grant.

98.     The net result is that CEO Jobs was given an "instant paper profit" in the amount of $83,762,000 (*i.e.*, $51.97 minus $43.5938 multiplied times 10 million shares) that was never disclosed to shareholders:



99.     While Apple has excluded this option grant from its Restatement on its claim that the option grant was authorized on January 12, 2000 but not formally approved on January

18, 2000, the net effect of this additional $84 million expense would be to almost double Apple's $105 million restatement.

100.    Misrepresentations to shareholders concerning CEO Jobs' stock-based compensation did not end with these two massive stock option grants in 2000 and 2001.  In exchange for these backdated options, Jobs received other compensation tainted by backdating. In Apple's subsequent proxy statements for the years 2003, 2004 and 2005, Apple stated that in March 2003, CEO Jobs voluntarily cancelled these options and the Board instead awarded him ten million (split adjusted) shares of restricted stock.  (At today's prices, these shares carry a value in excess of $1.8 billion.)  No mention was made, however, of the falsification of documents to cover up the phantom board meeting or that the options in exchange for which CEO Jobs received the restricted stock had been backdated.

### 3.    The Individual Defendants' Scheme to Backdate the January 17, 2001 Grant to Senior Apple Executives

101.    In early February 2001, Apple finalized the terms of a 4.8 million options grant to six members of Apple's executive team (the "Executive Team"), including one million options for Defendant Anderson and 400,000 for Defendant Heinen.  At the time, Apple's stock was trading at nearly $21 per share.  As revealed by the SEC's investigation into Apple's backdating, once again, a combination of Jobs, Heinen, Anderson and Apple's Board of Directors, caused Apple to backdate the grant to the Executive Team to January 17, 2001, when Apple's share price was only $16.81.  Heinen also directed her staff to prepare documents that falsely indicated that Apple's Board had approved the Executive Team grant on January 17. The difference between the price of the option had it been priced at the actual grant date and the price at which it was actually set was $18.9 million.  This amount should have been accounted for as a compensation expense in the first quarter of 2001.

102.    Heinen, working in conjunction with Jobs, picked the earlier date to price the January 17, 2001 grant.  Around late 2000, Apple's Board had begun considering a large options grant to Apple's Executive Team.  On January 30, 2001, Heinen provided Jobs with a

1    list of the daily closing share prices of Apple's common stock for January 2001 and suggested

2    that Apple use an earlier date and price for the Executive Team options grant.

3          103.    In her January 30 email to Jobs, Heinen wrote:  "There are 6.68m shares

4    available for grant in the 1998 Executive Officer plan.  To avoid any perception that the Board

5    was acting inappropriately [sic] for insiders prior to MacWorld announcements, I suggest we

6    use Jan. 10, the day after your MacWorld keynote, at $16.563.  That was one of the lowest

7    closes of the month, after the $14.875 price on Jan 2.  I don't think the [Executive Team] would

8    object to the $1.688 difference to avoid claims of inappropriate conduct."

9          104.    On January 31, 2001, Heinen sent the same set of January closing prices to

10   Anderson and recommended picking Tuesday, January 17 or Monday, January 22 as ostensible

11   grant dates.  Heinen subsequently corrected her earlier email noting that the 16th actually fell on

12   a Tuesday.  Anderson replied, "Tuesday the 16th looks fine to me."

13         105.    The following day, February 1, 2001, Heinen told Anderson that Jobs agreed to

14   use Apple's closing price on January 17, 2001 for the Executive Team grant.  Heinen began the

15   process of preparing false paperwork to submit to Apple's Board of Directors so that it could

16   authorize the grant.  That same day, Heinen directed a lawyer in Apple's legal department to

17   prepare a Unanimous Written Consent ("UWC") for the Board's signature, with an "effective

18   date of Jan. 17, 2001, priced at $16.813."  Contrary to these representations, no actual Board

19   action was taken on January 17, and Heinen only began the process of selecting the grant date

20   and price on January 30.

21         106.    Once the UWC was finalized, Heinen then forwarded the options grant

22   paperwork to Apple's Board, with a copy to Anderson.  Heinen's cover memorandum (dated

23   February 1) asked the Board to sign and return the UWC to her by fax, "if approved."  Apple's

24   directors—including Defendants Campell, Drexler, Levinson, York and Ellison subsequently

25   signed the UWCs and returned them to Heinen.

26         107.    Heinen received the UWCs by February 7, 2001.  Apple's stock closed at $20.75

27   per share on that date, approximately $3.94 higher than the January 17 price used for the

28

1  Executive Team grant.  As a result, the Executive Team grant was in the money by

2  approximately $3.94 per share.

3      108.    The concealment of this compensation expense that should have been recorded

4  as an expense in the first quarter of 2001 helped Apple meet its earnings expectations for that

5  quarter.  As reported by one analyst, Apple's earnings exceeded analyst earnings estimates for

6  the quarter despite a "difficult economic market":

> Buoyed by a lineup of new products, Apple (NSDQ:AAPL)
> Computer topped earnings projections for its second quarter ended
> March 31, posting net profit of $40 million, or 11 cents per diluted
> share, excluding investment gains and losses. The earnings results
> soared past a Thomson Financial consensus estimate of 1 cent per
> share, with a high forecast of 7 cents per share and a low of an 8-
> cent-per-share loss. Including after-tax gains and charges, Apple's
> second-quarter earnings were $43 million, or 12 cents per diluted
> share. In the year-ago quarter, the company's earnings totaled $233
> million, or 64 cents per diluted share. Apple's revenue for second-
> quarter 2001 was $1.43 billion, a 26 percent decline from sales a
> year earlier. Overall, the company shipped 751,000 Macs during
> the quarter, up from 659,000 in the first quarter. The Cupertino,
> Calif.-based computer maker's second-quarter results reflect a
> rebound from a disappointing first-quarter 2001, when revenue
> was down 57 percent year-over-year to $1 billion and the company
> posted a $195 million net loss. Gross margins also improved to
> 26.9 percent, up from minus 2.1 percent in the first quarter. "We're
> very pleased that our results exceeded expectations in a very
> difficult economic environment," said Apple CFO Fred Anderson
> in a call with financial analysts. "Most importantly, we returned
> the company to profitability."

19  Russell Redman, *Apple Gets 2Q Earnings Lift*, CRN (April 20, 2001)

20      109.    It is now clear that Apple's earnings announcement concealed the fact that

21  Apple failed to take <u>at least</u> $18.9 million expense in that quarter and thereby inflated earnings

22  for not only the first quarter of 2001, but for the entire year.

23      110.    These examples of Apple's backdating are only two of the 661 option grants to

24  Apple's senior executives that Apple *admits* were backdated or the dates manipulated.  As set

25  forth below, these instances of backdating materially inflated Apple's earnings and understated

26  Apple's expenses.

27      111.    As a result of Apple has admitted that the effect of these misdated option grants

28  was to understate its expenses, and thus overstate net income, over this period by $105 million.

31

By Apple's own admission, the bulk of the restated expenses, more than $68 million, are the result of backdated options awarded to Apple's executives and its CEO stemming from *intentional misconduct*.

112.    On an annual basis, the effect of the expenses on Apple's net income during the Class Period, prior to the change in the backdating rules in 2002, are dramatic:

| Fiscal Year (September through September) | Original Reported Income (Loss) in millions | Actual Income (Loss) in millions |
|---|---|---|
| 2001 | $(25) | $(38)[7] |
| 2002 | $65 | $42 (as restated) |
| 2003 | $69 | $57 (as restated) |
| 2004 | $276 | $266 (as restated) |
| 2005 | $1335 | $1328 (as restated) |

113.    As result of its inflated income during the Class Period and understated expenses, reported to investors through a series of false and misleading statements in Apple's public filings and press releases, Apple's share price was artificially inflated during the Class Period.

## VI.    FALSE AND MISLEADING STATEMENTS

114.    Prior to and during the Class Period, the Defendants made numerous public statements omitting material facts and deliberately misrepresenting Apple's financial performance, executive compensation, and associated expenses.  As a result, Apple's public statements disseminated during the Class Period were materially false and misleading and the price of Apple's securities was artificially inflated throughout the Class Period.  When the truth about Defendant's unlawful options backdating were finally disclosed, investors in Apple lost millions of dollars as the price of Apple's shares lost significant value.

### A.    PROXY STATEMENTS

115.    Prior to and during the Class Period, Apple published numerous false and misleading statements in its proxy statements which were relied upon by Class Members and which caused Apple's stock price to be materially inflated

---

[7] Calculated by subtracting additional after tax expenses from reported net loss

116.     From at least 1996 and through the Class Period, the Company, with the knowledge, approval, participation, or reckless disregard of each individual defendant (with respect to those disclosures made at a time when such defendant was an officer and/or director of the Company), disseminated to shareholders and filed with the SEC annual proxy statements that contained material misstatements and omissions falling into four general categories:  (a) statements failing to disclose that the stated purpose of option grants by Apple – *i.e.*, aligning executive and shareholder interests – was significantly undermined because the option grants described in the proxies were backdated; (b) misstatements that the options granted were priced at the fair market value on the date of grant, when in fact they were backdated; (c) misstatements relating to the amount of compensation received by Apple executives during the relevant time; and (d) misstatements (with respect to certain proxy statements) relating to the Company's intention to have executive stock options qualify for tax deductions under Section 162(m).

117.     The Company's proxy statements were distributed to shareholders in connection with, among other things, to secure  shareholder approval of proposals offered by management, including numerous votes seeking approval of the authorization for issuance of shares to be used for executive compensation arrangements.

118.     The materially misleading statements and omissions in each of these proxy statements are set forth below.  (Emphasis in passages excerpted from the proxy statements described below is supplied and does not appear in the original.)

## 1.     1997 Proxy

119.     Apple's definitive proxy statement dated December 26, 1996 filed with the SEC on Form 14A for the annual meeting to be held February 5, 1997 (the "1997 Proxy") was materially false and misleading.  (Defendants Jobs, Campbell, and York were directors at the time and signed the 1997 Proxy; Heinen signed the cover letter that accompanied the proxy; Anderson was CFO at the time the proxy was disseminated and participated in its preparation and/or reviewed and/or commented upon it.)

120.     With respect to shareholders of record as of December 9, 1996, the 1997 Proxy solicited shareholder votes to, among other things:  (a) approve an amendment to the ESPP to increase the number of shares reserved for issuance thereunder by 3.5 million shares; (b) approve an amendment to increase the number of shares reserved for issuance under the 1990 Plan by one million shares; and (c) approve the Performance Share Plan for executive officers, which plan provided for the issuance of up to two million shares of common stock.

121.     The 1997 Proxy stated:

> The Company's executive compensation programs are designed to use Company performance, individual executive performance and increasing stockholder value over time as determinants in establishing levels of executive compensation.  These design principles are **intended to motivate executive officers** to improve the financial position of the Company, hold executives accountable for the performance of the organizations for which they are responsible and to attract key executives into the service of the Company.

122.     This statement is misleading because it fails to disclose the instant paper profits being received by executives from backdating.  Such profits may not motivate executives to improve the financial position of the Company because an executive does not necessarily need to work to improve the financial position of the Company to gain from the award.  Unlike for shareholders, profit from backdated stock option awards is built-in from the outset.

123.     The 1997 Proxy stated, in a footnote to a chart depicting option grants during the fiscal year, that "[a]ll options were granted at an exercise price equal to fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the business day immediately preceding the date of grant."  These statements are false and misleading because they mislead investors regarding the actual compensation practices at Apple, and because the exercise prices, in fact, were *not* the fair market value of the Company's common stock on the trading day immediately preceding the date of grant.

124.     In addition, the Summary Compensation Table from the 1997 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Spindler in fiscal years 1994 and 1995 and Anderson in fiscal year 1996(and

34

1  others) as a result of their receipt of backdated stock options at less than fair market value on

2  the trading day immediately preceding the date of grant in fiscal years 1994, 1995 and/or 1996.

3  The Summary Compensation Table is set forth below (certain footnotes detailing compensation

4  unrelated to options are omitted):

| NAME AND PRINCIPAL POSITION | FISCAL YEAR | ANNUAL COMPENSATION | | | LONG-TERM COMPENSATION AWARDS | | ALL OTHER |
| | | SALARY ($) | BONUS ($) | OTHER ANNUAL COMPENSATION ($) | RESTRICTED STOCK ($) | OPTIONS (#) | COMPENSATION ($) |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Michael H. Spindler | 1996 | 557,076 | 382,500 | | | | 3,721,389 |
| Former President and | 1995 | 843,335 | 586,058 | | | 100,000 | |
| Chief Executive | | | | | | | |
| Officer* | 1994 | 684,922 | 249,500 | | | 200,000 | |
| | | | | | | | |
| Gilbert F. Amelio | 1996 | 655,061 | 2,334,000 | | 3,830,580 | 1,000,000 | 3,060 |
| Chairman of the Board | 1995 | ** | | | | | |
| and Chief Executive | 1994 | ** | | | | | |
| Officer | | | | | | | |
| | | | | | | | |
| Fred D. Anderson | 1996 | 252,126 | 1,275,000 | | | 400,000 | 141,361 |
| Executive Vice President | 1995 | ** | | | | | |
| and Chief Financial | 1994 | ** | | | | | |
| Officer | | | | | | | |
| | | | | | | | |
| Marco Landi | 1996 | 526,454 | 367,438 | 114,768 | | 400,000 | 54,570 |
| Executive Vice President | 1995 | 245,712 | 480,000 | 80,234 | | 120,000 | 50,000 |
| and Chief Operating | 1994 | *** | | | | | |
| Officer | | | | | | | |
| | | | | | | | |
| John Floisand | 1996 | 355,342 | 231,250 | 120,443 | | 30,000 | 180,893 |
| Senior Vice President, | 1995 | 302,831 | 199,544 | | | 55,000 | 23,799 |
| Worldwide Sales | 1994 | 234,866 | 171,680 | | | 155,000 | 28,852 |
| | | | | | | | |
| George M. | 1996 | 245,189 | 767,813 | | | 240,000 | 4,104 |

SUMMARY COMPENSATION TABLE

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Scalise | | | | | | | |
| Executive Vice President | 1995 | ** | | | | | |
| and Chief Administrative Officer | 1994 | ** | | | | | |

125.    Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered..."  (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

> (i)    For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.
>
> (ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…
>
> (iii)    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)    In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

126.    Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 1996 were backdated.  The Option Grants in Last Fiscal Year table is set forth below:

| OPTIONS/ SARS | % OF TOTAL OPTIONS/ SARS GRANTED TO EMPLOYEES | EXERCISE OR BASE | EXPIRATION | POTENTIAL REALISABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM(1) | |
|---|---|---|---|---|---|

| NAME | GRANTED (#) | IN FISCAL YEAR(2) | PRICE ($/SH.) | DATE | 5%($) | 10%($) |
|------|-------------|-------------------|---------------|------|-------|--------|
| Gilbert F. Amelio | 1,000,000 | 10.13% | 26.25 | 3/5/06 | 16,508,484 | 41,835,740 |
| John Floisand | 30,000 | 0.30% | 19.88 | 6/27/06 | 374,978 | 950,269 |
| Marco Landi | 400,000 | 4.05% | 28.50 | 11/7/04 | 7,169,399 | 18,168,664 |
| George M. Scalise | 240,000 | 2.43% | 25.88 | 3/12/06 | 3,905,436 | 9,897,141 |
| Michael H. Spindler* | | | | | | |

## 2.    1998 Proxy

127.    Apple's definitive proxy statement dated March 16, 1998 filed with the SEC on Form 14A for the annual meeting to be held April 22, 1998 (the "1998 Proxy") was materially false and misleading.  (Defendants Jobs, Campbell and York were directors at this time and signed the 1998 Proxy; Heinen signed the cover letter that accompanied the proxy; Anderson was CFO at the time the proxy was disseminated and participated in its preparation and/or reviewed and/or commented upon it.)

128.    With respect to shareholders of record as of February 23, 1998, the 1998 Proxy solicited shareholder votes to, among other things:  (a) "approve the 1997 Director Stock Option Plan which provid[ed] for the issuance of up to 400,000 shares of…common stock;" (b) approve the grant of 15,000 stock options each to defendants Chang and Wollard; (c) approve the reservation of 430,000 shares of common stock for issuance under the 1997 Director Stock Option Plan; and (d) approve the 1998 Plan and the reservation of 17 million shares for issuance thereunder.

129.    The 1998 Proxy stated:

> **The Company's executive compensation program utilizes** Company performance, individual performance and **an increase in stockholder value over time as determinants of executive pay levels**.  These principles are **intended to motivate executive officers** to improve the financial position of the Company, to hold executives accountable for the performance of the organizations for which they are responsible, to attract key executives into the service of the Company and **to create value for the Company's shareholders**.

130.    This statement is misleading because it fails to disclose the instant paper profits being received by executives from backdating.  An increase in stockholder value over time cannot be a determinant of executive pay levels where instant paper profits from stock options are built-in at the time of the award.  Such profits may not motivate executives to improve the financial position of the Company because an executive does not necessarily need to work to improve the financial position of the Company to gain from the award.  Unlike for shareholders, profit from backdated stock option awards is built-in from the outset.

131.    The 1998 Proxy stated "[d]uring fiscal year 1997, fourteen executive officers of the Company received new option grants under the 1990 Plan.  Options are granted under the 1990 Plan at an exercise price equal to the fair market value of the Common Stock…."[8] and, in a footnote to a chart depicting option grants during the fiscal year, "[a]ll options were granted at an exercise price equal to fair market value based on the closing market value of  Common Stock on the Nasdaq National Market on the trading day immediately preceding the date of grant.  For administrative purposes, the Board on November 5, 1997 amended the Company's stock option plans to provide that the exercise price of options granted under such plans will be the fair market value based on the closing market value on the date of grant."  These statements are false and misleading because they mislead investors regarding the actual compensation practices at Apple, and because the exercise prices, in fact, were not the fair market value of the Company's common stock on the trading day immediately preceding the date of grant.

132.    In addition, the Summary Compensation Table from the 1998 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Anderson in fiscal years 1996 and 1997 and Calderoni, DeLuca and Rubinstein in fiscal year 1997 as a result of their receipt of backdated stock options at less than fair market value on either the date of grant or the trading day immediately preceding the date of grant.  The Summary Compensation Table is set forth below:

---

[8]  This is the statement as it appears in the proxy statement.  Apparently the words "on the date of grant" were inadvertently omitted.

| | | ANNUAL COMPENSATION | | | | |
|---|---|---|---|---|---|---|
| | | | | | **LONG-TERM COMPENSATION** | |
| **NAME AND PRINCIPAL POSITION** | **FISCAL YEAR** | **SALARY ($)** | **BONUS ($)** | **RESTRICTED STOCK AWARDS ($)** | **SECURITIES UNDERLYING OPTIONS (#)** | **ALL OTHER COMPENSATION ($)** |
| Steven P. Jobs | 1997 | | | | 30,000 | |
| Interim Chief Executive Officer | 1996 | | | | | |
| | 1995 | | | | | |
| Gilbert F. Amelio | 1997 | 997,617 | 1,000,000 | 509,350 | | 6,749,094 |
| Former Chairman of the Board | 1996 | 655,061 | 2,334,000 | 3,830,580 | 1,000,000 | 3,060 |
| and Chief Executive Officer | 1995 | | | | | |
| Fred D. Anderson | 1997 | 520,311 | | 40,748 | 850,000 | 250,489 |
| Executive Vice President | 1996 | 252,156 | 1,275,000 | | 400,000 | 141,361 |
| and Chief Financial Officer | 1995 | | | | | |
| Guerrino De Luca | 1997 | 430,496 | 322,732 | 30,561 | 700,000 | 169,513 |
| Executive Vice President, | 1996 | 269,034 | 104,489 | | 78,000 | 62,327 |
| Marketing | 1995 | | | | | |
| Robert Calderoni | 1997 | 288,058 | 75,000 | 9,547 | 125,000 | 1,586 |
| Senior Vice President, | 1996 | 63,794 | 125,000 | | 75,000 | 4,750 |
| Corporate Controller | 1995 | | | | | |
| Jonathan Rubinstein | 1997 | 250,262 | 100,000 | 19,108 | 700,000 | 1,864 |
| Senior Vice President, | 1996 | | | | | |

**[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

| | | | | | | |
|---|---|---|---|---|---|---|
| Hardware Engineering | 1995 | | | | | |
| Ellen Hancock | 1997 | 424,120 | 360,000 | | | 480,000 |
| Former Executive Vice President | 1996 | 111,646 | 200,000 | | 300,000 | |

133.    Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered..."  (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

> (i)    For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

> (ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

> (iii)    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount in available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)    In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

134.    Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal 1997 were backdated.  The Option Grants in Last Fiscal Year table is set forth below:

**[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

| | | INDIVIDUAL GRANTS | | | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM(3) | |
| NAME | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED | PERCENT OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE OR BASE PRICE | EXPIRATION DATE | | |
| | (#) | (1) | ($/SH)(2) | DATE | 5% ($) | 10% ($) |
| Steven P. Jobs | 30,000 | 0.15% | 23.63 | 8/14/07 | 446,512 | 1,134,000 |
| Gilbert F. Amelio | | | | | | |
| Fred D. Anderson | 100,000 | 0.51% | 18.38 | 4/21/07 | 1,157,625 | 2,940,000 |
| | 500,000 | 2.55% | 13.25 | 7/11/07 | 4,173,750 | 10,600,000 |
| | 250,000 | 1.27% | 19.75 | 8/5/07 | 3,110,625 | 7,900,000 |
| Guerrino De Luca(6) | 200,000 | 1.02% | 17.00 | 2/21/07 | 2,142,000 | 5,440,000 |
| | 309,750 | 1.58% | 13.25 | 7/11/07 | 2,585,638 | 6,566,700 |
| | 190,250 | 0.97% | 19.75 | 8/5/07 | 2,367,186 | 6,011,900 |
| Robert Calderoni(6) | 25,000 | 0.13% | 17.00 | 2/21/07 | 267,750 | 680,000 |
| | 20,000 | 0.10% | 18.38 | 4/21/07 | 231,525 | 588,000 |
| | 80,000 | 0.41% | 19.75 | 8/5/07 | 995,400 | 2,528,000 |
| Jonathan Rubinstein | 200,000 | 1.02% | 17.00 | 2/21/07 | 2,142,000 | 5,440,000 |
| | 200,000 | 1.02% | 13.25 | 7/11/07 | 1,669,500 | 4,240,000 |
| | 300,000 | 1.53% | 19.75 | 8/5/07 | 3,732,750 | 9,480,000 |
| Ellen Hancock | | | | | | |

135.     Finally, the 1998 Proxy stated that the "Company intends that options granted under the 1990 Plan and any payments made or stock issued under the Performance Share Plan be deductible by the Company under Section 162(m)."  Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."  To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant.  Thus, a company's "at the money" stock option expenses are generally tax deductible even though an executive is paid more than $1 million.  The Company's statements of an intention to have options be deductible under Section 162(m) were false and misleading because certain options were backdated and, as a result, expense incurred with respect to such options could not have been properly deductible under Section 162(m).

**3.     2000 Proxy**

136.     Apple's definitive proxy statement dated March 6, 2000 filed with the SEC on Form 14A for the annual meeting to be held April 20, 2000 (the "2000 Proxy") was materially false and misleading.  (Defendants Jobs, Campbell and York were directors at this time and signed the 2000 Proxy; Heinen signed the cover letter that accompanied the proxy; Anderson was CFO at the time the proxy was disseminated and participated in its preparation and/or reviewed and/or commented upon it.)

137.     With respect to shareholders of record as of February 22, 2000, the 2000 Proxy solicited shareholder votes to, among other things, approve an amendment to the 1998 Plan to increase the number of shares reserved for issuance thereunder by two million shares.

138.     The 2000 Proxy stated:

> **The Company's executive compensation program utilizes** Company performance, individual performance and an **increase in stockholder value over time as determinants of executive pay levels.**   These principles are **intended to motivate executive officers** to improve the financial position of the Company, to hold executives accountable for the performance of the organizations for which they are responsible, to attract key executives into the service of the Company and **to create value for the Company's shareholders**.

139.     This statement is misleading because it fails to disclose the instant paper profits being received by executives from backdating.  An increase in stockholder value over time cannot be a determinant of executive pay levels where instant paper profits from stock options are built-in at the time of the award.  Such profits may not motivate executives to improve the financial position of the Company because an executive does not necessarily need to work to improve the financial position of the Company to gain from the award.  Unlike for shareholders, profit from backdated stock option awards is built-in from the outset.

140.     The 2000 Proxy stated that "[d]uring fiscal year 1999, all of the executive officers  of the Company received new option grants under the 1998 Plan.  The options granted under the 1998 Plan were at an exercise price equal to the fair market value of the Common Stock on the date of grant…." and, in a footnote to a chart depicting option grants during the fiscal year, "[a]ll options were granted at an exercise price equal to fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of

grant." These statements are false and misleading because they fail to disclose the backdating scheme and that the exercise price in fact was not the fair market value of the Company's common stock on the date of grant.

141. In addition, the Summary Compensation Table from the 2000 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Anderson in fiscal years 1997 and 1999, Mandich and Rubinstein (and others) in fiscal years 1997 and 1999 and Cook in fiscal years 1998 and 1999 as a result of their receipt of backdated stock options at less than fair market value on the date of grant. The Summary Compensation Table is set forth below:

| NAME AND PRINCIPAL POSITION | FISCAL YEAR | ANNUAL COMPENSATION | | LONG-TERM COMPENSATION | | |
| | | | | RESTRICTED | SECURITIES | |
| | | SALARY | BONUS | STOCK AWARDS | UNDERLYING OPTIONS | ALL OTHER COMPENSATION |
| | | ($) | ($) | ($) | (#) | ($) |
| Steven P. Jobs | 1999 | 1 | | | | |
| interim Chief Executive Officer* | 1998 | 1 | | | | |
| | 1997 | | | | 30,000 | |

| Fred D. Anderson | 1999 | 605,260 | | | 475,000 | 29,700 |
|---|---|---|---|---|---|---|
| Executive Vice President and Chief Financial | 1998 | 604,283 | | | 250,000 | 60,123 |
| Officer | 1997 | 520,311 | | 40,748 | 850,000 | 250,489 |
| Timothy D. Cook | 1999 | 401,940 | | | 300,000 | 29,519 |
| Senior Vice President, Worldwide Operations | 1998 | 223,953 | 500,000 | | 700,000 | 90,849 |
| Mitchell Mandich | 1999 | 402,941 | | | 387,876 | 7,200 |
| Senior Vice President, Worldwide Sales | 1998 | 402,253 | | | 424,250 | 8,118 |
| | 1997 | 174,348 | 104,000 | | 565,050 | 1,730 |
| Jonathan Rubinstein | 1999 | 402,200 | | | 458,334 | 5,888 |
| Senior Vice President, Hardware Engineering | 1998 | 402,095 | | | 300,000 | 4,804 |
| | 1997 | 250,262 | 100,000 | 19,108 | 700,000 | 1,864 |

142.    Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered ..."  (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

(i)    For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

(ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii)    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)    In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading absent the disclosure of the additional compensation received as a result of the backdated options.

143.    Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 1999 were backdated.  The Option Grants in Last Fiscal Year table is set forth below:

| | | INDIVIDUAL GRANTS | | | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM(3) | |
| NAME | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED (#) | PERCENT OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR (1) | EXERCISE OR BASE PRICE ($/SH)(2) | EXPIRATION DATE | 5% ($) | 10% ($) |
|---|---|---|---|---|---|---|
| Steven P. Jobs | | | | | | |
| Fred D. Anderson | 475,000 | 7.98% | 34.63 | 3/2/09 | 10,343,351 | 26,212,083 |
| Timothy D. Cook | 300,000 | 5.03% | 34.63 | 3/2/09 | 6,532,643 | 16,555,000 |
| Mitchell Mandich | 387,876 | 6.51% | 34.63 | 3/2/09 | 8,446,185 | 21,404,290 |
| Jonathan Rubinstein | 458,334 | 7.70% | 34.63 | 3/2/09 | 9,980,441 | 25,292,398 |

144.    Finally, the 2000 Proxy stated that the "Company intends that options granted under the Company's stock option plans be deductible by the Company under Section 162(m)." Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."  To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant. Thus, a company's "at the money" stock option expenses are generally tax deductible even though an executive is paid more than $1 million.  The Company's statements of an intention to have options be deductible under Section 162(m) were false and misleading because certain

options were backdated and, as a result, expense incurred with respect to such options could not have been properly deductible under Section 162(m).

**4.    2001 Proxy**

145.    Apple's definitive proxy statement dated March 12, 2001 filed with the SEC on Form 14A for the annual meeting to be held April 19, 2001 (the "2001 Proxy") was materially false and misleading.  (Defendants Jobs, Campbell, Drexler, Levinson and York were directors at this time and signed the 2001 Proxy; Heinen signed the cover letter that accompanied the proxy; Anderson was CFO at the time the proxy was disseminated and participated in its preparation and/or reviewed and/or commented upon it.)

146.    With respect to shareholders of record as of February 21, 2001, the 2001 Proxy solicited shareholder votes to, among other things, approve an amendment to the 1998 Plan to increase the number of shares reserved for issuance thereunder by 5 million shares.

147.    The 2001 Proxy stated:

> The Company's executive compensation program focuses on Company performance, individual performance and increases in stockholder value over time as determinants of executive pay levels. These principles are intended to motivate executive officers to improve the financial position of the Company, to hold executives accountable for the performance of the organizations for which they are responsible, to attract key executives into the service of the Company and to create value for the Company's shareholders.

148.    This statement is misleading because it fails to disclose the instant paper profits being received by executives from backdating.  An increase in stockholder value over time cannot be a determinant of executive pay levels where instant paper profits from stock options are built-in at the time of the award.  Such profits may not motivate executives to improve the financial position of the Company because an executive does not necessarily need to work to improve the financial position of the Company to gain from the award. Unlike for shareholders, profit from backdated stock option awards is built-in from the outset.

The 2001 Proxy stated that "[d]uring fiscal year 2000, options were granted under the 1998 Plan to Messrs. Jobs [and] Johnson…and Ms. Heinen.  The options granted under the 1998 Plan were at an exercise price equal to the fair market value of the Common Stock on the date of grant…."

and, in a footnote to a chart depicting option grants during the fiscal year, "[a]ll options were granted at an exercise price equal to fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of grant." These statements are false and misleading because they mislead investors regarding the actual compensation practices at Apple, and because the exercise prices, in fact, were *not* the fair market value of the Company's common stock on the trading day immediately preceding the date of grant.

149.    The 2001 Proxy stated that Jobs received a grant of 10 million (not split-adjusted) options in January 2000 "at an exercise price equal to the fair market value based on the closing market value of Common Stock on the Nasdaq National market on the date of grant." The 2001 Proxy further disclosed that the grant date was January 12, 2000, a date when Apple's stock price closed at $43.5938 and, therefore, the exercise price assigned to the award was $43.5938. These statements were false.

150.    As Apple has admitted, this grant was not memorialized until six days after January 12, 2000. During that time, Apple's stock price ran up from $43.5938 to $51.97 - a jump of almost 20%. Only then (on January 18, 2000) was board action taken to memorialize the grant. Thus, the exercise price assigned to the option grant should have been the January 18 Apple closing price of $51.97 rather than the $43.5938 that was falsely disclosed in the 2001 Proxy. The net result is that CEO Jobs was given an "instant paper profit" in the amount of $83,762,000 (*i.e.*, $51.97 minus $43.5938 multiplied times 10 million shares) that was never disclosed to shareholders.

151.    In addition, the Summary Compensation Table from the 2001 Proxy materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal year 2000, Anderson in fiscal year 1999, Johnson in fiscal year 2000 and Mandich and Rubinstein in fiscal year 1999 as a result of their receipt of backdated stock options at less than fair market value. The Summary Compensation Table is set forth below:

| NAME AND PRINCIPAL POSITION | FISCAL YEAR | ANNUAL COMPENSATION | | LONG-TERM COMPENSATION SECURITIES UNDERLYING OPTIONS | ALL OTHER COMPENSATION |
| | | SALARY | BONUS | | |
| --- | --- | --- | --- | --- | --- |
| | | ($) | ($) | (#) | ($) |
| Steven P. Jobs | 2000 | 1 | 90,000,000 | 20,000,000 | |
| Chief Executive Officer | 1999 | 1 | | | |
| | 1998 | 1 | | | |
| Fred D. Anderson | 2000 | 660,414 | | | 6,750 |
| Executive Vice President and Chief Financial Officer | 1999 | 605,260 | | 950,000 | 29,700 |
| | 1998 | 604,283 | | 500,000 | 60,123 |
| Ronald B. Johnson | 2000 | 328,719 | 500,000 | 1,200,000 | 111,444 |
| Senior Vice President, New Business Development | 1999 | | | | |
| | 1998 | | | | |
| Mitchell Mandich | 2000 | 453,444 | | | 7,650 |
| Senior Vice President, Worldwide Sales | 1999 | 402,941 | | 775,752 | 7,200 |
| | 1998 | 402,253 | | 916,668 | 8,118 |
| Jonathan Rubinstein | 2000 | 451,949 | | | 6,577 |
| Senior Vice President, Hardware Engineering | 1999 | 402,200 | | 458,334 | 5,888 |
| | 1998 | 402,095 | | 600,000 | 4,804 |

152.   Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered ..." (17 C.F.R. §

48

229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further

provide that the following items be disclosed in the Summary Compensation Table:

> (i)   For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.
>
> (ii)  Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…
>
> (iii) The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual

Compensation" and "Securities Underlying Options" are materially misleading because they

omit the additional compensation received as a result of the backdated options.

153.   Further, the Option Grants in Last Fiscal Year Table is materially misleading

because it fails to include an additional column showing the market price on the date of the

grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 2000 were

backdated.  The Option Grants in Last Fiscal Year Table is set forth below:

| | | INDIVIDUAL GRANTS | | | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM(3) | |
| | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED | PERCENT OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR (1) | EXERCISE OR BASE PRICE | | | |
| NAME | (#) | | ($/SH)(2) | DATE | 5% ($) | 10% ($) |
|---|---|---|---|---|---|---|
| Steven P. Jobs | 20,000,000 | 43.80% | 43.59 | 1/12/10 | 548,317,503 | 1,389,544,207 |
| Fred D. Anderson | | | | | | |
| Ronald B. Johnson | 1,200,000 | 2.63% | 47.44 | 12/14/09 | 35,799,827 | 90,723,790 |
| Mitchell Mandich(4) | | | | | | |
| Jonathan Rubinstein | | | | | | |

*(1)* Based on an aggregate of 45,662,484 options granted to all employees during  fiscal year 2000. Options

granted in fiscal year 2000, including those granted to Mr. Johnson, typically vest in four equal annual

installments commencing on the first anniversary of the date of grant. Of the options granted to Mr. Jobs, 10 million options were immediately vested and exercisable on the date of grant; 5 million vested in July 2000; and the remaining 5 million will vest in July 2001.

*(2)* **All options were granted at an exercise price equal to the fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of grant.**

*(3)* Potential gains are net of exercise price, but before taxes associated with exercise. These amounts represent certain assumed rates of appreciation only, based on SEC rules, and do not represent the Company's estimate or projection of the price of the Company's stock in the future. **Actual gains, if any, on stock option exercises depend upon the actual future price of Common Stock and the continued employment of the option holders throughout the vesting period.** Accordingly, the potential realizable values set forth in this table may not be achieved.

*(4)* Mr. Mandich resigned from his position of Senior Vice President, Worldwide Sales on October 9, 2000.

154.    The 2001 Proxy stated, in the footnotes to the chart above depicting option grants during the fiscal year, that "[a]ll options were granted at an exercise price equal to fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the business day immediately preceding the date of grant."  These statements are false and misleading because they mislead investors regarding the actual compensation practices at Apple, and because the exercise prices, in fact, were *not* the fair market value of the Company's common stock on the trading day immediately preceding the date of grant.

155.    Finally, the 2001 Proxy stated that the "Company intends that options granted under the Company's stock option plans be deductible by the Company under Section 162(m)." Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."  To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant. Thus, a company's "at the money" stock option expenses are generally tax deductible even though an executive is paid more than $1 million.  The Company's statements of an intention to have options be deductible under Section 162(m) were false and misleading because certain options were backdated and, as a result, expense incurred with respect to such options could not have been properly deductible under Section 162(m).

### 5.    2002 Proxy

156.    Apple's definitive proxy statement dated March 21, 2002 filed with the SEC on Form 14A for the annual meeting to be held April 24, 2002 (the "2002 Proxy") was materially false and misleading.  (Defendants Jobs, Campbell, Drexler, York, and Levinson were directors at this time and signed the 2002 Proxy; Heinen signed the cover letter that accompanied the proxy; Anderson was CFO at the time the proxy was disseminated and participated in its preparation and/or reviewed and/or commented upon it.)

157.    With respect to shareholders of record as of March 1, 2002, the 2002 Proxy solicited shareholder votes to, among other things, approve an amendment to the 1998 Plan to increase the number of shares reserved for issuance thereunder by 5 million shares.

158.    The 2002 Proxy stated:

> **The Company's executive compensation program focuses on** Company performance, individual performance and **increases in stockholder value over time as determinants of executive pay levels**.  These principles are **intended to motivate executive officers** to improve the financial position of the Company, to hold executives accountable for the performance of the organizations for which they are responsible, to attract key executives into the service of the Company and **to create value for the Company's shareholders**.

159.    This statement is misleading because it fails to disclose the instant paper profits being received by executives from backdating.  An increase in stockholder value over time cannot be a determinant of executive pay levels where instant paper profits from stock options are built-in at the time of the award.  Such profits may not motivate executives to improve the financial position of the Company because an executive does not necessarily need to work to improve the financial position of the Company to gain from the award.  Unlike for shareholders, profit from backdated stock option awards is built-in from the outset.

160.    The 2002 Proxy stated that "[d]uring fiscal year 2001, all of the Company's executive officers, excluding Mr. Jobs, received stock option grants under the 1998 Plan…. The options granted under the 1998 Plan were at an exercise price equal to the fair market value of the Common Stock on the date of grant…." and, in a footnote to a chart depicting option grants during the fiscal year, "[a]ll options were granted at an exercise price equal to the

1    fair market value based on the closing market value of Common Stock on the Nasdaq National

2    Market on the date of grant."  These statements are false and misleading because they mislead

3    investors regarding the actual compensation practices at Apple, and because the exercise prices,

4    in fact, were *not* the fair market value of the Company's common stock on the trading day

5    immediately preceding the date of grant.

6          161.    The 2002 Proxy disclosed  that:

> **in October 2001** the Compensation Committee recommended and
> **the Board approved** granting Mr. Jobs options to purchase
> 7,500,000 shares…in order to provide him with an incentive to
> continue to serve as the Company's CEO and maximize
> shareholder value.  The options were granted at an exercise price
> of $18.30, which is equal to the fair market value…on the date of
> grant.

11          162.    Apple has now admitted that this statement was false because such a Board

12    meeting did not occur. The true grant date was December 18, 2001 which means the assigned

13    exercise price should have been $21.01 -- Apple's December 18 closing price representing the

14    fair market value of Apple's shares on the true date of grant.  The net result of the pretense that

15    the grant of these options was approved at an October 2001 board meeting is CEO Jobs was

16    given an "instant paper profit" in the amount of $20,325,000 (*i.e.*, $21.01 minus $18.30

17    multiplied times 7.5 million shares) that was never disclosed to shareholders.

18          163.    In addition, the Summary Compensation Table from the 2002 Proxy materially

19    misstated the compensation of, and failed to disclose the illegal compensation received from

20    the Company by, Jobs in fiscal year 2000, Anderson, Cook and Rubinstein in fiscal years 1999

21    and 2001 and Tevanian in fiscal year 2001 as a result of their receipt of backdated stock options

22    at less than fair market value on the date of grant.  The Summary Compensation Table is set

23    forth below:

24

25

26

27

28

**SUMMARY COMPENSATION TABLE**

| Name and Principal Position | Fiscal Year | Annual Compensation | | Long-Term Compensation | All Other Compensation ($) |
| | | Salary ($) | Bonus ($) | Securities Underlying Options* (#) | |
|---|---|---|---|---|---|
| Steven P. Jobs Chief Executive Officer | 2001 2000 1999 | 1 1 1 | 43,511,534(1) | (2) 20,000,000 — | 40,484,594(1) — — |
| Fred D. Anderson Executive Vice President and Chief Financial Officer | 2001 2000 1999 | 657,039 660,414 605,260 | — — — | 1,000,000 — 950,000 | 7,312(3) 6,750(3) 29,700(4) |
| Timothy D. Cook Executive Vice President, Worldwide Sales and Operations | 2001 2000 1999 | 452,219 451,673 401,940 | 500,000(5) — — | 1,000,000 — 600,000 | 7,875(3) 6,352(3) 29,519(6) |
| Jonathan Rubinstein Senior Vice President, Hardware Engineering | 2001 2000 1999 | 469,737 451,949 402,200 | — — — | 1,000,000 — 916,668 | 7,875(3) 6,577(3) 5,888(7) |
| Avadis Tevanian, Jr. Ph.D Senior Vice President, Software Engineering | 2001 2000 1999 | 460,873 451,673 401,939 | 500(8) — — | 1,000,000 — 1,019,580 | 10,200(3) 10,200(3) 9,600(3) |

*(1)*In December 1999, Mr. Jobs was given a special executive bonus for serving as the Company's interim Chief Executive Officer for past services, in the form of an aircraft with a total cost to the Company of approximately $90,000,000. This amount was previously reported as a bonus for fiscal year 2000 in the Company's 2000 Form 10-K and 2000 Proxy Statement. Because the aircraft was transferred to Mr. Jobs in 2001, the amount of approximately $43.5 million paid by the Company during fiscal year 2001 towards the purchase of the plane and related tax assistance of approximately $40.5 million was reported as income to Mr. Jobs. Accordingly, the $90 million previously reported as a bonus in 2000 has been removed from the table above, and the amount reported as taxable income by Mr. Jobs related to the aircraft during fiscal year 2001 is reported as compensation.

*(2)***Subsequent to fiscal year 2001, in October 2001 the Board granted Mr. Jobs options to purchase 7,500,000 shares of Common Stock under the 1998 Plan at an exercise price per share of $18.30, which equaled the fair market value based on the closing market value of Common Stock on the date of grant. 25% of the options were vested as of the date of grant and the remainder vest in three equal annual installments commencing on the first anniversary of the date of grant.**

*(3)*Consists of matching contributions made by the Company in accordance with the terms of the 401(k) plan.

**[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

*(4)* Consists of $22,500 in relocation assistance and $7,200 in matching contributions made by the Company in accordance with the terms of the 401(k) plan.

*(5)* A special executive bonus was given to Mr. Cook for accepting the position of Senior Vice President, Worldwide Sales Service & Support in addition to holding the position of Senior Vice President, Operations. In January 2002, Mr. Cook was named Executive Vice President, Worldwide Sales and Operations.

*(6)* Consists of $24,719 in relocation assistance and $4,800 in matching contributions made by the Company in accordance with the terms of the 401(k) plan.

*(7)* Includes $3,465 from the disqualifying disposition of shares of Company stock acquired through the Company's Employee Stock Purchase Plan and $2,423 in matching contributions made by the Company in accordance with the terms of the 401(k) plan.

*(8)* Patent award.

The foregoing statements were false and misleading because Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered . . ." (17 C.F.R. § 229.402(b)(2)(iii)(B)), and Apple failed to include the non-cash compensation attributable to backdated options.   Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

> (i)    For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

> (ii)   Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

> (iii)  The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)     In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.   Footnote 2 of the summary table failed to disclose that the 7.5 million options awarded to Defendant Jobs in October 2001 were backdated.   These statements demonstrate that Apple management was

willing to and did materially mislead the investing public in order to enhance their own compensation.

164.   The Option Grants in Last Fiscal Year Table is set forth below:

**OPTION GRANTS IN LAST FISCAL YEAR**

| Name | Number of Securities Underlying Options Granted (#) | Percent of Total Options Granted to Employees in Fiscal Year(1) | Exercise or Base Price ($/Sh)(2) | Expiration Date | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term(3) | |
|---|---|---|---|---|---|---|
| | | | | | 5% ($) | 10% ($) |
| Steven P. Jobs | (4) | — | — | — | — | — |
| Fred D. Anderson | 1,000,000 | 2.87% | $ 16.8125 | 1/17/11 | $ 10,573,291 | $ 26,794,795 |
| Timothy D. Cook | 1,000,000 | 2.87% | $ 16.8125 | 1/17/11 | $ 10,573,291 | $ 26,794,795 |
| Jonathan Rubinstein | 1,000,000 | 2.87% | $ 16.8125 | 1/17/11 | $ 10,573,291 | $ 26,794,795 |
| Avadis Tevanian, Jr. | 1,000,000 | 2.87% | $ 16.8125 | 1/17/11 | $ 10,573,291 | $ 26,794,795 |

*(1)*Based on an aggregate of 34,874,440 options granted to all employees during fiscal year 2001. Options granted in fiscal year 2001 typically vest over four years in sixteen equal quarterly increments. Options granted to executive officers, including those granted to the Named Executive Officers, typically vest in four equal annual installments commencing on the first anniversary of the date of grant.

*(2)*All options were granted at an exercise price equal to the fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of grant.

*(3)*Potential gains are net of exercise price, but before taxes associated with exercise. These amounts represent certain assumed rates of appreciation only, based on SEC rules, and do not represent the Company's estimate or projection of the price of the Company's stock in the future. Actual gains, if any, on stock option exercises depend upon the actual future price of Common Stock and the continued employment of the option holders throughout the vesting period. Accordingly, the potential realizable values set forth in this table may not be achieved.

*(4)***Subsequent to fiscal year 2001, in October 2001 the Board granted Mr. Jobs options to purchase 7,500,000 shares of Common Stock under the 1998 Plan at an exercise price per share of $18.30, which equaled the fair market value based on the closing market value of Common Stock on the date of grant. 25% of the options were vested as of the date of grant and the remainder vest in three equal annual installments commencing on the first anniversary of the date of grant. The options expire in October 2011.**

165.     The Option Grants in Last Fiscal Year Table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 2001 were backdated. The footnotes to the chart depicted above falsely state that "[a]ll options were granted at an exercise price equal to fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the business day immediately preceding the date of grant" and that actual gains depend upon the actual future price of the Common Stock.  These statements are false and misleading because they mislead investors regarding the actual compensation practices at Apple, and because the exercise prices, in fact, were *not* the fair market value of the Company's common stock on the trading day immediately preceding the date of grant.

166.     Finally, the 2002 Proxy stated that the "Company intends that options granted under the Company's stock option plans be deductible by the Company under Section 162(m)." Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."  To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant. Thus, a company's "at the money" stock option expenses are generally tax deductible even though an executive is paid more than $1 million.  The Company's statements of an intention to have options be deductible under Section 162(m) were false and misleading because certain options were backdated and, as a result, expense incurred with respect to such options could not have been properly deductible under Section 162(m).

### 6.     2003 Proxy

167.     Apple's definitive statement dated March 24, 2003 filed with the SEC on Form 14A for the annual meeting to be held April 24, 2003 (the "2003 Proxy") was materially false and misleading.  (Defendants Jobs, Campbell, Drexler, York, and Levinson were directors at the time and signed the 2003 Proxy; Heinen signed the cover letter that accompanied the proxy; Anderson was CFO at the time the proxy was disseminated and participated in its preparation

and/or reviewed and/or commented upon it.)  With respect to shareholders of record as of

March 4, 2003, the 2003 Proxy solicited shareholder votes to, among other things:  (a)

"approve an amendment to the 1998 Executive Officer Stock Plan to allow broad-based grants

to all employees"; and (b) "approve an amendment to the [ESPP] to increase the number of

shares of Common Stock reserved for issuance thereunder by 4 [million] shares."

168.    The 2003 Proxy stated:

> The goal of the [Compensation] Committee is to align
> compensation with Company performance….
>
> * * *
>
> The Committee believes that a substantial portion of an executive
> officer's compensation **should be closely aligned with Company
> performance**.
>
> * * *
>
> The Committee believes that the granting of stock options is an
> important method of rewarding and motivating employees **by
> aligning the interests of the employee with those of the
> shareholders.  Stock options have value for an employee only if
> the Company's stock price increases above the exercise price of
> the option** and the employee remains employed by the Company
> for the duration of the vesting period.

169.    These statements are false and misleading because they fail to disclose the

instant paper profits being received by executives from backdating.  Contrary to the statement

above, backdated stock options that are "in the money" from the outset do have immediate

value for an employee; no increases of the Company's stock price are necessary.  Such instant

paper profits do not align executive and shareholder interests because only the executive

receiving the backdated option, not the shareholder who purchased in the open market at fair

market value, has received a built-in paper profit from the outset.  These statements

demonstrate that Apple management was willing to and did materially mislead the investing

public in order to enhance their own compensation.

170.    The 2003 Proxy stated that "[i]n fiscal year 2002…[t]he Committee made stock

option grants to…Mr. Jobs…in connection with [a] performance evaluation[,]" "[t]he options

granted under the 1998 Plan were at an exercise price equal to the fair market value of the

1   Common Stock on the date of grant….” and, in a footnote to a chart depicting the option grant

2   to Jobs during the fiscal year, “[a]ll options were granted at an exercise price equal to the fair

3   market value based on the closing market value of Common Stock on the Nasdaq National

4   Market on the date of grant.”  These statements are false and misleading because they mislead

5   investors regarding the actual compensation practices at Apple, and because the exercise prices,

6   in fact, were *not* the fair market value of the Company’s common stock on the trading day

7   immediately preceding the date of grant.

8        171.   As with the 2002 Proxy, the 2003 Proxy falsely stated:

9        **in October 2001** the Compensation Committee recommended and
    **the Board approved**, granting Mr. Jobs options to purchase
10       7,500,000 [not split-adjusted] shares…in order to provide him with
    an incentive to continue to serve as the Company’s CEO and
11       maximize shareholder value.   The options were granted at an
    exercise price of $18.30, which was equal to the fair market value
12       of the common stock on the date of grant.

13       172.   Apple has admitted that this statement was false because such a Board meeting

14  did not occur. The true grant date was December 18, 2001 which means the assigned exercise

15  price should have been $21.01 -- Apple’s December 18 closing price representing the fair

16  market value of Apple’s shares on the true date of grant.  The net result of the pretense that the

17  grant of these options was approved at an October 2001 board meeting is CEO Jobs was given

18  an “instant paper profit” in the amount of $20,325,000 (*i.e.*, $21.01 minus $18.30 multiplied

19  times 7.5 million shares) that was never disclosed to shareholders.

20       173.   Unlike the 2002 Proxy, however, the 2003 Proxy goes on to state:

21       In March 2003, Mr. Jobs voluntarily cancelled all of his
    outstanding options, excluding those granted to him in his capacity
22       as a director….In keeping with its philosophy to relate
    compensation to building shareholder value, **in exchange for his**
23       **cancelled options**, the Board approved a new retention and
    incentive program in the form of long-term equity compensation
24       consisting of five million [not adjusted for stock splits] restricted
    shares of the Company’s Common Stock which generally vest in
25       full on the third anniversary of the grant date.

26       174.   This statement is misleading because it fails to disclose that the five million

27  restricted shares (now ten million after adjustments for stock splits) were received by Jobs in

28  exchange for the backdated stock options discussed earlier herein.  It is estimated that as the

1  result of the $104,087,000 in "instant paper profits" Jobs received from backdated options, he

2  received at least an additional 630,000 shares of restricted stock that he would not have

3  received had the cancelled options not been backdated.  At prices prevailing in or about the

4  date of the 2003 Proxy, these extra 630,000 shares had a value in excess of $50 million.  The

5  2003 Proxy also fails to disclose these facts.

6        175.    In addition, the Summary Compensation Table from the 2003 Proxy materially

7  misstated the compensation of, and failed to disclose the illegal compensation received from

8  the Company by, Jobs in fiscal years 2000 and 2002 and Anderson, Cook, Rubinstein and

9  Tevanian in fiscal year 2001 as a result of their receipt of backdated stock options at less than

10  fair market value on the date of grant.  The Summary Compensation Table is set forth below:

**SUMMARY COMPENSATION TABLE**

| Name and Principal Position | Fiscal Year | Annual Compensation | | Long-Term Compensation | All Other Compensation ($) |
|---|---|---|---|---|---|
| | | Salary ($) | Bonus ($) | Securities Underlying Options* (#) | |
| Steven P. Jobs Chief Executive Officer | 2002 2001 2000 | 1 1 1 | 2,268,698(1) 43,511,534(1) | 7,500,000(2) — 20,000,000 | 1,302,795(1) 40,484,594(1) — |
| Fred D. Anderson Executive Vice President and Chief Financial Officer | 2002 2001 2000 | 656,631 657,039 660,414 | — — — | — 1,000,000 — | 11,000(3) 7,312(3) 6,750(3) |
| Timothy D. Cook Executive Vice President, Worldwide Sales and Operations | 2002 2001 2000 | 563,829 452,219 451,673 | — 500,000(4) — | — 1,000,000 — | 8,025(3) 7,875(3) 6,352(3) |

[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Jonathan Rubinstein Senior Vice President, Hardware Engineering | 2002 2001 2000 | 452,588 469,737 451,949 | | — — — | 1,000,000 | | 9,996(3) 7,875(3) 6,577(3) |
| Avadis Tevanian, Jr. Ph.D Senior Vice President, Software Engineering | 2002 2001 2000 | 492,212 460,873 451,673 | 500(5) | — — — | 1,000,000 | | 10,700(3) 10,200(3) 10,200(3) |

*(1)*In December 1999, Mr. Jobs was given a special executive bonus for serving as the Company's interim Chief Executive Officer for past services, in the form of an aircraft with a total cost to the Company of approximately $90,000,000. This amount was previously reported as a bonus for fiscal year 2000 in the Company's 2000 Form 10-K and 2000 Proxy Statement. Because the aircraft was transferred to Mr. Jobs in 2001, the amount of approximately $43.5 million paid by the Company during fiscal year 2001 towards the purchase of the plane and the related tax assistance of approximately $40.5 million was reported as income to Mr. Jobs. In fiscal 2002, approximately $2.27 million paid by the Company towards the purchase of the plane and approximately $1.3 million in related tax assistance was reported as income to Mr. Jobs. Accordingly, the $90 million previously reported as a bonus in 2000 has been removed from the table above, and the amounts reported as taxable income by Mr. Jobs related to the aircraft during each of fiscal 2001 and 2002 is reported as compensation.

*(2)*In March 2003, Mr. Jobs voluntarily cancelled all of his outstanding options, excluding those granted to him in his capacity as a director. In addition, in March 2003, the Board awarded Mr. Jobs five million restricted shares of the Company's Common Stock which generally vest in full on the third anniversary of the grant date.
*(3)*Consists of matching contributions made by the Company in accordance with the terms of the 401(k) plan.

*(4)*A special executive bonus was given to Mr. Cook for accepting the position of Senior Vice President, Worldwide Sales Service & Support in addition to holding the position of Senior Vice President Operations. In January 2002, Mr. Cook was named Executive Vice President, Worldwide Sales and Operations.

*(5)*Patent award.


176.    The foregoing statements were false and misleading because Item

402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include

the "dollar value of bonus (cash and non-cash) earned by the named executive officer during

the fiscal year covered . . ."  (17 C.F.R. § 229.402(b)(2)(iii)(B).), and Apple failed to include

the non-cash compensation attributable to backdated options.  Additionally, the Instructions to

Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the

Summary Compensation Table:

> (i)    For stock or any other form of non-cash compensation, disclose the fair
> market value at the time the compensation is awarded, earned or paid.

      (ii)     Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

      (iii)    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)    In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.  With respect to Defendant Jobs, the footnotes to the Summary Compensation Table, in describing the exchange of options to restricted stock, fail to disclose that the options awarded to Jobs were inflated in value due to backdating.

     177.    The Option Grants in Last Fiscal Year Table is set forth below:

**OPTION GRANTS IN LAST FISCAL YEAR**

| Name | Number of Securities Underlying Options Granted (#) | Percent of Total Options Granted to Employees in Fiscal Year (1) | Exercise or Base Price ($/Sh)(2) | Expiration Date | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term(3) | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | 5% ($) | | 10% ($) |
| Steven P. Jobs | 7,500,000 | 32.27% | 18.30 | 10/19/11 | $ | 86,315,788 | $ | 218,741,153 |
| Fred D. Anderson | — | — | — | — | | — | | — |
| Timothy D. Cook | — | — | — | — | | — | | — |
| Jonathan Rubinstein | — | — | — | — | | — | | — |
| Avadis Tevanian, Jr. | — | — | — | — | | — | | — |

*(1)*Based on an aggregate of 23,239,444 options granted to all employees during fiscal year 2002. Options granted in fiscal year 2002 typically vest over four years in sixteen equal quarterly increments. Options granted to executive officers including those granted to the Named Executive Officers typically vest in four equal annual installments commencing on the first anniversary of the date of grant. Of the options granted to Mr. Jobs, 25% were vested as of the date of grant and the remainder vest in three equal annual installments commencing on the first anniversary of the date of grant. Mr. Jobs voluntarily cancelled this option grant in March 2003.

*(2)***All options were granted at an exercise price equal to the fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of grant**.

*(3)*Potential gains are net of exercise price, but before taxes associated with exercise. These amounts represent certain assumed rates of appreciation only, based on SEC rules, and do not represent the Company's estimate or projection of the price of the Company's stock in the future. Actual gains, if any, on stock option exercises depend upon the actual future price of Common Stock and the continued employment of the option holders throughout the vesting period. Accordingly, the potential realizable values set forth in this table may not be achieved.

178.    The Option Grants in Last Fiscal Year Table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 2002 were backdated. The footnotes to the chart depicted above falsely state that "[a]ll options were granted at an exercise price equal to fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the business day immediately preceding the date of grant" and that actual gains depend upon the actual future price of the Common Stock.  These statements are false and misleading because they mislead investors regarding the actual compensation practices at Apple, and because the exercise prices, in fact, were *not* the fair market value of the Company's common stock on the trading day immediately preceding the date of grant.

### 7.    The 2004 Proxy

179.    Apple's definitive proxy statement dated March 11, 2004 filed with the SEC on Form 14A for the annual meeting to be held on April 22, 2004 (the "2004 Proxy") was materially false and misleading.  (Defendants Jobs, Campbell, Drexler, York and Levinson were directors at the time and signed the 2004 Proxy; Heinen signed the cover letter that accompanied the 2004 Proxy; Anderson was CFO at the time the proxy was disseminated and participated in its preparation and/or reviewed and/or commented upon it.)

180.    The 2004 Proxy stated:

> The Committee believes that the granting of stock options and/or restricted stock is an important method of rewarding and motivating employees by aligning the interests of the employee with those of the shareholders. **Stock options have value for an employee only if the Company's stock price increases above the exercise price of the option and the employee remains employed by the Company for the duration of the vesting period.** Restricted stock provides significant retentive value and incentive to manage the Company from the perspective of a shareholder with an equity stake in the business. Both stock options and restricted stock provide an opportunity to attract, motivate and retain high quality employees and executive officers while promoting the success of the Company's business.

181.    The foregoing statements were false and misleading because they fail to disclose the instant paper profits being received by executives from backdating.  Contrary to the statement above, backdated stock options that are "in the money" from the outset do have immediate value for an employee; no increases of the Company's stock price are necessary.  Such instant paper profits do not align executive and shareholder interests because only the executive receiving the backdated option, not the shareholder who purchased in the open market at fair market value, has received a built-in paper profit from the outset.  These statements demonstrate that Apple management was willing to and did materially mislead the investing public in order to enhance their own compensation.

182.    The 2004 Proxy stated that "[i]n March 2003, Mr. Jobs voluntarily cancelled all of his outstanding options, excluding those granted to him in his capacity as a director.  In March 2003, the Board awarded Mr. Jobs five million restricted shares of the Company's Common Stock that generally vest on the third anniversary of the grant date."

183.    This statement is misleading because it fails to disclose that the restricted shares were received by Jobs in exchange for the backdated stock options discussed earlier herein.  It is estimated that as the result of the $104,087,000 in "instant paper profits" Jobs received from backdated options, he received at least an additional 630,000 shares of restricted stock that he would not have received had the cancelled options not been backdated.  At prices prevailing in

1  or about the date of the 2003 Proxy, these extra 630,000 shares had a value in excess of $50

2  million.  The 2005 Proxy also fails to disclose these facts.

3                          **8.     2005 Proxy**

4        184.    Apple's definitive proxy statement dated March 14, 2005 filed with the SEC on

5  Form 14A for the annual meeting to be held April 21, 2005 (the "2005 Proxy") was materially

6  false and misleading.  (Defendants Jobs, Anderson, Campbell, Derxler, York and Levinson

7  were directors at the time and signed the 2005 Proxy; Heinen signed the cover letter that

8  accompanied the proxy.)

9        185.    With respect to shareholders of record as of March 1, 2005, the 2005 Proxy

10  solicited shareholder votes to, among other things:  (a) increase the aggregate shares available

11  for the ESPP by 2 million up to a total of 70 million shares; and (b) increase the aggregate

12  shares available for the 2003 ESOP by 49 million.

13        186.    The 2005 Proxy stated:

14        The [Compensation] Committee's compensation philosophy
          is…that any long-term incentive compensation **should be closely**
15        **aligned with shareholder interests**.  For executive officers, the
          Committee believes that a substantial portion of their
16        compensation **should be closely aligned with Company**
          **performance**.
17
                                    * * *
18
          The Committee believes that the granting of long-term incentives,
19        typically grants of stock options, is an important method of
          rewarding and motivating employees **by aligning the interests of**
20        **the employee with those of the shareholders.  Stock options**
          **have value for an employee only if the Company's stock price**
21        **increases above the exercise price of the option** and the
          employee remains employed by the Company for the remainder of
22        the vesting period.

23        187.    These statements are false and misleading because they fail to disclose the

24  instant paper profits being received by executives from backdating.  Contrary to the statement

25  above, backdated stock options that are "in the money" from the outset do have immediate

26  value for an employee; no increases of the Company's stock price are necessary.  Such instant

27  paper profits do not align executive and shareholder interests because only the executive

28  receiving the backdated option, not the shareholder who purchased in the open market at fair

1   market value, has received a built-in paper profit from the outset.  These statements

2   demonstrate that Apple management was willing to and did materially mislead the investing

3   public in order to enhance their own compensation.

4        188.    The 2005 Proxy stated that "Mr. Jobs has ten million [split-adjusted] shares of

5   restricted stock that were granted to him in 2003 which generally vest in full on the third

6   anniversary of the grant date" and that "[i]n March 2003, Mr. Jobs voluntarily cancelled all of

7   his outstanding options, excluding those granted to him in his capacity as a director.  In March

8   2003, the Board awarded Mr. Jobs 10 million [split-adjusted] restricted shares of the

9   Company's Common Stock that generally vest on the third anniversary of the grant date."

10       189.    This statement is misleading because it fails to disclose that the ten million

11  restricted shares were received by Jobs in exchange for the backdated stock options discussed

12  earlier herein.  It is estimated that as the result of the $104,087,000 in "instant paper profits"

13  Jobs received from backdated options, he received at least an additional 630,000 shares of

14  restricted stock that he would not have received had the cancelled options not been backdated.

15  At prices prevailing in or about the date of the 2003 Proxy, these extra 630,000 shares had a

16  value in excess of $50 million.  The 2005 Proxy also fails to disclose these facts.

17       190.    The 2005 Proxy also provided additional disclosures about the Company's

18  compensation practices.  Specifically, it noted the number of options that were outstanding

19  from prior stock option plans, and the fact that the Compensation Committee hired a consultant

20  to examine compensation trends, reviewed each executive's past performance in light of those

21  trends, and on that basis increased the executives' base pay and adopted a cash bonus program

22  upon which they asked shareholders to vote in the 2005 Proxy.  The 2005 Proxy states:  "The

23  Committee's outside compensation consultant concluded that the infrequent grant of

24  options…did not make up for the below market median total cash compensation paid to

25  executive officers."

26       191.    This representation that Apple employees were paid "below market median total

27  cash compensation" was materially misleading.  Certainly executives part with less cash when

28  exercising backdated stock options then they would have if the exercise price had been

determined on the actual date of grant instead of retrospectively cherry-picked based on historical stock price dips.

192.    The 2005 Proxy further stated that based upon a review of audited financial statements by the Audit Committee and discussion with the Company's auditors, "the Audit Committee recommended to the Board of Directors that the [audited] financial statements [reviewed with the Company's accountants] be included in the Company's Annual Report on Form 10-K for the fiscal year ended September 24, 2004." This statement was misleading because, as the Company has admitted, these financial statements were materially inaccurate and should not be relied upon.

**B.    ANNUAL REPORTS**

193.    Prior to and during the Class Period, Apple published numerous false and misleading statements in its annual reports which were relied upon by Class Members and which cause Apple's stock price to be materially inflated.

194.    From 1996 to 2005, the Company, with the knowledge, approval, participation or reckless disregard of each individual defendant (with respect to those disclosures made at a time when such defendant was an officer and/or director of the Company), disseminated to shareholders and filed with the SEC annual reports on Form 10-K and/or Form 10-K405 that contained material misstatements and omissions falling into five general categories:  (a) misstatements that options granted were priced at the fair market value on the date of the grant when in fact they were backdated; (b) misstatements relating to the amount of compensation received by Apple executives during the relevant time; (c) misstatements that the Company applied appropriate GAAP accounting for stock options by following APB No. 25; (d) misstatements (with respect to the Company's annual reports for fiscal years 1999 through 2001) relating to the Company's intention to have executive stock options qualify for tax deductions under Section 162(m); and (e) overstatement of the Company's operating and/or net income (or understatement of the Company's operating and/or net loss) due to the failure to recognize "instant paper profits" as expense and related financial effects associated with backdated options awarded to executives (the incremental impact of which the Company

1   reported in the 2006 restatement was at least $105 million on a pre-tax basis and $84 million on

2   an after-tax basis from fiscal years 1998 through 2006).

3                    **1.    1996 Annual Report**

4          195.    The Company's Form 10-K for the fiscal year ended September 27, 1996 (filed

5   with the SEC on December 19, 1996 and signed by Anderson and reviewed and/or commented

6   upon by Heinen at a time when Heinen was chief legal officer of the Company (the "1996

7   Annual Report")) was materially false and misleading for the reasons discussed below.

8          196.    The 1996 Annual Report states "[o]ptions may be granted under the 1990 Plan

9   to employees, including officers and directors who are employees, at not less than the fair

10  market value on the date of grant."  This statement was false and misleading because stock

11  options were backdated and, as a result, the exercise prices of options were in fact less than the

12  fair market value on the true date of grant.

13         197.    The 1996 Annual Report incorporated by reference certain sections of the 1997

14  Proxy, which as stated in the 1996 Annual Report was "to be delivered to shareholders in

15  connection with the Annual Meeting of Shareholders to be held February 5, 1997" (*i.e.*,

16  delivered subsequent to the date of the 1996 Annual Report).  Such sections included the

17  Summary Compensation Table in the 1997 Proxy which was false and misleading for the

18  reasons stated above.

19         198.    The 1996 Annual Report states "the Company has elected to continue measuring

20  compensation expense for its stock-based employee compensation plans using the intrinsic

21  value method prescribed by [APB No. 25], 'Accounting for Stock Issued to Employees'."  This

22  statement is false and misleading.  Since the market price of Apple shares on the true grant date

23  exceeded the exercise price, Apple should have recognized the difference

24         199.    (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a

25  result, the Company's statement that it followed APB No. 25 was false and misleading.

26         200.    And because the Company did not properly account for the compensation

27  expense created by backdating, the following operating income/loss and net income/loss figures

28  in the 1996 Annual Report were overstated or understated, as the case may be:  (a) the $1.383

67
**[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

billion operating loss and $816 million net loss figures reported for fiscal year 1996 were understated; (b) the $684 million operating income and $424 million net income figures for fiscal year 1995 were overstated; and (c) the $522 million operating income and $310 million net income figures for fiscal year 1994 were overstated.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre- or post- tax effects of the failure to properly account for the compensation expense created by backdating on its fiscal years 1994, 1995, 1996 financial results.

### 2.    1997 Annual Report

201.    The Company's Form 10-K for the fiscal year ended September 26, 1997 (filed with the SEC on December 5, 1997 and signed by Jobs, Anderson, Campbell, and York and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "1997 Annual Report")) was materially false and misleading for the reasons discussed below.

202.    The 1997 Annual Report states "[o]ptions may be granted under the 1990 Plan to employees, including officers and directors who are employees, at not less than the fair market value on the date of grant."  This statement was false and misleading because stock options were backdated and, as a result, the exercise prices of options were in fact less than the fair market value on the true date of grant.

203.    The 1997 Annual Report incorporated by reference certain sections of the 1998 Proxy.  Such sections included the Summary Compensation Table in the 1998 Proxy which was false and misleading for the reasons stated above.

204.    The 1997 Annual Report states "the Company has elected to follow [APB No. 25] and related interpretations in accounting for its employee stock option plans….Under [APB No. 25], if the exercise price of the Company's employee stock options equals or exceeds the fair value of the underlying stock on the date of grant, no compensation expense is recognized." This statement is false and misleading.  Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant

1   paper profit or spread) as expense, but failed to do so.  As a result, the Company's statement

2   that it followed APB No. 25 was false and misleading.

3        205.    And because the Company did not properly account for the compensation

4   expense created by backdating, the following operating income/loss and net income/loss figures

5   in the 1997 Annual Report were overstated or understated, as the case may be:  (a) the $1.070

6   billion operating loss and $1.045 billion net loss figures reported for fiscal year 1997 were

7   understated; (b) the $1.383 billion operating loss and $816 million net loss figures reported for

8   fiscal year 1996 were understated; (b) the $684 million operating income and $424 million net

9   income figures for fiscal year 1995 were overstated.  In its 2006 Annual Report, which

10  contained the restatement of Apple's historical results necessitated by backdating, Apple did

11  not state the incremental pre- or post- tax effects of the failure to properly account for the

12  compensation expense created by backdating had on its fiscal years 1995, 1996, 1997 financial

13  results.

14              **3.    1998 Annual Report**

15       206.    The Company's Form 10-K405 for the fiscal year ended September 25, 1998

16  (filed with the SEC on December 23, 1998 and signed by Jobs, Anderson, Campbell, and York

17  and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer

18  of the Company (the "1998 Annual Report")) was materially false and misleading for the

19  reasons discussed below.

20       207.    The 1998 Annual Report states, in a chart setting forth the aggregate number of

21  stock option grants and their weighted average exercise price for fiscal years 1996, 1997 and

22  1998, that the options were "Granted (price equals FMV)."  "FMV" stands for fair market

23  value.  This statement was false and misleading because some or all of the stock options

24  granted in those years were backdated and, as a result, the exercise price did not equal the fair

25  market value on the date of grant.[9]

26

27  [9]  The same chart contains a row depicting options "[g]ranted (price *less than* FMV)" and a footnote states:  "The
    options granted in fiscal 1997 at a price *less than* fair market value were to existing…optionholders [of a company
    Apple acquired] as part of the total purchase price paid for [the acquired company]."  (Emphasis added)  This

28  differentiation between "in the money" options granted to optionholders in connection with an acquisition and the

208.    The 1998 Annual Report includes a chart depicting option grants during fiscal year 1998 to Anderson, Cook, Rubinstein and Mandich as reflected in the table included earlier herein and states that "[a]ll options were granted at an exercise price equal to the fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of grant."  These statements are false and misleading because they fail to disclose the backdating scheme and that the exercise price in fact was not the fair market value of the Company's common stock on the date of grant.  The chart of option grants is set forth below:

| OPTION GRANTS IN LAST FISCAL YEAR | | | | | | |
|---|---|---|---|---|---|---|
| | INDIVIDUAL GRANTS | | | | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM | |
| | NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED | PERCENT OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE OR BASE PRICE | EXPIRATION DATE | | |
| NAME | (#) | ($/SH) | BASE PRICE | DATE | 5% ($) | 10% ($) |
| Steven P. Jobs | | 0.00% | | | | |
| Fred D. Anderson | 250,000 | 1.80% | 13.69 | 12/19/07 | 2,151,999 | 5,453,587 |
| Timothy D. Cook | 700,000 | 5.04% | 17.69 | 2/02/08 | 7,786,502 | 19,732,524 |
| Jonathan Rubinstein | 300,000 | 2.16% | 13.69 | 12/19/07 | 2,582,399 | 6,544,305 |
| Mitchell Mandich | 224,250 | 1.61% | 13.69 | 12/19/07 | 1,930,343 | 4,891,868 |
| | 200,000 | 1.44% | 13.13 | 12/29/07 | 1,650,848 | 4,183,574 |

209.    In addition, the 1998 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Anderson in fiscal years 1996, 1997 and 1998, Mandich and Rubinstein in fiscal years 1997 and 1998 and Cook in fiscal year 1998 as a result of their receipt of backdated stock options at less than fair market value.  The Summary Compensation Table is set forth below:

---

supposedly "at the money" options granted to Apple executives establishes that Apple knew how to distinguish between the two when it wanted to tell shareholders the truth.

[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)

| SUMMARY COMPENSATION TABLE | | | | | | |
| | | ANNUAL COMPENSATION | | SECURITIES RESTRICTED | LONG-TERM COMPENSATION | |
| | | | | | ALL UNDERLYING | OTHER |
| NAME AND PRINCIPAL POSITION | FISCAL YEAR | SALARY ($) | BONUS ($) | STOCK AWARDS ($) | OPTIONS (#) | COMPENSATION ($) |
| Steven P. Jobs interim Chief Executive Officer | 1998 | | | | | |
| | 1997 | | | | 30,000 | |
| | 1996 | | | | | |
| Fred D. Anderson Executive Vice President and Chief Financial Officer | 1998 | 604,283 | | | 250,000 | 60,123 |
| | 1997 | 520,311 | | 40,748 | 850,000 | 250,489 |
| | 1996 | 252,156 | 1,275,000 | | 400,000 | 141,361 |
| Timothy D. Cook Senior Vice President, | 1998 | 223,953 | 500,000 | 500,000 | 700,000 | 90,849 |
| | 1997 | | | | | |
| Jonathan Rubinstein Senior Vice President, Hardware Engineering | 1998 | 402,095 | | | 300,000 | 4,804 |
| | 1997 | 250,262 | 100,000 | 19,108 | 700,000 | 1,864 |
| | 1996 | | | | | |
| Mitchell Mandich Senior Vice President, Worldwide Sales | 1998 | 402,253 | | | 424,250 | 8,118 |
| | 1997 | 174,348 | 104,000 | | 565,050 | 11 |
| | 1996 | | | | | |

210.    Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered ..."  (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

(i)    For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

(ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

1
2
3
4

(iii)   The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

5   (*Id.*)     In addition, the disclosures in the Summary Compensation Table of "Annual

6   Compensation" and "Securities Underlying Options" are materially misleading because they

7   omit the additional compensation received as a result of the backdated options.

8       211.    Further, the Option Grants in Last Fiscal Year table is materially misleading

9   because it fails to include an additional column showing the market price on the date of the

10  grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 1998 were

11  backdated.

12      212.    The 1998 Annual Report states "the Company has elected to follow [APB No.

13  25] and related interpretations in accounting for its employee stock option plans and employee

14  stock purchase plan shares….Under APB No. 25, when the exercise price of the Company's

15  employee stock options equals the market price of the underlying stock on the date of grant, no

16  compensation expense is recognized."  This statement is false and misleading.  Since the

17  market price of Apple shares on the true grant date exceeded the exercise price, Apple should

18  have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to

19  do so.  As a result, the Company's statement that it followed APB No. 25 was false and

20  misleading.

21      213.    And because the Company did not properly account for the compensation

22  expense created by backdating, the following operating income/loss and net income/loss figures

23  in the 1998 Annual Report were overstated or understated, as the case may be:  (a) the $261

24  million operating income and $309 million net income figures reported for fiscal year 1998

25  were overstated; (b) the $1.070 billion operating loss and $1.045 billion net loss figures

26  reported for fiscal year 1997 were understated; (c) the $1.383 billion operating loss and $816

27  million net loss figures reported for fiscal year 1996 were understated; and (d) the $484 million

28  net income figure reported for fiscal year 1995 was overstated.  In its 2006 Annual Report

1   which contained the restatement of Apple's historical results necessitated by backdating, Apple

2   did not state the incremental pre- or post-tax effects of the failure to properly account for the

3   compensation expense created by backdating on its fiscal years 1996 and 1997 financial results.

4   In fiscal year 1998, Apple's undisclosed backdating caused a $1 million increase in pre-tax

5   compensation expense and had no effect on post-tax compensation expenses.

6                                   **4.     1999 Annual Report**

7           214.    The Company's Form 10-K for the fiscal year ended September 25, 1999 (filed

8   with the SEC on December 22, 1999 and signed by Anderson, Jobs, Campbell and Drexler and

9   reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of

10  the Company (the "1999 Annual Report")) was materially false and misleading for the reasons

11  discussed below.

12          215.    The 1999 Annual Report states, in a chart setting forth the aggregate number of

13  stock option grants and their weighted average exercise price for fiscal years 1997, 1998 and

14  1999, that the options were "Granted (price equals FMV)."  "FMV" stands for fair market

15  value.  This statement was false and misleading because some or all of the stock options

16  granted in those years were backdated and, as a result, the exercise price did not equal fair

17  market value on the date of grant.[10]

18          216.    The 1999 Annual Report includes a chart depicting option grants during fiscal

19  year 1998 to Anderson, Cook, Rubinstein and Mandich as reflected in the table included earlier

20  herein and states that "[a]ll options were granted at an exercise price equal to the fair market

21  value based on the closing market value of Common Stock on the Nasdaq National Market on

22  the date of grant."  These statements are false and misleading because they fail to disclose the

23  backdating scheme and that the exercise price in fact was not the fair market value of the

24  Company's common stock on the date of grant.  The Option Grants Chart is set forth below:

25  ────────────────────────

    [10]  The same chart contains a row depicting options "[g]ranted (price *less than* FMV)" and a footnote states:  "The

26  options granted in fiscal 1997 at a price *less than* fair market value were to existing…optionholders [of a company
    Apple acquired] as part of the total purchase price paid for [the acquired company]."  (Emphasis added)  This

27  differentiation between "in the money" options granted to optionholders in connection with an acquisition and the
    supposedly "at the money" options granted to Apple executives establishes that Apple knew how to distinguish

28  between the two when it wanted to tell shareholders the truth.

| | | OPTION GRANTS IN LAST FISCAL YEAR | | | | | |
|---|---|---|---|---|---|---|---|
| | | **INDIVIDUAL GRANTS** | | | | **POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM** | |
| | **NUMBER OF SECURITIES UNDERLYING OPTIONS GRANTED** | **PERCENT OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR** | **EXERCISE OR BASE PRICE ($/SH)** | **EXPIRATION DATE** | | | |
| **NAME** | **(#)** | | | | | **5% ($)** | **10% ($)** |
| Steven P. Jobs | | 0.00% | | | | | |
| Fred D. Anderson | 475,000 | 7.98% | 34.63 | 3/2/09 | | 10,343,351 | 26,212,083 |
| Timothy D. Cook | 300,000 | 5.03% | 34.63 | 3/2/09 | | 6,532,643 | 16,555,000 |
| Mitchell Mandich | 387,876 | 6.51% | 34.63 | 3/2/09 | | 8,446,185 | 21,404,290 |
| Jonathan Rubinstein | 458,334 | 7.70% | 34.63 | 3/2/09 | | 9,980,441 | 25,292,398 |

217.    These statements are false and misleading because they fail to disclose the backdating scheme and that the exercise price in fact was not the fair market value of the Company's common stock on the date of grant.

218.    In addition, the 1999 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Anderson, Mandich and Rubinstein in fiscal years 1997, 1998 and 1999, and Cook in fiscal years 1998 and 1999 as a result of their receipt of backdated stock options at less than fair market value.  The Summary Compensation Table is set forth below:

| NAME AND PRINCIPAL POSITION | FISCAL YEAR | ANNUAL COMPENSATION | | SECURITIES | | ALL OTHER |
| | | SALARY ($) | BONUS ($) | RESTRICTED STOCK AWARDS ($) | UNDERLYING OPTIONS (#) LONG-TERM COMPENSATION | COMPENSATION ($) |
|---|---|---|---|---|---|---|
| Steven P. Jobs interim Chief Executive Officer | 1999 | 1 | | | | |
| | 1998 | 1 | | | | |
| | 1997 | | | | 30,000 | |
| Fred D. Anderson Executive Vice President and Chief Financial Officer | 1999 | 605,260 | | | 475,000 | 29,700 |
| | 1998 | 604,283 | | | 250,000 | 60,123 |
| | 1997 | 520,311 | | 40,748 | 850,000 | 250,489 |
| Timothy D. Cook Senior Vice President, Worldwide Operations | 1999 | 401,940 | | | 300,000 | 29,519 |
| | 1998 | 223,953 | 500,000 | | 700,000 | 90,849 |
| | 1997 | | | | | |
| Mitchell Mandich Senior Vice President, Worldwide Sales | 1999 | 402,941 | | | 387,876 | 7,200 |
| | 1998 | 402,253 | | | 424,250 | 8,118 |
| | 1997 | 174,348 | 104,000 | | 565,050 | 565,050 |
| Jonathan Rubinstein Senior Vice President, Hardware Engineering | 1999 | 402,200 | | | 458,334 | 5,888 |
| | 1998 | 402,095 | | | 300,000 | 4,804 |
| | 1997 | 250,262 | 100,000 | 19,108 | 700,000 | 1,864 |

219.     Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered ..."  (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

> (i)     For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.
>
> (ii)     Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii)   The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

220.   Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 1999 were backdated.

221.   The 1999 Annual Report states "the Company has elected to follow [APB No. 25] and related interpretations in accounting for its employee stock option plans and employee stock purchase plan shares….Under APB No. 25, when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."  This statement is false and misleading.  Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, the Company's statement that it followed APB No. 25 was false and misleading.

222.   The 1999 Annual Report stated that the "Company intends that options granted under the Company's stock option plans be deductible by the Company under Section 162(m)." Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."  To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant. Thus, a company's "at the money" stock option expenses are generally tax deductible even though an executive is paid more than $1 million.  The Company's statement of an intention to have options be deductible under Section 162(m) was false and misleading because certain

1    options were backdated and, as a result, expense incurred with respect to such options could not

2    have been properly deductible under Section 162(m).

3         223.    And because the Company did not properly account for the compensation

4    expense created by backdating, the following operating income/loss and net income/loss figures

5    in the 1999 Annual Report were overstated or understated, as the case may be:  (a) the $359

6    million operating income and $601 million net income figures reported for fiscal year 1999

7    were overstated; (b) the $261 million operating income and $309 million net income figures

8    reported for fiscal year 1998 were overstated; (c) the $1.070 billion operating loss and $1.045

9    billion net loss figures reported for fiscal year 1997 were understated; (d) the $816 million net

10   loss figure reported for fiscal year 1996 was understated; and (e) $424 million net income

11   figure reported for fiscal year 1995 was overstated.  In its 2006 Annual Report which contained

12   the restatement of Apple's historical results necessitated by backdating, Apple did not state the

13   incremental pre- or post-tax effects of the failure to properly account for the compensation

14   expense created by backdating on its fiscal years 1995, 1996 and 1997  financial results.  In

15   fiscal year 1998, Apple's undisclosed backdating caused a $1 million increase in pre-tax

16   compensation expense and had no effect on post-tax compensation expenses.  In fiscal year

17   1999, Apple's undisclosed backdating caused $8 million and $6 million increases in pre-tax

18   and after-tax compensation expenses, respectively; thus Apple's reported operating and net

19   income for fiscal year 1999 should have been $351 million and $595 million, respectively.

20                              **5.    2000 Annual Report**

21        224.    The Company's Form 10-K for the fiscal year ended September 30, 2000 (filed

22   with the SEC on December 14, 2000 and signed by Anderson, Jobs, Campbell, Drexler,

23   Levinson and York (the "2000 Annual Report")) was materially false and misleading for the

24   reasons discussed below.

25        225.    The 2000 Annual Report includes a chart depicting option grants during fiscal

26   year 2000 to Jobs and Johnson as reflected in the table included earlier herein and states that

27   "[a]ll options were granted at an exercise price equal to the fair market value based on the

28   closing market value of Common Stock on the Nasdaq National Market on the date of grant."

1   These statements are false and misleading because they fail to disclose the backdating scheme

2   and that the exercise price in fact was not the fair market value of the Company's common

3   stock on the date of grant.  The Options Grants Chart is set forth below:

| OPTION GRANTS IN LAST FISCAL YEAR | | | | | | |
|---|---|---|---|---|---|---|
| | | INDIVIDUAL GRANTS | | | | POTENTIAL REALIZABLE VALUE AT ASSUMED ANNUAL RATES OF STOCK PRICE APPRECIATION FOR OPTION TERM |
| | NUMBER OF SECURITIES UNDERLYING OPTIONS | PERCENT OF TOTAL OPTIONS GRANTED TO EMPLOYEES IN FISCAL YEAR | EXERCISE OR BASE PRICE ($/SH) | EXPIRATION DATE | | |
| NAME | GRANTED (#) | | | | 5% ($) | 10% ($) |
| Steven P. Jobs | 20,000,000 | 43.80% | 43.59 | 1/12/10 | 548,317,503 | 1,389,544,207 |
| Fred D. Anderson | | | | | | |
| Ronald B. Johnson | 1,200,000 | 2.63% | 47.44 | 12/14/09 | 35,799,827 | 90,723,790 |
| Mitchell Mandich(4) | | | | | | |
| Jonathan Rubinstein | | | | | | |

16   226.   The 2000 Annual Report  reflects that Jobs received a grant of 10 million

17   options (not split-adjusted) in January 2000 "at an exercise price equal to the fair market value

18   based on the closing market value of Common Stock on the Nasdaq National market on the

19   date of grant."  The 2000 Annual Report further disclosed that the grant date was January 12,

20   2000, a date when Apple's stock price closed at $43.5938, and therefore the exercise price

21   assigned to the award was $43.5938.  These statements were false.

22   227.   As Apple has admitted, this grant was not memorialized until six days after

23   January 12, 2000.  During that time, Apple's stock price ran up from $43.5938 to $51.97 - a

24   jump of almost 20%.  Only then (on January 18, 2000) was board action taken to memorialize

25   the grant.  Thus, the exercise price assigned to the option grant should have been the January 18

26   Apple closing price of $51.97 rather than the $43.5938 that was falsely disclosed in the 2000

27   Annual Report.  The net result is that CEO Jobs was given an "instant paper profit" in the

28

amount of $83,762,000 (*i.e.*, $51.97 minus $43.5938 multiplied times 10 million shares) that was never disclosed to shareholders.

228.    In addition, the 2000 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal year 2000, Anderson, Mandich and Rubinstein in fiscal years 1998 and 1999, and Johnson in fiscal year 2000 as a result of their receipt of backdated stock options at less than fair market value on the date of grant.  The Summary Compensation Table is set forth below:

| NAME AND PRINCIPAL POSITION | FISCAL YEAR | ANNUAL COMPENSATION | | SECURITIES UNDERLYING OPTIONS (#) | ALL OTHER COMPENSATION ($) |
| | | SALARY ($) | BONUS ($) | | |
|---|---|---|---|---|---|
| | | | | LONG-TERM COMPENSATION | |
| Steven P. Jobs | 2000 | 1 | 90,000,000 | 20,000,000 | |
| Chief Executive Officer | 1999 | 1 | | | |
| | 1998 | 1 | | | |
| Fred D. Anderson | 2000 | 660,414 | | | 6,750 |
| Executive Vice President | 1999 | 605,260 | | 950,000 | 29,700 |
| and Chief Financial Officer | 1998 | 604,283 | | 500,000 | 60,123 |
| Ronald B. Johnson | 2000 | 328,719 | 500,000 | 1,200,000 | 111,444 |
| Senior Vice President, | 1999 | | | | |
| New Business Development | 1998 | | | | |
| Mitchell Mandich | 2000 | 453,444 | | | 7,650 |
| Senior Vice President, | 1999 | 402,941 | | 775,752 | 7,200 |
| Worldwide Sales(8) | 1998 | 402,253 | | 916,668 | 8,118 |
| Jonathan Rubinstein | 2000 | 451,949 | | | 6,577 |
| Senior Vice President, | 1999 | 402,200 | | 458,334 | 5,888 |
| Hardware Engineering | 1998 | 402,095 | | 600,000 | 4,804 |

229.    Specifically, Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered ..."  (17 C.F.R. § 229.402(b)(2)(iii)(B))  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

> (i)    For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.
>
> (ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…
>
> (iii)    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)    In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

230.    Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 2000 were backdated.

231.    The 2000 Annual Report states "the Company has elected to follow [APB No. 25] and related interpretations in accounting for its employee stock option plans and employee stock purchase plan shares….Under…[APB No. 25], when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."  This statement is false and misleading.  Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, the Company's statement that it followed APB No. 25 was false and misleading.

232.     The 2000 Annual Report stated that the "Company intends that options granted under the Company's stock option plans be deductible by the Company under Section 162(m)." Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."  To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant. Thus, a company's "at the money" stock option expenses are generally tax deductible even though an executive is paid more than $1 million.  The Company's statement of an intention to have options be deductible under Section 162(m) was false and misleading because certain options were backdated and, as a result, expense incurred with respect to such options could not have been properly deductible under Section 162(m).

233.     And because the Company did not properly account for the compensation expense created by backdating, the following operating income/loss and net income/loss figures in the 2000 Annual Report were overstated or understated, as the case may be:  (a) the $522 million operating income and $786 million net income figures reported for fiscal year 2000 were overstated; (b) the $359 million operating income and $601 million net income figures reported for fiscal year 1999 were overstated; (c) the $261 million operating income and $309 million net income figures reported for fiscal year 1998 were overstated; (d) the $1.045 billion net loss figure reported for fiscal year 1997 was understated; and (e) the $816 million net loss figure reported for fiscal year 1996 was understated.  In its 2006 Annual Report which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre- or post-tax effects of the failure to properly account for the compensation expense created by backdating had on its fiscal years 1996 and 1997  financial results.  In fiscal year 1998, Apple's undisclosed backdating caused a $1 million increase in pre-tax compensation expense and had no effect on post-tax compensation expenses.  In fiscal year 1999, Apple's undisclosed backdating caused $8 million and $6 million increases in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating and net income for fiscal year 1999 should have been $351 million and $595 million, respectively.  In

fiscal year 2000, Apple's undisclosed backdating caused $13 million and $9 million pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating and net income for fiscal year 2000 should have been $509 million and $777 million, respectively.

### 6.   2001 Annual Report

234.   The Company's Form 10-K405 for the fiscal year ended September 29, 2001 (filed with the SEC on December 21, 2001 and signed by Anderson, Jobs, Campbell, Drexler, Levinson and York and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "2001 Annual Report")) was materially false and misleading for the reasons discussed below.

235.   The 2001 Annual Report includes a chart depicting option grants during fiscal year 2001 to Anderson, Cook, Rubinstein and Tevanian as reflected in the table included earlier herein and states that "[a]ll options were granted at an exercise price equal to the fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of grant."  The Option Grant Chart is set forth below:

**OPTION GRANTS IN LAST FISCAL YEAR**

| Name | Number of Securities Underlying Options Granted (#) | Percent of Total Options Granted to Employees in Fiscal Year(1) | | Exercise or Base Price ($/Sh)(2) | Expiration Date | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term(3) | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | 10% ($) | | 5% ($) | |
| Steven P. Jobs | — | — | | — | — | — | | — | |
| Fred D. Anderson | 1,000,000 | 2.87 | % $ | 16.8125 | 1/17/11 | $ | 10,573,291 | $ | 26,794,795 |
| Timothy D. Cook | 1,000,000 | 2.87 | % $ | 16.8125 | 1/17/11 | $ | 10,573,291 | $ | 26,794,795 |
| Jonathan Rubinstein | 1,000,000 | 2.87 | % $ | 16.8125 | 1/17/11 | $ | 10,573,291 | $ | 26,794,795 |

| Avadis Tevanian, Jr. | 1,000,000 | 2.87% | $ 16.8125 | 1/17/11 | $ 10,573,291 | $ 26,794,795 |

236.   These statements are false and misleading because they fail to disclose the backdating scheme and that the exercise price in fact was not the fair market value of the Company's common stock on the date of grant.

237.   The 2001 Annual Report  reflects that Jobs received a grant of 20 million options (split-adjusted).  While the 2001 Annual Report does not expressly state that these 20 million options were granted at fair market value on the date of grant, it does generally state that "options granted under the 1998 Plan were at an exercise price equal to the fair market value of the Common Stock on the date of grant."  These statements were false and misleading because they failed to disclose that these options were backdated.

238.   As Apple has admitted, this grant was not memorialized until six days after January 12, 2000.  During that time, Apple's stock price ran up from $43.5938 to $51.97 - a jump of almost 20%.  Only then (on January 18, 2000) was board action taken to memorialize the grant.  Thus, the exercise price assigned to the option grant should have been the January 18 Apple closing price of $51.97 rather than the $43.5938 that was falsely disclosed.  The net result is that CEO Jobs was given an "instant paper profit" in the amount of $83,762,000 (*i.e.*, $51.97 minus $43.5938 multiplied times 10 million shares) that was never disclosed to shareholders.

239.   In addition, the 2001 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal year 2000, Anderson, Cook and Rubinstein in fiscal years 1999 and 2001, and Tevanian in fiscal year 2001 as a result of their receipt of backdated stock options at less than fair market value on the date of grant.  The Summary Compensation Table is set forth below:

**SUMMARY COMPENSATION TABLE**

| Name and Principal Position | Fiscal Year | Annual Compensation | | Long-Term Compensation | All Other Compensation ($) | |
| | | Salary ($) | Bonus ($) | Securities Underlying Options* | | |
|---|---|---|---|---|---|---|
| Steven P. Jobs<br>Chief Executive Officer | 2001<br>2000<br>1999 | 1<br>1<br>1 | 43,511,534 (1)<br>—<br>— | —<br>20,000,000<br> | 40,484,594<br>—<br>— | (1) |
| Fred D. Anderson<br> Executive Vice<br>President and Chief<br>Financial Officer | 2001<br>2000<br>1999 | 657,039<br>660,414<br>605,260 | —<br>—<br>— | 1,000,000<br><br>950,000 | 7,312<br>6,750<br>29,700 | (2)<br>(2)<br>(3) |
| Timothy D. Cook<br> Senior Vice President,<br>Worldwide Operations,<br>Sales, Service & Support | 2001<br>2000<br>1999 | 452,219<br>451,673<br>401,940 | 500,000 (4)<br>—<br>— | 1,000,000<br><br>600,000 | 7,875<br>6,352<br>29,519 | (2)<br>(2)<br>(5) |
| Jonathan Rubinstein<br> Senior Vice President,<br>Hardware Engineering | 2001<br>2000<br>1999 | 469,737<br>451,949<br>402,200 | —<br>—<br>— | 1,000,000<br><br>916,668 | 7,875<br>6,577<br>5,888 | (2)<br>(2)<br>(6) |
| Avadis Tevanian, Jr.<br>Ph.D<br> Senior Vice President,<br>Software Engineering | 2001<br>2000<br>1999 | 460,873<br>451,673<br>401,939 | 500 (7)<br>—<br>— | 1,000,000<br><br>1,019,580 | 10,200<br>10,200<br>9,600 | (2)<br>(2)<br>(2) |

240.    The foregoing statements were false and misleading because Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered ..." (17 C.F.R. § 229.402(b)(2)(iii)(B)), and Apple failed to include the non-cash compensation attributable to backdated options.  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

(i)    For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

(ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii)    The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries

84

purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

241.   Further, the Option Grants in Last Fiscal Year table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 2001 were backdated.

242.   The 2001 Annual Report stated "the Company has elected to follow [APB No. 25] and related interpretations in accounting for its employee stock options and employee stock purchase plan shares….Under…[APB No. 25], when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of the grant, no compensation expense is recognized."  This statement is false and misleading.  Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, the Company's statement that it followed APB No. 25 was false and misleading.

243.   The 2001 Annual Report stated that the "Company intends that options granted under the Company's stock option plans be deductible by the Company under Section 162(m)." Section 162(m) generally limits a public company's tax deductions for certain executive officers' compensation to $1 million unless the remuneration is "performance based."  To be "performance based" within the meaning of the Code, stock options must be issued at an exercise price no less than the fair market value of the company's stock on the date of grant. Thus, a company's "at the money" stock option expenses are generally tax deductible even though an executive is paid more than $1 million.  The Company's statement of an intention to have options be deductible under Section 162(m) was false and misleading because certain

85

1    options were backdated and, as a result, expense incurred with respect to such options could not

2    have been properly deductible under Section 162(m).

3         244.    And because the Company did not properly account for the compensation

4    expense created by backdating, the following operating income/loss and net income/loss figures

5    in the 2001 Annual Report were overstated or understated, as the case may be: (a) the $344

6    million operating loss and $25 million net loss figures reported for fiscal year 2001 were

7    understated; (b) the $522 million operating income and $786 million net income figures

8    reported for fiscal year 2000 were overstated; (c) the $359 million operating income and $601

9    million net income figures reported for fiscal year 1999 were overstated; (d) the $309 million

10   net income figure reported for fiscal year 1998 was overstated; and (e) the $1.045 billion net

11   loss figure reported for fiscal year 1997 was understated.  In its 2006 Annual Report which

12   contained the restatement of Apple's historical results necessitated by backdating, Apple did

13   not state the incremental pre- or post-tax effects of the failure to properly account for the

14   compensation expense created by backdating on its fiscal year 1997 financial results.  In fiscal

15   year 1998, Apple's undisclosed backdating caused a $1 million increase in pre-tax

16   compensation expense and had no effect on post-tax compensation expenses.  In fiscal year

17   1999, Apple's undisclosed backdating caused $8 million and $6 million increases in pre-tax

18   and after-tax compensation expenses, respectively; thus, Apple's reported operating and net

19   income for fiscal year 1999 should have been $351 million and $595 million, respectively.  In

20   fiscal year 2000, Apple's undisclosed backdating caused $13 million and $9 million pre-tax and

21   after-tax compensation expenses, respectively; thus, Apple's reported operating and net income

22   for fiscal year 2000 should have been $509 million and $777 million, respectively.  In fiscal

23   year 2001, Apple's undisclosed backdating caused $19 million and $13 million in pre-tax and

24   after-tax compensation expenses, respectively; thus, Apple's reported operating and net loss for

25   fiscal year 2001 should have been $363 million and $38 million, respectively.

26        245.    The Management's Discussion and Analysis of Financial Condition and Results

27   of Operation ("MD&A") section of the 2001 Annual Report also contained statements that

28   were rendered false and misleading by the failure to disclose backdating.

246.    The MD&A section states that the Company was required to and did prepare its "financial statements and related disclosures in conformity with U.S. generally accepted accounting principles ["GAAP"]." The MD&A section further states the following regarding Selling, General and Administrative Expense ("SG&A"):

> SG&A expenditures decreased $28 million or 2% during 2001 as compared to 2000. Total quarterly SG&A expenditures have declined consistently throughout 2001 from a high in the first quarter of $297 million to a low in the fourth quarter of $268 million. This trend reflects the Company's efforts to stabilize and selectively reduce recurring SG&A costs in light of lower net sales and to reduce discretionary marketing and advertising expenses. Given current economic conditions and the Company's continued strategic investments in new product development and its retail initiative, the Company is currently identifying additional opportunities to make appropriate cuts in SG&A costs.

> Selling, general, and administrative expenditures increased 17% to $1,166 million in 2000 as compared to 1999. These increases in total expenditures resulted from higher spending for promotional and marketing activities, increased sales expenses resulting from higher net sales, and an increase in combined sales, marketing, and general and administrative headcount from the end of 1999 to the end of 2000.

247.    The MD&A section also contained a following chart which included SG&A for each of the prior three fiscal years (in millions except for percentages) as follows:  (a) fiscal 2001 - $1,138; (b) fiscal 2000 - $1,166; and (c) fiscal 1999 - $996.  These statements are false and misleading because:  (a) the Company failed to properly account for backdated stock options as alleged in detail herein; (b) the Company's financial statements did not conform to GAAP; and (c) the expenditures for SG&A depicted in the chart for fiscal years ended 2001, 2000 and 1999 were materially understated by failing to account for the "instant paper profits" generated by backdating as compensation expense.  According to the Company's 2006 restatement, pre-tax operating expenses for fiscal years 2001, 2000 and 1999 were understated by $19 million, $13 million and $8 million, respectively; therefore, the Company's SG&A for fiscal years 2001, 2000 and 1999 should have been (in millions) $1,157, $1,179 and $1,004, respectively.

248.    The MD&A section further states the following regarding the Company's use of stock options to recruit and retain employees:

> The Company's success depends largely on its ability to attract and retain key personnel.
>
> Much of the future success of the Company depends on the continued service and availability of skilled personnel, including those in technical, marketing and staff positions. Experienced personnel in the information technology industry are in high demand and competition for their talents is intense, especially in the Silicon Valley, where the majority of the Company's employees are located. There can be no assurance that the company will be able to successfully attract and retain the key personnel it needs. Additionally, volatility or a lack of positive performance in the Company's stock price may adversely affect its ability to retain key employees.

249.    This statement is false and misleading because it fails to disclose that Apple management was willing to and did materially mislead the investing public in order to enhance their own compensation and also because it failed to disclose that the Company used backdated stock options to recruit and/or retain employees.

### 7.    2002 Annual Report

250.    The Company's Form 10-K for the fiscal year ended September 28, 2002 (filed with the SEC on December 19, 2002 and signed by Anderson, Jobs, Campbell, Drexler, Levinson and York and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "2002 Annual Report")) was materially false and misleading for the reasons discussed below.

251.    The 2002 Annual Report includes a chart depicting option grants during fiscal year 2002 to Jobs as reflected in the table included earlier herein and states that "[a]ll options were granted at an exercise price equal to the fair market value based on the closing market value of Common Stock on the Nasdaq National Market on the date of grant."  The Option Grants Chart is set forth below:

[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)

**OPTION GRANTS IN LAST FISCAL YEAR**

| | Individual Grants | | | | | | | Potential Realizable Value at Assumed Annual Rates of Stock Price Appreciation for Option Term(3) | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Name | Number of Securities Underlying Options Granted (#) | Percent of Total Options Granted to Employees in Fiscal Year(1) | | Exercise or Base Price ($/Sh)(2) | | Expiration Date | | 5% ($) | | 10% ($) |
| Steven P. Jobs | 7,500,000 | 32.27% | | $  18.30 | | 10/19/2011 | | $ 86,315,788 | $ | 218,741,153 |
| Fred D. Anderson | — | — | | — | | | | | | |
| Timothy D. Cook | — | — | | — | | | | | | |
| Jonathan Rubinstein | — | — | | — | | | | | | |
| Avadis Tevanian, Jr. | — | — | | — | | | | | | |

252.    These statements are false and misleading because they fail to disclose the backdating scheme and that the exercise price in fact was not the fair market value of the Company's common stock on the date of grant.

253.    The 2002 Annual Report disclosed that 7.5 million (not split-adjusted) shares were granted to Jobs on October 19, 2001 at an exercise price equal to fair market value on the date of grant.  Apple has admitted that this statement was false.

254.    Apple has admitted that no Board meeting occurred on October 19, 2001 despite the bogus documentation falsely indicating that such a meeting took place. The true grant date was December 18, 2001 which means the assigned exercise price should have been $21.01 -- Apple's December 18 closing price representing the fair market value of Apple's shares on the true date of grant.  The net result of the pretense that the grant of these options was approved at an October 2001 board meeting is CEO Jobs was given an "instant paper profit" in the amount

of $20,325,000 (*i.e.*, $21.01 minus $18.30 multiplied times 7.5 million shares) that was never disclosed to shareholders.

255.    In addition, the 2002 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal years 2000 and 2002, and Anderson, Cook, Rubinstein and Tevanian in fiscal year 2001 as a result of their receipt of backdated stock options at less than fair market value on the date of grant.  The Summary Compensation Table is set forth below:

**SUMMARY COMPENSATION TABLE**

| Name and Principal Position | Fiscal Year | Annual Compensation | | Long-Term Compensation | All Other Compensation ($) | |
|---|---|---|---|---|---|---|
| | | Salary ($) | Bonus ($) | Securities Underlying Options* (#) | | |
| Steven P. Jobs Chief Executive Officer | 2002 2001 2000 | 1 1 1 | 2,268,698 (1) (1) 43,511,534 | 7,500,000 — 20,000,000 | 1,302,795 (1) 40,484,594 (1) | |
| Fred D. Anderson Executive Vice President and Chief Financial Officer | 2002 2001 2000 | 656,631 657,039 660,414 | — — — | 1,000,000 — | 11,000 (2) 7,312 (2) 6,750 (2) | |
| Timothy D. Cook Executive Vice President, Worldwide Sales and Operations | 2002 2001 2000 | 563,829 452,219 451,673 | — 500,000 (3) — | 1,000,000 — | 8,025 (2) 7,875 (2) 6,352 (2) | |
| Jonathan Rubinstein Senior Vice President, Hardware Engineering | 2002 2001 2000 | 452,588 469,737 451,949 | — — — | 1,000,000 — | 9,996 (2) 7,875 (2) 6,577 (2) | |
| Avadis Tevanian, Jr. Ph.D Senior Vice President, Software Engineering | 2002 2001 2000 | 492,212 460,873 451,673 | — 500 (4) — | 1,000,000 — | 10,700 (2) 10,200 (2) 10,200 (2) | |

256.    The foregoing statements were false and misleading because Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered..." (17 C.F.R. § 229.402(b)(2)(iii)(B)), and Apple failed to include the

non-cash compensation attributable to backdated options.  Additionally, the Instructions to Item 402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

> (i)     For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.
>
> (ii)    Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…
>
> (iii)   The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)    In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

257.    Further, the Option Grants in Last Fiscal Year Table is materially misleading because it fails to include an additional column showing the market price on the date of the grant as required by Item 402(c)(2)(iv) even though options granted in fiscal year 2002 were backdated.

258.    The 2002 Annual Report stated "[t]he Company measures compensation expense for its employee stock-based compensation plans using the intrinsic value method prescribed by [APB No. 25]….The Company has elected to follow APB No. 25…. Under…[APB No. 25], when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."  This statement is false and misleading.  Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, the Company's statement that it followed APB No. 25 was false and misleading.

259.    And because the Company did not properly account for the compensation expense created by backdating, the following operating income/loss and net income/loss figures in the 2002 Annual Report were overstated or understated, as the case may be:  (a) the $17 million operating income and $65 million net income figures reported for fiscal year 2002 were overstated; (b) the $344 million operating loss and $25 million net loss figures reported for fiscal year 2001 were understated; (c) the $522 million operating income and $786 million net income figures reported for fiscal year 2000 were overstated; (d) the $601 million net income figure reported for fiscal year 1999 was overstated; and (e) the $309 million net income figure reported for fiscal year 1998 was overstated.  In its 2006 Annual Report which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre- or post-tax effects of the failure to properly account for the compensation expense created by backdating on its fiscal year 1997  financial results.  In fiscal year 1998, Apple's undisclosed backdating caused a $1 million increase in pre-tax compensation expense and had no effect on post-tax compensation expenses.  In fiscal year 1999, Apple's undisclosed backdating caused $8 million and $6 million increases in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating and net income for fiscal year 1999 should have been $351 million and $595 million, respectively.  In fiscal year 2000, Apple's undisclosed backdating caused $13 million and $9 million pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating and net income for fiscal year 2000 should have been $509 million and $777 million, respectively.  In fiscal year 2001, Apple's undisclosed backdating caused $19 million and $13 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating and net loss for fiscal year 2001 should have been $363 million and $38 million, respectively.  In fiscal year 2002, Apple's undisclosed backdating caused $29 million and $23 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating loss and net income for fiscal year 2002 should have been $12 million and $42 million, respectively.

260.    The MD&A section of the 2002 Annual Report also contained statements that were rendered false and misleading by the failure to disclose backdating.

261.    The MD&A section states that the Company was required to and did prepare its "financial statements and related disclosures in conformity with U.S. generally accepted accounting principles ["GAAP"]." The MD&A section further states the following regarding SG&A:

> SG&A decreased $27 million or 2% during 2002 as compared to 2001. The decrease in SG&A in 2002 is primarily the result of lower discretionary spending on marketing and advertising expenses, decreased spending related to information systems, and benefits directly related to the Company's restructuring actions in 2002 and 2001. These decreases were partially offset by higher sales expense in 2002 resulting from increased operating expenses associated with expansion of the Company's Retail segment. SG&A expenditures decreased $28 million or 2% during 2001 as compared to 2000. Declines in SG&A spending in both 2002 and 2001 reflect the Company's overall efforts to stabilize and selectively reduce recurring SG&A costs in light of lower net sales and to reduce discretionary marketing and advertising expenses. Given current economic conditions and the Company's continued strategic investments in new product development and its Retail segment, the Company is currently identifying additional opportunities to make appropriate reductions in SG&A costs.

262.    The MD&A section also contained the following chart of operating expenses for each of the prior three fiscal years (in millions except for percentages):

| | 2002 | | 2001 | | 2000 | |
|---|---|---|---|---|---|---|
| Research and development | $ 446 | $ | 430 | $ | 380 | |
| Percentage of net sales | 8% | | 8% | | 5% | |
| Selling, general, and administrative | $ 1,111 | $ | 1,138 | $ | 1,166 | |
| Percentage of net sales | 19% | | 21% | | 15% | |

263.    These statements are false and misleading because:  (a) the Company failed to properly account for backdated stock options as alleged in detail herein; (b) the Company's financial statements did not conform to GAAP; and (c) the expenditures for SG&A depicted in the chart for fiscal years ended 2002, 2001 and 2000 were materially understated by failing to account for the "instant paper profits" generated by backdating as compensation expense. According to the Company's 2006 restatement, pre-tax operating expenses for fiscal years 2002, 2001 and 2000 were understated by $29 million, $19 million and $13 million,

respectively; therefore, the Company's SG&A for fiscal years 2002, 2001 and 2000 should have been (in millions) $1,140, $1,157 and $1,179, respectively.

264.    The MD&A section further states the following regarding the Company's use of stock options to recruit and retain employees:

> The Company's success depends largely on its ability to attract and retain key personnel.
>
> Much of the future success of the Company depends on the continued service and availability of skilled personnel, including those in technical, marketing and staff positions. Experienced personnel in the information technology industry are in high demand and competition for their talents is intense, especially in the Silicon Valley, where the majority of the Company's employees are located. There can be no assurance that the Company will be able to successfully attract and retain the key personnel it needs. Additionally, volatility or a lack of positive performance in the Company's stock price may adversely affect its ability to retain key employees. As of September 28, 2002, a substantial majority of the Company's outstanding employee stock options were out-of-the-money.

265.    This statement is false and misleading because it fails to disclose that Apple management was willing to and did materially mislead the investing public in order to enhance their own compensation and also because it failed to disclose that the Company used backdated stock options to recruit and/or retain employees.

### 8.    2003 Annual Report

266.    The Company's Form 10-K for the fiscal year ended September 27, 2003 (filed with the SEC on December 19, 2003 and signed by Anderson, Jobs, Campbell, Drexler, Levinson and York and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company) (the "2003 Annual Report")) was materially false and misleading for the reasons discussed below.

267.    The 2003 Annual Report disclosed that 7.5 million (not split-adjusted) shares were granted to Jobs during fiscal year 2002.  This statement was false and misleading because it fails to disclose that these options were backdated.

268.    Apple has now admitted that no Board meeting occurred on October 19, 2001 despite the bogus documentation falsely indicating that such a meeting took place. The true

grant date was December 18, 2001 which means the assigned exercise price should have been $21.01 -- Apple's December 18 closing price representing the fair market value of Apple's shares on the true date of grant.  The net result of the pretense that the grant of these options was approved at an October 2001 board meeting is CEO Jobs was given an "instant paper profit" in the amount of $20,325,000 (*i.e.*, $21.01 minus $18.30 (the October 19th closing price) multiplied times 7.5 million shares) that was never disclosed to shareholders.

269.    The 2003 Annual Report also states:

> In March 2003, Mr. Jobs voluntarily cancelled all of his outstanding options, excluding those granted to him in his capacity as a director.  In March 2003, the Board awarded Mr. Jobs five million [not split-adjusted] restricted shares of the Company's Common Stock which generally vest in full on the third anniversary of the grant date.

270.    This statement is misleading because it fails to disclose that the five million restricted shares (now ten million after adjustments for stock splits) were received by Jobs in exchange for the backdated stock options discussed earlier herein.  As alleged earlier herein, as the result of the $104,087,000 in "instant paper profits" Jobs received from backdated options, he received at least an additional 630,000 shares of restricted stock that he would not have received had the cancelled options not been backdated.  At prices prevailing in or about the date of the 2003 Annual Report, these extra 630,000 shares had a value in excess of $50 million.  The 2003 Annual Report fails to disclose these facts.

271.    In addition, the 2003 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal years 2000 and 2002, and Anderson, Cook, Rubinstein and Tevanian in fiscal year 2001 as a result of their receipt of backdated stock options at less than fair market value on the date of grant.  The Summary Compensation Table is set forth below:

**SUMMARY COMPENSATION TABLE**

| Name and Principal Position | Fiscal Year | Annual Compensation | | Long-Term Compensation | | All Other Compensation ($) | |
|---|---|---|---|---|---|---|---|
| | | Salary ($) | Bonus ($) | Restricted Stock Award ($) | Securities Underlying Options* (#) | | |
| Steven P. Jobs Chief Executive Officer | 2003 | 1 | — | 74,750,000(1) | | — | |
| | 2002 | 1 | 2,268,698(2) | | 7,500,000(1) | 1,302,795 | (2) |
| | 2001 | 1 | 43,511,534(2) | | — | 40,484,594 | (2) |
| Fred D. Anderson Executive Vice President and Chief Financial Officer | 2003 | 656,631 | — | — | — | 11,450 | (3) |
| | 2002 | 656,631 | — | — | — | 11,000 | (3) |
| | 2001 | 657,039 | — | — | 1,000,000 | 7,312 | (3) |
| Timothy D. Cook Executive Vice President, Worldwide Sales | 2003 | 617,673 | — | — | — | 9,929 | (3) |
| | 2002 | 563,829 | — | — | — | 8,025 | (3) |
| | 2001 | 452,219 | 500,000 | — | 1,000,000 | 7,875 | (3) |
| Ronald B. Johnson Senior Vice President, Retail | 2003 | 452,404 | 1,500,000 | — | — | — | |
| | 2002 | 452,404 | — | — | 300,000 | — | |
| | 2001 | 452,429 | — | — | 300,000 | — | |
| Avadis Tevanian, Jr. Ph.D Senior Vice President, Chief Software Technology Officer | 2003 | 456,731 | — | — | — | 11,962 | |
| | 2002 | 492,212 | — | — | — | 10,700 | (3) |
| | 2001 | 460,873 | 500 | — | 1,000,000 | 10,200 | (3) |
| | | | | | | | (3) |

272.    The foregoing statements were false and misleading because Item

402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include

the "dollar value of bonus (cash and non-cash) earned by the named executive officer during

the fiscal year covered..." (17 C.F.R. § 229.402(b)(2)(iii)(B)), and Apple failed to include the

non-cash compensation attributable to backdated options.  Additionally, the Instructions to Item

96

402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

> (i) For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.
>
> (ii) Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…
>
> (iii) The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

273.   The 2003 Annual Report stated "[t]he Company measures compensation expense for its employee stock-based compensation plans using the intrinsic value method prescribed by [APB No. 25]….The Company has elected to follow APB No. 25…. Under…[APB No. 25], when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."  This statement is false and misleading.  Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, the Company's statement that it followed APB No. 25 was false and misleading.

274.   And because the Company did not properly account for the compensation expense created by backdating, the following operating income/loss and net income/loss figures in the 2003 Annual Report were overstated or understated, as the case may be:  (a) the $1 million operating loss figure reported for fiscal year 2003 was understated and the $69 million net income figure reported for fiscal year 2003 was overstated; (b) the $17 million operating income and $65 million net income figures reported for fiscal year 2002 were overstated; (c) the $344 million operating loss and $25 million net loss figures reported for fiscal year 2001

were understated; (d) the $786 million net income figure reported for fiscal year 2000 was overstated; and (e) the $601 million net income figure reported for fiscal year 1999 was overstated.  In fiscal year 1998, Apple's undisclosed backdating caused a $1 million increase in pre-tax compensation expense and had no effect on post-tax compensation expenses.  In fiscal year 1999, Apple's undisclosed backdating caused $8 million and $6 million increases in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating and net income for fiscal year 1999 should have been $351 million and $595 million, respectively.  In fiscal year 2000, Apple's undisclosed backdating caused $13 million and $9 million pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating and net income for fiscal year 2000 should have been $509 million and $777 million, respectively.  In fiscal year 2001, Apple's undisclosed backdating caused $19 million and $13 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating and net loss for fiscal year 2001 should have been $363 million and $38 million, respectively.  In fiscal year 2002, Apple's undisclosed backdating caused $29 million and $23 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating loss and net income for fiscal year 2002 should have been $12 million and $42 million, respectively.  In fiscal year 2003, Apple's undisclosed backdating caused $16 million and $12 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating loss and net income for fiscal year 2003 should have been $17 million and $57 million, respectively.

275.    The MD&A section of the 2003 Annual Report also contained statements that were rendered false and misleading by the failure to disclose backdating.

276.    The MD&A section states that the Company was required to and did prepare its "financial statements and related disclosures in conformity with U.S. generally accepted accounting principles ["GAAP"]." The MD&A section further states the following regarding SG&A:

> SG&A increased $103 million or 9% during 2003 as compared to 2002 due primarily to the Company's continued expansion of the Retail segment and increases in headcount. The overall increase was partially offset by a decrease in current year discretionary spending on marketing and advertising and by savings resulting from the 2003 and 2002 restructuring activities described below.

SG&A decreased $29 million or 3% during 2002 as compared to 2001. The decrease in SG&A in 2002 was primarily the result of lower discretionary spending on marketing and advertising expenses, decreased spending related to information systems, and benefits directly related to the Company's restructuring actions in 2002 and 2001. The decreases were partially offset by higher sales expense in 2002 resulting from increased operating expenses associated with expansion of the Company's Retail segment.

277.    The MD&A section also contained the following chart of operating expenses for each of the prior three fiscal years (in millions except for percentages):

| | 2003 | | 2002 | | 2001 | |
|---|---|---|---|---|---|---|
| Research and development | $ 471 | $ 446 | | $ 430 | | |
| Percentage of net sales | 8% | 8% | | 8% | | |
| Selling, general, and administrative | $ 1,212 | $ 1,109 | | $ 1,138 | | |
| Percentage of net sales | 20% | 19% | | 21% | | |
| Restructuring costs | $ 26 | $ 30 | | — | | |
| Purchased in-process research and development | — | $ 1 | | $ 11 | | |

278.    These statements are false and misleading because:  (a) the Company failed to properly account for backdated stock options as alleged in detail herein; (b) the Company's financial statements did not conform to GAAP; and (c) the expenditures for SG&A depicted in the chart for fiscal years ended 2003, 2002 and 2001 were materially understated by failing to account for the "instant paper profits" generated by backdating as compensation expense. According to the Company's 2006 restatement, pre-tax operating expenses for fiscal years 2003, 2002 and 2001 were understated by $16 million, $29 million and $19 million, respectively; therefore, the Company's SG&A for fiscal years 2003, 2002 and 2001 should have been (in millions) $1,228, $1,140 and $1,157, respectively.

279.    The MD&A section further states the following regarding the Company's use of stock options to recruit and retain employees:

1

2

> The Company's success depends largely on its ability to attract and retain key personnel.
>
> Much of the future success of the Company depends on the continued service and availability of skilled personnel, including its Chief Executive Officer, members of its executive team, and those in technical, marketing and staff positions. Experienced personnel in the information technology industry are in high demand and competition for their talents is intense, especially in the Silicon Valley, where the majority of the Company's employees are located. The Company has relied on its ability to grant stock options as one mechanism for recruiting and retaining this highly skilled talent. Potential accounting regulations requiring the expensing of stock options may impair the Company's future ability to provide these incentives without incurring significant compensation costs. There can be no assurance that the Company will continue to successfully attract and retain key personnel.

3

4

5

6

7

8

9

10     280.    This statement is false and misleading because it fails to disclose that Apple

11  management was willing to and did materially mislead the investing public in order to enhance

12  their own compensation and also because it failed to disclose that the Company used backdated

13  stock options to recruit and/or retain employees.

14                          **9.      2004 Annual Report**

15     281.    The Company's Form 10-K for the fiscal year ended September 25, 2004 (filed

16  with the SEC on December 3, 2004 and signed by Anderson, Jobs, Campbell, Drexler,

17  Levinson and York and reviewed and/or commented upon by Heinen at a time when Heinen

18  was chief legal officer of the Company) (the "2004 Annual Report")) was materially false and

19  misleading for the reasons discussed below.

20     282.    As previously alleged with respect to defendant Jobs, the 2004 Annual Report

21  disclosed that 7.5 million (not split-adjusted) shares were granted to Jobs during fiscal year

22  2002.  This statement was false and misleading because it fails to disclose that these options

23  were backdated.

24     283.    Apple has now admitted that no Board meeting occurred on October 19, 2001

25  despite the bogus documentation falsely indicating that such a meeting took place. The true

26  grant date was December 18, 2001 which means the assigned exercise price should have been

27  $21.01 -- Apple's December 18 closing price representing the fair market value of Apple's

28  shares on the true date of grant.  The net result of the pretense that the grant of these options

1    was approved at an October 2001 board meeting is CEO Jobs was given an "instant paper

2    profit" in the amount of $20,325,000 (*i.e.*, $21.01 minus $18.30 (the October 19th closing price)

3    multiplied times 7.5 million shares) that was never disclosed to shareholders.

4          284.    The 2004 Annual Report also states:

5                  In March 2003, Mr. Jobs voluntarily cancelled all of his
                   outstanding options, excluding those granted to him in his capacity
6                  as a director.  In March 2003, the Board awarded Mr. Jobs five
                   million [not split-adjusted] restricted shares of the Company's
7                  Common Stock which generally vest in full on the third
                   anniversary of the grant date.
8

9          285.    The 2004 Annual Report further states:

10                 On March 19, 2003, the Company entered into an Option
                   Cancellation and Restricted Stock Award Agreement (the
11                 Agreement) with Mr. Steven P. Jobs, its CEO.  The Agreement
                   cancelled stock option awards for the purchase of 27.5 million
12                 shares of the Company's common stock previously granted to Mr.
                   Jobs in 2000 and 2001.  Mr. Jobs retained options to purchase
13                 60,000 shares of the Company's common stock granted in August
                   of 1997 in his capacity as a member of the Company's Board of
14                 Directors, prior to becoming the Company's CEO.  The Agreement
                   replaced the cancelled options with a restricted stock award of 5
15                 million shares [not split-adjusted] of the Company's common
                   stock….
16

17         286.    These statements are misleading because they fail to disclose that the five

18   million restricted shares (now ten million after adjustments for stock splits) were received by

19   Jobs in exchange for the backdated stock options discussed earlier herein.  As alleged earlier

20   herein, it is estimated that as the result of the $104,087,000 in "instant paper profits" Jobs

21   received from backdated options, he received at least an additional 630,000 shares of restricted

22   stock that he would not have received had the cancelled options not been backdated.  At prices

23   prevailing in or about the date of the 2003 Annual Report, these extra 630,000 shares had a

24   value in excess of $50 million.  The 2004 Annual Report fails to disclose these facts.

25         287.    In addition, the 2004 Annual Report includes a Summary Compensation Table

26   that materially misstated the compensation of, and failed to disclose the illegal compensation

27   received from the Company by, Jobs in fiscal year 2002 as a result of his receipt of backdated

28   stock options at less than fair market value and in fiscal year 2003 as a result of his receipt of

101
**[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

restricted stock in exchange for backdated stock options at less than fair market value on the date of grant.  The Summary Compensation Table is set forth below:

**SUMMARY COMPENSATION TABLE**

| Name and Principal Position | Fiscal Year | Annual Compensation | | Long-Term Compensation | | All Other Compensation ($) |
| | | Salary ($) | Bonus ($) | Restricted Stock Award ($) | Securities Underlying Options* (#) | |
|---|---|---|---|---|---|---|
| Steven P. Jobs Chief Executive Officer | 2004 2003 2002 | 1 1 1 | — — 2,268,698(2) | — 74,750,000(1) — | — — 7,500,000(1) | — — 1,302,795(2) |
| Timothy D. Cook Executive Vice President, Worldwide Sales and Operations | 2004 2003 2002 | 602,632 617,673 563,829 | — — — | 7,650,000(3) — — | — — — | 12,588(4) 9,929(4) 8,025(4) |
| Ronald B. Johnson Senior Vice President, Retail | 2004 2003 2002 | 484,836 452,404 452,404 | 1,500,000 1,500,000 — | 6,375,000(3) — — | — — 300,000 | — — — |
| Jonathan Rubinstein Senior Vice President, iPod Division | 2004 2003 2002 | 485,216 452,939 452,558 | — — — | 6,375,000(3) — — | — — — | 12,300(4) 11,986(4) 9,996(4) |
| Avadis Tevanian, Jr. Ph.D Senior Vice President, Chief Software Technology Officer | 2004 2003 2002 | 469,681 456,731 492,212 | 1,000 — — | 5,100,000(3) — — | — — — | 12,338(4) 11,962(4) 10,700(4) |

288.    The foregoing statements were false and misleading because Item 402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include the "dollar value of bonus (cash and non-cash) earned by the named executive officer during the fiscal year covered..." (17 C.F.R. § 229.402(b)(2)(iii)(B)), and Apple failed to include the non-cash compensation attributable to backdated options.  Additionally, the Instructions to Item

402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary Compensation Table:

> (i)  For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.
>
> (ii)  Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…
>
> (iii)  The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*)   In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

289.   The 2004 Annual Report stated "[t]he Company measures compensation expense for its employee stock-based compensation plans using the intrinsic value method prescribed by [APB No. 25]….The Company has elected to follow APB No. 25…. Under…[APB No. 25], when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."  This statement is false and misleading.  Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, the Company's statement that it followed APB No. 25 was false and misleading.

290.   And because the Company did not properly account for the compensation expense created by backdating, the following operating income/loss and net income/loss figures in the 2004 Annual Report were overstated or understated, as the case may be:  (a) the $326 million operating income and $276 million net income figures reported for fiscal year 2004 were overstated; (b) the $1 million operating loss figure reported for fiscal year 2003 was understated and the $69 million net income figure reported for fiscal year 2003 was overstated; (c) the $17 million operating income and $65 million net income figures reported for fiscal year

2002 were overstated; (d) the $25 million net loss figure reported for fiscal year 2001 was understated; and (e) the $786 million net income figure reported for fiscal year 2000 was overstated.  In fiscal year 1998, Apple's undisclosed backdating caused a $1 million increase in pre-tax compensation expense and had no effect on post-tax compensation expenses.  In fiscal year 1999, Apple's undisclosed backdating caused $8 million and $6 million increases in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating and net income for fiscal year 1999 should have been $351 million and $595 million, respectively.  In fiscal year 2000, Apple's undisclosed backdating caused $13 million and $9 million pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating and net income for fiscal year 2000 should have been $509 million and $777 million, respectively.  In fiscal year 2001, Apple's undisclosed backdating caused $19 million and $13 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating and net loss for fiscal year 2001 should have been $363 million and $38 million, respectively.  In fiscal year 2002, Apple's undisclosed backdating caused $29 million and $23 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating loss and net income for fiscal year 2002 should have been $12 million and $42 million, respectively.  In fiscal year 2003, Apple's undisclosed backdating caused $16 million and $12 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating loss and net income for fiscal year 2003 should have been $17 million and $57 million, respectively.  In fiscal year 2004, Apple's undisclosed backdating caused $13 million and $10 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating loss and net income for fiscal year 2004 should have been $313 million and $266 million, respectively.

291.    The MD&A section of the 2004 Annual Report also contained statements that were rendered false and misleading by the failure to disclose backdating.

292.    The MD&A section states that the Company was required to and did prepare its "financial statements and related disclosures in conformity with U.S. generally accepted accounting principles ["GAAP"]." The MD&A section further states the following regarding SG&A:

Expenditures for SG&A increased $209 million or 17% during 2004 compared to 2003. These increases are due primarily to the Company's continued expansion of its Retail segment in both domestic and international markets, a current year increase in discretionary spending on marketing and advertising, an increase in amortization costs associated with restricted stock compensation, and higher direct and channel selling expenses resulting from the increase in net sales and employee salary merit increases. SG&A as a percentage of total net sales in 2004 was 17%, down from 20% in 2003. This decrease is due to the increase of 33% in total net sales of the Company for fiscal 2004, reflecting leverage on the Company's fixed costs.

293.    The MD&A section also contained the following chart of operating expenses for each of the prior three fiscal years (in millions except for percentages):

|  | | 2004 | | | 2003 | | | 2002 | |
|---|---|---|---|---|---|---|---|---|---|
| Research and development | $ | 489 | $ | | 471 | $ | | 446 | |
| Percentage of net sales | | 6 | % | | 8 | % | | 8 | % |
| Selling, general, and administrative | $ | 1,421 | $ | | 1,212 | $ | | 1,109 | |
| Percentage of net sales | | 17 | % | | 20 | % | | 19 | % |
| Restructuring costs | $ | 23 | $ | | 26 | $ | | 30 | |
| Purchased in-process research | | — | | | — | $ | | 1 | |

294.    These statements are false and misleading because:  (a) the Company failed to properly account for backdated stock options as alleged in detail herein; (b) the Company's financial statements did not conform to GAAP; and (c) the expenditures for SG&A depicted in the chart for fiscal years ended 2004, 2003 and 2002 were materially understated by failing to account for the "instant paper profits" generated by backdating as compensation expense. According to the Company's 2006 restatement, pre-tax operating expenses for fiscal years 2004, 2003 and 2002 were understated by $13 million, $16 million and $29 million, respectively; therefore, the Company's SG&A for fiscal years 2004, 2003 and 2002 should have been (in millions) $1,434, $1,228 and $1,140, respectively.

295.   The MD&A section further states the following regarding the Company's use of stock options to recruit and retain employees:

> The Company's success depends largely on its ability to attract and retain key personnel.
>
> Much of the future success of the Company depends on the continued service and availability of skilled personnel, including its Chief Executive Officer, members of its executive team, and those in technical, marketing and staff positions. Experienced personnel in the information technology industry are in high demand and competition for their talents is intense, especially in the Silicon Valley, where the majority of the Company's key employees are located. The Company has relied on its ability to grant stock options as one mechanism for recruiting and retaining this highly skilled talent. Potential accounting regulations requiring the expensing of stock options may impair the Company's future ability to provide these incentives without incurring significant compensation costs. There can be no assurance that the Company will continue to successfully attract and retain key personnel.

296.   This statement is false and misleading because it fails to disclose that Apple management was willing to and did materially mislead the investing public in order to enhance their own compensation and also because it failed to disclose that the Company used backdated stock options to recruit and/or retain employees.

### 10.   2005 Annual Report

297.   The Company's Form 10-K for the fiscal year ended September 24, 2005 (filed with the SEC on December 1, 2005 and signed by Anderson, Jobs, Campbell, Drexler, Levinson and York and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company) (the "2005 Annual Report")) was materially false and misleading for the reasons discussed below.

298.   The 2005 Annual Report states:

> In March 2003, Mr. Jobs voluntarily cancelled all of his outstanding options, excluding those granted to him in his capacity as a Director.  In March 2003, the Board awarded Mr. Jobs 10 million (split-adjusted) restricted shares of the Company's Common Stock that generally vest in full on the third anniversary of the grant date.

299.    The 2005 Annual Report further states:

> On March 19, 2003, the Company entered into an Option Cancellation and Restricted Stock Award Agreement (the Agreement) with Mr. Steven P. Jobs, its CEO.  The Agreement cancelled stock option awards for the purchase of 55 million shares of the Company's common stock previously granted to Mr. Jobs in 2000 and 2001.  Mr. Jobs retained options to purchase 120,000 shares of the Company's common stock granted in August of 1997 in his capacity as a member of the Company's Board of Directors, prior to becoming the Company's CEO.  The Agreement replaced the cancelled options with a restricted stock award of 10 million shares of the Company's common stock….

*  *  *

> The Company determined the value of the restricted stock award in accordance with APB Opinion No. 25….

300.    These statements are misleading because they fail to disclose that the ten million (split-adjusted) shares were received by Jobs in exchange for the backdated stock options discussed earlier herein.  As alleged earlier herein, it is estimated that as the result of the $104,087,000 in "instant paper profits" Jobs received from backdated options, he received at least an additional 630,000 shares of restricted stock that he would not have received had the cancelled options not been backdated.  At prices prevailing in or about the date of the 2003 Annual Report, these extra 630,000 shares had a value in excess of $50 million.  The 2005 Annual Report fails to disclose these facts.

301.    In addition, the 2005 Annual Report includes a Summary Compensation Table that materially misstated the compensation of, and failed to disclose the illegal compensation received from the Company by, Jobs in fiscal year 2003 as a result of his receipt of restricted stock in exchange for backdated stock options at less than fair market value on the date of grant.  The Summary Compensation Table is set forth below:

**[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

**SUMMARY COMPENSATION TABLE**

| Name and Principal Position | Fiscal Year | Annual Compensation | | Long-Term Compensation | | | | |
| | | Salary ($) | Bonus ($) | Restricted Stock Award ($) | | Securities Underlying Options* (#) | | All Other Compensation ($) |
| Steven P. Jobs | 2005 | 1 | — | — | | — | | — |
| Chief Executive Officer | 2004 | 1 | — | — | | — | | — |
| | 2003 | 1 | — | 74,750,000(1) | | — | | — |
| Timothy D. Cook | 2005 | 602,434 | 600,239 | — | | — | | 12,600(3) |
| Chief Operating Officer | 2004 | 602,632 | — | 7,650,000(2) | | — | | 12,588(3) |
| | 2003 | 617,673 | — | — | | — | | 9,929(3) |
| Ronald B. Johnson | 2005 | 552,795 | 550,202 | — | | — | | — |
| Senior Vice President, Retail | 2004 | 484,836 | 1,500,000 | 6,375,000(2) | | — | | — |
| | 2003 | 452,404 | 1,500,000 | — | | — | | — |
| Peter Oppenheimer | 2005 | 552,189 | 550,202 | — | | — | | 21,092(3) |
| Senior Vice President | 2004 | 450,739 | — | 6,375,000(2) | | — | | 3,808(3) |
| Chief Financial Officer | 2003 | 402,237 | — | — | | — | | — |
| Jonathan Rubinstein | 2005 | 552,795 | 551,239 | — | | — | | 12,600(3) |
| Senior Vice | 2004 | 485,216 | — | 6,375,000(2) | | — | | 12,300(3) |
| iPod Division | 2003 | 452,939 | — | — | | — | | 11,986(3) |

302.     The foregoing statements were false and misleading because Item

402(b)(2)(iii)(B) of Regulation S-K required that the Summary Compensation Table include

the "dollar value of bonus (cash and non-cash) earned by the named executive officer during

the fiscal year covered ..."  (17 C.F.R. § 229.402(b)(2)(iii)(B)), and Apple failed to include the

non-cash compensation attributable to backdated options.  Additionally, the Instructions to Item

402(b)(2)(iii)(A) and (B) further provide that the following items be disclosed in the Summary

Compensation Table:

    (i)     For stock or any other form of non-cash compensation, disclose the fair market value at the time the compensation is awarded, earned or paid.

108

(ii) Above-market or preferential earnings on restricted stock, options, SARs or deferred compensation paid during the fiscal year or payable during that period…

(iii) The dollar value of the difference between the price paid by a named executive officer for any security of the registrant or its subsidiaries purchased from the registrant or its subsidiaries (through deferral of salary or bonus, or otherwise), and the fair market value of such security at the date of purchase, unless that discount is available generally, either to all security holders or to all salaried employees of the registrant.

(*Id.*) In addition, the disclosures in the Summary Compensation Table of "Annual Compensation" and "Securities Underlying Options" are materially misleading because they omit the additional compensation received as a result of the backdated options.

303. The 2005 Annual Report stated "[t]he Company currently measures compensation expense for its employee stock-based compensation plans using the intrinsic value method prescribed by [APB No. 25]….Under…[APB No. 25], when the exercise price of the Company's employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recognized."  This statement is false and misleading. Since the market price of Apple shares on the true grant date exceeded the exercise price, Apple should have recognized the difference (*i.e.*, the instant paper profit or spread) as expense, but failed to do so.  As a result, Jobs should not have received less restricted stock  than he actually did in exchange for the backdated and options and, consequently, the Company's statement that it followed APB No. 25 was false and misleading.

304. Because the Company did not properly account for the compensation expense created by backdating, the following operating income/loss and net income/loss figures in the 2005 Annual Report were overstated or understated, as the case may be:  (a) the $1.650 billion operating income and $1.335 billion net income figures reported for fiscal year 2005 were overstated; (b) the $326 million operating income and $276 million net income figures reported for fiscal year 2004 were overstated; (c) the $1 million operating loss figure reported for fiscal year 2003 was understated and the $69 million net income figure reported for fiscal year 2003 was overstated; (d) the $65 million net income figure reported for fiscal year 2002 was overstated; and (e) the $25 million net loss figure reported for fiscal year 2001 was understated.

In fiscal year 2001, Apple's undisclosed backdating caused $19 million and $13 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating and net loss for fiscal year 2001 should have been $363 million and $38 million, respectively.  In fiscal year 2002, Apple's undisclosed backdating caused $29 million and $23 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating loss and net income for fiscal year 2002 should have been $12 million and $42 million, respectively.  In fiscal year 2003, Apple's undisclosed backdating caused $16 million and $12 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating loss and net income for fiscal year 2003 should have been $17 million and $57 million, respectively.  In fiscal year 2004, Apple's undisclosed backdating caused $13 million and $10 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating loss and net income for fiscal year 2004 should have been $313 million and $266 million, respectively. In fiscal year 2005, Apple's undisclosed backdating caused $7 million and $7 million in pre-tax and after-tax compensation expenses, respectively; thus, Apple's reported operating income and net income for fiscal year 2005 should have been $1.58 billion and $1.38 billion, respectively.

305.    The MD&A section of the 2005 Annual Report also contained statements that were rendered false and misleading by the failure to disclose backdating.

306.    The MD&A section states that the Company was required to and did prepare its "financial statements and related disclosures in conformity with U.S. generally accepted accounting principles ["GAAP"]." The MD&A section further states the following regarding SG&A:

> Expenditures for SG&A increased $438 million or 31% during 2005 compared to 2004. These increases are due primarily to the Company's continued expansion of its Retail segment in both domestic and international markets, a current year increase in discretionary spending on marketing and advertising, and higher direct and channel selling expenses resulting from the increase in net sales and employee salary merit increases. SG&A as a percentage of total net sales in 2005 was 13%, down from 17% in 2004, which is due to the increase in total net sales of 68% for the Company during 2005.

307.     The MD&A section also contained the following chart of operating expenses for each of the prior three fiscal years (in millions except for percentages):

| | September 24, 2005 | | September 25, 2004 | | September 27, 2003 | |
|---|---|---|---|---|---|---|
| Research and development | $ | 534 | $ | 489 | $ | 471 |
|    Percentage of net sales | | 4% | | 6% | | 8% |
| Selling, general, and administrative expenses | $ | 1,859 | $ | 1,421 | $ | 1,212 |
|    Percentage of net sales | | 13% | | 17% | | 20% |
| Restructuring costs | $ | — | $ | 23 | $ | 26 |

308.     These statements are false and misleading because:  (a) the Company failed to properly account for backdated stock options as alleged in detail herein; (b) the Company's financial statements did not conform to GAAP; and (c) the expenditures for SG&A depicted in the chart for fiscal years ended 2005, 2004 and 2003 were materially understated by failing to account for the "instant paper profits" generated by backdating as compensation expense. According to the Company's 2006 restatement, pre-tax operating expenses for fiscal years 2005, 2004 and 2003 were understated by $7million, $13 million and $16 million, respectively; therefore, the Company's SG&A for fiscal years 2005, 2004 and 2004 should have been (in millions) $1,866, $1,434 and $1,228, respectively.

309.     The MD&A section further states the following regarding the Company's use of stock options to recruit and retain employees:

> *The Company's success depends largely on its ability to attract and retain key personnel.*
>
> Much of the future success of the Company depends on the continued service and availability of skilled personnel, including its Chief Executive Officer, members of its executive team, and those in technical, marketing and staff positions. Experienced personnel in the information technology industry are in high demand and competition for their talents is intense, especially in the Silicon Valley, where the majority of the Company's key employees are located. The Company has relied on its ability to grant stock options as one mechanism for recruiting and retaining this highly skilled talent. Recent accounting regulations requiring

the expensing of stock options will impair the Company's future ability to provide these incentives without incurring significant compensation costs. There can be no assurance that the Company will continue to successfully attract and retain key personnel.

310.    This statement is false and misleading because it fails to disclose that Apple management was willing to and did materially mislead the investing public in order to enhance their own compensation and also because it failed to disclose that the Company used backdated stock options to recruit and/or retain employees.

## C.    QUARTERLY REPORTS

311.    During the Class Period, Apple published numerous false and misleading statements in its quarterly reports earnings releases which were relied upon by Class Members and which cause Apple's stock price to be materially inflated.

### 1.    Quarterly Reports Filed in 2001

312.    The Company's Form 10-Q for the period ended December 29, 2001 (filed with the SEC on February 11, 2002 and signed by Anderson and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "December 29, 2001 Quarterly Report")) was materially false and misleading for the reasons discussed below.

313.    The December 29, 2001 Quarterly Report conceals the backdating of options by Apple and fails to disclose the compensation expenses that should have been recorded under GAAP.  The December 29, 2001 Quarterly Report states that: (a) operating income (loss) for the three months ended December 29, 2001 and December 30, 2000, was ($4 million) and ($420 million), respectively; and (b) net income (loss) for the three months ended December 29, 2001 and December 30, 2000 was $38 million and ($195 million), respectively.  These results are false and misleading because they fail to account for compensation expenses created by backdating that reduced the actual operating and net income (or increased the actual operating or net loss); the precise amounts are known only to defendants.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

## 2. Quarterly Reports Filed in 2002

314.    The Company's Form 10-Q for the period ended March 30, 2002 (filed with the SEC on May 14, 2002 and signed by Anderson and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "March 30, 2002 Quarterly Report")) was materially false and misleading for the reasons discussed below.

315.    The March 30, 2002 Quarterly Report conceals the backdating of options by Apple and fails to disclose the compensation expenses that should have been recorded under GAAP.  The March 30, 2002 Quarterly Report states that: (a) operating income (loss) for the three months ended March 30, 2002 and March 31, 2001, was $28 million and ($8 million), respectively; (b) operating income (loss) for the six months ended March 30, 2002 and March 31, 2002 was $24 million and ($428 million), respectively; (c) net income (loss) for the three months ended March 30, 2002 and March 31, 2001 was $40 million and $43 million, respectively; and (d) net income (loss) for the six months ended March 30, 2002 and March 31, 2001 was $78 million and ($152 million), respectively.  These results are false and misleading because they fail to account for compensation expenses created by backdating that reduced the actual operating and net income (or increased the actual operating or net loss); the precise amounts are known only to defendants.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

316.    The Company's Form 10-Q for the period ended June 29, 2002 (filed with the SEC on August 9, 2002 and signed by Anderson and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "June 29, 2002 Quarterly Report")) was materially false and misleading for the reasons discussed below.

317.    The June 29, 2002 Quarterly Report conceals the backdating of options by Apple and fails to disclose the compensation expenses that should have been recorded under GAAP.  The June 29, 2002 Quarterly Report states that: (a) operating income (loss) for the three months ended June 29, 2002 and June 30, 2001, was $13 million and $31 million,

respectively; (b) operating income (loss) for the nine months ended June 29, 2002 and June 30, 2001 was $37 million and ($397 million), respectively; (c) net income (loss) for the three months ended June 29, 2002 and June 30, 2001 was $32 million and $61 million, respectively; and (d) net income (loss) for the nine months ended June 29, 2002 and June 30, 2001 was $110 million and ($91 million), respectively.  These results are false and misleading because they fail to account for compensation expenses created by backdating that reduced the actual operating and net income (or increased the actual operating or net loss); the precise amounts are known only to defendants.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

### 3.     Quarterly Reports Filed in 2003

318.    The Company's Form 10-Q for the period ended December 28, 2002 (filed with the SEC on February 10, 2003 and signed by Anderson and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "December 2002 Quarterly Report")) was materially false and misleading for the reasons discussed below.

319.    The December 2002 Quarterly Report conceals the backdating of options by Apple and fails to disclose the compensation expenses that should have been recorded under GAAP.  The December 2002 Quarterly Report states that: (a) operating income (loss) for the three months ended December 28, 2002 and December 28, 2001, was ($37 million) and ($4 million), respectively; and (b) net income (loss) for the three months ended December 28, 2002 and December 29, 2001 was ($8 million) and $38 million, respectively.  These results are false and misleading because they fail to account for compensation expenses created by backdating that reduced the actual operating and net income (or increased the actual operating or net loss); the precise amounts are known only to defendants.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

320.    The Company's Form 10-Q for the period ended March 29, 2003 (filed with the SEC on May 13, 2003 and signed by Anderson and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "March 29, 2003 Quarterly Report")) was materially false and misleading for the reasons discussed below.

321.    The March 29, 2003 Quarterly Report conceals the backdating of options by Apple and fails to disclose the compensation expenses that should have been recorded under GAAP.  The March 29, 2003 Quarterly Report states that: (a) operating income (loss) for the three months ended March 29, 2003 and March 30, 2002, was ($4 million) and $28 million, respectively; (b) operating income (loss) for the six months  ended March 29, 2003 and March 30, 2002 was ($41 million) and ($24 million), respectively; (c) net income (loss) for the three months ended March 29, 2003 and March 30, 2002 was $14 million and $40 million, respectively; and (d) net income (loss) for the six months ended March 29, 2003 and March 30, 2002 was $6 million and $78 million, respectively.  These results are false and misleading because they fail to account for compensation expenses created by backdating that reduced the actual operating and net income (or increased the actual operating or net loss); the precise amounts are known only to defendants.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

322.    The Company's Form 10-Q for the period ended June 28, 2003 (filed with the SEC on August 12, 2003 and signed by Anderson and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "June 28, 2003 Quarterly Report")) was materially false and misleading for the reasons discussed below.

323.    The June 28, 2003 Quarterly Report conceals the backdating of options by Apple and fails to disclose the compensation expenses that should have been recorded under GAAP.  The June 28, 2003 Quarterly Report states that: (a) operating income (loss) for the three months ended June 28, 2003 and June 29, 2002, was $9 million and $13 million, respectively; (b) operating income (loss) for the nine months ended June 28, 2003 and June 29,

1   2002 was ($32 million) and $37 million, respectively; (c) net income for the three months

2   ended June 28, 2003 and June 29, 2002 was $19 million and $32 million, respectively; and (d)

3   net income for the nine months ended June 28, 2003 and June 29, 2002 was $25 million and

4   $110 million, respectively.  These results are false and misleading because they fail to account

5   for compensation expenses created by backdating that reduced the actual operating and net

6   income (or increased the actual operating or net loss); the precise amounts are known only to

7   defendants.  In its 2006 Annual Report, which contained the restatement of Apple's historical

8   results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of

9   the failure to properly account for the compensation expense created by backdating on these

10  quarterly results.

11                          **4.      Quarterly Reports Filed in 2004**

12          324.    The Company's Form 10-Q for the period ended December 27, 2003 (filed with

13  the SEC on February 10, 2004 and signed by Jobs and Anderson and reviewed and/or

14  commented upon by Heinen at a time when Heinen was chief legal officer of the Company

15  (the "December 27, 2003 Quarterly Report")) was materially false and misleading for the

16  reasons discussed below.

17          325.    The December 27, 2003 Quarterly Report conceals the backdating of options by

18  Apple and fails to disclose the compensation expenses that should have been recorded under

19  GAAP.  The December 27, 2003 Quarterly Report states that: (a) operating income (loss) for

20  the three months ended December 27, 2003 and December 28, 2002, was $74 million and ($37

21  million), respectively; and (b) net income (loss) for the three months ended December 27, 2003

22  and December 28, 2002 was $63 million and ($8 million), respectively.  These results are false

23  and misleading because they fail to account for compensation expenses created by backdating

24  that reduced the actual operating and net income (or increased the actual operating or net loss);

25  the precise amounts are known only to defendants.  In its 2006 Annual Report, which contained

26  the restatement of Apple's historical results necessitated by backdating, Apple did not state the

27  incremental pre-or post-tax effects of the failure to properly account for the compensation

28  expense created by backdating on these quarterly results.

**[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

326.    The Company's Form 10-Q for the period ended March 27, 2004 (filed with the SEC on May 6, 2004 and signed by Jobs and Anderson and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company  (the "March 27, 2004 Quarterly Report")) was materially false and misleading for the reasons discussed below.

327.    The March 27, 2004 Quarterly Report conceals the backdating of options by Apple and fails to disclose the compensation expenses that should have been recorded under GAAP.  The March 27, 2004 Quarterly Report states that: (a) operating income (loss) for the three months ended March 27, 2004 and March 29, 2003, was $52 million and ($4 million), respectively; (b) operating income (loss) for the six months  ended March 27, 2004 and March 29, 2003 was $126 million and ($41 million), respectively; (c) net income for the three months ended March 27, 2004 and March 29, 2003 was $46 million and $14 million, respectively; and (d) net income for the six months ended March 27, 2004 and March 29, 2003 was $109 million and $6 million, respectively.  These results are false and misleading because they fail to account for compensation expenses created by backdating that reduced the actual operating and net income (or increased the actual operating or net loss); the precise amounts are known only to defendants.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

328.    The Company's Form 10-Q for the period ended June 26, 2004 (filed with the SEC on August 5, 2004 and signed by Jobs and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "June 26, 2004 Quarterly Report")) was materially false and misleading for the reasons discussed below.

329.    The June 26, 2004 Quarterly Report conceals the backdating of options by Apple and fails to disclose the compensation expenses that should have been recorded under GAAP.  The June 26, 2004 Quarterly Report states that: (a) operating income (loss) for the three months ended June 26, 2004 and June 28, 2003, was $72 million and $9 million, respectively; (b) operating income (loss) for the nine months ended June 26, 2004 and June 28,

2003 was $198 million and ($32 million), respectively; (c) net income for the three months ended June 26, 2004 and June 28, 2003 was $61 million and $19 million, respectively; and (d) net income for the nine months ended June 26, 2004 and June 28, 2003 was $170 million and $25 million, respectively.  These results are false and misleading because they fail to account for compensation expenses created by backdating that reduced the actual operating and net income (or increased the actual operating or net loss); the precise amounts are known only to defendants.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

### 5.    Quarterly Reports Filed in 2005

330.    The Company's Form 10-Q for the period ended December 25, 2004 (filed with the SEC on February 1, 2005 and signed by Jobs and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "December 25, 2004 Quarterly Report")) was materially false and misleading for the reasons discussed below.

331.    The December 25, 2004 Quarterly Report conceals the backdating of options by Apple and fails to disclose the compensation expenses that should have been recorded under GAAP.  The December 25, 2004 Quarterly Report states that: (a) operating income for the three months ended December 25, 2004 and December 27, 2003, was $403 and $74 million, respectively; and (b) net income for the three months ended December 25, 2004 and December 27, 2003 was $295 million and $63 million, respectively.  These results are false and misleading because they fail to account for compensation expenses created by backdating that reduced the actual operating and net income (or increased the actual operating or net loss); the precise amounts are known only to defendants.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

332.    The Company's Form 10-Q for the period ended March 26, 2005 (filed with the SEC on May 4, 2005 and signed by Jobs and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "March 26, 2005 Quarterly Report")) was materially false and misleading for the reasons discussed below.

333.    The March 26, 2005 Quarterly Report conceals the backdating of options by Apple and fails to disclose the compensation expenses that should have been recorded under GAAP.  The March 26, 2005 Quarterly Report states that: (a) operating income for the three months ended March 26, 2005 and March 27, 2004, was $402 million and $52 million, respectively; (b) operating income for the six months  ended March 26, 2005 and March 27, 2004 was $805 million and $126 million, respectively; (c) net income for the three months ended March 26, 2005 and March 27, 2004 was $290 million and $46 million, respectively; and (d) net income for the six months ended March 26, 2005 and March 27, 2004 was $585 million and $109 million, respectively.  These results are false and misleading because they fail to account for compensation expenses created by backdating that reduced the actual operating and net income (or increased the actual operating or net loss); the precise amounts are known only to defendants.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

334.    The Company's Form 10-Q for the period ended June 25, 2005 (filed with the SEC on August 3, 2005 and signed by Jobs and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "June 25, 2005 Quarterly Report")) was materially false and misleading for the reasons discussed below.

335.    The June 25, 2005 Quarterly Report conceals the backdating of options by Apple and fails to disclose the compensation expenses that should have been recorded under GAAP.  The June 25, 2005 Quarterly Report states that: (a) operating income for the three months ended June 25, 2005 and June 26, 2004 was $427 million and $72 million, respectively; (b) operating income for the nine months ended June 25, 2005 and June 26, 2004 was $1.232

119

billion and $198 million, respectively; (c) net income for the three months ended June 25, 2005 and June 26, 2004 was $320 million and $61 million, respectively; and (d) net income for the nine months ended June 25, 2005 and June 26, 2004 was $905 million and $170 million, respectively. These results are false and misleading because they fail to account for compensation expenses created by backdating that reduced the actual operating and net income (or increased the actual operating or net loss); the precise amounts are known only to defendants. In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

### 6.      Quarterly Reports Filed In 2006

336.    The Company's Form 10-Q for the period ended December 31, 2005 (filed with the SEC on February 3, 2006 and signed by Jobs and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "December 31, 2005 Quarterly Report")) was materially false and misleading for the reasons discussed below.

337.    The December 31, 2005 Quarterly Report conceals the backdating of options by Apple and fails to disclose the compensation expenses that should have been recorded under GAAP. The December 31, 2005 Quarterly Report states that: (a) operating income for the three months ended December 31, 2005 and December 25, 2004, was $750 million and $403 million, respectively; and (b) net income for the three months ended December 31, 2005 and December 25, 2004 was $565 million and $295 million, respectively. These results are false and misleading because they fail to account for compensation expenses created by backdating that reduced the actual operating and net income (or increased the actual operating or net loss); the precise amounts are known only to defendants. In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

338.   The Company's Form 10-Q for the period ended April 1, 2006 (filed with the SEC on May 5, 2006 and signed by Jobs and reviewed and/or commented upon by Heinen at a time when Heinen was chief legal officer of the Company (the "April 1, 2006 Quarterly Report")) was materially false and misleading for the reasons discussed below.

339.   The April 1, 2006 Quarterly Report conceals the backdating of options by Apple and fails to disclose the compensation expenses that should have been recorded under GAAP. The April 1, 2006 Quarterly Report states that: (a) operating income  for the three months ended April 1, 2006 and March 26, 2005 was $529 million and $402 million, respectively; (b) operating income  for the six months ended April 1, 2006 and March 26, 2005 was $1.279 billion and $805 million, respectively; (c) net income  for the three months ended April 1, 2006 and March 26, 2005 was $410 million and $290 million, respectively; and (d) net income  for the six months ended April 1, 2006 and March 26, 2005 was $975 million and $585 million, respectively.  These results are false and misleading because they fail to account for compensation expenses created by backdating that reduced the actual operating and net income (or increased the actual operating or net loss); the precise amounts are known only to defendants.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

**D.   APPLE'S EARNINGS RELEASES**

340.   Prior to and during the Class Period, Apple published numerous false and misleading statements in its earnings releases which were relied upon by Class Members and which caused Apple's stock price to be materially inflated.

**1.   Fiscal Year 2000 Earnings Releases**

341.   On January 19, 2000, Apple issued a press release announcing its results for its fiscal 2000 first quarter that ended January 1, 2000.  The press release states, in relevant part:

> CUPERTINO, California—January 19, 2000—Apple® today announced financial results for its fiscal 2000 first quarter that

ended January 1, 2000. *For the quarter, the Company posted a net profit of $183 million, or $1.03 per diluted share. These results compare to a net profit of $152 million, or $.95 per diluted share, achieved in the year-ago quarter.* Revenues for the quarter were $2.34 billion, up 37 percent from the year-ago quarter, and gross margins were 25.9 percent, down from 28.2 percent in the year-ago quarter. International sales accounted for 51 percent of the quarter's revenues.

The quarter's results included a $5 million net favorable impact from non-recurring items, including an after-tax gain of $101 million resulting from the sale of approximately five million shares of ARM Holdings plc., a net restructuring charge of $6 million, and a one-time charge for a special executive bonus of $90 million. *Without non-recurring items, the Company's net profit for the quarter would have been $178 million, up 45 percent from the year-ago-quarter, and earnings per diluted share would have been $1.00, up 28 percent from the year-ago quart*er.

(emphasis added).

342.    The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by the failure to properly account for option awards issued to Apple's employees and thereby artificially reducing Apple's reported expenses. During fiscal year 2000, Apple incurred at least $13 million in pre-tax expenses associated with its improperly dated options which were not reported in its financial results, and $9 million in after tax expenses.  Apple's income in fiscal 2000 was inflated by at least $9 million.

343.    On April 19, 2000, Apple issued its earnings release for its fiscal 2000 second quarter ended April 1, 2000.  The press release stated in relevant part:

CUPERTINO, California—April 19, 2000—Apple® today announced financial results for its fiscal 2000 second quarter ending April 1, 2000. *For the quarter, the Company posted a net profit of $233 million, or $1.28 per diluted share. These results compare to a net profit of $135 million, or $.84 per diluted share, achieved in the year-ago quarter.* Revenues for the quarter were $1.94 billion, up 27 percent from the year-ago quarter, and gross margins were 28.2 percent, up from 26.3 percent in the year-ago quarter. International sales accounted for 51 percent of the quarter's revenues.

The quarter's results included a $73 million after-tax gain from the sale of 1.5 million shares of ARM Holdings plc., which contributed $.40 to earnings per diluted share. Without non-recurring items, the Company's net profit was $160 million, an increase of 72 percent from the year-ago quarter and earnings per

1
2

diluted share increased 47 percent from the year-ago quarter. Sales of 1,043,000 units drove year-over-year unit growth of 26 percent.

3

(emphasis added)

4

344.    The statements emphasized above were materially false and misleading because

5

Apple's reported profits were inflated by the failure to properly account for option awards

6

issued to Apple's employees and thereby artificially reducing Apple's reported expenses.

7

During fiscal year 2000, Apple incurred at least $13 million in pre-tax expenses associated with

8

its improperly dated options which were not reported in its financial results, and $9 million in

9

after tax expenses.  Apple's income in fiscal 2000 was inflated by at least $9 million.

10

345.    On July 18, 2000, Apple published its earnings release for its fiscal 2000 third

11

quarter ended July 1, 2000.  The press release stated in relevant part:

12
13
14
15
16
17

CUPERTINO, California—July 18, 2000—Apple® today announced financial results for its fiscal 2000 third quarter ending July 1, 2000. *For the quarter, the Company posted a net profit of $200 million, or $.55 per diluted share. These results compare to a net profit of $203 million, or $.60 per diluted share, achieved in the year-ago quarter.* Revenues for the quarter were $1.825 billion, up 17 percent from the year-ago quarter, and gross margins were 29.8 percent, up from 27.4 percent in the year-ago quarter. International sales accounted for 46 percent of the quarter's revenues.

18
19
20
21

The quarter's results included a $37 million after-tax gain from the sale of 4.95 million shares of ARM Holdings plc., which contributed $.10 to earnings per diluted share. *Excluding investment gains, the Company's net profit would have been $163 million, an increase of 43 percent from the year-ago quarter, and earnings per diluted share would have been $.45, up 29 percent from the year-ago quarter.*

22
23

Sales of 1,016,000 units during the quarter including over 350 thousand Power Mac™ G4 systems and nearly 450 thousand iMac™ systems drove unit growth of 12 percent.

24
25
26

"We're pleased to report our eleventh consecutive profitable quarter, with net profits up 43 percent," said Steve Jobs, Apple's CEO. "We've now shipped 3.7 million iMacs since introduction, and we had a strong quarter for our pro products, especially PowerBooks."

27

346.    The statements emphasized above were materially false and misleading because

28

Apple's reported profits were inflated by the failure to properly account for option awards

issued to Apple's employees and thereby artificially reducing Apple's reported expenses. During fiscal year 2000, Apple incurred at least $13 million in pre-tax expenses associated with its improperly dated options which were not reported in its financial results, and $9 million in after tax expenses.  Apple's income in fiscal 2000 was inflated by at least $9 million.

347.   On September 28, 2000, Apple issued a press release warning that its earnings for the fourth quarter 2000 would be lower than anticipated.  The press release reported, in relevant part:

> CUPERTINO, California—September 28, 2000—Apple® today announced that earnings for its quarter ending September 30, 2000 will be substantially below expectations due to slower than expected sales in the month of September.
>
> *The Company indicated that it expects to report revenues between $1.85 and $1.90 billion and earnings per diluted share, excluding investment gains, between $.30 and $.33 when actual results are announced on October 18, 2000.*
>
> "Three factors contributed to our revenues and earnings coming in below expectations," said Fred Anderson, Apple's CFO. "First, we experienced lower than expected September sales due to a business slowdown in all geographies. Second, our Education sales, which normally peak during September, were lower than expected. And third, our Power Mac G4 Cube is off to a slower than expected start, resulting in revenues below expectations. We are currently re-evaluating our plans going forward, and will provide lower growth targets for next quarter and the next fiscal year when we announce our final results on October 18."
>
> "We've clearly hit a speedbump, which will result in our earning, before investment gains, approximately $110 million rather than the expected $165 million for the September quarter," said Steve Jobs, Apple's CEO. "Though this slowdown is disappointing, we have so many wonderful new products and programs in the pipeline—including Mac OS X early next year—and remain positive about our future."

348.   Then on October 18, 2000, Apple announced its financial results for its fiscal 2000 fourth quarter ended September 30, 2000.  The press release stated, in relevant part:

> CUPERTINO, California—October 18, 2000—Apple® today announced financial results for its fiscal 2000 fourth quarter ending September 30, 2000. *For the quarter, the Company posted a net profit of $170 million, or $.47 per diluted share. These results compare to a net profit of $111 million, or $.31 per diluted share, achieved in the year ago quarter. Revenues for the quarter were $1.87 billion, up 40 percent from the year ago quarter, and gross*

*margins were 25.0 percent, down from 28.7 percent in the year ago quarter.* International sales accounted for 44 percent of the quarter's revenues.

The quarter's results included a $62 million after-tax gain from the sale of 7.1 million shares of ARM Holdings plc., which contributed $.17 to earnings per diluted share. Excluding investment gains, the Company's net profit would have been $108 million, an increase of 20 percent from the year ago quarter, and earnings per diluted share would have been $.30, up 20 percent from the year ago quarter.

Apple shipped 1,122,000 units during the quarter including over 570,000 iMac™ systems.

"We have identified several factors which we believe contributed to our sales shortfall last quarter, and we are taking strong steps to remedy them going forward," said Steve Jobs, Apple's CEO. "Our sell-through for September was way below plan, leaving us with an overhang of channel inventory. Rather than reducing it gradually over the next several quarters, we have decided to reduce it to a normal level by the end of this quarter. This will result in a second disappointing financial quarter, even though our sell-through sales should be moderately strong. Our plan is to be back on track for the January quarter, and we remain very excited about our products and programs for 2001."

"In light of September's disappointing sales and higher-than-planned ending channel inventories, we are resetting our revenue estimates for the December quarter to about $1.6 billion and are targeting a slight profit," said Fred Anderson, Apple's CFO. "We are also resetting our revenue target for fiscal year 2001 to the $7.5 to $8 billion range and our target for EPS to the $1.10 to $1.25 range."

*For the year, the Company generated revenues of $7.98 billion and net earnings of $786 million, or $2.18 per diluted share. These results compare to fiscal 1999 revenues of $6.1 billion and net earnings of $601 million, or $1.81 per diluted share.*

(emphasis added).

349.    The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by the failure to properly account for option awards issued to Apple's employees and thereby artificially reducing Apple's reported expenses. During fiscal year 2000, Apple incurred at least $13 million in pre-tax expenses associated with its improperly dated options which were not reported in its financial results, and $9 million in after tax expenses.  Apple's income in fiscal 2000 was inflated by at least $9 million.

## 2.   Fiscal year 2001 Earnings Releases

350.   On July 17, 2001, Apple published an earnings release announcing Apple's earnings for its third quarter 2001 fiscal year ended June 30, 2001.  The press release stated, in relevant part:

> CUPERTINO, California—July 17, 2001—Apple® today announced financial results for its fiscal 2001 third quarter ended June 30, 2001. For *the quarter, the Company posted a net profit of $61 million, or $.17 per diluted share. These results compare to a net profit of $200 million, or $.55 per diluted share, achieved in the year ago quarter. Revenues for the quarter were $1.475 billion, down 19 percent from the year ago quarter, and gross margins were 29.4 percent, compared to 29.8 percent in the year ago quarter.* International sales accounted for 44 percent of the quarter's revenues.
>
> *            *            *
>
> "We're delivering solid profitability while maintaining lean channel inventories in a weak economic environment," said Fred Anderson, Apple's CFO. "Our balance sheet remains very strong, with over $4.2 billion in cash, and we are targeting a slight sequential increase in revenues and earnings per share in the September quarter."

(Emphasis added)

351.   The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by the failure to properly account for option awards issued to Apple's employees and thereby artificially reducing Apple's reported expenses. During fiscal year 2001, Apple incurred at least $19 million in pre-tax expenses associated with its improperly dated options which were not reported in its financial results, and $13 million in after tax expenses.  Apple's income in fiscal 2001 was inflated by at least $13 million.  For the January 17, 2001 grant alone, Apple's net loss for 2001 was understated by 10.77%.

352.   On October 17, 2001, Apple published an earnings release announcing Apple's earnings for its fourth quarter 2001 fiscal year ended October 1, 2001.  The press release stated in relevant part:

> CUPERTINO, California—October 17, 2001—Apple® today announced financial results for its fiscal 2001 fourth quarter ended September 29, 2001. *For the quarter, the Company posted a net profit of $66 million, or $.19 per diluted share. These results compare to a net profit of $170 million, or $.47 per diluted share,*

126

*achieved in the year ago quarter.* Revenues for the quarter were $1.45 billion, down 22 percent from the year ago quarter, and gross margins were 30.1 percent, compared to 25.0 percent in the year ago quarter. International sales accounted for 41 percent of the quarter's revenues.

The quarter's results included a $1 million favorable after-tax impact resulting from realized investment gains. *Excluding these gains, the Company's net profit for the quarter would have been $65 million, or $.18 per diluted share.*

Apple shipped 850 thousand Macintosh® units during the quarter.

"We accomplished a lot in FY 2001, even though it was a challenging year for us and our industry," said Steve Jobs, Apple's CEO. "We gained market share in education, and iBook sales to education tripled last quarter; we launched Mac OS X, and released the stunningly fast 10.1 update in September; we opened our first Apple retail stores, and are on track to open 25 stores across the U.S. by the end of 2001."

"We're pleased to have delivered solid results while maintaining lean channel inventories in a very challenging environment," said Fred Anderson, Apple's CFO. "Our balance sheet remains very strong, with over $4.3 billion in cash. Given the uncertain global political environment and weak economy, we are targeting December quarter revenues of at least $1.4 billion and EPS of at least $.10."

353.    The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by the failure to properly account for option awards issued to Apple's employees and thereby artificially reducing Apple's reported expenses. During fiscal year 2001, Apple incurred at least $19 million in pre-tax expenses associated with its improperly dated options which were not reported in its financial results, and $13 million in after tax expenses. Apple's income in fiscal 2001 was inflated by at least $13 million. For the January 17, 2001 grant alone, Apple's net loss for 2001 was understated by 10.77%.

### 3.    Fiscal year 2002 Earnings Releases

354.    On January 16, 2002, Apple announced its first quarter results for fiscal year 2002. According to Apple's press release:

*For the quarter, the Company posted a net profit of $38 million, or $.11 per diluted share. These results compare to a net loss of $195 million, or $.58 per diluted share, in the year ago quarter. Revenues for the quarter were $1.38 billion, up 37 percent from the year ago quarter, and gross margins were 30.7 percent,*

127

*compared to –2.1 percent in the year ago quarter. International sales accounted for 48 percent of the quarter's revenues.*

*"Apple delivered a solid quarter and is one of the few companies making a profit in personal computers during these challenging times," said Steve Jobs, Apple's CEO.* "During last quarter we continued our strategy of innovation. We launched the wildly popular iPod and sold more than 125,000 of them in two months. And we ended the year with 27 Apple retail stores that attracted over 800,000 visitors in the month of December alone."

"We're pleased to have delivered healthy results while maintaining lean channel inventories in a very challenging environment," said Fred Anderson, Apple's CFO. "Our balance sheet remains very strong, with almost $4.4 billion in cash. We are targeting March quarter revenues to be up sequentially to about $1.5 billion and EPS to be approximately flat with the December quarter."

355.   The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by the failure to properly account for option awards issued to Apple's employees and thereby artificially reducing Apple's reported expenses.  In the first quarter of fiscal 2002, Apple had backdated at least one option grant—to Defendant Jobs—and should have incurred at least $20.2 million in tax expenses associated with its improperly dated options which were not reported in its financial results.  This concealed expense together with expenses associated with other backdated options caused Apple to understate its expenses in fiscal 2002 by $29 million before taxes and to overstate its income by $23 million.

356.   On April 17, 2002, issued a press release announcing its financial results for its fiscal 2002 second quarter ended March 30, 2002.  The press release stated in pertinent part:

CUPERTINO, California—April 17, 2002—Apple® today announced financial results for its fiscal 2002 second quarter ended March 30, 2002. *For the quarter, the Company posted a net profit of $40 million, or $.11 per diluted share. These results compare to a net profit of $43 million, or $.12 per diluted share, in the year ago quarter. Revenues for the quarter were $1.5 billion, up 4 percent from the year ago quarter, and gross margins were 27.4 percent, compared to 26.9 percent in the year ago quarter. International sales accounted for 45 percent of the quarter's revenues.*

\*       \*       \*

> "We're pleased to have delivered solid results while executing a challenging product transition," said Fred Anderson, Apple's CFO. "Our balance sheet remains very strong with $4.3 billion in cash. We are targeting June quarter revenues to be up sequentially to about $1.6 billion and EPS to be flat to up slightly compared with the March quarter."

357.   The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by the failure to properly account for option awards issued to Apple's employees and thereby artificially reducing Apple's reported expenses.  In the first quarter of fiscal 2002, Apple had backdated at least one option grant—to Defendant Jobs—and should have incurred at least $20.2 million in tax expenses associated with its improperly dated options which were not reported in its financial results.  This concealed expense together with expenses associated with other backdated options caused Apple to understand its expenses in fiscal 2002 by $29 million before taxes and to overstate its income by $23 million.

358.   On July 16, 2002, Apple issued a press release announcing its financial results for the fiscal 2002 third quarter ended June 29, 2002.  The press release stated in relevant part:

> CUPERTINO, California—July 16, 2002—Apple® today announced financial results for its fiscal 2002 third quarter ended June 29, 2002. *For the quarter, the Company posted a net profit of $32 million, or $.09 per diluted share. These results compare to a net profit of $61 million, or $.17 per diluted share, in the year ago quarter. Revenues for the quarter were $1.43 billion, down 3 percent from the year ago quarter, and gross margins were 27.4 percent, down from 29.4 percent in the year ago quarter.* International sales accounted for 42 percent of the quarter's revenues.
>
> *                *                *
>
> "Despite the slowdown in the market, our operational efficiency was excellent," said Fred Anderson, Apple's CFO. "Our balance sheet is very strong, with $4.3 billion in cash, and we achieved a very efficient cash conversion cycle of -36 days. We expect September quarter revenues to be approximately flat with the June quarter, and expect a slight profit for the quarter before any non-recurring items."

359.   The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by the failure to properly account for option awards

issued to Apple's employees and thereby artificially reducing Apple's reported expenses. In the first quarter of fiscal 2002, Apple had backdated at least one option grant—to Defendant Jobs—and should have incurred at least $20.2 million in tax expenses associated with its improperly dated options which were not reported in its financial results. This concealed expense together with expenses associated with other backdated options caused Apple to understand its expenses in fiscal 2002 by $29 million before taxes and to overstate its income by $23 million.

360.    On October 16, 2002, Apple published a press release announcing its financial results for the fiscal 2002 fourth quarter ended September 28, 2002. The press release stated, in relevant part:

> CUPERTINO, California—October 16, 2002—Apple® today announced financial results for its fiscal 2002 fourth quarter ended September 28, 2002. For the quarter, the Company posted a net loss of $45 million, or $.13 per share. These results compare to a net profit of $66 million, or $.19 per diluted share, in the year-ago quarter. Revenues for the quarter were $1.44 billion, flat with the year ago quarter, and gross margins were 26.4 percent, down from 30.1 percent in the year-ago quarter. International sales accounted for 35 percent of the quarter's revenues.
>
> The quarter's results included several non-recurring items: the write-down of certain equity investments totaling $49 million net of tax; a restructuring charge of $4 million net of tax; an in-process R&D charge of $1 million net of tax; and the reversal of a portion of a previous executive compensation expense resulting in a favorable impact of $2 million. Excluding these non-recurring items, the Company's net profit for the quarter would have been $7 million, or $.02 per share.
>
> *       *       *
>
> "Though our industry continues to struggle, we had some bright spots this quarter—Mac OS X v10.2 Jaguar is a big hit and on track to have 5 million users by the end of this year, our 'Switchers' campaign is very well received and is attracting a lot of new customers, and our retail stores sold over $100 million and hosted 2.25 million visitors this quarter," said Steve Jobs, Apple's CEO. "Looking forward, we do not expect our industry to pick up anytime soon, though we're hoping to help put a lot of iPods, iMacs and iBooks under trees this holiday season. With the stability of our rock-solid balance sheet, Apple will continue to invest through this downturn to create the industry's most innovative products and best buying experience."

361.   The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by the failure to properly account for option awards issued to Apple's employees and thereby artificially reducing Apple's reported expenses.  In the first quarter of fiscal 2002, Apple had backdated at least one option grant—to Defendant Jobs—and should have incurred at least $20.2 million in tax expenses associated with its improperly dated options which were not reported in its financial results.  This concealed expense together with expenses associated with other backdated options caused Apple to understate its expenses in fiscal 2002 by $29 million before taxes and to overstate its income by $23 million.

### 4.   Fiscal Year 2003 Earnings Releases

362.   On January 15, 2003, Apple published an earnings release announcing its financial results for its first quarter 2003 fiscal year ended January 1, 2003.  The press release stated, in relevant part:

> Apple® today announced financial results for its fiscal 2003 first quarter ended December 28, 2002. *For the quarter, the Company posted a net loss of $8 million, or $.02 per share. These results compare to a net profit of $38 million, or $.11 per diluted share, in the year-ago quarter. Revenues for the quarter were $1.47 billion, up 7 percent from the year-ago quarter, and gross margins were 27.6 percent, down from 30.7 percent in the year-ago quarter. International sales accounted for 43 percent of the quarter's revenues.*
>
> *       *       *
>
> "We have a very strong new product pipeline for 2003, which we kicked off by introducing the two most advanced notebook computers in the industry last week at Macworld," said Steve Jobs, Apple's CEO. "We're going to keep investing through this downturn and continue to move our products and distribution channels ever further ahead of our competitors, so that when the economy rebounds we will be positioned for growth."
>
> "We were extremely pleased with our ability to achieve our revenue target for the first quarter while reducing channel inventories by 11 percent within the quarter," said Fred Anderson, Apple's CFO. "Continued strong asset management enabled us to increase cash to over $4.4 billion. Looking ahead to the second quarter of 2003, we expect revenue to be relatively flat with the December quarter, and expect a slight profit for the quarter."

363.   The statements emphasized above were materially false and misleading because Apple's reported losses were understated inflated by its failure to properly account for option awards issued to Apple's employees which artificially reducing Apple's reported expenses.  In the first quarter of fiscal 2002, Apple had backdated at least one option grant—to Defendant Jobs—and should have incurred at least $20.2 million in tax expenses associated with its improperly dated options which were not reported in its financial results.  This concealed expense together with expenses associated with other backdated options caused Apple to understate its expenses in fiscal 2002 by $29 million before taxes and to overstate its income by $23 million.  In fiscal 2003, Apple incurred at least $16 million in unrecorded compensation expenses due to misdated options grants, which should have reduced earnings by at least $13 million for the year.

364.   On April 16, 2003, Apple published an earnings release for its second quarter 2003 ended April 1, 2003.  The press release stated in relevant part:

> *For the quarter, the Company posted a net profit of $14 million, or $.04 per diluted share. These results compare to a net profit of $40 million, or $.11 per diluted share, in the year-ago quarter. Revenues for the quarter were $1.475 billion, down 1 percent from the year-ago quarter, and gross margins were 28.3 percent, up from 27.4 percent in the year-ago quarter.* International sales accounted for 47 percent of the quarter's revenues.
>
> Apple shipped 711,000 Macintosh® units during the quarter.
>
> "Our 'year of the notebook' is off to a great start, led by the incredible demand for our new aluminum 12-inch and 17-inch PowerBook G4s," said Steve Jobs, Apple's CEO. "This quarter over 40 percent of the Macs we shipped were notebooks—our highest percentage ever and well ahead of the industry average."
>
> "We are very pleased to have achieved our revenue target for the second quarter while maintaining channel inventories under 4.5 weeks," said Fred Anderson, Apple's CFO. "Continued strong asset management enabled us to increase cash to over $4.5 billion. Looking ahead to the third quarter of 2003, we expect revenue to be relatively flat with the March quarter and expect a slight profit for the quarter."

365.   The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by its failure to properly account for option awards

issued to Apple's employees which artificially reducing Apple's reported expenses.  Moreover, Apple's comparison of its performance with its second quarter of fiscal 2002 was misleading because Apple had backdated at least one option grant—to Defendant Jobs— in that quarter and should have incurred at least $20.2 million in tax expenses associated with its improperly dated options which were not reported in its financial results.  This concealed expense together with expenses associated with other backdated options caused Apple to understand its expenses in fiscal 2002 by $29 million before taxes and to overstate its income by $23 million.  In fiscal 2003, Apple incurred at least $16 million in unrecorded compensation expenses due to misdated options grants, which should have reduced earnings by at least $13 million for the year.

366.    On July 16, 2003, Apple published a press release announcing its financial results for its third quarter 2003 fiscal year.  The press release stated in relevant part:

> CUPERTINO, California—July 16, 2003—*Apple® today announced financial results for its fiscal 2003 third quarter ended June 28, 2003. For the quarter, the Company posted a net profit of $19 million, or $.05 per diluted share. These results compare to a net profit of $32 million, or $.09 per diluted share, in the year-ago quarter. Revenues for the quarter were $1.545 billion, up 8 percent from the year-ago quarter and up 5 percent sequentially, and gross margins were 27.7 percent, up from 27.4 percent in the year-ago quarter.* International sales accounted for 39 percent of the quarter's revenues.
>
> Apple shipped 771 thousand Macintosh® units during the quarter.
>
> "This was a great new product quarter for Apple, starting with the iTunes Music Store and the new third-generation iPods, and ending with the announcement of the Power Mac G5 and the developer preview of Panther, the fourth major release of Mac OS X," said Steve Jobs, Apple's CEO. "Customer response to our new products has been very strong, and this quarter we are focused on delivering Power Mac G5s beginning in August and finishing Panther for release later this year."
>
> "We are very proud to have exceeded our revenue target for the third quarter despite the difficult economic backdrop," said Fred Anderson, Apple's CFO. "We continue to be pleased with our working capital management and our ability to increase cash which totals over $4.5 billion. Looking ahead to the fourth quarter of 2003, we expect an increase in revenues and a slight increase in earnings relative to the June quarter."

1    (emphasis added)

2          367.    The statements emphasized above were materially false and misleading because

3    Apple's reported profits were inflated by its failure to properly account for option awards

4    issued to Apple's employees which artificially reducing Apple's reported expenses.  Moreover,

5    Apple's comparison of its performance with its second quarter of fiscal 2002 was misleading

6    because Apple had backdated at least one option grant—to Defendant Jobs— in the first quarter

7    of 2002 and should have incurred at least $20.2 million in tax expenses associated with its

8    improperly dated options which were not reported in its financial results.  This concealed

9    expense together with concealed expenses associated with other backdated options caused

10   Apple to understand its expenses in fiscal 2002 by $29 million before taxes and to overstate its

11   income by $23 million.  In fiscal 2003, Apple incurred at least $16 million in unrecorded

12   compensation expenses due to misdated options grants, which should have reduced earnings by

13   at least $13 million for the year.

14         368.    On October 15, 2003, Apple published a press release announcing its financial

15   results for its fourth quarter 2003 fiscal year.  The press release stated in relevant part:

16

17          CUPERTINO, California—October 15, 2003—*Apple® today
             announced financial results for its fiscal 2003 fourth quarter ended
18           September 27, 2003. For the quarter, the Company posted a net
             profit of $44 million, or $.12 per diluted share. These results
19           compare to a net loss of $45 million, or $.13 per diluted share, in
             the year-ago quarter. Revenues for the quarter were $1.715
20           billion, up 19 percent from the year-ago quarter, and gross
             margins were 26.6 percent, up from 26.4 percent in the year-ago
21           quarter. International sales accounted for 38 percent of the
             quarter's revenues.*

22          The quarter's results include an after-tax investment gain of $6
             million, a favorable accounting transition adjustment of $3 million
23           related to Apple's stock repurchase agreement, and a gain on
             settlement of the stock repurchase agreement of $6 million.
24           Without these items, net income would have been $29 million, or
             $.08 per share. Management believes that presentation of results
25           excluding these items provides meaningful supplemental
             information regarding the Company's operational performance.
26
             Apple shipped 787 thousand Macintosh® units during the quarter,
27           up 7 percent from the year-ago quarter, as well as 336 thousand
             iPod® units, up 140 percent from the year-ago quarter.

28

"It was a great new product quarter for Apple," said Steve Jobs, Apple's CEO. "We launched the Power Mac G5, the fastest personal computer in the world, new PowerBooks and new iPods. Plus, we're delivering Panther, the next major release of Mac OS X, later this month and we'll have some exciting news regarding our music efforts tomorrow."

"We are very pleased to have exceeded our revenue and profit targets for the fourth quarter," said Fred Anderson, Apple's CFO. "Our balance sheet remains strong and our working capital management is among the best in the industry. Looking ahead to the first quarter of fiscal 2004, we expect a sequential increase in revenues to about $1.9 billion and a slight sequential increase in GAAP earnings relative to the September quarter."

*For the year, the Company reported net income of $69 million on revenues of $6.21 billion compared to net income of $65 million on revenues of $5.74 billion in 2002.*

(emphasis added)

369.    The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by its failure to properly account for option awards issued to Apple's employees which artificially reducing Apple's reported expenses.  Moreover, Apple's comparison of its performance with its fourth quarter of fiscal 2002 was misleading because Apple had backdated at least one option grant—to Defendant Jobs— in the first quarter of 2002 and should have incurred at least $20.2 million in tax expenses associated with its improperly dated options which were not reported in its financial results.  This concealed expense together with concealed expenses associated with other backdated options caused Apple to understand its expenses in fiscal 2002 by $29 million before taxes and to overstate its income by $23 million.  In fiscal 2003, Apple incurred at least $16 million in unrecorded compensation expenses due to misdated options grants, which should have reduced earnings by at least $13 million for the year.

370.    On January 14, 2004, Apple published a press release announcing its financial results for its first quarter 2004 fiscal year.  The press release stated in relevant part:

CUPERTINO, California—January 14, 2004—Apple® today announced financial results for its fiscal 2004 first quarter ended December 27, 2003.  *For the quarter, the Company posted a net profit of $63 million, or $.17 per diluted share. These results*

135

*compare to a net loss of $8 million, or $.02 per diluted share, in the year-ago quarter.* Revenue for the quarter reached a four-year high of $2.006 billion, up 36 percent from the year-ago quarter. Gross margin was 26.7 percent, down from 27.6 percent in the year-ago quarter. International sales accounted for 44 percent of the quarter's revenue.

The quarter's results include an after-tax investment gain of $3 million which increased earnings per diluted share by $.01.

Apple shipped 829 thousand Macintosh® units during the quarter, up 12 percent from the year-ago quarter, as well as 733 thousand iPod® units, up 235 percent from the year-ago quarter.

"It was an outstanding quarter for Apple, with double-digit unit and revenue growth and over 730,000 iPods sold," said Steve Jobs, Apple's CEO. "We're kicking off 2004 with strong momentum, especially for Mac OS X, which is now used by almost 40 percent of our installed base, iPod and the iTunes Music Store, which has a 70 percent share of the legal music download market."

"We are very pleased to have exceeded our revenue and profit targets for the first quarter," said Fred Anderson, Apple's CFO. "Continued strong asset management enabled us to increase cash by $225 million to just under $4.8 billion. Looking ahead to the second quarter of fiscal 2004, we expect our third consecutive quarter of year-over-year double-digit growth in both revenue and earnings, with revenue of about $1.8 billion and earnings per diluted share of $.08 to $.10."

(emphasis added)

371.    The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by its failure to properly account for option awards issued to Apple's employees which artificially reducing Apple's reported expenses. These concealed expenses together with concealed expenses associated with other backdated options in prior years caused Apple to understand its expenses for prior years by a cumulative $84 million and income by a cumulative $63 million. In addition, Apple's reported profits in the first quarter of 2004 were overstated because Apple had unreported expenses in 2004 relating to its improper options dating practices of $13 million, which reduced 2004 net income by $10 million.

372.    On April 14, 2004, Apple published a press release announcing its second quarter 2004 results. The press release stated, in relevant part:

CUPERTINO, California—April 14, 2004—Apple® today announced financial results for its fiscal 2004 second quarter ended March 27, 2004. *For the quarter, the Company posted a net profit of $46 million, or $.12 per diluted share. These results compare to a net profit of $14 million, or $.04 per diluted share, in the year-ago quarter.* Revenue for the quarter was $1.909 billion, up 29 percent from the year-ago quarter. Gross margin was 27.8 percent, down from 28.3 percent in the year-ago quarter. International sales accounted for 43 percent of the quarter's revenue.

The quarter's results include an after-tax restructuring charge of $7 million. Excluding this charge, the Company's net profit for the quarter would have been $53 million, or $.14 per diluted share.

\*       \*       \*

"Apple had a great quarter with 29 percent revenue growth and 200 percent earnings per share growth year-over-year," said Steve Jobs, Apple's CEO. "We experienced growth in most areas of our business—most dramatically in selling a record 807,000 iPods, up more than 900 percent over the prior year."

"We are very pleased with our third straight quarter of double-digit revenue growth," said Fred Anderson, Apple's CFO. "More importantly our results demonstrate operating margin expansion. Our balance sheet remains very strong with about $4.6 billion in cash and no debt. Looking ahead to the third quarter of fiscal 2004, we expect our fourth consecutive quarter of year-over-year double-digit growth in both revenue and earnings, with revenue of about $1.925 billion. We expect GAAP earnings per diluted share of $.12 to $.13, including approximately $.02 per diluted share in restructuring charges."

373.     The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by its failure to properly account for option awards issued to Apple's employees which artificially reducing Apple's reported expenses. These concealed expenses together with concealed expenses associated with other backdated options in prior years caused Apple to understand its expenses for prior years by a cumulative $84 million and income by a cumulative $63 million. In addition, Apple's reported profits in the second quarter of 2004 were overstated because Apple had unreported expenses in 2004 relating to its improper options dating practices of $13 million, which reduced 2004 net income by $10 million.

374.   On July 24, 2004, Apple published a press release announcing its financial results for its fiscal 2004 third quarter ended June 26, 2004.  The press release stated in relevant part:

> CUPERTINO, California—July 14, 2004—Apple® today announced financial results for its fiscal 2004 third quarter ended June 26, 2004. *For the quarter, the Company posted a net profit of $61 million, or $.16 per diluted share. These results compare to a net profit of $19 million, or $.05 per diluted share, in the year-ago quarter. Revenue for the quarter was $2.014 billion, up 30 percent from the year-ago quarter.* Gross margin was 27.8 percent, up from 27.7 percent in the year-ago quarter. International sales accounted for 39 percent of the quarter's revenue.
>
> The quarter's results include an after-tax restructuring charge of $6 million. *Excluding this charge, the Company's net profit for the quarter would have been $67 million, or $.17 per diluted share.*
>
> Apple shipped 876 thousand Macintosh® units and 860 thousand iPods during the quarter, representing a 14 percent increase in CPU units and a 183 percent increase in iPods over the year-ago quarter.
>
> "It was an outstanding quarter—our highest third quarter revenue in eight years," said Steve Jobs, Apple's CEO. "Our Mac-based revenue grew a healthy 19 percent, and our music-based revenue grew an incredible 162 percent. We've got a strong product portfolio, with some amazing new additions coming later this year."
>
> "We were very pleased with our 30 percent year-over-year revenue growth and our operating margin expansion," said Peter Oppenheimer, Apple's CFO. "Looking ahead to the fourth quarter of fiscal 2004, we expect revenue of about $2.1 billion and earnings per diluted share of $.16 to $.17, including $.01 per diluted share in restructuring charges."

375.   The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by its failure to properly account for option awards issued to Apple's employees which artificially reducing Apple's reported expenses.  These concealed expenses together with concealed expenses associated with other backdated options in prior years caused Apple to understate its expenses for prior years by a cumulative $84 million and income by a cumulative $63 million.  In addition, Apple's reported profits in the third quarter of 2004 were overstated because Apple had unreported expenses in 2004 relating to its improper options dating practices of $13 million, which reduced 2004 net income by $10 million.

376.    On October 13, 2004, Apple published its earnings release for its 2004 fourth

quarter ended September 25, 2004.  The press release stated, in relevant part:

> CUPERTINO, California—October 13, 2004—Apple® today announced financial results for its fiscal 2004 fourth quarter ended September 25, 2004. For the quarter, the Company posted a net profit of $106 million, or $.26 per diluted share. These results compare to a net profit of $44 million, or $.12 per diluted share, in the year-ago quarter. Revenue for the quarter was $2.35 billion, up 37 percent over the year-ago quarter. Gross margin was 27.0 percent, up from 26.6 percent in the year-ago quarter. International sales accounted for 37 percent of the quarter's revenue.
>
> The quarter's results include an after-tax restructuring charge of $4 million. Excluding this charge, the Company's net profit for the quarter would have been $110 million, or $.27 per diluted share.
>
> Apple shipped 836,000 Macintosh® units and 2,016,000 iPods during the quarter, representing a 6 percent increase in CPU units and a 500 percent increase in iPods over the year-ago quarter.
>
> "We are thrilled to report our highest fourth quarter revenue in nine years," said Steve Jobs, Apple's CEO. "We shipped over 2 million iPods, our Retail store revenue grew 95 percent year-over-year, and the new iMac G5 has received phenomenal reviews and is off to a great start."
>
> "We're pleased to report 37 percent revenue growth for the quarter and operating margin above 5 percent," said Peter Oppenheimer, Apple's CFO. "Looking ahead to the first quarter of fiscal 2005, we expect revenue of between $2.8 and $2.9 billion, operating margin above 7 percent and earnings per diluted share of $.39 to $.42."
>
> For the year, the Company reported net income of $276 million on revenue of $8.28 billion compared to net income of $69 million on revenue of $6.21 billion in 2003.

(emphasis added)

377.    The statements emphasized above were materially false and misleading because

Apple's reported profits were inflated by its failure to properly account for option awards

issued to Apple's employees which artificially reducing Apple's reported expenses.  These

concealed expenses together with concealed expenses associated with other backdated options

in prior years caused Apple to understate its expenses for prior years by a cumulative $84

million and income  by a cumulative $63 million.  In addition, Apple's reported profits in the

fourth quarter of 2004 were overstated because Apple had unreported expenses in 2004 relating

1   to its improper options dating practices of $13 million, which reduced 2004 net income by $10

2   million.

3       378.    On January 12, 2005, Apple announced its financial results for its fiscal 2005

4   first quarter ended December 25, 2005.  The press release stated in relevant part:

5

6           CUPERTINO, California—January 12, 2005—Apple® today
            announced financial results for its fiscal 2005 first quarter ended
            December 25, 2004. *For the quarter, the Company posted a net
7           profit of $295 million, or $.70 per diluted share. These results
            compare to a net profit of $63 million, or $.17 per diluted share, in
8           the year-ago quarter. Revenue for the quarter was $3.49 billion,
            up 74 percent from the year-ago quarter.* Gross margin was 28.5
9           percent, up from 26.7 percent in the year-ago quarter. International
            sales accounted for 41 percent of the quarter's revenue.

10                                  *       *       *

11          "We are thrilled to report the highest quarterly revenue and net
12          income in Apple's history," said Steve Jobs, Apple's CEO. "We've
            sold over 10 million iPods to date and are kicking off the new year
13          with a slate of innovative new products including iPod shuffle,
            Mac mini and iLife '05."

14          "We're pleased to report 74 percent revenue growth, 26 percent
15          Mac unit growth and 525 percent iPod unit growth," said Peter
            Oppenheimer, Apple's CFO. "Looking ahead to the second quarter
16          of fiscal 2005, we expect revenue of about $2.9 billion and
            earnings per diluted share of about $.40."

17

18  (emphasis added).

19      379.    The statements emphasized above were materially false and misleading because

20  Apple's reported profits were inflated by its failure to properly account for option awards

21  issued to Apple's employees which artificially reducing Apple's reported expenses.  These

22  concealed expenses together with concealed expenses associated with other backdated options

23  in prior years caused Apple to understand its expenses for prior years by a cumulative $97

24  million and income by a cumulative $73 million.  In addition, Apple's reported profits in the

25  first quarter of 2005 were overstated because Apple had unreported expenses in 2005 relating

26  to its improper options back dating practices in an amount of $7 million, which reduced 2005

27  net income by $7 million.

28

380.    On April 13, 2005, Apple published an earnings release announcing its financial results for its fiscal 2005 second quarter ended March 26, 2005.  The press release stated in relevant part:

> CUPERTINO, California—April 13, 2005—Apple® today announced financial results for its fiscal 2005 second quarter ended March 26, 2005. *For the quarter, the Company posted a net profit of $290 million, or $.34 per diluted share. These results compare to a net profit of $46 million, or $.06 per diluted share, in the year-ago quarter. Revenue for the quarter was $3.24 billion, up 70 percent from the year-ago quarter.* Gross margin was 29.8 percent, up from 27.8 percent in the year-ago quarter. International sales accounted for 40 percent of the quarter's revenue.
>
> *            *            *
>
> "We are delighted to report a record second quarter for Apple in both revenue and earnings," said Steve Jobs, Apple's CEO. "Apple is firing on all cylinders and we have some incredible new products in the pipeline for the coming year, starting with Mac OS X Tiger later this month."
>
> "We're very pleased to report 70 percent revenue growth and a 530 percent increase in net income," said Peter Oppenheimer, Apple's CFO. "Looking ahead to the third quarter of fiscal 2005, we expect revenue of about $3.25 billion and earnings per diluted share of about $.28."

(emphasis added).

381.    The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by its failure to properly account for option awards issued to Apple's employees which artificially reducing Apple's reported expenses.  These concealed expenses together with concealed expenses associated with other backdated options in prior years caused Apple to understand its expenses for prior years by a cumulative $97 million and income by a cumulative $73 million.  In addition, Apple's reported profits in the second quarter of 2005 were overstated because Apple had unreported expenses in 2005 relating to its improper options back dating practices in an amount of $7 million, which reduced 2005 net income by $7 million.

382.    On  July 13, 2005, Apple published a press release announcing its earnings for its fiscal 2005 third quarter ended June 25, 2005. The press release stated in relevant part:

CUPERTINO, California—July 13, 2005—Apple® today announced financial results for its fiscal 2005 third quarter ended June 25, 2005, reporting the highest revenue and earnings in the Company's history. Apple posted a net quarterly profit of $320 million, or $.37 per diluted share, and revenue of $3.52 billion. These results compare to a net profit of $61 million, or $.08 per diluted share, and revenue of $2.01 billion in the year-ago quarter, and represent revenue growth of 75 percent and net profit growth of 425 percent. Gross margin was 29.7 percent, up from 27.8 percent in the year-ago quarter. International sales accounted for 39 percent of the quarter's revenue.

Apple shipped 1,182,000 Macintosh® units and 6,155,000 iPods during the quarter, representing 35 percent growth in Macs and 616 percent growth in iPods over the year-ago quarter.

"We are delighted to report Apple's best quarter ever in both revenue and earnings," said Steve Jobs, Apple's CEO. "The launch of Mac OS X Tiger has been a tremendous success, and we have more amazing new products in the pipeline."

"We're very pleased to report 75 percent revenue growth and a 425 percent increase in net income," said Peter Oppenheimer, Apple's CFO. "Looking ahead to the fourth quarter of fiscal 2005, we expect revenue of about $3.5 billion and earnings per diluted share of about $.32."

(emphasis added).

383.   The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by its failure to properly account for option awards issued to Apple's employees which artificially reducing Apple's reported expenses.  These concealed expenses together with concealed expenses associated with other backdated options in prior years caused Apple to understand its expenses for prior years by a cumulative $97 million and income by a cumulative $73 million.  In addition, Apple's reported profits in the third quarter of 2005 were overstated because Apple had unreported expenses in 2005 relating to its improper options back dating practices in an amount of $7 million, which reduced 2005 net income by $7 million.

384.   On October 11, 2005, Apple announced its financial results for its fiscal 2005 fourth quarter ended September 24, 2005.  The press release stated, in relevant part:

CUPERTINO, California—October 11, 2005—Apple® today announced financial results for its fiscal 2005 fourth quarter ended September 24, 2005, reporting the highest revenue and earnings in the Company's history. *Apple posted revenue of $3.68 billion and a net quarterly profit of $430 million, or $.50 per diluted share. These results compare to revenue of $2.35 billion and a net profit of $106 million, or $.13 per diluted share, in the year-ago quarter.* Gross margin was 28.1 percent, up from 27.0 percent in the year-ago quarter. International sales accounted for 40 percent of the quarter's revenue.

Earnings per share benefited by $.12 from several tax items related to net deferred tax assets, tax reserves, and a revision to the full year tax rate estimated in prior quarters.

*          *          *

For fiscal 2005, the Company generated revenue of $13.93 billion and a net profit of $1.335 billion, reflecting annual growth of 68 percent and 384 percent, respectively, and representing the highest annual revenue and net profit in the Company's history.

"We're thrilled to have concluded the best year in Apple's history, with 68 percent year-over-year revenue growth and 384 percent net profit growth," said Steve Jobs, Apple's CEO. "This is the direct result of our focus on innovation and the immense talent and creativity at Apple. We could not be more excited about the new products we're working on for 2006."

"We're very pleased to report 48 percent year-over-year growth in Mac shipments in Q4, as well as our 10th consecutive quarter of record iPod sales," said Peter Oppenheimer, Apple's CFO. "Looking ahead to the first quarter of fiscal 2006 which will span 14 weeks, we expect revenue of about $4.7 billion. We expect GAAP earnings per diluted share of about $.46, including an estimated $.03 per share expense impact from non-cash share-based compensation, translating to non-GAAP EPS of about $.49."

(emphasis added).

385.    The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by its failure to properly account for option awards issued to Apple's employees which artificially reducing Apple's reported expenses.  These concealed expenses together with concealed expenses associated with other backdated options in prior years caused Apple to understand its expenses for prior years by a cumulative $97 million and income by a cumulative $73 million.  In addition, Apple's reported profits in the fourth quarter of 2005 were overstated because Apple had unreported expenses in 2005 relating

1   to its improper options back dating practices in an amount of $7 million, which reduced 2005

2   net income by $7 million.

3       386.    On January 18, 2006, Apple accounted financial results for its fiscal 2006 first

4   quarter ended December 31, 2005.  The press release stated in relevant part:

5
6           CUPERTINO, California—January 18, 2006—Apple® today
            announced financial results for its fiscal 2006 first quarter ended
            December 31, 2005, reporting the highest revenue and earnings in
7           the Company's history. *Apple posted revenue of $5.75 billion and
            a net quarterly profit of $565 million, or $.65 per diluted share, in
8           this 14-week quarter. These results compare to revenue of $3.49
            billion and a net profit of $295 million, or $.35 per diluted share,
9           in the year-ago quarter.* Gross margin was 27.2 percent, down
            from 28.5 percent in the year-ago quarter. International sales
10          accounted for 40 percent of the quarter's revenue.

11          Apple shipped 1,254,000 Macintosh® computers and 14,043,000
            iPods during the quarter, representing 20 percent growth in Macs
12          and 207 percent growth in iPods over the year-ago quarter.

13          "We are thrilled to report the best quarter in Apple's history," said
            Steve Jobs, Apple's CEO. "Two highlights of an incredible quarter
14          were selling 14 million iPods and getting ready to launch our new
            Macs with Intel processors five to six months ahead of
15          expectations. We are working on more wonderful products for
            2006, and I can't wait to see what our customers think of them."
16
17          "We're very pleased to report year-over-year revenue growth of 65
            percent and net income that was nearly twice the year-ago level,"
18          said Peter Oppenheimer, Apple's CFO. "Looking ahead to the
            second quarter of fiscal 2006, we expect revenue of about $4.3
19          billion. We expect GAAP earnings per diluted share of about $.38,
            including an estimated $.04 per share expense impact from non-
20          cash stock-based compensation, translating to non-GAAP EPS of
            about $.42."

21  (emphasis added).

22      387.    The statements emphasized above were materially false and misleading because

23  Apple's reported profits were inflated by its failure to properly account for option awards

24  issued to Apple's employees which artificially reducing Apple's reported expenses.  These

25  concealed expenses together with concealed expenses associated with other backdated options

26  in prior years caused Apple to understand its expenses for prior years by a cumulative $104

27  million and income by a cumulative $80 million.  In addition, Apple's reported profits in the

28  first quarter of 2006 were overstated because Apple had unreported expenses in 2006 relating

to its improper options back dating practices in an amount of $1 million, and incurred additional tax expenses from previously backdated options reduced 2006 net income by $4 million.

388.    On April 19, 2006, Apple announced its financial results for its fiscal 2006 second quarter ended April 1, 2006.  The press release stated in relevant part:

> CUPERTINO, California—April 19, 2006—Apple® today announced financial results for its fiscal 2006 second quarter ended April 1, 2006. *The Company posted revenue of $4.36 billion and a net quarterly profit of $410 million, or $.47 per diluted share. These results compare to revenue of $3.24 billion and a net profit of $290 million, or $.34 per diluted share, in the year-ago quarter.* Gross margin was 29.8 percent, equivalent to the year-ago quarter. International sales accounted for 43 percent of the quarter's revenue.
>
> *              *              *
>
> "We've generated over $10 billion in revenue and almost $1 billion in earnings in the first half of fiscal 2006," said Steve Jobs, Apple's CEO. "Our transition to Intel processors is going very well, and our music business just experienced another quarter of outstanding growth."
>
> "We're very pleased to report the second highest quarterly sales in Apple's history, resulting in year-over-year revenue growth of 34 percent and earnings growth of 41 percent," said Peter Oppenheimer, Apple's CFO. "Looking ahead to the third quarter of fiscal 2006, we expect revenue of about $4.2 to $4.4 billion. We expect GAAP earnings per diluted share of about $.39 to $.43, including an estimated $.04 per share expense impact from non-cash stock-based compensation, translating to non-GAAP EPS of about $.43 to $.47."

(emphasis added).

389.    The statements emphasized above were materially false and misleading because Apple's reported profits were inflated by its failure to properly account for option awards issued to Apple's employees which artificially reducing Apple's reported expenses.  These concealed expenses together with concealed expenses associated with other backdated options in prior years caused Apple to understand its expenses for prior years by a cumulative $104 million and income by a cumulative $80 million.  In addition, Apple's reported profits in the second quarter of 2006 were overstated because Apple had unreported expenses in 2006

1    relating to its improper options back dating practices in an amount of $1 million, and incurred

2    additional tax expenses from previously backdated options reduced 2006 net income by $4

3    million.

4              390.    On July 19, 2006, Apple published a press release announcing its financial

5    results for its fiscal 2006 third quarter ended July 1, 2006.  The press release stated in relevant

6    part:

7

8              CUPERTINO, California—July 19, 2006—Apple® today
         announced financial results for its fiscal 2006 third quarter ended
9        July 1, 2006. *The Company posted revenue of $4.37 billion and a
         net quarterly profit of $472 million, or $.54 per diluted share.
         These results compare to revenue of $3.52 billion and a net profit
10       of $320 million, or $.37 per diluted share, in the year-ago quarter.*
         Gross margin was 30.3 percent, up from 29.7 percent in the year-
11       ago quarter. International sales accounted for 39 percent of the
         quarter's revenue.
12
         Apple shipped 1,327,000 Macintosh® computers and 8,111,000
13       iPods during the quarter, representing 12 percent growth in Macs
         and 32 percent growth in iPods over the year-ago quarter.
14
         "We're thrilled with the growth of our Mac business, and
15       especially that over 75 percent of the Macs sold during the quarter
         used Intel processors. This is the smoothest and most successful
16       transition that any of us have ever experienced, " said Steve Jobs,
         Apple's CEO. "In addition, iPod continued to earn a US market
17       share of over 75 percent and we are extremely excited about future
         iPod products in our pipeline."
18
         "We're very pleased to report the second highest quarterly sales
19       and earnings in Apple's history, resulting in year-over-year
         revenue growth of 24 percent and earnings growth of 48 percent,"
20       said Peter Oppenheimer, Apple's CFO. "Looking ahead to the
         fourth quarter of fiscal 2006, we expect revenue of about $4.5 to
21       $4.6 billion. We expect GAAP earnings per diluted share of about
         $.46 to $.48, including an estimated $.03 per share expense impact
22       from non-cash stock-based compensation, translating to non-
         GAAP EPS of about $.49 to $.51."
23

24             391.    The statements emphasized above were materially false and misleading because

25   Apple's reported profits were inflated by its failure to properly account for option awards

26   issued to Apple's employees which artificially reducing Apple's reported expenses.  These

27   concealed expenses together with concealed expenses associated with other backdated options

28   in prior years caused Apple to understate its expenses for prior years by a cumulative $104

146

million and income by a cumulative $80 million.  In addition, Apple's reported profits in the third quarter of 2006 were overstated because Apple had unreported expenses in 2006 relating to its improper options back dating practices in an amount of $1 million, and incurred additional tax expenses from previously backdated options reduced 2006 net income by $4 million.

### E.   EARNINGS CONFERENCE CALLS

392.   During the Class Period, Apple made numerous false and misleading statements in its earnings conference calls which were relied upon by Class Members and which cause Apple's stock price to be materially inflated

393.   During the Class Period, Apple held certain conference calls with Wall Street analysts, investors and others at which Anderson and other senior Apple executives discussed Apple's quarterly financial results and future earnings guidance.  During these calls, Anderson and other Apple senior executives concealed Apple's backdating practices, failed to disclose the compensation expenses that were required to be recognized under APB No. 25 when "in the money" options are issued and/or failed to disclose the negative effect such unrecognized compensation expenses had on Apple's quarterly net income, as discussed below.

Third Quarter 2002 Earnings Conference Call Held July16, 2002

394.   During Apple's Third Quarter 2002 Earnings Conference Call, which was held July 16, 2002, Anderson stated the following in relevant part:

> FRED ANDERSON, CFO, APPLE COMPUTER: Thank you, Nancy. As we indicated on June 18th, Apple's third quarter proved to be very challenging. We did not experience the seasonal uplift in demand that we typically experience in the latter part of May and in June, resulting in quarterly revenues of $1.429 billion, about 11% below our original guidance. We achieved diluted earnings per share of 9 cents, compared to our original guidance of 11 cents, or slightly better.
>
> *   *   *
>
> Operating expenses were 378 million, 5 million below the previous quarter. In accordance with generally accepted accounting principles, approximately 9 million of development costs related to the Jaguar release of Mac OS X were capitalized during the quarter and will be amortized over three years.

147

1   This statement was false and misleading because, as a result of the unrecognized compensation

2   expense from backdated options, Apple's operating expenses were more than $378 million for

3   the fiscal third quarter 2002 and were not in accordance with GAAP.  In its 2006 Annual Report,

4   which contained the restatement of Apple's historical results necessitated by backdating, Apple

5   did not state the incremental pre-or post-tax effects of the failure to properly account for the

6   compensation expense created by backdating on these quarterly results.

7   Fourth Quarter 2002 Earnings Conference Call Held October 16, 2002

8          395.    During Apple's Fourth Quarter 2002 Earnings Conference Call, which was held

9   October 16, 2002, Anderson stated the following in relevant part:

> FRED ANDERSON, EXECUTIVE VP AND CFO, APPLE COMPUTER: Thanks, Nancy. In its fiscal fourth quarter Apple generated revenues of 1.44 billion and earnings before nonrecurring items of 2 cents per share….
>
> Finally, we reversed a small portion of a previous charge related to a special executive bonus expense in the prior year resulting in a favorable impact of $2 million.
>
> Collectively, these nonrecurring items reduced net income by $52 million. Including the nonrecurring items, Apple reported a net loss of 45 million or 13c per share.

17         396.    This statement was false and misleading because, as a result of the unrecognized

18   compensation expense from backdated options, Apple's net loss was greater than the $45

19   million it reported for the fiscal fourth quarter 2002.  In its 2006 Annual Report, which

20   contained the restatement of Apple's historical results necessitated by backdating, Apple did

21   not state the incremental pre-or post-tax effects of the failure to properly account for the

22   compensation expense created by backdating on these quarterly results.

23   First Quarter 2003 Earnings Conference Call Held January 15, 2003

24         397.    During Apple's First Quarter 2003 Earnings Conference Call, which was held

25   January 15, 2003, Anderson stated the following in relevant part:

> FRED ANDERSON, CFO AND EXECUTIVE VP, APPLE COMPUTER INC.: Thank you, Nancy. We are pleased to report that despite an environment that continues to be very challenging

148

1

2

3

4

> Apple generated revenues of $1.47 billion in our first fiscal quarter. Representing a 7% increase from the year-ago quarter. Our [GAAP] results reflected a loss of 8 million, or 2 cents per share. These results included a $17 million after-tax restructuring charge and a $2 million after-tax accounting transition adjustment. Excluding these nonrecurring items, earnings were $11 million or 3 cents per share.

5    398.    This statement was false and misleading because, as a result of the unrecognized

6    compensation expense from backdated options, Apple's actual loss was greater than $8 million

7    and its earnings excluding the identified nonrecurring items were less than $11 million for the

8    fiscal first quarter 2003.  In its 2006 Annual Report, which contained the restatement of

9    Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or

10   post-tax effects of the failure to properly account for the compensation expense created by

11   backdating on these quarterly results.

12   Second Quarter 2003 Earnings Conference Call Held April 16, 2003

13   399.    During Apple's Second Quarter 2003 Earnings Conference Call, which was held

14   April 16, 2003, Anderson stated the following in relevant part:

15

16

> FRED ANDERSON, CFO AND EXECUTIVE VP, APPLE COMPUTER INCORPORATED: Thank you, Nancy.

17

18

> We're very pleased to report that despite an increasingly challenging and unpredictable environment, Apple generated revenues of $1.475 billion in our second fiscal quarter.

19

20

> Net income was $14 million or 4 cents per diluted share.

> *   *   *

21

> Reported operating expenses were 422 million, including a 3 million pre-tax restructuring charge.

22   400.    This statement was false and misleading because, as a result of the unrecognized

23   compensation expense from backdated options, Apple's net income was less than $14 million

24   and operating expenses were greater than $422 million for the fiscal second quarter 2003.  In its

25   2006 Annual Report, which contained the restatement of Apple's historical results necessitated

26   by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to

27

28

1    properly account for the compensation expense created by backdating on these quarterly

2    results.

3    Fourth Quarter 2004 Earnings Conference Call Held October 13, 2004

4        401.    During Apple's Fourth Quarter 2004 Earnings Conference Call, which was held

5    October 13, 2004, Peter Oppenheimer, Anderson's successor as Chief Financial Officer of the

6    Company, stated the following in relevant part:

7

8        **Peter Oppenheimer, Chief Financial Officer**

9        Thank you, Nancy. Thank you for joining us. We are pleased to
         report an outstanding quarter that exceeded our expectations.
10       Revenue of 2.35 billion was up 37% year over year and
         represented the highest fourth fiscal quarter

11       revenue for Apple in nine years. Net income was 106 million, or
         26 cents per diluted share.

12

13                          *   *   *

14       Excluding the pre-tax restructuring charge of 5 million, operating
         expense was 501 million, about 16 million higher than expected,
         primarily due to variable selling expenses associated with the
15       higher than expected revenue.

16       402.    This statement was false and misleading because, as a result of the unrecognized

17   compensation expense from backdated options, Apple's net income was less than $106 million

18   and operating expenses were greater than $501 million for the fiscal fourth quarter 2004.  In its

19   2006 Annual Report, which contained the restatement of Apple's historical results necessitated

20   by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to

21   properly account for the compensation expense created by backdating on these quarterly

22   results.

23   First Quarter 2005 Earnings Conference Call Held January 1, 2005

24       403.    During Apple's First Quarter 2005 Earnings Conference Call, which was held

25   January 1, 2005, Peter Oppenheimer stated the following in relevant part:

26

27

28

**Peter Oppenheimer, Senior Vice President and Chief Financial Officer**

Thank you, Nancy. Thank you for joining us….Revenue of 3.49 billion was up 74% year over year and net income was $295 million or 70 cents per diluted share.

\*   \*   \*

Operating expense was 593 million [sic] higher than expected primarily due to  variable selling expenses associated with the higher than expected revenue.

404.     This statement was false and misleading because, as a result of the unrecognized compensation expense from backdated options, Apple's net income was less than $295 million and operating expenses were greater than $593 million for the fiscal first quarter 2005.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

Second Quarter 2005 Earnings Conference Call Held April 13, 2005

405.     During Apple's Second Quarter 2005 Earnings Conference Call, which was held April 13, 2005, Peter Oppenheimer stated the following in relevant part:

**Peter Oppenheimer, Senior Vice President and Chief Financial Officer**

Thank you, Nancy. Thank you for joining us….Revenue of 3.243 billion was up 70% year over year and net income was $290 million, up 530% year over year, generating earnings per diluted share of 34 cents.

\*   \*   \*

Operating expense was 566 million, slightly lower than guidance, primarily due to greater capitalization of Tiger development costs.

406.     This statement was false and misleading because, as a result of the unrecognized compensation expense from backdated options, Apple's net income was less than $290 million and operating expenses were greater than $566 million for the fiscal second quarter 2005.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated

by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

Third Quarter 2005 Earnings Conference Call Held July 13, 2005

407.    During Apple's Third Quarter 2005 Earnings Conference Call, which was held July 13, 2005, Peter Oppenheimer stated the following in relevant part:

> **Peter Oppenheimer, Senior Vice President and Chief Financial Officer**
>
> Thank you, Nancy. Thank you for joining us....Revenue of 3.52 billion grew 75% year over year and net income of 320 million grew 425% year over year generating earnings per diluted share of 37 cents.
>
> \*   \*   \*
>
> Operating expense was 617 million, 17 million higher than guidance primarily due to variable selling expenses associated with the higher than expected revenue.

408.    This statement was false and misleading because, as a result of the unrecognized compensation expense from backdated options, Apple's net income was less than $320 million and operating expenses were greater than $617 million for the fiscal third quarter 2005.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

Fourth Quarter 2005 Earnings Conference Call Held October 11, 2005

409.    During Apple's Fourth Quarter 2005 Earnings Conference Call, which was held October 11, 2005, Peter Oppenheimer stated the following in relevant part:

> **Peter Oppenheimer, Senior Vice President and Chief Financial Officer**
>
> Thank you, Nancy. Thank you for joining us....Revenue of 3.68 billion grew 57% year over year....Net income of 430 million

grew 306% year over year, generating earnings per diluted share of 50 cents.

\*   \*   \*

Operating expense was 617 million, in line with our guidance. Included in operating expense was approximately 10 million in non-cash share-based compensation.

410.   This statement was false and misleading because, as a result of the unrecognized compensation expense from backdated options, Apple's net income was less than $430 million and operating expenses were greater than $617 million for the fiscal fourth quarter 2005.  In its 2006 Annual Report, which contained the restatement of Apple's historical results necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the failure to properly account for the compensation expense created by backdating on these quarterly results.

First Quarter 2006 Earnings Conference Call Held January 18, 2006

411.   During Apple's First Quarter 2006 Earnings Conference Call, which was held January 18, 2006, Peter Oppenheimer stated the following in relevant part:

**Peter Oppenheimer, Senior Vice President and Chief Financial Officer**

Thank you, Nancy. Thank you for joining us….Revenue of 5.75 billion increased over 2 billion from last quarter's record revenue….[N]et income was 565 million or $0.65 per diluted share on a GAAP basis.  Excluding the impact of non-cash stock-based compensation, operating margin was 13.8%, net income was 595 million, and diluted earnings per share were $0.68.

\*   \*   \*

GAAP operating expenses were 814 million, including 39 million in expense related to stock-based compensation.

412.   This statement was false and misleading because, as a result of the unrecognized compensation expense from backdated options, Apple's net income was less than $565 million, operating expenses were greater than $814 million and more than $39 million in expense related to stock-based compensation should have been recognized for the fiscal first quarter 2006.  In its 2006 Annual Report, which contained the restatement of Apple's historical results

1   necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the

2   failure to properly account for the compensation expense created by backdating on these

3   quarterly results.

4   Second Quarter 2006 Earnings Conference Call Held April 19, 2006

5       413.    During Apple's Second Quarter 2006 Earnings Conference Call, which was held

6   April 19, 2006, Peter Oppenheimer stated the following in relevant part:

7       **Peter Oppenheimer, Senior Vice President and Chief Financial
        Officer**

8

9       Thank you, Nancy. Thank you for joining us….The quarter's
        revenue of 4.36 billion was the second highest in Apple's
        history….[N]et income was 565 million or $0.65 per diluted share
10      on a GAAP basis. Excluding the impact of 42 million in non-cash
        stock-based compensation, operating margin was 13.1%, net
11      income was 440 million, and diluted earnings per share were
        $0.50.

12                                 *   *   *

13

14      GAAP operating expenses were 768 million, including 37 million
        in expense related to stock-based compensation.

15      414.    This statement was false and misleading because, as a result of the unrecognized

16  compensation expense from backdated options, Apple's net income was less than $565 million,

17  operating expenses were greater than $768 million and more than $37 million in expense

18  related to stock-based compensation should have been recognized for the second fiscal quarter

19  2006.  In its 2006 Annual Report, which contained the restatement of Apple's historical results

20  necessitated by backdating, Apple did not state the incremental pre-or post-tax effects of the

21  failure to properly account for the compensation expense created by backdating on these

22  quarterly results.

23      **F.      CEO AND CFO ANNUAL REPORT CERTIFICATIONS**

24      415.    During the Class Period, certain Apple filed false and misleading annual

25  certifications with the SEC which were relied upon by Class Members and which caused

26  Apple's stock price to be materially inflated.

27      416.    Individual defendants Jobs and Anderson filed false certifications with the SEC

28  relating to certain of Apple's financial statements as discussed more fully below.  These

certifications were required pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002.

417.    With respect to Apple's 2003 Annual Report, 2004 Annual Report and 2005 Annual Report, defendant Jobs, Apple's CEO, made the following false and misleading certification:

1.  I have reviewed this annual report on Form 10-K of Apple Computer, Inc.;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a)  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has

155

materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)  All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)   Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

418.    These certifications were false and misleading because, as alleged in detail herein, Jobs was aware of Apple's backdating practices, actually recommended the backdating of options and was aware of the accounting ramifications and the effect of backdating on the Company's financial statements and, therefore, (a) he lied when he certified that Apple's 2003 Annual Report, 2004 Annual Report and 2005 Annual Report contained (i) no untrue statements of material fact and did not omit to state material facts relating to backdating, (ii) financial statements that fairly presented the financial condition, results of operations and cash flows of the Company, and (b) he lied when he certified that he disclosed to the Company's auditors and/or Audit Committee any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

419.    With respect to Apple's 2003 Annual Report, defendant Anderson, Apple's former CFO, made the following false and misleading certification:

1.  I have reviewed this annual report on Form 10-K of Apple Computer, Inc.;

2.  Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.  Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.   The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and have:

a)Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;

b)Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c)Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.   The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)All significant deficiencies and material weaknesses in the design or operation of internal controls over financial

**[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

420.    This certification was false and misleading because, as alleged in detail herein, Anderson was aware of Apple's backdating practices and was aware of the accounting ramifications and the effect of backdating on the Company's financial statements and, therefore, (a) he lied when he certified that Apple's 2003 Annual Report contained (i) no untrue statements of material fact and did not omit to state material facts relating to backdating, (ii) financial statements that fairly presented the financial condition, results of operations and cash flows of the Company, and (b) he lied when he certified that he disclosed to the Company's auditors and/or Audit Committee any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

## G.    CEO AND CFO QUARTERLY CERTIFICATIONS

421.    During the Class Period, certain Apple filed false and misleading quarterly certifications with the SEC which were relied upon by Class Members and which caused Apple's stock price to be materially inflated.

422.    With respect to the December 28, 2002 Quarterly Report, the March 29, 2003 Quarterly Report, the June 28, 2003 Quarterly Report, the December 27, 2003 Quarterly Report, the March 27, 2004 Quarterly Report, the June 26, 2004 Quarterly Report, the December 25, 2004 Quarterly Report, the March 26, 2005 Quarterly Report, the June 25, 2005 Quarterly Report, the December 31, 2005 Quarterly Report and the April 1, 2006 Quarterly Report, defendant Jobs, Apple's CEO, made the following false and misleading certification:

1.  I have reviewed this quarterly report on Form 10-Q of Apple Computer, Inc.;

2.  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely

affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

423.    These certifications were false and misleading because, as alleged in detail herein, Jobs was aware of Apple's backdating practices, actually recommended the backdating of options and was aware of the accounting ramifications and the effect of backdating on the Company's financial statements and, therefore, (a) he lied when he certified that knew that Apple's December 28, 2002 Quarterly Report, the March 29, 2003 Quarterly Report, the June 28, 2003 Quarterly Report, the December 27, 2003 Quarterly Report, the March 27, 2004 Quarterly Report, the June 26, 2004 Quarterly Report, the December 25, 2004 Quarterly Report, the March 26, 2005 Quarterly Report, the June 25, 2005 Quarterly Report, the December 31, 2005 Quarterly Report and the April 1, 2006 Quarterly Report, contained (i) no untrue statements of material fact and did not omitted  to state material facts relating to backdating, (ii) quarterly reports that fairly presented the financial condition, results of operations and cash flows of the Company were false and misleading due to backdating, and (b) he lied when he certified that he disclosed to the Company's auditors and/or Audit Committee any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

424.    With respect to the December 28, 2002 Quarterly Report, the March 29, 2003 Quarterly Report, the June 28, 2003 Quarterly Report, the December 27, 2003 Quarterly Report and the March 27, 2004 Quarterly Report, defendant Anderson, Apple's former CFO, made the following false and misleading certification:

1.  I have reviewed this quarterly report on Form 10-Q of Apple Computer, Inc.;

2.  Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the

circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(c) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) Any fraud, whether or not material, that involves management or other employees who have a significant

1  role in the registrant's internal control over financial
2  reporting.

3  425.   These certifications were false and misleading because, as alleged in detail

4  herein, Anderson was aware of Apple's backdating practices and was aware of the accounting

5  ramifications and the effect of backdating on the Company's quarterly reports  and, therefore,

6  (a) he lied when he certified that Apple's December 28, 2002 Quarterly Report, the March 29,

7  2003 Quarterly Report, the June 28, 2003 Quarterly Report, the December 27, 2003 Quarterly

8  Report and the March 27, 2004 Quarterly Report contained (i) no untrue statements of material

9  fact and did not omit to state material facts relating to backdating, (ii) quarterly reports that

10  fairly presented the financial condition, results of operations and cash flows of the Company,

11  and (b) he lied when he certified that he disclosed to the Company's auditors and/or Audit

12  Committee any fraud, whether or not material, that involves management or other employees

13  who have a significant role in the Company's internal control over financial reporting.

14  **H.    REGISTRATION STATEMENTS**

15  426.   Prior to and during the Class Period, Apple filed certain false and misleading

16  registration statements with the SEC which were relied upon by Class Members and which

17  caused Apple's stock price to be materially inflated.

18  427.   Options to acquire shares would be far less valuable to employees if they were

19  unable to sell them on the Nasdaq National Market where Apple's stock trades publicly.  Thus,

20  in a series of registration statements filed with the SEC, Apple registered the shares it had

21  reserved for issuance under its various stock option plans to enable employees to publicly sell

22  shares acquired through option exercises.  This enabled the employees to realize the unlawful

23  instant paper profit built in to the backdated options the Stock Option Committee,

24  Compensation Committee or the full board of directors had awarded them.

25  428.   The registration statements the Company used to register these shares failed to

26  disclose backdating practices and incorporated by reference the Company's false Form 10-K's

27  for the fiscal year corresponding to the year in which the registration statement was filed or the

28

fiscal year prior to the year in which the registration statement was filed.  As a result, these registration statements are materially false and misleading as well.

429.   The following false and misleading registration statements were used for the purpose of enabling employees to sell shares in the public market through the exercise of backdated stock options:

(a)  registration statement on Form S-8 dated March 21, 1997 to register 1 million newly reserved shares of the Company's common stock under the Company's 1990 Plan, signed by Anderson;

(b)  registration statement on Form S-8 dated December 22, 1999 to register 8 million newly reserved shares of the Company's common stock under the Company's 1997 Employee Stock Option Plan, signed by Jobs, Anderson, Campbell, Drexler and York, and to which Heinen's legal opinion letter of the same date was attached stating "[a]s counsel in connection with this transaction, I have examined the actions taken, and I am familiar with the actions proposed to be taken….";

(c)  registration statement on Form S-8 dated December 19, 2000 to register 20 million newly reserved shares of the Company's common stock under the Company's 1997 Employee Stock Option Plan, signed by Jobs, Anderson, Campbell, Drexler and York, and to which Heinen's legal opinion letter of the same date was attached stating "[a]s counsel in connection with this transaction, I have examined the actions taken, and I am familiar with the action proposed to be taken….";

(d)  registration statement on Form S-8 dated May 18, 2001 to register 5 million newly reserved shares of the Company's common stock under the Company's 1998 Plan, signed by Jobs, Anderson, Campbell, Drexler, Levinson and York, and to which Heinen's legal opinion letter of the same date was attached stating "[a]s counsel in connection with this transaction, I have examined the actions taken, and I am familiar with the action proposed to be taken….";

(e)  registration statement on Form S-8 dated September 28, 2001 to register 2 million newly reserved shares of the Company's common stock under the Company's 1997 Employee Stock Option Plan, signed by Jobs, Anderson, Campbell, Drexler, Ellison, Levinson and York, and to which Heinen's legal opinion letter dated September 25, 2001 was attached stating "[a]s counsel in connection with this transaction, I have examined the actions taken, and I am familiar with the action proposed to be taken….";

(f)  registration statement on Form S-8 dated December 26, 2001 to register 10 million newly reserved shares of the Company's common stock under the Company's 1997 Employee Stock Option Plan, signed by Jobs, Anderson, Campbell, Drexler, Ellison, Levinson and York, and to which Heinen's legal opinion letter dated December 20, 2001 was attached stating "[a]s counsel in connection with this transaction, I have examined the actions taken, and I am familiar with the action proposed to be taken….";  and

(g)  registration statement on Form S-8 dated December 23, 2002, to register 5 million newly reserved shares of the Company's common stock under

163

the Company's 1998 Plan, signed by Jobs, Anderson, Campbell, Drexler, Levinson and York, and to which Heinen's legal opinion letter of the same date was attached stating "[a]s counsel in connection with this transaction, I have examined the actions taken, and I am familiar with the action proposed to be taken…."

## VII.   ADDITIONAL SCIENTER ALLEGATIONS

### A.   GENERAL ALLEGATIONS OF SCIENTER OF THE INDIVIDUAL DEFENDANTS

430.   The Individual Defendants, by virtue of their receipt of information reflecting the improper and fraudulent behavior described above and/or their failure to review information they had a duty to monitor, their actual issuance of and control over Apple's materially false and misleading statements, and their association with Apple which made them privy to confidential proprietary information concerning Apple, were active, culpable, and primary participants in the fraudulent schemes alleged herein to backdate Apple's stock options, conceal compensation expenses resulting from such backdating and mislead shareholders as to Apple's true financial performance.  The Individual Defendants knew or recklessly disregarded the materially false and misleading nature of the information they caused to be disseminated to the investing public.

431.   The Individual Defendants also knew or recklessly disregarded that the misleading statements and omissions contained in Apple's statements would adversely affect the integrity of the market for Apple's securities and would cause the price of Apple's common stock to be artificially inflated.  The Individual Defendants acted knowingly or in such reckless manner as to constitute a fraud and deceit upon Lead Plaintiff and other members of the Class.

432.   In addition to the foregoing and other acts alleged herein, the following facts provide compelling evidence that the Individual Defendants acted with actual knowledge, or, at the very least with recklessness.

### B.   KNOWLEDGE OR RECKLESS DISREGARD BY EACH OF THE INDIVIDUAL DEFENDANTS

433.   Options backdating, by definition, requires the affirmative misconduct of corporate managers to misrepresent the facts surrounding the actual grant date of an option award.  The Individual Defendants, Defendants Jobs, Anderson and Heinen, each acted with

1   actual knowledge of, or reckless disregard with respect to, Apple's backdating of stock options

2   and knowingly communicating false statements to the investing public and Apple's

3   shareholders regarding their conduct.  Moreover, these Individual Defendants were keenly

4   aware that the consequences of their actions would result in Apple misrepresenting materially

5   its financial performance during critical financial reporting periods.

6                                    **1.    Steve Jobs**

7          434.    Jobs was the single largest beneficiary of backdated options during the Class

8   Period.  Of the $105 million in income that Apple has been forced to restate, approximately

9   $20.3 million of the additional expenses relates to a single backdated option grant to Jobs

10  falsely dated October 19, 2001.  This single backdated option—of 7.5 million shares—caused

11  Apple to materially overstate its operating income by 47.1% and its net income by 9.2% for the

12  2002 fiscal year.

13         435.    With respect to the October 19, 2001 grant, Jobs was expressly informed, as set

14  forth *supra*, that this option grant would be backdated.  Indeed, it was only on December 18,

15  2001, that Jobs came to an agreement with the Compensation Committee of the Board of

16  Directors on the vesting schedule for his 7.5 million option grant.  The following day, on

17  December 19, 2001, the chair of the Compensation Committee, Defendant York emailed Jobs

18  and other members of Apple's board of director and informed the Board that he and Heinen had

19  selected October 19, 2001 as the date on which to date the grant because that was the date on

20  which the Board had held a conference call on a completely unrelated matter.  Jobs knew that

21  the Board had not approved the options on October 19 nor that the conference call held on that

22  day discuss his options grant.  .

23         436.    In Apple's proxy statement dated March 21, 2002, approved by Jobs, Apple's

24  shareholders were told that:

25              in October 2001 the Compensation Committee recommended and
                the Board approved granting Mr. Jobs options to purchase
26              7,500,000 shares…in order to provide him with an incentive to
                continue to serve as the Company's CEO and maximize
27              shareholder value.  The options were granted at an exercise price
                of $18.30, which is equal to the fair market value on the date of
28              grant.

1  (Emphasis added.)

2      437.    This statement was false – the Board did no such thing and Jobs clearly knew

3  that this statement was false. As acknowledged in the 2006 Annual Report which Jobs signed:

4  "the approval for the grant was improperly recorded as occurring at a special Board meeting on

5  October 19, 2001. *Such a special Board meeting did not occur*." (Emphasis added)

6      438.    The meeting not only never took place, but Apple took affirmative steps to hide

7  the truth. Defendant Heinen directed a former Apple in-house lawyer to falsify documents and

8  cover up the hoax. As reported in a January 12, 2007 *Journal* article, when the bogus paper

9  trail for Jobs' 2001 backdated grant was created, the Apple lawyer was acting at the direction

10  of Heinen. The *Journal* article states:

11          People familiar with the matter say the false documentation was
        created by an Apple attorney named Wendy Howell, whom the

12          company quietly dismissed last month. Ms. Howell contends that
        Apple's general counsel at the time, Nancy Heinen, instructed her

13          to create the false documentation, these people say. Thomas
        Carlucci, Ms. Howell's attorney, said that while at Apple Ms.

14          Howell acted as instructed by Apple management….

15      439.    This blatantly illegal conduct is consistent with Jobs's actions in connection

16  with his earlier grant of options to his executive team and his actions as a director at Pixar

17  Animation Studios ("Pixar"), a company he co-founded in 1986. The fact of Jobs's knowledge

18  is evidenced by Jobs involvement with the January 17, 2001 option grant to his Executive

19  Team. As set forth more fully *supra*, in late 2000, Apple's Board had began considering a

20  large options grant to Apple's senior executives. On January 30, 2001, Heinan and Jobs

21  conferred to select the lowest stock price for Apple's stock price in January 2001, picking

22  January 16, 2001. Heinen then conferred with Defendant Anderson who approved that grant

23  date and Heinen, once again, confirmed with Jobs to give approval to the backdated grant.

24  Following this discussion with Jobs, Heinen prepared fraudulent paperwork to submit to the

25  Board of Directors to authorize the grant

26      440.    Similarly, as stated in a February 9, 2007 article in the *Journal*, while Jobs was

27  at Pixar in or about March 2001, "Jobs helped negotiate an employment contract with a top

28  film director that included a large stock-options grant with an especially well-timed date,

according to a person familiar with the matter."  The one million share options grant, which was part of an employment contract with the director that Jobs signed in his then-capacity as Pixar's Chairman and CEO, "carried the lowest share price of the previous year – on a date more than three months before the employment contract was actually signed."  The contract was signed by Jobs on March 21, 2001, but the options carried an exercise price from December 6th of the prior year.  Pixar's shares had risen approximately 24% during the period from December 6th to March 20th.  (Pixar has since been acquired by Walt Disney Co.)  Thus, according to the *Journal* article, Jobs had participated in awarding the director an instant paper profit of $6.4 million.

441.    The actual grant date was December 18, 2001 which means the assigned exercise price should have been $21.01 -- Apple's December 18 closing price representing the fair market value of Apple's shares on the true date of grant.

442.    In settling an SEC enforcement action concerning Anderson's participation in Apple's backdating scheme (discussed *supra* and *infra*), Anderson, through his attorney, stated that in connection with a large, January 2001 backdated stock option award to a team of high-ranking Apple executives (which is discussed further below) "he told Mr. Jobs the company might have to take a charge against earnings if it backdated stock-options grants."  More specifically, Anderson "said he warned Mr. Jobs in late January 2001 -- while Apple was in the process of backdating a grant -- that the company might have to take an accounting charge if Apple didn't price stock options to its executive team based on the date the board approved the grant."  Nick Wingfield and Steve Stecklow, *Ex-Finance Chief Says Jobs Misled Him on Options*, THE WALL STREET JOURNAL, April 25, 2007, at A-1 ("Wingfield and Stecklow").

443.    Even if he had not been expressly informed of the consequences by Anderson, Jobs (and his fellow directors) had an obligation to understand the proper accounting rules and, more importantly, year after year, falsely represented to shareholders in SEC filings that the Company was following them.  Jobs and his fellow directors knew, as any reasonable person would, that backdating options awards to executives and not telling shareholders the truth about it was cheating.  To be clear, Jobs *knew* that the dates disclosed to shareholders as the dates on

1  which options supposedly were granted by the Company to him and to other employees *were*

2  *not true*, and that the Company had been engaging in the widespread and systemic backdating

3  of option grants.  Regardless of whether Jobs appreciated the accounting implications of these

4  misstatements, he knew and appreciated that these were false statements nevertheless.

5      444.    It was, or should have been, obvious to the defendants that shareholders would

6  consider the $104,087,000 in "instant paper profits" Jobs received from backdating important

7  in deciding how to vote on executive compensation matters.  The fact that Jobs received

8  restricted stock in exchange for these ill-gotten gains does not change the significance to

9  shareholders because in exchange for the "instant paper profits," Jobs received an inflated

10  amount of restricted stock that he would not have received had the cancelled options not been

11  backdated.  An excerpt from a January 11, 2007 *Washington Post* article explains:

> [The restricted stock Jobs received in 2001] was worth $75 million at the time, nearly the same as the value of the options he relinquished, using a technique for calculating the value of investments popular with financial analysts and used by Apple.
>
> Steve Dowling, Apple's director of corporate communications, said the 2003 transaction did not directly benefit Jobs because he could not sell the restricted shares until he had remained at Apple for another three years.
>
> **Some investor advocates call that explanation disingenuous. "You are torturing the English language to say he did not benefit from the options," said Patrick McGurn, executive vice president of Institutional Shareholder Services.  He certainly benefited from the grant because the grant was converted on a value-to-value basis**.  McGurn and other analysts also said the amount of stock Jobs received appeared to be inflated because the value of his options was exaggerated, at least in the case of one grant, by improper backdating.

22  (Emphasis added.)

23      445.    The January 11, 2007 *Washington Post* article further concluded that the

24  backdated 2001 stock option grant alone resulted in Jobs receiving 630,000 more restricted

25  shares in exchange for backdated options than he would have received had the options not been

26  backdated.  The article states:

> In the case of the 2001 grant, for instance, the difference between the false October [grant] date and the December [grant] date, which Apple now says was the proper one, was worth about $5

**[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

> million to Jobs when he traded the options in.  Had the lower value been used in calculating the amount of stock he would get in return, he would have received 630,000 fewer shares.  By the time he could sell them three years later, these shares would have been worth more than $40 million….

At more recent prices, these extra 630,000 shares have a value in excess of $100 million.

446.     As of March 19, 2006, Jobs reportedly held only about half of these tainted restricted shares.  On March 19, 2006 – just one day after publication of the *Journal* article disclosing the backdating issue -- Jobs sold 4,573,553 of his restricted shares at $64.66 for $295.7 million.  The remaining 5,426,451 shares are currently worth in excess of $900 million.

### 2.     Heinen

447.     As alleged *supra*, Heinen played a central role in arranging at least two of the most significant option grants that contributed to the overstatement of Apple's income during the Class Period and the understatement of its expenses.  For both the January 17, 2001 Executive Team Grant and the October 17, 2001 Grant, Heinen reviewed the Company's stock price, recommended the lowest price to Jobs and to the Board's compensation committee, and then falsified the Company's books and records, to create the appearance that these options were approved on dates when they were not.  As legal counsel, Heinen was responsible for signing and approving the Company's proxy disclosures and approved, despite her knowledge of their falsity, all of the statements concerning Apple's option grants in Apple's proxy statements, as alleged *supra*.

448.     As general counsel for Apple, Heinen was aware of the accounting implications for backdating options and issuing them while they were in the money.

449.     Heinen personally profited from the receipt of backdated options.  With respect to the January 18, 2001 Executive Team option grant, which the Defendants had backdated so that they were $3.94 in the money when issued, Heinen received 400,000 options and she exercised and sold all of them during the Class Period.

450.     On April 24, 2007, the SEC charged Heinen with fraud relating to stock options backdating at Apple.  According to SEC Litigation Release No. 20086 dated April 24, 2007:

(a) "Heinen … personally received millions of dollars in unreported compensation as a result of

the backdating"; and (b) the SEC's complaint allege[d] that Heinen … caused Apple to backdate to large option grants to senior executives of Apple – a February 2001 grant of 4.8 million options to Apple's Executive Team and a December 2001 grant of 7.5 million options to Apple Chief Executive Officer Steve Jobs – and altered company records to conceal the fraud."  (The foregoing SEC Litigation Release and the related SEC complaint are incorporated herein by reference.)

451.    To avoid the SEC's fraud charges, Heinen settled with the SEC.  Heinen was permanently enjoined from committing further fraud in violation of the federal securities laws and was required to disgorge more than $1.5 million in ill-gotten gains from illicit backdating, paid a $200,000 penalty, was barred from serving as an officer or director of a public company for five years and was suspended from appearing or practicing as an attorney before the SEC for three years.

### 3.    Anderson

452.    As set forth in detail supra, with respect to the January 17, 2001 Option Grant, Anderson was directly informed by Heinen that Jobs and her had backdated these option grants. Anderson received copies of the fraudulent paperwork that Heinen prepared and sent to the Board on February 1, 2001, for approval of the options dated January 17.  As Chief Financial Officer, Anderson understood that Apple would have to appropriately account for the in-the-money grant being awarded to Apple's senior executives.  As a former certified public accountant, he was no doubt familiar with ABP 25, the accounting literature that dictates how to account for the granting of an in the money option.

453.    Despite his knowledge of the relevant accounting principles, and despite the backdated options accruing an $18.3 million expense, Anderson allowed Apple to ignore this expense and signed Apple's public filings which falsely reported Apple's earnings.

454.    Pursuant to the backdated Executive Team grant, Anderson received in-the-money options worth an additional $3.94 per share.  Anderson exercised and sold 750,000 of the 1,000,000 shares granted to him before he retired from Apple in 2004.

455.   Indeed, on April 24, 2007, the SEC charged Anderson with fraud relating to stock options backdating at Apple.  According to SEC Litigation Release No. 20086 dated April 24, 2007:  (a) "Anderson personally received millions of dollars in unreported compensation as a result of the backating"; and (b) the SEC's complaint charged that Anderson "failed to disclose key information [about backdating] to Apple's auditors and neglected to ensure that the company's financial statements were accurate."  (The foregoing SEC Litigation Release and the related SEC complaint are incorporated herein by reference.)

456.   To avoid the fraud charges, Anderson settled with the SEC.  Anderson was permanently enjoined from committing further fraud in violation of the federal securities laws and was required to disgorge almost $3 million in ill-gotten gains from illicit backdating and paid a $150,000 penalty.

### C.   20(a) DEFENDANTS' CULPABILITY

457.   The 20(a) Defendants either were expressly told that options they approved were backdated or were extremely reckless in not knowing.  The 20(a) Defendants were ultimately entrusted, by virtue of their positions on the Board's compensation committee, to review and approve the terms and conditions of all option grants that were the subject of the Restatement.  In at least two circumstances, accounting for approximately $40 million of Apple's restatement of expenses, the 20(a) Defendants, as set forth *supra*, were explicitly told that options were being backdated to earlier dates and signed off on fabricated meeting minutes, thereby falsifying company records.  These directors then signed false public filings that misled investors regarding the Company's option grants.

## VIII.   LOSS CAUSATION ALLEGATIONS

458.   Throughout the Class Period, the price of Apple's securities was inflated as the result of the Defendants' false and misleading statements and omissions regarding Apple's compensation policies and financial results.  But for the Defendants' misrepresentations, Lead Plaintiff and the other members of the Class would not have purchased Apple's securities at the artificially inflated prices at which they were offered.

459.     Shortly after the release of the March 18, 2006 *Journal* article, which for the first time disclosed backdating practices at certain companies (but not at Apple), Apple's stock price closed at $63.99 on March 20, 2006.  In April 2006, Apple held its annual meeting at which certain Apple directors who had substantial involvement with backdating stood for reelection.  But Apple never said a word about its decade long practice of backdating options.  Entirely unaware that the practices the *Journal* article revealed had in fact persisted at Apple for many years, in late April and early May, 2006, ignorant Apple investors caused Apple's stock to trade in the low $70-range, closing at $71.59 on May 8, 2006.  Continuing uncertainty over Apple's earnings and the weakening economy caused Apple's share price to trade lower in the Summer of 2006.  By late June 2006, Apple's shares were trading in the high $50's and closed at $56.02 on June 28, 2006.

460.     On June 29, 2006, the last day of the Class Period, Apple announced that an internal investigation uncovered "irregularities" in its stock option practices.  Over the next two weeks, Apple's stock dropped precipitously from a close of $58.97 on June 29, 2006 to $50.67 on July 14, 2006 – a drop of more than 14%.  *With 850,508,144 outstanding shares at the time, this drop represented a decline in the market capitalization of Apple of well over $7 billion*.

461.     This fall in the price of Apple securities was directly attributable to the Company's disclosure of "irregularities" in its accounting for stock options.  As a result of this disclosure investors suddenly learned that Apple's most senior managers were willing to lie to investors and the general public in order to enhance their own compensation.  Thus, investors suddenly became aware that the managers to whom they had entrusted their funds lacked integrity and could not be trusted.  They further learned that Apple's financial results were inaccurate and overstated.

462.     That the fall in the price of Apple's securities is directly attributable to these revelations is demonstrated by the fact that the performance of Apple's stock price in the period immediately following the June 29, 2006 disclosure significantly lagged behind companies in the S&P 500 Index and S&P Info Tech Index.  More specifically, from June 29, 2006 to July 14, 2006, the shares of companies in the S&P 500 Index and S&P Info Tech Index declined

2.88% and 7.25%, respectively, whereas Apple's share price declined a far greater 14.07%. Accordingly, this $7 billion fall in Apple's stock price properly can be characterized as a "correction" caused by the disclosure of the Company's lack of management integrity and fraudulent compensation practices, which were revealed through disclosures relating to its improper accounting for stock options.

463.    It is, of course, true that since Apple's stock price fell in the period immediately after the June 29, 2006 disclosure, Apple's stock price has performed well.  Indeed, on July 19, 2006, Apple reported its second highest quarterly sales and earnings in its history and the Company's stock shot up from a close of $54.10 on July 19, 2006 to close at $60.50 on July 20, 2006.  And since that announcement, Apple has continued to outperform comparable companies through strong earnings through sales of its ubiquitous "iPod" and the release of its much-anticipated "iPhone."  The performance of the Company's stock price subsequent to the disclosure of the improper backdating, however, does nothing to eliminate the fact that, as demonstrated by the $7 billion collapse of Apple stock following the June 29, 2006, disclosure, Apple's stock was, in fact, inflated throughout the Class Period.  Indeed, had Apple not lied about its accounting for stock options, the price of Apple securities would be trading 14% higher even now.

## IX.    CLASS ACTION ALLEGATIONS

464.    Lead Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all others similarly situated.  Excluded from the Class are defendants and any person or entity related to or affiliated with any of the defendants, as well as any person or entity who received stock options from Apple, whether or not vested or exercised, that were backdated or any consideration in exchange for backdated stock options.

465.    The counts asserted herein are properly maintainable as class action counts.

466.    The Class is so numerous that joinder of all members is impracticable.  As of March 20, 2007, there were approximately 864,487,955 shares outstanding of Apple's common stock, held by individuals and entities too numerous to bring separate actions.  It is reasonable

to assume that holders of the common stock are geographically dispersed throughout the United States.

467.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, *inter alia*, the following:

(a)    whether certain defendants backdated stock options, knew or should have known options were being backdated and/or received backdated stock options;

(b)    whether Apple's financial statements report artificially inflated net income as the result of failing to recognize compensation expenses associated with improper backdating;

(c)    whether certain defendants issued false and misleading statements with the requisite scienter required under Section 10(b);

(d)    whether Apple's proxy statements, annual reports and registration statements were materially false and misleading; and

(e)    whether and to what extent Plaintiffs suffered financial loss as a result of defendants' misstatements and omissions.

468.    Lead Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Lead Plaintiff's claims are typical of the claims of other members of each of the Class.  Accordingly, Lead Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

469.    Lead Plaintiff anticipates that there will be no difficulty in the management of this action as a class action.

470.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class.

471.    The prosecution of separate actions would create the risk of:

(a)    inconsistent or varying adjudications which would establish incompatible standards for conduct for the defendants; and/or

(b)    adjudications which would as a practical matter be dispositive of the interests of other members of the Class.

## X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

472.    As alleged herein, the Defendants acted with scienter in that they knew at the time they issued them that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading or omitted material facts; knew that such statements or documents would be issued or disseminated to the investing public; knew that persons were likely to reasonably rely on those misrepresentations and omissions; and knowingly and substantially participated or were involved in the issuance or dissemination of such statements or documents as primary violations of the federal securities law.  As set forth elsewhere herein in detail, the Defendants, by virtue of their receipt of information reflecting the true facts regarding Apple, their control over, and/or receipt of Apple's allegedly materially misleading misstatements and/or their association with the Company which made them privy to confidential proprietary information concerning Apple which was used to inflate financial results and which the Individual Defendants caused or were informed of, participated in and knew of the fraudulent scheme alleged herein.  With respect to non-forward-looking statements and/or omissions, the Defendants knew and/or with deliberate recklessness disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.

473.    The false and misleading statements and omissions do not constitute forward-looking statements protected by any statutory safe harbor.  The statements alleged to be false and misleading herein all relate to facts and conditions existing at the time the statements were made.  No statutory safe harbor applies to any of Apple's material false or misleading statements.

474.    Alternatively, to the extent that any statutory safe harbor is intended to apply to any forward-looking statement pled herein, the Defendants are liable for the false forward-looking statement pled herein because, at the time each forward-looking statement was made, the speaker knew or had actual knowledge that the forward-looking statement was materially false or misleading, and the forward-looking statement was authorized and/or approved by a director and/or executive officer of Apple who knew that the forward-looking statement was

false or misleading. None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such an assumption underlying or relating to any projection or statement of future economic performance when made nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE:FRAUD-ON-THE MARKET DOCTRINE

475. The market for Apple's stock was an open, well-developed and efficient market at all relevant times for the following reasons, among others:

a. Apple common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b. As a regulated issuer, Apple was required to file and did file periodic reports with the SEC;

c. Apple regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national and international circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

d. Apple was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms, which reports were each publicly available and entered the public marketplace; and

e. The trading volume of Apple stock was substantial during the Class Period. As a result, the market for Apple common stock promptly digested current information regarding Apple from all publicly available sources and reflected such information in Apple's stock price. Under these circumstances, all persons in the Class who purchased Apple common stock during the Class Period based on the Defendants'

1   false and misleading statements suffered similar injury through their purchase of shares

2   of such stock at artificially inflated prices and a presumption of reliance applies.

3   **XII.   CLAIMS FOR RELIEF**

4                                       **COUNT I**
                    **CLASS CLAIM FOR VIOLATION OF SECTION 10(b)**
5            **AGAINST DEFENDANTS APPLE, JOBS, HEINEN AND ANDERSON**
                          **(THE SECTION 10(b) DEFENDANTS)**
6

7           476.    Plaintiffs hereby reallege and incorporate the allegations in the preceding

8   paragraphs as if fully set forth herein.

9           477.    This claim is asserted by Lead Plaintiff on behalf of itself and the Class against

10  the Section 10(b) Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C.

11  78j(b), and Rule 10b-5(b), 17 C.F.R. 240.10b-5, promulgated thereunder.

12          478.    During the Class Period, the Section 10(b) Defendants, singularly and in

13  concert, directly carried out a common plan, scheme and unlawful course of conduct, pursuant

14  to which they intended to and, throughout the Class Period, did: (a) deceive the investing

15  public, including Lead Plaintiff and other members of the Class, as alleged herein; (b)

16  artificially inflate and maintain the market price of Apple's stock; and (c) cause Lead Plaintiff

17  and other members of Class to purchase or otherwise acquire Apple's stock at artificially-

18  inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Section

19  10(b) Defendants, collectively and each of them, took the actions set forth herein.

20          479.    The Section 10(b) Defendants knowingly or with deliberate recklessness made

21  statements of material fact which were false and misleading primarily because of their omission

22  of material facts necessary to make the statements not misleading by use of means or

23  instrumentalities of interstate commerce, which operated as a fraud and deceit upon the

24  purchasers and acquirers of the Company's stock in an effort to maintain artificially high

25  market prices for Apple's  stock in violation of Section 10(b) of the Exchange Act and Rule

26  10b-5.

27

28

480.    The Section 10(b) Defendants engaged in the fraudulent activity described above knowingly and intentionally or with such extreme or deliberate recklessness as to constitute willful deceit and fraud upon Lead Plaintiff and the Class.  The Section 10(b) Defendants knowingly or with extreme or deliberate recklessness caused their reports and statements to contain misstatements and omissions of material fact as alleged herein, which caused Apple's stock price to be inflated at the time of Plaintiffs' purchases.

481.    As a result of the Section 10(b) Defendants' fraudulent activity, the market price of Apple's stock was artificially inflated during the Class Period, and remained inflated until the market began to no longer believe the Section 10(b) Defendants' fraudulent statements. The Section 10(b) Defendants' misrepresentations induced a disparity between the transaction price and the true investment quality and value of Apple's stock at the time Plaintiffs purchased or acquired the stock.

482.    The market price of Apple's stock declined materially when the Section 10(b) Defendants could not prop up Apple's stock price any more through their fraud.

483.    In ignorance of the true financial condition of Apple, Lead Plaintiff and other members of the Class, relying to their detriment on the integrity of the market and/or on the statements and reports of Apple containing the misleading information, purchased or otherwise acquired Apple stock at artificially inflated prices during the Class Period.

484.    Had Lead Plaintiff and the other members of the Section 10(b) Class known the truth, they would not have purchased Apple's stock or would not have purchased the stock at the inflated prices that were paid.

485.    Plaintiffs' losses were proximately caused by the Section 10(b) Defendants' material misrepresentations and omissions concerning Apple's financial condition, including regarding reported revenue, net income and retained earnings.

486.    Lead Plaintiff and the other members of the Class purchased Apple's stock in reliance on the integrity of the market price of the stock and/or the Section 10(b) Defendants' fraudulent and misleading statements and regulatory filings, and the Section 10(b) Defendants' manipulated the price of Apple's  stock through their misconduct as described above.

487.     Further, the Section 10(b) Defendants' misconduct proximately caused the losses of Lead Plaintiff and other members of the Class.  Plaintiffs' losses were a direct and foreseeable consequence of the Section 10(b) Defendants' failure to disclose and concealment of, *inter alia*, Apple's stock option backdating practices and the effects thereof on the financial condition of the Company.  As a direct and proximate cause of the Section 10(b) Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered substantial damages in connection with their respective purchases and sales of Apple's stock during the Class Period.

**COUNT II**
**CLASS CLAIM FOR VIOLATION OF SECTION 20(a)**
**AGAINST DEFENDANTS JOBS, ANDERSON, HEINEN, CAMPBELL, LEVINSON,**
**DREXLER, AND YORK WITH  RESPECT TO THE SECTION 10(b) SECURITIES**
**FRAUD CLAIM**

488.     Plaintiffs hereby reallege and incorporate the allegations in the preceding paragraphs as if fully set forth herein.

489.     This claim is asserted by Lead Plaintiff on behalf of itself and the Class against defendants Job, Anderson, Heinen, Campbell, Levinson, Drexler and York (the "Section 20(a) Securities Fraud Defendants") and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. 78t(a).

490.     The Section 20(a) Securities Fraud Defendants acted as controlling persons of Apple within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their executive positions, Board membership and/or stock ownership, as alleged above, the Section 20(a) Securities Fraud Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various materially false and misleading statements alleged herein.  The Section 20(a) Securities Fraud Defendants each had material contributions to the preparation and dissemination of Apple's press releases and SEC filings, and/or signed the SEC filings, and each and all of the Section 20(a) Securities Fraud Defendants were provided with or had unlimited access to copies of the Company's internal reports, press releases, public filings

1   and other statements that they knew were materially false and misleading, or with extreme or

2   deliberate recklessness disregarded their falsity, prior to and/or shortly after these statements

3   were issued and had the ability to prevent the issuance of the statements or cause the statements

4   to be corrected.

5   491.   In particular, the Section 20(a) Securities Fraud Defendants had direct

6   involvement with respect to backdating activities and financial reporting respecting stock

7   option related matters, and therefore, are presumed to have had the power to control or

8   influence the particular transactions giving rise to the securities violations as alleged herein,

9   and exercised the same.

10   492.   As set forth above, Apple committed a primary violation of Section 10(b) and

11   Rule 10b-5 of the Exchange Act by the acts and omissions alleged in this Complaint. By virtue

12   of their positions as controlling persons of Apple, the Section 20(a) Securities Fraud

13   Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate

14   result of the Section 20(a) Securities Fraud Defendants' wrongful conduct, Plaintiff and the

15   other members of the Class suffered damages in connection with their purchase or acquisition

16   of Apple's stock.

17   **XIII.   PRAYER FOR RELIEF**

18   **WHEREFORE,** Plaintiffs pray that the Court enter judgment and relief in their favor

19   against defendants on the counts contained herein as follows:

20   (a)   declaring that the Section 10(b) Defendants violated Section 10(b) by the
         conduct alleged herein;

21

22   (b)   declaring that the Section 20(a) Securities Fraud Defendants violated Section
         20(a) by the conduct alleged herein;

23   (c)   certifying the Class;

24   (d)   awarding compensatory damages together with pre- and post-judgment interest;

25   (e)   awarding Plaintiffs the costs and expenses incurred in this action, including, but
         not limited to, reasonable experts' and attorneys' fees; and

26

27   (f)   granting such other and further relief as may be just and proper.

28

1

## XIV.   DEMAND FOR JURY TRIAL

2

Plaintiffs demand a trial by jury on all claims so triable.

3

Dated:  May 14, 2010

4

GRANT & EISENHOFER P.A.

5

6

/s/  Michael J. Barry

Jay W. Eisenhofer (*pro hac vice*)
GRANT & EISENHOFER P.A.

7

485 Lexington Avenue
29th Floor

8

New York, NY 10117
Tel:  646.722.8500

9

Fax:  646.722.8501
jeisenhofer@gelaw.com

10

11

-and-

12

Michael J. Barry (*pro hac vice*)
Lesley E. Weaver (State Bar No. 191305)

13

GRANT & EISENHOFER P.A.
1201 North Market Street

14

Wilmington, DE 19801
Tel:  302.622.7000

15

Fax:  302.622.7100
mbarry@gelaw.com

16

17

-and-

Merrill G. Emerick (State Bar No. 117248)

18

Anderlini & Emerick LLP
411 Borel Avenue, Suite 501

19

San Mateo, CA  94402
Tel: 650.242.4884

20

Fax: 650.212.0081
memerick@aelawllp.com

21

22

*Attorneys for Lead Plaintiff*
*The New York City Employees' Retirement System*

23

-and-

24

25

26

27

28

**[CORRECTED] FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT (Case No.: C-06-05208-JF)**

PATRICE L. BISHOP (S.B. #182256)
STULL, STULL & BRODY
10940 Wilshire Boulevard, Suite 2300
Los Angeles, California 90024
Telephone:      (310) 209-2468
Facsimile:      (310) 209-2087
E-Mail:          service@ssbla.com
By:   /s/ Patrice L. Bishop
Patrice L. Bishop

Howard T. Longman
STULL, STULL & BRODY
6 East 45th Street
New York, NY 10017
Telephone:      (212) 687-7230
Facsimile:      (212) 490-2022

Gary S. Graifman
KANTROWITZ, GOLDHAMER & GRAIFMAN
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
Telephone:      (845) 356-2570
Facsimile:      (845) 356-4335

*Attorneys for Plaintiffs*
*Martin Vogel and Kenneth Mahoney*