1  GEORGE A. RILEY (State Bar No. 118304)
   O'MELVENY & MYERS LLP
2  Two Embarcadero Center
   28th Floor
3  San Francisco, California  94111-3828
   Telephone:   (415) 984-8700
4  Facsimile:   (415) 984-8701
   E-Mail:      griley@omm.com
5
   Attorneys for Defendant Apple Inc.
6

7

8

9              **UNITED STATES DISTRICT COURT**

10            **NORTHERN DISTRICT OF CALIFORNIA**

11                  **SAN JOSE DIVISION**

| | |
|---|---|
| 12  IN RE APPLE INC. SECURITIES LITIGATION | Case No. C06-05208-JF |
| 13 | <u>CLASS ACTION</u> |
| 14  THIS DOCUMENT RELATES TO: ALL ACTIONS | **APPLE INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JOINT MOTION FOR ORDER PRELIMINARILY APPROVING SETTLEMENT, DIRECTING NOTICE OF SETTLEMENT, AND SCHEDULING SETTLEMENT FAIRNESS HEARING** |
| 18 | Date:        October 7, 2010 Time:        10:00 a.m. Department: Ctrm. 3, 5th Floor Judge:       Honorable Jeremy Fogel |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ............................................................................................. 1

II. FACTUAL BACKGROUND ............................................................................ 3

    A.  Apple's Historic Turnaround and the Role of Stock Options ................................ 3

    B.  The Independent Investigation ............................................................................ 3

    C.  The Restatement .................................................................................................. 4

    D.  The SEC's Investigation ..................................................................................... 6

    E.  Derivative Actions .............................................................................................. 6

    F.  Apple's Stock Price ............................................................................................ 7

    G.  Plaintiffs' Claims ................................................................................................ 8

        1.  The Initial Complaint .............................................................................. 8

        2.  The Proposed Amended Consolidated Complaint .................................... 9

        3.  The FACC .............................................................................................. 10

    H.  Apple's Defenses .............................................................................................. 10

III. THE SETTLEMENT ....................................................................................... 11

IV. ARGUMENT ................................................................................................... 12

    A.  The Settlement Should be Preliminarily Approved ............................................ 12

        1.  The Settlement is Fair, Reasonable, and Adequate in Light of the
            Substantial Challenges Plaintiffs Face ...................................................... 13

            a.  The FACC's Allegations do not Give Rise to Section 10(b)
                Liability ........................................................................................ 13

                (1)  All Claims Based on Statements Made Before
                      August 24, 2001 are Time-Barred.................................... 13

                (2)  Claims Based on Statements Made After Fiscal Year
                      2002 that Simply Repeat Earlier Alleged
                      Misstatements About Stock Option Grants are not
                      Actionable .................................................................... 14

                b.  The Three Specific Grants Discussed in the FACC do not
                  Support a Section 10(b) Claim...................................................... 15

                (1)  The Statute of Repose has Run for Claims Based on
                      the Three Specific Grants................................................ 15

                  (2)  The FACC's Allegations Regarding the January 12,
                      2000 and October 19, 2001 CEO Grants do not
                      Satisfy the Pleading Requirements for a Section
                      10(b) Claim ................................................................... 15

                  c.  Plaintiffs Cannot Allege or Prove Loss Causation........................ 17

                (1)  Apple's December 29, 2006 Corrective Disclosure
                      did not Proximately Cause Economic Loss to
                      Shareholders .................................................................. 17

**TABLE OF CONTENTS**
(continued)

Page

(2)   No Statement Before December 29, 2006, Constitutes a Corrective Disclosure for Loss Causation Purposes ............................................ 18

(3)   Plaintiffs Cannot Plead or Prove Loss Causation Based on Apple's June 29, 2006 Press Release ................ 19

d.   Plaintiffs Cannot Show that any Significant Number of Putative Class Members Suffered Recoverable Damages ........... 20

2.   The Settlement Provides Significant Value and Benefits to the Class ..................................................................................... 21

B.   The Class Should be Conditionally Certified for Settlement Purposes ................ 23

C.   The Proposed Notice Program Should be Approved ............................................ 23

D.   The Court Should Schedule a Settlement Fairness Hearing ................................ 24

V.   CONCLUSION ............................................................................................................ 24

## TABLE OF AUTHORITIES

**Page**

### CASES

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1998) ................................................................................................. 16

*Churchill Vill., LLC v. Gen. Elec.,*
   361 F.3d 566 (9th Cir. 2004) .................................................................................... 23

*Class Plaintiffs v. City of Seattle,*
   955 F. 2d 1268 (9th Cir. 1992) ................................................................................ 12

*Dura Pharm. Inc. v. Broudo,*
   544 U.S. 336 (2005) ......................................................................................... *passim*

*Durning v. Citibank, Int'l,*
   990 F.2d 1133 (9th Cir. 1993) ................................................................................. 14

*Hanlon v. Chrysler Corp.,*
   150 F.3d 1011 (9th Cir. 1998) ................................................................................. 13

*Hulliung v. Bolen,*
   548 F. Supp. 2d 336 (N.D. Tex. 2008) .................................................................... 14

*In re Affiliated Computer Serv. Deriv. Litig.,*
   540 F. Supp. 2d 695 (N.D. Tex. 2007) .................................................................... 14

*In re Apple Computer Inc., Derivative Lit.,*
   Case No. C 06-4128 JF (N.D. Cal. Nov. 19, 2007) ................................................ 14

*In re Hansen Natural Corp. Sec. Litig.,*
   527 F. Supp. 2d 1142 (C.D. Cal. 2007) .................................................................. 19

*In re Heritage Bond Litig.,*
   289 F. Supp. 2d 1132 (C.D. Cal. 2003) .................................................................. 13

*In re Imperial Credit Indus., Inc. Sec. Litig.,*
   252 F. Supp. 2d 1005 (C.D. Cal. 2003) .................................................................. 17

*In re Intelligroup Sec. Litig.,*
   468 F. Supp. 2d 670 (D.N.J. 2006) ......................................................................... 20

*In re Maxim Integrated Prods., Inc. Sec. Litig.,*
   639 F. Supp. 2d 1038 (N.D. Cal. 2009) .................................................................. 19

*In re Tellium, Inc. Sec. Litig.,*
   No. Civ. A. 02cv5878FLW, 2005 WL 2090254 (D.N.J. Aug. 26, 2005) ................ 17

*In re Zoran Corp. Deriv. Litig.,*
   511 F. Supp. 2d 986 (N.D. Cal. 2007) .............................................................. 14, 15

*Mendoza v. Tucson Sch. Dist. No. 1,*
   623 F.2d 1338 (9th Cir. 1980) ................................................................................. 23

*Metzler Inv. GMBH v. Corinthian Colls., Inc.,*
   540 F.3d 1049 (9th Cir. 2008) ........................................................................... 17, 18

*MWS Wire Indus., Inc. v. Cal. Fine Wire Co.,*
   797 F.2d 799 (9th Cir. 1986) ................................................................................... 12

*New York City Employees' Ret. Sys. v. Jobs,*

APPLE'S MPA ISO MOT. FOR PRELIMINARY
APPROVAL ORDER – C-06-05208-JF

**TABLE OF AUTHORITIES**
(continued)

Page

593 F.3d 1018 (9th Cir. 2010) ............................................................................... 9, 10

*Rudolph v. UTStarcom,*
   560 F. Supp. 2d 880 (N.D. Cal. 2008) ............................................................. 18, 19

*Torrisi v. Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993) ............................................................................. 12, 13

**STATUTES**

15 U.S.C. § 78u-4(b)(4) ................................................................................. 14, 17, 19

15 U.S.C. § 78u-4(e)(1) ............................................................................................. 20

15 U.S.C. § 78u-4(e)(3) ......................................................................................... 9, 21

28 U.S.C. § 1658(b) ............................................................................................. 13, 14

**OTHER AUTHORITIES**

5 Moore's Federal Practice 23.83[1] (3d ed. 2002) ................................................ 13

*Manual for Complex Litigation* § 13.14 (3d ed. 1995) ......................................... 13

**RULES**

Fed. R. Civ. P. 23(b)(3) ........................................................................................... 23

Fed. R. Civ. P. 23(e) ................................................................................................ 23

Fed. R. Civ. P. 23(e)(2) ........................................................................................... 12

Fed. R. Civ. P. 9(b) ..................................................................................... 11, 15, 16

1   **I.      INTRODUCTION**

2         After four years of litigation, including an appeal to the Ninth Circuit and months of

3   negotiations, the parties have reached a proposed settlement of securities fraud claims against

4   Apple and individual defendants relating to stock options.  If the Court grants final approval,

5   Apple will create a $14 million settlement fund for class members, donate $2.5 million to

6   corporate governance programs at twelve universities, and implement internal reforms.  Apple

7   will separately pay the costs of administrating the settlement and plaintiffs' reasonable costs and

8   attorneys' fees.  The parties jointly request preliminary approval of the settlement so that notice

9   may be given to class members and a final settlement fairness hearing may be scheduled.

10         The settlement will mark the end of protracted litigation over Apple's past stock option

11   practices.  Two years ago, this Court approved a global settlement of twenty-one derivative

12   actions that included a $14 million payment to Apple from its insurance carriers.  This securities

13   fraud class action was not part of that settlement.

14         The derivative lawsuits were filed shortly after a June 29, 2006 announcement that Apple

15   was investigating its past stock option grants.  Unlike other companies that made such

16   announcements, Apple was not immediately sued for securities fraud because no plaintiff could

17   satisfy the requirements of alleging or proving loss causation and damages.  Apple's stock price

18   was unaffected by the June 29 announcement, and the price increased 43 percent between the

19   announcement and December 29, 2006, when Apple issued its restated financial statements.  The

20   stock price continued to increase thereafter.

21         Plaintiffs Vogel and Mahoney filed this securities fraud action on August 24, 2006, two

22   months after Apple announced its options investigation.  Vogel and Mahoney, however, soon

23   dropped out.  Not only could they show no injury caused by alleged misstatements regarding

24   stock options, but any conceivable recovery was also wiped out by the Private Securities

25   Litigation Reform Act's ("PLSRA") 90-day look back rule and Apple's rising stock price.

26         The New York City Employees' Retirement System ("NYCERS") was the only

27   shareholder to step forward to take over the case.  NYCER's counsel, Grant & Eisenhofer,

28   disparaged as "*de minimis*" the Section 10(b) claims filed by Vogel and Mahoney under the

1    Securities Exchange Act of 1934 ("Exchange Act").  NYCERS dismissed the Section 10(b)

2    claims and instead filed a new complaint alleging claims under Section 14(a) of the Exchange Act

3    and state law for dilution of shareholders' interests caused by improperly authorized option

4    shares.  This Court dismissed the new complaint on the grounds that the claims were derivative in

5    nature and failed to show loss causation.  In response, NYCERS moved for leave to amend to

6    resurrect the abandoned Section 10(b) claims.  The Court denied the motion, ruling that NYCERS

7    had voluntarily waived the claims.  On appeal, the Ninth Circuit affirmed this Court's dismissal

8    of the Section 14(a) and state law claims.  However, the appeals court ruled that NYCERS should

9    be given leave to amend.  NYCERS then filed a new class action complaint, reviving the Section

10   10(b) claims it had jettisoned as "*de minimis*."

11         The proposed settlement would fully and finally resolve the Section 10(b) claims relating

12   to Apple's past stock option practices.  The proposed settlement is appropriate in light of the

13   virtually insurmountable barriers to recovery of damages that, to the extent any could be proven,

14   would be *de minimis*, as plaintiffs admit.  As demonstrated below, the claims are barred by the

15   five year "statute of repose" governing federal securities fraud claims.  Plaintiffs also cannot

16   plead or prove loss causation.  Plaintiffs rely on a "fraud on the market" theory that requires, as a

17   matter of law, a showing that the correction of material misstatements proximately caused a

18   decline in the stock price.  Plaintiffs cannot make this showing because no stock option disclosure

19   caused a decline in Apple's stock price.  As a matter of law, the corrective disclosure of alleged

20   misstatements regarding executive compensation and accounting occurred with Apple's

21   December 29, 2006 restatement.  This disclosure caused no drop in Apple's stock price; indeed,

22   the price increased after the restatement.  Moreover, only class members who previously

23   purchased stock at a price higher than the average stock price ninety days after December 29,

24   2006, may be entitled to recovery under the PSLRA's 90-day look back rule.  Because of the

25   continued outstanding performance of Apple's stock after the restatement, the 90-day look back

26   rule is a further bar to recovery.

27         Although defendants vigorously maintain that they are not liable and have compelling

28   defenses, Apple believes that resolving the claims on the terms of the proposed settlement serves

APPLE'S MPA ISO MOT. FOR PRELIMINARY
APPROVAL ORDER – C-06-05208-JF

1    the best interest of the company and its shareholders. Further litigation will be expensive and

2    lengthy, diverting management attention and resources from Apple's business objectives. The

3    settlement will finally resolve all claims relating to Apple's past stock option practices while

4    establishing a compensation fund that is appropriate in light of the nature of the asserted claims.

5    Apple will institute important new reform measures as well as extend reforms implemented under

6    the derivative settlement. Accordingly, Apple urges this Court to grant preliminary approval to

7    the proposed settlement.

8    **II.    FACTUAL BACKGROUND**

9           **A.    Apple's Historic Turnaround and the Role of Stock Options.**

10         Plaintiffs' allegations span a period in which Apple recovered from what appeared to be a

11    certain demise in 1996 to become today's global leader in personal and mobile computing

12    innovation. This historic turnaround resulted from various factors, including disciplined

13    management, extraordinary creativity and an equity compensation system designed to attract,

14    retain and reward employees with stock options. The results are astounding. Today, Apple's

15    total market capitalization exceeds $250 billion, putting it among the top two publicly-traded

16    companies in the United States. A single share of Apple purchased in February 1997 for $3.81[1]

17    would now be worth over $290—a return of more than ***7,500 percent***.

18           **B.    The Independent Investigation.**

19         In the spring of 2006, a number of companies had begun to review their stock option

20    grants in the wake of media stories about alleged "backdating." In June 2006, Apple's

21    management launched a voluntary internal review of its stock option practices. This was entirely

22    proactive; Apple had not received any inquiries from the SEC or other authorities, and no

23    lawsuits had been filed against Apple regarding stock options.

24         Apple's internal review discovered apparent irregularities in past option grants. The

25    extent of the potential impact was unknown, and Apple did not know if any corrective financial

26    statements would be required. Accordingly, Apple's Board formed a Special Committee to

27    conduct a comprehensive independent investigation. On June 29, 2006, Apple announced:

28    
---
[1] Unless otherwise indicated, all share prices discussed herein are adjusted for stock splits.

APPLE'S MPA ISO MOT. FOR PRELIMINARY
APPROVAL ORDER – C-06-05208-JF

1
2
3
4

> Apple today announced that an internal investigation has discovered irregularities related to the issuance of certain stock option grants made between 1997 and 2001. One of the grants in question was to CEO Steve Jobs, but it was subsequently cancelled and resulted in no financial gain to the CEO. A special committee of Apple's outside directors has hired independent counsel to perform an investigation and the company has informed the SEC.

5   For the next several months, the investigative team carefully examined Apple's stock

6   option practices from 1994 until 2006 (the "relevant period").  On August 3, 2006, Apple issued a

7   statement that the investigation was "ongoing."  For the first time since the investigation began,

8   Apple reported in this statement that it would "likely need to restate its historical financial

9   statements to record non-cash charges for compensation expense relating to past stock option

10  grants."  But Apple reported that it had "not determined the amount of such charges, the resulting

11  tax and accounting impact, or which periods may require restatement."

12  On October 4, 2006, Apple issued a statement summarizing the Special Committee's

13  findings.  The Committee determined that of the more than 42,000 grants made during the

14  relevant period, the vast majority complied with applicable accounting rules.  No stock options

15  were misdated before December 1997 or after 2002.  The Committee reported that "[i]n a few

16  instances, Apple CEO Steve Jobs was aware that favorable grant dates had been selected, but he

17  did not receive or otherwise benefit from these grants and was unaware of the accounting

18  implications." Apple disclosed that "[t]he investigation raised serious concerns regarding the

19  actions of two former officers in connection with the accounting, recording and reporting of stock

20  option grants."  Apple stated that it would "likely need to restate its historical financial statements

21  to record non-cash charges for compensation expense relating to past stock option grants."  But

22  like its August 3, 2006 announcement, Apple stated it had "not determined the amount of such

23  charges, the resulting tax and accounting impact, or which periods may require restatement."

24  **C.      The Restatement.**

25  On December 29, 2006, Apple filed its Form 10-K for fiscal year 2006 with its

26  restatement for past stock option grants.  Employing an extremely conservative approach, Apple

27  recognized $105 million in non-cash compensation expense over a ten-year period (or $84 million

28

1   after taxes).[2]  This represented an annual average of about $10.5 million, before tax, of additional

2   non-cash compensation expense.  By any measure, the amount of the non-cash compensation

3   charge was not material: it represented just 0.12 percent of Apple's net sales between 1997 and

4   2006 and 0.14 percent of Apple's market capitalization in December 2006.

5            In keeping with its conservative approach, Apple included in the restatement non-cash

6   compensation charges resulting from misdating and delays that had no consequences for Apple

7   and no advantages for the option recipients.  For example, Apple recognized non-cash

8   compensation expense for misdated options that vested but were never exercised.  Apple also

9   included in the restatement properly dated executive grants where there was a delay in the

10   acceptance of the grants, even though the delay did not result in changes to the terms of the grants

11   and did not advantage the recipients.  Most of the grants subject to the restatement, moreover,

12   were misdated due to clerical errors or administrative delays—in many cases, by one or two days.

13            The restatement also provided details regarding the two grants made to Mr. Jobs during

14   the relevant period.  Although Mr. Jobs was asked to return to lead Apple as interim CEO in July

15   1997, he would accept no compensation for his services other than an annual $1 salary.  On

16   January 12, 2000, after Mr. Jobs accepted the position as CEO, the Board granted him options for

17   10 million shares.  The independent investigation determined that the January 12, 2000 grant was

18   properly approved and dated, a conclusion confirmed by Apple's outside auditors after they

19   conducted their own investigation.  This grant was cancelled in 2003, and Mr. Jobs never

20   benefited from it.

21            The second grant to Mr. Jobs, for 7.5 million shares, was approved by Apple's Board at a

22   meeting on August 29, 2001.  The options had an exercise price of $17.83, the trading price of

23   Apple's stock on that date (not adjusted for stock splits).  Acceptance of the grant, however, was

24   delayed pending discussions regarding the cancellation of the January 12, 2000 grant.  Ultimately,

25   the grant was dated October 19, 2001, the date of a Compensation Committee meeting, with an

26   exercise price of $18.30.  However, the grant was erroneously recorded as being approved at a

27
---

[2] No misdated options were discovered before December 1997 or after 2002.  However, options
granted in 2002 continued to vest for four years.  Thus, additional non-cash compensation charges
28   were recognized over the vesting period of the misdated options through 2006.

APPLE'S MPA ISO MOT. FOR PRELIMINARY
APPROVAL ORDER – C-06-05208-JF

1  full Board meeting.  The later date for the grant disadvantaged Mr. Jobs because the exercise

2  price increased to $18.30.  The grant, moreover, was cancelled in 2003.  Thus, Mr. Jobs never

3  benefited from the grant.

4          **D.      The SEC's Investigation.**

5          From June through October 2006, Apple voluntarily provided regular updates to the SEC

6  about its independent investigation.  Following its own investigation, the SEC announced on

7  April 24, 2007, that it would not bring an enforcement action against Apple:

8              The Commission also announced today that it would not bring any
                enforcement action against Apple based in part on its swift,
9              extensive, and extraordinary cooperation in the Commission's
                investigation.  Apple's cooperation consisted of, among other
10             things, prompt self-reporting, an independent internal investigation,
                the sharing of the results of that investigation with the government,
11             and the implementation of new controls designed to prevent the
                recurrence of fraudulent conduct.

12

13  After a detailed examination, the SEC accepted in full Apple's restatement and conservative

14  accounting for misdated option grants.  In particular, the SEC accepted Apple's independent

15  determination that the January 12, 2000 grant to Mr. Jobs was dated properly and that the second

16  grant to Mr. Jobs was approved by Apple's Board on August 29, 2001.

17         The SEC filed a complaint against former General Counsel Nancy Heinen and former

18  Chief Financial Officer Fred Anderson.  Without admitting liability, Mr. Anderson settled the

19  action by agreeing to pay approximately $3.5 million.  Ms. Heinen also settled the case without

20  admitting liability by agreeing to pay approximately $2.2 million.

21         **E.      Derivative Actions.**

22         Twenty-one derivative actions relating to Apple's past stock option practices were filed in

23  federal and state courts between June 2006 and October 2006.  After lengthy negotiations, the

24  parties reached a global settlement approved by this Court on November 5, 2008.  Apple's

25  officers' and directors' liability insurance carriers reimbursed Apple in the amount of $14 million.

26  Apple also agreed to implement several governance reforms:

27      •   An Equity Award Grant Practices Policy establishing rules and procedures for

28          granting, dating, and the vesting of employee stock options;

- 6 -

1      • A Trading Compliance Committee to develop a comprehensive program designed to

2        ensure compliance with internal stock trading policies;

3      • Amendments to the charter of the Board of Directors' Compensation Committee

4        specifying that, among other things, in-house counsel shall attend any meeting at

5        which stock option grants are granted or considered, the Compensation Committee

6        shall appoint an independent consultant to conduct a comparative study of Apple's

7        executive compensation policies and practices relative to other public companies, and

8        the Compensation Committee shall disclose its policy for the timing and rationale for

9        stock option grants in the annual proxy statement;

10     • An amendment to Apple's Corporate Governance Guidelines providing that at least

11       one member of the Compensation Committee shall not simultaneously serve on the

12       Audit and Finance Committee;

13     • A Corporate Minutes Procedure for the preparation, approval, and maintenance of

14       Board and Board committee meeting minutes;

15     • A procedure governing actions by written consent by the Board; and

16     • A training program for directors and officers relating to stock options.

17     **F.      Apple's Stock Price.**

18          Over the last thirteen years, Apple has created incredible value for shareholders.  During

19  the proposed Class Period, Apple's stock price increased from $9.28 (August 24, 2001) to $58.97

20  (June 29, 2006)—more than 535 percent.  By the end of 2006, Apple's stock price rose to $84.84

21  (December 29, 2006).

22          It is beyond reasonable dispute that the stock option disclosures discussed above had no

23  impact on Apple's stock price.  Like other technology stocks, Apple's stock price was trending

24  lower during the early- to mid-part of 2006 because of concerns entirely unrelated to option

25  granting practices.  Indeed, NYCERS admits that, by the summer of 2006, "uncertainty over

26  Apple's earnings and the weakening economy caused Apple's stock to trade lower."  (Corrected

27  First Amended Consolidated Class Action Complaint ("FACC") ¶ 459.)  At the same time, major

28  stock indexes were trending downward.

APPLE'S MPA ISO MOT. FOR PRELIMINARY
APPROVAL ORDER – C-06-05208-JF

On June 29, 2006, Apple's stock price closed at $58.97. After the market closed, Apple announced that it had initiated an investigation of its past stock option granting practices. This was a preliminary announcement; Apple did not know whether any previous statements would require correction or whether a restatement of its past financial statements would be required. The next day (June 30), Apple's stock price closed at $57.27, a decline of only $1.70 (or 2.8 percent). None of this price movement is attributable to Apple's announcement. To the contrary, the change was within the normal range of volatility in Apple's stock price. Indeed, several major indexes—including the NASDAQ, S&P 500, and S&P 500 Information Technology—and other technology stocks had similar declines on June 30, 2006. On the second trading day after the announcement, Monday, July 3, 2006, Apple's stock price increased by 1.2 percent.

By late September 2006, Apple's stock price recovered from the general downturn in the technology industry. Apple's stock price increased to $76.41 on September 27, 2006. A week later, Apple's stock price remained steady at $75.38 despite Apple's October 4, 2006 disclosure of the Special Committee's findings. Apple's stock price continued to increase following the October 4, 2006 announcement. On December 28, 2006, Apple's stock price closed at $80.87. Apple filed its restated financial statements before the market opened on December 29, 2006. The fact that investors were utterly unconcerned about Apple's stock option disclosures and non-cash compensation charges is demonstrated by the stock's performance after the restatement: Apple's stock price increased by nearly $4 from the previous day to close at $84.84. Three months after Apple's restatement, on March 28, 2007, Apple's stock price closed at $93.24. Apple's stock price continued to outperform the market. By June 29, 2007, Apple's stock traded at $122.04. On September 24, 2010, Apple's stock price increased to over $290.

### G. **Plaintiffs' Claims.**

#### 1. **The Initial Complaint.**

On August 24, 2006, plaintiffs Vogel and Mahoney filed a securities fraud class action complaint against Apple and certain of its current and former officers and directors ("*Vogel I*"). Vogel and Mahoney asserted claims under Section 10(b), Section 14(a), and Section 20(a). NYCERS was the only shareholder to attempt to seek appointment as lead plaintiff. NYCERS

1    explained that, unlike a "typical" securities class action case, the case against Apple afforded

2    potential relief to Apple shareholders only under Section 14(a), not under Section 10(b).  "This is

3    because," NYCERS acknowledged, "the damages recoverable under section 10(b)" were "*de*

4    *minimis*."  NYCERS explained that, under the PSLRA's 90-day look back rule, 15 U.S.C. § 78u-

5    4(e)(3),[3] the number of putative class members who could potentially recover damages under

6    Section 10(b) was "severely limited" because Apple's stock price increased significantly after

7    Apple's alleged June 29, 2006 corrective disclosure.

8          On January 19, 2007, this Court appointed NYCERS as lead plaintiff and Grant &

9    Eisenhofer as lead counsel.  NYCERS dropped the Section 10(b) claims from its Consolidated

10   Complaint.  NYCERS instead asserted claims for dilution of putative class members'

11   shareholdings based on alleged violations of Section 14(a) and state law duties of disclosure.

12                    **2.        The Proposed Amended Consolidated Complaint.**

13         On November 14, 2007, the Court granted defendants' motion to dismiss on the basis that

14   the Consolidated Complaint failed to allege facts giving rise to a direct claim and failed to

15   adequately plead loss causation as required by the PSLRA.  NYCERS subsequently moved for

16   leave to amend the Consolidated Complaint to resurrect the abandoned Section 10(b) claim.  On

17   May 14, 2008, the Court denied NYCERS's motion to amend.

18         NYCERS appealed the Court's rulings.[4]  On January 28, 2010, the U.S. Court of Appeals

19   for the Ninth Circuit affirmed the Court's dismissal of NYCERS's Section 14(a) claim and

20   related state law claims for failure to plead economic loss.  *New York City Employees' Ret. Sys. v.*

21   *Jobs*, 593 F.3d 1018, 1020 (9th Cir. 2010).  The Ninth Circuit also commented negatively about a

22   potential claim of economic loss based on an alleged drop of Apple's stock price.  Writing for the

---

23   [3] As discussed below, the PSLRA's 90-day look back rule limits the amount of damages that may
24   be recovered in a securities fraud action.  The rule provides that shareholders may not recover
     damages unless they purchased stock at a price above the "mean trading price" of the stock
25   during the 90 days after a corrective disclosure.  The rule's purpose is to preclude shareholders
     from recovering windfall damages when a stock increases after a corrective disclosure.
26   [4] On June 27, 2008, plaintiffs Vogel and Mahoney filed another purported class action suit against
     Apple and certain of its current or former officers and directors alleging violations of Sections
27   10(b) and 20(a) ("*Vogel II*").  On July 22, 2008, the Court stayed all proceedings in *Vogel II*
     pending the outcome of NYCERS's appeal before the U.S. Court of Appeals for the Ninth Circuit
28   in *Vogel I*.  On April 8, 2010, the Court consolidated *Vogel I* and *Vogel II* and designated
     NYCERS as Lead Plaintiff and Grant & Eisenhofer as lead counsel.

APPLE'S MPA ISO MOT. FOR PRELIMINARY
                                  APPROVAL ORDER – C-06-05208-JF

1   court, Judge Thompson stated that it was "unclear whether NYCERS could successfully establish

2   a causal connection between [an alleged drop in Apple's stock price] and any misrepresentation

3   in a proxy solicitation." *Id*. at 1024 n.3.  The Ninth Circuit held, however, that NYCERS should

4   be granted leave to amend its complaint.  *Id*. at 1025.

5                          **3.     The FACC.**

6           On March 22, 2010, NYCERS filed the First Amended Consolidated Class Action

7   Complaint.  On May 14, 2010, it filed the Corrected First Amended Consolidated Class Action

8   Complaint (the FACC) asserting claims under (i) Section 10(b) against Apple, Mr. Jobs, Mr.

9   Anderson, and Ms. Heinen and (ii) Section 20(a) against Mr. Jobs, Mr. Anderson, Ms. Heinen,

10  and certain current or former directors (Messrs. Campbell, Levinson, Drexler, and York).  (FACC

11  ¶¶ 476-492.)

12          According to the FACC, Apple issued false and misleading financial statements regarding

13  the amount of compensation paid to its executives and its accounting for certain past stock option

14  grants.  (*Id*. ¶¶ 93-94, 114.)  The FACC only points to three grants as allegedly misrepresented:

15      •   A January 12, 2000 grant of 10 million option shares to Mr. Jobs (*id*. ¶¶ 149-150);

16      •   A January 17, 2001 grant to members of Apple's executive team, including 1 million

17          option shares to Mr. Anderson, 1 million option shares to Timothy D. Cook, 1 million

18          option shares to Jonathan Rubinstein, 1 million option shares to Avadis Tevanian, Jr.,

19          and 400,000 option shares to Ms. Heinen (*id*. ¶¶ 163-64); and

20      •   An October 19, 2001 grant of 7.5 million option shares to Mr. Jobs (*id*. ¶¶ 160-62).

21  Plaintiffs claim these alleged misstatements "artificially inflated" Apple's stock price.  (*Id*. ¶

22  114.)  Plaintiffs contend the putative class suffered damages because Apple's stock price dropped

23  after the June 29, 2006 disclosure regarding the commencement of the Special Committee's

24  investigation.  (*Id*. ¶¶ 460-62.)

25          **H.     Apple's Defenses.**

26          In the face of the extraordinary returns realized by Apple shareholders both during and

27  after the proposed Class Period, it is clear that Plaintiffs do not have a viable securities fraud

28  claim.  NYCERS and its counsel admitted as much when they previously characterized the

                                    - 10 -            APPLE'S MPA ISO MOT. FOR PRELIMINARY
                                                      APPROVAL ORDER – C-06-05208-JF

1   Section 10(b) claims as, at best, "*de minimis*," and abandoned them in the Consolidated

2   Complaint.

3           As discussed below, Plaintiffs' claims likely will be dismissed if they proceed with

4   litigation, foreclosing any recovery for the Class.  The FACC asserts time-barred claims and fails

5   to comply with stringent pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b).  Plaintiffs

6   also cannot show that any Class Member suffered loss as a result of Apple's alleged

7   misstatements.  Apple's stock price ***increased*** by nearly $4 after Apple restated its financial

8   statements on December 29, 2006, proving investors were not concerned about its past stock

9   option practices.  Finally, the PSLRA's 90-day look back rule precludes any Class Member from

10   recovering damages because Apple's stock price continued to rise after Apple issued the

11   restatement.

12   **III.     THE SETTLEMENT**

13           During the last three years, the parties and counsel have had several meetings and

14   telephone conferences to discuss settlement.  In May 2010, the parties agreed to further settlement

15   discussions before an experienced mediator, Jonathan B. Marks.  After these extensive efforts, the

16   parties agreed to the Settlement they now propose to the Court for preliminary approval.

17           Under the proposed Settlement, Apple will pay $14 million in cash into a Settlement

18   Fund.[5]  Apple also will implement the following corporate governance measures:

19   •   Enhanced compliance requirements for Apple's Insider Trading Policy that (i)

20       mandate "blackout" trading periods for Apple directors and officers and certain

21       employees, (ii) require that certain investment decisions by directors and officers be

22       "pre-cleared" with the general counsel, and (iii) impose additional requirements for

23       and restrictions on the adoption of certain types of trading plans;

24   •   Amendments to its corporate Bylaws to clarify the "advance notice" provisions for

25       shareholder proposals for the annual proxy statement; and

26

27

28   [5] All capitalized terms not defined herein are defined in the Stipulation and Agreement of
     Settlement filed concurrently herewith.

APPLE'S MPA ISO MOT. FOR PRELIMINARY
APPROVAL ORDER – C-06-05208-JF

1        • Amendments to the charter of the Board's Compensation Committee requiring

2            consideration of "clawback" provisions for executive grants.

3    Apple has agreed to extend to at least May 1, 2013, the measures adopted in 2008 in connection

4    with the settlement of the derivative actions, which were set to expire May 1, 2011.  The details

5    of these measures are discussed above in Section II.E.  In addition, Apple has agreed to donate a

6    total of $2.5 million to corporate governance programs at twelve U.S. universities.

7            Apple has agreed to pay reasonable documented administrative fees and expenses, other

8    than Taxes, incurred by or payable to the Claims Administrator and Escrow Agent relating to

9    responsibilities set forth in the Stipulation.  Finally, Apple has agreed to pay Plaintiffs' Lead

10   Counsel the reasonable amount of Attorneys' Fees and Expenses as determined by the Court.

11   Attorneys' Fees and Expenses, notification costs, and costs to administer and distribute the Net

12   Settlement Fund will be paid separately by Apple and will not be deducted from the Net

13   Settlement Fund.

14   **IV.    ARGUMENT**

15       **A.    The Settlement Should be Preliminarily Approved.**

16           There is an "overriding public interest in settling and quieting litigation."  *MWS Wire*

17   *Indus., Inc. v. Cal. Fine Wire Co.*, 797 F.2d 799, 802 (9th Cir. 1986) (citations and internal

18   quotations marks omitted).  The judicial policy in favor of settlements is particularly strong

19   "where complex class action litigation is concerned."  *Class Plaintiffs v. City of Seattle*, 955 F. 2d

20   1268, 1276 (9th Cir. 1992).

21           When approving a class action settlement, "the universally applied standard is whether the

22   settlement is fundamentally fair, adequate and reasonable."  *Officers for Justice v. Civil Service*

23   *Com.*, 688 F.2d 615, 625 (9th Cir. Cal. 1982); *see* Fed. R. Civ. P. 23(e)(2).  In making this

24   determination, the reviewing court should consider factors such as "the strength of plaintiffs'

25   case," "the risk, expense, complexity, and likely duration of further litigation," and the "amount

26   offered in settlement," as well as "the experience and view of counsel."  *Officers for Justice*, 688

27   F.2d at 625; *accord Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).

28

APPLE'S MPA ISO MOT. FOR PRELIMINARY
APPROVAL ORDER – C-06-05208-JF

At this stage, the reviewing court is required to determine if the proposed settlement falls "within the range of possible approval" based on the factors identified above. *Manual for Complex Litigation* § 13.14 at 173, § 30.41 at 237 (3d ed. 1995); *Torrisi*, 8 F.3d at 1375, 1377. If a court grants preliminary approval, notice of the proposed settlement is given to class members. *Id.* The ultimate determination of whether to approve the settlement is made after class members have the opportunity to comment on the settlement and the court has held a final fairness hearing. *See* 5 Moore's Federal Practice 23.83[1] at 23-336.2 to 23-339 (3d ed. 2002). The "decision to approve or reject a settlement is committed to the sound discretion of the trial judge because he is exposed to the litigants, and their strategies, positions, and proof." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (citations and internal quotations marks omitted).

### 1.   The Settlement is Fair, Reasonable, and Adequate in Light of the Substantial Challenges Plaintiffs Face.

The FACC is unlikely to survive a motion to dismiss. If the claims did survive, they would fail against a summary judgment motion or at trial.

### a.   The FACC's Allegations do not Give Rise to Section 10(b) Liability.

According to Plaintiffs, Apple misrepresented the "amount of compensation received by Apple executives" and failed to "properly account for the compensation expense created by backdating" in each of the cited statements. (FACC ¶¶ 198, 203.) The FACC, however, discusses only three grants: (i) the January 12, 2000 grant to Mr. Jobs; (ii) the January 17, 2001 grant to members of Apple's Executive Team; and (iii) the October 19, 2001 grant to Mr. Jobs. (*Id.* ¶¶ 74-106.) None of these grants supports a Section 10(b) claim.

### (1)   All Claims Based on Statements Made Before August 24, 2001 are Time-Barred.

A claim asserting violations of Section 10(b) must be brought "not later than the earlier of (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b); *see also In re Heritage Bond Litig.*, 289 F. Supp. 2d 1132, 1147-48 (C.D. Cal. 2003). This five-year limitations period is not subject to equitable tolling because it

1   is a period of repose. *See Durning v. Citibank, Int'l*, 990 F.2d 1133, 1136-37 (9th Cir. 1993).

2   The initial complaint in this case was filed on August 24, 2006. Accordingly, Plaintiffs cannot

3   base their Section 10(b) claim on any statements—such as proxy statements, quarterly or annual

4   reports, or earnings releases—made before August 24, 2001, because any such claim is time-

5   barred. *See In re Zoran Corp. Deriv. Litig.*, 511 F. Supp. 2d 986, 1014 (N.D. Cal. 2007); *In re*

6   *Affiliated Computer Serv. Deriv. Litig.*, 540 F. Supp. 2d 695, 701 (N.D. Tex. 2007).

7        Plaintiffs may argue that Defendants are liable for time-barred claims because Apple

8   repeated the statements in more recent disclosures. This Court, however, has rejected the

9   "continuing wrong theory" in relation to alleged misdating of stock options by Apple. *See In re*

10  *Apple Computer Inc., Derivative Lit.*, Case No. C 06-4128 JF, slip op. at 9-10 n.8 (N.D. Cal. Nov.

11  19, 2007) ("11/19/07 Derivative Dismissal Order") ("Plaintiffs may not avoid the effect of the

12  statute of limitations by combining allegations of recent financial statements and time-barred

13  option backdating."). Thus, all claims based on statements made before August 24, 2001, are

14  time-barred.

### (2)    Claims Based on Statements Made After Fiscal Year 2002 that Simply Repeat Earlier Alleged Misstatements About Stock Option Grants are not Actionable.

15

16

17       Plaintiffs' claims based on statements made after fiscal year 2002 that merely repeat

18  earlier alleged misstatements are not actionable under Section 10(b). To state a claim under

19  Section 10(b), a plaintiff must identify an actual "violation" of the statute—a false and misleading

20  statement that proximately caused economic loss. 28 U.S.C. § 1658(b); 15 U.S.C. § 78u-4(b)(4).

21  No liability arises from a statement that only repeats a prior alleged misstatement. As this Court

22  explained in the related derivative cases, Section 10(b) liability based upon "issuance of a

23  financial statement that merely fails to correct a prior false statement … appears to approximate

24  the effects of the fraudulent concealment doctrine in relation to equitable tolling, a doctrine that

25  does not apply in the Section 10(b) context." *See* 11/19/07 Derivative Dismissal Order at 9-10

26  n.8. Other courts have rejected liability under Section 10(b) based on similar facts. *See Affiliated*

27  *Computer Serv.*, 540 F. Supp. 2d at 701; *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 338 & n.1 (N.D.

28  Tex. 2008).

**b.     The Three Specific Grants Discussed in the FACC do not Support a Section 10(b) Claim.**

Plaintiffs cannot assert a viable Section 10(b) claim based on the three specific grants—from January 12, 2000, January 17, 2001, and October 19, 2001—discussed in the FACC.  The combination of Plaintiffs' belated filing of their complaint and their voluntary dismissal of the Section 10(b) claim on March 23, 2007, bar all claims based on the three grants under the five-year statute of repose.  The FACC's allegations also do not satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b).

**(1)     The Statute of Repose has Run for Claims Based on the Three Specific Grants.**

Where a Section 10(b) claim is premised on alleged misdating of stock options, the five-year statute of repose begins to "run on the date that the option grant was made."  11/19/07 Derivative Dismissal Order at 9:16.  Because the initial complaint was filed on August 24, 2006, Plaintiffs' Section 10(b) claims based on grants made before August 24, 2001—which includes the January 12, 2000 and January 17, 2001 grants (FACC ¶¶ 94, 99)—are clearly time-barred. *See Zoran*, 511 F. Supp. 2d at 1014.

The five-year statute of repose also bars Plaintiffs' Section 10(b) claim based on the October 19, 2001 grant.  Initially, Plaintiffs had until October 19, 2006 to file such a claim.  On August 24, 2006, with only 56 days remaining under the five-year statute of repose, Plaintiffs asserted a Section 10(b) claim in their initial complaint.  But Plaintiffs abandoned that Section 10(b) claim when they filed the Consolidated Complaint on March 23, 2007.  As a result, the five-year statute of repose for the Section 10(b) claim began to run again on March 23, 2007.  Plaintiffs were therefore required to file their claim within the 56 days that remained on the clock, which made their deadline May 18, 2007.  Plaintiffs did not seek to reassert the Section 10(b) claim until December 14, 2007, more than six months after the statute had run.

**(2)     The FACC's Allegations Regarding the January 12, 2000 and October 19, 2001 CEO Grants do not Satisfy the Pleading Requirements for a Section 10(b) Claim.**

To state a claim under Section 10(b), a plaintiff must allege, among other things, that the

APPLE'S MPA ISO MOT. FOR PRELIMINARY
APPROVAL ORDER – C-06-05208-JF

1   defendant made a material misrepresentation or omission that proximately caused the plaintiff to

2   suffer an economic loss. *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). The

3   allegations must meet the stringent pleading standards under the PSLRA and Fed. R. Civ. P. 9(b).

4   *See* 15 U.S.C. § 78u-4(b)(1) (requiring that a plaintiff specify "each statement alleged to have

5   been misleading" and "the reason or reasons why the statement is misleading"); Fed. R. Civ. P.

6   9(b) (requiring that a party plead "with particularity the circumstances constituting fraud or

7   mistake"). Plaintiffs cannot satisfy these pleading standards with respect to any of the grants,

8   particularly the January 12, 2000 and October 19, 2001 grants.

9       Plaintiffs cannot plead with particularity that Apple's disclosures regarding the

10   January 12, 2000 grant to Mr. Jobs were false and misleading. As the FACC acknowledges,

11   Apple did not recognize any compensation charges for this grant. (FACC ¶ 97.) Nor were any

12   such charges required. The independent investigation team concluded that the grant was not

13   misdated. Further, Apple, its outside auditors, and the SEC all agreed that the terms of the grant

14   were finalized by a Board committee on January 12, 2000. Thus, the January 12, 2000 grant

15   cannot give rise to Section 10(b) liability. *See Dura*, 544 U.S. at 341.

16       Plaintiff also cannot plead with particularity that Apple made material misstatements or

17   omissions regarding the October 19, 2001 grant to Mr. Jobs. A misstatement or omission is

18   material only if there is a substantial likelihood that the reasonable investor would have viewed

19   the information as "having significantly altered the 'total mix' of information made available."

20   *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1998) (citation and internal quotation marks

21   omitted). No reasonable investor would have viewed the alleged misdating of the October 19,

22   2001 grant as important because the change in the grant date from August 29, 2001, to October

23   19, 2001, increased the exercise price Mr. Jobs would have to pay if he had ever exercised the

24   grant. Furthermore, Apple informed shareholders in 2003—well before Apple disclosed its

25   investigation of past stock option grants—that Mr. Jobs had voluntarily cancelled the option

26   grants. Thus, shareholders had no reason to react negatively to any subsequent disclosures

27   regarding this cancelled grant.

28

APPLE'S MPA ISO MOT. FOR PRELIMINARY
APPROVAL ORDER – C-06-05208-JF

1

### c.    Plaintiffs Cannot Allege or Prove Loss Causation.

2    Even if the FACC's claims were not barred by the statute of limitations and did satisfy the

3    strict pleading requirements described above, Plaintiffs cannot satisfy their burden to plead and

4    prove loss causation.  The PSLRA requires a plaintiff to plead and prove a direct causal

5    connection between a material misrepresentation and an economic loss.  *See* 15 U.S.C. § 78u-

6    4(b)(4).  As the Supreme Court explained in *Dura*, for claims based on stock price declines,

7    plaintiffs must plead and prove a significant stock price decline after the "relevant truth" is

8    disclosed.  *Dura*, 544 U.S. at 342.  Under *Dura*, a plaintiff cannot satisfy its burden merely by

9    showing a stock drop following an announcement of negative news.  Rather, a plaintiff must

10   show that the stock price decline was caused by the earlier misrepresentation and not by factors

11   unrelated to the alleged fraud.  *Id.* at 343-44; *see also Metzler Inv. GMBH v. Corinthian Colls.,

12   Inc.*, 540 F.3d 1049, 1063 (9th Cir. 2008) (plaintiff must show that "market learned of and reacted

13   to [the] fraud"); *In re Tellium, Inc. Sec. Litig.*, No. Civ. A. 02cv5878FLW, 2005 WL 2090254, at

14   *4 (D.N.J. Aug. 26, 2005) (same).  The plaintiff must disaggregate the "tangle of factors"

15   unrelated to the alleged fraud that may have affected a company's stock price and prove the

16   causal connection.  *See Dura*, 544 U.S. at 342-43; *In re Imperial Credit Indus., Inc. Sec. Litig.*,

17   252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003).

18

19

          **(1)    Apple's December 29, 2006 Corrective Disclosure did
not Proximately Cause Economic Loss to Shareholders.**

20   Plaintiffs assert they suffered economic loss caused by Apple's alleged misstatement of

21   the "amount of compensation received by Apple executives."  (FACC ¶ 192.)  Plaintiffs also

22   contend they incurred loss because Apple "did not properly account for the compensation expense

23   created by backdating" in its financial statements.  (*E.g.*, *id*. ¶¶ 198, 203.)  Plaintiffs cannot

24   satisfy their burden of showing that Apple's disclosure of the "relevant truth" regarding the

25   amount of executive compensation and the accounting for past stock option grants proximately

26   caused them any economic loss.

27   The only date on which Apple made a corrective disclosure regarding the amount of

28   compensation previously received by Apple executives and to correct past accounting for stock

1   option grants was December 29, 2006, when Apple restated its past financial results.  In the

2   restatement, Apple recognized additional non-cash compensation expense over a ten-year period.

3   Apple also restated several prior financial statements, including its income statement and

4   management's discussion of select historical financial and operational data—the exact statements

5   upon which Plaintiffs base their Section 10(b) claim.  The market, however, did not react

6   negatively to the December 29, 2006 restatement.  To the contrary, investors actually drove

7   Apple's stock price up to $84.84.  Given these facts, plaintiffs cannot plead or prove loss

8   causation.  *See Dura*, 544 U.S. at 342, 347 (dismissing complaint where plaintiffs failed to allege

9   a significant stock price decline after the "relevant truth" was disclosed).

10                      **(2)      No Statement Before December 29, 2006, Constitutes a
                                   Corrective Disclosure for Loss Causation Purposes.**
11

12          As discussed above, a corrective disclosure for loss causation purposes must reveal the

13   "relevant truth"—*i.e.*, that a prior statement was false or misleading—to the market.  *See Dura*,

14   544 U.S. at 342; *Metzler*, 540 F.3d at 1063.  Apple did not make any corrective disclosures before

15   December 29, 2006, regarding the compensation received by Apple's executives or its accounting

16   for past option grants.

17          Plaintiffs argue that the corrective disclosure occurred on June 29, 2006, when Apple

18   announced it was starting an independent investigation because of "irregularities related to the

19   issuance of certain stock option grants."  But Apple's press release did not "reveal" that its prior

20   disclosures regarding the amount of compensation received by Apple's executives were false or

21   misleading in any way.  Nor did Apple's press release "disclose" that Apple's accounting for past

22   option grants was incorrect or that Apple would have to restate its reported operating or net

23   income.  Indeed, Apple could not "disclose" that it was going to correct any previous statement

24   because it did not know whether the apparent irregularities would require correction until the

25   results of the investigation were available.  Thus, Apple's June 29, 2006 statement did not

26   constitute a "corrective disclosure," as argued by Plaintiffs.  Courts in other cases have rejected

27   similar assertions that a company's disclosure of the advent of an investigation constituted a

28   corrective disclosure.  *Rudolph v. UTStarcom*, 560 F. Supp. 2d 880, 888-89 (N.D. Cal. 2008)

1    (announcement of an internal investigation did not constitute a "corrective disclosure"); *In re*

2    *Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1162 (C.D. Cal. 2007) (same).

3           At most, the June 29 press release revealed that there was a risk that Apple might have to

4    restate the amount of executive compensation or correct the accounting treatment of certain

5    option grants.  But these potential consequences do not constitute the "relevant truth" until the

6    results of the investigation are known.  In other words, the June 29, 2006 press release is not a

7    corrective disclosure as a matter of law.  *See In re Maxim Integrated Prods., Inc. Sec. Litig.*, 639

8    F. Supp. 2d 1038, 1046-47 (N.D. Cal. 2009) (plaintiffs failed to adequately plead loss causation

9    based on disclosures that "do not themselves indicate anything more than a 'risk' or 'potential'

10    that Defendants engaged" in misconduct).

11           The FACC also references statements on August 3, 2006, and October 4, 2006, regarding

12    the Special Committee's investigation.  (FACC ¶¶ 52-53.)  Plaintiffs do not allege that either of

13    these statements was a corrective disclosure for loss causation purposes, even though both

14    statements provided more details regarding the investigation than did the June 29, 2006 press

15    release.  These statements disclosed that Apple would likely need to restate its financial results.

16    But in both statements, Apple was clear it had "not determined the amount of such charges, the

17    resulting tax and accounting impact, or which periods may require restatement."  Thus, neither

18    statement constitutes a corrective disclosure for loss causation purposes.  *See Maxim*, 639 F.

19    Supp. 2d at 1046-47; *Rudolph*, 560 F. Supp. 2d at 888.  Moreover, Apple's stock price increased

20    throughout this time period.  On August 3, 2006, Apple's stock price closed at $69.59.  On

21    October 4, 2006, Apple's stock price closed at $75.38.  By December 29, 2006, Apple's stock

22    price reached $84.84 and continued to increase thereafter.

23                 **(3)**      **Plaintiffs Cannot Plead or Prove Loss Causation Based**

24                           **on Apple's June 29, 2006 Press Release.**

25           Plaintiffs' Section 10(b) claim fails even if one assumes, contrary to the law, that Apple

26    disclosed the "relevant truth" about its financial statements on June 29, 2006.  Under the PSLRA,

27    Plaintiffs bear the burden of showing that the decline in Apple's stock price was proximately

28    caused by the alleged fraud.  15 U.S.C. § 78u-4(b)(4).  Plaintiffs cannot satisfy this burden.  As in

APPLE'S MPA ISO MOT. FOR PRELIMINARY
APPROVAL ORDER – C-06-05208-JF

1    *Dura*, any decline in Apple's stock price was caused by factors unrelated to Apple's June 29

2    statement, including "changed economic circumstances, changed investor expectations, new

3    industry-specific or firm-specific facts, conditions, or other events." *Dura*, 544 U.S. at 343-44.

4            Apple's stock price began declining in early 2006, in part because of concerns about sales

5    of iMac computers and Apple's ability to maintain sales and profit levels.  The decline sharpened

6    by the summer of 2006.  The FACC acknowledges that this decline was unrelated to any concerns

7    regarding past stock option grants.  (FACC ¶ 468.)  Several major stock indexes, including those

8    tracking technology stocks, were trending downward during that same time period.

9            Apple's stock price continued to decline after June 29, 2006, in parallel with market and

10   industry indexes.  The NASDAQ, the S&P 500, and the Dow Jones Industrial Average indexes,

11   for example, all declined on June 30, 2006.  Several industry-specific indexes that tracked

12   Apple's and other similar companies' stock prices also declined on June 30, 2006.  In addition,

13   the change in Apple's stock price on June 30, 2006, was well within its normal range of volatility.

14   Indeed, on the next trading day after June 30, 2006 (July 3, 2006), Apple's stock price increased,

15   again in parallel with indexes like the NASDAQ and NASDAQ Computer.  Accordingly,

16   Plaintiffs cannot base their Section 10(b) claim on the slight decline in Apple's stock price on

17   June 30, 2006.  *See In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 695 (D.N.J. 2006)

18   (plaintiff cannot rely on mere temporal proximity between disclosure and stock price decline to

19   prove loss causation, particularly when stock price is volatile).

20                    **d.      Plaintiffs Cannot Show that any Significant Number of Putative
                              Class Members Suffered Recoverable Damages.**
21

22           Even if Plaintiffs can overcome all of the defects discussed above, few—if any—class

23   members may recover damages.  The PSLRA's 90-day look back rule, by NYCERS's own

24   admission, "severely limits" any possible recovery under Section 10(b).  15 U.S.C. § 78u-4(e)(1).

25   Congress enacted the look back rule precisely to address situations like this case where a

26   company's stock price increases after an alleged corrective disclosure.

27           Under 15 U.S.C. § 78u-4(e)(1), shareholders may not recover damages that "exceed the

28   difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for

- 20 -                     APPLE'S MPA ISO MOT. FOR PRELIMINARY
                                                        APPROVAL ORDER – C-06-05208-JF

1  the subject security and the mean trading price of that security during the 90-day period beginning

2  on the date on which the information correcting the misstatement or omission that is the basis for

3  the action is disseminated to the market." The "mean trading price" is the "average of the daily

4  trading price of that security, determined as of the close of the market each day during the 90-day

5  period." 15 U.S.C. § 78u-4(e)(3). Only putative class members who purchased shares above the

6  mean trading price may potentially recover damages.

7       As discussed above, the only statement that corrected "the misstatement or omission that

8  is the basis for the action" was Apple's restatement on December 29, 2006. Within three months

9  of the restatement, Apple's stock price increased to $93.24 (March 28, 2007). The mean trading

10  price during that 90-day period was $88.30. Apple's stock price never traded above $88.30

11  during the Class Period. Accordingly, no Class Members could recover damages.

12       The result is materially identical if one assumes, as Plaintiffs contend, that the relevant

13  corrective disclosure date was June 29, 2006, when Apple disclosed its independent investigation.

14  Within ninety days of June 29, 2006, Apple's stock price increased to $76.41 (September 27,

15  2006)—well above the closing price of Apple's stock ($59.87) prior to the alleged disclosure.

16  The mean trading price during the 90-day period was $65.71. Apple's stock rarely traded above

17  $65.71 during the Class Period.

18       **2.   The Settlement Provides Significant Value and Benefits to the Class.**

19       Given the substantial barriers to recovery discussed above and the inherent uncertainties

20  and expense of litigation, Apple believes that the Settlement is fair, adequate, and reasonable.

21  Fourteen million dollars represents a significant share of the maximum amount of potential

22  damages that the Class could recover. As discussed above, there is a significant likelihood that

23  the FACC will be dismissed at the pleadings stage, resulting in no recovery for the Class. If

24  Plaintiffs' claims survive a motion to dismiss, Plaintiffs still have to overcome the serious

25  deficiencies in the FACC regarding, among other elements, loss causation and damages. For

26  example, Plaintiffs will have to demonstrate that the minor drop in Apple's stock price on June

27  30, 2006, was caused by the June 29, 2006 disclosure of the Special Committee's investigation.

28  But the facts show that Apple's stock price never suffered a material decline at any point during

APPLE'S MPA ISO MOT. FOR PRELIMINARY
APPROVAL ORDER – C-06-05208-JF

1    the pendency of the independent investigation.  Once concerns about iPod and iMac sales and

2    other industry-wide issues were dispelled by mid-summer 2006, Apple's stock price soared and

3    returned extraordinary gains to all shareholders.

4           Any potential recovery also would be drastically limited by the 90-day look back rule.  In

5    fact, no Class members could recover damages under the PSLRA if the Court ruled that Apple did

6    not correct its alleged misstatements regarding executive compensation and accounting for option

7    grants until the December 29, 2006 restatement.  If the Court ruled, as Plaintiffs contend, that the

8    relevant corrective disclosure occurred on June 29, 2006, only a limited number of Class

9    Members could recover damages because Apple's stock price rarely traded above the applicable

10   look back price during the Class Period.

11          Furthermore, Apple has agreed to separately pay (i) the reasonable amount of Attorneys'

12   Fees and Expenses incurred by Plaintiffs' Counsel as determined by the Court and (ii) reasonable

13   documented fees and expenses (other than Taxes) incurred by or payable to the Claims

14   Administrator and the Escrow Agent.  Thus, the entire Net Settlement Fund will be available for

15   distribution in accordance with the proposed Plan of Allocation.

16          Although Apple believes that the $14 million payment provides more than adequate

17   recovery to the Class, Apple has agreed to implement several corporate governance reforms that

18   will benefit the Class.  As discussed above in Section III, Apple has agreed to implement

19   measures regarding insider trading, shareholder proposals, and clawback provisions for executive

20   stock option grants.  In addition, Apple has agreed to extend the term of measures it adopted in

21   connection with the 2008 settlement of the derivative actions.  Finally, Apple has agreed to make

22   a $2.5 million donation to support corporate governance education.  Thus, the Settlement

23   provides immediate and substantial monetary and non-monetary benefits to the Class.

24          Settlement is preferable to continued litigation for all parties.  If the Settlement is not

25   approved, the Action will be vigorously contested at great expense.  The parties likely will have

26   to file and respond to a motion to dismiss.  If the FACC survives a motion to dismiss, the parties

27   will have to engage in extensive discovery, covering almost ten years of stock option grants.  The

28   parties will have to engage experts in accounting and economics to analyze historical stock prices

APPLE'S MPA ISO MOT. FOR PRELIMINARY
APPROVAL ORDER – C-06-05208-JF

1   and market movements. One or more parties may then seek summary judgment on specific

2   claims or defenses. If the case proceeds to trial, it will likely last several weeks. Any judgment

3   will be subject to appeal, leaving the ultimate outcome uncertain for years. During this process,

4   Apple's directors, officers, and employees will be distracted from running the company's day-to-

5   day affairs.

6       Accordingly, Apple respectfully requests that the Court grant preliminary approval of the

7   Settlement.

8       **B.    The Class Should be Conditionally Certified for Settlement Purposes.**

9       As set forth in the Stipulation, Defendants have stipulated to certification of the Class,

10  pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, solely for purposes of this

11  Settlement. Certification of the Class shall be binding only with respect to the Settlement and

12  only if the Order and Final Judgment becomes Final.

13      **C.    The Proposed Notice Program Should be Approved.**

14      A proposed notice program must "generally describe[ ] the terms of the settlement in

15  sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be

16  heard." *Churchill Vill., LLC v. Gen. Elec.,* 361 F.3d 566, 575 (9th Cir. 2004) (quoting *Mendoza*

17  *v. Tucson Sch. Dist. No. 1,* 623 F.2d 1338, 1352 (9th Cir.1980)). The proposed Notice and

18  Publication Notice and the proposed distribution thereof, as provided in the Preliminary Approval

19  Order, constitute the best notice practicable under the circumstances and satisfy the requirements

20  of Federal Rule of Civil Procedure 23(e), the PSLRA, and due process.

21      The Notice accurately describes the Settlement terms, the benefits to the Class, and the

22  parties' reasons for settling. The Notice explains that Class Members will have an opportunity to

23  object to the Settlement, Plan of Allocation, or Plaintiffs' Lead Counsel's application for an

24  award of Attorneys' Fees and Expenses and provides the relevant deadlines. The Notice details

25  how Class Members may exclude themselves from the Class. Finally, the Notice provides the

26  date and time of the Settlement Fairness Hearing, and it includes contact information for the

27  Claims Administrator and Plaintiffs' Lead Counsel if questions arise regarding the Settlement.

28

APPLE'S MPA ISO MOT. FOR PRELIMINARY
APPROVAL ORDER – C-06-05208-JF

1    The Preliminary Approval Order provides that the Claims Administrator shall send a copy
2    of the Notice and Proof of Claim by first-class mail postage pre-paid to all Class Members at the
3    address of each such person or entity as set forth in the records of Apple or its transfer agent, or
4    that otherwise may be identified through reasonable effort.  The Claims Administrator must use
5    reasonable efforts to give notice to nominee purchasers such as brokerage firms and other persons
6    and entities who purchased Apple common stock during the Class Period as record owners but
7    not beneficial owners.  The Claims Administrator also must publish the Publication Notice in
8    *Investor's Business Daily* and transmit it over *Business Wire*.

9    Accordingly, Apple believes that the proposed notice program provides the best notice
10   practicable to potential Class Members under the circumstances.

11   **D.    The Court Should Schedule a Settlement Fairness Hearing.**

12   Apple respectfully requests that the Court schedule a Settlement Fairness Hearing as soon
13   as practicable to, among other things, finally approve the Settlement and the Plan of Allocation;
14   determine whether the release of the Released Claims, as set forth in the Stipulation, should be
15   provided to the Released Parties; and consider the application of Plaintiffs' Lead Counsel for an
16   award of Attorneys' Fees and Expenses.

17   **V.    CONCLUSION**

18   For the foregoing reasons, Apple respectfully requests that the Court enter the proposed
19   Preliminary Approval Order.

20

21   Dated:  September 28, 2010          O'MELVENY & MYERS LLP

22

23                                       By:    /s/ George A. Riley
                                              George A. Riley

24                                       Attorneys for Defendant APPLE INC.

25

26

27

28